**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| U.S. Small Business Administration as Receiver of ELK ASSOCIATES FUNDING CORP. | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Case No. |
| MICHAEL FEINSOD, SILVIA MULLENS, RICHARD FEINSTEIN, GARY GRANOFF, STEVEN ETRA, JOHN LAIRD, IVAN J. WOLPERT, HOWARD SOMMER, MURRAY INDICK, ELLIOTT SINGER, AND PETER BOOCKVAR | ) ) ) ) ) ) ) | RELATED TO CIV. NO. 13-1326-LAW |
| Defendants. | ) ) ) | |

## ORIGINAL COMPLAINT

COMES NOW, Plaintiff, Elk Associates Funding Corp., by and through its court-appointed receiver, the U.S. Small Business Administration ("SBA"), and hereby brings its Original Complaint against Defendants Michael Feinsod, Silvia Mullens, Richard Feinstein, Gary Granoff, Steven Etra, John Laird, Ivan J. Wolpert, Howard Sommer, Murray Indick, Elliott Singer, and Peter Boockvar, as follows:

## I.    NATURE OF THE ACTION

*1.* The Receiver brings this action in its capacity as Receiver and on behalf of the receivership estate of Elk Associates Funding Corp. ("Elk") against the Defendants for breach of fiduciary duty, ultra vires acts, waste of assets, conversion, negligence, aiding and abetting a breach of fiduciary duty, civil conspiracy, and gross negligence based upon the Defendants' acts and omissions in connection with the management and performance

1

of their duties with respect to Elk, an entity which was licensed pursuant to Section 301(d) of the Act, 15 U.S.C. §681(d) and later Section 301(c) of the Small Business Investment Act, as SBA License 02/02-5377, to do business under the provisions of the Small Business Investment Act and applicable regulations.

2.  As a licensee under the Small Business Investment Act, Elk must be operated in accordance with the Small Business Investment Act and regulations promulgated thereunder.

3.  In early 2013, SBA filed a complaint and obtained an order of receivership against Elk based upon a default pursuant to the terms of a settlement agreement. SBA was appointed Receiver for Elk by Order of this Court, entered April 24, 2013 (the "Receivership Order"), in *United States of America v. Elk Associates Funding Corp.,* Civil Action No. 13-1326, ("the Receivership Action"), which action is currently pending before this Court.

4.  Pursuant to the Receivership Order, the Receiver was appointed for the purpose of, among other things, pursuing claims and causes of action available to Elk. The Receivership Order also contains an injunction, stay of civil legal proceedings with respect to Elk and the Elk receivership estate and a tolling provision with respect to applicable statutes of limitations.

5.  Upon entry of the Receivership Order, the Receiver assumed its duties to marshal the assets and records of Elk. In the course of doing so, the Receiver learned of the facts identified in this Complaint.

6.  In accordance with the Receivership Order, the Receiver obtained the turnover of

2

documents from the principals, managers and other agents of Elk, served document subpoenas; investigated potential claims in favor of the Elk receivership estate; and made demand upon the within named defendants.

7. The Receiver made an attempt to settle these claims, but was unable to reach settlement on terms that it believes would be in the best interests of the Elk Receivership Estate.

8. By and through the acts and omissions outlined in this Complaint, the Defendants (a) failed to act in accordance with the requirements of the Act, applicable regulations, and the license issued under section 301(c) of the Act, (b) breached their fiduciary duties to Elk, (c) failed to act in accordance with the Elk Articles of Incorporation, the standard of care imposed by 15 U.S.C. § 687f and applicable state law, (d) wasted corporate assets to the detriment of Elk, (e) converted Elk's corporate assets to the detriment of Elk, (f) failed to exercise professional competence and care in the exercise of their professional duties, as applicable, (g) through their acts and omissions were negligent, (h) aided and abetted other Defendants' in breaching their own fiduciary duties, (i) certain Defendants conspired to commit intentional acts in furtherance of said breaches of duties and failures to act to the detriment of Elk, and (j) through their acts and omissions were grossly negligent, and caused Elk to violate applicable law and regulations to the detriment of Elk.

9. On November 21, 2016, the Receiver obtained an order from this Court in the Receivership Action lifting the stay and injunction imposed by the Receivership Order for the limited purpose of authorizing the Receiver to bring this action.

## II. **PARTIES**

*10.* Plaintiff Elk is a New York corporation in receivership pursuant to the Receivership Order which appointed the SBA as liquidating receiver of Elk.

*11.* Defendant Michael Feinsod ("Feinsod") is an individual and, upon information and belief, a resident of the State of New York. Feinsod held either all or one of the offices of President, Chief Executive Officer, Chief Financial Officer, and director of Elk from approximately 2005 through July 2013. Feinsod was also a 36% common shareholder and served as President, Chief Executive Officer and Chairman of the Board, and Chief Compliance Officer of Ameritrans Capital Corporation ("Ameritrans"), a Delaware corporation and the parent company of Elk.

*12.* Defendant Silvia Mullens ("Mullens") is an individual who, upon information and belief, is a resident of the State of New Jersey. From approximately 1996 through April 2013, Mullens held either one or all of the offices of Secretary of Elk, Vice President of Elk and Executive Vice President of Elk. Mullens was also a signatory on Elk's bank accounts and submitted Elk's Statements of Financial Condition to Elk's regulator, SBA, on a quarterly basis. Mullens also served as Vice President of Ameritrans since 1998, as Executive Vice President since 2010 and was a shareholder of Ameritrans.

*13.* Defendant Richard Feinstein ("Feinstein") is an individual who, upon information and belief, is a resident of the State of New Jersey. From approximately September 2010 through April 2013, Feinstein was the Chief Financial Officer of Elk and a signatory on Elk's bank accounts. Feinstein was simultaneously Chief Financial Officer of Ameritrans.

*14.* Defendant Gary Granoff ("Granoff") is an individual who, upon information and

belief, is a resident of the State of New York. From approximately 1980 through July 2010, Granoff was President of Elk and was, through February 7, 2012, a director of Elk. Granoff also owned approximately eight percent (8%) of the common stock of Ameritrans, was a member of the Ameritrans Board of Directors and also acted as its Chairman of the Board until November 2010. After he resigned from the Board of Directors in February of 2012, Granoff stayed on as "Managing Director" of Elk through April 2013.

*15.* Defendant Steven Etra ("Etra") is an individual who, upon information and belief, is a resident of the State of New York. From approximately 1999 through April 2013, Etra was a member of Elk's board of directors. Etra was also a five percent (5%) shareholder in Ameritrans, a member of Ameritrans's board of directors until July 2013 and a creditor of Ameritrans.

*16.* Defendant John Laird ("Laird") is an individual who, upon information and belief, is a resident of the State of Connecticut. From approximately 1999 through April 2013, Laird was a member of Elk's board of directors and was a member of Ameritrans's board of directors, chairman of the Audit Committee, until July 2013 and shareholder of Ameritrans.

*17.* Defendant Ivan Wolpert ("Wolpert") is an individual who, upon information and belief, is a resident of the State of New York. From approximately 2005 through April 2013, Wolpert was a member of Elk's board of directors, and was a member of Ameritrans's board of directors until July 2013 and a shareholder of Ameritrans.

*18.* Defendant Howard Sommer ("Sommer") is an individual who, upon information

5

and belief, is a resident of the State of New York. From approximately 1999 through April 2013, Sommer was a member of Elk's board of directors and a member of Ameritrans's board of directors until July 2013 and a shareholder of Ameritrans.

*19.* Defendant Murray Indick ("Indick") is an individual who, upon information and belief, is a resident of the State of California. From approximately 2006 through June 2011, Indick was a member of Elk's board of directors and a member of Ameritrans's board of directors.

*20.* Defendant Elliott Singer ("Singer") is an individual who, upon information and belief, is a resident of the State of Florida. From approximately December 2009 through April 2013, Singer was a member of Elk's board of directors, a member of Ameritrans's board of directors until July 2013, and a shareholder of Ameritrans.

*21.* Defendant Peter Boockvar ("Boockvar") is an individual who, upon information and belief, is a resident of the State of New York. From approximately May 2008 through April 2013, Boockvar was a member of Elk's board of directors, and was a member of Ameritrans's board of directors until July 2013 and a shareholder of Ameritrans.

### III. JURISDICTION

*22.* This action arises under 15 U.S.C. § 687c, the Small Business Investment Act of 1958 (the "Act") as implemented by 13 CFR Part 107 (the "Regulations") and related state statutes. This Court has jurisdiction over this action pursuant to the Receivership Order, 28 U.S.C § 1331, 15 U.S.C. §§ 687c and 687h, 28 U.S.C. §§ 754, 1692 and 1367. The causes of action which arise under the laws of the States of New York are pendent or ancillary causes under 28 U.S.C. § 1367 to the Receivership Action.

6

## IV. VENUE

*23.* Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391 because the Defendants maintained offices and transacted business within the District. Venue is also proper pursuant to 28 U.S.C. § 754 as this action is ancillary to this Court's exclusive jurisdiction over Elk pursuant to 15 USC 687c.

## V. FACTS

### Background of SBIC Program

*24.* SBA administers a program known as the Small Business Investment Company Program pursuant to the Act, 15 U.S.C. §661 et seq. This program is designed to stimulate the U.S. economy by promoting Small Businesses which need, but which may otherwise be unable to obtain, financing. SBA licenses private investment firms, known as SBICs, to provide financing to qualified Small Businesses. Once licensed by the SBA, an SBIC can receive federal matching funds known as "Leverage".

*25.* Section 308(c) of the Act, 15 U.S.C. §687(c), empowers SBA to prescribe regulations to carry out the provisions of the Act and to govern the operations of SBICs. SBA has duly promulgated such regulations, which are codified at Title 13 of the Code of Federal Regulations, Part 107 (the "Regulations").

*26.* On or about July 24, 1980, Elk was licensed by SBA as a Small Business Investment Company ("SBIC") pursuant to Section 301(d) of the Act, 15 U.S.C. §681(d) and later Section 301(c) of the Act, as SBA License 02/02-5377, to do business under the provisions of the Act and the Regulations.

*27.* Elk's Certificate of Incorporation, specifically states that "[t]he corporation is organized and chartered solely for the purpose of performing the functions and conducting the activities contemplated under the Small Business Investment Act of 1958, as amended from time to time . . . ." Thus, any violation of the Act or Regulations violates Elk's Certificate of Incorporation and is an ultra vires act.

*28.* Section 301(c)(3)(a)(ii) of the Act provides that in reviewing and processing any SBIC license application, the Administrator must take into account whether the management of the applicant is qualified and has the knowledge, experience, and capability necessary to comply with the Act.

*29.* Each of Elk's officers and directors named as defendants herein, including Defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar had to submit a fingerprint card for a background check conducted by the Federal Bureau of Investigation together with an SBA Form 182, processing fee, and a U.S. Small Business Administration Statement of Personal History ("Form 182") with exhibits.

*30.* The Forms 182 executed by each of Defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer and Boockvar each state the information therein is provided under the penalty of perjury and "for the purpose of determining my eligibility for the Small Business Investment Company program."

*31.* As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar had actual knowledge at all relevant times that Elk was a licensed SBIC.

32. As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar were "Control Person" of Elk as that term is defined at 13 C.F.R. §107.5, *Control Person* and *Associate* of Elk. An "Associate" of a particular SBIC is a person or entity that, with respect to that SBIC, meets the definition set forth in 13 C.F.R. §107.50. "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Licensee or other concern, whether through the ownership of voting securities, by contract, or otherwise. 13 C.F.R. §107.50. The term "Associate" identifies persons and entities whose dealings with an SBIC trigger the application of a number of regulations, including, but without limitation, the conflict-of-interest provisions of 13 C.F.R. §107.730 and limitations on disposition of an SBIC's assets pursuant to 13 C.F.R. §107.885.

33. Section 303 of the Act, 15 U.S.C. §683, authorizes SBA to provide financing to licensed SBICs. Pursuant to Section 303 of the Act, 15 U.S.C. §683, SBA provided funds to Elk through the purchase and/or guaranty of Debentures, a form of Leverage, as those terms are defined under the Regulations.

34. Section 314 of the Act, 15 U.S.C. §687f(a), provides that whenever an SBIC violates the Act or Regulations, such violation shall be deemed to be a violation and an unlawful act on the part of any person who, directly or indirectly, authorizes, orders, participates in, or causes, brings about, counsels, aids, or abets in the commission of any acts, practices, or transactions which constitute or will constitute, in whole or in part, such violation.

*35.* Section 314 of the Act, 15 U.S.C. §687f(b) provides that it shall be unlawful for any officer, director, employee, agent, or other participant in the management or conduct of the affairs of an SBIC licensee to engage in any act or practice, or to omit any act, in breach of his fiduciary duty as such officer, director, employee, agent, or participant, if, as a result thereof, the SBIC licensee has suffered or is in imminent danger of suffering financial loss or other damage.

*36.* Once licensed, an SBIC may seek a "Leverage Commitment" of federal money from the SBA. *See* 13 C.F.R. § 107.1100 *et seq.* An SBIC may obtain a federal Leverage Commitment of up to twice its paid-in private capital. To be eligible for Leverage and to obtain a commitment from SBA to issue Leverage, an SBIC must be in compliance with the SBIC Regulations. 13 C.F.R. § 107.1120(i). Once a commitment has been obtained, the SBIC obtains funds from its Leverage Commitment through a series of "draws."

**SBA Leverage Commitment and Security Interests or Secured Interests**

*37.* In connection with the issuance of an SBA-guaranteed debenture in September 1993, Elk and SBA entered into a security agreement dated September 9, 1993 (the "SBA Security Agreement") pursuant to which Elk granted a security interest to SBA in all of Elk's assets, including among other things, Elk's portfolio of loans receivable, together with any guarantees thereon, and all other obligations owing to Elk, to secure payment of Debentures and any other indebtedness or liability of Elk to SBA, including future debentures which may be issued to or guaranteed by SBA.

*38.* On September 9, 1993, Elk and SBA entered into an agreement (the "SBA Agreement"), wherein Elk agreed to execute: (i) a security agreement in favor of SBA; (ii)

Form UCC-1 Financing Statements in favor of SBA which were subject to the rights of Elk's bank lenders (the "Senior Lenders"); (iii) an inter-creditor agreement with Elk's Senior Lenders; and (iv) a custodian agreement. The SBA Agreement further stated that non-performance of any of the terms of the SBA Agreement by Elk may be deemed also to be a violation of 13 CFR Sec. 107.906(a) now 13 CFR Sec. 107.507(a).

*39.* Also on September 9, 1993, Elk, and certain banks ("Senior Lender" or "Bank" or collectively as the "Senior Lenders" or "Banks"), and SBA entered into an Intercreditor Agreement (the Intercreditor Agreement") which provides that the security interest of SBA ranks junior in priority to the security interests of the Senior Lenders.

*40.* The Intercreditor Agreement defines "Senior Indebtedness" as "[a]ny and all indebtedness and other obligations including, without limitation, all principal, interest (including all interest accruing after commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of the Borrower) charges, expenses, fees and other sums owing by the Borrower under the Loan Agreements from time to time in effect, new or replacement loan agreements with other senior lenders and any refinancing or restructuring of the foregoing including any agreement or agreements increasing the obligations under, extending the maturity of, refinancing or restructuring any of the Loan Agreements, new or replacement loan agreements with other senior lenders or any successor agreement or agreements. The Company agrees that the Senior Indebtedness shall not be increased so that the Company's total indebtedness exceeds the limitations provided for in the SBA Agreement." Intercreditor Agreement at ¶1.3.1.

*41.* The Intercreditor Agreement defines "Junior Indebtedness" as "[a]ny and all

indebtedness and other obligations owing by the Borrower to SBA, including any and all amounts outstanding from time to time under any and all debentures sold to or guaranteed by the SBA (the "Debentures") whether principal, interest or otherwise, plus all fees, expenses, other amounts and other monetary obligations owing pursuant to the Debentures and refinancings [sic] of the foregoing, but not including any preferred stock sold to the SBA." Intercreditor Agreement at ¶1.3.2.

*42.* The Intercreditor Agreement states "simultaneously with the execution of this agreement, the Borrower, the Senior Lenders and the SBA are entering into a custodian agreement (the "Custodian Agreement"), pursuant to which IDB, as custodian…will hold certain collateral…solely for the benefit of the Senior Lenders and the SBA…."

*43.* The Intercreditor Agreement further states "provisions hereof as to payment priorities are solely for the purpose of defining the relative rights of holders of Senior Indebtedness, on the one hand, and the SBA…as holders of Junior Indebtedness…except to the extent otherwise provided in this Agreement, none of such provisions shall impair, as between the Borrower and the SBA…, the obligations of [Elk] which are unconditional and absolute, to pay the Junior Indebtedness….." Intercreditor Agreement at ¶2.4.

*44.* On September 9, 1993, Elk, the Senior Lenders and SBA entered into a custodian agreement (the "Custodian Agreement"), pursuant to which Israel Discount Bank ("IDB") was appointed custodian to hold all of Elk's assets for the benefit of the Senior Lenders and SBA. The Senior Lenders/Banks and SBA are collectively referred to as the Lenders in the Custodian Agreement. At all times relevant herein IDB was the custodian bank (the "Custodian").

45. Under the Custodian Agreement, Elk assigned and delivered to the Custodian all of Elk's notes, security agreements, financing statements, assignments of financing statements, and other instruments and securities from time to time hereafter delivered to or otherwise held by the Custodian for or on behalf of the Banks and SBA, as collateral security (the "Custodian Collateral").

46. Under the Custodian Agreement, Elk was directed to deliver to the Custodian the Custodian Collateral and the Custodian was directed to accept and hold the Custodian Collateral in accordance with the terms of the Custodian Agreement.

47. Under the Custodian Agreement, the "Custodian is hereby appointed to act as agent for the Bank and SBA hereunder and agrees to accept, hold and deliver the Custodian Collateral in accordance with the terms hereof. Each Lender [Banks and SBA] hereby designates and appoints Custodian to act as agent….for and on behalf of each of the Lenders to take such action on behalf of the Lenders under those provision of the Loan Agreements and the SBA Security Agreement, as the case may be, which relate solely to the Custodian Collateral, and to exercise such powers and to perform such duties, with respect to the management, supervision, servicing, administration and disbursement of the Custodian Collateral (including, without limitation, perfecting such Lender's security interest in the Custodian Collateral by filing financing statements, holding physical possession of instruments or otherwise) and the payments or amounts realized or recovered from the Custodian Collateral as are specifically delegated to or required of Custodian by the terms of this Agreement…." Custodian Agreement at ¶ 2.

48. Under the Custodian Agreement, "[a]ll notes, security agreements, financing

statements, assignments of financing statements, participation agreements/interest and other instruments and securities presently held or hereafter acquired by [Elk] shall be assigned to the Custodian…and be delivered to and held by the Custodian pursuant hereto. Custodian acknowledges that each Lender has been granted a security interest in the Custodian Collateral and agrees to hold any portion of the Custodian Collateral in possession of the Custodian as bailee for the benefit of each Lender." Custodian Agreement at ¶ 3.

*49.* The Custodian Agreement states at paragraph 5 (a), "[i]n the event [Elk] intends to sell all or a portion of [Elk's] interest in any note or other evidence of indebtedness, including but not limited to any participation interest proposed to be sold by [Elk], such sale may be made by [Elk] in its sole discretion and the Custodian shall deliver to Borrower, or allow Borrower access to the related Custodian Collateral, so long as [Elk] provides the Custodian with a written certification that the net proceeds from such sale will be utilized immediately to reduce [Elk's] Senior Indebtedness and the proceeds are so utilized; provided further, however, in the event [Elk] does not intend to utilize the proceeds to repay the Senior Indebtedness, it will notify the SBA, the Banks and the Custodian in writing…of the proposed sale (i) at least five (5) business days prior to the date of the proposed transaction if the transaction involves proceeds of not more than $500,000, which proceeds will be utilized for purposes other than reducing the Senior Indebtedness and (ii) at least six (6) business days prior to the date of the proposed transaction if the transaction involves proceeds of more than $500,000, which proceeds will be utilized for purposes other than reducing the Senior Indebtedness. Further stating

"[i]f the SBA and the Banks do not object to the proposed transaction within the applicable time period, the Borrower shall be entitled to proceed with the transaction and the Custodian shall deliver to Borrower, or allow Borrower access to the related Custodian Collateral." Custodian Agreement at ¶ 5.

*50.* The Custodian Agreement states at paragraph 5 (a) "[w]ritten notice from the Borrower to the SBA, the Banks and the Custodian, as required above shall set forth (i) the identity of the Borrower, (ii) the date the loan was entered into, (iii) the current loan balance as carried on the Borrower's books, (iv) the collateral securing the loan and the value thereof as estimated by Borrower, (v) the consideration to be received by Borrower and (vi) the use of the proceeds arising from the sale of the loan or interest in such loan." Custodian Agreement at ¶ 5.

*51.* The Custodian Agreement states at paragraph 7 that Elk "agrees that at any time and from time to time, at its expense, it will promptly deliver to the Custodian any further instruments and documents and take any further actions, that may be necessary or that SBA or the Custodian may reasonably request, in order to carry out the intent of this Custodian Agreement or the Intercreditor Agreement." Custodian Agreement at ¶ 7.

*52.* The Custodian Agreement states at paragraph 13 that the Custodian shall deliver to the parties to the Custodian Agreement within thirty (30) days of the end of each three month period a report itemizing the Custodian Collateral maintained by the Custodian as of the last business day of such three-month period. Custodian Agreement at ¶ 13.

*53.* The Custodian Agreement at paragraph 19 states that "[t]his Agreement shall become effective upon the date hereof and shall continue in full force and effect until the

15

indefeasible payment and satisfaction in full of all obligations of the Borrower to the Lenders [Banks and SBA] and the irrevocable termination of the Loan Agreement and the SBA Agreement, as the case may be…." Custodian Agreement at ¶ 19.

*54.* Uniform Commercial Code ("UCC") Financing Statements evidencing the Senior Lenders' security interests were filed with the State of New York but were extinguished upon the filing of UCC Termination Statements in March 2011, leaving SBA as the only secured party.

*55.* UCC Financing Statement No. 200708138326766 naming SBA as a Secured Party was in effect from its filing date of August 13, 2007. No subsequent UCC Financing Statement was filed by any subsequent secured party.

*56.* Prior to December 2008, Elk received debenture funding from SBA in the amount of approximately $11,600,000. Elk's and SBA's records indicate that by letter December 18, 2008, Elk through its president, Gary Granoff, requested a $15 million commitment from SBA. In the letter, Elk certified that "the proceeds of the issuance and sale of the securities to be committed by SBA as requested herein will be used only for the purposes contemplated by the Act and the Regulations." (emphasis in original).

*57.* In September 2009, SBA approved a commitment of $9,175,000, which was taken by Elk in one draw in December 2009. The new commitment amount was in addition to the $11,600,000 in debenture funding Elk had received. Currently, there remains approximately $19.5 million in unpaid and outstanding Debenture Leverage due from Elk to SBA.

*58.* As of April 8, 2011, Defendants Michael Feinsod, Silvia Mullens and Gary

Granoff had signature authority on the primary bank accounts with the Custodian IDB, and on Elk's non-custodian bank accounts including non-custodian Signature Bank.

*59.* Upon information and belief, on or about June 14, 2011 Gary Granoff was replaced by Richard Feinstein as an authorized signatory on the primary bank accounts with the Custodian IDB and on Elk's non-custodian bank accounts including non-custodian Signature Bank.

## Elk Associates Funding Corp. and Ameritrans Capital Corp.

*60.* Ameritrans is a Delaware corporation that is the parent company, and sole shareholder, of Elk. From on or about 2009 through April 2013, and while under the control of the defendants identified in paragraphs 11 through 21, above, Ameritrans received over $14 million in funds from Elk. Elk's general ledger for the period ended March 31, 2013 shows the receivable due from Ameritrans was $12,339,926.76. There are additional expenses of Ameritrans of $1,931,111.24 that were paid by Elk that were not recorded on Ameritrans's books until after April 2013, were never reimbursed by Ameritrans and which debt, to date, remains unpaid.

*61.* By letter dated October 9, 1998, Elk, through its then president Gary Granoff, asked that SBA review a Securities and Exchange Commission ("SEC") Form N-14 that was filed by Ameritrans on September 22, 1998. Elk, through Granoff, requested that SBA consent to a shareholder change whereby Ameritrans a publicly traded company, would be the sole shareholder of Elk.

*62.* By letter dated December 15, 1998, SBA responded to the October 9, 1998 letter with certain conditions, including that Elk's assets could not be used to collateralize the

17

indebtedness of Ameritrans.

*63.* By letter dated December 29, 1998, -Elk responded to SBA's comments and stated that "Elk's management is aware of the fact that the Licensee's assets cannot be used to collateralize any indebtedness of Ameritrans."

*64.* By letter dated August 4, 1999 ("the August 1999 Letter"), Elk's counsel wrote SBA in regards to Amendment No. 1 to Ameritrans' Registration Statement/Proxy Statement on Form N-14 filed with the SEC which "relates to the proposed one for one share exchange between Elk and Ameritrans Capital Corporation . . . in which Elk would become a wholly owned subsidiary of Ameritrans."

*65.* The August 1999 Letter at page 2 states that the December 29, 1998 letter "confirms that Elk is aware that assets cannot be used to collateralize debt of Ameritrans."

*66.* The August 1999 Letter at page 3 states that "Elk acknowledges that the SBA Comment Letter does not constitute SBA's agreement with or approval of each and every statement in the Registration Statement."

*67.* By letter dated September 21, 1999, SBA advised Elk it had no further comments to the transaction and Ameritrans was listed as the parent company and shareholder of Elk in SBA's records.

**Appointment of Receiver of Elk and the Receiver's Review of Elk and Ameritrans Corporate and Financial Information**

*68.* On February 14, 2013, after Elk failed to meet the terms of a Settlement Agreement executed with SBA in October 2012, SBA filed a complaint seeking its appointment as receiver of Elk.

*69.* By the Receivership Order entered April 24, 2013, this Court appointed the U.S.

Small Business Administration as Receiver (the "Receiver") of Elk under the provisions of 15 U.S.C. §687c and entered judgment in favor of SBA for the amount of Debentures outstanding, which at the time totaled over $20 million.

*70.* The Receiver was appointed for the primary purpose of liquidating all of Elk's assets and satisfying the claims of creditors in the order of priority as determined by this Court.

*71.* In May 2013, the Receiver met with Elk's former President and Chairman of the Board, Michael Feinsod, to conduct a transition meeting. The Receiver was informed that, given the length of time Elk had been an SBIC, there were numerous files in storage at an off-site facility, numerous boxes and files on site as well as various servers some of which were maintained by service providers of electronic information. At the time of the transition meeting, no minutes of board of directors' meetings for Elk were transferred to the Receiver, although they were requested.

*72.* On or about July 2, 2013, Ameritrans, Elk's sole shareholder, filed a notice of Changes in Directors or Principal Officers with the Securities and Exchange Commission which stated that Mr. Feinsod and the entire board of directors had resigned en masse.

*73.* Shortly after its appointment, the Receiver transferred the cash balance, totaling approximately $17,000, in Elk's account to the Receiver's trust account and reviewed Elk's financial and banking information, including quarterly financial statements submitted to SBA prior to the Elk receivership.

*74.* In its last quarterly financial statement filed with SBA for the quarter ending June 30, 2012, Elk reported, as an asset, a "Due From Parent" (Ameritrans) of

$10,901,847. On May 15, 2013, Ameritrans filed a Form 10-Q with the SEC reporting that Elk was due $14,271,038.

75. The Receiver met with the new Chairman of the Board for Ameritrans, Robert Ammerman, to discuss the amount due from Ameritrans and means of repayment. Although various communications took place, the Receiver and Ameritrans were unable to reach a resolution satisfactory to both parties. On or about October 2, 2015, the Receiver for Elk made demand upon Ameritrans for $12,339,927 to be paid on or before October 15, 2015. Ameritrans failed to remit any payments on the amount due Elk.

76. From May 2015 through August 2015, the Receiver subpoenaed two (2) electronic service providers, nine (9) banking institutions and Ameritrans itself for financial records and corporate documentation, including Minutes of Meetings, of both Elk and Ameritrans for the periods July 2009 through April 2013.

77. In November 2015, Ameritrans made its documents, including corporate minutes, available to the Receiver for inspection and production. The documents reviewed and copied included Minutes of Meetings of Elk, some of which had been held simultaneously with Ameritrans board meetings.

78. After reviewing the materials provided by Ameritrans, the Receiver determined that from on or about 2009 through April 2013, the former officers and directors of Elk named herein, repeatedly and improperly used Elk's funds to operate and conduct business for the benefit of Ameritrans and its shareholders, in violation of 13 C.F.R. §107.730(a), which prohibits self-dealing, and 13 C.F.R. §107.885, which prohibits the disposition of assets to an Associate as that term is defined in 13 C.F.R. §107.50.

*79.* On October 5, 2016, Ameritrans filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts. The Receiver for Elk was named as a creditor for $12,339,927 in Ameritrans's bankruptcy schedules. On January 20, 2017, the Receiver filed its Proof of Claim for $12,339,927 in the Ameritrans bankruptcy matter. To date, no payments have been received from the Ameritrans bankruptcy estate.

*80.* As part of its diligence in bringing this civil action, the Receiver retained the services of a forensic accounting firm which, along with the Receiver, analyzed the financial records and filings of both Elk and Ameritrans from 2008 through 2013. The Receiver has now concluded that another $1,931,111 of Elk funds was used by Ameritrans to pay Ameritrans expenses for the nine-month period ending March 31, 2013. Thus, the total outstanding amount due Elk from Ameritrans is $14,271,038.

*81.* On June 2, 2017, the Receiver filed an amended Proof of Claim in the amount of $14,271,038 in the Ameritrans bankruptcy matter.

**The 2009 SBA Guaranteed $9 Million Debenture**

*82.* From 2009 through 2013, the Defendants approved and/or caused Elk to pay $7,491,139 of Ameritrans' expenses and transferred $6,779,898 of Elk's cash to Ameritrans for no consideration. As set forth in the Minutes of a Board of Directors meeting held on or about September 23, 2009, Debenture funds committed to Elk by SBA were already being sourced by Elk's officers and directors to benefit Ameritrans, whose financial situation was precarious.

*83.* As memorialized in both Elk and Ameritrans's general ledger entries, from June 2009 through April 2013, the amount of Ameritrans's expenses paid by Elk and allocated

to Ameritrans, and the resulting liability from Ameritrans to Elk increased yearly from $418,595 in 2009, to $590,199 in 2010, to $2,949,442 in 2011, to $10,901,847 in 2012, and finally to $14,271.038 by April 2013.

*84.* On May 26, 2009, a special meeting of the Board of Ameritrans and Elk was held. The Minutes of the Board of Directors Meeting of Ameritrans (defined as "the Company") and Elk (defined as "Elk") indicate that Gary Granoff was present as Chairman of the Board and Michael Feinsod, Ivan Wolpert, John Laird, Peter Boockvar, Howard Sommer, Murray Indick, and Steven Etra (via telephone) were present as directors. The Minutes indicate that Mr. Feinsod stated that Ameritrans "was at a crossroads" and the Board had to determine how Ameritrans "was to proceed into the future."

*85.* The Minutes of the May 26, 2009 meeting reference a memorandum dated May 22, 2009 that had been emailed to the Board on May 23, 2009. In the May 22, 2009 memorandum, Mr. Feinsod writes that unless Ameritrans "is able to secure SBA debentures, or other debt financing, it seems unlikely that the Company can achieve any level of meaningful profitability. In order to maximize shareholder value, specific action is required."

*86.* The Board Minutes of the May 26, 2009 special meeting also indicate that in response to questions from Messrs. Sommer and Indick, Mr. Granoff stated that Ameritrans's life insurance investment premiums could not come from the sale of Elk assets as that would violate SBA rules and regulations because the life settlement contracts were assets of Ameritrans.

*87.* The Board Minutes of May 26, 2009 also indicate that Mr. Sommer asked whether

it was correct that there were two scenarios for Ameritrans: (i) with SBA financing of Elk, Ameritrans would have various alternatives; or (ii) without SBA funding there was only an Ameritrans liquidation scenario. Mr. Sommer also commented that without SBA financing, there would have to be drastic cutbacks at Ameritrans.

*88.* Mr. Feinsod then stated that the Board had to determine whether Ameritrans was facing only a liquidation scenario without SBA Leverage. Mr. Boockvar then asked what the timeline was to decide whether Ameritrans would be liquidated if Elk was unable to obtain the SBA Leverage Commitment. Mr. Feinsod responded that Ameritrans would look for a merger partner for 4-5 months before proceeding to liquidate Ameritrans's portfolio, but if the SBA leverage commitment was issued, Ameritrans could go forward without a liquidation or merger.

*89.* Mr. Feinsod indicated that at a June 4, 2009 meeting with SBA "Elk would show the agency a scenario when more expenses would run through Ameritrans rather than Elk. Though the consolidated returns would still look the same the Elk balance sheet would look stronger to SBA."

*90.* The Minutes of the May 26, 2009 meeting were approved by the Board of Directors, including those individuals named in paragraph 84, above, at a board meeting held on September 23, 2009. Pursuant to the Minutes of the September 23, 2009 meeting, the same individuals present at the May 26, 2009 meeting were present at the September 23, 2009 Board meeting.

*91.* At the September 23, 2009 Board meeting, Mr. Feinsod informed the Board that SBA "was amenable to approving Elk's pending leverage application but that SBA was

requesting some updated information." Mr. Feinsod had received word from SBA that it had approved Elk's leverage request in the range of $9 million to $10 million. Mr. Etra, a board member of Elk, then stated that "based on the new SBA leverage commitment he would try and assist in a small private placement to raise capital" for Ameritrans.

*92.* The Minutes of the September 23, 2009 Board Meetings were approved at a Board of Directors meeting held November 11, 2009. Compensation for the Board of Directors was discussed, with Mr. Feinsod indicating that the average non-management director received about $16,000-$18,000 per year. Although an increase in fees was discussed, the potential cutbacks discussed at the May 26, 2009 meeting were no longer mentioned. The Minutes also set forth that "the SBA Debentures should help us get back to breakeven."

*93.* The Minutes of the November 11, 2009 Board meeting were approved at a Board meeting held on February 10, 2010. Messrs. Granoff, Feinsod, Wolpert, Boockvar, and Etra were present at the meeting. Mr. Feinsod discussed the "receipt of SBA debenture funding of over $9 million and the Etra loan syndication of $2,000,000 to Ameritrans."

*94.* On December 15, 2009, a Special Meeting of the Board of Directors of both Ameritrans and Elk was held. At that meeting, Elliott Singer was welcomed to the Board of Directors of both Ameritrans and Elk. The meeting was also attended by Defendants Granoff, Feinsod, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar. At that meeting, the Board approved a "$3 million private Offering" of debt securities of the Company [Ameritrans], and the Promissory Note that was circulated by prior email dated December 10, 2009, was also approved.

*95.* The SEC Form 10-Q for the quarter ending December 31, 2009 ("the 12-09 10-Q"), filed on February 16, 2010 by Ameritrans stated, at page 21, that the Company issued $2,025,000 of notes in a private offering and that a member of the Company's Board of Directors, and certain affiliated entities acquired $1,375,000 of the Notes in the offering. The 12-09 10Q was executed by Michael Feinsod, Chief Executive Officer and President.

*96.* The SEC Form 10-K for fiscal year ending June 30, 2010 (the "6-10 10-K"), filed on September 24, 2010 by Ameritrans, stated in Notes to Consolidated Financial Statements at page F-25, that Ameritrans issued an additional $975,000 of notes in a private offering on March 24, 2010, and that a member of Ameritrans's Board of Directors and certain affiliated entities acquired $660,000 of the notes in the offering. The $975,000 of Notes issued in March 2010 together with the $2,025,000 of Notes issued in December 2009 are hereinafter referred to as the "Etra-affiliated Notes".

**Improper Use of Elk's Funds and Assets – Ameritrans Expenses Paid by Elk (Allocations)**

*97.* As described in paragraphs 84 through 94, above, the Board of Directors of Ameritrans and Elk knew that SBA Debenture funding was critical if Ameritrans was to remain viable. Accordingly, after the receipt of SBA Debentures in December 2009, the amount of Ameritrans expenses paid by Elk increased, and reimbursements from Ameritrans decreased.

*98.* Under the Regulations found at 13 C.F.R. §107.630, *Requirement for Licensees to File Financial Statements with SBA*, an SBIC such as Elk must file an audited financial statement each fiscal year. The financial statement, a "Form 468" must be filed by the last day of the third month following the end of the fiscal year. Elk's fiscal year ended on June

30 of each calendar year. The Form 468 contains representations by the SBIC's management made under the penalties of Title 18 of the United States Code, 18 U.S.C. §§ 1001 and 1006 and 15 U.S.C. § 645(a).

*99.* Under the Regulations found at 13 C.F.R. §107.1220, *Requirements for Licensees to File Quarterly Financial Statements,* an SBIC such as Elk that has SBA Leverage commitment outstanding must file a quarterly, but unaudited, Form 468. The quarterly report is due within thirty (30) days after the close of the respective quarter, other than the fourth quarter which is covered by the annual audited Form 468.

*100.* Elk's Annual Form 468 for the period ending June 30, 2009 shows, at page 2 under *Assets,* an entry "Due From Parent" of $418,595.00. Note No. 8 to the Annual Form 468 for the period ending June 30, 2009 states that "Amounts due from and due to parent represent net temporary advances from and to [Elk] by Ameritrans in the normal course of business. These advances are non-interest bearing and have no formal repayment terms." The amount due from Ameritrans is referred to in the section labeled "Current Assets" and included the section labeled "Total Assets". The Management Certification was executed by Gary Granoff as Chief Financial Officer and the Secretary's Certification was executed by Margaret Chance as Secretary.

*101.* Elk's general ledger, obtained post-receivership, indicates that, for the fiscal year ending 2009, $1.2 million was allocated to Ameritrans with $921,000 having been reimbursed, leaving the disclosed balance of $418,595 outstanding.

*102.* Based on information submitted by Elk in its SBA Form 468 for the period ending March 31, 2010, Elk was, and remains, capitally impaired as that term is defined in

26

13 CFR 107.1830 (2010).

*103.*     Elk's Annual Form 468 for the period ending June 30, 2010 indicates, under current assets at page 2(c), an entry "Due From Parent" of $590,199. The amount due from Ameritrans is referred to in the section labeled "Current Assets" and included the section labeled "Total Assets". The Management Certification was executed by Michael Feinsod as Chief Financial Officer and the Secretary's Certification was executed by Executive Vice President and Secretary Silvia Mullens.

*104.*     Elk's general ledger, obtained post-receivership, indicates that, for the fiscal year ending 2010, $1.0 million of Ameritrans's expenses were paid by Elk and allocated to Ameritrans of which $850,000 was reimbursed to Elk, leaving the reported "Due From Parent" aggregate balance of $590,199.

*105.*     As of December 31, 2010, onward, Elk was insolvent.

*106.*     Elk's Annual Form 468 for the period ending June 30, 2011 indicates, under current assets at page 2(c), an entry "Due From Parent" of $2,949,442. The amount due from Ameritrans is referred to in the section labeled "Current Assets" and included the section labeled "Total Assets". The Management Certification was executed by Richard Feinstein as Chief Financial Officer and the Secretary's Certification was executed by Executive Vice President and Secretary Silvia Mullens.

*107.*     Elk's general ledger, obtained post-receivership, indicates that, for the fiscal year ending 2011, $2.3 million of Ameritrans' expenses were paid by Elk and allocated to Ameritrans in 2011, of which only $38,000 was reimbursed, leaving the reported "Due From Parent" aggregate balance of $2,949,442.

*108.*　　　Elk's Form 468 for the period ending March 31, 2012 indicates, under current assets at page 2(c), an entry "Due From Parent" of $10,100,527. The amount due from Ameritrans is referred to in the section labeled "Current Assets" and included the section labeled "Total Assets". The Management Certification was executed by Richard Feinstein as Chief Financial Officer and the Secretary's Certification was executed by Executive Vice President and Secretary Silvia Mullens.

*109.*　　　Elk's unaudited Form 468 for the period ending June 30, 2012 indicates, under current assets at page 2(c), an entry "Due From Parent" of $10,901,847. The amount due from Ameritrans continues to be identified in the "Current Assets" section and included in the "Total Assets" calculation. The undated Management Certification was executed by Richard Feinstein as Chief Financial Officer and the Secretary's Certification was executed by Executive Vice President and Secretary Silvia Mullens.

*110.*　　　Elk's general ledger, obtained post-receivership, indicates that, for the nine months ending 2012, an additional $2,800,000 of Ameritrans's expenses were paid by Elk and allocated to Ameritrans with no reimbursement to Elk.

*111.*　　　Ameritrans's repeated failure to fully reimburse Elk, since 2009, was the result of Ameritrans' increasingly dire financial condition. Ameritrans' declining financial condition was known to the Board of Directors of Ameritrans and Elk despite the repeated misrepresentations made and certified by Elk in the Form 468s that the amount due from Ameritrans was a "current" asset and therefore was to be paid within one year.

*112.*　　　SEC Form 10-K for the fiscal year ending June 30, 2010 ("the 2010 10-K"), filed on September 28, 2010 by Ameritrans, states at page 19 that Ameritrans had not

operated at a profit "in recent years" and "anticipated incurring a loss in fiscal year 2011...." Ameritrans went on to report that it had a decline in revenue, down from $6.3 million in 2008 to $1.7 million in 2010.

113.     The books and records produced to the Receiver by Ameritrans in November 2015 indicate that the 2010 10-K was approved by the Board of Directors of both Ameritrans and Elk at a meeting held on September 23, 2010.

114.     SEC Form 10-K for the fiscal year ending June 30, 2011("the 2011 10-K"), filed on September 28, 2011 by Ameritrans, states at page 20 that Ameritrans had not operated at a profit "in recent years" and "anticipated incurring a loss in fiscal year 2012...." Ameritrans went on to report that it had a decline in revenue from $6.3 million in 2008 to $2.1 million in 2011.

115.     The books and records produced to the Receiver by Ameritrans in November 2015 indicate that the 2011 10-K was approved by the Board of Directors of both Ameritrans and Elk at a meeting held on September 27, 2011.

116.     SEC Form 10-K for the fiscal year ending June 30, 2012 ("the 2012 10-K"), filed on September 28, 2012 by Ameritrans, states at page 25 that Ameritrans had not operated at a profit "in recent years" and "anticipated incurring a loss in fiscal year 2013...." Ameritrans went on to report that it had a decline in revenue from $6.3 million in 2008 to $2.1 million in 2012.

117.     The 2012 10-K was approved by the Board of Directors of both Ameritrans and Elk at a meeting held, upon information and belief, on or about September 21, 2012.

118.     Ameritrans' SEC Form 10-Q for the period ending March 31, 2013, filed

on May 15, 2013, indicates at Page 24 that due to the deconsolidation of the Elk and Ameritrans financial statements (due to the appointment of SBA as Receiver of Elk on April 24, 2013), future Ameritrans financial statements would show a liability due to Elk of approximately $14.3 million.  Pursuant to Note 14 of the March 31, 2013 10-Q, the amount was prepared by "applying pro forma adjustments to the amounts previously reported in the Consolidated Financial Statements included in the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2012 and the amounts reported herein as of and for the period ended March 31, 2013."

*119.*      The Ameritrans March 31, 2013 10-Q, filed on May 15, 2013, was executed as of that same date by Michael Feinsod as Chief Executive Officer and President.

*120.*      Each fiscal year Elk's payment of Ameritrans's expenses and the resulting allocations to Ameritrans increased, while the reimbursements from Ameritrans decreased, with the last reimbursement a dismal $38,000 in 2011.  There was no reserve set up on Elk's books for repayment of the "Due From Parent".  The entire amount of unpaid allocations, $7,491,139, including $2 million in Ameritrans's salary and directors' fees, remains outstanding.

**Improper Use of Elk's Funds and Assets – Cash Transfers**

*121.*      During the same period that Elk was paying Ameritrans's expenses and the allocated but unpaid expenses ballooned to over $7,491,139 million payable to Elk, Elk also transferred cash directly from Elk to Ameritrans to fund the payment of Ameritrans's other debts. The total amount of cash transferred to Ameritrans from Elk totaled

$6,779,898 million. The entire amount remains unpaid.

122. The majority of the cash transferred from Elk to Ameritrans was generated from the sale of Elk's assets in which Elk had invested using SBA's Debenture Leverage.

123. On January 19, 2012, Ameritrans Holdings, LLC, a special purpose entity formed by Ameritrans's creditor, Columbus Nova, Ltd., delivered written notice to Ameritrans that an event of default under a $1.5 million Senior Secured Note had occurred and declared all amounts immediately due and payable.

124. According to Ameritrans's Daily Bank Accounts Balance Report dated January 20, 2012, Ameritrans's total bank accounts balance was $15,417.48.

125. On February 24, 2012, Elk was informed via telephone by SBA that Elk was being transferred to the Office of Liquidation due to Elk's condition of capital impairment, as defined at 13 C.F.R. §107.1830. SBA's telephone call of February 24, 2012 was memorialized via a letter from SBA dated March 6, 2012 which stated "[t]he Licensee is hereby directed to cure its condition of Capital Impairment to SBA's satisfaction within 15 days from the date of this letter." Immediately thereafter, on March 9, 2012, Ameritrans executed a "secured note" in the amount of $4,500,000 in favor of Elk.

126. The execution of the "secured note" and the transfers of cash were executed, facilitated and/or approved by each of the within named defendants despite their knowledge that Ameritrans did not have the funds to repay Elk, as evidenced by Elk's Board Minutes and Ameritrans's Form 10-K filings with the SEC.

127. The execution of the "secured note" and the transfers of cash were

executed, facilitated and/or approved by each of the within named defendants while each was on notice that Elk owed SBA over $20 million. Thus, the money was transferred out of Elk, and out of reach of its creditors, to Ameritrans for no consideration.

128. The Minutes of a Special Meeting of the Board of Directors of Ameritrans and Elk indicate that on February 24, 2012, the Board of both entities passed a resolution approving "the borrowing of $4.5 million from Elk." Present at the meeting were Defendants Feinsod, Etra, Singer, Wolpert, Boockvar and Feinstein.

129. By email dated March 2, 2012, Defendant Mullens instructed Jefferies High Yield Trading, LLC, that approximately $2.7 million received from the sale of Elk's investments in two (2) portfolio concerns Affinity Group, Inc. and Miramax Film NY, LLC be wired to Elk's checking account at non-custodian Signature Bank, rather than Custodian IDB without required notice to SBA -and the Custodian and without transfer of proceeds of the sale of Elk's investment in portfolio concerns to the Custodian bank.

130. Via an email sent on March 7, 2012, Dominic Granito, Controller of Elk and Ameritrans ("Granito") informed Defendants Mullens and Feinstein that over $2.7 million had been received from the sale of Elk's investments in two (2) portfolio concerns Affinity and Miramax.

131. By email dated March 7, 2012, Feinsod instructed Mullens and Granito to prepare a wire transfer to Ameritrans in the amount of $2.5 million from Elk's non-custodian Signature Bank account. The funds transfer request was then executed by Feinsod and Feinstein and the transaction was confirmed by bank email that same day.

132. Also by email dated March 7, 2012, Feinsod instructed Granito and

32

Mullens to prepare a wire from Ameritrans to Ameritrans Holdings LLC in the amount of $1.42 million. The funds transfer request was then executed by Feinsod and Mullens and the transaction was confirmed by bank email that same day. The transfer of $2.5 million from Elk's non-custodian Signature Bank account to Ameritrans Signature Bank Account, and the transfer of $1.42 million from Ameritrans Signature Bank Account to Ameritrans Holding LLC was confirmed in an email between Granito and defendants Feinsod, Mullens and Feinstein.

*133.* Via email dated March 7, 2012 Granito informed non-custodian Signature Bank that it would be receiving a wire for $989,968.75 from the sale of Elk's investment in a third portfolio concern Centerplate, Inc. Via email dated March 13, 2012, from Granito to Feinsod, Mullens, and Feinstein, receipt of the proceeds was confirmed into Elk's non-custodian Signature bank account, rather than into Custodian IDB and without required notice to SBA and the Custodian.

*134.* Via an email dated March 19, 2012, Granito informed Mullens, and Feinstein that $853,776.71 was received into Elk's account at non-custodian Signature Bank from the sale of Elk's investment in a fourth portfolio concern Syncsort Incorporated on March 13, 2012 without required notice to SBA -and the Custodian and without transfer of proceeds of the sale of Elk's portfolio concerns to the Custodian bank, for an aggregate total of $1.8 million.

*135.* Via email dated March 16, 2012, Feinsod instructed Granito and Mullens to prepare a wire for $1.7 million from Elk to Ameritrans. A funds transfer request for $1.7 million was sent by Mullens to Elk's bank, which confirmed the wire had been processed.

Via an email dated March 19, 2012, Granito informed Mullens, Feinstein that $1.7 million had been transferred from Elk to Ameritrans and that $2.65 million was paid from Ameritrans to director Etra and his affiliates to repay the Etra affiliated notes described in paragraphs 93-96, above.

136.    Via email dated March 20, 2012, Defendant Mullens directed that the $1,428,001.29 from the sale of Elk's investment in a fifth portfolio concern, Fairway Group Acquisition Company, be forwarded to Elk's account at non-custodian Signature Bank, without required notice to SBA -and the Custodian and without transfer of proceeds of the sale of Elk's investment in a portfolio concern to the Custodian bank.  Via email dated March 21, 2012, Granito informed defendants Feinsod, Feinstein, and Mullens that $1,428,001.29 from the sale of Elk's investment in a portfolio concern was received in Elk's account at non-custodian Signature Bank.

137.    Also on March 20, 2012, one day prior to the March 21, 2012 expiration of SBA's deadline to cure Elk's violation of capital impairment, Elk filed for an emergency temporary restraining order against SBA in the United States District Court for District of Columbia to forestall SBA's transfer of Elk to the Office of Liquidation.

138.    Via an email dated March 23, 2012, Feinsod instructed Feinstein and Granito to transfer $300,000 from Elk to Ameritrans as the "final advance under the Note".

139.    On April 24, 2012, a ruling was issued in favor of SBA and against Elk. Elk was immediately transferred to SBA's Office of Liquidation and ultimately placed into receivership by Order of this Court entered April 24, 2013.

*140.* On or about August 7, 2012, Defendant Mullins and Feinsod directed that the $967,395 from the sale of Elk's investment in a sixth portfolio concern, Shearer's Foods, Inc., be forwarded to Elk's account at non-custodian Signature Bank, without required notice to SBA and the Custodian and without transfer of proceeds of the sale of Elk's investment in a portfolio concern to the Custodian bank.

*141.* Via an email on August 9, 2012 Granito informed Defendants Feinsod, Mullens and Feinstein that the proceeds of the sale had been transferred to Elk's non-custodian account at Signature Bank.

*142.* On August 10, 2012, $100,000 was transferred from Elk's non-custodian account at Signature Bank to Ameritrans.

*143.* On September 19, 2012, $175,000 was transferred from Elk's non-custodian account at Signature Bank to Ameritrans.

*144.* On or about October 3, 2012, Defendant Mullins and Feinsod directed that the $1,235,855 from the sale of Elk's investment in a seventh portfolio concern, Hudson Products Holdings, Inc., be forwarded to Elk's account at non-custodian Signature Bank, without required notice to SBA -and the Custodian and without transfer of proceeds of the sale of Elk's investment in a portfolio concern to the Custodian bank.

*145.* Via email on October 5, 2012, Granito informed Defendant Feinsod, Mullens and Feinstein that the proceeds of the sale had been transferred to Elk's non-custodian account at Signature Bank and that $64,000 was transferred from Elk's non-custodian account at Signature Bank to Ameritrans.

*146.* On or about November 16, 2012, Defendant Mullins, Feinsod and Feinstein

35

directed that the $995,000 from the sale of Elk's investment in an eighth portfolio concern, Sterling Infosystems, Inc., be forwarded to Elk's non-custodian account at Signature Bank, without required notice to SBA - and the Custodian and without transfer of proceeds of the sale of Elk's investment in a portfolio concern to the Custodian bank.

*147.* Via email on November 19, 2012, Granito informed Defendants Feinsod, Mullens and Feinstein that the proceeds of the sale had been transferred to Elk's non-custodian account at Signature Bank

*148.* On or about November 19, 2012, $100,000 was transferred from Elk's non-custodian account at Signature Bank to Ameritrans.

*149.* On or about December 19, 2012, $450,000 was transferred from Elk's non-custodian account at Signature Bank to Ameritrans.

*150.* On or about December 19, 2012, Defendant Mullins directed that the $561,000 from the sale of Elk's investment in a ninth portfolio concern, Sealmax, Inc., be forwarded to Elk's account at non-custodian Signature Bank, without required notice to SBA -and the Custodian and without transfer of proceeds of the sale of Elk's investment in a portfolio concern to the Custodian bank.

*151.* On or about February 26, 2013, $60,000 was transferred from Elk's non-custodian account at Signature Bank to Ameritrans.

*152.* On or about March 27, 2013, Defendants Mullens, Feinsod and Feinstein either directed or authorized that $1,178,911.10 from the sale of Elk's investment in a tenth portfolio concern, Impact Confections, Inc., be forwarded to Elk's account at non-custodian Signature Bank, without required notice to SBA and the Custodian and without

transfer of proceeds of the sale of Elk's investment in portfolio concerns to the Custodian bank. Via email dated March 27, 2013, Defendant Mullens informed Defendants Feinsod and Feinstein that "...We closed Impact today – the funds will hit tonight ($1,177,839.68)." Elk's Cash Receipts Journal indicates that $1,178,839.68 was deposited in Elk's non-custodian account at Signature Bank on March 27, 2013. On or about March 28, 2013, $655,000 was transferred from Elk's non-custodian account at Signature Bank to Ameritrans.

153. Between April 1, 2013 and April 24, 2013, the Defendants approved and/or caused Elk to pay an additional $226,043 of Ameritrans's expenses with no consideration, and had depleted Elk's bank account balance to $17,415.85.

154. Upon information and belief $10,953,895.05 of the foregoing funds were transferred to Elk's non-custodian account at Signature Bank without required notice to SBA and the Custodian and without transfer of proceeds of the sale of Elk's investment in portfolio concerns to the Custodian bank.

155. Ameritrans's contemporaneous records indicate that it did not have funds or assets, or the reasonable likelihood of Ameritrans of obtaining any funds or assets, to repay the "secured" note or any other indebtedness due Elk. Ameritrans's lack of financial wherewithal is further demonstrated by the fact that simultaneous with its receipt of Elk funds, Ameritrans was paying its operating expenses and repaying its debts, including those to insider Etra.

156. By the time Elk was placed into receivership, Ameritrans had received over $6,779,898 in cash from Elk and owed Elk over $7,491,139 for Ameritrans expenses that

were paid by Elk from the sales proceeds of at least ten (10) of Elk's assets, all of which were subject to the Custodian Agreement, SBA's Security Agreement, and Security Interest.

*157.*    The payment of expenses and transfers of assets by and from Elk for the benefit of Ameritrans were approved by the officers and directors of both Elk and Ameritrans, to the detriment of Elk, despite the fact that recovery of the funds advanced was highly unlikely and that such payments constituted multiple and continued conflict of interest transactions in violation of SBA's regulations, and occurred while SBA had a valid security interest in all of Elk's assets.

*158.*    After reviewing the available financial records and minutes of meetings made available to the Receiver, the Receiver determined that Elk's former officers and directors of Elk had (a) committed breaches of fiduciary duty, (b) committed ultra vires acts; (c) wasted Elk's assets, (d) converted Elk's assets, (e) acted in a negligent manner, (f) aided and abetted each other in breaching their fiduciary duty towards Elk, (g) civil conspiracy, and (h) acted in a grossly negligent manner with respect to Elk.

**Demand for Payment by the Receiver**

*159.*    By letter dated January 6, 2016, the Receiver for Elk made demand upon Michael Feinsod for $12,209,000 in damages suffered by Elk as a consequence of Defendant Feinsod's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above.  The letter gave Defendant Feinsod until February 15, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver

have been made.

*160.*     By letter dated January 7, 2016, the Receiver for Elk made demand upon Silvia Mullens for the $12,209,000 in damages suffered by Elk as a consequence of Defendant Mullens actions in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above.  The letter gave Defendant Mullens until February 15, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*161.*     By letter dated January 6, 2016, the Receiver for Elk made demand upon Richard Feinstein for the $9,390,489 in damages suffered by Elk as a consequence of Defendant Feinstein's actions in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above.  The letter gave Defendant Feinstein until February 15, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*162.*     By letter dated January 6, 2016, the Receiver for Elk made demand upon Steven Etra for the $12,209,000 in damages suffered by Elk as a consequence of Defendant Etra's actions in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above.  The letter gave Defendant Etra until February 15, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*163.*     By letter dated January 6, 2016, the Receiver for Elk made demand upon John Laird for the $12,209,000 in damages suffered by Elk as a consequence of Defendant Laird's actions in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above.  The letter gave Defendant Laird until February 15, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*164.*     By letter dated January 6, 2016, the Receiver for Elk made demand upon Ivan Wolpert for the $12,209,000 in damages suffered by Elk as a consequence of Defendant Wolpert's actions in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above.  The letter gave Defendant Wolpert until February 15, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*165.*     By letter dated January 6, 2016, the Receiver for Elk made demand upon Peter Boockvar for the $12,209,000 in damages suffered by Elk as a consequence of Defendant Boockvar's actions in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above.  The letter gave Defendant Boockvar until February 15, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*166.*     By letter dated January 23, 2016, the Receiver for Elk made demand upon

Gary Granoff for the $5,124,413 in damages suffered by Elk as a consequence of Defendant Granoff's actions in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above. The letter gave Defendant Granoff until February 29, 2016 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*167.* By letter dated April 28, 2017, the Receiver renewed its demand upon Mr. Feinsod for the adjusted amount of damages suffered by Elk, $14,271,038, as a consequence of Defendant Feinsod's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Feinsod until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*168.* By letter dated April 28, 2017, the Receiver renewed its demand upon Ms. Mullens for the adjusted amount of damages suffered by Elk, $14,271,038, as a consequence of Defendant Mullens's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Mullens until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*169.* By letter dated April 28, 2017, the Receiver renewed its demand upon Mr. Feinstein for the adjusted amount of damages suffered by Elk, $13,251,320.64, as a

consequence of Defendant Feinstein's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Feinstein until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*170.* By letter dated April 28, 2017, the Receiver renewed its demand upon Mr. Etra for the adjusted amount of damages suffered by Elk, $14,271,038, as a consequence of Defendant Etra's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Etra until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*171.* By letter dated April 28, 2017, the Receiver renewed its demand upon Mr. Laird for the adjusted amount of damages suffered by Elk, $14,271,038, as a consequence of Defendant Laird's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Laird until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*172.* By letter dated April 28, 2017, the Receiver renewed its demand upon Mr. Wolpert for the adjusted amount of damages suffered by Elk, $14,271,038, as a consequence of Defendant Wolpert's actions in approving, facilitating and/or executing

the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Wolpert until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*173.* By letter dated April 28, 2017, the Receiver made demand upon Mr. Howard Sommer for the $14,271,038 in damages suffered by Elk as a consequence of Defendant Sommer's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Sommer until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*174.* By letter dated April 28, 2017, the Receiver made demand upon Mr. Murray Indick for $1,845,145.76 in damages, suffered by Elk as a consequence of Defendant Indick's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Indick until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

*175.* By letter dated April 28, 2017, the Receiver made demand upon Mr. Elliott Singer for $13,886,492 in damages suffered by Elk as a consequence of Defendant Singer's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Singer until

May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

176.    By letter dated April 28, 2017, the Receiver renewed its demand against Defendant Boockvar for the adjusted amount of damages suffered by Elk, $14,271,038, as a consequence of Defendant Boockvar's actions in approving, facilitating and/or executing the actions and transactions described herein at paragraphs 82-158, above. The letter gave Defendant Boockvar until May 26, 2017 to remit payment or make financial arrangements with the Receiver. To date, no payments or financial arrangements for repayment to the Receiver have been made.

## VI. CAUSES OF ACTION

### A.    BREACH OF FIDUCIARY DUTY

177.    Paragraphs 1 through 176 are re-alleged and reincorporated as though fully set forth herein.

178.    Elk is a New York corporation whose principal place of business was, at all times prior to the April 24, 2013 receivership, located in New York. Under New York law, officers and directors of a corporation owe the corporation a fiduciary duty to act in that corporation's best interest.

179.    Elk's Certificate of Incorporation provides that Elk is organized and chartered solely for the purpose of performing the functions and conducting the activities contemplated under the Small Business Investment Act of 1958, as amended from time to time.

*180.*     A request to amend the Certificate of Incorporation was made by Elk October of 1998 for (1) an Approval of Change in Stockholders to Control Licensee; and (2) Approval of Certificate of Amendment to Certificate of Incorporation to delete preferred stock and to increase authorization of common stock from 2,000,000 shares to 3,000,000 shares.

*181.*     The request for amendment described in paragraph 180, above, was approved by SBA and filed with the New York Secretary of State in May 1999.

*182.*     Elk's Certificate of Incorporation at Certification 3 provides that it shall have the powers and authorities set forth therein, including, at 3(j), to conduct its affairs in accordance with, and subject to, Regulations prescribed by the Small Business Administration and, at 3(n), to regulate its business and conduct its affairs in a manner not inconsistent with the Act and Regulations prescribed by the Small Business Administration thereunder.

*183.*     The Regulations at 13 C.F.R. §107.885 (2008-2016), *Disposition of Assets to Licensee's Associates or to competitors of Portfolio Concern,* provide that except with SBA's prior written approval, a licensee such as Elk cannot dispose of any assets to an Associate if they have outstanding Leverage.

*184.*     Ameritrans, the sole shareholder of Elk, was an Associate of Elk as the term is defined at 13 C.F.R. §107.50, *Associate.* All of the officers and directors of Elk, including the Defendants named herein, are Associates of Ameritrans as the term is defined at 13 C.F.R. §107.50, *Associate.*

*185.*     Although, Elk had outstanding Leverage from SBA at all times relevant hereto, at no time did Elk obtain SBA's written approval for any of the transactions set forth at paragraphs 82-158, above. Thus, each and every such transaction was done in violation of the Act, Regulations and Elk's Certificate of Incorporation.

*186.*     The Regulations at 13 C.F.R. § 107.730 (2008-2016), *Financings Which Constitute a Conflict of Interest,* provide at Section 107.730 (a), *General Rule,* that a Licensee must not self-deal to the prejudice of a Licensee by providing Financing to any Associate without SBA's written approval.

*187.*     Financing, as used in paragraph 186, above, includes a loan under the definition of Financing found at 13 C.F.R. §107.50, *Financing.*

*188.*     At no time did Elk obtain or request SBA's written approval for any of the transactions set forth at paragraphs 82-158, above. Each and every transfer, advance and/or loan from Elk to Ameritrans was done in violation of the Act, Regulations and Elk's Certificate of Incorporation.

*189.*     Section 314 of the Act, 15 U.S.C. 687f(a), provides that "[w]herever a licensee violates any provision of this chapter or regulation issued thereunder by reason of its failure to comply with the terms thereof or by reason of its engaging in any act or practice which constitutes or will constitute a violation thereof, such violation shall be deemed to be also a violation and an unlawful act on the part of any person who, directly or indirectly, authorizes, orders, participates in, or causes, brings about, counsels, aids, or abets in the commission of any acts, practices, or transactions which constitute or will constitute, in whole or in part, such violation."

*190.*      Section 314 of the Act, 15 U.S.C. 687f (b), provides that "[i]t shall be unlawful for any officer, director, employee, agent, or other participant in the management or conduct of the affairs of a licensee to engage in any act or practice, or to omit any act, in breach of his fiduciary duty as such officer, director, employee, agent, or participant, if, as a result thereof, the licensee has suffered or is in imminent danger of suffering financial loss or other damage."

*191.*      Thus, under the Act and Elk's Certificate of Incorporation, each and every one of the defendants named herein as former officers and directors of Elk has violated the Act and Certificate of Incorporation of Elk and has committed unlawful acts constituting a breach of fiduciary duty.

*192.*      Each of Elk's officers and directors named as defendants herein, including (a) Defendant Michael Feinsod, its former President and Chief Executive Officer, (b) Richard Feinstein, its former Chief Financial Officer, (c) Silvia Mullens, its former Secretary and Executive Vice President, (d) Gary Granoff, its former President, Chairman of the Board, board member and Managing Director, (e) Steven Etra, its former board member (f) John Laird, its former board member, (g) Ivan Wolpert, its former board member, (h) Howard Sommer, its former board member, (i) Murray Indick, its former board member, (j) Elliott Singer, its former board member, and (k) Peter Boockvar, its former board member, each breached their fiduciary duty to Elk by causing the depletion and transfer of Elk's assets, as set forth herein at paragraphs 82-158, above, to the detriment of Elk.

*193.*     By approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, put the interests of Ameritrans and of themselves ahead of the interest of Elk to the financial detriment of Elk.

*194.*     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, Elk has suffered damages in the amount of at least $14,271,038.

*195.*     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each defendant has breached their fiduciary duty in violation of New York law, Elk's Certificate of Incorporation and 15 U.S.C. §687f and each defendant is liable for damages as set forth in paragraphs 166-176, above.

## B.     ULTRA VIRES ACTS

*196.*     Paragraphs 1 through 195 are re-alleged and reincorporated as though fully set forth herein.

*197.*     Each of the transaction set forth in paragraphs 82-158, above, constituted a violation of the Act, Regulations and therefore of Elk's Certificate of Incorporation.

*198.*     By approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, as former officers

and directors of Elk, acted outside of their corporate powers and committed ultra vires acts by causing the depletion and transfer of Elk's assets in contravention of the Act, Regulations and Elk's Certificate of Incorporation.

199.     Each and every defendant named herein acted outside of their corporate powers and committed ultra vires acts, described in detail at paragraphs 82-158, above, to the detriment of Elk and in favor of Ameritrans Capital Corporation, an entity that each named defendant controlled, managed and/or invested in.

200.     As a consequence of the ultra vires acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, and acting outside of their corporate powers Elk has suffered damages in the amount of $14,271,038.

201.     As a consequence of the ultra vires acts which were outside of their corporate powers of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each defendant has committed ultra vires acts in violation of New York law, 15 U.S.C. §687f and Elk's Certificate of Incorporation and is liable for damages as set forth at paragraphs 166-176, above.

## C.     WASTE OF CORPORATE ASSETS

202.     Paragraphs 1 through 201 are re-alleged and reincorporated as though fully set forth herein.

203.     The financial and corporate records of both Elk and Ameritrans indicate that there was no consideration or exchange of value for the $7,491,139 in unpaid expenses advanced by Elk to Ameritrans or for the $6,779,898 in cash that was transferred by Elk to Ameritrans as described herein at paragraphs 82-158, above.

204.     The official books and records and the financial records of both Elk and Ameritrans establish that the systematic payment of expenses and transfers of cash from Elk to Ameritrans were authorized or facilitated by each defendant named herein for the benefit of Ameritrans and each defendant named herein through the payments of Ameritrans salaries, Ameritrans directors' fees and, Ameritrans's debts, including payment of over $1.67 million to satisfy its loan from Defendant Etra, and $2.65 million to satisfy its loan from Ameritrans Holdings, LLC.

205.     By approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar directly conveyed, diverted, or wasted the assets of Elk either for an improper or unnecessary purpose or in exchange for consideration which, in the view of any person of ordinarily sound business judgment, was inadequate , in violation of New York law, 15 U.S.C. §687f and Elk's Certificate of Incorporation.

206.     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, Elk has suffered damages in the amount of at least $14,271,038.

50

*207.*     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each of which constitutes a waste of corporate assets, each defendant is liable for damages as set forth herein at paragraphs 166-176, above.

### D.     CONVERSION

*208.*     Paragraphs 1 through 207 are re-alleged and reincorporated as though fully set forth herein.

*209.*     From 2009 through 2013, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, intentionally and without authority approved, authorized, facilitated, or participated in the transfer of funds from Elk's possession to Ameritrans for the benefit of Ameritrans and to the detriment of Elk.

*210.*     As a consequence of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, intentionally and without authority approved, authorized, facilitated, or participated in the transfer of funds from Elk's possession to Ameritrans for the benefit of Ameritrans and to the detriment of Elk, Elk could no longer use the funds for the purposes set forth in its Certificate of Incorporation and each of the defendants interfered in Elk's right of possession of the funds by assuming control of the funds.

*211.*     By intentionally and without authority facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each of defendants Feinsod,

Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer and Boockvar, converted and interfered in Elk's right of possession of Elk's assets in violation of New York law, the Act and Regulations and Elk's Certificate of Incorporation.

212.     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in intentionally and without authority approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, and interfering in Elk's right of possession of the funds, Elk has suffered damages in the amount of at least $14,271,038.

213.     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each defendant is liable for damages as set forth herein at paragraphs 166-176, above.

## E.     NEGLIGENCE

214.     Paragraphs 1 through 213 are re-alleged and reincorporated as though fully set forth herein.

215.     Elk's Certificate of Incorporation provides that Elk is organized and chartered solely for the purpose of performing the functions and conducting the activities contemplated under the Small Business Investment Act of 1958, as amended from time to time.

216.     The Regulations at 13 C.F.R. §107.885 (2008-2016), *Disposition of Assets to Licensee's Associates or to competitors of Portfolio Concern,* provide that except with

SBA's prior written approval, a licensee such as Elk cannot dispose of any assets to an Associate if they have outstanding Leverage.

217.    Ameritrans, the sole shareholder of Elk, was an Associate of Elk as the term is defined at 13 C.F.R. §107.50, *Associate.*

218.    Although, Elk had outstanding Leverage from SBA at all times relevant hereto, at no time did Elk request or obtain SBA's written approval for any of the transactions set forth at paragraphs 82-158, above.

219.    The Regulations at 13 C.F.R. § 107.730 (2008-2016), *Financings Which Constitute a Conflict of Interest,* provide at Section 107.730 (a), *General Rule,* that a Licensee must not self-deal to the prejudice of a Licensee by providing Financing to any Associate without SBA's written approval.

220.    At no time did Elk obtain or request SBA's written approval for any of the transactions set forth at paragraphs 82-158, above.  Each and every advance and/or loan from Elk to Ameritrans and approved by the each and every defendant named herein was done in violation of the Act, Regulations and Elk's Certificate of Incorporation.

221.    Each of Elk's officers and directors named as defendants herein, including (a) Defendant Michael Feinsod, its former President and Chief Executive Officer, (b) Richard Feinstein, its former Chief Financial Officer, (c) Silvia Mullens, its former Secretary and Executive Vice President, (d) Gary Granoff, its former President, Chairman of the Board and board member, (e) Steven Etra, its former board member (f) John Laird, its former board member, (g) Ivan Wolpert, its former board member, (h) Howard Sommer, its former board member, (i) Murray Indick, its former board member, (j) Elliott

Singer, its former board member, and (k) Peter Boockvar, its former board member, owed a recognized and cognizable duty of care to Elk.

222.     By approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar acted in negligent manner and breached their duty of care to Elk.

223.     As a direct and proximate cause of the negligent acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, Elk has suffered damages in the amount of $14,271,038.

224.     As a consequence of the negligence of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each defendant is liable for damages as set forth herein at paragraphs 166-176, above.

## F.     AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY

225.     Paragraphs 1 through 224 are re-alleged and reincorporated as though fully set forth herein.

226.     As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, owed a fiduciary duty to Elk.

227.     As officers and/or directors of Elk, each of defendants Feinsod, Feinstein,

Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar were aware that each of them individually owed a fiduciary duty to Elk.

228.	As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, knew that Elk was a Small Business Investment Company regulated by the Act and Regulations as well as Elk's Certificate of Incorporation, which specifically refers to the Act and Regulations.

229.	As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, knew that Elk's Certificate of Incorporation specifically refers to the Act and Regulations and requires Elk's business activity to be conducted in accordance with the Actual Regulations.

230.	As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar knew that Elk had not obtained SBA's prior written approval before Elk advanced the $7,491,139 in expenses to Ameritrans or before Elk advanced $6,779,898 in cash to Ameritrans as set forth in paragraphs 82-158, above.

231.	As officers and/or directors of Elk, each defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar knew that Elk's payment of Ameritrans expenses and Elk's cash advances to Ameritrans, as set forth in paragraphs 82-158, above, were a violation of the Act and Regulations, specifically 13 C.F.R. §107.730, *Conflict of Interest* and 13 C.F.R. §107.885, *Disposition of Assets to an*

*Associate.*

232.     As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar knew that approving, facilitating and/or executing each transaction described herein at paragraphs 82-158, above, was a violation of the Act, the Regulations and Elk's Certificate of Incorporation and therefore an ultra vires act and breach of fiduciary duty.

233.     As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar knew that by approving, facilitating and/or executing each transaction described herein at paragraphs 82-158, each was aiding and abetting the breach of fiduciary duty of the other.

234.     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in aiding and abetting the breach of fiduciary duty and ultra vires acts committed by each other through the approval, facilitation and/or execution of the transactions described herein at paragraphs 82-158, above, Elk has suffered damages in the amount of $14,271,038.

235.     As a consequence of the acts of each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in aiding and abetting the breach of fiduciary duty and ultra vires acts committed by each other through the approval, facilitation and/or execution of the transactions described herein at paragraphs 82-158, above, each defendant is liable for damages as set forth herein at paragraphs 166-176, above.

## G.    CIVIL CONSPIRACY

*236.*    Paragraphs 1 through 235 are re-alleged and reincorporated as though fully set forth herein.

*237.*    As officers and/or directors of Elk, each of Defendants Feinsod, Mullens and Feinstein entered into an agreement to transfer proceeds from the sale of Elk's investment in portfolio concerns secured by SBA Agreement, SBA Security Agreement, Intercreditor Agreement, Custodian Agreement and SBA's UCC Financing Statement, to Elk's non-custodian bank account at Signature Bank without required notice to the SBA or the Custodian and without transfer of proceeds of the sale of Elk's investment in portfolio concerns to the Custodian bank.

*238.*    As officers and/or directors of Elk, each of defendant Feinsod, Mullens and Feinstein also entered into an agreement to transfer proceeds from the sale of Elk's investment in portfolio concerns secured by SBA Agreement, SBA Security Agreement, Intercreditor Agreement, Custodian Agreement and SBA's UCC Financing Statement, without required notice to SBA or the Custodian, without transfer of proceeds of sale of Elk's investment in portfolio concerns to the Custodian Bank, to pay Elk's operating expenses and as an alleged financing and/or purported loan to Ameritrans which Ameritrans used to satisfy its creditors and to pay Ameritrans operating expenses to the detriment of Elk.

*239.*    The underlying torts include breach of fiduciary duty, aiding and abetting breach of fiduciary duty, ultra vires act, waste of corporate assets, conversion and negligence, which allegations are outlined in paragraphs 82 through 158, above.

57

*240.* Defendants Feinsod, Mullens and Feinstein committed multiple overt acts in furtherance of their agreement by failing to properly and timely notify SBA and the Custodian of the transfers of funds from Elk's sales of its investments in portfolio concerns, outlined in paragraphs 82 through 158, above, by (i) diverting the sales proceeds from Custodian Bank IDB and directing that the proceeds be deposited in Elk's account at non-custodian Signature Bank, which was not a party to the SBA Agreement, SBA Security Agreement, Intercreditor Agreement or Custodian Agreement, (ii) failing to provide notification of the proposed sales of Custodian Collateral to the Custodian or SBA prior to such sales as required by the Custodian Agreement; (iii) concealing from the SBA that the proceeds from the sales of the Custodian Collateral were used to pay Elk's operating expenses and improperly transferred to Elk's parent Ameritrans as an alleged financing and/or purported loan, which Ameritrans used to satisfy Ameritrans creditors and to pay Ameritrans operating expenses, without required notice to the Custodian and SBA and to the detriment of Elk.

*241.* Defendants Feinsod, Mullens and Feinstein committed multiple overt acts in furtherance of the agreements to subvert Elk's obligations relating to the SBA Agreement, SBA Security Agreement, Intercreditor Agreement, Custodian Agreement and SBA's UCC Financing Statement, directing that the proceeds from the sale of Elk's investment in portfolio concerns, described in paragraphs 82-158, above, to Elk's non-custodian bank account at Signature Bank and then to pay Elk's operating expense and as an alleged financing and/or purported loan to Ameritrans, which Ameritrans used to satisfy its creditors and to pay Ameritrans operating expenses to the detriment of Elk.

58

242.    Each of defendants Feinsod, Mullens and Feinstein intentionally participated in the furtherance of their plan and purpose of diverting funds from the Custodian IDB to Elk's non-custodian bank account at Signature Bank without required notice to the Custodian or the SBA, which intentional furtherance is evidenced by the emails by and between defendants Mullens, Feinsod and Feinstein, directing the sales proceeds from Elk's investment in portfolio concerns which were Custodian Collateral to non-custodian Signature Bank, without required notice to the Custodian or the SBA.

243.    Each of defendants Feinsod, Mullens and Feinstein intentionally participated in the furtherance of their plan and purpose of diverting funds from Elk to Ameritrans by directing the transfer of the sales proceeds from the sale of Elk's investment in portfolio concerns which were Custodian Collateral from Elk's account at non-custodian Signature Bank to pay Elk's operating expenses and as an alleged financing and/or purported loan, which Ameritrans used to satisfy Ameritrans creditors and to pay Ameritrans operating expenses, which intentional furtherance is evidence by the emails by and between defendants Mullens, Feinsod and Feinstein, directing the transfer of funds from Elk's non-custodian Signature bank to Ameritrans, to the detriment of Elk.

244.    Elk was damaged in the amount of $10,953,895.05, from defendants Feinsod, Mullens, and Feinstein's agreement to divert funds from the sales of Elk's investments in portfolio concerns which were Custodian Collateral, to non-custodian Signature Bank without required notice to the SBA and the Custodian and without transfer of proceeds of the sale of Elk's investments in portfolio concerns to the Custodian bank.

245.    As a consequence of each of defendants Feinsod, Mullens, and Feinstein

59

actions to further their agreement to divert the sales proceeds from Elk's investments in portfolio concerns which were Custodian Collateral, from Elk's custodian bank IDB to Elk's non-custodian account at Signature Bank, without required notice to the Custodian or the SBA that Custodian Collateral had been sold, and with continuing diversion for payment of Elk's operating expenses and as an alleged financing and/or purported loan to Ameritrans which Ameritrans used to pay its operating expenses and to pay its creditors, each of defendants Mullens, Feinsod and Feinstein is liable for damages to Elk in the amount of $10,953,895.05.

## H. GROSS NEGLIGENCE

*246.* Paragraphs 1 through 245 are re-alleged and reincorporated as though fully set forth herein.

*247.* As officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar repeatedly, systematically and improperly with willful and reckless indifference caused Elk's funds to be used for the benefit of Ameritrans and to the detriment of Elk despite the prohibition of such use of Elk's funds as stated in the Act and Regulations and Elk's Certificate of Incorporation.

*248.* By approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, in their capacities as officers and/or directors of Elk, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar with willful and reckless indifference failed to act in the best interest of Elk and affirmatively violated the Act and Regulations and Elk's Certificate of

Incorporation.

249.     By approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, in their capacities as officers and/or directors of Elk and in violation of the Act, the Regulations and Elk's Certificate of Incorporation, each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar with willful and reckless indifference and without exercising even slight care and acted in a grossly negligent manner causing Elk damages in the amount of $14,271,038.

250.     As a consequence of the willful and reckless indifference and gross negligence each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each defendant is liable for damages as set forth herein at paragraphs 166-176, above.

251.     As a consequence of the willful and reckless indifference and gross negligence each of defendants Feinsod, Feinstein, Mullens, Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar in approving, facilitating and/or executing the transactions described herein at paragraphs 82-158, above, each defendant is liable for punitive damages and attorney's fees.

## VI.     PRAYER FOR RELIEF

WHERFORE, the Receiver for Elk respectfully requests that this Court enter judgment against each of the Defendants and in favor of the Plaintiff Receiver for Elk as follows:

A.   As against Defendant Michael Feinsod up to the amount of $14,271,038, plus all applicable interest thereon;

B.   As against Defendant Silvia Mullens up to the amount of $14,271,038, plus all applicable interest thereon;

C.   As against Defendant Richard Feinstein up to the amount of $13,251,320.64, plus all applicable interest thereon;

D.   As against Defendant Gary Granoff up to the amount of $5,124,413, plus all applicable interest thereon;

E.   As against Defendant Steven Etra up to the amount of $14,271,038, plus all applicable interest thereon;

F.   As against Defendant John Laird up to the amount of $14,271,038, plus all applicable interest thereon;

G.   As against Defendant Ivan Wolpert up to the amount of $14,271,038, plus all applicable interest thereon;

H.   As against Defendant Howard Sommer up to the amount of $14,271,038, plus all applicable interest thereon;

I.   As against Defendant Murray Indick up to the amount of $1,845,145.76, plus all applicable interest thereon;

J.   As against Defendant Elliott Singer up to the amount of $13,886,492, plus all applicable interest thereon;

K.   As against Defendant Peter Boockvar up to the amount of $14,271,038, plus all applicable interest thereon; and

L.   As against all Defendants punitive damages and attorney's fees; and

M.   For any such other relief as the Court deems just and proper.

Dated: New York, New York
      June 14, 2017

Respectfully submitted,

U.S. SMALL BUSINESS ADMINISTRATION
Receiver for Elk Associates Funding Corp.

By: _____
Arlene M. Embrey, Trial Attorney
U.S. Small Business Administration
409 Third Street, S.W., Seventh Floor
Washington, D.C. 20416
Telephone: (202) 205-6976
Email: Arlene.embrey@sba.gov

GOTTESMAN, WOLGEL, FLYNN,
WEINBERG & LEE, P.C.

By: _____
Steven Weinberg, Esq.
11 Hanover Square, 4th Floor
New York, N.Y. 10005
Tel.: (212) 495-0100
Fax: (212) 480-9797
Email: sweinberg@gottesmanlaw.com

ALL-STATE LEGAL®
07181-BF • 07182-BL • 07183-GY • 07184-WH
800.222.0510 www.aslegal.com

*Index No.*          *Year 20*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

U.S. SMALL BUSINESS ADMINISTRATION AS RECEIVER OF ELK,
ASSOCIATES FUNDING CORP.

                       Plaintiff,

    - against -

MICHAEL FEINSOD, SILVIA MULLENS, RICHARD FEINSTEIN, GARRY GRANOFF,
ET AL,

                       Defendants.

COPY

# ORIGINAL COMPLAINT

GOTTESMAN, WOLGEL, FLYNN, WEINBERG & LEE, P.C.
A Professional Corporation Incorporated in the State of New York

*Attorneys for*

## USSBA as Receiver for Elk Associates

11 HANOVER SQUARE
NEW YORK, N.Y. 10005
TEL. NO. (212) 495-0100
FAX NO. (212) 480-9797

*Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, (1) the contentions contained in the annexed document are not frivolous and that (2) if the annexed document is an initiating pleading, (i) the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the matter or sharing in any fee earned therefrom and that (ii) if the matter involves potential claims for personal injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.*

*Dated:*....................................      Signature ...............................................................

                                Print Signer's Name...............................................

*Service of a copy of the within*                             *is hereby admitted.*

*Dated:*

                      ...........................................................................
                           *Attorney(s) for*

## PLEASE TAKE NOTICE

☐    *that the within is a (certified) true copy of a*
**NOTICE OF**   *entered in the office of the clerk of the within-named Court on*           *20*
**ENTRY**

☐    *that an Order of which the within is a true copy will be presented for settlement to the*
**NOTICE OF**   *Hon.*                       , *one of the judges of the within-named Court,*
**SETTLEMENT**   *at*
          *on*                *20*      *, at*           *M.*

*Check Applicable Box*

*Dated:*

             GOTTESMAN, WOLGEL, FLYNN, WEINBERG & LEE, P.C.
             A Professional Corporation Incorporated in the State of New York
        *Attorneys for*

*To:*
                                 11 HANOVER SQUARE
                               NEW YORK, N.Y. 10005