# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 17-CV-3586 (JFB)(AYS)

---

UNITED STATES SMALL BUSINESS ADMINISTRATION AS RECEIVER OF ELK ASSOCIATES FUNDING CORP.,

Plaintiff,

VERSUS

MICHAEL FEINSOD, SILVIA MULLENS, RICHARD FEINSTEIN, GARY GRANOFF, STEVEN ETRA, JOHN LAIRD, IVAN J. WOLPERT, HOWARD SOMMER, MURRAY INDICK, ELLIOTT SINGER, AND PETER BOOCKVAR,

Defendants.

---

**MEMORANDUM AND ORDER**
October 1, 2018

---

JOSEPH F. BIANCO, District Judge:

Plaintiff Elk Associates Funding Corporation ("Elk"), by and through its court-appointed receiver, the U.S. Small Business Administration ("the SBA," and as receiver for Elk, "plaintiff"), brings this action against former Elk officers and directors Michael Feinsod, Silvia Mullens, Richard Feinstein, Gary Granoff, Steven Etra, John Laird, Ivan J. Wolpert, Howard Sommer, Murray Indick, Elliott Singer, and Peter Boockvar (collectively, "defendants") for breach of fiduciary duty, *ultra vires* acts, waste of assets, conversion, negligence, aiding and abetting a breach of fiduciary duty, civil conspiracy, and gross negligence.

Presently before the Court are defendants' motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court grants the motions in part and denies the motions in part. More specifically, defendants' motions to dismiss are granted as to plaintiff's claim for aiding and abetting breach of fiduciary duty, and defendants Feinsod's, Feinstein's, and Mullens' motions to dismiss are granted as to plaintiff's claim for conspiracy. Defendants' motions to dismiss are denied in all other respects.

## I. BACKGROUND

### A. Facts

The Court takes the following facts from the complaint (ECF No. 1), unless indicated otherwise herein. The Court assumes these facts to be true in deciding the motion to

dismiss, and construes them in the light most favorable to plaintiff.

1. Regulatory Background

The Small Business Investment Act of 1958 ("SBIA"), 15 U.S.C. § 661 *et seq.* was enacted to stimulate the national economy by promoting small businesses in need of financing. 15 U.S.C. § 661. To that end, the SBIA authorizes the SBA to license small business investment companies ("SBICs") to invest in qualified small businesses. *Id.* § 681. The SBA then makes favorable loans to the SBICs for investment in the small businesses. *Id.* §§ 683, 685. SBICs also receive funding from private parties. (*See* Compl. ¶ 36.)

Section 687(c) of the SBIA authorizes the SBA to enact regulations governing SBICs. These regulations are codified at Title 13 of the Code of Federal Regulations, Part 107. The following two regulations are relevant to this action: 13 C.F.R. §§ 107.730 and 107.885. Section 107.730 prohibits an SBIC from self-dealing to its prejudice by providing financing to an associate[1] without a prior written exemption from the SBA. *Id.* § 107.730(a). However, it provides an exception for SBICs that receive an exemption from the U.S. Securities and Exchange Commission. *See id.* § 107.730(f). Those SBICs "need not obtain SBA's approval of the transaction[,] [h]owever, [they] must promptly notify SBA of the transaction and satisfy the public notice requirements." *Id.* Section 107.885 provides that, except with the SBA's prior written approval, an SBIC cannot dispose of assets to an associate if they have outstanding leverage.

The SBIA provides that the SBA may enforce its provisions and regulations by, among other things, suspending or revoking the SBIC's license, 15 U.S.C. § 687a, removing or suspending management, *id.* § 687e, or imposing monetary fines for failure to adhere to reporting requirements, *id.* § 687g. In addition, the SBA may also seek judicial intervention to "take exclusive jurisdiction of the licensee or licensees and the assets thereof," *id.* § 687c(b), and to appoint the SBA as "trustee or receiver of the licensee," *id.* § 687c(c).

2. The Parties

Elk, a New York corporation, became licensed as an SBIC on July 24, 1980. (Compl. ¶¶ 10, 26.) Elk's Certificate of Incorporation states that "[t]he corporation is organized and chartered solely for the purpose of performing the functions and conducting the activities contemplated under the Small Business Act of 1958, as amended from time to time." (*Id.* ¶ 27.)

Defendants are former officers and directors of Elk. Defendants Feinsod, Feinstein, and Mullens served as officers of Elk. (*Id.* ¶¶ 11-13.) Feinsod also served as a director of Elk, and Feinstein participated in Board of Director meetings. (*Id.* ¶¶ 11, 128.) Defendants Granoff, Etra, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar (collectively, "the Independent Director defendants") served as directors of Elk, but did not hold management roles. (*Id.* ¶¶ 14-21.)[2] Defendants, as Elk's officers and directors, were required to undergo a background check and submit a Statement of

[1] The terms "financing" and "associate" are defined at 13 C.F.R. § 107.50.

[2] The Court notes that Granoff served as an officer of Elk until July 2010, and then served as Managing Director of Elk until 2013. (Compl. ¶ 14.) However, for the purpose of this opinion, the Court considers Granoff as an independent director. *See infra* note 15.

Personal History (Form 182) to the SBA, in which defendants acknowledged that they were providing the information "for the purpose of determining [their] eligibility for the Small Business Investment Company Program." (*Id.* ¶¶ 29-30.)

3. Elk and the SBA

In September 1993, Elk received a loan from the SBA. (*Id.* ¶ 37.) In connection with the loan, Elk and the SBA entered into several agreements, which the complaint refers to as the "SBA Security Agreement," the "SBA Agreement," the "Intercreditor Agreement," and the "Custodian Agreement." (*Id.* ¶¶ 37-40, 44.)

The Custodian Agreement appointed Israel Discount Bank ("IDB") as custodian of Elk's assets for the benefit of the SBA and the other private lenders. (*Id.* ¶ 44.) Pursuant to the Custodian Agreement, Elk was required to assign and deliver to IDB "Custodian Collateral," including Elk's "notes, security agreements, financing statements, assignments of financing statements, and other instruments and securities." (*Id.* ¶¶ 45-46.) Elk had the discretion to sell its "interest in any note or other evidence of indebtedness," as long as it delivered to IDB a "written certification" that the net proceeds from such sale would be used immediately to pay down Elk's "Senior Indebtedness." (*Id.* ¶ 49.) However, in the event that Elk intended to use the net sale proceeds for another purpose, Elk was required to provide the SBA and the other lenders advance notice of the proposed sale and an opportunity to object. (*Id.* ¶¶ 49-50.)

4. Elk and Ameritrans

In 1998, Elk was reorganized as a wholly-owned subsidiary of Ameritrans Capital Corporation ("Ameritrans"). (*See id.* ¶ 60.) Ameritrans was not licensed as an SBIC, and, therefore, had "greater flexibility in its investment and lending business activities than the investment policies of Elk." (Decl. of Justin Shur in Supp. of Defs. Omnibus Mot. ("Shur Decl.") Ex. A at 9, ECF No. 47-2.)[3]

Elk sought approval from the SBA and the SEC to reorganize as a wholly-owned subsidiary under Ameritrans. (Compl. ¶ 61; Shur Decl. Exs. B-D.) In order to secure SEC approval, Elk and Ameritrans filed an application for an order granting certain exemptions from SEC regulations that might otherwise apply. (Shur Decl. Exs. B, C.) In the application, Elk and Ameritrans detailed how the corporations would be organized. Specifically, the application disclosed that Elk and Ameritrans would operate as "one company" (Shur Decl. Ex. C at 14); that "Ameritrans [would] engage directly and/or through its principal subsidiary [Elk] primarily in the business of making loans to small businesses" (*id.* at 5); and that the companies would share a Board of Directors (*id.* at 43).

The application also sought exemptions to allow the following transactions: (1) "making of loans or advances by any of Elk or any Future Subsidiary to Ameritrans or to any other of Elk or any Future Subsidiary," (*id.* at 18); (2) "lending of money or other property by Elk . . . to Ameritrans or another Subsidiary" (*id.* at 30); (3) "borrowing of money or other property by

[3] As discussed *infra*, in addition to the facts alleged in the complaint, the Court is permitted to consider on a motion to dismiss documents that are incorporated by reference in the complaint, documents that are "integral" to the complaint, and public disclosure documents filed with the SEC. *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). All non-complaint documents cited by the Court fall under these criteria.

Ameritrans from Elk" (*id.*); and (4) financial reporting by "Ameritrans, Elk, and Future . . . Subsidiaries . . . on a consolidated basis" (*id.* at 38-39).

The SBA approved Ameritrans' acquisition of Elk on September 21, 1999, after receiving confirmation that Elk's assets could not be used to collateralize any indebtedness to Ameritrans. (Compl. ¶¶ 61-67.) On December 7, 1999, the SEC granted the application for exemptions. (Shur Decl. Ex. D.)

Defendants, aside from Mullens and Feinstein, served as directors of Ameritrans (Feinstein participated in meetings). (Compl. ¶¶ 11, 13-21, 128.) Defendants, aside from Feinstein and Indick, were also shareholders of Ameritrans. (*Id.* ¶¶ 11-12, 14-18, 20-21.)

5. Financial Difficulties and Alleged Improper Transactions

Following the Great Recession, Elk and Ameritrans faced financial difficulties. (*See, e.g.*, *id.* ¶¶ 84-96.) Board of Director meeting minutes in 2009 reflect that Ameritrans, in particular, was suffering, and that the directors recognized that SBA funding was critical to Ameritrans' survival. (*See id.*) For example, minutes from a May 26, 2009 meeting indicate that defendant Sommer asked whether "it was correct that there were two scenarios for Ameritrans: (i) with SBA financing of Elk, Ameritrans would have various alternatives; or (ii) without SBA funding there was only an Ameritrans liquidation scenario" (*id.* ¶ 87), to which defendant Feinsod responded that, without an SBA leverage commitment, Ameritrans would look for merger opportunities before proceeding to liquidate (*id.* ¶ 88).

In September 2009, the SBA approved a commitment of $9,175,000 for Elk. (*Id.* ¶ 57.) Elk took the SBA funds in one draw in December 2009. (*Id.*) After learning that the SBA had approved additional funding for Elk, defendant Etra helped facilitate a private placement for Ameritrans. Elk issued approximately $3 million in notes ("the Etra-affiliated notes"), including $650,000 to Etra personally. (*Id.* ¶¶ 93-96; Decl. of Keith R. Murphy in Supp. of Etra Mot. ("Murphy Decl.") Ex. B, ECF No. 33-2.)

Starting in or around this time, in 2009, Ameritrans also received significant financial support from Elk, including through (1) Elk's payment of Ameritrans' expenses; (2) cash transfers; and (3) a $4.5 million board-approved loan. (*See* Compl. ¶¶ 82, 97-158.) More specifically, from 2009 until 2013, when the SBA took over as receiver, Elk paid $7,491,139 of Ameritrans' expenses and transferred Ameritrans $6,779,898 in cash (including the above-mentioned loan), ultimately depleting Elk's bank account to $17,415.85. (*Id.* ¶¶ 73, 82, 153.) These transactions form the bases of plaintiff's causes of action. Plaintiff alleges that defendants "repeatedly and improperly used Elk's funds to operate and conduct business for the benefit of Ameritrans and its shareholders" (*id.* ¶ 78) and gave Ameritrans over $14 million "for no consideration" (*id.* ¶ 82). Plaintiff alleges that Elk was insolvent as of December 31, 2010. (*Id.* ¶ 105.) The Court discusses each transaction in turn.

a. Alleged Improper Payment of Expenses

After Elk received SBA funding in 2009, Elk's payment of Ameritrans' expenses increased, while reimbursements from Ameritrans decreased. (*Id.* ¶ 97.) Elk's financial statements filed with the SBA ("Form 468s"), as well as Elk's general ledger, reflect that Ameritrans' liability to Elk grew from $418,595 in 2009 to $10,901,847 in 2012, the majority of the liabilities being unpaid expenses. (*Id.* ¶¶ 100-09.) In the last nine months of 2012, Elk also paid an additional $2,800,000 of Ameritrans' expenses without any reimbursement. (*Id.*

¶ 110.) Further, between April 1, 2013 and April 24, 2013, defendants "approved and/or caused Elk to pay an additional $226,043 of Ameritrans' expenses with no consideration." (*Id.* ¶ 153.) Ameritrans' last reimbursement to Elk was in 2011, for $38,000. (*Id.* ¶ 120.)

The Form 468s, which reported the amount "Due From Parent," were certified by defendants Feinstein and Mullens, and were reviewed and approved by the other defendants. (*See, e.g.*, *id.* ¶ 106; Shur Decl. Exs. P, T.) Ameritrans' Form 10-K filings with the SEC in 2010, 2011, and 2012, which reported that Ameritrans had not operated at a profit in recent years and anticipated incurring a loss in the next year, were also approved by the Board of Directors. (Compl. ¶¶ 112-17.)

b. Alleged Improper Loan and Cash Transfers

Elk also transferred cash directly to Ameritrans to pay Ameritrans' debts. (*Id.* ¶ 121.) The alleged improper transfers started in early 2012, and reached $6,779,898 by April 2013. (*Id.*) The complaint connects the alleged improper cash transfers to two events.

First, in January 2012, Ameritrans' bank account balance fell to approximately $15,000. (*Id.* ¶ 124.) This constituted an "event of default" under a loan agreement between Ameritrans and Columbus Nova, Ltd. ("CN"), causing CN to notify Ameritrans that its $1.5 million loan was immediately due and payable. (*Id.* ¶¶ 123-24.)

Second, on February 24, 2012, the SBA informed Elk by telephone that, as a result of Elk's "capital impairment" (as defined in 13 C.F.R. § 107.1830), the SBA was transferring Elk to its Office of Liquidation. (*Id.* ¶ 125.) The SBA memorialized its call to Elk in a letter dated March 6, 2012, stating that "Licensee is hereby directed to cure its condition of Capital Impairment to SBA's satisfaction within 15 days from the date of this letter." (*Id.*)

On February 24, 2012, the Board of Directors (including Feinstein) held a "Special Meeting of the Board of Directors of Ameritrans and Elk," during which the directors discussed, among other things, the SBA's referral of Elk to its Office of Liquidation and the CN and Etra-affiliated loans. (Compl. ¶ 128; Shur Decl. Ex. K.) At the end of the meeting, the boards passed a resolution approving a $4.5 million loan from Elk to Ameritrans. (Compl. ¶ 128; Shur Decl. Ex. K.) Etra recused himself from the discussion of the Etra-affiliated loans, as well as the vote. (*See* Shur Decl. Ex. K.)

Following the February 24, 2012 board meeting, defendants Feinsod, Feinstein, and Mullens facilitated cash transfers from the sale of Elk assets to Ameritrans. (*E.g.*, Compl. ¶¶ 129-32.) The majority of the cash transferred from Elk to Ameritrans came from the sale of Elk's investments that had been made with SBA funds. (*Id.* ¶ 122.) Instead of depositing the cash with IDB (as required under the Custodian Agreement), the cash was wired to a different Elk bank account, and then to Ameritrans, without the required notice to the SBA or Elk's other lenders. (*Id.* ¶¶ 129-38, 140-52.)[4] Defendants continued to transfer cash from Elk to Ameritrans into 2013, when the SBA took over as receiver. (*See id.*) Plaintiff alleges that the transfers were made "for no consideration" (*id.* ¶ 127), and "despite [defendants'] knowledge that Ameritrans did

[4] The Etra-affiliated notes were repaid with the transferred cash on March 19, 2012. (Compl. ¶ 135.)

not have the funds to repay Elk" (*id.* ¶ 126; *see also id.* ¶ 155).

6. 2012 Elk Lawsuit and Settlement

On March 20, 2012, in the midst of the alleged improper cash transfers and one day before the March 21, 2012 deadline for Elk to cure its capital impairment, Elk moved for an emergency temporary restraining order against the SBA in the U.S. District Court for the District of Columbia, to stall the SBA's transfer of Elk to the Office of Liquidation. (*Id.* ¶ 137.) The basis of Elk's lawsuit was that the SBA violated the Administrative Procedure Act by rejecting certain transactions proposed by Elk that would have recapitalized Elk and prevented Ameritrans' event of default on the CN notes. *See* Compl., *Elk Assocs. Funding Corp. v. SBA*, No. 12-CV-0438 (CKK) (D.D.C. Mar. 20, 2012).

Elk and the SBA settled the lawsuit on October 31, 2012. (Shur Decl. Ex. N.) Pursuant to the settlement agreement, Elk voluntarily surrendered its SBIC license, and, in return, the SBA agreed to accept a discounted amount of $7,900,000 from Elk in satisfaction of Elk's debt to the SBA. (*Id.* ¶¶ 1-3.) In addition Elk agreed that, in the event it did not timely repay the SBA, the SBA would be entitled to put Elk into receivership. (*Id.* ¶ 4.)

The settlement agreement also contained the following release:

> SBA, on behalf of itself and its successors and assigns, predecessors, officers, officials and its present and former employees and agents, in their official capacities only (collectively, the "SBA Releasors"), hereby releases and forever discharges ELK, its successors and assigns, predecessors, shareholders, officers, directors, representatives, agents, and employees (collectively, the "Elk Releasees") from any and all actions, causes of action, claims, rights, and demands of every kind of nature, in law or equity, whether known or unknown, suspected or unsuspected, which the SBIA Releasors now have, may have or has ever had against any against any Elk Releasee, from the beginning of the world to [October 31, 2012].

(*Id.* ¶ 6.)

7. 2013 Receivership Action

Elk failed to timely pay the SBA the $7,900,000 due under the settlement agreement. (Compl. ¶¶ 3, 68.) Accordingly, on February 14, 2013, the SBA filed a complaint in this Court seeking its appointment as receiver of Elk. (*Id.*); *see also* Compl., *United States v. Elk Assocs. Funding Corp.*, No. 13-CV-1326 (JFB)(GRB) (E.D.N.Y. Feb. 14, 2013) ("the receivership action"). By Order dated April 24, 2013, the Court appointed the SBA as receiver of Elk pursuant to 15 U.S.C. § 687c, and entered judgment in favor of the SBA for the amount of the loans outstanding, which totaled over $20 million. (Compl. ¶ 69); Consent Order Appointing SBA as Receiver of Elk, *United States v. Elk Assocs. Funding Corp.*, No. 13-CV-1326 (JFB)(GRB) (E.D.N.Y. Apr. 24, 2013).[5]

8. 2016 Ameritrans Bankruptcy

On October 5, 2016, Ameritrans filed for bankruptcy in the U.S. Bankruptcy Court for the District of Massachusetts. (Compl. ¶ 79.) Plaintiff filed a proof of claim for $12,339,927 with the bankruptcy court on

[5] At the time of the April 24, 2013 Order, the receivership action was assigned to District Judge Leonard D. Wexler. The receivership action was reassigned to the undersigned on April 4, 2018.

January 20, 2017. (*Id.*)[6] On June 2, 2017, after determining that an additional $1,931,111 of Elk's funds had been used to pay Ameritrans' expenses, plaintiff filed an amended proof of claim for $14,271,038. (*Id.* ¶¶ 79-80.)

9. Pending Action

In 2016 and 2017, plaintiff made demands on defendants for "damages suffered by Elk as a consequence of [defendant's alleged] actions in approving, facilitating and/or executing the actions and transactions described [in the complaint]." (*Id.* ¶¶ 159-76.)

By Order dated November 21, 2016, the receivership action court lifted the stay and injunction imposed by the receivership order for the limited purpose of authorizing plaintiff to bring this action. (*Id.* ¶ 9.); Order Partially Lifting Judicial Stay, *United States v. Elk Assocs. Funding Corp.*, No. 13-CV-1326 (JFB)(GRB) (E.D.N.Y. Nov. 21, 2016).

B. Procedural History

Plaintiff filed the complaint in this action on June 14, 2017. (ECF No. 1.) The case was assigned to District Judge Sandra J. Feuerstein. On October 6, 2017, pursuant to Judge Feuerstein's Individual Rules, the parties filed fully submitted motions to dismiss. (ECF Nos. 31-53.)[7] On November 6, 2017, this action was reassigned to District Judge Leonard D. Wexler, on the basis that it is related to the receivership action. On April 4, 2018, both actions were reassigned to the undersigned. The Court held oral argument on the motions to dismiss on September 24, 2018. The Court has considered all of the parties' arguments and submissions.

## II. Standard of Review

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for deciding motions to dismiss. 556 U.S. 662, 678-80 (2009). Specifically, the

[6] Plaintiff had made a demand on Ameritrans for $12,339,927 on October 2, 2015, which Ameritrans did not pay. (Compl. ¶ 75.)

[7] Defendants submitted five motions to dismiss: (1) Defendants Feinsod and Feinstein submitted a joint motion to dismiss (the "Omnibus Motion"), which all defendants incorporated by reference in their respective motions; (2) Defendants Laird, Wolpert, Sommer, Indick, Singer, and Boockvar submitted a joint motion to dismiss, which was joined by defendants Granoff and Etra; (3) Mullens submitted a separate motion to dismiss, which was incorporated by reference as to defendant Feinstein in the Omnibus Motion; (4) Granoff submitted a separate motion to dismiss; and (5) Etra submitted a separate motion to dismiss. Plaintiff separately opposed each motion, incorporating by reference its opposition to defendants' Omnibus Motion in each opposition brief, as well as incorporating by reference its opposition to the Independent Director defendants', Mullens', Granoff's, and Etra's briefs in its opposition to the Omnibus Motion.

Supreme Court instructed district courts to first "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

The Court notes that, in adjudicating this motion to dismiss, it may consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

## III. Discussion

### A. Applicable Law

As an initial matter, the parties dispute to what extent the Court can rely on defendants' alleged violation of the SBIA and its regulations to support plaintiff's claims.

As noted, plaintiff brings causes of action for breach of fiduciary duty, *ultra vires* acts, waste of assets, conversion, negligence, aiding and abetting a breach of fiduciary duty, civil conspiracy, and gross negligence. The parties agree that plaintiff's claims are governed by New York law in the first instance. Plaintiff, however, references defendants' alleged violations of the SBIA throughout its complaint, and appears to argue that such violations give rise to defendants' liability in this action. In particular, plaintiff asserts that Section 687f of the SBIA establishes that defendants are personally liable for their violations of the SBIA and its regulations, and that defendants owe fiduciary duties to Elk. To the extent that plaintiff contends that the alleged SBIA violations (by themselves) establish liability, the Court rejects that assertion.

There is no private right of action for a violation of the SBIA or its regulations. *United States v. Fid. Capital Corp.*, 920 F.2d 827, 838 n.39 (11th Cir. 1991) (citing *Goodall v. Columbia Ventures, Inc.*, 374 F. Supp. 1324, 1330-31 (S.D.N.Y. 1974)). Instead, Congress provided that the SBIA would be enforced by the SBA, and delineated specific remedies under the statute (e.g., revocation of an SBIC license, 15 U.S.C. § 687a, or removal or suspension of management, *id.* § 687e). Accordingly, although defendants' alleged violations of the SBIA and its regulations might be relevant for purposes of establishing that defendants committed the asserted torts, a "violation of the[] regulations, in and of themselves, does not give rise to liability." *SBA v. Echevarria*, 864 F. Supp. 1254, 1260 (S.D. Fla. 1994).

The Court also disagrees with plaintiff's argument that the SBIA establishes that defendants owed fiduciary duties to Elk. As written, Section 687f simply provides that it is unlawful under the SBIA to breach one's fiduciary duty. *See* 15 U.S.C. § 687f(b) ("It

shall be unlawful for any officer [or] director . . . to engage in any act or practice, or to omit any act, in breach of his fiduciary duty as such officer [or] director."). It does not purport to create fiduciary duties that do not otherwise exist under state law, and the Court "decline[s the] invitation to read into [New York] law greater rights and remedies than the Federal scheme provides." *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 603 N.E.2d 246, 248 (N.Y. 1992) (holding loan agreement that violated SBIA regulations enforceable).

Accordingly, the Court will now address whether plaintiff has plausibly stated that defendants committed the alleged torts under New York state law.[8]

B. Breach of Fiduciary Duty

1. Applicable law

In general, officers and directors owe fiduciary duties, including a duty of loyalty and a duty of care, to a corporation and its shareholders. *E.g.*, *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984); *RSL Commc'ns PLC ex rel. Jervis v. Bildirici*, No. 04-CV-5217 (KMK), 2006 WL 2689869, at *4 (S.D.N.Y. Sept. 14, 2006). "The duty of loyalty[] derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *Norlin Corp.*, 744 F.2d at 264 (citing *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939)). Under New York law, "[d]irectors are self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to shareholders generally." *Marx v. Akers*, 666 N.E.2d 1034, 1042 (N.Y. 1996). The duty of care requires officers and directors to perform their duties "in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Bus. Corp. Law §§ 715(h) (officers), 717(a) (directors).

New York's business judgment rule "creates a presumption that directors of a company act in good faith and in the best interests of the corporation." *In re Sabine Oil & Gas Corp.*, 562 B.R. 211, 231 (S.D.N.Y. 2016). The business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach v. Bennett*, 393 N.E.2d 994, 1000 (N.Y. 1979); *accord In re Kenneth Cole Prods., Inc.*, 52 N.E.3d 214, 218 (N.Y. 2016) ("[W]here corporate officers or directors exercise unbiased judgment in determining that certain actions will promote the corporation's interests, courts will defer to those determinations if they were made in good faith."). This rule, however, "will not protect a decision that was the product of fraud, self-dealing, or bad faith." *Patrick v. Allen*, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005). Moreover, "to earn the protection of the business judgment rule, directors must do more than merely avoid fraud, bad faith, and self-dealing." *In re 1st Rochdale Co-op Grp., Ltd.*, No. 07 Civ. 7852(DC), 2008 WL 170410, at *1 (S.D.N.Y. Jan. 17, 2008) (citing *Hanson Tr. PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274 (2d Cir. 1986)). Officers and directors are also "held to a standard of due care," and "[t]hey must meet this standard with 'conscientious fairness.'" *Hanson Tr.*, 781 F.2d at 274

[8] Defendants urge the Court to look to Delaware law for guidance in interpreting New York law. *See, e.g.*, *In re Kenneth Cole Prods., Inc.*, 52 N.E.3d 214 (N.Y. 2016) (adopting standard of review for going-private transactions that had recently been announced by the Delaware Supreme Court). As a threshold matter, as discussed *infra*, New York law is sufficiently developed on these issues such that reference to Delaware law is unnecessary. In any event, and also discussed *infra*, Delaware law would not yield a different result under the allegations in this case.

(quoting *Alpert v. 28 Williams St. Corp.*, 473 N.E.2d 19, 26 (N.Y. 1984)). The "duty of due care requires that a director's decision be made on the basis of 'reasonable diligence' in gathering and considering material information." *Id.* In other words, "while directors are protected to the extent that their actions evidence their business *judgment*, such protection assumes that courts must not reflexively decline to consider the content of their 'judgment' and the extent of the information on which it is based." *Id.* at 275.

2. Analysis

Defendants argue that plaintiff's breach of fiduciary duty claim fails because defendants did not owe a duty to Elk and, in the alternative, because defendants are protected under the business judgment rule. The Independent Director defendants further assert that plaintiff's allegations are insufficient to establish the Independent Director defendants' involvement in the allocation of expenses and cash transfers. Defendants Mullen, Granoff, Etra, and Feinsod also make specific arguments as to their involvement. For the reasons that follow, the Court concludes that defendants owed a duty to Elk once it is alleged to have been rendered insolvent, and that plaintiff's allegations are sufficient to plausibly rebut the business judgment rule at this stage of the litigation.

a. Duty

As noted, "[d]irectors and officers typically owe fiduciary duties to a corporation and its shareholders." *RSL Commc'ns PLC*, 2006 WL 2689869, at *4. Where, as here, a corporation is a wholly-owned subsidiary, its directors and officers owe their fiduciary duties to the parent corporation. *E.g.*, *RSL Commc'ns PLC v. Bildirici*, 649 F. Supp. 2d 184, 201 (S.D.N.Y. 2009) (explaining that fiduciary duties "operate to the benefit of the corporation's owners" and that, "[i]n the context of a wholly-owned subsidiary, . . . the relevant 'owner' is the firm's parent"); *see also In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 180 n.15 (S.D.N.Y. 2014) ("[T]he general rule is that directors and officers of a wholly owned subsidiary . . . owe fiduciary duties only to the parent corporation, not to the subsidiary.").

However, "once a corporation is insolvent, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of the creditors." *Teras Int'l Corp. v. Gimbel*, No. 13-CV-6788 (VEC), 2014 WL 7177972, at *11 (S.D.N.Y. Dec. 17, 2014) (citing *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 729 N.E.2d 683, 688 (N.Y. 2000)); *see also, e.g.*, *In re Magnesium Corp. of Am.*, 399 B.R. 722, 773 (Bankr. S.D.N.Y. 2009) ("[W]hile officers and directors of subsidiaries may legitimately advance the interests of the corporate parent when the subsidiaries are not insolvent, they may no longer do so when the subsidiaries are insolvent, or would be rendered insolvent by the contemplated action."); *In re Scott Acquisition Corp.*, 344 B.R. 283, 290 (Bankr. D. Del. 2006) (Under Delaware law, "upon insolvency directors of a wholly-owned subsidiary owe fiduciary duties to the subsidiary and its creditors."). New York courts refer to this principle as the "'trust fund doctrine,' by virtue of which the officers and directors of an insolvent corporation are said to hold the remaining corporate assets in trust for the benefit of its general creditors." *Credit Agricole*, 729 N.E.2d at 688.

Here, whether defendants owed a duty to Elk is complicated by the fact that plaintiff alleges that Elk was insolvent by December

31, 2010. (Compl. ¶ 105.)[9] The Court agrees with defendants that, prior to December 31, 2010, defendants owed fiduciary duties to Ameritrans, and, accordingly, that plaintiff has failed to state a claim for breach of fiduciary duty for any actions taken by defendants in the interest of Ameritrans up until that date. Once Elk became insolvent, however, defendants' fiduciary duties shifted to "preserv[ing] the assets of [Elk] for the benefit of creditors." *RSL Commcn's*, 649 F. Supp. 2d at 202 (quoting *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006)).

Defendants argue that, even assuming Elk was insolvent, plaintiff's breach of fiduciary duty claim fails because defendants owed duties to Elk's creditors, and not Elk. The Court disagrees. In short, although defendants' duties shifted to preserving Elk's assets for its creditors, the breach of fiduciary claim belongs to the corporation (Elk), and plaintiff is the proper party to bring this action. *See, e.g.*, *Teras Int'l Corp.*, 2014 WL 7177972, at *12 (concluding insolvent corporations "can sue their officers and directors for breach of fiduciary duty"); *In re Magnesium Corp. of Am.*, 399 B.R. at 773-74 ("[T]he Court rejects the contention that claims of breach of fiduciary duty belong to the creditors, and not to the representative of the corporation whom those officers and directors served."); *c.f. N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) ("[I]ndividual *creditors* of an *insolvent* corporation have *no right to assert direct* claims for breach of fiduciary duty against corporate directors.").[10] Thus, the SBA may

[9] Defendants argue that plaintiff's allegation that Elk was insolvent by December 31, 2010 is a "bare assertion of a legal conclusion" and, therefore, "is insufficient to plead insolvency." (Defs. Omnibus Reply 11, ECF No. 52.) The Court disagrees, and concludes that whether Elk was insolvent is a question of fact that cannot be resolved at this stage. *See, e.g.*, *In re Tronox Inc.*, 450 B.R. 432, 439 (Bankr. S.D.N.Y. 2011) ("The real dispute is the factual question whether Tronox was insolvent or undercapitalized following the IPO. Since the insolvency of Tronox is a hotly contested factual question, it follows that this branch of the motion to dismiss must be denied."); *In re Die Fliedermaus* LLC, 323 B.R. 101, 106-07 (Bankr. S.D.N.Y. 2005) (finding issue of insolvency "a question of fact" and allegations that debtor was insolvent "adequate pleading"). Accordingly, the Court concludes that plaintiff's allegation that Elk was insolvent by December 31, 2010 (Compl. ¶ 105), considered with plaintiff's other allegations regarding Elk's financial condition (*see, e.g.*, *id.* ¶¶ 68-69, 97, 102-10, 120-22), is sufficient for purposes of Federal Rule of Civil Procedure 8(a) to put defendants on notice regarding Elk's alleged insolvency, and to survive a motion to dismiss. Although plaintiff's counsel asserted at oral argument that it had expert discovery that supported that Elk was insolvent by December 31, 2010, the Court did not consider that assertion in determining that the complaint sufficiently alleges insolvency.

[10] As noted in *Teras International Corp.*, in order to have standing, plaintiff must assert injuries suffered by Elk that are distinct from the injuries suffered by its creditors. 2014 WL 7177972, at *7-8. The parties did not brief this issue. However, similar to *Teras International Corp.*, plaintiff has alleged injuries that are distinct from the injuries suffered by creditors. *See, e.g.*, *id.* at *7 (finding assignee for subsidiary Yick Bo had standing to pursue breach of fiduciary duty and reimbursement claims based on the following analysis: "Yick Bo [subsidiary] purchased merchandise (apparently both in cash and on credit) and transmitted the merchandise to Worldwide Dreams [parent]; Worldwide Dreams neither paid Yick Bo for the cost of the merchandise nor paid its commissions. . . . Until Worldwide Dreams pays what it owes to Yick Bo, Yick Bo has approximately $15 million less than it otherwise would; this constitutes a clear injury-in-fact. The fact that Yick Bo, a debtor, might ultimately owe some or all of its recovery to its creditors is irrelevant to the standing inquiry. To paraphrase the Court in *APCC Services*, if Teras prevails in this litigation, the Defendants would write a check to it for the amount they owe. What does it matter what Teras does with the money? *APCC Servs.*, 554 U.S. at 287." (internal citations omitted)).

pursue this action not as a creditor, but rather as receiver for Elk.[11]

b. Breach of Duty and Application of Business Judgment Rule

Having concluded that plaintiff can assert a breach of fiduciary duty claim against defendants for their actions after December 31, 2010, the Court turns to defendants' alternative argument—that defendants are insulated from liability by the business judgment rule.

As noted, the business judgment rule "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach*, 393 N.E.2d at 1000. However, defendants' decisions are not protected by the business judgment rule if they were the product of fraud, bad faith, self-dealing, or lack of due care. *In re 1st Rochdale Co-op Grp., Ltd.*, 2008 WL 170410, at *1.

The Court concludes that the complaint sufficiently pleads around the business judgment rule. Plaintiff alleges that defendants breached their fiduciary duties to Elk by causing Elk to enter into the alleged unlawful transactions (paying over $7 million of Ameritrans' expenses, issuing the $4.5 million loan to Ameritrans, and transferring additional cash to Ameritrans) for no consideration; aware that Ameritrans could not repay Elk; and for the improper purpose of using Elk's assets to pay Ameritrans' expenses and debts before Elk faced liquidation by the SBA, all of which wrongly "put the interests of Ameritrans and of themselves ahead of the interest of Elk to the financial detriment of Elk." (Compl. ¶ 193; *see also id.* ¶¶ 82, 87, 111-17, 120-27, 137-38, 153-57, 192.) These allegations are sufficient to plausibly allege that defendants lacked good faith as to Elk and acted with the improper purpose of paying Ameritrans' expenses and debts, and, therefore, are sufficient to rebut the business judgment rule at this juncture.[12]

Defendants argue that Elk's payment of Ameritrans' expenses does not suggest bad faith because Elk and Ameritrans operated as "one company," with "shared 'administrative costs,'" and "Elk did not simply gift Ameritrans these amounts—it accounted for them as debt Ameritrans was to repay to Elk once it was able." (Defs. Omnibus Mot. 15, ECF No. 47-1.) However, defendants overlook the fact that, once Elk became insolvent, defendants' duties shifted to preserving Elk's assets for the benefit of its creditors. *See In re Magnesium Corp. of Am.*, 399 B.R. at 773 (When subsidiary is insolvent, its officers and directors "must then look to the needs and concerns of the

---

[11] Defendants argue that the settlement agreement entered into between the SBA and Elk in connection with Elk's lawsuit in 2012 precludes the SBA from pursuing this action. However, because the SBA is bringing this action in its role as receiver for Elk, the terms and conditions of the settlement agreement do not apply here. Accordingly, defendants' motions to dismiss based upon the settlement agreement are denied.

[12] Defendants point out that Elk's Certificate of Incorporation "provide[s] for indemnification of the officers and directors of [Elk] to the fullest extent permissible under the Business Corporation Law of New York." (Shur Decl. Ex. Q.) New York Business Corporation Law § 402(b) provides that "[t]he certificate of incorporation may set forth a provision eliminating or limiting the personal liability of directors to the corporation or its shareholders for damages for any breach of duty in such capacity," aside from "bad faith," "intentional misconduct," "a knowing violation of law," or self-dealing. N.Y. Bus. Corp. Law § 402(b)(1). Accordingly, even assuming that a provision providing for indemnification (as opposed to limiting liability) could exculpate defendants at this stage of the litigation, and assuming that it applies to officers as well as directors, it would not alter the Court's conclusion given that the Court concludes that plaintiff has plausibly alleged bad faith.

subsidiaries . . . , and must take into account, in any corporate decision-making, the fact that creditors will have a superior claim to corporate assets."). Accordingly, defendants cannot simply rely on Elk's and Ameritrans' corporate structure to avoid liability, particularly where, as here, the allegations indicate that Elk began paying a disproportionate share of the expenses. Moreover, how defendants accounted for the payments is not dispositive; the complaint plausibly alleges that defendants knew that Ameritrans could not reimburse Elk, as supported by the alleged facts that Ameritrans was dependent on Elk's receipt of SBA funding in 2009; Ameritrans' financial condition continued to decline each year thereafter; and Ameritrans' last reimbursement to Elk was in 2011, for only $38,000. (Compl. ¶¶ 82-91, 97, 100-17, 120.)[13]

The Independent Director defendants separately argue that the complaint fails to allege that they were involved with the allocation of expenses. The Court disagrees. The complaint alleges that all defendants, including the Independent Director defendants, "approved and/or caused Elk to pay $7,491,139 of Ameritrans' expenses." (*E.g.*, *id.* ¶ 82.) Moreover, the Form 468s, which documented the amount due to Elk from Ameritrans, state that the Elk board "reviewed and approved" those financial reports. (Shur Decl. Exs. P, T.) Accepting the allegations in the complaint as true, and drawing all reasonable inferences in plaintiff's favor, plaintiff has plausibly alleged the Independent Director defendants' involvement in Elk's payment of Ameritrans' expenses, and, for the reasons just discussed, these allegations are sufficient to withstand the Independent Director defendants' motions to dismiss.

With respect to the cash transfers, defendants claim that plaintiff "does not explain what those transfers were, much less how they show bad faith." (Defs. Omnibus Mot. 16.) To the contrary, the complaint alleges that defendants caused Elk to transfer cash generated from the sale of identified Elk assets to Ameritrans, bypassing the Custodian Account, and receiving no consideration in return. (Compl. ¶¶ 126, 127, 140-52.) Further, defendants allegedly started transferring the cash after learning that the SBA was going to move Elk to its Office of Liquidation, and the transfers continued up until SBA was named as receiver. (*Id.* ¶¶ 125, 140-52.) Thus, in essence, plaintiff contends that defendants' actions are "explicable only by bad faith."[14] *KDW Restructuring & Liquidation Servs.*

---

[13] The Court also notes that the complaint alleges that defendants misrepresented Ameritrans' debt as a "current asset," payable within one year. (Compl. ¶ 111.)

[14] The Court notes that, although plaintiff does not use the phrase "bad faith" in the complaint, it is clear that the complaint, in essence, is alleging bad faith based upon the alleged lack of legitimate corporate purpose for the transactions at issue. In fact, at oral argument, plaintiff's counsel equated the actions of the defendants to "setting Elk's money on fire." Thus, whether characterized as "bad faith" or as actions lacking any legitimate business purpose for Elk, the allegations themselves are sufficient for the claim to overcome the business judgment rule for purposes of a motion to dismiss. *See Hanson Tr.*, 781 F.2d at 274 ("[T]he exercise of fiduciary duties by a corporate board member includes more than avoiding fraud, bad faith and self-dealing. Directors must exercise their 'honest judgment in the lawful and legitimate furtherance of corporate purposes.'" (quoting *Auerbach*, 393 N.E.2d at 1000)); *40 W. 67th St. v. Pullman*, 790 N.E.2d 1174, 1180 (N.Y. 2003) ("Despite this deferential standard, there are instances when courts should undertake review of board decisions. To trigger further judicial scrutiny, an aggrieved shareholder-tenant must make a showing that the board acted (1) outside the scope of its authority, (2) in a way that did not legitimately further the corporate purposes or (3) in bad faith."); *M&M Country Store, Inc. v. Kelly*, 159 A.D.3d 1102, 1103 (3d Dep't 2018) ("To be sure, under the business judgment rule, courts defer to the determinations of

*LLC v. Greenfield*, 874 F. Supp. 2d 213, 226 (S.D.N.Y. 2012) (quoting *In re Tower Air, Inc.*, 416 F.3d 229, 241 (3d Cir. 2005)).[15]

Finally, defendants assert that the business judgment rule bars plaintiff's breach of fiduciary duty claim with respect to the intercompany loan. More specifically, defendants argue that the special board meeting where the directors approved the loan demonstrates that defendants acted in good faith and with adequate process, and that any arguments to the contrary constitute improper second-guessing of their business decision.

The Court disagrees that plaintiff's claim regarding the intercompany loan is barred by the business judgment rule at this juncture. This is not a situation where plaintiff, in hindsight, is simply second-guessing defendants' good faith business judgments as to Elk. Instead, the complaint alleges that, at the time defendants approved the loan, defendants acted with the improper purpose of paying Ameritrans' debts before Elk's assets were liquidated by the SBA, while aware that Ameritrans could not repay Elk. (*See, e.g.*, Compl. ¶¶ 125-28, 155.) In other words, accepting the facts in the complaint as true, and drawing all reasonable inferences in plaintiff's favor, plaintiff has plausibly alleged that the loan did not further any legitimate business purpose for Elk.

The Court notes that defendants cite portions of the board minutes that state that defendants considered, among other things, whether the loan was in the best interest of Elk and its stakeholders and whether Ameritrans' collateral was sufficient to repay the loan. However, at the motion to dismiss stage, the procedures and methodologies reflected in the board minutes are not dispositive as to whether the business judgment rule would cover defendants' decision in this case. *See RSL Commc'ns PLC*, 2006 WL 2689869, at *6 ("[W]here the directors' 'methodologies and procedures are so restricted in scope, so shallow in execution, or otherwise so *pro forma* or halfhearted as to constitute a pretext or a sham, . . . inquiry into their acts is not shielded by the business judgment rule.'" (quoting *Hanson Tr.*, 781 F.3d at 274)); *see also F.D.I.C. v. Abel*, No. 92 Civ. 9175 (JFK), 1995 WL 716729, at *8 (S.D.N.Y. Dec. 6, 1995) (declining to grant motion to dismiss under business judgment rule).

---

directors and officers as to the best interests of the corporations that they serve, and do not inquire further into their actions in the absence of bad faith or fraud. However, this rule will not insulate a director or officer from liability where his or her actions lack a legitimate and lawful business purpose and waste corporate assets." (citations omitted)). To the extent that New York courts look to Delaware law for additional guidance on this question, Delaware law would not produce a different result. *See Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) ("Bad faith . . . may be shown where 'the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of known duty to act, demonstrating a conscious disregard for his duties.' Additionally, other examples of bad faith might exist. These examples include any action that demonstrates a faithlessness or lack of true devotion to the interests of the corporation and its shareholders." (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006))).

[15] The Independent Director defendants also argue that the complaint fails to allege that they were involved in the cash transfers. However, given that the Court concludes that plaintiff has plausibly stated a breach of fiduciary duty claim against the Independent Director defendants in connection with the expense payments and/or intercompany loan, the Court need not address the adequacy of the pleading with respect to these additional allegations regarding the cash transfers. For the same reason, the Court also declines to dismiss plaintiff's claims against defendants Etra, Indick, and Granoff, given their alleged involvement in the improper payment of Ameritrans' expenses, without addressing the sufficiency of the pleading as to each of them regarding the other transactions.

Accordingly, the Court is unable to conclude as a matter of law that the special board meeting minutes establish that defendants were acting in good faith as to Elk such that they are insulated by the business judgment rule. *See Ackerman v. 305 E. 40th Owners Corp.*, 592 N.Y.S.2d 365, 367 (1st Dep't 1993) ("Pre-discovery dismissal of pleadings in the name of the business judgment rule is inappropriate where those pleadings suggest that the directors did not act in good faith.").[16]

In sum, after accepting the facts in the allegations as true, and drawing all reasonable inferences in plaintiff's favor, the Court concludes that plaintiff has plausibly alleged that defendants' actions lacked good faith and legitimate corporate purpose as to Elk, sufficient to plausibly rebut the business judgment rule. Accordingly, defendants' motions to dismiss plaintiff's claim for breach of fiduciary duty are denied.[17] The Court notes, however, that its determination that plaintiff has plausibly rebutted the business judgment rule is without prejudice to defendants raising this defense in the context of a summary judgment motion at the close of discovery.

C. *Ultra Vires* Acts

Plaintiff alleges that defendants committed *ultra vires* acts because the three transactions discussed herein constituted violations of the SBIA and its regulations, which, in turn, constituted a violation of Elk's Certificate of Incorporation. More specifically, plaintiff alleges that defendants violated SBIA regulations 13 C.F.R. §§ 107.730 and 107.885. As noted, Section 107.730 prohibits an SBIC from self-dealing to its prejudice by providing financing to an associate without the SBA's prior written approval. *Id.* § 107.730(a). Section 107.885 provides that, except with the SBA's prior written approval, an SBIC cannot dispose of assets to an associate if they have outstanding leverage.

The parties seem to agree that plaintiff's *ultra vires* claim is governed by New York Business Corporation Law § 203, which states, in relevant part, that "the fact that the corporation was without capacity or power to do [an] act . . . may be asserted . . . [in] an action by or in the right of the corporation to procure a judgment in its favor against an incumbent or former officer or director of the corporation for loss or damage due to his

[16] The Court has also considered defendant Mullens' arguments in support of her motion to dismiss plaintiff's breach of fiduciary claim. However, the Court concludes that plaintiff's allegations with respect to Mullens, and in particular plaintiff's allegations regarding her role in executing the cash transfers in 2012, are sufficient to state a claim for breach of fiduciary duty at this juncture. Mullens served as an officer of Elk and Ameritrans starting in 1996 and 1998, respectively (Compl. ¶¶ 12, 29-31); was a signatory on Elk's bank accounts (*id.* ¶ 58); certified the Form 468s (*e.g.*, *id.* ¶ 109); and was an active participant in each of the alleged unlawful cash transfers (*id.* ¶¶ 129-36, 141, 145, 147, 152). Accordingly, although Mullens did not attend board meetings, the reasonable inferences drawn from the totality of plaintiff's allegations in the complaint would support a plausible claim that Mullens was aware of the financial conditions of Ameritrans and Elk; was familiar with the processes for selling Elk's assets; and therefore that Mullens' actions lacked good faith and a legitimate corporate purpose as to Elk.

[17] The Court also denies defendants' motions to dismiss plaintiff's claims for negligence and gross negligence. Defendants moved to dismiss these claims on the same basis that they moved to dismiss plaintiff's claim for breach of fiduciary duty—specifically, defendants argue that these claims fail because defendants did not owe a duty to Elk and because plaintiff failed to plead around the business judgment rule. Accordingly, in light of the fact that the Court finds that plaintiff has plausibly stated a claim for breach of fiduciary duty and denies defendants' motions to dismiss that claim, the Court likewise denies defendants' motions to dismiss plaintiff's negligence and gross negligence claims.

unauthorized act." N.Y. Bus. Corp. Law § 203(a)(2).

The parties, however, dispute to what extent the business judgment rule applies. Defendants urge the Court to import the business judgment rule into its analysis, relying on the New York Court of Appeals' decision in *People ex rel. Spitzer v. Grasso*, 893 N.E.2d 105 (N.Y. 2008) for support. There, the Court of Appeals found that the Attorney General lacked authority to pursue claims for what essentially amounted to *ultra vires* acts that would impose a type of strict liability under the New York Not-For-Profit Corporation Law, because such claims were inconsistent with the statutory scheme, which is fault-based and provides directors and officers protection under the business judgment rule. *Id.* at 109-10. Accordingly, defendants argue that any claim under New York Business Corporation Law § 203 similarly must apply the business judgment rule, which would require plaintiff to plead that defendants knowingly violated SBIA regulations in order to state a claim. In response, plaintiff argues that § 203(a)(2) does not require plaintiff to plead a knowing violation of the law, and that *Grasso* is inapplicable because New York's Not-For-Profit Corporation Law is a separate statutory scheme, with different policy purposes and legal analyses.

Defendants also argue that plaintiff has failed to allege that defendants breached the SBIA regulations. Defendants note that Section 107.730 provides that SBICs that receive an SEC exemption do not need the SBA's approval of the transaction as long as they promptly notify the SBA. 13 C.F.R. § 107.730(f). Defendants argue that they fall under this exception because Elk received an exemption from the SEC and the Form 468s constitute notice to the SBA. With respect to Section 107.750, defendants argue that this provision is inapplicable because it refers to

the "sale" of assets, and plaintiff alleges that the transactions were loans, not sales.

Here, the Court concludes that plaintiff has plausibly alleged that defendants knowingly violated the SBIA regulations. Accordingly, the Court need not, and does not, determine whether the business judgment rule applies to claims under § 203.

Although defendants argue that they did not violate the SBIA regulations, based on the pleadings, the Court cannot conclude at this juncture as a matter of law that the transactions were in full compliance with the regulations. For example, defendants argue that they were exempt from seeking SBA approval under § 107.730(f), however the Court is unable to conclude as a matter of law that the Form 468s constituted "prompt notification" as required under the regulation, and, even if they did, that defendants documented all of the alleged improper transactions in those forms (e.g., the cash transfers). As another example, defendants claim that they did not violate § 107.885 because the alleged unlawful transactions were loans, however, the Court is likewise unable to conclude based on the pleadings that the cash transfers do not fall under this provision. In addition, the Court determines that plaintiff's allegations are sufficient to establish that defendants' alleged violation of the regulations was knowing. (*See, e.g.*, Compl. ¶¶ 29, 86, 125-57, 228-33.)

Accordingly, for these reasons, defendants' motions to dismiss plaintiff's claim for *ultra vires* acts are denied.

D. Waste of Assets

Under New York law, "[c]orporate waste occurs when assets are used in a manner 'so far opposed to the true interests [of the corporation so] as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests.'" *Patrick*, 355 F. Supp.

2d at 715 (second alteration in original) (quoting *Meredith v. Camp Hill Estates, Inc.*, 430 N.Y.S.2d 383, 385 (2d Dep't 1980)).[18]

The Court concludes that plaintiff has plausibly alleged a claim for corporate waste against defendants for substantially the same reasons it concludes plaintiff has plausibly stated a claim for breach of fiduciary duty. The complaint alleges that defendants authorized and facilitated the use of over $14 million of Elk's cash to pay Ameritrans' expenses and debts (including defendants' salaries and directors' fees) for no consideration, ultimately depleting Elk's bank account to $17,415.85 by April 24, 2013. (Compl. ¶¶ 153, 203-05.) Plaintiff has plausibly asserted that no interest of Elk could be served by these transactions, particularly when considering the fact that the loan and cash transfers began after defendants allegedly learned that the SBA was going to transfer Elk to its Office of Liquidation, and continued up until the days leading up to the SBA taking over as receiver. Accordingly, defendants' motions to dismiss plaintiff's corporate waste claim are denied. *See Patrick*, 355 F. Supp. 2d at 715 (denying motion to dismiss waste claim when "neither the Complaint nor the documents incorporated therein dictate[d] that the [transaction alleged to constitute waste was] consistent with the corporate purpose of [the company]").

E. Conversion

In New York, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006); *see also Key Bank of N.Y. v. Grossi*, 642 N.Y.S.2d 403, 405 (3d Dep't 1996) ("The tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner." (citation omitted)). Accordingly, to state a claim for conversion, the plaintiff must plead two elements: "(1) plaintiff's possessory right or interest in the property[,] and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Colavito*, 860 N.E.2d at 717 (citations omitted).

Accepting the facts in the complaint as true, and drawing all reasonable inferences in plaintiff's favor, the Court concludes that plaintiff has plausibly stated a claim for conversion. First, plaintiff has sufficiently alleged that Elk had an interest in the cash advanced, loaned, and transferred to Ameritrans. (*E.g.*, Compl. ¶¶ 82, 210-11.) Second, plaintiff plausibly alleges that defendants, without authorization, transferred Elk's cash to Ameritrans for the purpose of paying Ameritrans' expenses and debts, and therefore interfered with Elk's rights to that money. (*Id.* ¶¶ 210-13.)

Defendants argue that plaintiff's conversion claim fails because plaintiff has failed to allege defendants' "unauthorized possession." The Court disagrees. As noted, plaintiff plausibly alleges that defendants'

[18] Even if New York courts looked to Delaware courts for additional guidance, the standard under Delware law would be similar. *See, e.g.*, *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) ("The judicial standard for determination of corporate waste is well developed. Roughly, a waste entails an exchange of corporate assets for consideration so disproportionally small as to lie beyond the range at which any reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift." (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 366 (Del. Ch. 1997))).

actions were unauthorized. In addition, the Court concludes that defendants' role in approving and facilitating the alleged unlawful expense payments and transfers is sufficient to establish defendants' "dominion over the property or interference with it" at this juncture. For example, in *Grossi*, the case upon which defendants rely, the court found that the plaintiff had stated a cause of action for conversion when the defendants "exercised dominion and control over [plaintiff's] proceeds in such a manner that the proceeds *were used to pay customers or creditors of* [a party] other than plaintiff." 642 N.Y.S.2d at 404. Similarly, here, plaintiff has plausibly alleged that defendants exercised dominion and control over Elk's property when they caused it to be used to pay Ameritrans' expenses and debts.

Accordingly, defendants' motions to dismiss plaintiff's claim for conversion are denied.

F. Aiding and Abetting Breach of Fiduciary Duty

Plaintiff asserts a claim for aiding and abetting breach of fiduciary duty against all defendants. Because plaintiff also alleges that each defendant owed a fiduciary duty to Elk, and because the Court concludes that plaintiff has plausibly alleged that defendants owed duties to Elk (and breached those duties), the Court dismisses plaintiff's aiding and abetting claim as duplicative. *See Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P.*, 936 F. Supp. 2d 376, 412-13 (S.D.N.Y. 2013) (dismissing aiding and abetting breach of fiduciary duty claims as duplicative when plaintiffs had plausibly alleged breach of fiduciary duty claims against same defendants regarding same transaction). The Court also notes that plaintiff appears to concede that its aiding and abetting claim is duplicative, stating in its opposition brief that, "[t]o the extent that this Court determines that any one of the Defendants' actions was insufficient to constitute a breach of their own fiduciary duty, that Defendant is still liable for aiding and abetting the breach of fiduciary duty by the other Defendants, as all Defendants knowingly agreed to, and/or actively participated in, the defalcation of funds from Elk to Ameritrans." (Pl. Opp. Defs. Omnibus Mot. 21, ECF No. 51.)

G. Conspiracy

Plaintiff alleges a claim for conspiracy against defendants Feinsod, Feinstein, and Mullens. The Court agrees with defendants that plaintiff's conspiracy claim must be dismissed because it is duplicative of plaintiff's other tort claims.

To state a claim for civil conspiracy under New York law, a plaintiff must allege an underlying tort, as well as the following elements: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 176 (2d Cir. 2012) (quoting *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (1st Dep't 2010)).

"[A] cause of action for 'conspiracy may be alleged to connect a defendant' to a sufficiently pleaded tort claim, but plaintiffs may not 'reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-CV-3723 (RJS), 2016 WL 5719749, at *7-8 (S.D.N.Y. Sept. 29, 2016) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 591 (2d Cir. 2005)). Thus, "a cause of action for civil conspiracy that 'offers no new allegations beyond those alleged in support of' other tort claims alleged elsewhere must 'be dismissed as duplicative.'" *Id.* (quoting *De Sole v.*

*Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 315 (S.D.N.Y. 2013)).

Here, plaintiff's conspiracy claim is premised on the same allegations and the same torts asserted elsewhere in the complaint. (Compl. ¶ 239 ("The underlying torts [for the civil conspiracy claim] include breach of fiduciary duty, aiding and abetting breach of fiduciary duty, *ultra vires* act[s], waste of corporate assets, conversion and negligence, which allegations are outlined in paragraphs 82 through 158, above.").) Accordingly, the Court dismisses this claim as duplicative.[19]

## IV. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted as to plaintiff's claim for aiding and abetting breach of fiduciary duty, and defendants Feinsod's, Feinstein's, and Mullens' motions to dismiss are granted as to plaintiff's claim for conspiracy. Defendants' motions to dismiss are denied in all other respects.

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: October 1, 2018
Central Islip, NY

* * *

Plaintiff is represented by Arlene M. Embrey, U.S. Small Business Administration, Office of General Counsel, 409 3rd Street, SW, 7th Floor, Washington, D.C. 20416; and Steven Weinberg and Kelsey Bilodeau, Gottesman, Wolgel, Weinberg & Lee, P.C., 11 Hanover Square, 4th Floor, New York, New York 10005.

Defendants Michael Feinsod and Richard Feinstein are represented by Justin V. Shur, MoloLamken LLP, 600 New Hampshire Avenue, NW, Washington, D.C. 20037, and Justin Weiner, MoloLamken LLP, 300 North LaSalle Street, Chicago, Illinois 60654. Defendants Peter Boockvar, Murray Indick, John Laird, Elliott Singer, Howard Sommer, and Ivan J. Wolpert are represented by Martin L. Seidel, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019. Defendant Silvia Mullens is represented by Wendy Michael, Greenspoon Marder, P.A. P.C., 1270 Avenue of the Americas, New York, New York 10020. Defendant Gary Granoff is represented by Edward M. Spiro and Miriam L. Glaser, Morvillo Abramowitz Grand Iason & Anello P.C., 565 Fifth Avenue, New York, New York 10017. Defendant Steven Etra is represented by Mark A. Kornfeld, Keith R. Murphy, and Michael A. Sabella, Baker & Hostetler LLP, 45 Rockefeller Plaza, New York, New York 10111.

[19] Because the Court dismisses plaintiff's conspiracy claim as duplicative, it need not, and does not, reach defendants' argument that this claim is also barred by the intracorporate conspiracy doctrine.