UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
U.S. Small Business Administration, as
Receiver of ELK ASSOCIATES FUNDING
CORP.,

                                              **REPORT AND**
                                              **RECOMMENDATION**
                          Plaintiff,          17-CV-3586 (JS)(SIL)

   -against-

MICHAEL FEINSOD, SILVIA MULLENS,
RICHARD FEINSTEIN, GARY GRANOFF,
STEVEN ETRA, JOHN LAIRD, IVAN
J. WOLPERT, HOWARD SOMMER,
MURRAY INDICK, ELLIOT SINGER,
and PETER BOOCKVAR,

                          Defendants.
-------------------------------------------------------------x

**STEVEN I. LOCKE, United States Magistrate Judge:**

By way of Complaint dated June 14, 2017, Plaintiff U.S. Small Business

Administration, as Receiver for Elk Associates Funding Corp. ("Plaintiff" or the

"Receiver") commenced this action against Defendants Michael Feinsod ("Feinsod"),

Silvia Mullens ("Mullens"), Richard Feinstein ("Feinstein"), Gary Granoff ("Granoff"),

Steven Etra ("Etra"), John Laird ("Laird"), Ivan J. Wolpert ("Wolpert"), Howard

Sommer ("Sommer"), Murray Indick ("Indick"), Elliot Singer ("Singer"), and Peter

Boockvar ("Boockvar") (collectively, "Defendants") for:  (1) breach of fiduciary duty;

(2) ultra vires acts; (3) waste of assets; (4) conversion; (5) negligence; (6) aiding and

abetting a breach of fiduciary duty; (7) civil conspiracy; and (8) gross negligence based

upon Defendants' acts and omissions in connection with the management and

performance of their duties with respect to Elk Associates Funding Corp.  *See*

Complaint ("Compl."), Docket Entry ("DE") [1]. Presently before the Court, on referral from the Honorable Joanna Seybert[1] for report and recommendation, is Plaintiff's First Motion to Amend the Complaint ("Plaintiff's Motion"), DE [147], pursuant to Rule 15 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). For the reasons set forth herein, the Court respectfully recommends that Plaintiff's Motion be granted.

## I.    BACKGROUND

Unless otherwise indicated, the facts set forth herein are taken from Receiver's proposed First Amended Complaint ("FAC"), DE [147-2], and are accepted as true for purposes of the instant Report and Recommendation.

### A.    Initial Relationship Between Elk, Ameritrans, and SBA

Elk Associates Funding Corp. ("Elk") is a New York corporation that, on or about July 24, 1980, was licensed to do business as a Small Business Investment Company ("SBIC") pursuant to Section 301(d), and later Section 301(c) of the Small Business Administration Act (the "Act"). FAC ¶¶ 1; 10; 26. As an SBIC, Elk was regulated by, and received initial funding from, the U.S. Small Business Administration ("SBA"). *Id.* at ¶¶ 33-36. Ameritrans Capital Corporation ("Ameritrans"), a Delaware corporation, is Elk's parent company and sole shareholder. *Id.* at ¶ 60.

---

[1] This matter was initially assigned to Judge Sandra J. Feuerstein, and was transferred from Judge Feuerstein to Judge Leonard D. Wexler on November 6, 2017, from Judge Wexler to Judge Joseph F. Bianco on April 4, 2018, from Judge Bianco to Judge Kiyo A. Matsumoto on May 31, 2019, and from Judge Matsumoto to Judge Joanna Seybert on June 4, 2019.

In connection with this funding, Elk and SBA "entered into a security agreement on September 9, 1993 (the "SBA Security Agreement") pursuant to which Elk granted a security interest to SBA in all of Elk's assets, including among other things, Elk's portfolio of loans receivable, together with any guarantees thereon, and all other obligations owing to Elk, to secure payment of Debentures and any other indebtedness or liability to SBA, including future debentures which may be issued to or guaranteed by SBA." *Id.* at ¶ 37. Also on September 9, 1993, Elk received funding from certain banks (the "Senior Lenders"), and Elk, the Senior Lenders, and SBA "entered into an Intercreditor Agreement (the "Intercreditor Agreement"), which provide[d] that the security interest of SBA rank[ed] junior in priority to the security interests of the Senior Lenders." *Id.* at ¶¶ 38-39. Elk, SBA, and the Senior Lenders also entered into a Custodian Agreement with Israel Discount Bank ("IDB"), pursuant to which IDB "was appointed custodian to hold all of Elk's assets for the benefit of the Senior Lenders and SBA." *Id.* at ¶¶ 43-46. Under the Custodian Agreement, if Elk intended "to sell all or a portion of [Elk's] interest in any note or other evidence of indebtedness," it was required to provide IDB with "written certification that the net proceeds from such sale [would] be utilized immediately to reduce [Elk's] Senior Indebtedness." *Id.* at ¶ 49. If Elk did not, however, "intend to utilize the proceeds to repay the Senior Indebtedness," it was required to provide written notice to "the SBA, the [Senior Lenders] and the Custodian" of the amount that would not be used to pay back Elk's debt, and could only consummate a proposed transaction "[i]f the SBA and the Banks d[id] not object." *Id.* "Uniform Commercial

Code ("UCC") Financing Statements evidencing the Senior Lenders' security interests [in Elk's assets] were filed with the State of New York but were extinguished upon the filing of UCC Termination Statements in March 2011, leaving SBA as the only secured party" from March 2011 onward.  *Id.* at ¶¶ 54-56.

### B. <u>Defendants' Membership on Elk's and Ameritrans's Boards of Directors</u>

For different amounts of time from 2005 to July 2013, each of the Defendants served on the Board of Directors of Elk, Ameritrans, or both.  Some Defendants served as directors and officers, while others served only as board members.

Feinsod is a New York resident who, from approximately 2005 through July 2013, allegedly "held either all or one of the offices of President, Chief Executive Officer, Chief Financial Officer, and director of Elk." *Id.* at ¶ 11.  During this time, Feinsod was allegedly "also a 36% common shareholder and served as President, Chief Executive Officer and Chairman of the Board, and Chief Compliance Officer of Ameritrans[.]" *Id.*  Mullens is a New Jersey resident who, from approximately 1996 through April 2013, "held either one or all of the offices of Secretary of Elk, Vice President of Elk and Executive Vice President of Elk," was "a signatory on Elk's bank accounts," and "submitted Elk's Statements of Financial Condition to Elk's regulator, [the United States Small Business Administration], on a quarterly basis." *Id.* at ¶ 12.  Mullens served as Vice President of Ameritrans beginning in 1998, as Executive Vice President beginning in 2010, and was also an Ameritrans shareholder.  *See id.* Feinstein, a New Jersey resident, served as the Chief Financial Officer of both Elk

and Ameritrans from approximately September 2010 through April 2013, and was a signatory on Elk's bank accounts.  *Id.* at ¶ 13.

Granoff is a New York resident who, from approximately 1980 through July 2010, served as Elk's President and, "through February 7, 2012, [served as] a director[.]"  *Id.* at ¶ 14.  According to the Receiver, "Granoff also owned approximately eight percent (8%) of the common stock of Ameritrans, was a member of the Ameritrans Board of Directors and also acted as its Chairman of the Board until November 2010."  *Id.*  Granoff resigned from Elk's Board of Directors in February 2012, but "stayed on as 'Managing Director' and officer of Elk through April 2013, and as 'Managing Director' and officer of Ameritrans until on or about June 30, 2013[, at which point] he submitted a letter of resignation and his employment agreement terminated."  *Id.*  Etra is a New York resident who, from approximately 1999 through April 2013, served on Elk's Board of Directors and was a "a five percent (5%) shareholder in Ameritrans, a member of Ameritrans's board of directors until July 2013 and a creditor of Ameritrans."  *Id.* at ¶ 15.

Laird, a Connecticut resident, served on both Elk's and Ameritrans's Board of Directors from approximately 1999 through April 2013, chaired Ameritrans's Audit Committee, and was an Ameritrans shareholder.  *Id.* at ¶ 16.  Wolpert and Sommer, both New York residents, served on Elk's Board of Directors from approximately 2005 through April 2013, served on Ameritrans's Board of Directors from approximately 2005 through July 2013, and were shareholders of Ameritrans.  *Id.* at ¶¶ 17-18. Indick is a California resident who, from approximately 2006 through September 7,

2011, served on both Elk's and Ameritrans's Boards of Directors. *Id.* at ¶ 19. Singer, a Florida resident, was a member of Elk's Board of Directors from approximately December 2009 through April 2013, served on Ameritrans's Board of Directors from approximately December 2009 through July 2013, and was an Ameritrans shareholder. *Id.* at ¶ 20. Boockvar, a New York resident, was a member of Elk's Board of Directors from approximately May 2008 through April 2013, served on Ameritrans's Board of Directors from approximately May 2008 through July 2013, and was an Ameritrans shareholder. *Id.* at ¶ 21.

### C. Elk's Payment of Ameritrans's Expenses

From approximately 2009 through April 2013, while under Defendants' control, "Ameritrans received over $14 million in funds from Elk." *Id.* at ¶ 60. Based on both Elk's and Ameritrans's accounting ledgers, "from June 2009 through April 2013, the total amount of Ameritrans's expenses paid by Elk and allocated to Ameritrans, and the resulting liability from Ameritrans to Elk increased yearly from $418,595 in 2009, to $590,199 in 2010, to $2,949,442 in 2011, to $10,901,847 in 2012, and finally to $14,271,038 by April 2013." *Id.* at ¶ 83. According to the Receiver, "[f]rom 2009 through 2013, the Defendants approved and/or caused Elk to pay $7,491,139 of Ameritrans' expenses and transferred $6,779,898 of Elk's cash to Ameritrans for no consideration." *Id.* at ¶ 82. "Elk's general ledger for the period ended March 31, 2013 shows the receivable due from Ameritrans was $12,339,926.76[,]" and "additional expenses of Ameritrans of $1,931,111.24 that were paid by Elk…were not recorded on Ameritrans's books until after April 2013, were

never reimbursed by Ameritrans and which debt, to date, remains unpaid." *Id.* Minutes from a May 26, 2009 special meeting of the Boards of Directors of Ameritrans and Elk indicate that Ameritrans was, according to Feinsod, believed to be "at a crossroads," and without further funding or debt financing, would be "unlikely [to] achieve any level of meaningful profitability." *Id.* at ¶ 85. During that meeting, Feinsod stated that "the Board had to determine whether Ameritrans was facing only a liquidation scenario without SBA leverage [or funding]." *Id.* at ¶ 88.

Minutes from a September 23, 2009 meeting of the Boards of Directors of Ameritrans and Elk reflect that Feinsod informed the Board that SBA "was amenable to approving Elk's pending leverage application but that SBA was requesting some updated information." *Id.* at ¶ 91. At that same meeting, Etra stated that, "based on the new SBA leverage commitment he would try and assist a small private placement to raise capital" for Ameritrans." *Id.* In the following months, Defendants continued to propose and discuss ways to acquire funding for Ameritrans, and became increasingly aware that "SBA Debenture funding was critical if Ameritrans was to remain viable." *Id.* at ¶¶ 92-97. According to Elk's quarterly statements filed with SBA, for fiscal years 2009 and 2010, Ameritrans's outstanding expense reimbursements owed to Elk were $418,595 and $590,199, respectively. *Id.* at ¶¶ 101-104. As of December 31, 2010, Elk was insolvent. *Id.* at ¶ 105. Throughout March 2012, Elk received approximately $5.9 million from the sale of its investments in five portfolios and, at the instruction of Feinsod, transferred nearly all of those funds to Ameritrans. *Id.* at ¶¶ 129-138.

### D. **Transfer of Elk into Receivership**

On April 24, 2012, a ruling was issued in favor of SBA and against Elk, and
Elk was immediately transferred to SBA's Office of Liquidation and placed into
receivership. *Id.* at ¶ 139. As part of the receivership, Elk's Board of Directors was
required to notify SBA of any external transfer of funds from Elk's accounts to the
accounts of other entities, including Ameritrans. *Id.* For the period of August 2012-
April 2013, although Elk was in receivership, Feinsod and Mullens directed
approximately $10.9 million to be transferred an external bank account, without
notifying SBA. *Id.* at ¶¶ 140-154. On or about October 31, 2012, Elk and SBA entered
into a settlement agreement (the "Settlement Agreement") which, if violated, would
permit SBA to seek appointment as receiver for Elk's assets.[2] *Id.* at ¶ 3.

On February 14, 2013, after Elk failed to meet the terms of the Settlement
Agreement, SBA filed a complaint seeking its appointment as receiver of Elk. *Id.* at
¶ 68. On April 24, 2013, this Court appointed Plaintiff to serve as receiver and
entered judgment in favor of SBA for the amount of its outstanding funding, "which
at the time totaled over $20 million." *Id.* at ¶ 69. The Receiver was tasked with
"liquidating all of Elk's assets and satisfying the claims of creditors[.]" *Id.* at ¶ 70.
On or about July 2, 2013, Ameritrans filed a notice with the Securities and Exchange
Commission ("SEC"), "which stated that [Feinsod] and the entire board of directors
had resigned en masse." *Id.* at ¶ 72. "In its last quarterly financial statement filed
with SBA for the quarter ending June 30, 2012, Elk reported, as an asset, a "Due

---

[2] The parties provide virtually no details regarding the Settlement Agreement in their
pleadings, besides what is summarized in this Report and Recommendation.

From Parent" (Ameritrans) amount of $10,901,847.  On May 15, 2013, Ameritrans filed a Form 10-Q with the SEC reporting that Elk was due $14,271,038." *Id.* at ¶ 74.

Thereafter, Plaintiff met with the then-new Chairman of Ameritrans's Board of Directors, Robert Ammerman, "to discuss the amount due from Ameritrans and means of repayment," but the Receiver and Ameritrans "were unable to reach a resolution satisfactory to both parties." *Id.* at ¶ 75.  On or about October 2, 2015, Plaintiff "made demand upon Ameritrans for $12,339,927 to be paid on or before October 15, 2015," but "Ameritrans failed to remit any payments on the amount due Elk." *Id.*  Ameritrans did, however, "ma[ke] its documents, including corporate minutes, available to the Receiver for inspection and production." *Id.* at ¶ 77.  After reviewing these materials, Plaintiff "determined that from on or about 2009 through April 2013, [Defendants] repeatedly and improperly used Elk's funds to operate and conduct business for the benefit of Ameritrans and its shareholders." *Id.* at ¶ 78.  On October 5, 2016, Ameritrans filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts, and the Receiver "was named as a creditor for $12,339,927 in Ameritrans's bankruptcy schedules." *Id.* at ¶ 79.  To date, however, Plaintiff has not received any payments from the Ameritrans bankruptcy estate. *See id.*  Through a forensic analysis of the financial records of both Elk and Ameritrans from the 2008-2013 time period, the Receiver concluded "that another $1,931,111 of Elk funds was used by Ameritrans to pay Ameritrans expenses for the nine-month period ending March 31, 2013," meaning the "total outstanding amount due Elk from Ameritrans is $14,271,038." *Id.* at ¶ 80.

9

By letter dated January 6, 2016, Plaintiff made demand upon each of the Defendants for the then-outstanding funds owed by Ameritrans to Elk, and gave each Defendant until February 16, 2016 "to remit payment or make financial arrangements with the Receiver." *Id.* at ¶¶ 159-166. The Receiver renewed its demand upon each Defendant by letter dated April 28, 2017, and gave each Defendant until May 26, 2017 "to remit payment or make financial arrangements with the Receiver." *Id.* at ¶¶ 167-176. To date, Plaintiff has not received payment from any of the Defendants. *See id.*

**E. <u>Procedural History</u>**

Based on the above, the Receiver commenced this action against Defendants on June 14, 2017. *See* Compl. The Complaint alleges that Defendants: (1) breached their fiduciary duties to Elk; (2) failed to act in accordance with the Elk Articles of Incorporation, and applicable federal and state laws; (3) wasted and converted Elk's corporate assets; (4) failed to exercise professional competence and care in the exercise of their professional duties; (5) were negligent in their acts and omissions; (6) aided and abetted other Defendants in breaching their own fiduciary duties; and (7) through their grossly negligent acts and omissions, caused Elk to violate applicable laws and regulations. *See id.* at ¶8.

Through the Complaint, Plaintiff seeks: (1) judgment in a specific minimum amount of money against each Defendant; (2) attorneys' fees; and (3) unspecified "punitive damages" against all Defendants. *See id.* at 62-63. Specifically, the Receiver seeks a judgment against Granoff "up to the amount of $14,271,038," and a

judgment against Indick "up to the amount of $3,245,986." *Id.* at 63.  On October 6, 2017, Defendants filed five individual Motions to Dismiss.[3]  On September 30, 2018, then-United States District Judge Joseph F. Bianco issued an Order granting in part and denying in part Defendants' individual Motions to Dismiss.  *See* DE [66].  Judge Bianco ordered that the Receiver's claims for:  (1) aiding and abetting breach of fiduciary duty; and (2) conspiracy be dismissed, but allowed the Receiver's other causes of action to survive.  *See id.*

Defendants filed their Answers on November 14, 2018, *see* DEs [69], [71]-[80], and Plaintiff, with the permission of Judge Bianco, amended the Complaint on March 4, 2019.  *See* DEs [86]-[87].  Defendants filed their amended Answers on March 22, 2019, *see* DEs [88]-[98], and, on July 1, 2019, amended their Answers to assert counterclaims of indemnification against the Receiver.  *See* DEs [105]-[115].  On July 22, 2019, Plaintiff filed its Answer to the counterclaims.  *See* DEs [116]-[126].  After these filings, Etra and Mullens were dismissed from the matter.  *See* DEs [134], [153].

On May 15, 2020, after the parties had begun the initial phases of discovery, Plaintiff filed a Motion to Amend the Complaint, which seeks to:  (1) conform the Complaint to the Court's September 30, 2018 Order; and (2) allege new facts against, and hold Granoff and Indick responsible for a larger amount of Elk's financial losses.  *See generally* Plaintiff's Motion.

---

[3] *See* Motion to Dismiss for Failure to State a Claim by Steven Etra, DE [31]; Motion to Dismiss on Behalf of Defendant Granoff, DE [39]; Motion to Dismiss for Failure to State a Claim by Peter Boockvar, Murray Indick, John Laird, Elliott Singer, Howard Sommer, Ivan J. Wolpert, DE [40]; Fully Briefed Motion to Dismiss for Failure to State a Claim by Michael Feinsod, Richard Feinstein, DE [47]; Notice of Motion to Dismiss for Failure to State a Claim by Silvia Mullens, DE [48] (collectively, "Defendants' Motions to Dismiss").

On August 21, 2020, after this motion was fully briefed and filed with the Court, pursuant to a stipulation between the Receiver and Granoff: (1) Plaintiff's claims solely as asserted against Granoff were dismissed with prejudice; and (2) Granoff's counterclaim against the Receiver was dismissed with prejudice. *See* DEs [156]-[157]. The causes of action, claims, and counterclaims between Plaintiff and Feinsod, Laird, Wolpert, Sommer, Indick, Singer, and Boockvar, however, were not dismissed. *Id.* Granoff was dismissed from the matter on October 7, 2020. *See* DE [158]. Accordingly, the Court will only consider Plaintiff's Motion to the extent it seeks to allege new facts against Indick.

For the reasons set forth below, the Court respectfully recommends that Plaintiff's Motion be granted, and that the Receiver be permitted to file its First Amended Complaint to conform with the Court's September 30, 2018 Order, and assert new facts against Indick.

## II.    LEGAL STANDARDS

### A. <u>Legal Standard Under Fed. R. Civ. P. 15(a)</u>

Pursuant to Fed. R. Civ. P. 15(a), courts have discretion to allow parties to amend their pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) ("Under Fed. R. Civ. P. Rule 15(a), leave to amend shall be freely given when justice so requires."); *Amaya v. Roadhouse Brick Oven Pizza, Inc.*, 285 F.R.D. 251, 253 (E.D.N.Y. 2012) ("A court should freely give leave when justice so requires, and such leave is in the court's discretion.") (internal quotation omitted). The amendment standard is liberal so as

12

to permit plaintiffs "to assert matters that were overlooked or were unknown at the time of the original complaint or answer." *RCX I, LLC v. Pitter-Nelson*, No. 11-cv-03513, 2014 WL 5809514, at *5 (S.D.N.Y. Nov. 6, 2014) (internal quotation marks, citation and alterations omitted); *see also Assam v. Deer Park Spring Water, Inc.*, 163 F.R.D. 400, 404 (E.D.N.Y. 1995) ("[Fed. R. Civ. P.] 15(a) dictates that motions to amend complaints be liberally granted absent a good reason to the contrary….").

A Rule 15 motion should be denied where there is "undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment[.]" *Amaya*, 285 F.R.D. at 253; *see also Agerbrink v. Model Serv. LLC,* 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016) ("a motion to amend should be denied only if the moving party has unduly delayed or acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile."); *Bryant v. Carlisle Carrier Corp.*, No. 13-cv-578, 2014 WL 712592, at *1 (E.D.N.Y. Feb. 25, 2014) (quoting *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995)); *Bernhard v. Cent. Parking Sys. of New York, Inc.*, 282 F.R.D. 284, 287 (E.D.N.Y. 2012).

The party opposing a motion to amend bears the burden of establishing that the amendment should be denied. *See Joinnides v. Floral Park–Bellerose Union Sch. Dist.*, No. 12-cv-5682, 2015 WL 1476422, at *9 (E.D.N.Y. Mar. 31, 2015) ("With respect to the Rule 15(a) factors, '[t]he party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial or futile.'")

(quoting *Cummings–Fowler v. Suffolk Cty. Cnty. Coll.*, 282 F.R.D. 292, 296 (E.D.N.Y. 2012)).

### B. Substantial Delay Standard

"[L]eave to amend may be denied where the moving party knows or should have known of the facts upon which the proposed amendment is based, but failed to include them in the original pleading." *Coggins v. Cnty. of Nassau*, 254 F. Supp. 3d 500, 508 (E.D.N.Y. 2017) (quoting *Priestley v. Am. Airlines, Inc.*, No. 89-cv-8265, 1991 WL 64459, at *1 (S.D.N.Y. Apr. 12, 1991)). "Following a lengthy postponement in moving to amend a complaint, the movant must offer a satisfactory explanation for the hiatus." *In re 'Agent Orange' Prod. Liab. Litig.*, 220 F.R.D. 22, 24-25 (E.D.N.Y. 2004); *see also Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (counsel's lack of awareness of statute was unsatisfactory excuse for 17-month delay in asserting new claim); *Sala v. Gates Constr. Co.*, 155 F.R.D. 414, 415 (E.D.N.Y. 1994) (denying plaintiff's motion for leave seeking to assert new legal theory four years after plaintiff's injury and more than two years after plaintiff filed complaint). "[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Coggins*, 254 F. Supp. 3d at 508 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). At least one court in this Circuit has denied a plaintiff's motion to amend over undue delay because the plaintiff "knew or should have known" the facts underlying the proposed amendment at least a year before it sought leave to file a second amended complaint.

*See Pkfinans Int'l Corp. v. IBJ Schroeder Leasing Corp.*, No. 93-cv-5375, 1996 WL 84481, at*2 (S.D.N.Y. Feb. 27, 1996).

### C. Undue Prejudice Standard

"[P]rejudice to the opposing party resulting from a proposed amendment [is] among the most important reasons to deny leave to amend." *AEP Energy Services Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010); *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 604-05 (2d Cir. 2005) (leave to amend may be denied "for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.") (internal quotation marks omitted). "Undue prejudice exists where 'an amendment would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of a dispute.'" *Hadid v. City of New York*, 182 F. Supp. 3d 4, 8 (E.D.N.Y. 2016) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)). Notably, "the longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Coggins*, 254 F. Supp. 3d at 508 (quoting *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993)).

## III.   DISCUSSION

Applying the standards outlined above, and for the reasons set forth below, the Court respectfully recommends granting Plaintiff leave to file its First Amended Complaint to conform with the Court's September 30, 2018 Order, and assert new facts against Indick.

## A. __Whether Plaintiff's First Amended Complaint is Timely__

Indick contends that the Receiver should be prohibited from filing its proposed First Amended Complaint because "Plaintiff has inexcusably delayed for three years before now seeking leave to amend its factual allegations against [Indick]," and the new allegations against Indick "are based on information that Plaintiff acknowledges was publicly available in 2011, nine years ago, and based on documents that Plaintiff possessed or had access to years before it filed the Complaint in June 2017." Def.'s Opp. at 10.

A motion to amend a complaint is considered timely filed if submitted in the pleading stage and prior to the commencement of discovery. *See Esquire Radio & Electronics, Inc. v. Montgomery Ward & Co., Inc.*, 804 F.2d 787, 795 (2d Cir. 1986) ("A party cannot claim unfair surprise when it has been provided with notice of the subject of the amendment to a complaint, by discovery or documents, well in advance of the actual amendment."); *Hosking v. New World Mortg., Inc.*, 602 F. Supp. 441, 445 (E.D.N.Y. 2009) ("The plaintiff filed his motion . . . well before the court-established deadline. Accordingly, the Court finds that the plaintiff's motion was timely filed and not the result of any undue delay.").

Courts in this Second Circuit have held that when a party seeks to amend after a lapse in time between the Complaint's filing and the movant's motion to amend, "[t]he burden is on the party who wishes to amend to provide a satisfactory explanation for the delay." *Cresswell*, 922 F.2d at 72 (quoting *Sanders v. Thrall Car Mfg. Co.*, 582 F. Supp. 945, 952 (S.D.N.Y. 1983), *aff'd*, 730 F.2d 910 (2d Cir. 1984));

*see also Sala*, 155 F.R.D. at 415 ("It is Plaintiff's burden to demonstrate why such leave should be granted in the face of an overly long delay.").  Notwithstanding this burden, those same Courts have historically permitted amendment after a longer period of time than that at issue here.  *See Richardson Greenshields Securities, Inc. v Lau,* 825 F.2d 647, 653, n. 6 (2d Cir. 1987) (collecting cases where leave to amend granted after delays ranging from two to five years); *see also Affiliated FM Ins. Co. v. Liberty Mech. Contrs. Inc.*, No. 12-cv-5160, 2013 WL 4526246, at *5 (S.D.N.Y. Aug. 27, 2013) (allowing amendment after nine months despite movant's prior knowledge of relevant information because a party "need not prove that they uncovered new facts or law" to receive leave to amend).

Pursuant to the parties' April 6, 2020 Proposed Scheduling Order, the deadline for a motion to join new parties or to amend the pleadings was May 15, 2020.  *See* DE [145], 2.  Plaintiff's Motion was filed on May 15, 2020, *see* DE [147], making it timely under the parties' Scheduling Order, and at "the appropriate time in the litigation for [a] motion to amend the Complaint."  Pl.'s Mem. at 4.

Further in support of Plaintiff's Motion, Plaintiff relies on the Declaration of Christine Lewis, the Receiver's "principal agent[.]"  *See* Declaration of Christine Lewis in Support of Receiver's Motion to Amend the Receiver's Complaint ("Lewis Decl."), DE [147-1].  According to Lewis, "at the time of filing the Complaint on June 14, 2017, the Receiver previously believed" that the Complaint contained all allegations against Indick, but that after the Complaint was filed, Plaintiff "located documents that evidence[d] that Indick did not resign as a director of Elk in June

2011, but remained a director of Elk until on or about September 7, 2011." Lewis Decl. ¶¶ 3-5; 13-14. Specifically, Lewis cites an "email dated September 7, 2011 from Indick to Defendants Feinsod, Singer, Granoff, Wolpert, Laird, Boockvar, Sommer, and Etra…which stated "[e]ffective immediately, I hereby resign as a director of Ameritrans Capital and its subsidiaries and affiliates, including all committees upon which I serve." *Id.* at ¶ 16. Further according to Lewis, Indick's "resignation as of September 7, 2011 was also reported in Ameritrans SEC Form 8-K filed on or about September 7, 2011. *Id.* Based on these findings, the Receiver seeks to amend the Complaint to allege that Indick "continued to be a director of Elk until on or about September 7, 2011, and therefore was a director during the period of time in which funds were diverted from and damages accrued to Elk…up until September 7, 2011, totaling $3,245,986.76" and seeks from Indick "$3,245,986.76 plus all applicable interest thereon." *Id.* at ¶¶ 17-19.

Indick, however, speculatively argues that because Plaintiff was appointed prior to the filing of the Complaint, it should have known and previously asserted the facts now alleged in the First Amended Complaint, and that Plaintiff's Motion constitutes bad faith or negligence on the part of the Receiver. *See generally* Def.'s Opp. The standard to amend, however, does not require the Receiver to have unearthed new facts or law to be permitted leave to amend. *See Affiliated FM Ins. Co.*, 2013 WL 4526246, at *5. Nor is delay between initial filing and a motion amend, by itself, a sufficient basis to deny a motion to amend. *See U.S. v. Cont'l. Ill. Nat'l Bank & Trust Co.,* 889 F.2d 1248, 1254 (2d Cir. 1989) (reversing denial of motion to

amend and finding that, "delay, standing alone, is an insufficient basis to deny leave to amend"); *see also Middle Atl. Util. Co. v. SM.W. Dev. Corp.,* 392 F.2d 380, 384 (2d Cir. 1968) (reversing denial of motion to amend and finding that a three-year delay does not support a finding of bad faith or of prejudice to defendant stating, "delay by itself is not enough to deny the requisite relief").

The Court is not persuaded by the cases cited in Indick's opposition, as they involve the consideration (and denial) of motions to amend that were either filed: (1) after the completion of all discovery; or (2) after dispositive motions had been fully submitted and resolution of the matter was imminent. Those cases are inapplicable to the facts at hand, as the parties have barely started, much less completed, discovery, no dispositive motions have been filed, and no scheduling deadlines have been violated. Accordingly, the Court respectfully recommends that the Receiver's proposed amendments be considered timely as a matter of law.

### B. Whether the Permitting Plaintiff to File its First Amended Complaint Would Unduly Prejudice Indick

Indick next argues that the permitting the Receiver to file its FAC would unduly prejudice him because its new allegations of fact "would require [Indick] to spend significant additional resources to defend against newly asserted facts that Plaintiff has had access to since at least September 2011 and that should have been raised in its original pleading." Def.'s Opp. at 12.

In determining what constitutes "prejudice," Courts within this Circuit generally consider whether assertion of a new claim or defense would "(i) require the opponent to expend significant additional resources to conduct discovery and prepare

for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *See Monahan v. New York City Dep't. of Corrections,* 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Block,* 988 F.2d at 351). The undue prejudice calculation also requires analysis of: (1) whether the non-asserting party had prior notice of the proposed new allegations; and (2) whether the new facts arise from the same transaction as those facts alleged in the original pleading. *Id.* This analysis is crucial because "prejudice occurs if the opposing party would experience undue difficulty in defending a lawsuit because of a change in tactics or theories on the part of the movant." *Henry v.* Murphy, No. M-82, 2002 WL 24307, at *2 (S.D.N.Y. Jan. 8, 2002), *aff'd.* 50 F. App'x 55 (2d Cir. 2002); *see also Rissman v. City of New York*, No. 01-cv-6284, 2001 WL 1398655, at *1, n. 1 (S.D.N.Y. Nov. 9, 2001) (("In determining whether a party's interests have been unduly prejudiced, the Second Circuit has instructed district courts to consider 'whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute.'") (quoting *Block*, 988 F.2d at 350)).

Further, even if the Receiver's proposed amendments necessitate additional discovery, the expenditure of additional time, effort, or money alone does not constitute undue prejudice. *See A.V. by Versace Inc. v. Gianni Versace, S.p.A.,* 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) (motion to amend granted since there was no prejudice where there was no trial date set, nor was discovery completed, and amended factual claims were related to original complaint (quoting *Block,* 988 F.2d

20

at 351)); *see also . Cont'l. Ill. Nat'l Bank & Trust Co.,* 889 F.2d at 1255 ("[An] adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading.").

Applying these standards, the proposed amendments are not unduly prejudicial. Indick will not expend significant additional resources and there is no perceivable delay to the resolution of this action, because Plaintiff's main additional allegation – that "Indick remained a director of Elk for a longer period than the period alleged in the Complaint" – is based entirely on documents with which Indick has been provided. *See* Pl.'s Mem. at 7-8; *see also* Plaintiff's Reply Memorandum of Law in Further Support of the Receiver's Motion to Amend the Receiver's Complaint ("Pl.'s Reply"), DE [151], at 6. Additionally, Indick will not be unduly prejudiced because the facts alleged against him have not materially changed – only the amount of the alleged diversion is modified. Pl.'s Mem. at 8.

In his opposition, Indick asserts that "[t]his Court has consistently denied motions to amend where the amendment would prejudice the defendant by imposing significant additional resources to conduct discovery and prepare for trial, and where the plaintiff unduly delayed in moving to amend." Def.'s Opp. at 11. Notwithstanding these claims, Indick has failed to provide the Court with support – legal or factual – to buttress his arguments against Plaintiff's Motion. Each case that Indick relies on sought to add a new legal theory or claim to an already existing complaint and, in the majority of cases, such requests were made after the completion of fact discovery. *See generally, In re 'Agent Orange' Prod. Liab. Litig.*, 220 F.R.D. at 24-25; *Cresswell*, 922

F.2d at 72; *Sala*, 155 F.R.D. at 415; *Morritt v. Stryker Corp.*, 973 F. Supp. 2d 177, 191-92 (E.D.N.Y. 2013) (Denial of plaintiff's motion for leave to add factual allegations about the plaintiff's hip injuries, which plaintiff had known about before filing the Complaint, yet failed to raise until after the close of fact discovery).  Indick has also yet to provide the Court with any support for his position that defending against Plaintiff's proposed amendments would actually require "significant time and resources, in addition to the time and resources Mr. Indick has already spent in the past three year[s] investigating and defending against Plaintiff's allegations in the original Complaint."  Def.'s Opp. at 12.

Based on the above, the Court does not believe that there will not be an expansion of discovery based on Plaintiff's Motion, nor would such an expansion of discovery unduly prejudice Indick.  Accordingly, the Court respectfully recommends that the Receiver be permitted to file its proposed First Amended Complaint.

**IV.    CONCLUSION**

For the reasons set forth above, the Court respectfully recommends that Plaintiff's Motion be granted, and that Plaintiff:  (1) be permitted to file its First Amended Complaint to conform with the Court's September 30, 2018 Order; and (2) assert new facts against Indick.

**V.    OBJECTIONS**

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt

of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:        Central Islip, New York
              February 4, 2021                 /s/ Steven I. Locke
                                               STEVEN I. LOCKE
                                               United States Magistrate Judge