**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

UNITED STATES SMALL
BUSINESS ADMINISTRATION AS
RECEIVER FOR ELK ASSOCIATES
FUNDING CORP.,

               Plaintiff,

      v.

MICHAEL FEINSOD, SILVIA
MULLENS, RICHARD FEINSTEIN,
GARY GRANOFF, STEVEN ETRA,
JOHN LAIRD, IVAN J. WOLPERT,
HOWARD SOMMER, MURRAY
INDICK, ELLIOTT SINGER, AND
PETER BOOCKVAR,

               Defendants.

No. 17-CV-3586-JS-JMW

---

**DEFENDANTS FEINSOD AND FEINSTEIN'S MOTION TO**
**EXCLUDE EXPERT TESTIMONY OF ADAM J. HANOVER**

# TABLE OF CONTENTS

**Page**

BACKGROUND ............................................................................................................... 2

I.    Procedural Background .......................................................................................... 2

II.    Hanover's Proffered Expert Testimony ................................................................ 3

    A.    Elk's Solvency as of December 31, 2010 ................................................. 3

    B.    Elk and Ameritrans' Solvency as of December 31, 2011 ....................... 4

        1.    Ameritrans' Solvency ................................................................... 4

        2.    Elk's Solvency ............................................................................... 5

ARGUMENT ................................................................................................................... 6

I.    Hanover's Cash Flow Analysis Must Be Excluded .............................................. 7

    A.    Hanover Applies Incorrect Legal Standards ............................................. 7

    B.    Hanover's Opinion Is Not Sufficiently Tied to the Facts of the Case and Relies on Assumptions Contradicted by the Undisputed Facts ........................... 9

II.    Hanover's Balance Sheet Analysis Must Be Excluded ...................................... 10

    A.    Hanover Incorrectly Relied on Liquidation Valuations of Elk's Assets .............. 11

    B.    Hanover's Analysis Rests on Arbitrary and Unreliable "Adjustments" .............. 15

III.    Hanover's Small Capital Analysis Must Be Excluded ....................................... 16

    A.    Hanover Failed To Apply the Correct Legal Standard ........................... 16

    B.    Hanover's Small Capital Analysis Is Unreliable .................................... 17

CONCLUSION ................................................................................................................ 18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
    323 B.R. 345 (S.D.N.Y. 2005)............................................................................9

*In re Adelphia Commc'ns Corp.*,
    652 F. App'x 19 (2d Cir. 2016) ........................................................................17

*In re Adler, Coleman Clearing Corp.*,
    247 B.R. 51 (Bankr. S.D.N.Y. 1999)...............................................................12

*In re Am. Classic Voyages Co.*,
    367 B.R. 500 (Bankr. D. Del. 2007) ...........................................................12, 14

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)...............................................................................7

*Baker v. Anschutz Exploration Corp.*,
    68 F. Supp. 3d 368 (W.D.N.Y. 2014) ..............................................................14

*Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*,
    969 F. Supp. 2d 339 (S.D.N.Y. 2013)..............................................................14

*Bank of N.Y. Mellon Trust. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
    910 F. Supp. 2d 629 (S.D.N.Y. 2012)..............................................................10

*Buckley v. Deloitte & Touche USA LLP*,
    888 F. Supp. 2d 404 (S.D.N.Y. 2012)..............................................................10

*Chen v. New Trend Apparel, Inc.*,
    8 F. Supp. 3d 406 (S.D.N.Y. 2014) .........................................................7, 8, 11

*In re Chin*,
    492 B.R. 117 (Bankr. E.D.N.Y. 2013)...............................................................8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................. *passim*

*In re F-Squared Inv. Mgmt., LLC*,
    No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019)...................17

*In re Gucciardo*,
    577 B.R. 23 (Bankr. E.D.N.Y. 2017)................................................................16

*In re Heilig-Meyers Co.*,
    319 B.R. 447 (E.D. Va. 2014)......................................................................................12

*In re HHE Choices Health Plan, LLC*,
    No. 15-11158, 2019 WL 6112679 (Bankr. S.D.N.Y. Nov. 15, 2019).............................12, 14

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)....................................................................................................6

*Lemmermann v. Blue Cross Blue Shield of Wis.*,
    713 F. Supp. 2d 791 (E.D. Wis. 2010).........................................................................16

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)..........................................................................15

*LinkCo, Inc. v. Fujitsu Ltd.*,
    No. 00-7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002)............................................15

*McCarty v. Nostrand Lumber Co.*,
    232 A.D. 63 (2d Dep't 1931)........................................................................................8

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*,
    910 F. Supp. 913 (S.D.N.Y. 1995).............................................................................17

*Morgan Guar. Trust. Co. v. Hellenic Lines Ltd.*,
    621 F. Supp. 198 (S.D.N.Y. 1985)................................................................................8

*In re Nirvana Restaurant Inc.*,
    337 B.R. 495 (S.D.N.Y. 2006)....................................................................................11

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002)......................................................................................17

*Pereira v. Farace*,
    413 F.3d 330 (2d Cir. 2005).........................................................................................9

*In re Roblin Industries, Inc.*,
    78 F.3d 30 (2d Cir. 1996)............................................................................................12

*SBA v. Feinsod*,
    347 F. Supp. 3d 147 (E.D.N.Y. 2018)........................................................................1, 2

*In re Taxman Clothing Co., Inc.*,
    905 F.2d 166 (7th Cir. 1990)...................................................................................11, 12

*In re Trib. Co. Fraudulent Conv. Litig.*,
    10 F.4th 147 (2d Cir. 2021).......................................................................................8, 9

*In re Trinsum Grp., Inc.*,
   460 B.R. 379 (Bankr. S.D.N.Y. 2011) ..................................................................8, 11

*United States v. Tabor Ct. Realty Corp.*,
   803 F.2d 1288 (3d Cir. 1986)........................................................................................9

*Union Bank of Switzerland v. Deutsche Financial Services Corp.*,
   No. 98-cv-3251, 2000 WL 178278 (S.D.N.Y. Feb. 16, 2000) .........................11, 12

**Statutes**

11 U.S.C. § 101(32)...............................................................................................7, 11

N.Y. Debt. & Cred. L. § 271 (2013) .........................................................................7

Fed. R. Civ. P. 26(a)(2)(B)(i)...................................................................................13

Fed. R. Civ. P. 26(a)(2)(B)(ii)..................................................................................13

Fed. R. Evid. 702(c)...................................................................................................7

Fed. R. Evid. 702(d)...................................................................................................7

Insolvency is an important issue in this case. Four of the Amended Complaint's six counts require a common law duty. As this Court has held, because Elk Associates Funding Corp. ("Elk") was a wholly owned subsidiary of Ameritrans Capital Corp. ("Ameritrans"), Defendants had a duty to Elk itself only if and when Elk became insolvent. *SBA v. Feinsod*, 347 F. Supp. 3d 147, 159-60 (E.D.N.Y. 2018).

The Receiver offers proposed expert testimony from Adam J. Hanover to support its allegation that Elk was insolvent from December 31, 2010. Hanover opines that Elk was insolvent as of December 31, 2010, based on a so-called "cashflow test." In the alternative, he opines that Elk was insolvent as of December 31, 2011, based on a "cashflow test," a "balance sheet test," and a "small capital" test. Hanover, however, failed to apply governing legal standards, relied on assumptions contrary to the undisputed factual record, and applied an unreliable methodology to unreliable inputs. Hanover's proposed testimony should be excluded in its entirety.

Hanover's cash flow analysis fails to apply governing legal standards. He concluded that Elk was insolvent because it could not pay debts that hypothetically ***could have become*** due, ***if*** the creditor had accelerated the debt and required repayment before the maturity date. But binding Second Circuit precedent holds that a corporation is insolvent under the cash flow test only if it fails to timely pay debts that actually ***became*** due during a relevant time period.

Hanover's balance-sheet analysis rests on circular logic. Hanover applies the balance-sheet test using asset values from the Receiver's other expert, Jeffrey Manning. But Manning admittedly calculated those asset values based on ***his own conclusion*** that Elk was insolvent under the cash-flow test. Hanover's analysis also disregards governing law. A balance-sheet analysis must be conducted based on valuing the company's assets under the assumption that the company is a "going concern." The only exception is that, where a company has ceased to operate altogether,

"liquidation" valuations can be used instead.  Hanover relied on liquidation valuation, even though Elk continued to operate until 2013.  Hanover used unreliable methods as well.  In assessing Elk's solvency, for example, he assigned zero value to Ameritrans' debt to Elk, on the assumption that Ameritrans was insolvent.  But in assessing Ameritrans' solvency, he valued Elk at zero, on the assumption that Elk was insolvent.

Hanover's small-capital analysis, finally, must be excluded as irrelevant.  Court after court has held that the small capital test *is not a test for insolvency*.

Hanover's opinions apply incorrect standards and are based on *ad hoc* assumptions and circular reasoning.  They do not meet *Daubert*'s stringent requirements, and must be excluded.

## BACKGROUND

### I.    PROCEDURAL BACKGROUND

As explained in Defendants' summary judgment motion, Feinsod is a former director and officer of Elk Associates Funding Corp., and Feinstein is a former officer.  Mot. S.J. at 4.[1]  Elk, a New York corporation, was a wholly owned subsidiary of Ameritrans, a Delaware corporation. *Id.* at 3-4.  The Amended Complaint alleges that Defendants breached their common-law duties to Elk by causing Elk to advance and loan money to Ameritrans.  *Id.* at 8.  The only duty alleged by the Receiver is that of a corporate officer or director to the corporation.  *SBA v. Feinsod*, 347 F. Supp. 3d 147, 158 (E.D.N.Y. 2018) ("*MTD Order*").  The *MTD Order* held that, because corporate directors and officers of a solvent wholly owned subsidiary owe duties to the corporate parent, the Receiver "failed to state a claim for breach of fiduciary duty . . . until [the] date" Elk became insolvent.  *MTD Order* at 160.  The *MTD Order* did not fully dismiss those claims, however, because the complaint alleged that "Elk was insolvent as of December 31, 2010."  *Id.* at 154.

---

[1] "Mot. S.J." refers to Feinsod and Feinstein's joint motion for summary judgment.

The Receiver served opening and rebuttal expert reports of Adam J. Hanover and Jeffrey R. Manning to support its allegations of insolvency. *See* Exs. 35, 37, 66. On February 22, 2022, the Receiver belatedly served an amended opening expert report for Manning. Ex. 67.[2]

## II.   HANOVER'S PROFFERED EXPERT TESTIMONY

Hanover's report purported to analyze Elk's solvency as of December 31, 2010, and Elk's and Ameritrans' solvency as of December 31, 2011. Ex. 35 at 2.[3]

Hanover's report does not address the applicable standards for insolvency under New York or Delaware law. Hanover, who is not a practicing attorney, also confirmed that counsel for the Receiver did not instruct him as to the legal standards for insolvency. Ex. 32 at 97:8-16. His report instead purports to address solvency under three "standard tests":

- "The Balance Sheet Test" — used to "determine if their assets, at fair value (or orderly liquidation value, if necessary), exceed their liabilities";

- "The Cash Flow Test" — used to "determine if they were able to pay their debts as they matured"; and

- "The Small Capital Test" — used to "determine if they conducted their business with unreasonably small capital."

Ex. 35 at 13.

### A.   Elk's Solvency as of December 31, 2010

Hanover analyzed Elk's insolvency as of December 31, 2010, only under what he called a "cash flow test." Hanover's report acknowledges that the cash flow test measures a company's "ability to pay debts as they mature[ ]"—*i.e.*, as they become due. Ex. 35 at 13-15; Ex. 32 at 100:7-15. Hanover did not, however, purport to identify any debt Elk failed to pay as it matured. Ex. 35

---

[2] References to "Ex. __" refer to the exhibits to the Declaration of Rayiner I. Hashem in support of Defendants Feinsod and Feinstein's motion for summary judgment.

[3] For purposes of determining Defendants' legal duties, it is Elk's solvency that matters. Hanover analyzed Ameritrans' insolvency because one of Elk's assets was an intercompany debt from Ameritrans to Elk. Ex. 32 at 163:10-14.

at 13-15.  Elk's only material debt was SBA debentures, Ex. 14 at 3C, and the earliest maturity date was September 2012 for $2 million of debentures, Ex. 68 at 20.

Hanover nevertheless concluded that Elk was insolvent under the cash flow test.  He noted that Elk "was in a state of capital impairment," which "***gave the SBA the right*** to declare Elk's entire $21 million SBA indebtedness immediately due and payable."  Ex. 35 at 14 (emphasis altered).  Hanover did not identify when, if ever, the SBA exercised that right to accelerate the debt, but for purposes of his analysis "treated the SBA debentures as being immediately due" as of December 31, 2010. Ex. 32 at 121:7-12.  If the SBA had accelerated the debt, Hanover reasoned, then Elk would have lacked liquid funds to "immediately" repay it.  Ex. 35 at 14-15.  According to him, that rendered Elk insolvent under the cash flow analysis.  *Id.*

**B.      Elk and Ameritrans' Solvency as of December 31, 2011**

Hanover purported to analyze Elk and Ameritrans' solvency as of December 31, 2011 under the cash flow, balance sheet, and small capital tests, and concluded that both were insolvent as of that date.  Ex. 35 at 16-23.

1.      *Ameritrans' Solvency*

Hanover first considered Ameritrans' solvency.  For the balance sheet test, Hanover used "orderly liquidation values" for Ameritrans' assets.  Ex. 35 at 16.  Hanover stated that he applied those values "because of the need to promptly satisfy" Elk's as-yet unaccelerated SBA debenture and because of Ameritrans' purported inability to obtain investment financing.  *Id.*  Hanover accordingly made "adjustments"—steep discounts—to Ameritrans' assets "[b]ased on the Manning Report."  Ex. 35 at 17-18.  Additionally, based on his later conclusion that Elk was insolvent, Hanover "eliminated the value ascribed to Elk on Ameritrans' balance sheet."  Ex. 35 at 18. Based on those "adjustments"—which resulted in Ameritrans' approximately $20 million

4

in assets being written down to just $1.3 million—Hanover concluded that Ameritrans' liabilities exceeded its assets. *Id.* at 17-18.

Hanover then purported to apply his "cash flow" test to "determine if Ameritrans had the ability to pay its debts as they matured." Ex. 35 at 19. Instead of identifying any debt that Ameritrans had failed to pay in the ordinary course, Hanover reasoned that Ameritrans "had $4.4 million in liabilities maturing shortly after December 31, 2011," and that Ameritrans had supposedly been unable to secure additional financing. *Id.* Additionally, Hanover reasoned that Ameritrans was unable to "promptly cure" Elk's capital impairment. *Id.* Based on those factors, Hanover concluded that Ameritrans was insolvent under his cash flow test.

Finally, Hanover purported to apply a "small capital" test. Hanover reasoned that, in light of his earlier conclusion that Elk was balance-sheet insolvent, Ameritrans had no "equity capital." Ex. 35 at 19. He also asserted that Ameritrans had historically generated losses, and "without additional capital, there was no expectation that Ameritrans could generate profits." *Id.* at 20. Based on that scant analysis, Hanover concluded that Ameritrans "certainly had 'small capital'" on December 31, 2011. *Id.*

2.    *Elk's Solvency*

Hanover used a similar approach to opine that Elk was insolvent as of December 31, 2011. Hanover again used "orderly liquidation values" in his balance-sheet analysis—apparently based purely on the fact that Elk had "recorded losses" in most quarters from July 2009 through December 2011. Ex. 35 at 20. Again drawing from the Manning Report, Hanover slashed the value of Elk's assets. *Id.* at 20-21. Additionally, based on his earlier conclusion that Ameritrans was insolvent, Hanover wrote off the value of Elk's receivable from Ameritrans. *Id.* at 21. Based on those "adjustments," Hanover concluded that Elk's liabilities exceeded the "orderly liquidation" value of Elk's assets. *Id.*

5

Hanover next purported to perform a cash flow test. Hanover's one-paragraph analysis observed that Elk had historically generated losses, that it had a "state of capital impairment," and that it "did not have the ability to cure the impairment or to immediately pay the SBA the amount of its outstanding debt." Ex. 35 at 22. Hanover also asserted that Elk "did not have the werewithal" to pay about $2 million in SBA debt that matured in 2012 (i.e., after the date of the solvency analysis). *Id.* Again, however, Hanover did not identify any debt payment that Elk actually failed to make in the ordinary course.

Lastly, Hanover opined that Elk was insolvent under the small capital test. As with Ameritrans, Hanover concluded that Elk did not have any "equity capital" based on his earlier conclusion that it was balance-sheet insolvent. Ex. 35 at 22. Hanover also observed that Elk had historically generated losses and asserted that "without additional capital, there was no expectation that Elk could generate profits." *Id.* Finally, Hanover cited a 2009 statement from Mr. Feinsod to assert that Elk needed $35 million in assets to "generate a profit." *Id.* Based on those assertions, Hanover opined that Elk had "small capital" as of December 31, 2011.[4]

## **ARGUMENT**

Federal Rule of Evidence 702 imposes a critical "gatekeeping" role on district courts with respect to expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Given the persuasive force of expert testimony to a jury—and the risk of disastrous prejudice if the jury is allowed to hear irrelevant or unreliable expert testimony—a trial court must "exercise[ ] more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). To be admissible, expert opinions must be "relevant" to the issues in the case

---

[4] Hanover also performed a cursory analysis of the Ameritrans/Elk consolidated entity. Ex. 35 at 22-23. Hanover concluded that because each of the "component entities" was insolvent, the consolidated entity was "insolvent as well." *Id.*

under governing law and "sufficiently tied to the facts of the case." *Id.* at 591.  And they must be "reliable"—*i.e.*, "the product of reliable principles and methods," which have been "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702(c), (d).  Consistent with that, testimony must be excluded if it is not relevant, or is "based on data, a methodology, or studies that are . . . inadequate to support the conclusions reached."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  The proponent of expert testimony bears the burden of proving by a preponderance of the evidence that the testimony is admissible.  *Daubert*, 509 U.S. at 592 n.10.  Hanover's proffered testimony does not come close to meeting *Daubert*'s standards of relevance and reliability and must be excluded in their entirety.

## I.   HANOVER'S CASH FLOW ANALYSIS MUST BE EXCLUDED

Hanover's cash flow analysis—the only opinion supporting the Amended Complaint's allegation that Elk was insolvent by December 31, 2010—fails to apply the correct legal standards.  For one thing, New York law relies on the balance sheet test, not the cash flow test.  For another, the Second Circuit has held that the cash flow test (where it applies) looks backward at a company's actual payment history.  But Hanover concededly applied a "forward-looking test."

Leaving aside the use of an incorrect test for insolvency, Hanover's cash flow analysis must be excluded because it relies on hypothetical scenarios untethered from the facts of the case.

### A.   Hanover Applies Incorrect Legal Standards

Elk is a New York corporation, and New York law applies.  *MTD Order* at 159.  Under the New York Debtor and Creditor Law, as under the federal Bankruptcy Code, an entity is insolvent only when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."  N.Y. Debt. & Cred. L. § 271 (2013); *see Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 445 (S.D.N.Y. 2014); 11 U.S.C. § 101(32) ("insolvent" means a "financial condition such that the sum

of such entity's debts is greater than all of such entity's property, at a fair valuation").  The New York Debtor and Creditor Law imposes a "balance sheet" test for solvency, which requires comparing the "fair valu[e]" of a company's assets as of the relevant date to its liabilities.  *Chen*, 8 F. Supp. 3d at 445; *In re Trinsum Grp., Inc.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011).

Hanover's cash flow analysis—which purports to address whether Elk "[was] able to pay [its] debts as they matured," Ex. 35 at 13—does not reflect the standard under New York law. "The DCL's measure of insolvency focuses on companies in serious overall financial trouble, as opposed to companies experiencing a temporary lack of liquidity."  *Chen*, 8 F. Supp. 3d at 445. Therefore, "under the DCL, '[c]ash flow is not a factor, and an inability to pay current obligations as they mature does not show insolvency.'"  *Id.* (quoting *Morgan Guar. Trust. Co. v. Hellenic Lines Ltd.*, 621 F. Supp. 198, 220 (S.D.N.Y. 1985) (quoting *McCarty v. Nostrand Lumber Co.*, 232 A.D. 63, 65-66 (2d Dep't 1931))); *In re Chin*, 492 B.R. 117, 128 (Bankr. E.D.N.Y. 2013) (evidence of debtor's cash flow problems was "insufficient to create a genuine dispute" as to insolvency "because it does not address balance sheet insolvency").  Because Elk's supposed "illiquidity" under the cash flow test, Ex. 35 at 14, is irrelevant to insolvency, Hanover's cash flow analysis must be excluded.  *Daubert*, 509 U.S. at 591 ("'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'").

The Second Circuit has also foreclosed Hanover's formulation of the cash flow test. Hanover acknowledged that he applied the cash flow test as "a forward-looking test."  Ex. 32 at 195:23-25.  He concluded Elk was insolvent because, based on Elk's "projected ***future*** losses," he determined that Elk would not be able to pay its debts "a[s] they c[a]me due in the ***future***."  Ex. 32 at 196:1-16 (emphasis added).  The Second Circuit has "definitive[ly] . . . rejected [that] forward looking approach" to the cash flow test.  *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th

147, 166 (2d Cir. 2021) (quoting *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005)).  In the Second Circuit, the cash flow test (where it applies) does not "project[ ] into the future," but instead " 'looks solely at whether the corporation has been paying bills on a timely basis.' "  *Id.*  Hanover's report never addresses whether Elk "[had] been paying bills on time."  He cites factors such as Elk's capital impairment, and its history of losses, Ex. 35 at 13-14, 19, 21-22, but fails to address the only factor that is actually relevant under the test: Elk's payment history.  His cash flow opinion is irrelevant and must be excluded.  *Daubert*, 509 U.S. at 591.

Hanover's assertion that the cash flow test is "standard," Ex. 35 at 13, is unavailing. Insolvency is a "mixed question of fact and law."  *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 386 (S.D.N.Y. 2005); *see United States v. Tabor Ct. Realty Corp.*, 803 F.2d 1288, 1303 (3d Cir. 1986).  The applicable standard for insolvency is a question of law, and district courts must exclude expert testimony that does not reflect the standard under governing law.  *Cf. In re Tribune Co.*, 10 F. 4th at 166 (rejecting expert testimony based on incorrect legal standard).

### B.   Hanover's Opinion Is Not Sufficiently Tied to the Facts of the Case and Relies on Assumptions Contradicted by the Undisputed Facts

Hanover's sole basis for asserting that Elk was unable to pay its debts as they came due is the counterfactual assumption that the SBA debt was accelerated (becoming immediately due) when Elk became capitally impaired.  Hanover noted that Elk's capital impairment gave the SBA "***the right*** to declare Elk's entire $21 million SBA indebtedness immediately due and payable" at any time.  Ex. 35 at 14 (emphasis altered).  Hanover thus assumed that the SBA had exercised that right during the relevant period.  Ex. 32 at 196:17-197:1 (admitting analysis "is based on the ***assumption*** that . . . [the] $21 million [SBA] debt [was] due and payable" as of "December 31, 2010" (emphasis added)); *id.* at 112:12-23 (admitting opinion is "based upon the acceleration of these debentures").  However, it is undisputed that the SBA ***did not*** accelerate the debentures in

2010 or 2011.  Ex. 69 at 4 (declaration of Harry Haskins stating that "SBA has refrained from sending Elk an acceleration letter and has not accelerated the repayment of Elk's debentures" as of April 9, 2012).  Hanover admitted as much.  Ex. 32 at 197:17-20.

The district court's gatekeeper role requires it to scrutinize expert testimony to ensure that it is "sufficiently tied to the facts of the case."  *Daubert*, 509 U.S. at 591.  Courts must exclude testimony that relies on "'faulty assumptions'" or assumptions that are contradicted by the "'record.'"  *Bank of N.Y. Mellon Trust. Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 649-50 (S.D.N.Y. 2012).  In particular, expert testimony must be excluded where it relies on "'unfounded assumptions about what'" might have happened "'if certain hypothetical events took place.'"  *Id.* (quoting *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 413 (S.D.N.Y. 2012)).  That describes Hanover's proffered testimony to a tee.  Hanover relied on an assumption—that the $21 million SBA debt was due and payable as of December 31, 2010—that ***he conceded*** reflected a hypothetical and not what actually happened.  Ex. 32 at 197:17-21; *id.* at 201:16-25 (conceding SBA debt was not actually due and payable prior to acceleration, and relying on the SBA's "right" to possibly "tak[e] that course of action"); *id.* at 203:14-15 ("SBA may call the loan due and payable immediately"); *id.* at 204:2-5 (debt "could be declared due and payable immediately").  A clearer example of inadmissible expert testimony based on a counterfactual assumption about "hypothetical" events is hard to imagine.

## II.   Hanover's Balance Sheet Analysis Must Be Excluded

The balance-sheet test simply considers whether a company's assets exceed its liabilities. Elk's balance sheets—its audited financial statements filed with the SBA and SEC—show that its assets exceeded its liabilities on both December 31, 2010 and December 31, 2011—even assigning zero value to Ameritrans' debt to Elk.  Ex. 14, lines 24, 29, 44; Ex. 18, lines 24, 29, 44; *see* Ex. 25.

Hanover came to a contrary conclusion only by applying incorrect standards.  Instead of using "going concern" asset values reported in Elk's audited financial statements, he relied on "liquidation values" calculated by Manning.  Neither Hanover nor Manning justified that choice.  And use of liquidation values is unsupportable under governing law.

Hanover's balance sheet analysis is also unreliable.  It piles circular logic and unsupported adjustments on top of Manning's unreliable valuations.  It must be excluded.

### A.      Hanover Incorrectly Relied on Liquidation Valuations of Elk's Assets

Under governing law, assets are valued for purposes of the balance-sheet test on a so-called "going concern" basis.  Only if a company is "defunct" or "inoperative" can so-called "liquidation values" be used to determine solvency.  Hanover relied on liquidation values, but did not explain how Elk was "defunct" or "inoperative."  And the record cannot support his assumption that Elk was defunct such that use of liquidation values would be permissible under governing law.

1.      Under the "balance sheet" test, a court must compare the "fair salable value of [the company's] assets" to the debtor's total "liability."  *In re Nirvana Restaurant Inc.*, 337 B.R. 495, 506 (S.D.N.Y. 2006); *see* 11 U.S.C. § 101(32) (defining "insolvent" to mean where "the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation"); *Chen*, 8 F. Supp. 3d at 445; *In re Trinsum Grp.*, 460 B.R. at 392.

"[O]verwhelming authority" holds that, in applying the balance-sheet test, a company must be valued on a "going concern" basis.  2 Collier on Bankruptcy ¶ 101.32[5] (15th ed. 1991); *see Union Bank of Switzerland v. Deutsche Financial Services Corp.*, No. 98-cv-3251, 2000 WL 178278, at *9 (S.D.N.Y. Feb. 16, 2000); *In re Taxman Clothing Co., Inc.*, 905 F.2d 166, 170-171 (7th Cir. 1990) (Posner, J.); Ex. 36 at 9-10.  Going concern valuation assumes a business can operate long enough to sell its assets " 'in a prudent manner within a reasonable period of time.' "

*Union Bank*, 2000 WL 178278, at *9 (quoting *In re Roblin Industries, Inc.*, 78 F.3d 30, 38 (2d Cir. 1996)); Ex. 36 at 9.

In limited circumstances, a company may be valued based on "what could be obtained at a liquidation sale" of its assets. *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 110-11 (Bankr. S.D.N.Y. 1999); *see In re Taxman*, 905 F.2d at 170; Ex. 36 at 9-10. But the "threshold" where a company must be treated as a "going concern . . . is very low." *In re Heilig-Meyers Co.*, 319 B.R. 447, 457 (E.D. Va. 2014) (citing *In re Taxman*, 905 F.2d at 170). A company is "still a going concern as long as the amount it could realize from converting its assets to cash in the ordinary course of business exceeds the expenses of conducting business." *Id.* Indeed, "[b]efore the going concern valuation is to be abandoned, the business must be ***wholly inoperative, defunct or dead on its feet***." *In re Am. Classic Voyages Co.*, 367 B.R. 500, 508 (Bankr. D. Del. 2007) (emphasis added). Courts have "consistently frowned upon the use of calculations that are based on liquidation values rather than going concern values, unless the demise of a business is so clearly imminent that the business is ***incapable of generating any further revenues***." *In re HHE Choices Health Plan, LLC*, No. 15-11158, 2019 WL 6112679, at *5 (Bankr. S.D.N.Y. Nov. 15, 2019) (emphasis added) (collecting cases).

As Judge Posner explained in *In re Taxman*, courts and experts risk falling into a trap of circular reasoning if they abandon going concern valuation. For solvency purposes, "the question is whether [a company] ***was*** on its deathbed." *In re Taxman*, 905 F.2d at 170 (emphasis added). Presuming that a company faces imminent liquidation, to justify application of steeply discounted liquidation valuations, assumes the very thing that is to be proved. *Id.* at 169-170 (holding it was improper to apply liquidation valuation to a company that was solvent when using going-concern valuation but insolvent when using liquidation valuation); *see* 2 Collier on Bankruptcy, *supra*,

12

¶101.31[5] ("[C]aution should be taken not to consider [a company] as 'dead' merely because hindsight teaches that the debtor was traveling on the road to financial ruin.'"). In other words, the assumption that liquidation valuation applies because the company is on the verge of failure can make insolvency a foregone conclusion under the balance-sheet test.

2.      Hanover (and Manning) fall into the trap Judge Posner identified in *In re Taxman*. Hanover's balance sheet analysis of solvency relies on Manning's liquidation valuation. Ex. 35 at 14-15. But Manning admitted that he calculated those valuations based on his conclusion that Elk was insolvent under a cash-flow test. MTE Manning 7-8.[5] A starker example of the problem identified in *In re Taxman* is hard to imagine.

Hanover, moreover, offers no legally relevant justification for using "liquidation values" in his balance sheet analysis. Ex. 35 at 16. As to ***Elk***, he cites only the "need to promptly satisfy" the $21 million SBA Debt. Ex. 35 at 16, 20. That smuggles into Hanover's balance-sheet analysis the same impermissible hypothetical assumption that infects his cash-flow analysis. *See* pp. 9-11, *supra*. Hanover also invokes the CN Note and the Senior Notes. Ex. 35 at 16. But those are irrelevant to whether Elk was a going concern, or "wholly inoperative, defunct, or dead on its feet."

When to justify use of liquidation values, Hanover invoked "many indicia" of Elk not being a "going concern"—such as not "mak[ing] a profit." Ex. 32 at 147:25-151:2. But even if those were relevant factors (and they are not), they are addressed nowhere in Hanover's report. Rule 26 states that an expert "report must contain . . . a complete statement of all opinions the witness will express and the basis and reasons for them" and the "facts or data" supporting those opinions. Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). Use of liquidation values rather going concern values is a fundamental assumption in Hanover's balance sheet analysis, which values Elk's assets at a

---

[5] "MTE Manning" refers to Feinsod and Feinstein's Motion To Exclude Expert Testimony of Jeffrey R. Manning.

fraction of the going concern valuations in Elk's audited financial statements. Hanover was required to justify that choice under the relevant legal standards as a "basis and reason[] for" the opinions in his report. Rule 26 does not permit backfilling that critical reasoning after the fact. Hanover insists that the use of going concern versus liquidation values is a "very factual intensive exercise." Ex. 32 at 150:3-6. But that only confirms why Hanover's opinion is inadmissible. A fact-intensive analysis on an issue central to the expert's opinion must be disclosed in his report. Rule 26 does not permit an expert to try "to cure deficient expert reports by supplementing them with later deposition testimony." *Baker v. Anschutz Exploration Corp.*, 68 F. Supp. 3d 368, 382 (W.D.N.Y. 2014).

3.     Use of liquidation values is unsupportable on the record in any event. Elk plainly was not "wholly inoperative, defunct or dead on its feet," *In re Am. Classic Voyages*, 367 B.R. at 508, or "incapable of generating any further revenues," *In re HHE Choices Health Plan*, 2019 WL 6112679, at \*5, on either December 31, 2010 or December 31, 2011.

In the quarter ending December 31, 2011, Elk had $27,203,696 in assets, including $2,393,700 in cash and cash equivalents. Ex. 18 lines 14, 29. It had a gross income from business operations of $942,264 and a net income (loss) of -$478,697. *Id.* lines 10, 34. Elk's cash alone was sufficient to allow Elk to operate for at least another year at that rate. In April 2011, Columbus Nova entered into an agreement to purchase $25-65 million of Ameritrans equity—an undisputed fact that cannot be reconciled with the assumption that Ameritrans (or Elk) were "defunct" by December 31, 2010. Similarly, in February 2012, Full Circle entered into a term sheet in which it would invest up to $75 million in Elk. That undisputed fact, too, is simply incompatible with the assumption that Elk was "defunct" by December 31, 2011. Hanover's assumption that Elk was an inoperative, defunct company has no basis in the record, and must be excluded. *See Bank of Am.,*

*N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 358 (S.D.N.Y. 2013) (excluding expert testimony where "no facts in the record . . . could lead a reasonable juror" to agree with expert's "unfounded assumption").

**B.      Hanover's Analysis Rests on Arbitrary and Unreliable "Adjustments"**

Hanover's balance sheet analysis fails for an independent reason:  It fails to apply any reliable methodology.  Hanover started with unreliable inputs—the liquidation values of Elk's assets as calculated by Manning.  Ex. 35 at 17-18, 21.  As explained in Defendants' motion to exclude Manning's report, Manning's valuations are the product of applying *ad hoc* discounts to Elk's audited financial statements, not a reliable methodology.  Without Manning's numbers, there is no basis for Hanover to conclude Elk was insolvent.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 494 (S.D.N.Y. 2018) (expert is "not entitled to rely on" another expert's "unreliable opinions").

Hanover compounded that error by introducing further "adjustments" to the asset values based on unexplained assumptions.  Elk and Ameritrans had small amounts of "assets acquired in satisfaction of loans."  Ex. 35 at 17, 21.  Hanover "assumed" that those assets "would have an orderly liquidation value of 80% of their net cost."  *Id.*  Hanover provided no explanation why that deduction was appropriate.  Hanover also deducted $300,000 from Elk's cash balance "to reflect the estimated administrative costs of winding down Elk"—again, with no explanation of how he arrived at that figure.  *Id.*  Those claims, which are supported by nothing but Hanover's say-so, cannot pass muster under *Daubert*.  Experts "must provide some explanation for their conclusions," because "[w]ithout good explanations, courts cannot assess the reliability of any conclusion drawn by an expert."  *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002).  Hanover's failure to explain those adjustments requires exclusion.

Worse, Hanover wrote off the value of Elk on Ameritrans' balance sheet, and the value of Elk's Ameritrans receivable on Elk's balance sheet, based on purely circular reasoning. In considering Ameritrans' solvency, Hanover "eliminated the value ascribed to Elk on Ameritrans' balance sheet" because he determined later in his report "that Elk was insolvent." Ex. 35 at 18. And in considering Elk's solvency, Hanover "removed the Ameritrans receivable" "[d]ue to the Ameritrans solvency analysis discussed above." Ex. 35 at 21. In other words, Hanover's conclusion that Ameritrans was insolvent depended on his conclusion that Elk was insolvent, and his conclusion that Elk was insolvent depended on his conclusion that Ameritrans was insolvent. That reasoning is "utterly circular in its logic and is the epitome of an unreliable methodology." *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 802 (E.D. Wis. 2010).

In short, Hanover has no reliable basis for his supposed "orderly liquidation values" for Elk and Ameritrans' assets. *See* Ex. 35 at 16-18, 20-21. Without those values, he has no basis to conclude that Elk or Ameritrans was insolvent. His opinions are therefore unhelpful to the trier of fact and must be excluded under Rule 702.

## III.   HANOVER'S SMALL CAPITAL ANALYSIS MUST BE EXCLUDED

Hanover's "small capital" analysis is likewise inadmissible. The "small capital" test is not a recognized test for insolvency under New York law, and thus Hanover's opinions based on that test are irrelevant to the issues in this case. And even if small capital were applicable here, Hanover failed to apply it correctly, making his opinions unhelpful and unreliable.

### A.   Hanover Failed To Apply the Correct Legal Standard

Hanover applied the "small capital test" to conclude that Elk was insolvent as of December 31, 2011. Ex. 35 at 22. The "small capital" test is not an applicable test for insolvency under New York law. *In re Gucciardo*, 577 B.R. 23, 35 n.5 (Bankr. E.D.N.Y. 2017) (small capital test "is not equivalent to a finding of insolvency"). Instead, the "small capital [test] denotes a financial

condition short of equitable insolvency." *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995); *see also In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168, at *17 (Bankr. D. Del. Sept. 6, 2019) ("Undercapitalization is a distinct concept from insolvency."); pp. 7-9 *supra*.   Whether Elk or Ameritrans had "small capital" thus " 'does not relate to any issue in the case,' " making Hanover's opinions " 'not relevant and, ergo, non-helpful.' " *Daubert*, 509 U.S. at 591.

### B.      Hanover's Small Capital Analysis Is Unreliable

To the extent there is a "small capital" test, Hanover's opinion is inadmissible because he failed to apply it.  "The test for whether assets are 'unreasonably small' focuses on reasonable foreseeability"—whether "the debtor had such minimal assets that insolvency was inevitable in the reasonably foreseeable future." *In re Adelphia Commc'ns Corp.*, 652 F. App'x 19, 21 (2d Cir. 2016).   "Determining whether a firm has unreasonably small capital requires an objective assessment of the [company's] financial projections," as well as " 'all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period.' " *Peltz v. Hatten*, 279 B.R. 710, 744-45 (D. Del. 2002), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 F. App'x 401 (3d Cir. 2003).

Hanover, however, did not analyze Elk's financial projections or assess whether Elk could have anticipated obtaining capital from other sources.  *See* Ex. 35 at 22; Ex. 32 at 238:13-240:2. Instead, he apparently concluded—in a single paragraph of analysis—that because "the orderly liquidation value of Elk's assets were less than its liabilities," and because Elk had historically experienced losses, it had small capital.  Ex. 35 at 22.  That analysis fails to apply the relevant standards and is therefore unreliable and unhelpful to the jury under Rule 702.  *Daubert*, 509 U.S. at 591.  It also fails for the independent reason that the "orderly liquidation value" it relies on is

17

drawn from Manning's inadmissible valuations.  *See* pp. 15-16, *supra*.  Hanover's opinions on "small capital" therefore must be excluded.

### <u>CONCLUSION</u>

This Court should exclude Hanover's opinions and testimony in their entirety.

Dated: December 6, 2022

Respectfully submitted,

/s/ Rayiner I. Hashem

Justin V. Shur
Rayiner I. Hashem
Fu Shek R. Li
MOLOLAMKEN LLP
600 New Hampshire Ave., NW
Washington, DC  20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
jshur@mololamken.com
rhashem@mololamken.com
rli@mololamken.com

Elizabeth K. Clarke
Thomas P. Schubert
MOLOLAMKEN LLP
300 N. LaSalle Street
Chicago, IL  60654
(312) 450-6700 (telephone)
(312) 450-6701 (facsimile)
eclarke@mololamken.com
tschubert@mololamken.com

*Attorneys for Michael R. Feinsod and Richard L. Feinstein*