# Exhibit 1

Page 1

1

2    UNITED STATES DISTRICT COURT

     EASTERN DISTRICT OF NEW YORK

3    17-cv-3586(JS)(JMW)

     --------------------------------x

4    U.S. Small Business

     Administration as Receiver of

5    ELK ASSOCIATES FUNDING CORP.,

6                      Plaintiff,

7           -against-

8    MICHAEL FEINSOD, SILVIA MULLENS,

     RICHARD FEINSTEIN, GARY GRANOFF,

9    STEVEN ETRA, JOHN LAIRD, IVAN J.

     WOLPERT, HOWARD SOMMER, MURRAY

10   INDICK, ELLIOTT SINGER, and PETER

     BOOCKVAR,

11

12                   Defendants.

13   --------------------------------x

14                   October 28, 2021

15                   9:20 a.m.

16

17        VIDEOTAPED REMOTE DEPOSITION of MICHAEL ROSS

18   FEINSOD, held at the above-mentioned date and time,

19   before Judith Castore, a Certified Livenote Reporter

20   and Notary Public of the State of New York.

21

22

23

24

25

Page 2

```
1
2              A P P E A R A N C E S
3  (ALL PARTIES APPEARED VIA ZOOM VIDEOCONFERENCE)
4        ON BEHALF OF PLAINTIFF
              GOTTESMAN, WOLGEL, FLYNN,
5              WEINBERG & LEE, P.C.
              11 Hanover Square, 4th Floor
6              New York, New York 10005
              BY:    STEVEN WEINBERG, ESQ.
7                    sweinberg@gottesmanlaw.com
                     KELSEY BILODEAU, ESQ.
8                    kbilodeau@gottesmanlaw.com
9
10       ON BEHALF OF DEFENDANTS:  John Laird, Ivan
         Wolpert, Howard Sommer, Elliott Singer, Peter
11       Boockvar and Murray Indick
              HOLLAND & KNIGHT, LLP
12             31 West 52nd Street
              New York, New York 10019
13             BY:   MARTIN SEIDEL, ESQ.
                     Martin.Seidel@hklaw.com
14                   MARIE LARSEN, ESQ.
                     marie.larsen@hklaw.com
15
16       ON BEHALF OF DEFENDANTS:  Michael Feinsod and
         Richard Feinstein
17             MOLO LAMKEN, LLP
              430 Park Avenue
18             New York, New York 10022
              BY:    RAYINER HASHEM, ESQ.
19                   rhashem@mololamken.com
                     ELIZABETH CLARKE, ESQ.
20                   eclarke@mololamken.com
21
22       ALSO PRESENT:
              BOB BRASCH, IT Concierge
23             Veritext Legal Solutions
              PHIL GLAUBERSON, Legal Video Specialist
24             Veritext Legal Solutions
25
```

Page 3

```
1
2
3        IT IS HEREBY STIPULATED AND AGREED, by and
4  among counsel for the respective parties hereto,
5  that the filing, sealing and certification of the
6  within deposition shall be and the same are hereby
7  waived.
8        IT IS FURTHER STIPULATED AND AGREED that all
9  objections, except to the form of the question,
10 shall be reserved to the time of trial;
11       IT IS FURTHER STIPULATED AND AGREED that the
12 within deposition may be signed before any Notary
13 Public with the same force and effect as if signed
14 and sworn to before the court.
15                   * * * *
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                   FEINSOD
2        VIDEOGRAPHER:  Good morning.
3  We are going on the record at
4  9:20 a.m. Eastern Time,
5  October 28, 2021.
6        Please note that microphones
7  are sensitive and may pick up
8  whispering and private
9  conversations.  Please mute your
10 microphone whenever possible.
11 Audio and video recording will
12 continue to take place unless all
13 parties agree to go off the
14 record.
15       This is Media Unit 1 of the
16 video-recorded deposition of
17 Michael Feinsod in the matter of
18 U.S. Small Business Administration
19 as receiver of Elk Associates
20 Funding Corp. versus Michael
21 Feinsod, et al., filed in the
22 United States District Court
23 Eastern District of New York,
24 17-cv-3586.
25       This deposition is being held
```

Page 5

```
1                   FEINSOD
2  remotely.  My name is Phil
3  Glauberson from the firm Veritext
4  and I am the videographer.  The
5  court reporter is Judy Castore
6  from Veritext.
7        I am not authorized to
8  administer an oath.  I'm not
9  related to any party in this
10 action, nor am I financially
11 interested in the outcome.
12       Counsel will please now state
13 their appearances and affiliations
14 for the record.  If there are any
15 objections to proceeding or to the
16 court reporter administering the
17 oath virtually, please state them
18 at the time of your appearance,
19 beginning with the noticing
20 attorney.
21       MR. WEINBERG:  Steven
22 Weinberg; Gottesman, Wolgel, Flynn
23 & Weinberg, P.C.  We are the
24 attorneys for the Plaintiff,
25 United States Small Business
```

---

FEINSOD

1  FEINSOD
2  Administration as receiver for Elk
3  Associates Funding Corp.
4       MS. BILODEAU:  Kelsey
5  Bilodeau, also Gottesman, Wolgel,
6  Flynn & Weinberg, P.C., also for
7  the receiver.
8       MR. HASHEM:  Ray Hashem; Molo
9  Lamken, LLP, attorney for Michael
10  Feinsod and Richard Feinstein.
11       MS. CLARKE:  Elizabeth
12  Clarke, also of Molo Lamken, LLP,
13  also for Defendants Feinsod, and
14  Feinstein.
15       MR. SEIDEL:  Good morning.
16  Martin Seidel, Holland & Knight,
17  LLP, for the independent director
18  Defendants.
19       MS. LARSON:  Marie Larson,
20  also Holland & Knight, on behalf
21  of six independent director
22  Defendants.
23       VIDEOGRAPHER:  Okay.
24       Will the court reporter
25  please swear in the witness.

---

1  FEINSOD
2  M-I-C-H-A-E-L  R-O-S-S  F-E-I-N-S-O-D,
3       Having been duly sworn by a Notary Public
4  within and for the State of New York, stated an
5  address as 60 The Intervale, Roslyn, New York 11576,
6  was examined and testified as follows:
7       MR. WEINBERG:  Thank you.
8       Just briefly, we would like
9  to let everyone know that we're
10  going leave the deposition open to
11  reserve time for any additional
12  questions, but also for the
13  questions relating to any
14  additional documents that may be
15  produced by the defendants, for
16  example --
17       THE WITNESS:  Can I -- sorry
18  to interrupt.  Would there be any
19  way for you to -- the window
20  behind you is producing a lot of
21  glare that -- when you move from
22  side to side.  Is there any way --
23  do you mind closing that window or
24  the binds.
25       MR. WEINBERG:  Sure.

---

1  FEINSOD
2       THE WITNESS:  Thank you.
3       MR. WEINBERG:  If I may
4  finish my statement.
5       THE WITNESS:  Sure.  I'm
6  sorry.  I apologize.
7       MR. WEINBERG:  Thank you.
8       And subject to the production
9  of any additional documents that
10  were found before Mr. Feinstein's
11  deposition, to question Mr.
12  Feinsod about any additional
13  documents that are produced.
14  Okay.
15       Excuse me one second.
16       THE WITNESS:  Thank you.
17  It's still there.  I apologize.
18       MR. WEINBERG:  Okay.  But now
19  you hit on rule one.  Rule one.
20  EXAMINATION BY MR. WEINBERG:
21       Q   Good morning, Mr. Feinsod.
22  You know that I represent the receiver
23  in this action and I'm going to be
24  asking questions about the claims in
25  this action.

---

1  FEINSOD
2       Have you -- and rule one
3  is -- and I appreciate what you are
4  asking for, no problem.  But just when
5  we give a question, let me finish the
6  question.  Or if I give a statement,
7  let me finish the statement, and then
8  you will give your answer.
9       As you know or may know, it
10  will make it easier for the court
11  reporter to take the transcript.  Okay?
12       A   Absolutely.
13       Would you mind fixing the --
14  I apologize, but the window -- you
15  still keep -- when you move over,
16  there's this glare in the right corner.
17       Q   It will probably pass in less
18  than 15 minutes, but is -- if it's
19  bothering you --
20       A   I appreciate it.  Thank you.
21       That's perfect.  Thank you
22  very much.
23       Q   Okay.  Mr. Feinsod, have you
24  been deposed before?
25       A   Yes.

Page 10

FEINSOD

1
2      Q     Okay.  How many times?
3      A     Once.
4      Q     What -- what type of case was
5   it?
6      A     It was a -- it was a divorce
7   case.
8      Q     Have you testified before?
9      A     Not outside of that
10  deposition.
11     Q     Just a couple of rules for
12  today.  It's very important when I ask
13  a question for you to give a verbal
14  answer, as you have been doing.
15         If you -- is there anything
16  that you -- any medication or any
17  condition that affects your ability to
18  give truthful testimony under oath to
19  answer questions today?
20     A     No.
21     Q     We'll probably take a break
22  about one every hour, hour and a half.
23  If you need a break at any time, please
24  let us know.
25         Judy, the court reporter,

Page 11

FEINSOD

1
2   please let us know as well if you need
3   a break.
4         Typically, we have been
5   taking a lunch break at about 12:30 for
6   half hour.  So hopefully that will work
7   with your schedule; is that okay?
8      A     It should.  I got my day --
9   my day is full -- my day is blocked out
10  for this.
11     Q     Thank you.
12         If, at any time, you don't
13  understand the question, please say so
14  and I will be happy to rephrase it.
15  Okay?
16     A     Yes.
17     Q     Did you review documents or
18  categories of documents to prepare for
19  the deposition today?
20     A     Yes.
21     Q     What did you review?
22     A     A substantial amount of
23  documents that were provided within
24  the -- I'm sorry -- within the
25  discovery delivered by your client.

Page 12

FEINSOD

1
2      Q     Okay.  What were the general
3   categories of documents that you looked
4   at?
5      A     There were no general
6   categories; there were 25 years' of
7   e-mails, roughly, 20 -- about 20 years
8   of e-mails, many duplicative.  There
9   were over a million -- million
10  documents within the discovery, so.
11     Q     Okay.
12     A     I tried to limit them and
13  review some of them.
14     Q     Okay.  Did you review any
15  pleadings or court papers?
16     A     Yes.
17     Q     Okay.  Which ones, if you
18  remember?
19     A     Various ones.  Complaints
20  filed against the SBA, complaints filed
21  against me, answers, amended
22  complaints, amended answers in general.
23     Q     In the -- did you review any
24  company records?
25     A     Yes.

Page 13

FEINSOD

1
2      Q     What were the company records
3   you looked at?
4      A     What company?
5         Just to establish, what
6   company are we talking about?
7      Q     Talking about AmeriTrans.
8   We're talking -- the company operated
9   with the parent-subsidiary
10  relationship.  The company, I believe,
11  is commonly referred to AmeriTrans and
12  Elk together.
13         What was -- was that your
14  understanding of the company?
15     A     The company -- again, I
16  don't -- there are two companies, I
17  guess, in the way you just spoke.  So
18  there's AmeriTrans and it's
19  wholly-owned subsidiary, Elk.
20     Q     Did you review -- what were
21  the records that you reviewed for
22  AmeriTrans and/or Elk?
23     A     SEC filings; SBA filings;
24  e-mails; underlying documents; stock
25  purchase agreements; ancillary

Page 14

FEINSOD

1
2  agreements to stock purchase
3  agreements; other documents that I
4  might not have specified there.
5          E-mails between SBA
6  officials; investment committee reports
7  at the SBA; materials submitted by Elk
8  to the SBA; examination reports
9  prepared by the SBA.
10         I could -- that's about as
11 specific as I can get.
12     Q    Did you take any notes to
13 prepare for your testimony for today?
14     A    No.
15     Q    Did you -- I'm not asking
16 about what conversations you had with
17 your attorneys.  If your attorneys were
18 part of the conversation, please do not
19 answer the question.
20         Did you have any
21 conversations with Mr. Feinstein in
22 preparing for today's deposition?
23     A    No.
24     Q    Did you have any
25 conversations with any of the former

Page 15

FEINSOD

1
2  board members in preparing for today's
3  deposition?
4      A    No.
5      Q    Could you briefly tell us
6  your educational background.
7      A    Starting when?
8      Q    College.
9      A    College.  I attended the
10 George Washington University in
11 Washington, DC.
12     Q    What was your degree in, when
13 did you graduate?
14     A    Graduated in 1993 with a
15 Bachelor of Arts in Political Science.
16 And a minor in Economics.
17     Q    Did you -- and did you
18 continue after college with your
19 education?
20     A    Yes.
21     Q    And where did you go?
22     A    I attended Fordham Law
23 School, graduating in 1996.
24     Q    And what was your employment
25 history either during law school or

Page 16

FEINSOD

1
2  after law school?
3      A    During law school, I worked
4  for several different money management
5  firms, as well as the summer -- I had
6  summer associate position at Paul
7  Hastings.
8      Q    And what did you do --
9  generally, what was your work at the
10 money management firms?
11     A    Analytical.  Financial
12 statement analytics, understanding the
13 markets, learning to -- assisting
14 trading in the bond markets and in the
15 equity markets.
16     Q    And at Paul Hastings,
17 generally, what were your assignments?
18     A    I was an associate in the
19 mergers and acquisitions department.  I
20 concentrated in telecommunications
21 mergers and acquisitions, specifically
22 cellar and cable systems.
23     Q    After your graduation from
24 law school -- well, other than your JD
25 degree, do you have any other

Page 17

FEINSOD

1
2  educational certifications?
3      A    Educational, no.
4      Q    Okay.  Are there other
5  certifications that you have?
6      A    At one point was a licensed
7  stockbroker in order to be affiliated
8  with a broker-dealer.  I don't know
9  what the license is called.
10     Q    And did you maintain that
11 license, or you do not maintain that
12 license?
13     A    No, I don't maintain that
14 license, since probably 1998.
15     Q    And is there -- why do you
16 not -- why did you decide not to
17 continue to maintain that license?
18     A    I was no longer affiliated
19 with the registered broker-dealer, and
20 have not been since.
21     Q    And who was the registered
22 broker-dealer that you were affiliated
23 with?
24     A    Mark Boyer and Company.
25     Q    And what was your work with

Page 18

FEINSOD

1
2 them?
3      A     I was a research analyst and
4 a leverage buyout analyst.
5      Q     And what -- in terms of --
6 now after -- after you graduated from
7 law school, what was your employment
8 history?
9      A     I mentioned I joined Paul
10 Hastings as an associate in the
11 corporate law department.
12      Q     How long was that?
13      A     Until late 1997, I believe.
14      Q     Okay.  Generally, what were
15 your assignments there?
16      A     My assignments were working
17 with telecommunications companies
18 primarily, and cellar and cable
19 transactions in mergers and
20 acquisitions.
21           Acquisitions, my primary job
22 was due diligence and facilitating
23 transfers of -- helping the clients
24 complete the transactions through the
25 transfer of any licenses.

Page 19

FEINSOD

1
2 Specifically, FCC cellar licenses,
3 local municipal licenses that might be
4 associated with it, and in some
5 cases --
6           (Clarification by the
7 reporter.)
8      A     -- pole attachment
9 agreements.
10      Q     Thank you.
11           After '97, what did you next
12 do for work?
13      A     I joined Mark Boyer and
14 Company full-time as a research
15 analyst.
16      Q     And how long were you a
17 research analyst for Mark Boyer?
18      A     Until December of 1998.
19      Q     Okay.  Was your -- and your
20 research analysis assignments, were
21 they the same as to what you testified
22 before, or were they different during
23 '97 and '98?
24      A     I'm sorry.  I didn't -- I
25 didn't understand the question.

Page 20

FEINSOD

1
2      Q     Sure.
3           As a research analyst, were
4 the assignments or topics the same as
5 what you had previously testified to
6 today?
7      A     We -- I had two -- we had two
8 primary lines of business.  One was
9 identifying publicly traded companies
10 that were trading below their intrinsic
11 value; and then the second line of
12 business was evaluating private
13 transactions that people -- that
14 investors might be considering doing
15 known as management buyouts, private
16 market as opposed to public market
17 equities.
18      Q     Okay.  All right.
19           In terms -- all right.  After
20 working for Mark Boyer, did you have
21 employment?
22      A     I formed my own company
23 called Infinity Capital Management --
24 Infinity Capital, excuse me.
25      Q     Sure.

Page 21

FEINSOD

1
2           What was your position with
3 Infinity Capital?
4      A     I was the managing member.
5      Q     And what did you do for
6 Infinity Capital?
7      A     Infinity Capital's major
8 business was managing Infinity Capital
9 Partners, which was an investment
10 partnership that focused on small
11 capitalization stocks, publicly traded
12 stocks.
13      Q     And what was the size of
14 Infinity Capital Partners?
15      A     I'm sorry.  What does that
16 mean?
17      Q     I'm sorry.  For -- well,
18 Infinity Capital, were you the sole
19 member or were there other members?
20      A     There are various Infinity
21 entities, so -- that had different
22 investors in them.  Infinity
23 Capital LLC, I was the sole member.
24      Q     How many investors?
25      A     In Infinity Capital, none.

Page 22

```
 1              FEINSOD
 2      Q    I'm sorry.
 3      A    None.  In Infinity Capital,
 4 none.
 5      Q    Were the investors in
 6 Infinity Capital Partners?
 7      A    Yes.
 8      Q    How many investors were in
 9 Infinity Capital Partners?
10      A    I don't recall.
11      Q    What was the --
12 approximately, what was the size of the
13 investment pool?
14      A    At what point?
15           It ranged.  It exists
16 today -- it existed -- I'm sorry.  It
17 doesn't exist anymore.
18           It was -- it existed for 20
19 years.  It had different sizes at
20 different times.
21      Q    What was the --
22 approximately, what was the range?
23      A    Zero to 40 million.
24      Q    And what were the type of
25 investments that Infinity Capital
```

Page 23

```
 1              FEINSOD
 2 invested in -- Infinity Capital
 3 Partners?
 4      A    Publicly traded equities.
 5      Q    Did there -- after 1999, did
 6 you serve on any boards?
 7      A    Yes.
 8      Q    What boards did you serve on?
 9      A    Corporate or charitable or
10 what?
11      Q    Corporate.
12      A    I sat on the board of --
13           (Clarification by the
14 reporter.)
15      A    -- Asta Funding.  A-S-T-A,
16 Funding, F-U-N-D-I-N-G.
17      Q    What is Asta Funding?
18      A    Asta Funding was a publicly
19 traded finance -- specialty finance
20 company.
21      Q    And what type of investments?
22      A    Purchased credit card
23 receivables, charged off credit card
24 receivables were their major line of
25 business.
```

Page 24

```
 1              FEINSOD
 2      Q    And what was your position on
 3 the board?
 4      A    Just a member of the board.
 5      Q    Did you serve on any board
 6 committees?
 7      A    No.
 8      Q    Any other corporate boards
 9 that you have served on?
10      A    Yes.
11      Q    I'm sorry.  One more question
12 for Asta Funding.  When -- what was
13 your approximate dates of service as a
14 member of the board of Asta?
15      A    Late 2001 through 2003, maybe
16 2004.
17      Q    What were the other boards
18 that you have served on?
19      A    Publicly traded companies or
20 charities?
21      Q    I'm sorry.  Corporate boards,
22 please.
23      A    Private -- just public or
24 private, just to be clear as to when
25 we're talking about companies?
```

Page 25

```
 1              FEINSOD
 2      Q    I'm sorry.  How many
 3 companies.  We'll cover both.  How many
 4 companies did you serve on the board?
 5      A    I'm just clarifying.  You
 6 would like private companies as well?
 7      Q    Yes.
 8      A    Okay.  I served on the board
 9 of a company called FreeSamples.com
10 from 1997 until 2000.
11      Q    Okay.  In what capacity?
12      A    As a board member.  No
13 committees.
14           (Unreportable cross-talk.)
15           (Clarification by the
16 reporter.)
17      A    No committees.
18           (Clarification by the
19 reporter.)
20      MR. WEINBERG:  I said "Any
21 committee assignments?"
22      Q    In addition to
23 FreeSamples.com, what other corporate
24 boarded have you served on?
25      A    In 2007 -- I'm sorry.  In
```

Page 26

```
          FEINSOD
1
2   2005, I joined the board of AmeriTrans
3   Capital and Elk Associates Funding
4   Corporation simultaneously.
5        Q    And in what capacity did you
6   join AmeriTrans and Elk?
7        A    As a board member.
8        (Whereupon, a discussion was
9        held off the record.)
10       Q    As a board member for
11  AmeriTrans and Elk, did you have any
12  committee assignments starting in 2005?
13       A    No, I don't believe.
14       Q    And what were your --
15  generally, what responsibilities did
16  you have as a board member for
17  AmeriTrans and Elk starting in 2005?
18       A    I need a more specific
19  question.  I apologize.
20       Q    Sure.
21       A    What my responsibilities
22  were.
23       Q    What were your
24  responsibilities as a board member for
25  AmeriTrans and Elk?
```

Page 27

```
          FEINSOD
1
2        A    Generally, to observe
3   management and make sure -- because
4   we -- served in various capacities to
5   observe management, how they were
6   running the company, and the management
7   of the company -- the management of the
8   company.
9        Q    And that -- and you served in
10  that capacity from 2005 until what
11  time?
12       A    With respect to Elk, till the
13  receivership, which would be April of
14  2013, I believe, when I was -- and then
15  with respect to AmeriTrans, as a
16  director until July of 2013, I believe.
17       Q    And at what time did you
18  become an officer of AmeriTrans and
19  Elk?
20       A    I don't recall specifically.
21       Q    Were you an officer when you
22  joined the board in 2005?
23       A    No, I was not.
24       Q    Would it be -- do you
25  remember approximately when you became
```

Page 28

```
          FEINSOD
1
2   president -- withdrawn.
3        Did you become president of
4   Elk and AmeriTrans?
5        A    Yes.
6        Q    Do you remember approximately
7   as to when that was?
8        A    I would -- I believe it was
9   approximately late 2007, December of
10  2007.
11       Q    When you became president of
12  AmeriTrans and Elk, were you -- did you
13  have any other titles at that time in
14  late 2007?
15       A    Any titles?  With respect to
16  what?  Sorry.
17       Q    For example, CEO, CFO --
18       A    I was --
19       Q    -- CCO.  Did you have any --
20       A    At AmeriTrans?
21       Q    Or Elk, between the time
22  period of 2005 and 2007.
23       A    No, I don't believe so.
24       Q    Before you became president
25  at AmeriTrans, do you recall any
```

Page 29

```
          FEINSOD
1
2   particular board issues that -- where
3   you were exercising oversight as to how
4   management was running the company?
5        A    No, I don't recall.
6        Q    We'll come back to AmeriTrans
7   and Elk.
8        Did you serve as a member of
9   any other corporate boards in addition
10  to FreeSamples.com, Asta Funding, and
11  AmeriTrans and Elk?
12       A    Yes.  I served on the board
13  of directors of Kingstone Companies.
14       Q    When was that?
15       A    K-I-N-G-S-T-O-N-E.
16       I'm sorry.  The company was
17  originally called DCAP, new word,
18  Group, when I joined the board,
19  approximately 2007.
20       Q    I'm sorry.  How long were you
21  a board member?
22       A    DCAP subsequently changed its
23  name to Kingstone Companies, and I was
24  a board member of Kingstone Companies
25  until early 2015.
```

Page 30

```
FEINSOD
1
2       Q     Okay.  And what were you --
3   did you serve on any committees as a
4   board member of Kingstone or DCAP?
5       A     I served on the compensation
6   committee of Kingstone.
7       Q     And what were your
8   responsibilities as a board member for
9   DCAP and Kingstone?
10      A     General board member
11  responsibilities of corporate oversight
12  and making -- and interviewing
13  management's actions in running the
14  company.
15      Q     Do you recall any particular
16  issues that developed there that
17  required the board to have an action
18  involvement with oversight or how
19  management was running the company?
20      A     I don't understand.  Could
21  you repeat the question.
22      Q     Okay.  With respect to
23  Kingstone, do you recall any board
24  issues or discussions regarding board
25  oversight or how management was
```

Page 31

```
FEINSOD
1
2   operating the company?
3       A     I don't recall specifically.
4       Q     Have you served on any other
5   corporate boards?
6       A     No -- I'm sorry.  I
7   apologize.
8       Q     Please.
9       A     Yes, yes, I did.  I served as
10  the -- on the board of General Cannabis
11  Corporation, excuse me.
12      Q     And in what capacity did you
13  serve on the board of General Cannabis?
14      A     Executive chairman of the
15  board.
16      Q     And approximately what years
17  did you hold that position?
18      A     2014 through 2020.
19      Q     And what were your general
20  responsibilities as executive chairman
21  of the board for General Cannabis?
22      A     They were -- I managed the
23  day-to-day functions of the company in
24  conjunction with the CEO.
25      Q     And what occurred or what
```

Page 32

```
FEINSOD
1
2   decisions were made that you left
3   General Cannabis in 2020?
4           MR. HASHEM:  Objection.
5       Assumes facts not in evidence.
6       Lack of foundation.
7       Q     Do you understand the
8   question?
9       A     No, I didn't.  Could you
10  repeat it.
11      Q     Sure.
12          You left General Cannabis in
13  2020; is that right?
14      A     As a board member and -- yes.
15          And as an employee.  Excuse
16  me.
17      Q     Okay.  And what was -- why
18  did you leave General Cannabis as a
19  board member and as an employee in
20  2020?
21      A     A general disagreement with
22  management.
23      Q     What was the disagreement?
24      A     On bookkeeping, and policies
25  and procedures.
```

Page 33

```
FEINSOD
1
2       Q     What policies and procedures
3   did you disagree with?
4       A     The CFO's recordkeeping with
5   respect to option plans and certain
6   accounting nuances.
7       Q     What were the accounting
8   nuances?
9       A     Just the CFO's qualifications
10  in general, and understanding of public
11  company accounting.
12      Q     Okay.  Do you have any
13  certifications in accounting?
14      A     No.
15      Q     Is your knowledge of
16  accounting based upon your
17  experience -- your work experience that
18  you've outlined here today so far?
19      A     Yes.  And I've taken several
20  accounting classes.
21      Q     What accounting classes have
22  you taken?
23      A     I don't recall.  They were
24  over 25 years ago.
25      Q     And where did you take the
```

Page 34

FEINSOD

1
2  accounting classes?  Was that
3  undergraduate?
4       A    At George Washington
5  University and at Fordham Law School.
6       Q    Briefly, what were the --
7  what charitable boards have you served
8  on or are you serving on?
9       A    I currently sit on the board
10  of the Sid Jacobson Jewish Community
11  Center in Rosalyn, New York.  I've sat
12  on that for 19 years, I believe.
13       I sit on the board of George
14  Washington University's liberal arts
15  school.  I sat on that over 10 years.
16       I sat on few other charity
17  boards historically that I no longer am
18  affiliated with.
19       Q    Okay.  Any of them -- any one
20  of them come to mind, or you don't
21  recall?
22       A    Jacob's Cure is a 501(c)(3).
23       Q    Any others come to mind?
24       A    No, I don't believe so.
25       Q    What's your current

Page 35

FEINSOD

1
2  employment?
3       A    I'm not employed currently.
4       Q    With AmeriTrans -- well, with
5  AmeriTrans and Elk, did there come a
6  time where you became the CEO of
7  AmeriTrans and Elk?
8       A    Yes.
9       Q    When was that?
10       A    I don't recall.
11       Q    Would that have been sometime
12  in 2008?
13       A    Could you repeat the
14  question, just to be clear.
15       Q    Approximately when did you --
16  approximately what year or by what year
17  were you the CEO of AmeriTrans and Elk?
18       A    Probably 2009 is when I
19  became -- when I was appointed
20  president, I believe.
21       Q    Okay.  Did you hold the
22  titles at the same time, president and
23  CEO?
24       A    At one point, yes.
25       Q    Okay.  Was there -- I'm

Page 36

FEINSOD

1
2  sorry.  I'm just trying to understand
3  your answer.
4       Was there a period of time
5  where you were only the president and
6  not yet the CEO of AmeriTrans and Elk?
7       A    Yes.  I believe I joined the
8  company as president, and then the
9  added title of CEO in 2009, in early
10  2009 or late 2008.
11       Q    Okay.  And how did you come
12  to join; in other words, how were you
13  introduced to AmeriTrans and Elk to
14  join the board?
15       A    Beginning in 2001 through
16  Infinity Capital Partners, I began
17  acquiring common shares in AmeriTrans
18  Capital.
19       And that lead to a multi-year
20  process of getting to know the company
21  better; getting to know Gary Granoff,
22  the chairman and CEO, the president of
23  the company.  And increasing -- and
24  over -- beginning by 2005, I believe we
25  owned over 5 percent of the company.

Page 37

FEINSOD

1
2       Q    When you say "we," who is
3  "we"?
4       A    Infinity Capital Partners.
5       Q    Okay.  And what were -- was
6  it at that point in 2005, then, you
7  were asked to join the board and become
8  president of AmeriTrans -- withdrawn.
9       A    No.
10       Q    Please correct me.
11       A    I didn't hear you.  I'm
12  sorry.  What's the question?
13       Q    In 2005, who asked -- did you
14  ask to join the board or did someone
15  ask you to join the board for
16  AmeriTrans and Elk?
17       A    Gary Granoff asked me to join
18  the board.
19       Q    Okay.  And it was some point
20  later, I guess -- was it some point
21  later -- was it 2008 that you thought
22  you became the president?
23       A    Yeah, I believe -- I don't
24  know the exact dates.  I apologize.
25       Q    Okay.  If you recall, what

Page 38

FEINSOD

1
2  was your discussions with Mr. Granoff
3  as to what role he was looking for you
4  to fulfill at AmeriTrans and Elk, and
5  why he wanted you to join the board?
6      A    To work alongside him to
7  expand the company's portfolio into --
8  beyond medallion funding and into
9  corporate loans.
10     Q    And in your initial
11 discussions with Mr. Granoff, what were
12 you -- in what areas were you looking
13 to expand the company's portfolio?
14     A    Shift the focus of the
15 company's portfolio from medallion --
16 from taxicab medallion loans to what
17 are known as senior secured corporate
18 loans.
19     Q    And the senior secured
20 corporate loans, in your discussions
21 with Mr. Granoff, what was the -- was
22 that for AmeriTrans to invest, Elk to
23 invest, both companies to invest?
24 Which company was taking the
25 investment -- I'm sorry.  Which company

Page 39

FEINSOD

1
2  was taking the investment vehicle?
3      A    Elk was always going be to
4  the investment vehicle.
5      Q    When you joined the board for
6  AmeriTrans and Elk, were there
7  companies -- I'm sorry -- where there
8  committees to help the board with its
9  assignments or work?
10          (Clarification by the
11 reporter.)
12     A    I don't recall.
13     Q    What committees did Elk and
14 AmeriTrans have?
15     A    In 2005 when I joined the
16 board, I don't recall.
17     Q    I understand.
18          After 2005, did Elk and
19 AmeriTrans have any committees for the
20 board of directors to help with its
21 work and oversight?
22     A    Yes.
23     Q    What were those committees?
24     A    The -- it was a compensation
25 committee and an audit committee as

Page 40

FEINSOD

1
2  required by -- I guess as required by
3  NASDAQ regulations, in compliance with
4  NASDAQ regulations.
5      Q    Was there an investment
6  committee?
7      A    Under the 1940 act, the
8  entire board was considered the
9  investment committee.
10     Q    Other than what's considered
11 or designated under a statute, was
12 there an investment committee that
13 was -- that operated under a charter
14 for AmeriTrans or Elk?
15     A    I don't recall.
16     Q    Was there an investment
17 committee at any time for AmeriTrans or
18 Elk that met separately -- that met
19 separately to discuss company business?
20     A    Yes, there were ad hoc
21 committees that met from time to time
22 to discuss certain aspects outside of
23 the two committees that you might be
24 referring to.
25     Q    Such as?  You can recall

Page 41

FEINSOD

1
2  anyone of the ad hoc committees?
3      A    Conklin.  There was an ad hoc
4  committee to handle the co-lendings --
5  the some of the loans that Elk had
6  entered into as a co-lender with other
7  SBICs.
8      Q    Do you remember who -- now,
9  when we say ad hoc committee to handle
10 the co lending that Elk entered into
11 with respect to the Conklin investment,
12 was that an ad hoc committee within
13 Elk?
14          MS. CLARKE:  Objection to the
15 form.
16     Q    You can answer.
17     A    To -- clarify again.  I
18 apologize.
19     Q    Do you know who served on the
20 ad hoc committee for Elk for the
21 Conklin investment?
22     A    Myself, Gary Granoff, and
23 that was -- I believe that was it with
24 respect to that.
25     Q    Do you remember what the

Page 42

FEINSOD

1
2  particular issues were regarding the
3  Conklin investment that the ad hoc
4  committee --
5      A   Yes.
6      Q   What was --
7      A   Yes.  The lead lender was in
8  receivership because another SBIC was
9  in receivership, and very little could
10 be done to -- the loan went into
11 default.
12         The loan was originated
13 before I joined the company and was in
14 default from the day I joined the
15 company as a board member.  And the
16 loan had been restructured by the lead
17 lender several times and was a troubled
18 asset -- it was a non-performing asset,
19 excuse me.
20     Q   Do you remember who the lead
21 lender was?
22     A   Yes.
23     Q   Who was the lead lender?
24     A   I believe it was Fundex
25 Capital.

Page 43

FEINSOD

1
2      Q   When you met with Gary
3  Granoff regarding the Elks investment
4  in Conklin, was there any formal agenda
5  for the meeting?
6      A   No.
7          MR. HASHEM:  Objection.  What
8      meeting are you --
9          MR. WEINBERG:  For an ad hoc
10     committee meeting.
11     Q   Were minutes taken of ad hoc
12 committee meetings?
13     A   E-mails may have been.
14         They weren't meetings.  To
15 call them meetings would misconstrue
16 them.
17     Q   Okay.  So then would the
18 e-mails be minutes if they're not --
19     A   The e-mails would be minutes
20 memorializing what Gary and I had done
21 as directors to evaluate the
22 investment.  Does that help?  Is that
23 clear?  Excuse me.
24     Q   Okay.  And do you recall
25 approximately what period of time -- or

Page 44

FEINSOD

1
2  during what period of time generally
3  you would have met with Gary Granoff to
4  discuss the Conklin investment?
5          MS. CLARKE:  Objection to the
6  form.  And mischaracterizes the
7  testimony.
8      Q   Go ahead.  You could answer.
9  The testimony speaks for itself.
10         Do you remember when or over
11 what --
12     A   We discussed it -- we
13 discussed it regularly from when I
14 joined the company till Gary left the
15 company.
16     Q   And when did Gary leave the
17 company?  Do you remember?
18     A   I don't recall.
19     Q   Were there other ad hoc
20 committees that discussed -- withdrawn.
21         Were there other ad hoc
22 committees to discuss other topics at
23 Elk?
24     A   No, I don't believe so.
25     Q   Were there other ad hoc

Page 45

FEINSOD

1
2  committees to discuss topics at
3  AmeriTrans?
4      A   No, there were not.
5      Q   Were there -- were there any
6  formal meetings of an investment
7  committee that was separate and apart
8  from a board meeting?
9      A   Yeah.  There were
10 investment -- there was an ad hoc
11 committee to follow the corporate loan
12 program when we first launched it.  And
13 that committee, I believe, was at one
14 point myself, Gary Granoff, and
15 Murray --
16         (Clarification by the
17 reporter.)
18     A   Murray Indick, I-N-D-I-C-K.
19     Q   And what were some of the
20 corporate loans that the committee was
21 following?
22     A   I don't recall specifically.
23     Q   Okay.  Do you recall any one
24 of them?
25     A   Not from memory, no.

---

Page 46

FEINSOD

1     FEINSOD

2    Q   And when you met, was this

3 informally or formally that there were

4 discussions between yourself, Gary

5 Granoff, and Murray Indick?

6    A   You said when we met was

7 there --

8     Was that the question?

9    Q   In order for the -- how did

10 the ad hoc committee meet or discuss

11 following the corporate loan program?

12    A   We would review written

13 summaries of the proposed loans, and

14 maybe ancillary documents as well; and

15 then consider both, I guess, the

16 viability of the investment.

17    Q   And would this be reviewed

18 informally through e-mails, or would

19 there be a sit-down meeting that you

20 would review these items?

21    A   It was e-mails, e-mails and

22 memos.

23    Q   Other than the e-mails and

24 memos, was there any agenda or meeting

25 minutes that were taken with respect to

---

Page 47

FEINSOD

1     FEINSOD

2 the ad hoc committee to follow the

3 corporate loan program?

4    A   I don't recall.

5    Q   And approximately what was

6 the time frame that this ad hoc

7 committee followed the corporate loan

8 program?  From when until when?

9    A   I don't recall specifically.

10    Q   There came a time when

11 Mr. Indick resigned from the board.  Do

12 you recall that?

13    A   That he resigned I recall,

14 yes.

15    Q   Okay.  Did the ad hoc

16 committee that was following the

17 corporate loan program continue their

18 review until Mr. Indick resigned from

19 the board?

20    A   I don't recall.

21    Q   Did there come a time where

22 you, Gary Granoff, and Murray Indick

23 had stopped following the corporate

24 loan program and reviewing it?

25    A   I can only speak to me, but

---

Page 48

FEINSOD

1     FEINSOD

2 never.  Never for myself.

3    Q   Never for yourself?

4    A   Never for myself. Could you

5 repeat -- the question didn't -- I

6 can't speak about Gary and Murray.

7    Q   Okay.  Well, I'm talking --

8 you always continued to review the

9 corporate loan programs yourself,

10 correct?

11    A   Correct.

12    Q   Okay.  I'm talking about --

13 I'm asking about an ad hoc committee

14 reviewing the corporate loan program.

15    Your discussions with Gary

16 and Murray, did there come a point in

17 time where those discussions stopped?

18    A   Probably when Murray left the

19 board.

20    To be clear, the full board

21 reviewed the entire corporate loan

22 portfolio quarterly.

23    Q   Okay.  And that --

24    A   As the investment committee

25 for Elk.

---

Page 49

FEINSOD

1     FEINSOD

2    Q   That was at a board meeting,

3 correct?

4    A   I don't recall where, but it

5 was approved.

6    Q   How did --

7    A   Each loan -- the board

8 reviewed each loan in the portfolio on

9 a quarterly basis.

10    Q   Are you referring to the

11 board's review of the 10-Qs or the

12 468s?

13    MR. HASHEM:  Objection to

14   form.  Among other items, yes.

15    A   Among other items, yes.

16    Q   Okay.  What other items would

17 the board review quarterly?

18    A   There was a detailed loan

19 review report prepared quarterly.

20    Q   And how was that report

21 presented to the board?

22    A   By e-mail.

23    Q   And where -- was that report

24 discussed with the board at a board

25 meeting?

## Page 50

FEINSOD

1
2     A     Which report?
3     Q     The detailed loan report.
4     A     From which quarter -- from
5  what date?
6     Q     I don't know.  We're just
7  talking about your general practice.
8          You said the investment
9  committee was the entire board that
10 reviewed --
11    A     Yes.
12    Q     -- quarterly the --
13          (Unreportable cross-talk.)
14          (Clarification by the
15 reporter.)
16    A     I apologize.  The question
17 again?
18    Q     What's the general practice
19 or procedure that you followed that the
20 board members reviewed each corporate
21 loan on a quarterly basis?
22          MS. CLARKE:  Objection --
23    A     Management -- I'm sorry.
24          MS. CLARKE:  Objection to the
25    form.

## Page 51

FEINSOD

1
2     Q     You could answer.
3     A     Management prepared a
4  document, a summary document going
5  through the loans.  The performance,
6  the character, the size, the
7  collateral, and the value of each asset
8  at the end of each quarter and
9  presented it to the board.
10    Q     When management presented it
11 to the board, was that -- how was it
12 presented to the board; by e-mail
13 orally?
14    A     It was a PDF -- it was always
15 a paper document that was PDFed and
16 delivered, either electronically or on
17 paper, to the directors -- to the
18 members of the board, excuse me.
19    Q     And as your general practice,
20 was this an agenda item that was to be
21 reviewed or discussed if there were any
22 questions at a board meeting?
23    A     Yes.
24    Q     And obviously --
25    A     Could I -- to qualify that,

## Page 52

FEINSOD

1
2  at quarterly board meetings.  There
3  were board meetings that didn't cover
4  those items -- I apologize -- to
5  clarify.
6     Q     Understood.
7          So what -- in addition, were
8  there other documents that the board
9  reviewed to review the investments that
10 the company made in addition to the
11 quarterly valuations that management
12 prepared?
13    A     I don't recall.
14    Q     What are 10-Qs and 10-Ks?
15    A     SEC filing, required SEC
16 filing.
17    Q     Do they -- do the 10-Qs or
18 10-K have schedule of investments?
19    A     Do whose 10-Ks and 10-Qs
20 have?
21    Q     AmeriTrans's 10-Qs and 10-Ks,
22 do they generally have a schedule of
23 investments?
24    A     Yes.
25    Q     Is a draft 10-Q or 10-K

## Page 53

FEINSOD

1
2  presented to the board to review on a
3  quarterly basis?
4     A     Could you restate the
5  question.  The board doesn't exist
6  anymore, so.
7     Q     Does the -- we're talking
8  about what the general practice was of
9  AmeriTrans and Elk when you --
10    A     Sorry to interrupt.
11    Q     When you were the president
12 of AmeriTrans and Elk, during that
13 period of time, was it the general
14 practice of the board to review a 10-K
15 and a 10-Q on a quarterly basis?
16          MR. SEIDEL:  Objection to
17    form.
18    A     Prior to filing, the board
19 distributed a draft copy of the
20 documents you refer to, to review.
21    Q     And do the -- does the draft
22 10-K or 10-Q generally have a schedule
23 of investments?
24    A     Specifically it does.
25    Q     Are there other documents

Page 54

FEINSOD

1
2    that are distributed to the board to
3    review that have a schedule of
4    investments or portfolio financials for
5    AmeriTrans or Elk?
6         A    I apologize.  You were
7    speaking in the present tense.  It
8    doesn't exist anymore, so "are" as
9    opposed to "were."  Can we clarify
10   that.
11        Q    So that we don't have to
12   clarify for every question, I'm talking
13   about the general practice and
14   procedure for your -- while you were
15   president of Elk and AmeriTrans.
16        A    Okay.
17        Q    So we're talking about the
18   time period from approximately 2008
19   through 2013.
20        A    Okay.
21        Q    During the time period of
22   2008 through 2013, were there other
23   documents that the board reviewed on a
24   periodic basis that contained a
25   schedule of investments?

Page 55

FEINSOD

1
2         A    I believe so.
3         Q    What were those other
4    documents?
5         A    We had internal loan reports,
6    referred to as OLS reports, which were
7    distributed as well.
8         Q    On what date and what
9    periodic time were they distributed --
10   were the OLS reports distributed?
11        A    Quarterly.
12        Q    Are the OLS reports the same
13   or different than the reports you
14   previously testified to that management
15   prepared as a summary of all the
16   investments?
17        A    Yes.
18        Q    In what way was the OLS
19   reports different than the quarterly
20   valuation reports?
21        A    OLS is a payment report
22   showing payments, disbursements, and
23   receipts with respect to the loan.
24        Q    Now, the OLS reports and the
25   valuation reports -- withdrawn.

Page 56

FEINSOD

1
2              Were there any other reports
3    or financial documents that were
4    prepared for the board to review that
5    show a schedule of the investments
6    during the period of 2008 through 2013?
7         A    With respect to the
8    preparation of the 10-Qs and -Ks?
9         Q    Anything.  The preparation of
10   any document.
11        A    It's a broad question.  I
12   don't recall specifically.
13        Q    Okay.  Was there anything
14   else with respect to the 10-Qs and -Ks?
15        A    I don't believe so.
16        Q    Okay.  Were there any
17   schedules of investments prepared in --
18              First of all, what is a 468?
19        A    Say quarterly filing, and
20   SBIC is required to file the SBA.
21        Q    We lost your -- okay.
22        A    Did you get my back?
23        Q    We got you back.  We lost you
24   there.
25        A    I'm sorry.  Computer timed

Page 57

FEINSOD

1
2    out, I apologize, from not touching it.
3         Q    Okay.  Does the 468 -- how
4    often is the 468 filed with the SBA?
5         A    I believe there's different
6    requirements for different types of
7    SBICs, and the timing and the
8    requirements of filing of the 468.
9         Q    Do you remember what the
10   timing or requirements for the filing
11   of the 468 for Elk as a corporate SBIC?
12        A    I don't believe -- it's not a
13   corporate test, its other members, it's
14   other tests.  But I believe we filed it
15   quarterly.
16        Q    The 468, is that a summary of
17   financial statements or information
18   regarding Elk?
19        A    I wouldn't want to
20   characterize it.  It's a government --
21   it's a mandated report that the SBA
22   requires.
23        Q    What type of information is
24   contained on the 468 that's filed with
25   the SBA by Elk?

Page 58

```
            FEINSOD
 1
 2      A    Financial information in the
 3  format that's guided by the SBA's
 4  charter accounts.
 5           Every -- I guess.  Sorry.
 6  Every SBIC, when you're formed, is
 7  required to adopt the SBA's chart of
 8  accounts.  And then that Form 468, I
 9  believe the reporting on that Form 468
10  follows that chart of accounts.
11      Q    Is there a schedule of
12  investments or financings that are a
13  part of the 468 that Elk files with the
14  SBA?
15      A    Within the Form 468 the
16  investments are detailed.  I don't
17  know.  It's a thick document broken
18  into different sections, so I don't
19  know if a considered a schedule or not.
20      Q    Is the --
21      A    As they're listed.
22      Q    Sure.
23           Is the 468 reviewed by the
24  board?
25      A    Yes -- I'm sorry.  Sorry,
```

Page 59

```
            FEINSOD
 1
 2  yes.
 3      Q    Okay.  And is that also
 4  generally reviewed by the board for Elk
 5  on a quarterly basis?
 6           MR. SEIDEL:  Objection to
 7      form.
 8      A    Yes.
 9      Q    Other -- okay.
10           What I'm asking is a very
11  specific question.  Other than at a
12  board meeting reviewing loan reports as
13  to valuations, has the AmeriTrans or
14  Elk board members met at a separate
15  time to discuss investments or loans
16  that were made by AmeriTrans or Elk?
17           MR. SEIDEL:  Objection to
18      form.
19      A    Should I answer?
20      Q    Sure.
21      A    It was discussed at -- I'm
22  sure loans were discussed at meetings
23  other than quarterly approved meetings
24  where the 468 was approved.
25      Q    Okay.  When we say
```

Page 60

```
            FEINSOD
 1
 2  "meetings," what meetings are you
 3  referring to?  Are you referring to
 4  other board meetings where loans may
 5  have been discussed?
 6      A    I believe so.  Yes, I believe
 7  so.
 8      Q    Other than board of directors
 9  meetings discussing loans, were there
10  other -- were there other meetings of
11  board members as an investment
12  committee?
13           MR. SEIDEL:  Objection to
14      form.
15      A    Other than described, I don't
16  believe so.
17      Q    In terms of what was
18  discussed at board meetings, were
19  minutes generally kept of board
20  meetings?
21      A    When?
22      Q    At any time from 2008 through
23  2013, were there --
24      A    Generally, yes.
25      Q    Did there come a time when as
```

Page 61

```
            FEINSOD
 1
 2  president and CEO of AmeriTrans and Elk
 3  you would act as secretary for the
 4  board meeting?
 5      A    Yes.
 6      Q    What was your general
 7  practice as secretary -- I'm sorry.
 8  Withdrawn.
 9           Would the secretary generally
10  take the minutes for the meeting?
11      A    Yes, I believe so.
12      Q    What was your general
13  practice when you acted as secretary
14  for taking the minutes of the meeting?
15      A    To keep an accurate summary
16  of what was discussed at the board
17  meeting, and memorialize any
18  resolutions that might need to be
19  memorialized or any decisions that
20  might need to be memorialized
21  specifically at board meetings.
22      Q    What was the practice, your
23  general practice that you followed, as
24  to how you would -- withdrawn.
25           In order to memorialize, did
```

Page 62

```
 1              FEINSOD
 2   you make a draft copy of the minutes?
 3        A    No -- I'm sorry.  When?
 4   Before the meeting or after the
 5   meeting?  I apologize.
 6        Q    At any time.  Would you make
 7   a draft copy of the minutes before the
 8   board meeting as a part of your general
 9   practice?
10        A    Never.
11        Q    Did you make a draft copy of
12   the minutes after the board meeting?
13        A    Yes.
14        Q    And then --
15        A    When I was secretary.
16        Q    I'm sorry?
17        A    When I was secretary, yes.
18        Q    And what was your practice
19   with respect to how you -- you would
20   get comments regarding the draft
21   minutes?
22        A    The draft minutes would be
23   presented at a subsequent board meeting
24   to the full board for review.
25        Q    After the draft minutes are
```

Page 63

```
 1              FEINSOD
 2   presented at a subsequent board meeting
 3   and the full board reviewed it, what
 4   happens next with respect to the draft
 5   minutes?
 6        A    Specifically, I don't recall.
 7   But in general, they would be ratified,
 8   would be the normal process.
 9        Q    When the minutes -- okay.
10             Would there be a point in
11   time where if the minutes are
12   ratified -- withdrawn.
13             Are the draft copies of the
14   minutes signed by you as secretary
15   before they're reviewed and approved by
16   the board at a subsequent meeting?
17        A    I don't recall, but I
18   wouldn't believe that they would be
19   signed as a draft.
20        Q    I'm asking you what your
21   general practice is as to whether you
22   signed draft copies of the minutes
23   before they were reviewed or --
24        A    I don't --
25        Q    -- before they were reviewed
```

Page 64

```
 1              FEINSOD
 2   or approved by the board?
 3        A    I don't recall as to signing,
 4   the procedure.
 5        Q    Was there a way that the
 6   minutes -- when it says "draft," are
 7   they marked as a draft?  Is there
 8   something to indicate that it's a draft
 9   on the document itself?
10        A    Historically -- sometimes
11   they would be -- it would have a
12   watermark, might be the practice.
13        Q    And did you have a practice
14   after the board reviewed and approved
15   the minutes to take -- to reprint the
16   minutes without a watermark or draft?
17        A    I don't recall, but I believe
18   that they were put in a binder, what
19   were considered the final minutes.  I
20   don't recall the specific steps with
21   respect to signing them.
22        Q    Okay.  Would the -- okay.
23             What was your general
24   practice in terms of when you would
25   sign the -- would you sign minutes
```

Page 65

```
 1              FEINSOD
 2   after the board reviewed and approved
 3   and made any changes or comments to the
 4   minutes?
 5        A    I don't recall a specific
 6   procedure.
 7        Q    What was -- what was your
 8   general practice during that period of
 9   time?
10        A    With respect to what?
11        Q    When you would sign the
12   minutes, whether you would sign it
13   before the board had reviewed it or
14   after the board added any comments to
15   the draft?
16        A    I don't recall, but I would
17   believe it would be after they were in
18   draft -- after they were approved.
19        Q    And ratified by the board?
20        A    And ratified by the board.
21             And if they were submitted to
22   the board with a signature on them,
23   they would be open to comment at any
24   board meeting.
25        Q    If the board had any comments
```

Page 66

FEINSOD

1  or corrections, was it your practice to
2  put those comments or corrections in
3  the board minutes?
4      A    Yes.
5          MR. WEINBERG:  This is
6      probably a good place to take a
7      five-minute break.  If I may just
8      ask you -- I should have included
9      this in the beginning.
10     Q    At any -- I assume during
11 your testimony you've been -- you're
12 alone in the room; is that correct?
13     A    Your assumption is correct.
14     Q    Okay.  Thank you.
15         Just a general instruction
16 that we give to all the witnesses.  If
17 at any times someone does enter the
18 room, just please let us know.  Okay?
19     A    Sure.
20     Q    Thank you.
21         MR. WEINBERG:  May we take a
22     five-minute break?
23         MR. HASHEM:  Yep.
24         VIDEOGRAPHER:  This will end


Page 67

FEINSOD

1      Media Unit 1.  Going off the
2      record at 10:28, October 28, 2021.
3          (Whereupon, a brief recess
4      was taken.)
5          VIDEOGRAPHER:  We are back on
6      the record.  The time is 10:43,
7      October 28, 2021.  This will begin
8      Media Unit 2.
9      Q    Welcome back, Mr. Feinsod.
10 Thank you.  Is your mic okay?  Just
11 test your mic.
12     A    Yes.
13     Q    Okay.  Thank you.
14         When you joined the board to
15 become a director for Elk and
16 AmeriTrans, did you receive -- well,
17 Elk is an SBIC; is that correct?
18         MR. HASHEM:  What was the
19     question?
20     Q    Do you know that Elk is an
21 SBIC?
22     A    It's not.
23         MR. HASHEM:  Objection.
24     Assumes.

Page 68

FEINSOD

1      Q    Did you know that Elk was an
2  SBIC?
3      A    Yes.
4      Q    Okay.  What is an SBIC?  What
5  is your understanding of an SBIC?
6      A    It's a small business
7  investment company.
8          (Whereupon, a discussion was
9      held off the record.)
10     A    Sorry.  I apologize.
11     Q    I'm sorry.  Mr. Feinsod, is
12 there a technical problem, or is that
13 something that just happens --
14     A    There's something -- no,
15 it's -- it seems to be timing out every
16 couple of minutes, like sleep function.
17 I'll try and avoid that.  I will move
18 it.  Thanks.
19     Q    Okay.  And is there a
20 government agency that regulates small
21 business investment companies?
22     A    Yes.
23     Q    And which agency is that?
24     A    The Small Business

Page 69

FEINSOD

1  Administration.
2      Q    When you began as a board
3  member of Elk, did you receive any type
4  of training with respect to a small
5  business investment company?
6      A    No.
7      Q    Did you ever attend any
8  training with respect to the Small
9  Business Administration Act and
10 regulations regarding small business
11 investment companies?
12     A    I believe I did.
13     Q    When was that?
14     A    I don't recall the date.
15     Q    Was it a coverage, training,
16 what -- what was the class
17 certification or how was it arranged?
18     A    I attended -- I attended a
19 NASBIC seminar by Carol Fin- --
20         (Clarification by the
21     reporter.)
22     A    I can spell it out, NASBIC,
23 N-A-S-B-I-C.
24         They were the, I guess -- I

Page 70

```
              FEINSOD
1
2   don't know technically what they are,
3   but they organized and arranged what
4   are known as SBA regulatory classes.
5   And I attended one taught by primarily
6   Carole Finler and Howard Cooper.
7        Q    You said "they."  Who is
8   "they"?
9             Are you referring back to
10  NASBIC organizing the class?
11       A    I apologize.  I don't --
12  could you repeat my -- what I said?
13       Q    Sure.  Let me restate the
14  question.
15            Do you know who organized the
16  seminar?  Was it organized by the SBA
17  or NASBIC?
18       A    I don't know who organized
19  it.
20       Q    Do you know what NASBIC
21  stands for?
22       A    National Association of Small
23  Business Investment Companies.
24       Q    It seemed to be that -- did
25  you attend the one class or more than
```

Page 71

```
              FEINSOD
1
2   one class?
3        A    I attended one regulatory
4   class.
5        Q    And did they hand out
6   materials?
7        A    I believe so.
8        Q    Did you -- did you maintain
9   or keep those materials?
10       A    I believe I kept them until I
11  left -- when I left Elk.  I considered
12  them the property of Elk.
13       Q    What were the materials that
14  were provided at the regulatory class?
15       A    It was a large binder.
16       Q    Do you remember what year you
17  took the class, approximately?
18       A    No.
19       Q    Did you -- did you read
20  what -- the information that was in the
21  binder?
22       A    I don't recall.
23       Q    Do you remember what the
24  topics were that covered in the
25  regulatory class?
```

Page 72

```
              FEINSOD
1
2        A    Not specifically.
3        Q    Do you remember any of the
4   topics that were covered in the
5   regulatory class?
6        A    Not specifically.
7        Q    Do you remember any of the
8   topics that were covered in the binder?
9        A    Not specifically.
10       Q    Did you -- did you review the
11  binder after you took the class?
12       A    No.
13       Q    During -- after you took the
14  class, did you need -- did you review
15  any portion or check any part of the
16  binder regarding any issue that may
17  have come up in your work for Elk as
18  board member, president, or CEO?
19       A    I don't recall.
20       Q    Do you recall reviewing any
21  of the regulations regarding the
22  operation of small business investment
23  companies?
24       A    Yes.
25       Q    Which regulations did you
```

Page 73

```
              FEINSOD
1
2   review?
3        A    Various sections of the CFR
4   that would associate -- that would deal
5   with the regulation of SBICs.
6        Q    There is a reference to
7   self-dealing -- well, withdrawn.
8             Do you know -- there is a
9   reference to what's called a conflict
10  of interest.  Do you have an
11  understanding as to what a conflict of
12  interest is?
13            MR. HASHEM:  Objection.
14       There's -- objection.
15       Q    Okay.  Do you know if there's
16  a regulation dealing with conflicts of
17  interest?
18       A    I believe there is.
19       Q    Do you have an understanding
20  as to what the -- what a conflict of
21  interest is regarding an SBIC?
22            MR. HASHEM:  Objection.
23       Calls for legal conclusion.
24            MR. WEINBERG:  I'm asking for
25       his own understanding.
```

Page 74

FEINSOD

```
 1              FEINSOD
 2      A    Not by memory.
 3      Q    Do you know if there is any
 4  requirement with respect to -- well,
 5  withdrawn.
 6           Could we introduce --
 7  withdrawn.
 8           Other than looking at the
 9  regulations, do you know if there -- do
10  you know what TechNotes are?
11      A    Yes.
12      Q    Okay.  What are -- what is
13  your -- from your experience, what's
14  your understanding of TechNotes?
15      A    Periodic updates distributed
16  by the SBA to SBICs with regard to
17  operating items.
18      Q    Did you receive any -- do you
19  know if you've reviewed any SBIC
20  TechNotes from the SBA?
21      A    I believe I did.
22      Q    Which ones?
23      A    I don't recall which ones.
24           MR. WEINBERG:  If we can mark
25      Tab 37, please, as Exhibit 1.
```

Page 75

FEINSOD

```
 1              FEINSOD
 2           (Technote 8 - April 2002, was
 3      marked Exhibit 1, for
 4      identification, as of this date.)
 5      A    Should I be doing anything
 6  within Egnyte?
 7      Q    Once that's marked, we will
 8  let you know and you could refresh your
 9  exhibit folder.
10           While we're waiting for that
11  to be marked, is AmeriTrans a small
12  business that is eligible -- withdrawn.
13           Is AmeriTrans a small
14  business that may get a financing from
15  a small business investment company?
16           MR. HASHEM:  Objection.
17      Calls for a legal conclusion.
18      Q    I'm talking about your --
19  Mr. Feinsod, in your understanding,
20  would AmeriTrans be a small business
21  that could receive financing from a
22  small business investment company?
23      A    No.  It's bankrupt.  I don't
24  think the SBA would -- I don't think
25  you could lend to a bankrupt company.
```

Page 76

FEINSOD

```
 1              FEINSOD
 2  I don't believe so.
 3      Q    We're talking about the
 4  period of time 2008 to 2013, before
 5  AmeriTrans filed for bankruptcy.
 6           Would AmeriTrans qualify as a
 7  small business and receive financing
 8  from a small business investment
 9  company, from your understanding?
10           MR. HASHEM:  Objection.
11      Calls for a legal conclusion.
12      Q    Again, I'm -- Mr. Feinsod,
13  you can answer, your understanding.
14      A    I don't know.
15      Q    Did Elk make a financing to
16  AmeriTrans?
17           MR. HASHEM:  Objection.
18      Calls for a legal conclusion.
19      Q    You can answer the question.
20      A    No, I don't believe we did.
21      Q    There are certain
22  requirements -- do you understand that
23  SBIC has certain requirements as to
24  what types of financings an SBIC can
25  make to a small business; is that
```

Page 77

FEINSOD

```
 1              FEINSOD
 2  correct?
 3           MR. HASHEM:  Objection.
 4      Calls for a legal conclusion.
 5      What does "financing" mean?
 6      Q    You can answer.
 7      A    Yeah, what does "financing"
 8  mean?  Just so I can --
 9      Q    Yeah, well, what is -- what
10  is a financing that an SBIC can make?
11  Do you have an understanding of what a
12  financing is?
13      A    I don't -- not specifically
14  anymore.  I don't remember the details
15  of it.
16      Q    What were Elk's assets?
17      A    Elk's assets were loans; and
18  to a lesser extent, equity investments
19  in companies -- or to companies --
20  loans to companies or equity
21  investments in companies.
22      Q    Do you know if those loans or
23  equity investments are called
24  "financings" or "portfolio financings"?
25      A    I don't recall.
```

Page 78

```
                    FEINSOD
 1
 2      Q    We can look at Exhibit 1,
 3  please.  Mr. Feinsod, were you able to
 4  open it?
 5      A    It's not coming yet.
 6      Q    Okay.
 7      A    I'm refreshing.  It might.
 8      Sorry.  I'm going to log back
 9  into Egnyte.
10      MR. WEINBERG:  May we go off
11      the record so we don't take up
12      time.
13      VIDEOGRAPHER:  Going off the
14      record.  The time is 10:57.
15      (Whereupon, a brief recess
16      was taken.)
17      VIDEOGRAPHER:  We are back on
18      the record.  The time is 11:07.
19      Q    Mr. Feinsod, I believe you
20  are looking at Exhibit 1.  Can you just
21  tell me generally what exhibit 1?
22      A    It's entitled:  SBIC
23  TechNotes, April 2002nd, number 8.
24      (Clarification by the
25  reporter.)
```

Page 79

```
                    FEINSOD
 1
 2      A    2002 number 8.
 3      Q    Guidelines for SBA Approval
 4  of Conflict of Interest Transactions.
 5      Have you reviewed or read the
 6  SBIC TechNote number 8 before?
 7      A    I don't recall.
 8      Q    Okay.
 9      A    I have it in front of me now.
10      Q    Okay.  If you look at the
11  word "associate," does -- did you have
12  an understanding as to what the term
13  "associate" meant with respect to
14  operating an SBIC?
15      A    I apologize.  I'm reading the
16  definition, if you would give me a
17  minute.
18      Q    Again, please review it, but
19  I'm just asking if it refreshes your
20  recollection if you knew or have an
21  understanding as to what an associate
22  was in connection with operating an
23  SBIC.
24      A    I had an understanding that
25  it was a defined term under the
```

Page 80

```
                    FEINSOD
 1
 2  regulations.
 3      Q    Okay.  Did you have an
 4  understanding as to whether common
 5  officers, directors, or owners are
 6  associates with respect to Elk and
 7  AmeriTrans?
 8      MR. HASHEM:  Objection.
 9      Calls for a legal conclusion.
10      A    Not specifically.
11      Q    Did you have an understanding
12  if Elk and AmeriTrans were associates
13  of each other as a parent and a
14  subsidiary?
15      MR. HASHEM:  Objection.
16      Q    You can answer.  I'm just
17  asking --
18      A    I'm reading.  You gave me the
19  exhibit, so I'm reviewing it and trying
20  to form an understanding.
21      So I don't -- I apologize.
22      Q    Okay.
23      A    Is there a question?
24      Q    Okay.  It was just whether or
25  not -- I'm sorry.  Did you answer the
```

Page 81

```
                    FEINSOD
 1
 2  question whether -- did you have an
 3  understanding as to whether Elk and
 4  AmeriTrans were associates of each
 5  other?
 6      MR. HASHEM:  Asked and
 7      answered.
 8      Q    What was your answer?
 9      A    No, not specifically.
10      Q    Okay.  No, that you did not
11  have an understanding; is that -- is
12  that your answer?
13      A    You gave me -- I'm reading --
14  you give me an exhibit to review.  I
15  apologize.  Do you want me to review
16  the exhibit, or do you want me to
17  answer the question?
18      Q    You can review the exhibit if
19  it refreshes your recollection.
20      I'm asking as to whether or
21  not you had an understanding -- when
22  you were operating Elk as an SBIC as
23  president and CEO, did you have an
24  understanding if Elk and AmeriTrans
25  were associates of each other?
```

Page 82

```
 1              FEINSOD
 2      A    Okay.  If you give me a
 3  minute to review the document to
 4  refresh my memory, I appreciate it.
 5          No, I don't have a
 6  recollection.
 7      Q    Okay.
 8      A    This doesn't help.
 9      Q    Okay.  Thank you.
10          If you go to page 2:  Control
11  Person.
12      A    Okay.
13      Q    Above it, do you see the
14  word:  Definition of control and
15  control person?
16      A    Yeah.
17      Q    Did you have an under- --
18  when you were operating Elk as an SBIC
19  as the president and CEO, did you have
20  an understanding of what the term
21  "control" meant?
22          MR. HASHEM:  Objection.
23      A    I don't recall.
24      Q    Okay.  Did you have -- in
25  terms of management and CEO -- I'm
```

Page 83

```
 1              FEINSOD
 2  sorry.
 3          In terms of your position as
 4  president and CEO of Elk, were you a --
 5  do you have an understanding if that
 6  meant you were a control person for Elk
 7  as an SBIC?
 8      A    I don't recall, no.
 9      Q    Okay.  As president and CEO
10  of AmeriTrans, did you have an
11  understanding that you were a control
12  person for AmeriTrans?
13          MR. HASHEM:  Objection.
14      A    I don't recall.
15      Q    If you skip -- on page 2, if
16  you look at where it says:  Subsection
17  A general rule:  You must not self-deal
18  to the prejudice of a small business
19  licensee, its shareholders or partners
20  or SBA.
21          Did you -- had you reviewed
22  that provision before with respect to
23  13 CFR 107.730?
24          MR. HASHEM:  Objection.
25      Asked and answered.
```

Page 84

```
 1              FEINSOD
 2      Q    You could answer.
 3      A    This only -- this only
 4  contains part -- I don't know what
 5  107.730, I don't -- you know, at the
 6  time, I don't know what -- I guess the
 7  time period, it probably changes.  Regs
 8  are amended from time to time.
 9          So the question specifically
10  is -- I don't know if I'm looking at a
11  summary of 107 --
12      Q    Okay.
13      A    -- 730.
14      Q    Sure.  I'll restate the
15  question.
16          Do you recall reviewing a
17  regulation about self-dealing as
18  president and CEO of Elk?
19      A    Not specifically.
20      Q    Okay.  As president and CEO
21  of Elk, do you have an understanding as
22  to what self-dealing is?
23          MR. HASHEM:  Objection.
24      Calls for a legal conclusion.
25      A    I don't recall specifically
```

Page 85

```
 1              FEINSOD
 2  how the regulation is worded.
 3      Q    Okay.  I'm not asking how the
 4  regular is worded.  Do you have an
 5  understanding of self-dealing in terms
 6  of the operation of Elk and AmeriTrans
 7  as president and CEO?
 8          MR. HASHEM:  Objection.
 9      Calls for a legal conclusion.
10      A    I don't recall.  It's been
11  more than six years since I've been
12  active in the management of an SBIC.
13  If not longer, eight years.
14      Q    You could put the exhibit
15  away.  Thank you.
16      A    Thanks.
17      Q    In terms -- in terms of
18  operating Elk as an SBIC, do you recall
19  if there are regulations affecting
20  regulating transactions regarding
21  whether Elk may be able to make a
22  profit?
23          MR. HASHEM:  Objection.
24      Form.  Objection.  Calls for a
25      legal conclusion.
```

Page 86

```
                    FEINSOD
1
2      A    I am going to ask you to say
3  the question one more time because I
4  didn't hear it.
5      Q    Sure.
6      A    It's very detailed.  Sorry.
7      Q    No worries.
8           In terms of what are -- well,
9  withdrawn.
10          Do you have an understanding
11 as to what a prohibited transaction is
12 in terms of operating Elk as a small
13 business investment company?
14          MR. HASHEM:  Objection.
15     A    No, I don't recall what
16 prohibited transactions means.
17     Q    Do you -- when making a
18 transaction -- withdrawn.
19          When making a transaction for
20 Elk, do you know or do you have an
21 understanding that one of the factors
22 is whether or not Elk is able to make a
23 profit on the transaction as a small
24 business investment company?
25          MR. HASHEM:  Objection.
```

Page 87

```
                    FEINSOD
1
2      A    I don't know what you mean by
3  "transaction."
4      Q    Any type of financial
5  transfer.
6           MS. CLARKE:  Object to the
7      form.
8      Q    You can answer.
9      A    I really don't understand the
10 question.  Explain what the
11 transaction -- what are you asking --
12 please repeat the question.  Thank you.
13     Q    Elk as an SBIC may make a
14 financing; is that correct?
15          MR. HASHEM:  Objection.
16     Calls for a legal conclusion.
17     A    I don't know technically what
18 a financing is.
19     Q    What are Elk's assets?  Their
20 loans and investments, correct?
21     A    I believe I asked and
22 answered that already.
23     Q    Is that right?
24     A    Correct.
25     Q    Okay.  And as to -- do you
```

Page 88

```
                    FEINSOD
1
2  have an understanding that Elk's loans
3  and investments are supposed to make a
4  profit for Elk as an SBIC; is that
5  correct?
6      A    The question doesn't make
7  sense.
8      Q    Okay.  If you can't answer
9  the question, then you can't answer the
10 question.
11     A    What was the question
12 referring to?
13          MR. HASHEM:  Michael, let me
14     see if I can clarify.  Are you
15     asking, as a business matter, are
16     they trying to make a profit, or
17     is as a matter of what regulations
18     might require?  I think that's
19     just a lack of the -- lack of
20     clarity there.
21     Q    Do you have an understanding
22 as to whether or not the regulations
23 require that Elk's loans or investments
24 make a profit for the company?
25          MR. HASHEM:  Objection
```

Page 89

```
                    FEINSOD
1
2  insofar as it calls for a legal
3  conclusion.
4          (Clarification by the
5      reporter.)
6      Q    Mr. Feinsod, are you able to
7  answer the question?
8      A    I didn't hear -- like her, I
9  didn't hear the end of it.  Sorry.
10          What was the end of it?
11     Q    Withdrawn.  Let me restate
12 the question.
13     A    Great.
14     Q    As a general business
15 proposition, Elk makes its loans and
16 investments to make a profit, correct?
17     A    I don't recall if that was --
18 you know, where that would come in.
19     Q    Okay.
20          Elk is an SBIC engaged in a
21 financial transaction that affects its
22 ability to repay a debenture to the
23 SBA?
24          MR. HASHEM:  Objection.
25     Calls for a legal conclusion.
```

Page 90

```
                        FEINSOD
 1
 2      Q    You can answer.
 3      A    I don't know.
 4      Q    Do you know what the -- what
 5  the debentures are between Elk and the
 6  SBA?
 7      A    Generally I'm familiar with
 8  them.
 9      Q    Generally, what are they?
10      A    They were 10-year
11  financing -- 10-year financings
12  provided by the SBI -- by -- provided
13  to the SBIC and guaranteed by the SBA.
14      Q    And did Elk, as an SBIC, have
15  an obligation to repay the SBA for the
16  financing?
17      MR. HASHEM:  Objection.
18      Calls for a legal conclusion.
19      A    At what time frame?
20      Q    We're talking generally.
21      Did Elk have a general
22  obligation to repay the financing known
23  as the debenture to the SB- --
24      A    No, it had -- it had a
25  specific obligation, known as the
```

Page 91

```
                        FEINSOD
 1
 2  debenture, which contains terms and
 3  conditions.
 4      Q    Okay.  And at some point,
 5  those terms and conditions required
 6  repayment to the SBA; is that correct?
 7      A    Among other things, correct.
 8      Q    Did you have an understanding
 9  as to whether Elk could participate in
10  a financial transaction that would
11  limit Elk's ability to repay the SBA on
12  the debenture?
13      MR. SEIDEL:  Objection to
14      form.
15      A    Yeah, I don't -- I apologize.
16  I don't understand the question.
17      Q    Do you have an understanding
18  as to whether Elk can engage in a
19  financial transaction that limits its
20  ability to repay the SBA on the
21  debenture as a creditor of Elk?
22      MR. HASHEM:  Objection.
23      A    I don't -- I don't understand
24  what you mean by "limits it's ability
25  to repay."  Are you talking about a
```

Page 92

```
                        FEINSOD
 1
 2  specific period in time?  Or when is --
 3  what are you speaking of?  Clarify the
 4  question.  Thank you.
 5      Q    Generally, may Elk engage in
 6  a financial transaction that limits
 7  Elk's financial ability to repay the
 8  debenture to the SBA as a creditor?
 9      MR. SEIDEL:  Objection.
10      MR. HASHEM:  Objection --
11      MR. SEIDEL:  -- question.
12      MR. HASHEM:  Let me see if I
13      can help here.  You know, you're
14      asking about limiting ability to
15      repay.  There's no time frame,
16      there's no specific transaction.
17      So what you're really asking about
18      is the content of some regulation.
19      So if you want to know if
20      he's aware of a regulation that
21      governs what kind of transactions
22      that an SBIC can enter into, ask
23      him that.
24      Q    Are you aware if there are
25  regulations that limit that deal with
```

Page 93

```
                        FEINSOD
 1
 2  whether the SBIC is allowed to engage
 3  in financial transactions that may
 4  limit the SBIC's ability to pay the
 5  debenture back to the SBA?
 6      A    No, I'm a not aware of any
 7  regulation.
 8      Q    Thank you.
 9      As CEO, what is your role --
10  generally, what's your role for Elk as
11  a small business investment?
12      A    Managing the day-to-day
13  affairs of the company.
14      Q    And what is your -- is that
15  role the same for AmeriTrans?
16      A    No.  My job at AmeriTrans is
17  managing the day-to-day -- I'm sorry --
18  yeah, I was managing the day-to-day
19  affairs of Elk, which represented over
20  95 percent of the company's assets.
21      Q    When you say "the company,"
22  you're referring to 95 percent of
23  AmeriTrans's assets; is that right?
24      A    At different times, yes,
25  inside of 99.
```

Page 94

```
                    FEINSOD
1
2       Q    Okay.  What was the value of
3  AmeriTrans's assets when it was
4  approximately 95 percent?
5       A    I don't recall.
6       Q    What was the value of
7  AmeriTrans assets when AmeriTrans
8  assets represented approximately
9  5 percent of the companies's assets?
10          MR. HASHEM:  Objection.
11      Mischaracterizes the prior
12      testimony.  He testified that
13      Elk's assets comprised 95 percent.
14      Q    If Elk's assets comprised
15  95 percent, does AmeriTrans' assets
16  comprise the other 5 percent?
17      A    No.  There could be other
18  subsidiaries that it might be held in.
19      Q    Were there any other
20  subsidiaries of AmeriTrans Capital
21  other than Elk?
22      A    Yes.
23      Q    Who were the other
24  subsidiaries of AmeriTrans Capital?
25      A    At what time?
```

Page 95

```
                    FEINSOD
1
2       Q    Between the period of 2011 to
3  2013.
4       A    I don't recall specifically,
5  but in general, I believe that they
6  were Elk Capital Corp.; EAFC Holdings;
7  EAFC Holdings I; EAFC Holdings II.
8  There were several subsidiaries.
9       Q    When you refer to Elk as
10  holding 95 percent, which subsidiary
11  were you referring to?
12      A    Elk and its subsidiaries,
13  which might have included those
14  subsidiaries.
15      Q    So would that --
16      A    Some of those.
17      Q    Okay.  So were you referring
18  to all of the Elk named subsidiaries?
19      A    Yes.
20      Q    Okay.
21          So -- and then who held the
22  other 5 percent of the assets for the
23  company?
24      A    Either AmeriTrans or another
25  subsidiary of AmeriTrans.
```

Page 96

```
                    FEINSOD
1
2       Q    During the period of 2011 to
3  2012, who were the other subsidiaries
4  of AmeriTrans?
5       A    I believe Elk Capital Corp.
6  is one; and I don't recall the names of
7  any others.
8       Q    When we refer to Elk Capital
9  Corp., are they one of the Elk entities
10  that hold the 95 percent?
11      A    No.  It's a wholly owned
12  subsidiary of AmeriTrans.
13      Q    What asset did Elk Capital
14  Corp. own?
15      A    I don't believe any.
16      Q    So if Elk Associates Funding
17  Corp. and the related subsidiaries
18  named Elk hold 95 percent and Elk
19  Capital holds zero percent of the
20  assets, who holds the remaining
21  5 percent the assets of the company
22  during the period 2011 through 2013?
23      A    To clarify, it ranged between
24  95 and 99 percent of the assets at Elk.
25          And to answer your question,
```

Page 97

```
                    FEINSOD
1
2  AmeriTrans or a wholly owned subsidiary
3  of AmeriTrans likely owned the
4  remaining less than 5 percent.
5       Q    You referred to Elk Capital
6  as a subsidiary of AmeriTrans.
7       A    Um-hum.
8       Q    You stated that Elk Capital
9  did not hold any of the assets of the
10  company.  Is there something you want
11  to change with that testimony?
12      A    You gave a broad time frame,
13  so I'm going to qualify it by saying it
14  was at the last date when I left, as
15  much as I remember.
16      Q    Right.
17      A    I don't recall any assets in
18  Elk Capital Corp.
19      Q    Okay.  Was there any other
20  subsidiary of AmeriTrans that may have
21  held assets constituting 5 percent or
22  less than 5 percent of the company
23  during the period of time 2011 to 2013?
24      A    I don't recall the other
25  subsidiaries.
```

Page 98

FEINSOD

1
2      Q     Okay.  Is it that you don't
3  recall the name the of the other
4  subsidiaries, or you don't recall that
5  there were other subsidiaries of
6  AmeriTrans during the time period 2011
7  through 2013?
8      A     Other than Elk, which was the
9  bulk of -- which was AmeriTrans, there
10  was no loans originated during the
11  period that you referenced.  So as CEO,
12  I had -- there were only what might be
13  referred to as legacy assets.
14      Q     What are legacy assets?
15      A     What -- the assets that would
16  be in AmeriTrans that preceded my
17  joining the company.  And that's my
18  term that I just coined.
19      Q     And the legacy assets that
20  AmeriTrans had while you were president
21  and CEO of the company, approximately
22  what were those assets valued at?
23      A     At different times,
24  between -- I don't recall, actually.  I
25  don't recall without numbers in front

Page 99

FEINSOD

1
2  of me.
3      Q     Okay.  Do you recall a range?
4      A     No, I don't, without numbers
5  in front of me.
6      Q     In terms of managing the
7  day-to-day affairs of AmeriTrans and
8  Elk, what would you generally do to
9  manage the day-to-day workings of Elk
10  and AmeriTrans?
11      A     At what time?
12      Q     During the period 2011 to
13  2013.
14      A     2011 to 2013, monitor the
15  existing loan portfolio.
16      Q     Um-hum.
17      A     Review new investments,
18  review capital raising opportunities,
19  and consider -- just the other one as
20  SBIC.  The period that you speak was
21  interrupted by litigation and some
22  other issues.
23      Q     Looking at the period of time
24  2009 through 2011, would your duties
25  have been different in terms of

Page 100

FEINSOD

1
2  operating AmeriTrans and Elk on a
3  day-to-day basis?
4          MR. HASHEM:  Objection.  When
5      you say "your duties," given the
6      witness testified that he had a
7      different position in 2009 to
8      2011.  So the question shouldn't
9      be construed to imply that we're
10      talking about his duties as a CEO
11      in the 2009 to 2011 time frame
12      since he wasn't CEO at that time.
13      Q     When did you become CEO of
14  Elk and AmeriTrans?
15      A     I don't recall, but I'm sure
16  the record is --
17      Q     Okay.
18      A     You have that in the record.
19      Q     From the time when you became
20  the CEO of Elk and AmeriTrans, whether
21  it was 2009 or 2010, what -- from that
22  period of time until 2011, were there
23  additional day-to-day duties that you
24  had for AmeriTrans in addition to what
25  you've testified to already?

Page 101

FEINSOD

1
2      A     I don't recall.
3      Q     Do you recall what your
4  duties were as president and CEO of Elk
5  as an SBIC in terms of the day-to-day
6  function?
7      A     To manage the day-to-day
8  affairs of the company.  I just
9  mentioned that.  I thought we just went
10  through that.
11      Q     Okay.  Is it the same for Elk
12  as to was for AmeriTrans?
13      A     AmeriTrans was 95 percent of
14  Elk -- or 99 percent of Elk, so there
15  were -- yes, at all times it was -- the
16  business -- my day-to-day job at
17  running AmeriTrans was managing the
18  Elk -- was managing Elk's portfolio and
19  assets.
20      Q     In terms -- earlier today we
21  were talking about the valuation
22  reports that you prepared -- that
23  management prepared of the loans and
24  investments that were made on behalf of
25  the company.

Page 102

```
 1            FEINSOD
 2          Do you remember -- do you
 3   remember that?
 4      A    Yes.
 5      Q    Who at management would
 6   prepare those quarterly reports?
 7      A    During different time frames
 8   distinguishing, again, it was -- they
 9   would be prepared by -- initially by
10   Silvia, Gary -- Silvia Mullens, Gary
11   Granoff, and then I began to work with
12   the -- when I joined management, I had
13   assisted in the preparation of them.
14      Q    Would there be someone in
15   management as an employee that would
16   help you with preparing the valuation
17   reports?
18      A    Silvia and Gary Granoff.
19      Q    And anyone else as an
20   employee of management that would help
21   prepare the reports?
22      A    Maybe Dominic.
23      Q    When you refer to Dominic,
24   are you referring to Dominic Granito?
25      A    Yes, Dominic Granito, who was
```

Page 103

```
 1            FEINSOD
 2   a controller.  I would use information
 3   gathered by him through the LOS system.
 4      Q    Anyone else on staff as an
 5   employee that would help prepare the
 6   reports for the valuation --
 7      A    No.
 8      Q    -- of loans and investments
 9   at the company?
10      A    No.
11      Q    When you joined -- when you
12   became president of AmeriTrans and Elk,
13   did you have a salary?
14      A    When I -- when I --
15      Q    When you became president of
16   AmeriTrans and Elk, did you have a
17   salary?  Were you compensated?
18      A    Yes.  I had an employment
19   contract.
20      Q    Okay.  Under your employment
21   contract, what -- what did your salary
22   or compensation begin at?
23      A    I don't recall.
24      Q    When you -- when you -- do
25   you recall what it rose -- what your
```

Page 104

```
 1            FEINSOD
 2   compensation rose to as president --
 3      A    No.
 4      Q    -- and CEO of Elk?
 5          MS. CLARKE:  Objection.
 6   Assumes facts not in evidence.
 7      A    I don't recall.
 8      Q    Do you recall what your
 9   salary was when you left Elk and
10   AmeriTrans as president and CEO?
11      A    I don't recall, but I'm sure
12   the record contains it.
13      Q    Okay.  Do you remember
14   approximately what it was?
15      A    I don't recall.  It was a
16   long time ago.
17      Q    If we -- do you recall --
18   when you were president and --
19   withdrawn.
20          In your discussions with Gary
21   Granoff -- well, withdrawn.
22          Mr. Granoff was the past
23   president and CEO of Elk and
24   AmeriTrans, correct?
25      A    At different times, yes.
```

Page 105

```
 1            FEINSOD
 2      Q    Did you have discussions with
 3   Mr. Granoff about what was required as
 4   to how to operate a small business
 5   investment company under the
 6   regulations by the SBA?
 7      A    I don't recall.
 8      Q    Did you have any discussions
 9   with Mr. Granoff about whether Elk
10   could pay certain financial obligations
11   of AmeriTrans' investments?
12      A    I don't recall specifically.
13          MR. WEINBERG:  If we could
14      mark as the next exhibit, minutes
15      at Tab 5, May 26, 2009.
16          (Meeting minutes dated
17      Tuesday, May 26, 2009, was marked
18      Exhibit 2, for identification, as
19      of this date.)
20      Q    While that's being -- the
21   exhibit is being loaded, let me ask a
22   question, please.
23          Did you have an understanding
24   that when acting as president and CEO
25   on behalf of that Elk as a small
```

Page 106

```
                              FEINSOD
 1                  FEINSOD
 2    business investment company, that Elk
 3    was supposed to be operated pursuant to
 4    the SBA regulations?
 5        A    I believe so.
 6        Q    With respect to the board of
 7    directors -- withdrawn.
 8             In terms of any decisions
 9    that the board of directors made on
10    behalf of Elk, were those decisions
11    generally supposed to be in compliance
12    with the SBA regulations?
13             MR. SEIDEL:  Objection to
14        form.
15        Q    You could answer.
16        A    Yeah, could you rephrase the
17    question, because SBA regulations, I
18    don't believe -- I'm trying to figure
19    out how the governed board decision.
20        Q    When a board made decisions
21    with respect to Elk, was it supposed to
22    be pursuant to what is permitted by SBA
23    regulations?
24             MR. SEIDEL:  Objection to
25        form.
```

Page 107

```
 1                  FEINSOD
 2        Q    As a general matter?
 3             MR. SEIDEL:  Same objection.
 4        A    I don't recall.
 5        Q    Are board members, in their
 6    decisions or work, supposed to oversee
 7    the operation of Elk as an SBIC in
 8    accordance with the regulations of the
 9    SBA?
10             MR. SEIDEL:  Objection to
11        form.
12        A    I'm having trouble
13    understanding the question, maybe due
14    to the form.
15        Q    When board members operate --
16    oversee what management is doing, does
17    the oversight include whether Elk is
18    being operated as an SBIC pursuant to
19    the regulations that exist from the
20    SBA?
21             MR. SEIDEL:  Objection to
22        form.
23        A    Yes, I believe so.
24        Q    Okay.  Was there a period of
25    time where Mr. Granoff was acting as
```

Page 108

```
 1                  FEINSOD
 2    the CFO, or chief financial officer?
 3        A    Yes.
 4        Q    And was there a period of
 5    time where you became the chief
 6    financial officer?
 7        A    Yes.
 8        Q    Do you recall what period of
 9    time that was that you were the chief
10    financial officer for AmeriTrans and
11    Elk?
12        A    I believe it was less than
13    one quarter following Gary Granoff's
14    resignation from the post.  Less than
15    90 days, I believe.
16        Q    During that period of time,
17    do you recall what the general duties
18    were of the chief financial officer for
19    AmeriTrans and Elk?
20        A    Not specifically.
21        Q    Okay.  Do you have an
22    understanding of what the duties were
23    generally of the chief financial
24    officer for AmeriTrans and Elk during
25    the period 2009 through 2013?
```

Page 109

```
 1                  FEINSOD
 2        A    To prepare the financial
 3    statements was my primary
 4    responsibility.
 5        Q    And what was the general
 6    process that AmeriTrans and Elk
 7    followed with respect to preparing,
 8    reviewing, and approval of financial
 9    statements?
10        A    There is two different --
11    repeat the question, please.
12        Q    Sure.
13             When you refer to preparing
14    financial statements, what financial
15    statements are you referring to?
16        A    With respect to Elk, the
17    Form 468; with respect to AmeriTrans,
18    the consolidated financials that were
19    reported on Form 10-Q or 10-K.
20        Q    Okay.  And was there a
21    process or procedure that Elk had in
22    terms of drafting and reviewing the
23    Form 468 before it's filed with the
24    SBA?
25        A    Yes.
```

---

**Page 110**

FEINSOD

1
2     Q    What was that general process
3  and procedure?
4     A    The form was prepared by
5  management and sent to the board for
6  approval -- review and approval, excuse
7  me.
8     Q    Was there an interim step
9  where the draft 468 was sent to the
10  audit committee prior to the board?
11     A    Oh, I'm sorry.  Correct.
12  Yes, there likely was an interim step
13  of the audit committee reviewing the
14  Form 468 --
15     Q    After the --
16     A    -- prior to the board.
17     Q    Oh, okay.  And then the next
18  step would be board review?
19     A    Yes.
20     Q    And the last step would be
21  filing the -- signing the certification
22  and filing the Form 468 with the SBA?
23     A    With respect to Elk, the last
24  step with respect to the 468 is
25  probably filing it, if that's what

---

**Page 111**

FEINSOD

1
2  you're looking for, electronically
3  filing it with SBA with the attached
4  schedule.
5     Q    Okay.  And are there
6  certifications that are filed that are
7  signed by -- on behalf of Elk of the
8  468?
9     A    I believe so.
10     Q    Okay.
11        And now the general practice
12  as to the 10-Q and 10-K, would that
13  follow the same procedure that you
14  outlined or a different procedure in
15  terms of the chief financial officer
16  preparing the draft, sending it to the
17  audit committee for review and
18  approval --
19        MS. CLARKE:  Objection.
20     Mis-- oh, I'm sorry.  I thought
21     you were done.  Go ahead.
22        MR. SEIDEL:  Why don't you,
23     please, start over, Steven.
24     Q    What is the -- what is the
25  general process for approval of the

---

**Page 112**

FEINSOD

1
2  10-Q and 10-K filed with the SEC?
3     A    Prepared by management, sent
4  to the audit committee and the external
5  auditors simultaneously.  And
6  management might make any small
7  changes, and then a final -- a final
8  presentation of that document is made
9  to the board -- full board for
10  approval.
11     Q    When -- now, the 10- -- the
12  general process to go to the external
13  auditor, would that include the 10-K
14  and the 10-Q?
15     A    Yes.
16     Q    And who acted as the external
17  auditor for reviewing the 10-Q and 10-K
18  for AmeriTrans?
19     A    With respect -- Rosen Seymour
20  Shapss and Martin were the external
21  auditors who reviewed the quarterly
22  statements and audited the 10-K and
23  financial statements annually.
24     Q    Do you know what the review
25  was for the 10-Q that Rosen Seymour

---

**Page 113**

FEINSOD

1
2  performed?
3     A    What was the question?
4        Repeat the question, please.
5     Q    You just said that the 10-K
6  was an audited financial statement; is
7  that correct?
8     A    Correct.
9     Q    And the 10-K is filed
10  annually; is that correct?
11     A    Correct.
12     Q    The 10-Q is reviewed by Rosen
13  Seymour; is that right?
14     A    Correct.
15     Q    What is -- do you know what
16  the procedures or what constitutes the
17  review that Rosen Seymour does with
18  respect to the 10-Q?
19     A    Not specifically, no.
20     Q    Do you know what the audit is
21  that Rosen Seymour performs with
22  respect to the 10-K?
23     A    I believe it's a
24  PCAOB-compliant audit process, as
25  detailed by the accounting oversight

Page 114

FEINSOD

1
2  board.
3      Q    Does AmeriTrans -- do you
4  know, does AmeriTrans have its own
5  plan -- an internal plan as to how the
6  audit is to be conducted by Rosen
7  Seymour of the 10-K?
8      A    Could you repeat the
9  question.  AmeriTrans doesn't exist
10 anymore.
11     Q    We're talking about -- again,
12 this entire deposition is about the
13 period of time when AmeriTrans existed,
14 and you were in management as president
15 and CEO.
16     A    I understand.  But you said
17 "does."  So it would be "did."  I'm
18 trying to answer your questions as
19 correctly as possible, so if you
20 rephrase them, really I appreciate it.
21     Q    For AmeriTrans, was there --
22 for the Rosen Seymour audit of the
23 10-K, did AmeriTrans have a plan as to
24 how the audit was to be conducted by
25 Rosen Seymour?

Page 115

FEINSOD

1
2      MR. SEIDEL:  Let me hear that
3  back --
4      Wait, Mr. Feinsod, hold off a
5  minute.
6      Could I hear that question
7  read back please, Judy.
8      (Whereupon, the record was
9  read.)
10     MR. SEIDEL:  I'm going to
11 object to the form the question.
12     MR. WEINBERG:  I apologize
13 for cutting you off.  I'm
14 withdrawing the question.  Okay?
15     MR. SEIDEL:  Yep.
16     Q    Mr. Feinsod, you mentioned
17 that Rosen Seymour conducted audits of
18 the 10-K by the PCA?
19     A    No.
20     Q    What?
21     A    No, that's not what I
22 mentioned.
23     Q    Okay.  What did you mention?
24     A    I mentioned that they were
25 subject to the PCAOB accounting

Page 116

FEINSOD

1
2  standards.
3      Q    Do you know how Rosen Seymour
4  conducted its audit of the 10-K for
5  AmeriTrans?
6      MR. SEIDEL:  Objection to
7  form.
8      A    No, not specifically.
9      Q    Do you know what Rosen
10 Seymour reviewed with respect to the
11 company records in order to conduct its
12 audit of the 10-K for AmeriTrans?
13     A    In general, yes.
14     MR. SEIDEL:  Objection to
15 form.
16     Q    What did Rosen Seymour review
17 for the audited 10-K?
18     A    Anything that was in the
19 office, from the loan report to the
20 bank reconciliations.  Loan files,
21 collateral files, they had full access
22 to every document.  Other than employee
23 files, excuse me.
24     Q    Did the external auditor
25 review internal controls of the company

Page 117

FEINSOD

1
2  for the audited 10-K that was filed for
3  AmeriTrans?
4      A    I believe they did.
5      I'm sorry.  I need to qualify
6  that.  At certain periods of time I
7  believe they did.  It wasn't required.
8  When it became required under SEC
9  laws -- under SEC regulations, they
10 did.  So I don't know when that
11 changed.
12     Q    Was the review -- was the
13 auditors' review of the internal
14 controls required during the period
15 2011 through 2013?
16     A    I believe it was.
17     Q    Do you know what the review
18 was that Rosen Seymour conducted with
19 respect to AmeriTrans's internal
20 controls regarding the audit for the
21 10-K?
22     A    No, I would not know that.
23     Q    Now, at what point --
24 generally, in terms of the 10-Q and
25 10-K -- withdrawn.

Page 118

```
                    FEINSOD
 1
 2          When would the review of the
 3  10-K go to Rosen Seymour in relation to
 4  the process of the audit committee
 5  reviewing the draft 10-K and/or the
 6  board reviewing the draft 10-K prior to
 7  being filed with the SEC?
 8      A    They would receive a copy
 9  somewhere between on the way to the
10  audit -- when the audit committee had
11  signed off on the document, what we
12  believed was the final document.
13      Q    When you say "the final
14  document," referring to after the audit
15  committee approved the 10-K or after
16  the board --
17      A    Yes.
18      Q    -- or after the board
19  approved the --
20      A    They'd receive it before --
21  they would receive it before the board.
22  It was always reviewed by the auditors
23  before the board signed off on it.
24      Q    Okay.  And then after the
25  board signs off, that's when the
```

Page 119

```
                    FEINSOD
 1
 2  certifications are signed for the
 3  company and the 10-K is filed with the
 4  SEC; is that correct?
 5      A    With respect to the 10-K,
 6  yeah.  Yes.
 7      Q    Now, with respect to the 468,
 8  was there a quarter or an annual 468
 9  that was reviewed by Rosen Seymour as
10  auditor?
11      A    I believe so.
12      Q    And was -- in terms of
13  which --
14      A    Can I clarify?
15      Q    Sure.  Sure.
16      A    I believe Rosen Seymour was
17  also specifically engaged by Elk to
18  prepare standalone financials each
19  year.
20      Q    So is that an annual
21  financial statement?
22      A    Standalone annual financial
23  statements.
24      Q    And that would be an audited
25  financial statement; is that correct?
```

Page 120

```
                    FEINSOD
 1
 2      A    Yes.
 3      Q    And with respect to the
 4  quarterly, or what would be an annual
 5  468, do you know which 468 was audited
 6  by Rosen Seymour?
 7      A    The annual, I believe.
 8      Q    Okay.  Do you know if the
 9  quarterly 468s were generally reviewed
10  by Rosen Seymour?
11      A    I believe they were.
12      Q    Do you know where in the
13  process of reviewing the 468s any
14  review would have occurred by Rosen
15  Seymour?
16      A    I -- just trying to
17  distinguish that from the last
18  question.  Could you restate it.
19      Q    Sure.
20          Elk would -- the chief
21  financial officer would have -- would
22  have management-prepared draft 468s; is
23  that right?
24          MS. CLARKE:  Objection.
25      Mischaracterizes the testimony.
```

Page 121

```
                    FEINSOD
 1
 2      Q    Management would prepare
 3  draft 468s; is that right?
 4      A    Management would prepare
 5  draft 468s, that's correct.
 6      Q    Who in management would
 7  prepare a draft 468 generally during
 8  the time 2009 through 2013?
 9      A    I believe it would be the
10  controller, and then the information
11  generally came from OLS and was fed
12  into the Form 468 direct -- it was
13  self-populating program.  And then that
14  report would be reviewed for, I guess,
15  human errors or anything.  And that it
16  was -- it was a somewhat automated
17  process.
18      Q    And who on behalf of
19  management would review that draft
20  report?
21      A    From time to time, I believe
22  the CF -- I mean, it would be the CFO
23  who would ultimately certify it at the
24  time, so it was either Gary Granoff or
25  myself.  But while I was president, I
```

Page 122

```
                         FEINSOD
 1
 2   always reviewed it.
 3        Q    And at what point in the
 4   process after management prepares the
 5   draft 468 would the report go to the
 6   audit committee or the -- Rosen
 7   Seymour?
 8        A    It would go to -- it would
 9   generally go to the audit committee --
10   Rosen Seymour after the audit committee
11   had approved it.
12        Q    Rosen Seymour would conduct
13   its review of a quarterly 468; is that
14   correct?
15        A    I believe so, yes.
16        Q    And they would -- Rosen
17   Seymour would conduct its annual audit
18   of an annual 468; is that right?
19        A    I'm going to just -- they
20   appropriated audit the standalone
21   financial statements of Elk.  Whether
22   or not the Elk 468 was audited, I'm not
23   sure.  There is a technical difference
24   between them.
25        Q    Do you know what would
```

Page 123

```
                         FEINSOD
 1
 2   constitute --
 3             Okay.  So you don't know if
 4   the annual 468 was separately audited
 5   by Rosen Seymour in addition to the
 6   annual audited financial statements?
 7        A    I don't recall.  But I
 8   believe an annual 468, if it was
 9   audited, would say "audited" on it.  So
10   if you have any exhibits, that might be
11   helpful in jarring my memory.
12        Q    And if it doesn't say
13   "audited," then the 468 was not audited
14   with -- with -- by Rosen Seymour; is
15   that right?
16        A    It would generally say
17   "unaudited" specifically if it wasn't
18   audited.
19        Q    Do you know if there -- do
20   you know if there are two different
21   forms for 468 between the audited form
22   and a quarterly 468?
23        A    I don't.  I don't recall.
24        Q    Do you know if there is
25   something that's called a short form
```

Page 124

```
                         FEINSOD
 1
 2   468?
 3        A    I don't recall the structure
 4   of it.
 5        Q    In terms of -- okay.
 6             Would it then follow the same
 7   procedure after the 468 is reviewed, or
 8   it's the annual 468, reviewed or
 9   audited by Rosen Seymour, does the 468
10   then go to the board for final approval
11   before filing?
12        A    Yes.
13             MS. CLARKE:  Object to form.
14        A    It did.
15        Q    Do you know what review Rosen
16   Seymour conducted with respect to a
17   quarterly 468 that's not an annual
18   audit?
19        A    I don't.  I'm not an auditor.
20        Q    Do you know what the audit
21   consisted -- do you know what Rosen
22   Seymour did to perform the annual audit
23   for the annual financial statement of
24   Elk?
25        A    I believe I explained it
```

Page 125

```
                         FEINSOD
 1
 2   before generally.
 3        Q    Were there internal controls
 4   that related to the annual audit for
 5   Elk?
 6             MR. SEIDEL:  Objection to
 7        form.
 8        A    The audit wasn't done by Elk;
 9   it was done by auditors.  So the
10   controls -- we wouldn't have controls.
11   The question doesn't make sense.
12        Q    Were there internal controls
13   for Elk that the annual auditors would
14   review when preparing the Elk financial
15   statement?
16        A    I believe so.
17        Q    Do you know what that review
18   would consist of?
19        A    I don't.
20             MR. WEINBERG:  If we can
21        refresh the exhibit.  I'm sorry.
22        Do we have Tab 5, the May 26,
23        2009, minutes?
24             MS. BILODEAU:  They're marked
25        Exhibit 2, if you refresh.
```

Page 126

FEINSOD

1
2      Q    Is Exhibit 2 open,
3  Mr. Feinsod?
4      A    Yes.  I'm reviewing it.
5      Q    Okay.  After you've had a
6  chance to generally review, if you
7  would just tell us what Exhibit 2 is.
8      A    Okay.
9           Okay.
10     Q    Generally, what is Exhibit 2,
11 please?
12     A    It's a -- minutes of a board
13 meeting of Elk Associates Funding and
14 AmeriTrans Capital held on May 26,
15 2009.
16     Q    If you would look at the
17 bottom of page 2, the last paragraph
18 continuing on to the top of page 3.
19          The discussion:  Mr. Granoff
20 then interjected that the life
21 settlement investments still required
22 premiums to be paid and he any further
23 added that the funds to pay the life
24 settlement premiums could not come from
25 the sale of Elk assets since that would

Page 127

FEINSOD

1
2  violate SBA rules and regulations since
3  these were AmeriTrans' assets.
4           Do you recall that
5  discussion?
6      A    I don't.
7      Q    Okay.  Do you recall
8  reviewing or learning at any time that
9  the sale of Elk's assets -- the
10 proceeds of the sale of Elk's assets,
11 using that to pay life settlement
12 premiums would violate SBA rules and
13 regulations because the life settlement
14 policies were AmeriTrans' investments?
15          MR. HASHEM:  Objection to
16     form.
17     A    No, I don't recall this.
18     Q    Okay.  Did you subsequently,
19 after 2009, ever have a discussion
20 about that topic, whether or not the
21 sale of Elk's -- proceeds from sale of
22 Elk's assets could be used to pay the
23 AmeriTrans life settlement premiums?
24     A    I don't recall specifically.
25     Q    At the bottom of page 3, the

Page 128

FEINSOD

1
2  next-to-last paragraph:  Mr. Feinsod
3  then stated that for the company to be
4  profitable it required 35 million in
5  performing assets.
6           Do you see that statement?
7      A    I do.
8      Q    In terms of "the company,"
9  are you referring to AmeriTrans and Elk
10 on a consolidated basis?  Is that
11 right?
12     A    I don't recall.  I did not
13 keep the minutes.  I was not the
14 secretary.
15     Q    Do you know -- well, in
16 terms -- do you remember making a
17 statement that in order for the company
18 to be profitable, it required
19 35 million in performing assets?
20     A    I don't remember.
21     Q    During the period of time
22 2009 through 2013, was Elk generally
23 operating the at a profit or a loss?
24     A    I don't recall.
25     Q    During the period of time

Page 129

FEINSOD

1
2  2009 to 2013, was AmeriTrans generally
3  operating at a profit or a loss?
4      A    I don't recall.
5      Q    During the period of time
6  subsequently, 2011 to 2013, was
7  AmeriTrans operating at a loss?
8      A    I don't recall financial
9  performance from 10 years ago.
10     Q    Okay.  Do you recall as to
11 what the level of activity you needed
12 for performing loans in order for Elk
13 or AmeriTrans to be profitable?
14     A    No, I don't recall.
15     Q    Did you -- would you have
16 done some sort of analysis in order to
17 determine what level of performing
18 loans were necessary in order for a
19 company to become profitable?
20     A    Could you repeat the
21 question.
22     Q    Sure.
23          As a part of your duties with
24 respect to AmeriTrans and Elk, would
25 you do an analysis as to what the

Page 130

```
 1              FEINSOD
 2  amount of performing loans is necessary
 3  in order for a company to become
 4  profitable?
 5      A   I apologize.  I need to take
 6  a break and restate something.
 7          The exhibit isn't -- is
 8  actually not what -- as I described,
 9  now that I'm looking at it.  So I would
10  like to -- to answer that question, to
11  revisit that.  There's actually two
12  copies of minutes here in this exhibit.
13  And I'm trying to understand what's --
14  I'm a little confused.
15          Exhibit 3 -- Exhibit 2 is
16  what?  Should be -- when we talk about
17  it, it looks like it's actually two
18  copies of board minutes.
19      Q   Is one draft, an unsigned
20  copy of board minutes, and the another
21  one is a signed copy by Lee Forlenza
22  who acted as a secretary of the
23  meeting?
24      A   Okay.  Is there a difference
25  between the two copies?
```

Page 131

```
 1              FEINSOD
 2      Q   I don't know.  I'm asking you
 3  about the signed copy.  That's the
 4  first five pages.
 5      A   Okay.  I apologize.  Because
 6  when I looked at it, I thought I was
 7  looking at one document.  Now I realize
 8  that it's actually two documents, so.
 9      Q   I'm only asking you about the
10  one document, the signed exhibit, the
11  signed copy of the board minutes for
12  May 26, 2009.  It is the first six
13  pages of the document.
14      A   In order to refresh my
15  memory, I'm just trying to understand
16  what the changes are from the draft
17  copy, which appears to be a draft copy
18  attached to the same exhibit.
19          It's very confusing and
20  difficult to answer your question.
21      Q   I'm simply asking about the
22  entries on the signed copy of the
23  minutes.
24      A   Okay.  So restate your
25  question.
```

Page 132

```
 1              FEINSOD
 2      Q   In 2009, would you prepare an
 3  analysis as to the value of performing
 4  loans that was necessary for the
 5  company to become profitable?
 6      A   I may have.
 7      Q   But you don't recall; is that
 8  right?
 9      A   I don't recall.
10          Could I put this exhibit
11  away?  Are we done with this?
12      Q   No, we're not.
13          If you go to page 3 -- I'm
14  sorry.  Page 4?
15      A   Of the PDF or of the --
16      Q   Of the PDF.
17          It's -- again, we're in the
18  first page, PDF page 4, of the signed
19  copy of the minutes.
20      A   Um-hum.
21      Q   It is the paragraph
22  beginning:  Mr. Boockvar asked what was
23  the timeline to decide whether the
24  company would be liquidated --
25          Do you see that paragraph?
```

Page 133

```
 1              FEINSOD
 2          -- if Elk was unable to
 3  obtain SBA leverage commitment?
 4      A   Okay.
 5      Q   Does this paragraph refresh
 6  your recollection that at this point in
 7  time, Elk was waiting for an SBA
 8  leverage commitment?
 9      A   Yes, it does at this -- an
10  overdue one at this point.
11      Q   I'm sorry.  What?
12      A   An overdue commitment.
13      Q   Oh.  And do you remember what
14  the amount was of the commitment by the
15  SBA with respect to a debenture that
16  was in 2009?
17      A   You gotta repeat -- please
18  repeat the question.
19      Q   Do you know how much of a
20  commitment Elk was seeking -- or
21  withdrawn.
22          Do you know Elk obtained with
23  respect to a commitment from the SBA
24  for an additional leverage or
25  debenture?
```

Page 134

```
 1            FEINSOD
 2      A    Yes.
 3      Q    How much was that?
 4      A    After 12-month delay, I
 5 believe it was $11.1 million.
 6      Q    Now, there was a discussion
 7 here that -- if you review that
 8 paragraph, that if the SBA did not make
 9 the leverage commitment, the company
10 would look 4 to 6 months for a merger
11 partner before proceeding to liquidate
12 the company's portfolio.
13           Do you see that?
14      MR. HASHEM:  Objection to
15   form.
16      A    Yes, I see it.
17      Q    Okay.  What was the -- and
18 you -- what was the basis -- well, in
19 terms of your response, was that a --
20 what you felt at the time was a
21 reasonable amount of time to look for a
22 merger partner before considering other
23 alternative plans, such as liquidation?
24      MR. HASHEM:  Objection to
25   form.
```

Page 135

```
 1            FEINSOD
 2      A    Given the specific time of
 3 May of 2009, as of that date, that
 4 was -- that was my belief, which I
 5 would put in the context of what was
 6 going on in the financial markets.
 7      Q    Okay.  And had you prepared
 8 what would be a proposed liquidation
 9 plan for the board to review with
10 respect to the company?
11      A    I don't recall.
12      Q    Is that something that you
13 would do as a part of your duties for
14 the board to consider?
15      A    If requested under special
16 circumstances potentially.
17           It was not a normal course
18 of -- it was not a regular financial --
19 it was not a regular preparation by any
20 means.
21      MR. WEINBERG:  The exhibit
22   for May 22, 2009.  I believe it's
23   Tab 2.
24      (Memo dated May 22, 2009, was
25   marked Exhibit 3, for
```

Page 136

```
 1            FEINSOD
 2   identification, as of this date.)
 3      MS. BILODEAU:  It's been
 4   marked Exhibit 3.  You can
 5   refresh.
 6      Q    When you're able to
 7 Exhibit 3, please generally review it
 8 and tell us what it is.
 9      A    Okay.  I have generally
10 reviewed it.
11      Q    Okay.  You did?
12      A    Yes.
13      Q    Do you recognize the
14 document?
15      A    Yes.
16      Q    Okay.  Does it refresh your
17 recollection as to your memory
18 preparing the document --
19      A    No.
20      Q    -- dated May 22, 2009,
21 Financial Projections?
22      A    Slightly, yes.
23      Q    The document on page -- there
24 is a summary of a consolidated balance
25 sheet on page 1; is that right?
```

Page 137

```
 1            FEINSOD
 2      A    I believe so, yes.
 3      Q    There's a chart of --
 4      A    The date is wrong on the
 5 consolidated balance sheet.
 6      Q    Okay.  What should be the
 7 date be?
 8      A    I can't tell.  One has 2009,
 9 and then one says 2008.
10      Q    Okay.  So there might have
11 been a typo on the document.
12           In terms of page 2 as a
13 category of investments; is that right?
14      A    Page 2, company and
15 invest- -- I think it speaks for
16 itself.  It's says a -- it's a summary
17 of what quote/unquote investment asset.
18      Q    Okay.  Page 3 is titled:
19 Liquidation Analysis; is that right?
20      A    That is the title.
21      Q    Page 4 has a title:
22 Employment Contracts; is that right?
23      A    Yes.
24      Q    If you look down for fiscal
25 year 2010, is -- your employment
```

Page 138

```
           FEINSOD
1
2  contract, does that refresh your
3  recollection as to what your
4  compensation was for fiscal year 2010
5  for the company?
6      A   On that page, you're saying
7  the six employment contracts?
8      Q   Yes.  You're listed as one of
9  the employment contracts.
10     A   Okay.  That refreshes my
11 memory, yes.
12     Q   Did you receive compensation
13 of $175,540 for your work on behalf of
14 Elk and AmeriTrans for fiscal year
15 2010?
16     A   I don't recall what I
17 actually received.
18     Q   Would it have been
19 approximately that amount?
20     A   Most likely it was, yes.
21     Q   And your employment contract,
22 what -- what benefits -- do you
23 remember what benefits were?
24     A   No.
25     Q   Do you know what it did --
```

Page 139

```
           FEINSOD
1
2  I'm sorry.
3      Do you know what additional
4  benefits the company, Elk and
5  AmeriTrans, paid on your behalf?
6      A   I believe we had a -- Elk had
7  a -- what is it called -- the SEP.
8  It's similar to an IRA, I believe.
9      Q   Right.
10     A   So Elk had set that up for
11 all its employees, and each of the -- I
12 was not receiving the SEP.  Gary
13 Granoff and each of the other employees
14 were receiving the SEP due to -- I
15 didn't -- so I might have received
16 maybe expense reimbursement, which was
17 probably -- I don't -- I mean, I assume
18 it was business expenses.
19     Q   If we go to -- then there --
20 the next four pages include various
21 charts.  And chart C or chart D in the
22 last two pages talks about models for
23 operating the company or alternatively
24 if the company has to liquidate.
25     A   Where is chart C and D -- is
```

Page 140

```
           FEINSOD
1
2  there a chart C and D?
3      Q   C and D.
4      A   Is there a chart C and D in
5  this memo?  I don't see it.
6      Q   On the --
7      A   I see the summary -- I
8  don't -- I see a summary.  Mine ends on
9  chart D on a half a page with no
10 pictures, no charts.
11     Q   Okay.  On the last page, says
12 chart D as in David?
13     A   It says chart? D, but there is
14 no chart.
15     Q   Okay.
16     A   There's one -- there's
17 various bullet points with respect to
18 charts C and D but there are no charts
19 C and D.  I don't know what they refer
20 to -- or even chart A and B doesn't
21 show up in my -- there are no charts in
22 my --
23     Q   Okay.
24     A   -- exhibit.
25     Q   That's what the exhibit is.
```

Page 141

```
           FEINSOD
1
2  It says chart A, but there is no chart,
3  there are just bullet points.
4      Does this refresh your
5  recollection as to whether or not,
6  after 2009, you prepared any models or
7  analysis for a liquidation plan for the
8  company?
9      A   With respect to this data,
10 yes, it does.
11     Q   Okay.  It refreshes your
12 recollection that you prepared this
13 document to set forth different models
14 as to how the company would operate or
15 liquidate depending upon what happened
16 with respect to the leverage --
17     A   I don't -- I don't remember
18 the preparation of this memo at all,
19 but I'm looking at it.
20     I can read the memo.
21     Q   Okay.
22     A   And review it.
23     Q   What I'm asking, after this
24 memo was prepared, does this refresh
25 your recollection whether or not you
```

Page 142

FEINSOD

1
2  prepared any subsequent memos outlining
3  models as to how the company would
4  operate or liquidate its assets?
5      A    Not specifically, no.
6      Q    Do you remember generally if
7  you would have done that as a part of
8  your duties as president and CEO for
9  Elk and AmeriTrans?
10     A    No, not generally.  This was
11 when we were waiting on the debentures
12 inexplicably.
13     Q    Uh-hum.
14     A    And that was what was causing
15 the consternation of doing this
16 analysis if we don't get the money.  So
17 it wasn't a -- you would never
18 characterize it as a regular
19 occurrence.  This was prepared due to
20 the delay in getting SBA debentures.
21         (Clarification by the
22 reporter.)
23     A    In receiving SBA debentures.
24     Q    You can put that away.  We
25 can go to a -- can we go to the 468 for

Page 143

FEINSOD

1
2  December 31st, 2010.
3      A    I'd like to take a break
4  soon.
5      Q    Sure.  Should we take our
6  half hour lunch break now?
7      A    Fine with me.
8          VIDEOGRAPHER:  This will end
9      Media Unit 2.  Going off the
10     record at 12:24 p.m., October 28,
11     2021.
12         (Whereupon, a lunch recess
13     was taken at 12:24 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 144

FEINSOD

1
2      A F T E R N O O N   S E S S I O N
3          (Time noted:  12:57 p.m.)
4  M-I-C-H-A-E-L  R-O-S-S  F-E-I-N-S-O-D,
5          Resumed, having been previously sworn by a
6  Notary Public within and for the State of New York,
7  was further examined and testified under oath as
8  follows:
9          VIDEOGRAPHER:  We're back on
10     the record.  The time is 12:57
11     October 28, 2021.  This will begin
12     Media Unit 3.
13 CONTINUED EXAMINATION BY MR. WEINBERG:
14     Q    Good afternoon, Mr. Feinsod.
15 If you would refresh your exhibit and
16 go to Exhibit 4, please.
17     A    Exhibit 4.  Okay.
18         (Form 468 as of 12/31/10, was
19     marked Exhibit 4, for
20     identification, as of this date.)
21     A    Okay.  I have the exhibit.
22     Q    Okay.  Great.  Would you --
23 now that you're able to open the
24 exhibit, can you look at it just
25 generally and just tell us what the

Page 145

FEINSOD

1
2  Exhibit 4 is.
3      A    It's multiple -- it's at
4  least one copy, if not multiple copies,
5  of this same 468 -- a form 468, but
6  there's multiple -- again, there's
7  multiple copies there.
8      Q    Okay.  And is this the 468
9  for the six months ended December 31st,
10 2010?
11     A    The first page says that,
12 yes.  I can go to every page and
13 confirm it.
14     Q    I think we -- if you feel you
15 have to, but I think we can let go with
16 just the first page.
17     A    The first page is the first
18 page of a 468 dated -- yes.
19     Q    Okay.
20         You had mentioned there's
21 multiple copies.  If you go to the last
22 page of the 468 --
23     A    This is what page of this
24 document, of the 41-page document?
25     Q    Page 41.

Page 146

```
 1                     FEINSOD
 2        A    Great.  Thank you.
 3             Got it.
 4        Q    Okay.  And do you see the --
 5             What is that page called,
 6   page 41?
 7        A    It says:  Quarterly
 8   Certifications.
 9        Q    Okay.  And that's for Elk
10   Associates.  And what is -- we have the
11   management certification; is that
12   right?
13        A    I'm reviewing it.  Give me a
14   second.
15             Yes.
16        Q    What is the management
17   certification?
18        A    It's the box that -- the box
19   with a pre-written paragraph.  Do you
20   want me to read the paragraph into the
21   record?
22        Q    No, no.  Is the management
23   certification the certification by
24   Richard Feinstein as the chief
25   financial officer as to the accuracy of
```

Page 147

```
 1                     FEINSOD
 2   the 468 that's filed with the SBA?
 3        A    It doesn't say "accuracy," it
 4   uses the words "true and correct."
 5        Q    Okay.  And the secretary
 6   certification is by Silvia Mullens as
 7   secretary.  Is that stating when the
 8   468 was reviewed and approved by the
 9   board of Elk Associates Funding Corp.?
10        A    Yes.
11        Q    Okay.  And if we go to
12   page 2 -- before we go to the pages, in
13   terms of looking at the 468 for 12/31,
14   is this -- is this -- 2010, is this an
15   audited 468 or just a short Form 468?
16        A    I would assume this was not
17   audited.
18        Q    Okay.
19        A    I don't know what -- I don't
20   know what "short form" refers to.
21        Q    Okay.  On the -- in terms of
22   the audited 468 would be on the annual
23   term or the fiscal year when Elk
24   reported; is that right?
25        A    Yes.
```

Page 148

```
 1                     FEINSOD
 2        Q    And did Elk operate on a
 3   June 30 fiscal year?
 4        A    Yes.
 5        Q    And in -- and the quarterly
 6   468 that -- when you described what the
 7   general practice was, that would be the
 8   468 that is reviewed by the external
 9   auditors as opposed to audited by the
10   external auditors; is that right?
11        A    The distinction is that it's
12   not audited quarterly; is that your
13   question?
14        Q    Yes.
15        A    Okay.
16        Q    Yes, that it's only reviewed;
17   is that right?
18        A    Yes.
19        Q    If we go to page 4C, net
20   income or loss, it's line 39.
21        A    What page of the PDF?
22        Q    Well, if we just go to the
23   fourth page of the PDF.
24        A    Okay.  Got it.
25        Q    Tell you what --
```

Page 149

```
 1                     FEINSOD
 2        A    I'm sorry.  I'm there.
 3        A    I'm sorry.  Bear with me one
 4   more second.
 5             Okay.  If you go to page 20
 6   of the PDF.
 7        A    I believe I have the right
 8   page.  Investment Income.
 9        Q    Let's see.  Do you have a
10   page 4C in the lower right-hand corner?
11        A    Yes.
12        Q    Okay.  Line 39.
13        A    Yeah.
14        Q    Net income or loss?
15        A    Yes.
16        Q    What is the net income or
17   loss for the period ending December 31,
18   2010, for the six months?
19        A    Negative 332,387.
20        Q    Okay.  So does that refresh
21   your recollection that for that quarter
22   was Elk operating at a profit or a
23   loss?
24        A    It speaks to six months, I
25   believe, right?  So I don't know about
```

Page 150

FEINSOD

1
2 a quarter.
3      Q    Okay.  So in that six-month
4 period, was Elk operating at a profit
5 or a loss?
6      A    For the six-month period
7 ended 12/31/10, Elk operated at a loss.
8      Q    Of 332,987; is that right
9 dollars?
10     A    No.  It's not.
11     Q    What is the amount again?
12 I'm sorry.  Would you read the dollar
13 amount?
14     A    Negative 332,387.
15     Q    Okay.  $332,387 loss, right?
16          Is that right?
17     A    Yes.  That's what it says.
18     Q    Okay.  If you go to -- if you
19 scroll up to page 2C, which I think is
20 page 18 of 41.
21     A    Okay.
22     Q    Do you see line 24:  Other,
23 Due from parent?
24     A    Yes.
25     Q    What is the due from parent?

Page 151

FEINSOD

1
2      A    It is an amount due from
3 AmeriTrans Capital Corp. to Elk
4 Associates.
5      Q    And as of that -- I'm sorry.
6 I didn't mean to interrupt.  Were you
7 finished?
8      A    I was.
9      Q    As of December 31st, 2010,
10 how much it AmeriTrans owe Elk?
11     A    1,436,726.
12     Q    $1,436,726; is that right?
13     A    Yes.
14     Q    Do you know generally what
15 made up the due from parent at that
16 time for the period ending
17 December 31st, 2010?
18     A    I want to answer, but could
19 you just read that again.  Do I know
20 what?
21     Q    Sure.
22          The due from parent, was that
23 an allocation of expenses between Elk
24 and AmeriTrans?
25     A    It represented -- it

Page 152

FEINSOD

1
2 represented the balance due from
3 AmeriTrans -- from Elk to AmeriTrans,
4 yes.
5      Q    And how was that number --
6 how was the amount derived at?
7      A    A variety -- a variety of
8 factors went into it.  This ties to --
9 so if I remember correctly, this ties
10 to -- this form is generated
11 automatically --
12     Q    Um-hum.
13     A    -- from a -- from a variety
14 of sources, that full information using
15 the SBA's chart of accounts.  So this
16 ties to the SBA regulation that would
17 create -- that would be described under
18 this.
19     Q    Do you know what regulation?
20     A    It's in the chart of
21 accounts.  If you have one handy, I'm
22 sure I could find it quickly.
23     Q    Okay.
24     A    When you form an SBIC, the
25 chart of accounts is given by the SBA

Page 153

FEINSOD

1
2 to the SBIC, and then they create the
3 each quarter flows from that
4 accounting system.  And then I believe
5 SBA creates accounts -- reports on
6 their end using this information.
7          (Clarification by the
8 reporter.)
9      A    On their end.
10     Q    For the $1,436,726, are those
11 expenses that Elk paid for on behalf of
12 itself and AmeriTrans?
13     A    I don't recall as of this
14 specific day.
15     Q    Okay.  I'm talking about
16 generally.  At this time, for the
17 period of time before December 31,
18 2010, did Elk make any advances or
19 loans to AmeriTrans?
20     A    To AmeriTrans or on behalf of
21 AmeriTrans, yes, both, from time to
22 time.
23     Q    Okay.  Did Elk do that before
24 December 31, 2010?
25     A    Yes, absolutely.

Page 154

```
1              FEINSOD
2     Q    What -- what advance or loan
3 did Elk make to AmeriTrans before
4 December 31st, 2010?
5     A    If you could pull up a
6 previous 468, it might provide some
7 information.
8          This statement is cumulative,
9 so I can't tell what -- from -- the
10 period from when this was generated.
11    Q    But the prior 468 would have
12 what was cumulative from the prior
13 period in terms of the dollar value,
14 correct?
15    A    Yes, it should.
16    Q    If we can go to the general
17 ledger for the next exhibit.
18         (Intercompany Balance Per G/L
19         7/1/2012, was marked Exhibit 5,
20         for identification, as of this
21         date.)
22         MS. BILODEAU:  That has been
23    marked Exhibit 5.
24    Q    Let us know when you are able
25 to open up Exhibit 5.
```

Page 155

```
1              FEINSOD
2     A    I have it.
3     Q    Could you tell us what
4 Exhibit 5 is, generally.
5     A    It looks like work papers
6 referring to the intercompany balance
7 with AmeriTrans.
8     Q    Okay.
9     A    Between AmeriTrans -- I'm
10 sorry.  Its -- has its title at the
11 top, I think is accurate.
12    Q    Okay.  Thank you.
13    A    Would you like me to -- if
14 you'd like me to read it, I will.
15    Q    Intercompany Balance with
16 Ameri- -- it says:  Elk Associates
17 Funding Corp. Intercompany Balance With
18 AmeriTrans Capital Corporation.
19         If you do the fourth page of
20 the PDF.
21    A    Okay.
22    Q    Okay?
23    A    Yes, sir.
24    Q    It has an intercompany
25 balance between the period July 21st,
```

Page 156

```
1              FEINSOD
2 2009 through June 8th of 2010; is that
3 right?
4     A    Correct.
5     Q    And --
6     A    That is correct.
7     Q    -- the intercompany balance
8 that it's showing in the general ledger
9 is $207,363.36 -- I'm sorry --
10 $207,353.36; is that right?
11    A    On the -- at the bottom, yes.
12    Q    Okay.  And it's showing
13 various payments is it -- that Elk made
14 on the -- in connection with the
15 intercompany; is that right?
16    A    It's showing both payments,
17 and it's showing allocation of expenses
18 that was performed at the end of each
19 quarter.
20    Q    Okay.  What are the payments
21 that it's showing?  What is Payment MF
22 payroll, with a date?
23    A    I don't know.
24    Q    Do you know generally what
25 the payment is referring to for the
```

Page 157

```
1              FEINSOD
2 entry Payment MF payroll, and with the
3 date July '09?
4     A    An allo- -- yes, it may be an
5 allocation of my, Michael Feinsod --
6 because I'm probably MF -- for the
7 month.  I can't tell for -- as
8 indicated on a monthly basis.
9     Q    Okay.  At this point in time,
10 were you paid your salary by AmeriTrans
11 or Elk?
12    A    I was always paid my salary
13 by Elk.
14    Q    Your payment that's being
15 allocated to the intercompany balance
16 is showing a negative, is that -- on
17 the -- on the sheet that we're looking
18 at page 4; is that right?
19    A    Yes, it looks like it is,
20 yes.
21    Q    So did you receive any
22 payments from AmeriTrans that would
23 have been credited to the intercompany
24 balance that AmeriTrans owed Elk for
25 your salary?
```

Page 158

```
                    FEINSOD
 1
 2       A    It was technical -- please
 3   repeat the question.  Would I have
 4   received?
 5       Q    Any payment of your salary
 6   from AmeriTrans that would have been
 7   credited to Elk on the intercompany
 8   balance that AmeriTrans owed Elk?
 9            MS. CLARKE:  Objection.
10       A    I don't know the components
11   that make up the pages -- the
12   payments --
13       Q    Okay.
14       A    -- or the allocation from the
15   one in this information I don't know
16   what's in those quarterly allocations.
17       Q    But your payroll -- okay.
18            Your salary, generally, as
19   you understood it, you were paid by
20   Elk, and a portion of your salary was
21   credited to AmeriTrans and a portion
22   was accredited to Elk; is that right?
23       A    Yeah.  I believe that is
24   correct.
25       Q    Okay.  And do you know how
```

Page 159

```
                    FEINSOD
 1
 2   the allocation was made as to how much
 3   Elk would be responsible for and how
 4   much AmeriTrans was responsible for?
 5       A    I don't specifically.  I
 6   believe it was tied to the percentage
 7   of assets that were related to Elk.
 8       Q    Do you know if that changed
 9   during the period of time 2010 through
10   2013?
11       A    If what changed?
12       Q    If the -- a formula
13   allocating your salary based upon a
14   percentage of assets owned by Elk, was
15   that -- was the use of a formula based
16   upon a percentage of assets changed
17   during the time period 2010 through
18   2013?
19       A    I don't recall.
20            No, I don't recall it at all.
21   I wouldn't be involved at that level of
22   detail.
23       Q    There are various entries
24   here, allocation of expenses.
25   Generally, what is your understanding
```

Page 160

```
                    FEINSOD
 1
 2   as to allocation of expenses on the
 3   intercompany balance?
 4       A    Pursuant to -- we had a
 5   formula whereby which certain --
 6   certain expenses were allocated to
 7   either Elk or AmeriTrans based on a
 8   percentage of assets held at each
 9   entity.  And it was a backward-looking
10   adjustment made at the end of each
11   quarter.  And I note that this -- I
12   guess from this it seems that the
13   intercompany balance is reduced during
14   this quarter, right?
15       Q    Right.
16       A    Great.
17       Q    There is even a payment on
18   December -- on January 20th of 2010, a
19   payment of the intercompany balance was
20   entered; is that right?
21       A    On 1/20/10 I see a payment.
22   Is that what you're referring to?
23       Q    Yeah, yeah.
24       A    Okay.  I see what you're
25   referring to.
```

Page 161

```
                    FEINSOD
 1
 2       Q    Of $162,821.65, right?
 3       A    That's what it says, yes.
 4       Q    Okay.  The -- now, when you
 5   say the -- there was a formula
 6   allocating expenses based upon
 7   percentage of assets owned by Elk and
 8   AmeriTrans, was that -- was that same
 9   formula applied to different types of
10   expenses?
11       A    I wasn't intimately involved
12   with the formula.
13       Q    Do you know what types of
14   expenses the formula was applied -- a
15   formula was applied to?
16       A    I don't recall specifically,
17   but I'm sure it's detailed in the
18   financial statements.
19       Q    Do you know if -- was it just
20   your salary, or was it also
21   employees' -- other employees' salaries
22   that were allocated pursuant to a
23   formula for the intercompany?
24       A    As I said, I don't know the
25   mechanics or the -- I don't remember
```

Page 162

FEINSOD

1
2  the details of the allocation, but I'm
3  sure there is documentation that might
4  be helpful -- so.  And I guess these
5  aren't signed, I've got to point out,
6  so I don't know if these are final.
7       Q.   Okay.
8       A.   And this whole exhibit looks
9  like it could be a draft.
10      IT CONCIERGE:  Excuse me.
11      This is Bob.  It looks like Ray
12      may have dropped off.  I don't
13      know if that was intentional.
14      MR. WEINBERG:  I'm sure not.
15      Should we go off the record,
16      Elizabeth?
17      MS. CLARKE:  He says he is
18      looking for a better WiFi signal
19      and we could keep going in his
20      absence.
21      Thank you.  Thank you for
22      letting us know.
23      Q.   Do you know if these are
24  excerpts -- these are excerpts from the
25  general ledger that are part of Elk's

Page 163

FEINSOD

1
2  records.
3       A.   But they're not signed, so
4  are they -- they drafts or are they --
5       Q.   Mr. Feinsod, the -- these are
6  copies of Elk's general ledger that
7  were produced in discovery.  If you go
8  to -- do you know if rent was or lease
9  payments were allocated by a formula?
10      A.   I believe they were.
11      Q.   Rents, salaries, does that
12  refresh your recollection as to what
13  other expenses were allocated between
14  Elk and AmeriTrans?
15      A.   No.  With respect to rent, it
16  does.
17      Q.   Okay.  If you go to the third
18  page of the PDF.
19      A.   Okay.  A draft of the
20  intercompany balance work papers.
21      Q.   Okay.  It's titled:  Elk
22  Associates Funding Corporation
23  Intercompany Balance with AmeriTrans
24  Capital Corporation Operating Expenses,
25  correct?

Page 164

FEINSOD

1
2       A.   Correct.
3       Q.   That's the title.  Okay.
4  Before December 31, '10, and including
5  December 31, '10, are the entries:
6  Allocation of expenses and MF payroll?
7       A.   Yes.  Yes, they are the items
8  that you mentioned.
9       Q.   Okay.  So for the --
10      A.   For specific periods, okay.
11      Yes.  So for the specific
12  period from July 1 of 2009 through
13  December 31, 2010, on this document, do
14  we have any entry that's in advance or
15  a loan from Elk to AmeriTrans?
16      A.   There's the allocation of
17  expenses.
18      Q.   Right.
19      A.   And -- okay.  So -- I see the
20  four items that you mentioned.  That's
21  all I see.
22      The three entries that you
23  mentioned, those are the only three
24  that are there, yes.
25      Q.   Meaning payment, FM payroll,

Page 165

FEINSOD

1
2  and allocation of expenses, and
3  payments to the intercompany balance;
4  is that right?
5       MR. SEIDEL:  Objection to
6       form.
7       A.   I apologize.  Where is
8  payment to intercompany balance?
9       Q.   Payment of intercompany
10  balance that was January 20th of 2010
11  on page 4.
12      A.   I'm sorry.  You had me
13  looking at page 2.  Okay.  So we're
14  looking -- we're talking about page 2
15  now, right?
16      Q.   No, we're actually -- sorry.
17      What -- we first looked at
18  page 4, we then moved --
19      A.   Yes.
20      Q.   -- we then moved to page 3.
21  Pages 3 and 4 --
22      A.   Yes.
23      Q.   -- cover the period of time
24  July 1, 2009, through December 31,
25  2010, correct?

Page 166

FEINSOD

1    A    Page 2.  Do you want to go --
2  you're going backwards and forwards.
3  So you want to go in one spot and go
4  forward?  That would be more helpful
5  for me.  You're jumping around and
6  asking me to -- to dates that are going
7  backwards, so -- with documents that
8  have worked forwards.  I apologize.
9    Q    I'll restate the question so
10  it's --
11    A    Yeah.
12    Q    -- easier for you, okay?
13    On page 4 --
14    A    Yes.
15    Q    -- we had allocation of
16  payments for MF payroll and allocation
17  of expenses, and a payment of an
18  intercompany balance; is that correct?
19    A    Yes, that is correct.
20    Q    Okay.  Is there anything on
21  page 4 that's an advance or loan from
22  Elk to AmeriTrans?
23    MR. HASHEM:  I'm going to
24    object insofar as --

Page 167

FEINSOD

1    A    I'm sorry.
2    MR. HASHEM:  -- you're
3    calling for legal opinion on what
4    an advance or a loan is.
5    (Clarification by the
6    reporter.)
7    MR. WEINBERG:  I'm sorry.  I
8    thought you were done, Ray.
9    Ray, I apologize.
10    MS. CLARKE:  Your audio is
11    not coming in clearly.
12    MR. HASHEM:  I'm done.
13    Steven, sorry.
14    MR. WEINBERG:  That's all
15    right.
16    Q    Is there any other
17  description on page 4 other than
18  payment of FM payroll, and allocation
19  pf expense, and a payment of an
20  intercompany balance?
21    A    No, I don't believe there is.
22    Q    Okay.  So there is no other
23  description for any entry on the
24  intercompany balance, per the general

Page 168

FEINSOD

1  ledger on page 4; is that right?
2    A    On this unsigned draft,
3  correct.
4    Q    Okay.  The one that says work
5  paper on top and an account member.  In
6  terms of the page 3, is there any
7  description other than payment of MF
8  payroll, and allocation of expense, and
9  a Duff & Phelps invoice paid by AMTC?
10    A    No, there is none.
11    Q    Is there any description that
12  talks about a loan on page 3?
13    A    No.
14    Q    Is there any description on
15  page 4 that talks about a loan?
16    A    No.
17    Q    All right.  Now, if we go to
18  June.  Let's put this away.  We'll come
19  back to this.  For Exhibit 6, can we
20  have the June 30, 2011, 468.
21    (Letter dated 10/3/11 with
22    attachments, was marked Exhibit 6,
23    for identification, as of this
24    date.)

Page 169

FEINSOD

1    MS. BILODEAU:  That's been
2    marked Exhibit 6.  You can
3    refresh.
4    Q    If you've a chance to open
5  Exhibit 6 and could briefly look at it,
6  and tell us what is Exhibit 6.
7    A    It looks like a -- it looks
8  like the -- what we would refer to
9  maybe as the hard copy submission of
10  the 468.  And the only reason I'm
11  saying that, meaning the cover letter
12  says it was -- this is the three paper
13  copies that were filed with the SBA of
14  the annual Form 468, probably, because
15  the accountants' opinions in the
16  standalones were included.  I don't see
17  the standalones, I'm sorry, I see the
18  opinion.  I don't see the standalone
19  financials.
20    Q    When you say the
21  "standalone," what are you referring
22  to?
23    A    On page -- page -- I'm
24  sorry -- page 2 of the PDF, there is

Page 170

                    FEINSOD

1
2   the first page of the auditors' --
3   there's the auditors' opinion.
4        Q    Right?
5        A    And I would have thought that
6   this hard copy would include financial
7   statements with notes, but I don't see
8   them.
9        Q    Okay.  So would the --
10       A    So this is -- this looks like
11  part of an annual Form 468 filing, this
12  paper version of it.
13       Q    Okay.
14            If we can -- just bear with
15  me one second.
16            Can we look at the next
17  exhibit, the annual audited financial
18  statement for the period ending
19  June 30, 2011.
20            (E-mail dated 10/3/11 with
21       attachments, was marked Exhibit 7,
22       for identification, as of this
23       date.)
24       Q    While that's being loaded,
25  would you go to the last page of the

Page 171

                    FEINSOD

1
2   PDF?
3        A    I'm sorry.  I went back out.
4   So you want me to go back into
5   Exhibit 6?
6        Q    Yes.
7        A    Okay.
8        Q    Exhibit 6 is a 53-page
9   document; is that right?
10       A    Yes, but I thought you were
11  loading 5, so -- I mean, I thought you
12  were loading a new exhibit.
13            I got it.  Got it.
14       Q    And Exhibit 6 is for the
15  annual period ending June 30, 2011; is
16  that right?
17       A    June 30, yes, it looks to be.
18       Q    Okay.  So that would have
19  been -- is it your testimony that the
20  annual 468 would have been submitted
21  with an annual audited financial
22  statement from the auditors for Elk?
23       A    The electronic version would
24  be filed without it.  And I believe the
25  paper version would be mailed with the

Page 172

                    FEINSOD

1
2   auditor's report.  Yes.
3        Q    If you look at the last page
4   of the PDF, does it have the
5   certifications signed by management and
6   the secretary?
7        A    It has a management
8   certification signed by the chief
9   financial officer, and it has a
10  secretary certification similar to the
11  one we described before.
12       Q    Management certification
13  being that from Richard Feinstein,
14  chief financial officer, that the
15  information is true and correct; is
16  that right?
17       A    Yes, and I guess this one
18  maybe adds tax returns to its title.
19       Q    And the secretary
20  certification that the 468 was approved
21  at a board meeting, signed by Silvia
22  Mullens, the secretary; is that right?
23       A    That's what this -- yes,
24  that's what this document is.
25       Q    And if we go to page 4C,

Page 173

                    FEINSOD

1
2   which is page 6 of the PDF, line 39 for
3   the period ending June 30, 2010, was
4   Elk operating at a profit or a loss?
5        A    Hold on.  I didn't get to the
6   page yet.
7             I can't tell from this
8   statement.  It doesn't -- this is not a
9   P&L.  This is a balance sheet.
10       Q    What's reported on line 39
11  for net income or net loss?  39.
12       A    You're on page 6 of the PDF,
13  right?
14       Q    Page 6 of the PDF -- well,
15  I'm sorry.  I'm sorry.  I misread my --
16  would you go to page 7 of the PDF.  It
17  should be page 4C at the lower
18  right-hand corner.
19       A    Okay.  If you give me a
20  minute, I'll get there.
21            Okay.  I'm at that page.
22       Q    Line 39, net income or loss,
23  was Elk operating at a profit or loss
24  for the period ending June 30, 2011?
25       A    For the 12 months ended

Page 174

                    FEINSOD

1
2    6/30/11, this -- this document says
3    that it was operating at a loss.
4         Q    That was a loss of
5    $1,010,290; is that right?
6         A    That's what it says.
7         Q    If we look at page 2C, which
8    is page 4 of the PDF.
9         A    I think you're wrong.  I
10   believe it's page 5.
11        Q    Are you there, page 5 of the
12   PDF?
13        A    I am.
14        Q    Line 24, due from parent?
15        A    2,949,442.
16        Q    $2,949,442; is that right?
17        A    Yes.
18        Q    That's the amount that
19   AmeriTrans owes Elk as of June 30,
20   2011; is that right?
21        A    Yes, this Form 468 says that.
22        Q    Okay.  As of June 30, 2011,
23   is that number represented by
24   allocation of expenses only, or does it
25   include loans from Elk to AmeriTrans?

Page 175

                    FEINSOD

1
2         MR. SEIDEL:  Objection.
3         MS. CLARKE:  Objection.
4    Calls for a legal conclusion.
5         A    It's a cumulative -- it's a
6    cumulative number that is a loan to
7    AmeriTrans.
8         Q    I'm sorry.  What?
9         A    It's a cumulative number that
10   is due from parent and is a loan from
11   the parent.
12        Q    What I'm asking is what makes
13   up the amount of money.  Is it an
14   allocation of expenses, or is it a loan
15   that was made by Elk to AmeriTrans?
16        A    It's a cumulative number of
17   the allocation of expenses for
18   AmeriTrans -- of the allocation of
19   expenses.
20        Q    If we go to -- we have the
21   next exhibit.  I believe Exhibit 6 --
22   open up Exhibit 7.
23        Have you had a chance to open
24   up Exhibit 7?
25        A    Yes, I'm opening -- I have it

Page 176

                    FEINSOD

1
2    open.
3         Looks like a 38-page PDF.
4         Q    Okay.  Is Exhibit 7 the
5    audited financial statement that Elk's
6    accountants would have submitted with
7    the paper copy to the SBA with the 468
8    for the annual period ending, in this
9    case, June 30, 2010 -- June 30, 2011?
10        A    I believe so.  I haven't
11   fully reviewed it, but I believe so.
12        Q    Is there any -- is there any
13   other document that would be a part of
14   the annual -- the submission of the
15   annual report by Elk to the SBA?
16        A    Is there any other -- I
17   assume there's probably a portfolio
18   valuation report that goes with it as
19   well.
20        Q    That's in the 468 schedule of
21   financings, isn't it?
22        A    I haven't looked through the
23   whole document.  It's not here.
24        Q    Sure.
25        In your testimony looking at

Page 177

                    FEINSOD

1
2    the annual 468, you referred to an --
3    the audited financial statement would
4    come from the Elk's accountants.
5         A    That is included in this PDF,
6    yeah.
7         Q    That's Exhibit 7.  If you go
8    back -- you have to look at Exhibit 6
9    and 7 together.  If you go back to
10   Exhibit 6, if you flip through the PDF
11   until you come to page -- on the lower
12   right-hand corner it's page 12C.
13        A    6 and 7 are the essentially
14   the same document for the same time
15   period, is that what these two
16   exhibits --
17        Q    Not the same document, it's
18   for the same time period.  So the
19   period ending June 24, 2011.
20        A    Okay.  I have them both.  I
21   can't have them both open
22   simultaneously.
23        Q    Right.
24        A    Which one would you like me
25   to work with?

FEINSOD

1
2      Q    If you look at page -- if you
3  go to approximately page 16 of
4  Exhibit 6.
5      A    So 6, 16, there is a sideways
6  page.
7      Q    Yep.  It's a schedule of
8  loans and investments.  Is that --
9      A    Yeah, no, I think there would
10  have been a memo.  I think they would
11  have gotten the loan report as well,
12  the valuation summary somewhere as
13  well.
14      Q    Okay.  Is that something you
15  would have reviewed and sent, or would
16  someone else have reviewed and sent the
17  loan report?
18      A    Silvia would have.
19      Q    Okay.  In addition to the
20  loan report, the 468, and the annual
21  audited financial statements, would
22  anything else be submitted by Elk to
23  the SBA for the annual report?
24      A    I don't recall.  There would
25  be an audit.  Yes, there would be an

FEINSOD

1
2  audit that SBA would have.  There's a
3  separate agency that would come in for
4  the same period and would audit Elk
5  simultaneously I guess -- I believe in
6  a parallel time frame, roughly.  And
7  that would be submitted to SBA.
8      Q    Go ahead.  I'm sorry.
9      A    That was -- I believe that
10  was part of the annual 468 process
11  where -- what SBA would take to review
12  at the end of the year.
13      So this and the examination
14  report, and any -- I don't know if
15  there is any clarification documents or
16  any e-mails between Fonda and Sylvia
17  of -- I don't want to give you an
18  absolute answer.  I would like to say
19  there might have been other SBA forms
20  that were also filed dealing with
21  individual portfolio companies at the
22  end of the year certifying -- there
23  were other items at the end of the year
24  that needed to be done as well.  Like
25  portfolio concentration reports maybe.

FEINSOD

1
2  So I don't know if those schedules are
3  included here.
4      Q    Okay.  Anything else come to
5  mind?
6      A    I'm reading it sideways, so
7  it's -- but I think that's the general
8  idea.  There was some -- there was some
9  additional information outside of this
10  that was -- but I can't speak
11  specifically what it is.
12      Q    Would the information outside
13  of the 468 and annual audited report
14  vary, depending -- from year to year?
15      A    It -- no, it should be
16  similar.
17      Q    You made a reference to a
18  audit report by the SBA and an
19  examination report.  Isn't the SBA's
20  review an examination report not an
21  audit report?
22      A    We would have an annual
23  examination by SBA where an SBA
24  examiner would come in and audit or
25  examine, so it's not using -- let's say

FEINSOD

1
2  examine to use, I guess, a technical
3  term -- our compliance with rules and
4  regulations and look for -- I guess
5  examine the books and records, go
6  through the GL, go through the loan,
7  the portfolio, do a -- do a -- it's
8  similar to an audit in that it was run
9  like an audit, but it was for SBA
10  regulatory period.
11      They would prepare a
12  financial statement from the ground up.
13  And I think that was a check and a
14  balance so that -- sorry.
15      Q    Okay.  But that was from the
16  office of examination?
17      A    Yes.  I -- you asked at the
18  end of year what was delivered as part
19  of the annual audit of Elk.  And that
20  audit was required to closeout the year
21  in order to stay in good standing.
22      Q    It's, if you know, whether
23  the SBA audits the books or whether
24  they examine the books, if you know the
25  difference.  If you don't know, that's

Page 182

FEINSOD

1    fine, too.
2         A    I don't know the
3    difference -- the distinction.  I don't
4    understand the distinction you're
5    making.
6         Q    Okay.  In terms -- okay.
7         If we can go to the next 468,
8    which is for the period ending
9    December 31, 2011.
10        A    Which exhibit?
11        Q    That would be the next
12   exhibit once it's loaded.
13        MS. BILODEAU:  It's marked
14   Exhibit 8.
15        THE WITNESS:  Thank you.
16        A    25-page PDF dated -- it's a
17   short form SBA Form 468 dated 12/31/11.
18        Q    Okay.
19        A    This is the short form.  Now
20   I understand.
21        Q    Now, this -- if we go to --
22        MR. WEINBERG:  I'm sorry.
23        Let's see if we have the right --
24   we might have to substitute

Page 183

FEINSOD

1    exhibits.  Let me see.  I'm sorry.
2         Bob, can we substitute for
3    Exhibit 8 -- Kelsey, we'll need
4    the one from Tab 13.
5         Bob, can you do that?
6         MS. BILODEAU:  Steve, can we
7    go off the record.
8         MR. WEINBERG:  Yes.
9         VIDEOGRAPHER:  This will end
10   Media Unit 3.  Going off the
11   record at 1:47, October 28, 2021.
12        (Whereupon, a brief recess
13   was taken.)
14        VIDEOGRAPHER:  We are back on
15   the record.  The time is 2:00 p.m.
16   October 28, 2021.  This will begin
17   Media Unit 4.
18        (Form 468 as of 12/31/11, was
19   marked Exhibit 8, for
20   identification, as of this date.)
21        MR. WEINBERG:  Bob, can you
22   substitute for the new Exhibit 8.
23        Q    Mr. Feinsod, can you open up
24   Exhibit 8?

Page 184

FEINSOD

1         A    Marked exhibit 8 replacement
2    PDF.  Exhibit 8 Feinsod.  Looks like a
3    28-page PDF I have open to the first
4    page.
5         Q    Can you tell us -- after
6    you've looked at it briefly, could you
7    tell us what Exhibit 8 is, please.
8         A    Give me a minute.
9         It looks like a quarterly
10   Form 468 for the period ending 12/30 --
11   for the six months ending 12/31/2011.
12        Q    Thank you.
13        And if you go to the last
14   page of the PDF, page 28, management
15   and secretary certification signed.
16        A    They're both signed as of
17   February 15th, 2012.
18        Q    That the 468 for the six
19   months ended --
20        (Clarification by the
21   reporter.)
22        Q    -- ended 12/31/2011 is true
23   and correct and that the secretary
24   certification, which is the management

Page 185

FEINSOD

1    certification, and the secretary
2    certification that was approved by the
3    board; is that right?
4         A    That is correct.
5         Q    And if we go to page 2C,
6    which is the second page of the PDF.
7         A    Okay.
8         Q    Line 24, how much is due from
9    parent that AmeriTrans owes Elk as of
10   December 31, 2011?
11        A    5,124,413.
12        Q    $5,124,413; is that right?
13        A    Yes.
14        Q    Okay.  Now, as of that date,
15   does the amount that AmeriTrans owes
16   Elk consist of an allocation of
17   expenses, or are there loans from Elk
18   to AmeriTrans in the $5 million?
19        A    An allocation -- I believe
20   it's an allocation of expenses.
21        Q    And if we look at page 4C,
22   which is the -- should be the fourth
23   page of the PDF, I believe.
24        A    Okay.

```
                                              Page 186
 1              FEINSOD
 2      Q    Line 31, net income or loss,
 3  is Elk operating at a profit or a loss
 4  for the six-month period ending
 5  December 31, 2011?
 6      A    It looks like a loss.
 7      Q    And the loss is $478,697; is
 8  that right?
 9      A    Yes.
10      Q    If we go to the next exhibit.
11          (Form 468 as of 3/31/12, was
12      marked Exhibit 9, for
13      identification, as of this date.)
14      Q    What exhibit is that?
15      Q    You have to wait for it to
16  load.
17      A    Okay.
18      Q    That's March -- the -- I
19  guess it's 10 of 14, March 31st, 2012,
20  468.
21          (Clarification by the
22      reporter.)
23      MS. BILODEAU:  That's going
24  to be Exhibit 9.
25          You can refresh.
```

```
                                              Page 187
 1              FEINSOD
 2      Q    Are you able to open
 3  Exhibit 9?
 4      A    That's already been open.
 5      Q    Okay.  Can you tell us what
 6  Exhibit 9 is.
 7      A    It looks like a 468 for the
 8  period ending 3/31/12.
 9      Q    Okay.  Is that an -- and
10  that's on the short form; is that
11  right?
12          (Unreportable cross-talk.)
13          (Clarification by the
14      reporter.)
15      A    Let me go back to the first
16  page to check.
17          And yes, on the first page
18  this says it's a short form.
19      Q    And if we go to the last page
20  of the PDF, do you have the management
21  certification signed by Richard
22  Feinstein; is that correct?
23      A    Yes.
24      Q    Okay.  And now, on the -- we
25  have -- if we go to page 2 of the PDF,
```

```
                                              Page 188
 1              FEINSOD
 2  we go to line 24, we have the due from
 3  parent.
 4          How much is the due from
 5  parent that's owed from AmeriTrans to
 6  Elk as of the --
 7          (Clarification by the
 8  reporter.)
 9      Q    -- March 31st, 2012?
10      A    What page?
11      Q    Second page of the PDF.
12      A    Okay.  According to this,
13  which I can't -- I'd like to point out
14  I can't tell if it's draft or not --
15  line 24, is that what you asked about?
16      Q    Yes.
17      A    Okay.  According to this,
18  what may you been a draft, says:
19  10,100,527.
20      Q    $10,100,527; is that right?
21      A    Yes.
22      Q    Okay.  Now, does that amount
23  include an allocation of expenses and a
24  loan from Elk to AmeriTrans?
25      A    I don't believe so.
```

```
                                              Page 189
 1              FEINSOD
 2      Q    By the period ending
 3  March 31, 2012, do you know if Elk made
 4  a loan to AmeriTrans?
 5      MR. HASHEM:  Objection.
 6  Calls for a legal conclusion.
 7      A    I don't recall the dates when
 8  certain things happened.
 9      Q    Okay.  Was there a certain
10  point in time where Elk -- where the
11  board authorized a loan or a note with
12  AmeriTrans?
13      A    I don't recall specifically.
14      Q    Okay.
15          Looking at the 468 for March
16  of 2012, do you recall reviewing the
17  468 for that period quarter ending
18  March 31st, 2012?
19      A    Not specifically, no.
20      Q    If -- if we go to the audit
21  committee minutes, the audit committee
22  minutes for May 8th of 2012 -- let's
23  see, before we load that --
24          Okay.  If you could load as
25  the next exhibit, the audit committee
```

Page 190

```
                                  FEINSOD
1                                 FEINSOD
2     minutes, which is Tab 22 for May 8,
3     2012.
4            (Board meeting minutes dated
5            May 8, 2012, was marked Exhibit
6            10, for identification, as of this
7            date.)
8            MS. BILODEAU:  That's been
9     marked Exhibit 10.
10    Q    Would you open up Exhibit 10.
11    A    Yes.
12    Q    Can you tell us what
13    Exhibit 10 is.
14    A    It looks like draft minutes
15    from the audit committee.
16    Q    Okay.  Now, were you listed
17    as being present at the audit committee
18    meeting of May 8, 2012?
19    A    The draft says I am.
20    Q    Okay.  Do you recall the
21    meeting?
22    A    No, I do not.
23    Q    Would you go to page 2 and
24    refresh -- and see if the entries to
25    Form 468 refreshes your recollection.
```

Page 191

```
1                                 FEINSOD
2     A    Okay.  I've read the page.
3     Q    Is the reference in the
4     minutes discussing that Elk being late
5     with the filing of the Form 468s, at
6     least for the period ending -- quarter
7     ending March 31, 2012?
8     A    Yes, it appears to be.
9     Q    Okay.  And does that refresh
10    your recollection as to that being the
11    case with the 468s?
12    A    From time to time, we've been
13    late.  Yes, that does refresh my
14    memory.
15    Q    Okay.  And was there a
16    direction here by the audit committee
17    or that the audit committee agreed to
18    have the Form 468 for the period ended
19    March 31st, 2012, filed concurrently
20    with or immediately filing the --
21    following the filing of the company's
22    form 10-Q for that period?
23           MR. SEIDEL:  Objection to
24           form.
25    A    Yes, yes, that's what --
```

Page 192

```
1                                 FEINSOD
2     that's what the aspiration was.
3     Q    Okay.  Does that refresh your
4     recollection as to what occurred here
5     with respect to the filing of the
6     Form 468 for Elk for the quarter of
7     March 31st, 2012?
8     A    Give me a minute.  I'm just
9     trying to understand the time frame.
10    It was March 31, that would make it to
11    April 31st, May 15th, and it was
12    May 8th.
13           I'm trying to -- I have read
14    the paragraph.  So I don't believe it's
15    late yet, so I'm trying to
16    understand --
17    Q    I'm asking --
18    A    -- the paragraph.
19    Q    -- does it refresh your
20    recollection --
21    A    It refreshes my memory.
22    Q    -- that that was the process
23    that Elk followed that after -- that
24    the committee agreed that after the
25    filing -- after the approval and filing
```

Page 193

```
1                                 FEINSOD
2     of the 10-Q, the 468 would be filed
3     concurrently or after the filing of the
4     10-Q?
5            MR. SEIDEL:  Objection to
6            form.
7            (Clarification by the
8            reporter.)
9     A    It refreshes my memory that
10    that was the aspiration of the audit
11    committee, that that -- that those two
12    documents be filed that that time
13    which -- sorry.
14           It said:  30 -- okay.  I'm
15    sorry.
16    Q    Okay.  We can go to a 468 for
17    the period ending June 30, 2012.
18           (Form 468 as of 6/30/12, was
19           marked Exhibit 11, for
20           identification, as of this date.)
21           MS. BILODEAU:  That's been
22    marked Exhibit 11.
23    A    Okay.  I have it open.
24    Q    Okay.  Can you -- after
25    you --
```

Page 194

```
                              FEINSOD
 1
 2            Have you had a chance to look
 3   at it and see what the Form 468 is
 4   for --
 5       A    I've scanned -- yes, I've
 6   scanned through it.  It appears to be a
 7   draft copy of a Form 468.
 8       Q    Okay.  Now, do you -- if you
 9   go to the last page, is the last -- are
10   there any signatures or certifications
11   from management or the secretary
12   certification?
13       A    No, that -- that's what made
14   me believe it's a draft.
15       Q    Okay.  Now, do you -- do you
16   know if the end, in terms of a being a
17   draft form is -- can you tell from this
18   if it's a draft form or if there was an
19   audit for the period ending June 30,
20   2012?
21           MS. CLARKE:  Objection to the
22       form.
23       A    Going back to the first page.
24   Give me a few minutes -- give me a
25   minute to review.
```

Page 195

```
                              FEINSOD
 1
 2            The annual Form 468, it
 3   doesn't indicate on it that it is
 4   audited, no.
 5       Q    Do you know -- and at this
 6   time, June 30, 2012, do you know
 7   whether Elk, as a small business
 8   investment company -- withdrawn.
 9            Do you know what the office
10   of operations is for the SBA?
11       A    The office of operations?
12       Q    Yes.
13       A    No, I'm not even -- never
14   heard of it.
15       Q    Okay.  Elk, was an operating
16   SBIC, small business investment
17   company; is that -- is that correct?
18           MR. HASHEM:  Objection.
19       Foundation.  What do you mean by
20       "operating"?
21       Q    Was Elk -- during the period
22   of time while you were president and
23   CEO, was Elk operating pursuant to a
24   small business investment company
25   license?
```

Page 196

```
                              FEINSOD
 1
 2       A    For part of the time, yes,
 3   until -- until October of 2012, I
 4   believe, we were an SBIC.
 5       Q    Do you know what the office
 6   of liquidation is for the SBA?
 7       A    I'm familiar with it.
 8       Q    Do you know when Elk was
 9   transferred to the office of
10   liquidation?
11       A    I don't remember the date,
12   no.
13       Q    In relation for the period
14   ending June 30, 2012, had Elk been
15   transferred to liquidation -- the
16   office of liquidation for the SBA?
17       A    I don't believe so.
18       Q    Do you remember -- withdrawn.
19            Do you know if the annual 468
20   for the period ending June 30, 2012,
21   was filed with the SBA?
22       A    I don't recall during the
23   litigation this period was covering
24   when we were actively suing the SBA and
25   we had already been in initial contact
```

Page 197

```
                              FEINSOD
 1
 2   with -- June 30th?  No, I don't know.
 3   I don't know.
 4       Q    Okay.  Would Elk -- has Elk
 5   filed a Form 468 with the SBA without
 6   approval by the audit committee?
 7       A    I -- I wouldn't -- I do not
 8   know.  Let me back up.  Not that I know
 9   of.
10       Q    On behalf of Elk, who files
11   a -- who does the physical electronic
12   and hard copy mailing of the 468 to the
13   SBA?
14       A    It was historically Silvia
15   Mullens and Margaret Chance's
16   responsibility.
17       Q    For the period ending
18   June 30, 2012, the 468 would have been
19   mailed some months after June 30; is
20   that right?
21       A    Yeah, it would have been -- I
22   believe it was due -- is it due 90 days
23   after?
24       Q    Whatever the period of time
25   is that the annual is due is -- is when
```

Page 198

FEINSOD

1
2 it's due whether it's 45 --
3     A    I don't know the dates that
4 it's due.  I apologize.
5     Q    No worries.  But it would
6 be -- it would be 45, 60, 90 days, it
7 would be a period of time after
8 June 30, 2012, that the annual June 30,
9 2012, 468 would be due to the SBA,
10 right?
11    A    Yes.
12    Q    Okay.
13    A    At that time, we had stopped
14 talking to our analyst at that point.
15 I would -- around this point, we
16 weren't -- the office of operations was
17 no longer speaking to us.
18    Q    Okay.  Who was Elk's analyst
19 at the office of operations?
20    A    Fonda, it's Fonda Stevens
21 Kelly.
22    Q    And did -- was there a
23 counterpart in the office of
24 liquidation that Elk communicated with?
25    A    We communicated with several

Page 199

FEINSOD

1
2 people in the office of liquidation.  I
3 don't recall their names.
4     Q    I'm sorry.  You do or don't
5 recall their names?
6     A    I don't recall their names.
7 I don't remember.
8     Q    At this time in 2012 was it
9 Silvia Mullens or Margaret Chance who
10 would may have filed an L -- a 468 with
11 the SBA?
12    A    A 468 covering the period
13 ending 6/30/2012 likely would have been
14 filed by Silvia Mullens.
15    Q    Okay.  Is there anyone else
16 on behalf of Elk that would have
17 electronically or physically mailed a
18 hard copy of a 468 for period ending
19 June 30, 2012?
20    A    I don't believe so.
21    Q    If the audit committee
22 reviewed a 468, would its review be
23 reflected in audit committee minutes?
24        MR. SEIDEL:  Objection to
25    form.

Page 200

FEINSOD

1
2     A    I believe it normally would
3 have.
4     Q    If the board -- if the board
5 of directors reviewed a 468 for Elk,
6 would it have been reflected in the
7 board meeting minutes?
8        MR. SEIDEL:  Objection to
9    form.
10    A    I believe it would have.
11    Q    Is the converse true?  If a
12 468 is not submitted to the board of
13 directors for review, would there be
14 any reference to not reviewing a board
15 meeting minutes -- not reviewing a 468
16 in the board minutes?
17        MS. CLARKE:  Objection to
18    form.  Calls for speculation.
19    Lacks foundation.
20        MR. SEIDEL:  Vague.
21    Confusing as well.
22        (Unreportable cross-talk.)
23    Q    We'll withdraw the question.
24    Did Elk have an alternative
25 procedure for review and approval of a

Page 201

FEINSOD

1
2 468 if it was not done at an audit
3 committee meeting?
4     A    It's a confusing question,
5 and not that I recall.
6     Q    Did Elk have an alternative
7 procedure for review and approval of
8 the 468 if a 468 was not reviewed at a
9 board meeting?
10    A    I don't recall anything that
11 would be an alternate procedure at Elk.
12    Q    To review or approve a 468?
13    A    I don't -- an alternative
14 procedure in any context, its
15 misleading, it's not -- it doesn't make
16 sense to me.
17    Q    Okay.  Other than taking a
18 vote at a board meeting, is there any
19 other way the board can approve a 468?
20        MR. SEIDEL:  Objection.
21    Calls for speculation.
22    A    Not that I know.  Sorry.
23    Q    Is there a procedure that is
24 known as getting a -- what -- a
25 unanimous written consent to the filing

Page 202

```
 1            FEINSOD
 2  of the 468?
 3          MR. SEIDEL:  Objection to
 4     form.
 5     A    I apologize for my confusion.
 6          Yes.  A UWC might meet --
 7          (Clarification by the
 8     reporter.)
 9     A    A UWC might meet the
10  requirements of a board meeting to
11  review the 468, on reflection.  Thank
12  you.
13     Q    What was Elk's practice or
14  procedure with respect to a UWC?
15          MR. SEIDEL:  Objection to
16     form.  No foundation.
17     A    I can answer?
18     Q    You can answer.  Sure.
19     A    Elk's procedure with respect
20  to UWCs followed our understanding of
21  law where if a -- the board wasn't
22  physically present together, there
23  could be authorized by unanimous
24  written consent.  Board action that
25  would otherwise require a full board
```

Page 203

```
 1            FEINSOD
 2  meeting could be approved by an
 3  anonymous written consent.
 4          That was my -- that was our
 5  understanding, non-legalese summary of
 6  it.
 7     Q    Do you know if that was -- if
 8  the board did that with respect to
 9  filing or approving the June 30, 2012,
10  468?
11     A    I don't recall.  It's a long
12  time ago.
13     Q    Did the audit committee have
14  a procedure to approve a 468 by
15  unanimous written consent?
16          MR. SEIDEL:  Objection to
17     form.
18     A    I would believe that the
19  audit committee -- it was my impression
20  that the audit committee utilized
21  Robert's Rules of Order to dictate its
22  actions and the law.  And I think
23  specifies when a UWC is necessary, and
24  we tried -- we followed that, when
25  appropriate.
```

Page 204

```
 1            FEINSOD
 2     Q    Do you have an understanding
 3  if Robert's Rules of Order and the law
 4  allowed the audit committee to utilize
 5  a UWC to review and approve a 468?
 6          MR. SEIDEL:  Objection to
 7     form.
 8     A    I believe that the procedures
 9  adopted and the laws of various states
10  permitted a UWC to be used in lieu of
11  for board action, to ratify board
12  action, and that was the goal --
13     Q    Do you know if the --
14     A    -- of the UWC.
15     Q    Do you know if the audit
16  committee utilized a UWC procedure to
17  ratify the 468 --
18     A    I don't recall.  I don't
19  recall.
20     Q    Just to complete the
21  question:
22          -- for the period ending
23  June 30, 2012?  Is your answer --
24     A    I apologize for interrupting.
25  And no, I don't recall.
```

Page 205

```
 1            FEINSOD
 2     Q    Other than a UWC, is there
 3  any other alternative procedure for
 4  approval of a 468?
 5     A    Not that comes to mind, but
 6  if you refresh my memory, maybe.
 7     Q    If we can now go to the --
 8  let's go to the 10-Q for the period
 9  ending March 31, 2013.
10          (EDGAR Submission Header
11     Summary/Form 10Q, was marked
12     Exhibit 12, for identification, as
13     of this date.)
14          MS. BILODEAU:  That has been
15     marked Exhibit 12.
16     A    I have it open and flipped
17  through the pages.
18     Q    Just flipping through the
19  pages, could you tell us what
20  Exhibit 12 is.
21     A    It appears to be a filing --
22  an EDGAR filing copy of the 10-Q for
23  the period the company's actual
24  submission to EDGAR --
25     Q    Okay.
```

Page 206

```
                    FEINSOD
 1
 2        A    -- the receipt.
 3        Q    And who on behalf of the
 4   company would sign the 10-Q for filing?
 5        A    I believe I would, and the
 6   CFO would at this point.
 7        Q    Okay.
 8        A    If you bear with me, I can
 9   confirm that.
10        Q    Sure.  If you check the
11   last --
12        A    I know where it is.  Thank
13   you.
14        Q    Sure.  Last 5 pages of the
15   exhibit.
16        A    This a file copy indicating
17   that I signed it before it was filed,
18   and -- as CEO and president, and
19   Richard Feinstein signed it as chief
20   financial officer.
21        Q    And by your signature, you're
22   attesting that it's a true and
23   correct --
24        A    I don't think so.  I have a
25   couple of -- there's a lot of things
```

Page 207

```
                    FEINSOD
 1
 2   that -- it's true and correct is the
 3   reference from the 468.  There's a lot
 4   of -- there's attestations here
 5   different from that.
 6        Q    What are your attestations on
 7   behalf of 10-Q?
 8        A    They're specified on page --
 9   what is this -- 46, there's five of
10   them with a couple of sub parts.  If
11   you want me to read them, I'm happy to.
12        Q    That's okay.  They'll speak
13   for themselves.
14        Mr. Feinstein, what is his
15   certification attesting to?  Again, the
16   attestations that --
17        A    Mr. Feinstein --
18        (Clarification by the
19   reporter.)
20        Q    Are the attestations that
21   Mr. Feinstein is attesting to on
22   page 47 of the PDF?
23        A    I'm just looking through
24   them.  They're different than mine, so
25   bear with me.
```

Page 208

```
                    FEINSOD
 1
 2        They refer to my disclosures,
 3   and they refer to certain disclosures
 4   that apply to the CFO, to
 5   Mr. Feinstein's declaration.
 6        Q    Okay.  And these disclosures
 7   refer to the accuracy of the
 8   information that's in the document; is
 9   that fair to say?
10        A    Amongst other things, yeah.
11        Q    Now, if we look at the -- the
12   numerical page is 14.
13        A    Okay.
14        Okay.  I'm at page 14.
15        Q    At this point, the
16   investments that are here, these
17   investments are still on a consolidated
18   basis; is that correct?
19        A    Yes, they should be reported
20   on a consolidated basis, yes.
21        Q    Okay.  So the value of both
22   Elk and AmeriTrans investments as of
23   March 31, 2013, is listed as
24   $9,924,740; is that right?
25        A    Under fair value, yes.
```

Page 209

```
                    FEINSOD
 1
 2        Q    Okay.  If we go to page 27
 3   numerical page 27 on the filing.
 4        A    Okay.
 5        Q    Are you there?
 6        A    Yes.
 7        Q    Under Liabilities there is
 8   entry:  Liabilities and Net Liabilities
 9   Due to Elk Associates Funding.
10        Is that a liability from
11   AmeriTrans to Elk?
12        A    Which is -- which is -- what
13   line are you referring to?  Could you
14   tell me what it's -- what it --
15        Q    Do you see where it says
16   Liabilities and Net Liabilities?
17        A    Do -- I see two sections,
18   yes, Elk is not on either one.
19        Q    The section Liabilities and
20   Net Liabilities.  Do you see the third
21   line?
22        A    Oh, I see it.  I'm sorry.  I
23   see Liabilities and Net Liabilities
24   now.
25        Q    Due to Elk funding Corp.?
```

Page 210

```
 1              FEINSOD
 2      A    Yes, I see it.
 3      Q    It's $14,271,038; is that
 4  correct?
 5      A    That's what it says.
 6      Q    There is a reference to a
 7  note C.
 8      A    In one of the columns, yes.
 9      Q    Okay.  And note C on page 31,
10  if you go to page 31.
11      A    Okay.
12      Q    It's:  To record amounts owed
13  by AmeriTrans Capital Corporation to
14  Elk.
15           Do you see that note?
16      A    Okay.
17      Q    Now, sorry, but if you go
18  back to page 28.
19      A    Okay.
20      Q    There is a heading:
21  Expenses.
22      A    Expenses, okay.
23      Q    And under Expenses, there are
24  salaries and employee benefits;
25  occupancy; legal fees; accounting and
```

Page 211

```
 1              FEINSOD
 2  compliance fees; director's fees and
 3  expenses; other administrative
 4  expenses; loss and impairment on assets
 5  acquired in satisfaction of loans.
 6           Do you see all those entries?
 7      A    Yes.
 8      Q    Okay.  And the entries total
 9  $1,826,111; is that right?
10      A    The pro forma adjustments in
11  column -- for those items total that,
12  correct.
13      Q    And are those expenses that
14  Elk paid for that AmeriTrans owes Elk
15  for its share of those expenses?
16      A    I don't recall how this
17  number was constructed.
18      Q    If we go back to page 31,
19  look at note D.
20      A    Okay.
21      Q    Does -- does that refresh
22  your recollection as to what those
23  expenses represent that are listed on
24  page 28 in the amount of $1,826,111?
25      A    It helps to understand the
```

Page 212

```
 1              FEINSOD
 2  pro forma or the letter.
 3      Q    Okay.  What is -- what is
 4  your understanding of the pro forma
 5  adjustments?
 6      A    After the de-consolidation of
 7  Elk we would have -- we had -- we --
 8  excuse me.
 9           Once Elk was de-consolidated,
10  it looks like Elk had been 100 percent
11  or 95 percent -- 99 percent of the
12  income of the company, and then after
13  de-consolidation, the company had small
14  income and expenses that after
15  de-consolidated were $1.7 million.  So
16  the $1.8 million was associated with
17  Elk -- allocated to Elk, maybe.
18      Q    Are these the expenses that
19  Elk paid but AmeriTrans owes Elk that
20  share of the money, the 1.8 million?
21      MR. SEIDEL:  Objection to
22      form.
23      A    I'd be speculating.  I don't
24  remember the -- the preparation around
25  this.
```

Page 213

```
 1              FEINSOD
 2      Q    Okay.  And if you go on
 3  page 31.
 4      A    Yes.
 5      Q    Do you understand what the
 6  footnote is in D?
 7      (Clarification by the
 8      reporter.)
 9      A    This is, I guess, part of the
10  accounting treatment caused by the
11  de-consolidation of Elk that happened
12  during the quarter due to the
13  receivership, caused some
14  backward-looking adjustments, and, I
15  guess, you know, pro forma adjustments
16  which I believe are estimates of a sort
17  as well.
18      Q    Okay.
19      MS. CLARKE:  Mr. Feinsod, I'm
20      just going to caution you not to
21      speculate in your answers.
22      THE WITNESS:  Thank you.
23      Q    Is there anything that's
24  incorrect about the statement:
25  Adjustments relate to allocation
```

Page 214

```
                            FEINSOD
1
2   expenses incurred by AmeriTrans Capital
3   Corporation but paid for by and
4   recorded on the books of Elk; and
5   hence, would not be eliminated by the
6   de-consolidation of Elk?
7       A    I'm not sure.  I'd be
8   speculating.
9       Q    Okay.  In terms of what --
10  your certification, your certifications
11  of the statements in 10-Q are correct?
12      A    I believe they are.
13      Q    In terms of the due from
14  parent, so does this refresh your
15  recollection that the due from parent
16  from AmeriTrans to Elk increased to
17  over $14 million?
18      A    It does.
19      Q    In terms of the due from
20  parent, were there any -- what internal
21  controls, if any, did Elk have with
22  respect to the due from parent?
23      A    We followed SBA accounting
24  policies.
25      Q    Anything else?
```

Page 215

```
                            FEINSOD
1
2       A    Not that I remember.
3            It was created by -- it was
4   created by guidance from SBA.
5       Q    What guidance are you
6   referring to?
7       A    The chart of accounts sets
8   out this due from parent relationship,
9   which is standard with drop-down SBICs.
10           Standard item on the 468, so.
11      Q    What is a drop-down SBIC?
12      A    SBIC -- drop-down SBIC is an
13  SBIC that's owned by another company.
14      Q    And was there any guidance as
15  to when the due from parent had to be
16  paid or true up by the parent to Elk?
17      A    I don't believe so.  It was
18  discussed with Fonda and Paul on a
19  regular basis, on a quarterly basis at
20  least, excuse me.
21           (Clarification by the
22      reporter.)
23      A    Fonda and Paul.
24      Q    Okay.  Well, what generally
25  were the discussions with Fonda and
```

Page 216

```
                            FEINSOD
1
2   Paul with respect to the due from
3   parent?
4       A    Just the existence of it.  It
5   was acknowledged, it was -- you know,
6   at certain points when we met with them
7   it was -- for a portfolio review
8   meeting, it was discussed as part of
9   the recapitalization of Elk.
10           It was -- it was -- it was, I
11  guess, that we kept them up-to-date on
12  everything that was going on, so very
13  intimately.  Fonda was intimately
14  involved with the portfolio, and Paul
15  to a lesser extent.
16      Q    When you refer to a
17  recapitalization of Elk, what period of
18  time are you referring to?
19      A    After our portfolio review
20  meeting, sometime in 2010, and at
21  various instances after that.
22      Q    Do you recall an instance
23  after that where -- after --
24           And who on behalf of Elk
25  would have the discussion with Fonda
```

Page 217

```
                            FEINSOD
1
2   Stevens Kelly at a portfolio review
3   meeting?
4       A    At that portfolio meeting, it
5   was definitely at least me and Silvia.
6   I don't recall.  We submitted a
7   presentation as well.  I believe I saw
8   in the record at one point.
9       Q    Presentation, we talked about
10  the portfolio or portfolio financings,
11  which are the loans and investments
12  file; is that right?
13      A    No, that's not correct.
14      Q    What would be included in the
15  portfolio review in the presentation?
16      A    I don't recall exactly, but
17  there's a TechNote somewhere that
18  details it.
19      Q    And how often would you have
20  the -- would the portfolio review
21  meeting be in person or over the phone?
22      A    It was in person in
23  Washington, DC.
24      Q    And would this place -- take
25  place annually or quarterly how often?
```

Page 218

```
                              FEINSOD
1                FEINSOD
2   What would be the regularity that the
3   meeting would take place?
4        A     Portfolio -- one was on
5   invitation, but what the rest were --
6            (Clarification by the
7        reporter.)
8        A     -- and Fonda would visit, I
9   believe, at least once a year and spend
10  the day or half a day with us and
11  Silvia, familiarizing ourself, getting
12  up to date with what's going on.
13           She had a handful of SBICs in
14  the New York area that she would
15  oversee at the same period.
16       Q     And in addition -- and what
17  was --
18       A     It was also --
19       Q     Go ahead.  Finish your
20  answer, please.
21       A     It was also discussed at
22  length during our settlement
23  conferences with the SBA in October of
24  2012.
25       Q     Other than at the portfolio
```

Page 219

```
1                FEINSOD
2   review meeting, did the period of time
3   2009 through 2011, was there any other
4   reference or discussion about the due
5   from parent with the SBA?
6        A     Absolutely.  Quarterly.
7        Q     And when you say "quarterly,"
8   what are you referring to?  Are you
9   referring to the --
10       A     We would file --
11           (Clarification by the
12       reporter.)
13       Q     What are you referring to
14  quarterly?
15       A     After we would file the
16  Form 468, at some point Fonda would
17  have a discussion about the items
18  contained in the 468.
19           Her job was overseeing Elk,
20  so she would ask questions about the
21  loans, she would ask questions about
22  the different lines of the 468.  And
23  that was an account that was
24  consistently in flux.
25       Q     Do you recall if there was a
```

Page 220

```
1                FEINSOD
2   specific discussion about the due from
3   parent between yourself and Fonda
4   Stevens Kelly?
5        A     Yes.
6        Q     What was your discussion?
7        A     About -- it was within the
8   total review of Elk during a quarterly
9   visit on each quarterly -- each time
10  that she visited or spoke and went over
11  a Form 468, it was discussed.  The
12  existence of it was discussed.
13           And then, I guess, maybe on a
14  less regular basis, Paul Salgado, when
15  we did speak to him.  So like, for
16  instance, probably in 2011 when we
17  applied for debenture -- 2009, it was
18  probably discussed.
19       Q     Okay.  Do you have a more
20  specific recollection as to what the
21  discussion was about the due from
22  parent in -- at any time in 2011?
23           MR. SEIDEL:  Objection to the
24       form of the question.
25       A     Can you repeat the question.
```

Page 221

```
1                FEINSOD
2   I got confused with Martin's objection.
3        Q     Sure.
4            Do you have a specific --
5   more specific recollection as to what
6   was discussed with Fonda Stevens Kelly
7   between Elk and the SBA about the due
8   from parent?
9            MR. SEIDEL:  Same objection.
10       A     The number was discussed and
11  the amount was discussed, so I don't --
12  I can't be more clear than that.  I
13  apologize.
14           The amount grew, to your
15  point as you referenced, and they
16  were -- we discussed at each filing.
17       Q     Can you recall anything --
18  were there any discussion about when
19  the amount will be paid back with the
20  SBA in 2011?
21           MR. SEIDEL:  Objection to
22       form.
23            (Clarification by the
24       reporter.)
25       A     Can you repeat the question
```

                    FEINSOD
1
2   one more time, Steven.  Thank you.
3       Q    Other than the amount, was
4   there any discussion with the SBA in
5   2011 as to when the due from parent
6   would be paid back from AmeriTrans to
7   Elk?
8           MR. SEIDEL:  Objection to
9       form.
10      A    I don't recall.  You showed
11  me an item before, I don't know if the
12  repayment was made, but that was 2011
13  or 2010.
14      Q    When you say "an item," are
15  you referring to the general ledger
16  work paper?
17      A    The draft work paper -- the
18  work papers that you showed me, yeah.
19      Q    Do you recall what Fonda
20  Stevens Kelly said about the due from
21  parent in any meeting with you or
22  Silvia in connection with the quarterly
23  review?
24      A    No, it wasn't -- it wasn't an
25  item of large concern.  It was normal

                    FEINSOD
1
2   course.
3       Q    Are there any additional --
4   are there any other internal controls
5   that the company followed with respect
6   to incurring the expenses, advances
7   with respect to the due from parent?
8       A    I don't recall, but there
9   probably -- they were documented.  We
10  had documented controls, so they're
11  probably in the record.
12      Q    Okay.  Do you know -- do you
13  know what review, if any, the
14  accountants for Elk or AmeriTrans would
15  do with respect to the due from parent?
16      A    I believe -- I believe they
17  would test it -- test the -- all the
18  assumptions made under it.  And I would
19  assume they audit it for validity,
20  policy practices.
21      Q    I'm not asking what you
22  assume or believe; I'm asking you what
23  you know or understand.
24      A    It was my understanding that
25  they engaged in their regular audit

                    FEINSOD
1
2   procedures and confirmed that our --
3   the entry recorded as due to parent was
4   recorded as it was supposed to be
5   presented.
6       Q    Their audit procedure would
7   confirm that the number was accurate;
8   is that right?
9       A    I believe it would.
10          MR. HASHEM:  Objection.
11      Mischaracterizes testimony.  He
12      didn't say accurate.  He said it's
13      presented as it's supposed to be
14      presented.
15      Q    The audit procedure would
16  view or check for the amount of -- that
17  would be due from the parent; is that
18  fair to say?
19          MR. SEIDEL:  Objection to
20      form.
21      A    Which audit procedure?  Let's
22  be specific.
23      Q    Is it different?  Is the
24  audit procedure different for a 468
25  compared with a 10-K?

                    FEINSOD
1
2           MR. SEIDEL:  Objection to
3       form.
4           I think the confusion is
5       there are often multiple audit
6       procedures applicable to any one
7       patent.  You're acting as if
8       there's a single audit procedure,
9       describing it and saying:  Is that
10      it?
11          MR. WEINBERG:  I'm asking
12      what the witness knows.
13          MR. SEIDEL:  No, you're not
14      asking a question about what
15      witness knows.
16      Q    Do you know what the audit
17  procedure is with respect -- or
18  procedures are that would review the
19  due from parent?
20      A    No, I don't remember after
21  all these years.
22          (Whereupon, a discussion was
23      held off the record.)
24          VIDEOGRAPHER:  This will end
25      Media Unit 4.  Going off the

Page 226

```
1              FEINSOD
2      record at 2:56, October 28, 2021.
3          (Whereupon, a brief recess
4      was taken.)
5          VIDEOGRAPHER:  We are back on
6      the record.  The time is 3:13,
7      October 28, 2021.  This will begin
8      Media Unit 5.
9      Q    Mr. Feinsod, if you would go
10   to Exhibit 13, please.
11         (EDGAR Submission Header
12     Summary/Form 8K, was marked
13     Exhibit 13, for identification, as
14     of this date.)
15     A    Okay.  I have it.
16     Q    Did you look at -- look at
17   Exhibit 13.  After you've had a chance,
18   please review it, and tell us what it
19   is.
20     A    It's a Form 8-K.  It's
21   dated -- it is a Form 8-K dated
22   April 25th -- or probably dated
23   April 27 or somewhere thereafter,
24   reporting an event that happened --
25         (Clarification by the
```

Page 227

```
1              FEINSOD
2      reporter.)
3      A    It was -- it's an 8-K
4    reporting an event from April 25th.
5    That event appears to be the filing of
6    the receivership order in appointing
7    SBA as receiver -- as permanent
8    liquidating receiver for Elk.
9      Q    Did you sign the 8-K filing
10   on behalf of AmeriTrans?
11     A    This is -- indicates that I
12   signed an original somewhere.
13     Q    Okay.
14     A    This is a filing copy.
15     Q    That you signed as chief
16   executive officer and president on
17   behalf of AmeriTrans Capital
18   Corporation; is that right?
19     A    I signed as the -- yes,
20   correct, in those two titles.
21     Q    I believe if you look at
22   page 6 of the PDF, it's page -- there
23   is a number 2 on the bottom of the
24   page.  It is titled:  AmeriTrans
25   Capital Corporation Pro Forma
```

Page 228

```
1              FEINSOD
2    Consolidated Balance Sheet.
3      A    Yes.
4      Q    Does the pro forma balance
5    sheet restate the assets of AmeriTrans
6    and liabilities of AmeriTrans on a
7    de-consolidated basis?
8      A    On a pro forma basis giving
9    effect to the Elk receivership that
10   occurred in the next financial period.
11   It does not reflect the actual
12   condition of the company on December --
13   it does not reflect the actual
14   financial condition of the company of
15   AmeriTrans on December 31, 2012.
16     Q    On a pro forma basis, what
17   was the value of AmeriTrans' assets as
18   of December 31, 2012?
19     A    On a pro forma reported
20   basis, according to this, it says
21   5.5 -- 5,486,327.
22     Q    Sorry.  That's the total
23   investments at fair value, but the
24   company has some cash, right?
25     A    Oh, I apologize.  I was
```

Page 229

```
1              FEINSOD
2    looking at the investment value.  Yes,
3    going down to total assets, the line --
4    I was looking at the wrong line in my
5    last answer, is 5,787,376.
6      Q    Is that $5,787,376?
7      A    Yes, it is.
8      Q    And that represents the value
9    of the total assets of AmeriTrans
10   Capital Corporation as of December 31,
11   2012, on a pro forma basis?
12     A    Reports the amount of pro
13   forma -- yes, it represents that.
14     Q    When we talked about total
15   investments at fair value, that was the
16   line you started to read at,
17   $5,486,327?
18     A    Um-hum.
19     Q    Is that the right value on
20   that -- on that line?
21     A    For the purposes of the pro
22   forma, I believe it is.
23     Q    Okay.
24     A    This was not -- on
25   December 31, this was not our balance
```

Page 230

FEINSOD

1    sheet. I just want to clarify that
2    this was not the balance sheet of the
3    company, of any company.
4        Q    It's the pro forma -- is
5    it -- the total investments at fair
6    value is the balance of the investments
7    that are owned by AmeriTrans and the
8    fair value of those investments; is
9    that right?
10       A    I apologize. One more --
11   please repeat the question.
12       Q    The total investments at fair
13   value represent the assets owned by
14   AmeriTrans as opposed to Elk; is that
15   right?
16       A    In which column? In the as
17   reported, yes, the 16,521,165 is what
18   we reported as of December 31st, 2012.
19       Q    That's what was reported on a
20   de-consolidated basis the assets are
21   actually owned by AmeriTrans at fair
22   value are 5,486,327; is that right?
23       A    Not as of December 31st,
24   2012, no. That's incorrect.
25

Page 231

FEINSOD

1        Q    Any reported now in terms of
2    what the fair value are of the
3    investments owned by AmeriTrans is
4    approximately 5,486,327, isn't it?
5        A    On a pro forma basis after
6    giving effect to the April filing of
7    the receivership order, that's what
8    this represents.
9        Q    Okay. And on a pro forma
10   basis, after the filing of the
11   receivership, the total assets of
12   AmeriTrans, excluding Elk, as of
13   June 30, 2012, was $4,989,323; is that
14   right?
15       A    I don't have that number in
16   front of me. I don't know what you are
17   reading from.
18       Q    If you go to page 4.
19       A    Page 4 of the 8-K?
20       Q    Yes.
21       A    The question is what?
22       Q    Page 8 of the PDF, page 4 of
23   the 8-K.
24       Are the total --
25

Page 232

FEINSOD

1        (Unreportable cross-talk.)
2        MR. WEINBERG: May I ask the
3    question?
4        MS. CLARKE: I'm sorry. What
5    page are we on?
6        THE WITNESS: No, I'm trying
7    to clarify the page.
8        Q    Sure. It's on page number 4
9    at the bottom, it is page 8 of the PDF.
10       A    Got it.
11       MS. CLARKE: Page 9?
12       A    Page 9 of the PDF.
13       MR. WEINBERG: I apologize,
14   Elizabeth.
15       MS. CLARKE: Sorry, I was
16   just trying to make sure we're all
17   on the same page.
18       MR. WEINBERG: I have a hard
19   time reading the bottom of the
20   page.
21       Okay. Page 9 of the PDF,
22   page 4 on the document titled:
23   AmeriTrans Capital Pro Forma
24   Consolidated Balance Sheet
25

Page 233

FEINSOD

1    June 30, 2012, Unaudited.
2        Q    Okay. Is the total assets of
3    AmeriTrans on a pro forma basis taking
4    into account the receivership and
5    excluding the Elk assets, $4,989,323 as
6    of June 30, 2012?
7        A    That's what this 8-K says.
8        Q    Okay. And the fair value of
9    AmeriTrans investments, investments
10   that are owned by -- were owned by
11   AmeriTrans on a pro forma basis is
12   restated as of June 30, 2012, as
13   $4,739,428; is that right?
14       A    I'm not sure from this.
15       Q    Okay. You see line 3 -- I'm
16   sorry, after assets?
17       A    They're not numbered.
18       Q    Total investments at fair
19   value pro forma?
20       A    Yes, I see that.
21       Q    Okay.
22       A    But you're forgetting
23   June 30 -- I'm sorry.
24       Okay. I got it. I
25

Page 234

FEINSOD

1
2  apologize.  I realize now that we're
3  jumping between periods more.
4         Q    I'm sorry.  What?
5         A    I realize now that we're
6  jumping between -- that the financial
7  statements are jumping between
8  different periods now that I'm
9  familiarizing myself with the document.
10        Q    Okay.  Is it fair to -- on
11 the restating the fair value of
12 AmeriTrans investments as of
13 December 31, 2012, on a pro forma
14 basis, it was $5,486,327.  As of
15 June 30, 2012, it was $4,739,428.
16        A    On a pro forma restated
17 basis, yes.
18        Q    When we refer to assets owned
19 by AmeriTrans, are we referring to what
20 you called earlier as the legacy
21 assets?
22        A    I don't know at this point
23 what's in the portfolio now.  This
24 is -- and I don't know which period
25 you're referring to at this point.

Page 235

FEINSOD

1
2  There's multiple periods here.
3         Q    All right.  For the period
4  ending December 30, 2011, would there
5  be a change, a significant change in
6  the value of the assets owned by
7  AmeriTrans at fair value from --
8         A    I don't have a --
9              (Clarification by the
10        reporter.)
11        A    Sorry.  It was my fault.  I
12 apologize.
13        MR. WEINBERG:  Do you have:
14        From what's represented here,
15        Judy?
16             (Whereupon, a discussion was
17        held off the record.)
18        Q    As of December 30, 2011, were
19 the investments owned by AmeriTrans in
20 approximately the same value range of
21 5 1/2 million to $4 1/2 million?
22        A    I do not recall and this
23 exhibit doesn't give me a way to figure
24 that out.
25        Q    Do you have any reason to

Page 236

FEINSOD

1
2  believe that the AmeriTrans investments
3  as of December 30, 2011, were worth
4  more than $6 million?
5         A    I don't recall.  I don't have
6  anything in front of me to make that --
7  make that assumption.
8         Q    $7 million?  Is there a
9  reasonable cap at which you would be
10 comfortable saying:  Yeah, the
11 AmeriTrans investments or legacy assets
12 were not worth more than 5 million,
13 6 million, 7 million?
14             What would that cap be?
15        A    As of what date?
16        Q    December 30, 2011.
17        A    I would have to look at the
18 financial statements to make that --
19 everything in front of me is
20 dated 2012.
21        Q    Okay.  You would have to look
22 at the financial statements for
23 AmeriTrans and you would have to lock
24 at the financial statements for Elk in
25 order to separate out the assets that

Page 237

FEINSOD

1
2  are owned solely by AmeriTrans; is that
3  correct?
4         MR. SEIDEL:  Objection to
5         form.
6         A    I would have to look at the
7  financial statements for the periods
8  that you reference in order to make any
9  assumptions or any -- any -- any
10 representations about either company's
11 asset base.
12        Q    If we go back to Exhibit 5,
13 please.
14        A    Got it.
15        Q    We can go to page 2 of
16 Exhibit 5.
17             Exhibit 5 is titled:  Elk
18 Associates Funding Corp. Intercompany
19 Balance of AmeriTrans Capital
20 Corporation Operating Expenses.
21             Does this refresh your
22 recollection that there was a point in
23 time when Elk entered into a loan with
24 AmeriTrans?
25        A    It refers to a note, a senior

Page 238

```
              FEINSOD
1
2    secured note.
3            (Unreportable cross-talk.)
4        Q    Go ahead.  I'm sorry.  Please
5    finish your answer.
6        A    It refreshes my memory as to
7    a senior secured note, yes.
8        Q    And in terms of the
9    allocation of expenses that are entered
10   previously, what were the -- were there
11   any payment terms from AmeriTrans to
12   Elk?
13           MR. SEIDEL:  Objection to
14       form.
15       A    I don't recall.
16       Q    Did AmeriTrans owe Elk any
17   interest for payment of AmeriTrans's
18   share of expenses?
19           MR. SEIDEL:  Objection --
20       A    I don't believe so.
21       Sorry.
22       I don't believe so.
23       Q    And was there any time for
24   repayment by AmeriTrans to Elk for
25   AmeriTrans's share of the expenses paid
```

Page 239

```
              FEINSOD
1
2    by Elk?
3            MS. CLARKE:  Objection to the
4        form.
5        A    SBA permitted us to keep it
6    quarter to quarter and pay it down from
7    time to time.
8        Q    Are there any payments on
9    page 2?
10       A    There are numbers on page 2.
11       Q    Are there any payments by
12   AmeriTrans to Elk on page 2?
13       A    I don't know what -- I don't
14   know what payments would be.  What do
15   you mean by payments?
16       Q    Payments by -- is there any
17   entry on the ledger indicating a
18   payment by AmeriTrans to Elk on page 2?
19       A    No, on that page there is
20   not.
21       Q    On page 3, are there any
22   entries of payments from AmeriTrans to
23   Elk?
24       A    No.
25       Q    Looking at page 2, do you
```

Page 240

```
              FEINSOD
1
2    remember what the -- was the senior
3    secured note for $4 1/2 million?
4        A    I believe it was.
5        Q    And was there interest that
6    was owed by AmeriTrans to Elk on the
7    note?
8        A    I don't recall the terms of
9    the note.
10       Q    Do you recall -- okay.
11       Do you recall when AmeriTrans
12   had paid back Elk under the terms of
13   the note?
14       A    I don't recall, but I believe
15   it was specified in the note.
16       Q    Now, the last payment on the
17   note was March 23rd, 2012; is that
18   right?
19       I'm sorry.  The last advance
20   on the note was March 23rd, 2012; is
21   that right?
22       A    I don't know from the last --
23   from the documents you've given me,
24   that's what it looks like.
25       Q    Okay.  There's an entry here
```

Page 241

```
              FEINSOD
1
2    for a transfer from Elk Associates
3    Funding Corporation to AmeriTrans
4    Capital Corporation.
5        A    On which page?
6        Q    Same page, page 2.
7        175,000 business development
8    expense.  Do you know what that is for?
9        A    Whatever business development
10   expense falls into that category under,
11   I guess, the general ledger system --
12   or the chart of accounts, excuse me.
13       Q    Under what authority does Elk
14   have to advance or make a payment to
15   AmeriTrans as a business development
16   expense?
17           MS. CLARKE:  Objection.
18       Calls for a legal conclusion.
19       A    I believe we were operating
20   under both the regulations that
21   provided for the intercompany balance,
22   specifically, the advancement of
23   expenses, to be paid by a parent under
24   SBA regs.
25       Q    Does that mean -- is your
```

Page 242

```
                        FEINSOD
1
2    understanding of the reg that you could
3    pay the parent an obligation of a
4    parent's investment?
5        A    I don't understand the
6    question.
7        Q    Okay.  Does that mean you can
8    pay life settlement premiums which were
9    an investment owned by the parent?
10            MS. CLARKE:  Objection.
11   Calls for a legal conclusion.
12       A    I don't know -- business
13   development expenses being -- I'm not
14   understanding the question directly.
15       Q    Okay.  I'm asking what's a
16   business development expense?  Is
17   that --
18       A    Whatever our controls and
19   policies and procedures and our chart
20   of accounts characterized as a business
21   development expense, in the other
22   accounting guidance.
23       Q    Does that include paying
24   investment -- buying investments for
25   AmeriTrans?
```

Page 243

```
                        FEINSOD
1
2        A    Buying investments for
3    AmeriTrans?  I don't know.
4        Q    Does that include --
5        A    I don't know what -- I
6    don't -- I can't speak to what the
7    definition means without seeing the
8    regulation.
9        Q    Okay.  The senior secured
10   note that's referenced on page 2, was
11   that approved by the board?
12       A    I believe it was.
13       Q    In order to make a transfer,
14   whose signatures are required to make a
15   transfer between Elk and AmeriTrans?
16       A    I don't recall whose.
17       Q    Would it have been yours and
18   Richard Feinstein's?
19       A    I don't recall who had
20   signatory authority on the bank
21   accounts specifically.
22       Q    Or a fund transfer request?
23       A    I don't recall.  In the
24   record, there's, I'm sure,
25   documentation that can refresh my
```

Page 244

```
                        FEINSOD
1
2    memory.
3        Q    Would the audit committee
4    have reviewed the business development
5    expenses?
6        A    I believe they would have.
7        Q    How would they -- how would
8    the audit committee review the business
9    development expenses?
10       A    Because I believe this
11   worksheet would have been shared with
12   the audit committee, or the final
13   version of the worksheet representing
14   what this purports to represent.
15       Q    Would this worksheet be part
16   of the audit committee's review of
17   journal entries that exceed 5 percent
18   of quarterly revenue?
19            MR. SEIDEL:  Objection to
20       form.  No foundation.
21       A    I believe this would fit that
22   category.
23       Q    Did you have an understanding
24   as to what the -- what the significance
25   is of the category of journal entries
```

Page 245

```
                        FEINSOD
1
2    of 5 percent that exceed 5 percent of
3    quarterly revenue?
4            MS. CLARKE:  Objection.
5        Vague.
6        A    Could you repeat the question
7    so I can answer it clearly.
8        Q    Sure.
9            Do you have an understanding
10   as to the significance of why the audit
11   committee would review journal entries
12   that are in excess of 5 percent of
13   quarterly revenue?
14       A    Yes.
15            MR. SEIDEL:  Wait, hold on.
16            Objection to form.  Vague.
17       Incomplete hypothetical.  I don't
18       see the -- if you're asking a
19       generalized question about
20       5 percent of review, Steven,
21       that's one thing.  If you're
22       trying misleadingly to suggest a
23       specific item was reviewed, then
24       no foundation.
25            MR. WEINBERG:  I didn't say a
```

Page 246

```
 1                     FEINSOD
 2        specific item.  We're talking
 3        generally.
 4            Q    Generally.  You can answer
 5        the question.
 6            A    So generally, I believe that
 7        this report would have -- would have
 8        met the 5 percent requirement to be
 9        reviewed for journal entries.
10            And I guess, what was the --
11        the larger question was?
12            Q    Do you have an understanding
13        as to why the audit committee would
14        review journal entries that are in
15        excess of 5 percent of general revenue?
16            A    Yes, because in 2008, I asked
17        them to put that policy in place,
18        personally.
19            Q    Okay.  Why did you ask for
20        that policy to be in place?
21            A    Because Gary Granoff had a --
22        when he was CFO in 2008, we were forced
23        to restate earnings by a material
24        amount due to an incorrect journal
25        entry.
```

Page 247

```
 1                     FEINSOD
 2            And given we had -- there
 3        were a few people checking when --
 4        Gary's work when he was CFO, we
 5        instituted a policy to make sure that
 6        the financial statements were accurate
 7        and that all journal entries above --
 8        above 5 percent of revenue, I guess as
 9        you described, there was a specific
10        written policy.
11            And I don't want to quote it,
12        but there was a policy that was put in
13        place in order to make sure the general
14        entries were not made without the audit
15        committee's and the board's
16        knowledge -- or, I'm sorry, the audit
17        committee's review.  Excuse me.
18            Q    Okay.  And generally, what
19        would the audit committee review with
20        respect to journal entries that are
21        excess of 5 percent of quarterly
22        revenue?
23            A    Everything.  Every
24        transaction that the company did during
25        that quarter.
```

Page 248

```
 1                     FEINSOD
 2            Q    When you say "everything," is
 3        that just verifying the amount of the
 4        transaction or --
 5            A    No, journal entries.
 6            Q    Okay.
 7            A    Journal entries or changes
 8        are made.  It's an accounting term.
 9            Q    What does that include?
10            A    It's an accounting term that
11        means it's a journal entry making a
12        change to the financial statements --
13        making an entry in the financial
14        statements.
15            I don't know if it's
16        considered an adjustment or not, but it
17        is a -- it's an entry.  It's something
18        unusual.
19            And our control overshot the
20        mark by putting a 5 percent limit in,
21        which if you look at 5 percent of
22        revenues, that would equal -- I mean,
23        you could do the math, I don't have it
24        in front of me, but on a million-dollar
25        quarter maybe, it would throw in
```

Page 249

```
 1                     FEINSOD
 2        everything over -- under $51,000 and
 3        above.
 4            So it became a large amount
 5        of entries and probably was impractical
 6        after Gary was no longer -- and not
 7        needed after we adopted Sarbanes Oxley
 8        controls, but it stayed in place.
 9            Q    With respect to -- in terms
10        of the journal entities --
11            (Clarification by the
12        reporter.)
13            Q    In terms of the journal
14        entries, are they -- is the audit
15        committee reviewing only the dollar
16        amount, or are they also reviewing what
17        the purpose was of the expense or
18        entry?
19            A    They were reporting --
20            MR. SEIDEL:  Objection to
21        form.
22            A    They were reviewing the
23        substance and the totality of each
24        journal entry.
25            And I believe it was the
```

Page 250

```
            FEINSOD
 1
 2   chairman.  I don't believe it was done
 3   by the committee.
 4       Q    Would the business
 5   development expenses that you see here
 6   on the -- on Exhibit 5 come before the
 7   board for review?
 8       MR. SEIDEL:  Objection to
 9       form.  No foundation that there
10       were -- that there was any
11       presentation to the board; that
12       there were board meetings at which
13       an opportunity for a presentation
14       could have been made during this
15       time period; or that there was any
16       suggestion -- there's no record
17       that these were ever put to the
18       board.  There's no record that the
19       board was meeting at that time at
20       a point where they could have been
21       put to the board, or for that
22       matter, the audit committee or the
23       audit committee chair.
24       Q    For the period of time from
25   June 2012 until December 2012, were
```

Page 251

```
            FEINSOD
 1
 2   there audit committee meetings?
 3       A    I believe there were.
 4       Q    Were there board meetings?
 5       A    Yes.
 6       Q    Was there procedure that Elk
 7   followed that would submit the business
 8   development expenses to the board for
 9   review?
10       MR. SEIDEL:  Objection to
11       form.  Mischaracterizes the
12       record.  No foundation.
13       A    I don't recall.
14       Q    Other than your testimony as
15   to the audit committee and/or the
16   chair, do you know if there is any way
17   that the board of directors would know
18   about the business development expenses
19   between Elk and AmeriTrans?
20       A    Maybe through this schedule.
21       Q    What schedule?
22       A    The schedule in front of you,
23   this work paper.
24       Q    I'm not asking you to
25   speculate.  Do you know if the schedule
```

Page 252

```
            FEINSOD
 1
 2   that we're looking at, the general
 3   ledger work paper, would be presented
 4   to the board as a matter of --
 5       A    I do not know.
 6       (Clarification by the
 7   reporter.)
 8       Q    -- Elk's practice?
 9       A    I did not recall.
10       Q    We can go to the --
11       A    I point out, again, that
12   during -- on this page that we're
13   looking at.
14       Q    Yes?  Which page are you
15   looking at?
16       A    The 2012 references.
17       Q    Yes?
18       A    Elk was not an SBIC for most
19   of this period.
20       Q    Wasn't Elk in the office of
21   liquidation during that period?
22       A    No, it was not.
23       Q    During -- I'm sorry.
24       A    It had entered into -- it had
25   entered into a settlement agreement
```

Page 253

```
            FEINSOD
 1
 2   with the SBA most of the time covering
 3   these transfers.
 4       Q    Wasn't the settlement
 5   agreement with the SBA October 31st of
 6   2012?
 7       A    Yes.
 8       Q    Okay.
 9       A    That's what this covers, this
10   time period.
11       Q    The time period covers
12   business development expense from
13   June 22, 2012, through December 19,
14   2012, correct?
15       A    No, that's not correct.
16       Q    We're looking at the entries
17   on page -- just for the ones that are
18   business development expenses, page 2
19   of the document, dated June 22, 2012,
20   is a transfer from Elk to AmeriTrans
21   business development expense, correct?
22       A    Um-hum, correct.
23       Q    That's before October 2012,
24   isn't it?
25       A    Yes.  And then there's
```

---

Page 254

FEINSOD

1
2  multiple transfers that happened after.
3      Q    Well, there are multiple
4  transfers that occurred before
5  October 31 of 2012, and they're on
6  page 1 of the exhibit, correct?
7          Is that right?
8      A    On page 1 of the exhibit,
9  there are multiple transfers that
10  occurred after the settlement agreement
11  was entered into.
12      Q    I'm talking about the
13  business development expense.  There
14  were --
15      A    Yes, I am too.
16      Q    -- of the agreement, my --
17  there are four transfers that occurred
18  from August 10th, 2012, through
19  August 24th, 2012, before the
20  settlement agreement with the SBA,
21  correct?
22      A    No, there aren't.  It says
23  they go from 8/10/12, 9/19/12, 10/3/12,
24  and 10/20/14.  You said August --
25      Q    Go ahead.

---

Page 255

FEINSOD

1
2      A    In the record, I believe you
3  stated they went until August 2012.
4      Q    If I did, I misstated.  I
5  said from August 10, 2012, through
6  October 24, 2012, there are four
7  transfers prior to October 31st of
8  2012, is that right, that are business
9  development expenses?
10      A    Yes.
11      Q    Okay.  After October 31,
12  2012, there were three transfers from
13  Elk to AmeriTrans that are classified
14  as business development expenses; is
15  that right?
16      A    Yes.
17      Q    Those transfers were made
18  from Elk to AmeriTrans and not made to
19  the SBA under any settlement agreement;
20  is that right?
21      A    I believe there were payments
22  made --
23      Q    That wasn't the question.
24      A    -- to the SBA --
25          So what was the question?

---

Page 256

FEINSOD

1
2      Q    The business development
3  expense transfers that were made
4  November 19, December 19 of 2012, and
5  another business development was made
6  March 28 of 2013 from Elk to
7  AmeriTrans, correct?
8      A    Correct.  And my point is
9  that at that point, Elk was not an
10  SB- -- was no longer an SBIC, so I'm
11  not sure if the business development
12  expenses were accounted for the same
13  way.
14      Q    Okay.  Well --
15          (Whereupon a discussion was
16      held off the record.)
17      Q    What is your basis -- what is
18  your basis for the statement that Elk
19  was no longer an SBIC based upon the
20  settlement agreement?
21      A    We turned in our license.
22      Q    As of what date?
23      A    Settlement agreement.
24          (Whereupon a discussion was
25      held off the record.)

---

Page 257

FEINSOD

1
2      Q    As to when Elk turned in its
3  license, that would be stated in the
4  settlement agreement?
5      A    It was simultaneous, I
6  believe, with the settlement agreement.
7  I believe, but it would be specified in
8  the settlement.
9      Q    Do you know if it would be
10  specified or set forth in the
11  receivership order as to when Elk turns
12  in its license?
13      A    It preceded the receivership
14  order.  The receivership order was
15  stapled to the settlement agreement, so
16  it was a single -- a single document
17  with exhibits.
18      Q    While Elk was an SBIC, was
19  the SBA a creditor of Elk?
20          MS. CLARKE:  Objection.
21      Calls for a legal conclusion.
22      A    I believe it was.
23      Q    Okay.  After the date of the
24  settlement, was the SBA a creditor of
25  Elk?

Page 258

```
1              FEINSOD
2          MS. CLARKE:  Same objection.
3      A    Yes, for a far reduced
4  amount.
5      Q    Was the -- after --
6      A    The debt under the settlement
7  agreement was -- our debt under the
8  settlement was reduced by more than
9  $10 million.  So after October 31st on
10 a pro forma basis, one would imply
11 that --
12     Q    Was the --
13          (Clarification by the
14 reporter.)
15     A    -- that Elk had significantly
16 less debt.
17     Q    With respect to the reduction
18 of the debt --
19     A    I'm sorry.  I didn't hear
20 you.
21     Q    Did the -- could the
22 reduction of debt result in a
23 cancellation of debt?
24     A    In what -- in what context?
25     Q    To Elk.  Would that
```

Page 259

```
1              FEINSOD
2  constitute investment income?
3          MS. CLARKE:  Objection.
4      Calls for a legal conclusion.
5      A    I don't -- I remember we
6  investigated it and we were concerned
7  about it and the implications of it,
8  but I don't remember the actual -- what
9  we discovered.  I remember we
10 investigated it.
11     Q    Was there discussion about
12 reducing any tax liability based upon
13 Elk being insolvent as of
14 September 2012?
15     A    Not that I recall.
16     Q    Do you recall any discussion
17 about a date when Elk may be insolvent?
18     A    No, I do not.
19     Q    We can go to the board
20 minutes of May 5th, 2011.
21          MS. BILODEAU:  That's been
22     marked Exhibit 14.
23          (Board meeting minutes dated
24     May 5, 2011, was marked Exhibit
25     14, for identification, as of this
```

Page 260

```
1              FEINSOD
2      date.)
3      Q    Would you -- when you've had
4  a chance to open Exhibit 14, would you
5  just generally review Exhibit 14 just
6  to be able to tell us what it is.
7      A    It's a long document.  Just
8  bear with me.
9      Q    Again, I'll point you to
10 where I would like you to refresh your
11 recollection.  I just wanted to know
12 generally what the document is.
13     A    This looks like a board
14 meeting that was held after we executed
15 the stock purchase agreement for an
16 investment by Columbus Nova into
17 AmeriTrans and Elk.
18     Q    If you look at page 2,
19 Approval of the Stock Pledge Agreement.
20     A    Um-hum.
21     Q    Mr. Feinsod, introduced the
22 next order of business concerning the
23 need.  It says:  Amend and restate the
24 stock pledge agreement entered into
25 between the company and AmeriTrans
```

Page 261

```
1              FEINSOD
2  Holdings, LLC, the secured party in
3  connection with the company's bridge
4  loan in order to release the common
5  stock of Elk Associates, Elk stock,
6  from the existing pledge thereof and to
7  substitute other assets of the company
8  as collateral in lieu of the Elk stock.
9      A    I have reviewed it, yes.
10     Q    Okay.  The motion to take
11 that action was approved by the board
12 at this meeting; is that right?
13     A    Correct.
14     Q    And what was the other
15 collateral -- other assets of the
16 company's collateral that was used to
17 secure the bridge loan?
18     A    I'm trying to -- if I recall,
19 when we made the loan to -- when
20 AmeriTrans Holdings made the loan to
21 AmeriTrans, they asked for a pledge of
22 Elk stock.  We gave them a pledge of
23 Elk stock.
24          Shortly thereafter, we
25 executed the agreement with the stock
```

Page 262

FEINSOD

1
2 purchase agreement, and submitted the
3 pledge of Elk stock and notified SBA of
4 the pledge of Elk stock.
5     The Elk -- the pledge of Elk
6 stock was considered a violation of the
7 regulations.  We were made aware of it,
8 and we quickly entered into discussions
9 with Columbus Nova to remove the pledge
10 and replace it with substitute
11 collateral.
12     I don't remember what the
13 collateral is, but I believe it is
14 specified in the record.  And that --
15 and SBA was satisfied with that matter.
16     Q   Do you know what -- can you
17 be more specific as to what the
18 violation was of the reg with
19 respect --
20     A   I believe it was a direct
21 violation of not being permitted to
22 pledge the stock of an SBIC.  And from
23 time to time, SBICs had minor
24 violations, and SBA had a way of
25 dealing with them.

Page 263

FEINSOD

1
2     Q   Were the assets that were
3 substituted as collateral for the Elk
4 stock assets owned by AmeriTrans as
5 opposed to Elk?
6     A   I don't recall what the
7 substitute collateral was.
8     Q   Was Elk a guarantor of the
9 bridge loan?
10     A   I don't recall the note, the
11 substance of the note.
12     Q   If we look at the end of the
13 minutes -- actually, you were the
14 secretary at this -- at the meeting of
15 May 5; is that right?
16     A   It should say I was.
17     I was, yes.
18     Q   Okay.
19     A   And it looks like John Weiner
20 was there as well, so he probably kept
21 the minutes.
22     Q   And would this be an example
23 of what a final version of the minutes
24 would look like after review and
25 approval of the board signed by

Page 264

FEINSOD

1
2 yourself?
3     A   The last page probably does.
4     MS. CLARKE:  Objection to the
5 form.
6     (Clarification by the
7 reporter.)
8     A   The last page does.
9     Q   Do pages 1 through 8 appear
10 to be a final version of the minutes?
11     A   I can't tell.
12     Q   Do you have any reason --
13     A   I've seen a lot.
14     Yes, I do.  I've been
15 presented with numerous draft minutes
16 today.  I can't -- I don't know the
17 integrity of the document.
18     Q   Okay.  Do you see anything on
19 the document that says:  Draft?
20     A   No, but that wasn't the
21 regular practice of always marking them
22 draft.  It was actually probably a less
23 regular process.
24     Q   Do you recall --
25     Let's turn to e-mail dated

Page 265

FEINSOD

1
2 August 2nd, 2011.  I believe it's
3 Tab 4.
4     (E-mail dated 8/2/11, was
5 marked Exhibit 15, for
6 identification, as of this date.)
7     MS. BILODEAU:  That's been
8 marked Exhibit 15.
9     A   Okay.
10     Q   Have you had a chance to look
11 at Exhibit 4?
12     A   Yes.
13     Q   Okay.  Is Exhibit 4 a --
14     MS. BILODEAU:  14, Steve?
15     MR. WEINBERG:  Yes, I'm
16 sorry.
17     MS. CLARKE:  15.
18     Q   Is Exhibit 15 a chain of
19 e-mail communications of August 2nd,
20 2011?
21     A   It appears to begin -- yeah,
22 yeah, it looks like they all are on
23 August 2nd.
24     Q   And it starts with an e-mail
25 that you've sent to various board

Page 266

FEINSOD

1
2  members -- to the board members
3  updating them on the SBA's review of
4  the Columbus Nova transaction; that
5  there was issues the SBA was raising as
6  to whether or not SBA would approve the
7  Columbus Nova transaction.
8       A    It seems to summarize that,
9  yes.
10      Q    And then there were e-mails
11 between yourself and Peter Boockvar
12 which talked about -- Peter was asking
13 you if you were comfortable as to
14 whether this will eventually close.
15           And you stated:  Comfortable
16 is not in my vocabulary at this point.
17 I'm not sure about anything.
18      A    That's what it says.
19      Q    Is that your understanding
20 that this may -- the SBA may reject the
21 Columbus Nova transaction?
22      A    No.
23      Q    No?  What does it mean:  I'm
24 not sure about anything?
25      A    I'm not sure about how the

Page 267

FEINSOD

1
2  SBA -- I was never expecting the
3  transaction to be rejected.  I always
4  believed that it would be approved.
5       Q    Okay.
6       A    And I wasn't sure about
7  whether -- this actually refers to a
8  part- -- I believe it looks like it
9  refers to a partner coming in to
10 satisfy the false claims about
11 management ownership diversity that SBA
12 had thrown up.
13      Q    Did the SBA always have
14 discretion to reject the Columbus Nova
15 transaction?
16      A    Did they have discretion?
17      Q    Yes.
18      A    I don't know.  I don't know.
19      Q    Okay.
20      A    I don't know.  What does
21 "discretion" mean in this context?
22      Q    Did the SBA reject the
23 Columbus Nova transaction?
24      A    Ultimately in December --
25 late December, this was four months

Page 268

FEINSOD

1
2  later five months later than this.
3       Q    Okay.  Now --
4       A    In between this e-mail and
5  the rejection, we spent significant
6  time speaking with --
7            (Clarification by the
8       reporter.)
9       A    After these e-mails and in
10 between the ultimate rejection, which
11 occurred 5 1/2 months later, we had
12 numerous conversations with SBA.
13           And even in this e-mail,
14 Marja seems -- I would view this to
15 remember, this refreshes my memory that
16 Marja seemed to give us a way that we
17 could get the transaction done.
18      Q    Again -- okay.  If we turn to
19 the minutes of October 5, 2011.
20           MS. BILODEAU:  What was that
21      date again?
22           MR. WEINBERG:  October 5th,
23      2011.  Tab 26.
24           MS. BILODEAU:  That's been
25      marked Exhibit 16.

Page 269

FEINSOD

1
2            (Board meeting minutes dated
3       Oct. 5, 2011, was marked Exhibit
4       16, for identification, as of this
5       date.)
6       Q    Open Exhibit 16.
7            Was Exhibit 16 the minutes of
8  the board of directors of AmeriTrans
9  Capital Corporation on October 5th,
10 2011?
11      A    It appears to be.
12      Q    Okay.  If we go to page 3,
13 the last sentence of the first
14 paragraph on page 3:  The board also
15 discussed the company's current
16 financial position, its cash burn rate,
17 the value to holders of the company's
18 common stock, preferred stock, and
19 promissory notes of winding down the
20 company's operations, and the need to
21 complete the financing transaction with
22 CN otherwise in the near future.
23           Did you prepare any type of
24 wind-down plan or liquidation plan for
25 the board to consider?

```
 1            FEINSOD
 2      A    I don't recall.  If I did, it
 3 would be in the records of the company.
 4      Q    Did you prepare any type of
 5 cash burn rate analysis for the board
 6 to consider?
 7      A    I don't recall, but if I did,
 8 it's in the records of the company.
 9      Q    Could we go to the minutes of
10 November 9, 2011, Tab 37.
11      MS. BILODEAU:  Marked as
12      Exhibit 17.
13      (Board meeting minutes dated
14      Nov. 9, 2011, was marked Exhibit
15      17, for identification, as of this
16      date.)
17      Q    Have you been able to open
18 Exhibit 17?
19      A    Yes.
20      Q    Okay.  Is Exhibit 17 the
21 board minutes for the board of
22 directors of AmeriTrans Capital on
23 November 9th, 2011?
24      A    Yes.
25      Q    I'd like to direct your
```

```
 1            FEINSOD
 2 attention to page 2.
 3      A    To refine my answer for the
 4 last question, it's also some land
 5 written notes outside of the minutes
 6 that -- I can't read my own handwriting
 7 on the fly, so I don't want to
 8 characterize it.
 9      So pages 1, 2, and 3 are --
10 look like minutes, and then page -- the
11 other pages are handwritten notes, and
12 there is a -- looks like a page of
13 typed notes as well.
14      Q    The first four pages of the
15 exhibit are the minutes of the meeting
16 of November 9th, 2011?
17      A    They appear to be, yes.
18      Q    The handwritten notes, is
19 that your handwriting?
20      A    First two pages, three pages
21 are -- yes, that's my handwriting.
22      Q    If we go to page 2 of the
23 minutes.
24      A    Um-hum.
25      Q    There is paragraph -- six
```

```
 1            FEINSOD
 2 paragraphs down, sixth and seventh
 3 paragraphs.
 4      A    Mr. Feinsod invited?
 5      Q    Yes.  Does that refresh your
 6 recollection about those two
 7 paragraphs?
 8      A    Yes.
 9      Q    Okay.  Do you recall what was
10 the discussion about the zone of
11 insolvency other than what's written
12 here in the minutes?
13      (Clarification by the
14      reporter.)
15      A    I don't.
16      MR. WEINBERG:  Zone of
17      insolvency.
18      (Clarification by the
19      reporter.)
20      A    I don't recall.  It was a
21 long time ago.
22      Q    Do you recall what the
23 discussion was about metrics that would
24 be used to determine whether the
25 company is insolvent?
```

```
 1            FEINSOD
 2      A    No, I don't.
 3      Q    Did you review any of the
 4 metrics to determine whether the
 5 company was insolvent?
 6      A    As I mentioned, I don't
 7 remember discussing the metrics.
 8      Q    Okay.  Did you review or
 9 discuss with the board as to making a
10 determination whether the company was
11 insolvent?
12      A    I don't recall.
13      These board -- the meeting
14 was -- it was a long board meeting.
15 I'm trying to just -- it's just a
16 summary.
17      Q    Okay.  Did you take any --
18 did you take any steps to change the
19 operation of the company with respect
20 to the use of Elk assets for AmeriTrans
21 after the meeting of November 9th,
22 2011?
23      A    I don't understand the
24 question.
25      MR. SEIDEL:  Objection.
```

```
 1                FEINSOD
 2       Foundation.
 3            MR. WEINBERG:  Sorry, did you
 4       get the answer, Judy?
 5            MS. COURT REPORTER:  Yes,
 6       sir.
 7       Q    Did you take any measures to
 8  utilize the proceeds of the sale of
 9  Elk's assets only for Elk's creditors
10  after the November 9th, 2011, meeting?
11            MS. CLARKE:  Object to form.
12       And foundation.
13            MR. SEIDEL:  Objection.
14       A    I don't recall.
15       Q    The next minutes, are
16  December 15th, 2011, Tab 38.
17            (Board meeting minutes dated
18       Dec. 15, 2011 with attached
19       handwritten note, was marked
20       Exhibit 18, for identification, as
21       of this date.)
22            MS. BILODEAU:  They've been
23       marked Exhibit 18.
24       Q    Is Exhibit 18 the
25  December 15th, 2011, board meeting
```

```
 1                FEINSOD
 2  minutes?
 3       A    Pages 2 and 3 are, yeah.
 4       Q    And the first page are
 5  handwritten notes.  Is that your
 6  handwriting?
 7       A    Yes.
 8       Q    If we go to the bottom
 9  paragraph on page 1, could you review
10  that paragraph, please.
11       A    Okay.
12       Q    Do you know what -- do you
13  remember what the default -- technical
14  default was under the note, the CN note
15  issued by the company --
16       A    Yes.
17       Q    -- in favor of AmeriTrans
18  Holdings, LLC?
19       A    Yes.
20       Q    What was it?
21       A    It was a -- we had fallen
22  below a minimum net asset value,
23  $4 million, I believe.
24       Q    If you -- when you say a "net
25  asset value," that was for AmeriTrans
```

```
 1                FEINSOD
 2  stock?
 3       A    No.
 4       Q    What was -- that was for
 5  AmeriTrans?
 6       A    Let me back up.  It was a
 7  defined term under the agreement that
 8  tied to the '40 act.
 9            (Clarification by the
10       reporter.)
11       A    '40 act, 1940 act.
12       Q    You see the last sentence:
13  Mr. Feinsod indicated the company would
14  most likely sell its life settlement
15  policies to finance payments due under
16  the notes, but the sale process would
17  take a few weeks to complete in order
18  to maximize the value received for the
19  policies?
20       A    Correct.
21       Q    Does that refresh your
22  recollection as to what assets were
23  used to secure the note?
24       A    What note?
25       Q    What's referred to as the CN
```

```
 1                FEINSOD
 2  note; in other words, the bridge loan.
 3       A    No, I don't -- it doesn't.
 4       Q    Was AmeriTrans able to sell
 5  the life settlement policies to pay the
 6  note?
 7       A    I don't recall.
 8       Q    Was AmeriTrans able to sell
 9  the life settlement policies in order
10  to pay Elk back?
11       A    This was during the period
12  when we were expecting -- we were
13  waiting on SBA approval still, and I
14  don't recall.
15       Q    Do you -- okay.
16            If we look at the next
17  minutes, February 24, 2012.
18            (Board meeting minutes dated
19       Feb. 24, 2012, was marked Exhibit
20       19, for identification, as of this
21       date.)
22            MR. WEINBERG:  Tab 42.
23            MS. BILODEAU:  That's been
24       marked Exhibit 19.
25       Q    If you can open Exhibit 19.
```

Page 278

```
              FEINSOD
1
2   Please open the minutes and --
3        A    Yes.
4        Q    Okay.  Is Exhibit 19 the
5   board meeting minutes for Elk and
6   AmeriTrans of February 24th, 2012?
7        A    It appears to be.
8        I said it appears to be.  I
9   apologize if you didn't hear me.
10       Q    Is this the meeting where
11  Elk -- where the board approved a --
12  what's called a senior secured note to
13  loan $4 1/2 million to AmeriTrans?
14       MR. HASHEM:  Objection to
15       form.
16       A    I'd have to read the whole
17  minutes.  This was a board meeting
18  following the termination of the S- of
19  the Columbus Novis -- Columbus Nova
20  transaction --
21       Q    Okay.
22       --  and rejection the Full
23  Circle transaction as well, and was the
24  beginning of some of the inconsistent
25  behavior by Paul Salgado and SBA that
```

Page 279

```
              FEINSOD
1
2   led to the company litigating.  That
3   was the -- it looks like that was the
4   bulk of what we talked about.
5        Q    Okay.  Was -- the litigation
6   that you sought was for preliminary
7   injunction, correct?
8        A    Among other things.
9        (Clarification by the
10       reporter.)
11       MR. HASHEM:  Michael, please
12       wait -- let me object before you
13       finish.
14       Objection.  Mischaracterizes
15       the prior testimony.
16       MR. WEINBERG:  Okay.  And the
17       answer was:  Yes, among other
18       things.
19       Did you get the answer, Judy?
20       MS. COURT REPORTER:  I just
21       got "Among other things."
22       Q    Okay.  Do you know that the
23       relief for the preliminary injunction
24  was denied, correct?
25       A    Yes.  I don't believe we
```

Page 280

```
              FEINSOD
1
2   were -- okay.
3        Q    If you take a look at the
4   minutes for --
5        A    The litigation was ultimately
6   successful.
7        Q    Would you -- there was a
8   settlement agreement that was entered
9   into; is that right?
10       A    Yes.  And the litigation was
11  ultimately successful for Elk.
12       Q    In terms of -- would you
13  briefly review the minutes of
14  February 24th, and see if this is the
15  meeting where Elk -- where the board
16  approved a loan from Elk to AmeriTrans?
17       MR. HASHEM:  Objection to
18       form.  Foundation.
19       A    See where we talked about
20  inconsistencies and the move to the
21  office of liquidation.
22       Q    Was -- was the movement to
23  the office of liquidation based upon
24  the letter rejecting the Full Circle
25  term sheet by the SBA?
```

Page 281

```
              FEINSOD
1
2        A    Was the what?
3        Q    Did you know at this time
4   that the SBA was making a referral to
5   the office of liquidation based opinion
6   the rejection of the Full Circle term
7   sheet?
8        A    No.  They were independent of
9   each other.
10       And at this point, it looks
11  like our counsel was advising us that
12  we had a period to cure before we move
13  into liquidation.
14       So we were evaluating the
15  SBA's actions with respect to their
16  failure to deliver the proper notice
17  and their failure to act according to
18  their own policies and procedures over
19  the last couple of months.
20       Q    I'm not asking you to read
21  the minutes.  And I don't have a --
22       A    You asked me to refresh my
23  memory.  I apologize.
24       Q    What I'm asking is -- well,
25  we'll ask a question.
```

Page 282

```
 1            FEINSOD
 2        What I asked was to review
 3  the minutes and to -- so that you can
 4  satisfy yourself as to whether this was
 5  the meeting where the Elk board agreed
 6  to make a loan to AmeriTrans for
 7  $4 1/2 million.
 8        A    On page 7, this contains
 9  that -- the resolution to make the
10  loan.
11        Q    Now, with respect to the loan
12  from Elk to AmeriTrans, there was a
13  discussion about:  The SBA and/or the
14  Elk receiver may have a claim in terms
15  of an intercompany secured loan.
16        Do you recall that?
17        A    No.
18        MR. HASHEM:  Objection.
19        A    Sorry.
20        Q    Do you recall that there was
21  a discussion that the SBA may object to
22  an intercompany loan?
23        A    I don't recall.  I've only
24  gotten to page 5 of the minutes.
25        Q    Do you recall a discussion
```

Page 283

```
 1            FEINSOD
 2  that the SBA may object that such a
 3  loan may affect Elk's ability to repay
 4  the debentures to the SBA?
 5        MR. CLARKE:  Object to form.
 6        Lacks foundation.
 7        A    No, I don't recall that.
 8        (Whereupon, a discussion was
 9  held off the record.)
10        Q    On page 5 in the third
11  paragraph down, Mr. Press stated in the
12  middle of the paragraph:  Elk on the
13  theory that a loan to AmeriTrans is
14  improper because it subverts Elk's
15  ability to repay its debt to the SBA.
16        Does that refresh your
17  recollection?
18        A    With respect to what the
19  minutes say, yes.
20        Q    Do you recall any discussion
21  about any other basis for the SBA to
22  object to the loan from Elk to
23  AmeriTrans?
24        A    No, I don't recall what was
25  discussed with the specifics to this.
```

Page 284

```
 1            FEINSOD
 2  This is a --
 3        Q    Okay.
 4        A    These -- well, hold on one
 5  second.  I'm trying to refresh my
 6  memory.
 7        This is a long board meeting.
 8  I don't recall.  It looks like we spent
 9  three hours, four hours discussing this
10  that's reduced to three or four pages.
11        Q    Do you recall discussing
12  about the short term of the loan and
13  the importance of prepaying the loan
14  between Elk and AmeriTrans?
15        A    I recall it, no.
16        Q    Do you have any -- do you
17  remember any --
18        Do you have any understanding
19  as to why you thought it was important
20  to prepay the loan before it was due
21  from AmeriTrans to Elk?
22        MS. CLARKE:  Objection to the
23  form.  And lacks foundation.
24        A    I don't recall.
25        Q    Was AmeriTrans able to pay
```

Page 285

```
 1            FEINSOD
 2  Elk back for the loan?
 3        MS. CLARKE:  Objection to the
 4        form.
 5        A    I don't -- I don't recall.
 6        Q    At this meeting of
 7  February 24th, was there any discussion
 8  about the board reviewing any metric or
 9  measure to determine whether the
10  company Elk or AmeriTrans was
11  insolvent?
12        A    I don't recall.
13        MR. WEINBERG:  Could we have,
14        I'm sorry, the February 22nd
15        letter.
16        MS. BILODEAU:  Tab 10?
17        MR. WEINBERG:  Hold on.  We
18        could -- let's move on on that.
19        Let's go right to the -- I think
20        there was a March 7th --
21        Instead of the February 22nd
22        letter, could we go to the minutes
23        of April 25, 2012.
24        MS. BILODEAU:  Marked
25        Exhibit 20.
```

```
                                        Page 286
 1              FEINSOD
 2        (Clarification by the
 3    reporter.)
 4        (Board meeting minutes dated
 5    April 25, 2012, was marked Exhibit
 6    20, for identification, as of this
 7    date.)
 8    Q    You could open Exhibit 20.
 9        Exhibit 20, the minutes for
10    the April 25th, 2012, board meeting of
11    AmeriTrans and Elk.
12    A    Yes, I have them in front of
13    me.
14    Q    Okay.  Do you see -- if you
15    turn to page 3, the third full
16    paragraph?
17    A    Where Lee Forlenza and Ellen
18    Walker reached out to SBA?
19        The boards of AmeriTrans and
20    Elks then discussed --
21        (Clarification by the
22    reporter.)
23    A    Sure.  The minutes state that
24    the boards of AmeriTrans and Elk then
25    discuss possible claims against Ellen
```

```
                                        Page 287
 1              FEINSOD
 2    Walker and/or Lee Forlenza based on
 3    certain communications included among
 4    the discovery materials provided by the
 5    SBA.
 6    Q    Okay.
 7    A    Is that the paragraph?
 8    Q    No.  That's the paragraph you
 9    picked.
10    A    Sorry.  I --
11    Q    If you look --
12    A    That's the third one.
13        (Clarification by the
14    reporter.)
15    Q    That's rule 1.
16        Let's go to the next
17    paragraph, please:  The board then
18    discussed potential liquidation models.
19    A    The fourth paragraph, then,
20    not the third, correct?
21    Q    We're not arguing.  If you
22    can --
23    A    I'm asking -- I'm asking --
24    Q    I'm asking you to look at the
25    paragraph beginning:  The board then
```

```
                                        Page 288
 1              FEINSOD
 2    discussed potential liquidation models.
 3    A    Got it.
 4        Okay.
 5    Q    Does that paragraph refresh
 6    your recollection as to whether or not
 7    you prepared any analysis of a
 8    liquidation model for AmeriTrans or Elk
 9    for the board meeting of April 25,
10    2012?
11    A    At that time, no.
12    Q    If you go to the next page,
13    page 4, the first full paragraph
14    beginning:  Mr. Singer then asked
15    whether and when the board would owe
16    fiduciary dutied to the SBA, as a
17    creditor of Elk, particularly if
18    liquidation is required.
19        Would you review that
20    paragraph, please.
21        (Clarification by the
22    reporter.)
23    Q    Was -- did the board make a
24    determination as to whether Elk was
25    insolvent as of April 25th, 2012?
```

```
                                        Page 289
 1              FEINSOD
 2    A    It doesn't look like it did.
 3    Q    Did the board review any
 4    metrics for measures to determine
 5    whether Elk was insolvent as of the
 6    board meeting of April 25th, 2012?
 7    A    I can't tell from these
 8    minutes.
 9    Q    Did Elk change its controls
10    with respect to limiting Elk's assets
11    solely for benefit of Elk's
12    creditors --
13        MS. CLARKE:  Objection --
14    Q    -- as of April 25th, 2012,
15    board meeting?
16        MS. CLARKE:  Objection.
17    Foundation and form.
18    A    I don't recall.
19    Q    Did Elk change its procedures
20    to limit the proceeds of the sale of
21    Elk assets only for Elk's creditors as
22    of the April 25th, 2012, board meeting?
23        MS. CLARKE:  Objection to the
24    form.  And lack of foundation.
25        MR. SEIDEL:  Objection to
```

Page 290

```
 1              FEINSOD
 2    form.
 3        A    I don't recall.
 4             MR. WEINBERG:  Can we take a
 5    five-minute break, please.
 6             MS. CLARKE:  Yes.
 7             VIDEOGRAPHER:  This will end
 8    Media Unit 5.  Going off the
 9    record at 4:34, October 28, 2021.
10             (Whereupon, a brief recess
11    was taken.)
12             VIDEOGRAPHER:  We're back on
13    the record.  The time is
14    4:56 p.m., October 28, 2021.  This
15    will begin Media Unit 6.
16        Q    If you would refresh your
17    exhibit, please.
18             (Clarification by the
19    reporter.)
20             MR. WEINBERG:  Exhibit 21.
21             MS. BILODEAU:  Exhibit 21.
22             (E-mail dated 1/20/12, was
23    marked Exhibit 21, for
24    identification, as of this date.)
25        Q    Mr. Feinsod, have you had a
```

Page 291

```
 1              FEINSOD
 2    chance to look at Exhibit 21?
 3        A    I have it open, yes.
 4        Q    Do you remember, what did
 5    AmeriTrans use the proceeds of the loan
 6    from Elk to AmeriTrans to pay?
 7        A    I believe just to operate the
 8    business in general.
 9        Q    Didn't AmeriTrans use the
10    money to pay Columbus Nova on the
11    bridge loan?
12        A    Part of the bridge loan, yes.
13        Q    It wasn't --
14        A    Part of the loan, excuse --
15    the loan, excuse me.
16        Q    It wasn't --
17        A    Originally.
18        Q    -- of the loan --
19             (Clarification by the
20    reporter.)
21        Q    Wasn't the settlement of the
22    loan $1,420,000?
23        A    Settlement of the loan?  What
24    does that mean?
25        Q    The payment by AmeriTrans to
```

Page 292

```
 1              FEINSOD
 2    AmeriTrans Holding.
 3             MS. CLARKE:  Objection.
 4    Foundation.
 5        A    I don't recall, but this says
 6    it was 1.2 -- that they were willing
 7    to -- looks like we were contemplating
 8    1.4 million.
 9        Q    Okay.  Did AmeriTrans owe
10    money to senior note holders?
11        A    I believe so.
12        Q    Were the senior note holders
13    Steve Etra and various family members?
14        A    I don't know if they were
15    family members.
16        Q    Or various affiliates of
17    Steven Etra?
18        A    I don't know if they were
19    affiliates, but they were associates.
20    Affiliates -- certainly not -- I don't
21    want to use "affiliate" in the defined
22    term.
23        Q    Okay.  And did AmeriTrans use
24    the money from the loan from Elk to pay
25    the senior note holders?
```

Page 293

```
 1              FEINSOD
 2        A    I believe so.
 3        Q    Now, the assets that are --
 4    if you go to page 2 of this document,
 5    referring to Exhibit 21 --
 6        A    Yes.
 7        Q    -- it says:  Collateral pool
 8    as of 12/31/2011.
 9        A    Okay.
10        Q    Are the -- is the collateral
11    pool consisting of Elk assets or
12    AmeriTrans assets?
13        A    I don't recall.  I can't tell
14    from this.
15        Q    In terms of the fair value,
16    is this the fair value of collateral
17    that was used with respect to the note
18    between AmeriTrans -- between Elk and
19    AmeriTrans?
20             MS. CLARKE:  Objection to the
21    form.
22        A    The fair value appears to
23    refer to the fair value of each
24    individual asset as of 12/31/11.
25        Q    And what is the fair value
```

Page 294

```
                    FEINSOD
 1
 2    for the collateral pool as of
 3    12/31/2011?
 4        A    4,666,654.
 5        Q    4 million --
 6             (Clarification by the
 7    reporter.)
 8        Q    $4,666,654; is that right?
 9        A    That's what it says, yes.
10        Q    Okay.  Now, do you see it
11    says -- well, on top of this diagram,
12    it says:  Total proposed settlement.
13             Is that for the CN note and
14    the senior notes?
15        A    At the top of this it says --
16    where?
17        Q    Let me help you.  The
18    first -- the first bold entry or topic
19    is the financial information for the CN
20    note; is that right?
21        A    Top left, CN note, yes.
22        Q    Okay.  And then you have
23    financial information as to the senior
24    note, right?
25        A    That's what it looks like,
```

Page 295

```
                    FEINSOD
 1
 2    yes.
 3        Q    And then it says:  Total
 4    proposed settlement $4,166,713.
 5             Is that right?
 6        A    Yes.
 7        Q    Does that total proposed
 8    settlement refer to settlement of both
 9    the CN note and the senior note?
10        A    Total proposed settlement --
11    it looks like it is the sum of those,
12    the two numbers above it, yes.
13        Q    Okay.  Then the next line is
14    the proposed loan, Elk to AmeriTrans,
15    correct?
16        A    Yeah, on the left, yes.
17        Q    And that's $4 1/2 million,
18    right?
19        A    Yes.
20        Q    Then the next line is --
21    well, before we get to the collateral
22    pool, it says:  Excess working capital
23    at AMTC.
24             That's three hundred --
25    $333,287, right?
```

Page 296

```
                    FEINSOD
 1
 2        A    That's what the worksheet
 3    says, yes.
 4        Q    So that's obviously not
 5    enough money to pay the proposed
 6    settlement, right?
 7        A    To pay what?  What
 8    settlement?
 9        Q    To pay the proposed
10    settlements of the CN note or the
11    senior notes?
12        A    Okay.  What's not enough?
13        Q    The $333,287.
14             MS. CLARKE:  Objection to the
15    form.
16        A    I'm not -- I'm not following.
17        Q    Okay.
18        A    I don't understand the
19    question.
20        Q    Sure.
21        A    It's after -- the 333,000
22    would imply that the note was paid
23    back, imply that the settlement was
24    paid.
25        Q    Isn't that just listing the
```

Page 297

```
                    FEINSOD
 1
 2    excess working -- that would be the
 3    excess working capital remaining at
 4    AMTC?
 5        A    After the payment of the
 6    settlement.
 7        Q    After the payment of the
 8    settlement, and after the loan by Elk;
 9    is that right?
10        A    That's what it seems to lay
11    out, yes.
12        Q    Okay.  And it's laying out
13    the collateral pool as of 12/31/11,
14    correct?
15        A    On the left side, yes.
16        Q    Okay.  Wouldn't -- isn't that
17    the collateral pool with respect to the
18    note between Elk and AmeriTrans?
19        A    I don't believe the note
20    existed.  This is the proposed -- the
21    proposed collateral pool at the time, I
22    believe.  The note didn't exist at this
23    point.  So there was no collateral pool
24    yet.
25        Q    Okay.  But when the note was
```

Page 298

FEINSOD

1 approved at the February 24th meeting,
2 would these assets have been in the
3 collateral pool?
4 A    I don't recall whether or not
5 they would have been or would not.  I'd
6 have to look at the financial
7 statements from that period.
8 Q    Did Elk take possession of
9 the collateral from AmeriTrans?
10 A    Did Elk -- what -- what does
11 that mean?
12 Q    Did Elk take physical custody
13 of the collateral from AmeriTrans?
14 MR. SEIDEL:  Objection to
15 form.
16 A    I don't know what physical
17 possession would mean in terms of these
18 assets.  These assets are -- are
19 documents -- these assets are
20 represented by documents, excuse me.
21 They're not --
22 Q    Did Elk take physical
23 possession of the documents
24 representing these assets?


Page 299

FEINSOD

1 A    Elk always had possession of
2 these documents.
3 Q    And do you know which
4 custodian had possession of these
5 documents?
6 A    Which custodian had
7 possession of these documents?
8 Q    Yes.
9 A    I do not know.  Why would --
10 I don't understand why a custodian
11 would be relevant.
12 Q    Okay.  Would the documents --
13 well, just would the documents be in
14 AmeriTrans's or Elk's office?
15 A    The documents would exist in
16 multiple places.  They could -- there
17 are -- there would be copies of the
18 documents.  They weren't securities, to
19 be clear.  They were loan documents
20 representing -- they weren't
21 negotiable --
22 To the best of my knowledge,
23 none of these documents -- none of the
24 documents representing these would

Page 300

FEINSOD

1 entitle the holder of such documents to
2 any benefits.
3 Q    Okay.
4 A    So possession might --
5 possession -- they were always in Elk's
6 possession, but I don't know if that
7 possession is of any meaning.
8 Q    Okay.  Then we have the
9 working capital at Elk.
10 What does that column
11 represent?
12 A    I don't recall.  It's a short
13 summary.  I don't recall.
14 Q    Was this a summary as to how
15 Elk was going to sell its assets to
16 make the loan to AmeriTrans?
17 MS. CLARKE:  Objection.
18 Foundation.
19 A    I don't recall.
20 Q    Do you know if Elk ever filed
21 a UCC with respect to AmeriTrans?
22 MS. CLARKE:  Object to form.
23 Q    Do I know if Elk ever filed a
24 UCC with respect to AmeriTrans?

Page 301

FEINSOD

1 I don't believe it -- any one
2 was filed while I was an employee of
3 the company.  But no, not in my
4 experience.
5 Q    Now, at the time of
6 12/31/2011, we had looked at it
7 earlier, wasn't the due from parent
8 over $10 million?
9 A    I don't recall.
10 Q    Was it -- okay.
11 Was it approximately
12 $10.1 million?
13 MS. CLARKE:  Objection.
14 A    I don't recall.
15 MS. CLARKE:  Sorry.
16 A    I don't recall.  We can look
17 at the actual schedule, if you'd like.
18 Q    We'd have to go back.  Go
19 back to Exhibit 21.
20 MR. WEINBERG:  Where do we
21 have the 468 for the period ending
22 12/31/2011?
23 MS. BILODEAU:  Exhibit 8.
24 Q    Would you look at Exhibit 8,

```
                                               Page 302
1              FEINSOD
2   please.
3       A    I have Exhibit 8 open.
4       Q    Okay.
5       A    I have the exhibit.  So what
6   would you like me to look at?
7       Q    If you look at the due from
8   parent on line 24, isn't it in excess
9   of 5.1 million?
10      A    Yeah, but I point out that
11  it's nowhere near the 10 million that
12  you referenced before.
13      Q    No problem.
14           If you look at Exhibit 9.
15      A    I'm sorry?  Look at exhibit
16  what?
17      Q    Look at Exhibit 9, please.
18      A    So to answer your question,
19  on this, the corresponding debt was
20  $5.12 million.
21      Q    Correct.
22           If you go to Exhibit 9,
23  please.
24      A    Okay.
25      Q    The due from parent for the
```

```
                                               Page 303
1              FEINSOD
2   period ending March 31st, 2012, is in
3   excess of $10 million, correct?
4       A    Yes.
5       Q    Okay.  It's in excess of
6   $10.1 million, correct?
7           MS. CLARKE:  Asked and
8       answered.
9       A    Correct.
10      Q    And that was after the loan
11  was approved by the board
12  February 24th, 2012, right?
13      A    That?  That refers to the
14  $10 million?
15      Q    Yes.
16      A    As of March 31st, 2012, it
17  was $10 million.
18           It probably includes that
19  increase.
20      Q    Okay.  Now, did AmeriTrans
21  have assets in excess of four million,
22  six hundred -- withdrawn.
23           Did AmeriTrans have assets
24  that it owned by itself to repay the
25  due from parent to Elk in excess of
```

```
                                               Page 304
1              FEINSOD
2   $10 million?
3           MS. CLARKE:  Objection to the
4       form.
5       A    I believe it did.
6       Q    Was the $10 million part of
7   the secured note?
8           MS. CLARKE:  Objection to the
9       form.
10      A    The question doesn't --
11  can't -- I don't understand the
12  question.
13      Q    Okay.  Did AmeriTrans secure
14  the full $10 million that was owed to
15  Elk?
16      A    I -- I don't know.  I don't
17  recall.
18      Q    Didn't AmeriTrans secure only
19  the $4 1/2 million note?
20      A    I don't recall.
21      Q    In terms of the assets on the
22  collateral pool, the fair value of the
23  assets on the collateral pool is
24  $4,666,654.
25           MS. CLARKE:  Objection to the
```

```
                                               Page 305
1              FEINSOD
2       form.  Is that a question?
3       Q    Is that correct?
4       A    I don't know.  What -- what
5   exhibit are we referring to now?
6       Q    Okay.  Let's go to back to
7   Exhibit 21.
8       A    Okay.
9           According to this worksheet,
10  yes, it was 4.666,654 [sic].
11      Q    Did AmeriTrans own assets
12  other than what's listed in the
13  collateral pool on Exhibit 21?
14      A    I believe it did.
15      Q    What were those assets?
16      A    It owned Elk and all the
17  assets in Elk.
18      Q    Other than the assets in Elk,
19  did AmeriTrans have any other assets
20  from which to pay Elk the due from
21  parent of $10 million?
22      A    Repeat the question, please.
23      Q    The assets that are listed in
24  the collateral pool are owned by
25  AmeriTrans and not Elk, correct?
```

Page 306

```
                    FEINSOD
1
2        MS. CLARKE:  Objection --
3    A    It can't.
4        MS. CLARKE:  -- he said he
5    doesn't know.
6    Q    There were certain assets
7    that you referred to earlier as legacy
8    assets; is that right?
9    A    Yes.
10   Q    Those legacy assets were
11   owned independently by AmeriTrans and
12   are not assets of Elk; is that correct?
13   A    No, that wouldn't be correct.
14   That might have been too general when I
15   spoke before.
16   Q    The life settlement policies
17   were assets of AmeriTrans, correct?
18   A    Life settlement policies were
19   assets of AmeriTrans, yes.
20   Q    Okay.  They were not owned by
21   Elk, were they?
22   A    They were not -- I'm thinking
23   of the question.
24        I don't -- I don't believe
25   so.
```

Page 307

```
                    FEINSOD
1
2    Q    Okay.  In addition to the
3    life settlement policies, were there
4    some corporate loans or investments
5    owned --
6        (Clarification by the
7        reporter.)
8    Q    In addition to the life
9    settlement policies, what other assets
10   were owned by AmeriTrans that were not
11   owned by Elk?
12   A    I don't recall specifically.
13   I'd have to look at the company's
14   financial statements.
15        But there were no corporate
16   loans owned by AmeriTrans.
17   Q    Okay.  Any other types of
18   investments that were owned by
19   AmeriTrans?
20   A    I don't -- I don't remember.
21   I didn't -- there were no loans
22   originated by AmeriTrans when I was
23   there.  There were no new investments
24   originated for the -- my tenure -- my
25   tenure as an executive.
```

Page 308

```
                    FEINSOD
1
2    Q    Excluding Elk assets, did
3    AmeriTrans have its own assets from
4    with which to pay back a $10 million
5    due from parent to Elk?
6        MS. CLARKE:  Objection to the
7        form.
8    A    I don't recall.
9    Q    In terms of Velocity -- I'm
10   sorry.  Let me ask the question.  You
11   can close the exhibit.
12        What was the role between --
13   withdrawn.
14        Did AmeriTrans have an
15   investment advisor?
16   A    Did AmeriTrans have an
17   investment advisor?
18        For a period of time, we
19   engaged Velocity Capital Advisors as an
20   external advisor.
21   Q    And what period of time was
22   that?
23   A    I don't recall specifically,
24   but I'm sure it's in the records of the
25   company.
```

Page 309

```
                    FEINSOD
1
2    Q    And what was Velocity's
3    responsibility as an external advisor
4    to AmeriTrans?
5    A    In general, it was to help us
6    source and evaluate corporate loan
7    investments.
8    Q    And did they -- and what did
9    they do to evaluate corporate loan
10   investments?
11   A    Go ahead.  I'm sorry.
12   Q    Go ahead.  I'm sorry.  I
13   interrupted you.
14   A    I don't know if there was
15   somebody objecting.  I apologize.
16        What did Velocity do -- can
17   you repeat the question.  Sorry.
18   Q    Sure.
19        Did Velocity offer advice to
20   AmeriTrans and Elk with respect to
21   purchase of new assets?
22   A    Yes.
23   Q    Did Velocity offer -- have
24   any obligations with respect to
25   maintaining assets of Elk and
```

Page 310

FEINSOD

1
2  AmeriTrans?
3      A    I wouldn't know what
4  "maintaining" means.  I apologize.
5      Q    Okay.  Would Velocity offer
6  advice as to when to sell assets of Elk
7  or AmeriTrans?
8      A    Let me back up.
9           Velocity offered no advice
10  with respect to assets of AmeriTrans.
11  All the advice with Velocity was for
12  the corporate loan program, and all
13  those corporate loans were held by Elk.
14           So if you could repeat the
15  question.  Or if that answers your
16  question.
17      Q    Was -- okay.
18           And what was Velocity's
19  obligations with respect to sale of Elk
20  assets?
21      A    While they were an active
22  advisor, to give advice.  That was it.
23      Q    Was Velocity consulted with
24  respect to the sale of Elk's assets in
25  March of 2012?

Page 311

FEINSOD

1
2      A    I don't recall specifically.
3           I believe it may -- March of
4  2012, their agreement may have been
5  terminated already.
6      Q    Okay.
7           MR. WEINBERG:  The next
8           exhibit, could we go to the
9           termination.  I believe it's in
10           the e-mail folder.
11           (E-mail dated 3/1/12, was
12           marked Exhibit 22, for
13           identification, as of this date.)
14           MR. WEINBERG:  Tab 13.
15           MS. BILODEAU:  That's been
16           introduced as Exhibit 22.
17      Q    Generally, before we -- you
18  could look at Exhibit 22, but
19  generally, what was the practice of Elk
20  in terms of how it would consult with
21  Velocity regarding the sale of an asset
22  prior to the termination of the
23  Velocity agreement?
24      A    We would speak with them
25  about -- about obtaining bids from

Page 312

FEINSOD

1
2  different desks and using their
3  contacts, quote/unquote, to facilitate
4  disposals of assets.
5           These are not securities, but
6  they are -- they are tradable.
7      Q    And Elk's assets consisted of
8  loans and corporate loans, correct?
9      A    Elk's assets, when?
10      Q    We're talking about the
11  period of time from 2011 through 2013.
12      A    I can't speak to the totality
13  of the portfolio, but the bulk -- a
14  substantial portion was corporate
15  loans.
16           And this was -- this
17  letter -- this letter -- this
18  termination letter comes about a year
19  after Velocity had actually been
20  terminated.
21           In other words, they had the
22  termination letter in their possession
23  already.
24      Q    When was Velocity terminated?
25      A    I believe they were delivered

Page 313

FEINSOD

1
2  the termination when we signed the
3  Columbus Nova stock purchase agreement.
4      Q    Okay.  So the letter that
5  you're looking at, Exhibit 22, the
6  letter dated March 1st, 2012.
7      A    I have it open, yes.
8      Q    Okay.  You're saying the
9  agreement with Velocity was no longer
10  in effect based upon the Columbus Nova
11  stock purchase agreement?
12      A    I believe so, correct.
13      Q    Was -- based upon the
14  Columbus Nova stock purchase agreement,
15  would the substitution of advisors take
16  place upon consummation of the
17  transaction?
18      A    I don't --
19           MS. CLARKE:  Objection to the
20           form.  And lacks foundation.
21      A    I don't recall the specifics
22  of it.
23      Q    Was --
24      A    It created some acri- --
25  significant acrimony between Velocity

Page 314

```
              FEINSOD
1
2   and AmeriTrans/Elk following the entry
3   into the stock purchase agreement with
4   Columbus Nova.
5          They were upset that they
6   were being terminated.
7      Q    But obviously, the Columbus
8   Nova agreement did not close, correct?
9      A    The Columbus Nova did not
10  close because of -- because of the
11  SBA's failure to advance --
12     Q    I didn't ask why, I just
13  asked you yes or no if it closed.
14     A    Okay.
15     Q    Okay.  Is the letter correct
16  that the Velocity was not consulted
17  with respect to the sale of Elk's
18  assets on or before March 1st of 2012?
19     A    No, it's not correct.
20     Q    Velocity was consulted
21  regarding the February 29th sale of
22  Elk's assets?
23     A    Significant --
24          Sorry.
25          MS. CLARKE:  Sorry.
```

Page 315

```
              FEINSOD
1
2          Objection to the form.  And
3   I'm not sure there's any
4   foundation for a February 29th
5   sale of assets.
6          MR. WEINBERG:  Okay.
7      A    Yeah.
8      Q    With respect to the
9   statement:  In a shift from the
10  portfolio -- sell --
11         In the second paragraph:
12  Given the apparent --
13         (Clarification by the
14  reporter.)
15     Q    Given the apparent material
16  shift in portfolio strategy resulting
17  from the urgent desire to sell Elk's
18  most liquid assets, for which we had no
19  involvement and were not consulted,
20  notice is hereby given that the
21  advisors elected to terminate the
22  advisory agreement.
23         Is it correct that Elk did
24  not notify Velocity with respect to the
25  sale of its assets during February of
```

Page 316

```
              FEINSOD
1
2   2012?
3          MS. CLARKE:  Objection.
4      Foundation.
5      A    No, it is not correct.
6      Q    Okay.
7      A    Velocity was consulted about
8   the sale of every asset.
9      Q    Okay.  What was the
10  consultation with Velocity with respect
11  to the sale of Affinity?
12     A    I don't recall
13  specifically --
14         MS. CLARKE:  Objection.
15     Foundation.
16     A    Sorry.
17     Q    What was the --
18         (Clarification by the
19  reporter.)
20     Q    What was the consultation
21  with Velocity about the sale of
22  Miramax?
23         MS. CLARKE:  Objection.
24     Lacks foundation.
25     A    I don't know what Miramax is.
```

Page 317

```
              FEINSOD
1
2      Q    Do you know what -- do you
3   know Miramax is an asset of Elk -- was
4   an asset of Elk?
5      A    What -- Miramax what?
6      Q    Do you know if Miramax was an
7   asset of Elk?
8      A    I don't recall.
9      Q    Do you know if --
10         MR. HASHEM:  Sorry.  I'm just
11     going to object.  The letter is
12     dated March 2012, March 21st, 2011
13     [sic]
14         There's no foundation that
15     any of these assets -- none of the
16     asset sales you are referring
17     happened before or after that.
18         MR. WEINBERG:  Okay.
19     Q    Under the Velocity advisory
20  agreement, did Velocity have a right of
21  first refusal with respect to the
22  purchase of Elk assets?
23     A    I don't recall specifically.
24     Q    You made reference to -- you
25  talked about corporate loans that were
```

Page 318

```
 1              FEINSOD
 2   owned by Elk not AmeriTrans.
 3          Did Elk also own commercial
 4   loans?
 5      A    Yes.  And medallion loans.
 6      Q    The medallion loans were
 7   sold, correct?
 8      A    Medallion loans were sold in
 9   2008 -- correct -- 2008 or '9, sorry.
10      Q    So during the period of time
11   of 2011 through 2013, Elk owned
12   corporate loans and commercial loans;
13   is that correct?
14      A    Yeah, I believe that would --
15   that's correct.
16      Q    Okay.  Were there any other
17   types of loans or investments that Elk
18   made during 2011 to 2013?
19      A    I don't recall specifically,
20   but they'd be detailed in the financial
21   statements.
22      Q    Did AmeriTrans own, in its
23   own name, commercial loans?
24      A    No.
25      Q    So all commercial loans that
```

Page 319

```
 1              FEINSOD
 2   were owned by the company were owned in
 3   the name of Elk; is that correct?
 4      A    Yes.  I believe the
 5   commercial loans were a category that
 6   referred exclusively to AmeriTrans'
 7   portfolio, and was -- actually was a
 8   term used from OLS -- was a heading
 9   within OLS.
10          That's a different -- that's
11   where the term comes from.
12          So yes, they were -- Elk,
13   sorry, I didn't finish my answer.
14      Q    Okay.  Just so the record is
15   clear, because you said the name of
16   both companies.
17          With respect to the reference
18   to commercial loans, were they assets
19   or investments solely in the name of
20   Elk and not AmeriTrans?
21      A    I believe that assets that
22   might be classified as commercial loans
23   were classified as such because that
24   was their heading in OLS.
25          It wasn't a term of art, for
```

Page 320

```
 1              FEINSOD
 2   lack of a better way of putting it.  It
 3   was medallion -- just to differentiate
 4   them from medallion loans, excuse me.
 5      Q    Were they loans that were
 6   assets of Elk, or were the commercial
 7   loans assets of AmeriTrans?
 8      A    I don't recall the specific
 9   nuances of it.  I apologize.
10      Q    Okay.
11      A    All of the loans -- all of
12   the assets in AmeriTrans were
13   originated prior to the -- to 2009.  So
14   before my tenure as an executive.  So
15   how they were characterized, I don't
16   recall as well as some of the other
17   ones.
18          MR. WEINBERG:  Okay.  I
19      think -- can we go off the record
20      for one minute.
21          VIDEOGRAPHER:  Going off the
22      record.  The time is 5:31.
23          (Whereupon, a brief recess
24      was taken.)
25          VIDEOGRAPHER:  We're back on
```

Page 321

```
 1
 2   the record.  The time is 5:36.
 3          MR. WEINBERG:  We'll break
 4      here and continue the deposition
 5      on a day to be mutually agreed
 6      upon between the parties and the
 7      witness.
 8          MR. HASHEM:  That's okay with
 9      counsel for Feinsod and Feinstein.
10          MR. SEIDEL:  Same for the
11      independent directors.
12          VIDEOGRAPHER:  This will end
13      Media Unit 6 in the deposition of
14      Michael Feinsod and conclude the
15      recording of his deposition.
16          We're going off the record at
17      5:36 p.m., October 28, 2021.
18          (Time noted: 5:36 p.m.)
19
20
21
22
23
24
25
```

Page 322

```
 1
 2        A C K N O W L E D G E M E N T
 3
      STATE OF NEW YORK  )
 4                       ) ss.:
      COUNTY OF NEW YORK )
 5
 6        I, MICHAEL ROSS FEINSOD, certify, I have
 7      read the transcript of my testimony taken
 8      under oath in my deposition of October 28,
 9      2021; that the transcript is a true,
10      complete and correct record of what was
11      asked, answered and said during this
12      deposition, and that the answers on the
13      record as given by me are true and
14      correct.
15
16        - - - - - - - - - - - - - -
          MICHAEL ROSS FEINSOD
17
18
      Sworn and subscribed to before me
19
      this_____ day of_____, _____.
20
21
      _____
22      Notary Public
23
24
25
```

Page 323

```
 1
 2        C E R T I F I C A T I O N
 3
      STATE OF NEW YORK  )
 4                       ) ss.:
      COUNTY OF NEW YORK )
 5
 6        I, JUDITH CASTORE, Shorthand Reporter
 7      and Notary Public within and for the State
 8      of New York, do hereby certify:
 9        That MICHAEL ROSS FEINSOD, the
10      witness whose deposition is hereinbefore
11      set forth, was duly sworn by me and that
12      this transcript of such examination is a
13      true record of the testimony given by such
14      witness.
15        I further certify that I am not
16      related to any of the parties to this
17      action by blood or marriage and that I am
18      in no way interested in the outcome of
19      this matter.
20        IN WITNESS WHEREOF, I have hereunto
21      set my hand this 29th day of October,
22      2021.
23                         Judith Castore
24        - - - - - - - - - -
          JUDITH CASTORE
25
```

Page 324

```
 1
 2             I N D E X
      WITNESS                              PAGE
 3    MICHAEL ROSS FEINSOD
          Examination by:
 4        MR. WEINBERG                      8
 5          E X H I B I T S
          (Retained by Veritext Legal Solutions)
 6    EXHIBIT                              PAGE
      Exhibit 1   Technote 8 - April 2002   75
 7    Exhibit 2   Meeting minutes dated Tuesday, 105
                  May 26, 2009
 8    Exhibit 3   Memo dated May 22, 2009    136
      Exhibit 4   Form 468 as of 12/31/10    144
 9    Exhibit 5   Intercompany Balance Per G/L 154
                  7/1/2012
10    Exhibit 6   Letter dated 10/3/11 with  169
                  attachments
11    Exhibit 7   E-mail dated 10/3/11 with  170
                  attachments
12    Exhibit 8   Form 468 as of 12/31/11    183
      Exhibit 9   Form 468 as of 3/31/12     186
13    Exhibit 10  Board meeting minutes dated May 190
                  8, 2012
14    Exhibit 11  Form 468 as of 6/30/12     193
      Exhibit 12  EDGAR Submission Header    205
15                Summary/Form 10Q
      Exhibit 13  EDGAR Submission Header    226
16                Summary/Form 8K
      Exhibit 14  Board meeting minutes dated May 260
17                5, 2011
      Exhibit 15  E-mail dated 8/2/11        265
18    Exhibit 16  Board meeting minutes dated Oct. 269
                  5, 2011
19    Exhibit 17  Board meeting minutes dated Nov. 270
                  9, 2011
20    Exhibit 18  Board meeting minutes dated Dec. 274
                  15, 2011 with attached
21                handwritten note
      Exhibit 19  Board meeting minutes dated Feb. 277
22                24, 2012
      Exhibit 20  Board meeting minutes dated April 286
23                25, 2012
      Exhibit 21  E-mail dated 1/20/12       290
24    Exhibit 22  E-mail dated 3/1/12        311
25
```

Page 325

```
 1
 2        INSTRUCTIONS TO WITNESS
 3        Please read your deposition over
 4    carefully and make any necessary corrections.  You
 5    should state the reason in the appropriate space on
 6    the errata sheet for any corrections that are made.
 7        After doing so, please sign the errata
 8    sheet and date it.
 9        You are signing same subject to the
10    changes you have noted on the errata sheet, which
11    will be attached to your deposition.
12        It is imperative that you return the
13    original errata sheet to the deposing attorney
14    within thirty(30) days of receipt of the deposition
15    transcript by you. If you fail to do so, the
16    deposition transcript may be deemed to be accurate
17    and may be used in court.
18
19
20
21
22
23
24
25
```

Page 326

1
2                        E R R A T A
3
           I wish to make the following changes,
4
         for the following reasons:
5
6
PAGE LINE
7
___  ___  CHANGE:_____
8
REASON:_____
9
___  ___  CHANGE:_____
10
REASON:_____
11
___  ___  CHANGE:_____
12
REASON:_____
13
___  ___  CHANGE:_____
14
REASON:_____
15
___  ___  CHANGE:_____
16
REASON:_____
17
___  ___  CHANGE:_____
18
REASON:_____
19
20
_____     _____
21
    WITNESS' SIGNATURE              DATE
22
23
24
25

**[& - 20]**

| & |
| --- |

**&**   2:5,11 5:23 6:6
6:16,20 168:10

| 0 |
| --- |

**09**   157:3

| 1 |
| --- |

**1**   4:15 67:2 74:25
75:3 78:2,20,21
136:25 164:12
165:24 254:6,8
264:9 271:9 275:9
287:15 324:6
**1,010,290**   174:5
**1,420,000**   291:22
**1,436,726**   151:11
151:12 153:10
**1,826,111**   211:9,24
**1.2**   292:6
**1.4**   292:8
**1.7**   212:15
**1.8**   212:16,20
**1/2**   235:21,21
240:3 268:11
278:13 282:7
295:17 304:19
**1/20/10**   160:21
**1/20/12**   290:22
324:23
**10**   34:15 49:11
52:14,14,17,18,19
52:19,21,21,25,25
53:14,15,22,22
56:8,14 90:10,11
109:19,19 111:12
111:12 112:2,2,11
112:13,14,17,17
112:22,25 113:5,9
113:12,18,22
114:7,23 115:18
116:4,12,17 117:2

117:21,24,25
118:3,5,6,15 119:3
119:5 129:9 164:4
164:5 186:19
190:6,9,10,13
191:22 193:2,4
205:8,22 206:4
207:7 214:11
224:25 255:5
258:9 285:16
301:9 302:11
303:3,14,17 304:2
304:6,14 305:21
308:4 324:13
**10,100,527**   188:19
188:20
**10.1**   301:13 303:6
**10/20/14**   254:24
**10/3/11**   168:22
170:20 324:10,11
**10/3/12**   254:23
**100**   212:10
**10005**   2:6
**10019**   2:12
**10022**   2:18
**105**   324:7
**107**   84:11
**107.730**   83:23 84:5
**10:28**   67:3
**10:43**   67:7
**10:57**   78:14
**10q**   205:11 324:15
**10th**   254:18
**11**   2:5 193:19,22
324:14
**11.1**   134:5
**11576**   7:5
**11:07**   78:18
**12**   134:4 173:25
205:12,15,20
324:14

**12/30**   184:11
**12/31**   147:13
**12/31/10**   144:18
150:7 324:8
**12/31/11**   182:18
183:19 293:24
297:13 324:12
**12/31/2011**   184:12
184:23 293:8
294:3 301:7,23
**12:24**   143:10,13
**12:30**   11:5
**12c**   177:12
**13**   83:23 183:5
226:10,13,17
311:14 324:15
**136**   324:8
**14**   186:19 208:12
208:14 214:17
259:22,25 260:4,5
265:14 324:16
**14,271,038**   210:3
**144**   324:8
**15**   9:18 265:5,8,17
265:18 274:18
324:17,20
**154**   324:9
**15th**   184:18
192:11 274:16,25
**16**   178:3,5 268:25
269:4,6,7 324:18
**16,521,165**   230:18
**162,821.65**   161:2
**169**   324:10
**17**   1:3 4:24 270:12
270:15,18,20
324:19
**170**   324:11
**17436**   323:23
**175,000**   241:7

**175,540**   138:13
**18**   150:20 274:20
274:23,24 324:20
**183**   324:12
**186**   324:12
**19**   34:12 253:13
256:4,4 277:20,24
277:25 278:4
324:21
**190**   324:13
**193**   324:14
**1940**   40:7 276:11
**1993**   15:14
**1996**   15:23
**1997**   18:13 25:10
**1998**   17:14 19:18
**1999**   23:5
**1:47**   183:12
**1st**   313:6 314:18

| 2 |
| --- |

**2**   67:9 82:10 83:15
105:18 125:25
126:2,7,10,17
130:15 135:23
137:12,14 143:9
147:12 165:13,14
166:2 169:25
187:25 190:23
227:23 237:15
239:9,10,12,18,25
241:6 243:10
253:18 260:18
271:2,9,22 275:3
293:4 324:7
**2,949,442**   174:15
174:16
**20**   12:7,7 22:18
149:5 173:24
285:25 286:6,8,9
324:22

**[2000 - 28]**                                                                 Page 2

**2000**   25:10
**2001**   24:15 36:15
**2002**   75:2 79:2
   324:6
**2002nd**   78:23
**2003**   24:15
**2004**   24:16
**2005**   26:2,12,17
   27:10,22 28:22
   36:24 37:6,13
   39:15,18
**2007**   25:25 28:9,10
   28:14,22 29:19
**2008**   35:12 36:10
   37:21 54:18,22
   56:6 60:22 76:4
   137:9 246:16,22
   318:9,9
**2009**   35:18 36:9,10
   99:24 100:7,11,21
   105:15,17 108:25
   121:8 125:23
   126:15 127:19
   128:22 129:2
   131:12 132:2
   133:16 135:3,22
   135:24 136:20
   137:8 141:6 156:2
   164:12 165:24
   219:3 220:17
   320:13 324:7,8
**2010**   100:21
   137:25 138:4,15
   143:2 145:10
   147:14 149:18
   151:9,17 153:18
   153:24 154:4
   156:2 159:9,17
   160:18 164:13
   165:10,25 173:3
   176:9 216:20

222:13
**2011**   95:2 96:2,22
   97:23 98:6 99:12
   99:14,24 100:8,11
   100:22 117:15
   129:6 168:21
   170:19 171:15
   173:24 174:20,22
   176:9 177:19
   182:10 185:11
   186:5 219:3
   220:16,22 221:20
   222:5,12 235:4,18
   236:3,16 259:20
   259:24 265:2,20
   268:19,23 269:3
   269:10 270:10,14
   270:23 271:16
   273:22 274:10,16
   274:18,25 312:11
   317:12 318:11,18
   324:17,18,19,20
**2012**   96:3 184:18
   186:19 188:9
   189:3,16,18,22
   190:3,5,18 191:7
   191:19 192:7
   193:17 194:20
   195:6 196:3,14,20
   197:18 198:8,9
   199:8,19 203:9
   204:23 218:24
   228:15,18 229:11
   230:19,25 231:14
   233:2,7,13 234:13
   234:15 236:20
   240:17,20 250:25
   250:25 252:16
   253:6,13,14,19,23
   254:5,18,19 255:3
   255:5,6,8,12 256:4

259:14 277:17,19
   278:6 285:23
   286:5,10 288:10
   288:25 289:6,14
   289:22 303:2,12
   303:16 310:25
   311:4 313:6
   314:18 316:2
   317:12 324:13,22
   324:23
**2013**   27:14,16
   54:19,22 56:6
   60:23 76:4 95:3
   96:22 97:23 98:7
   99:13,14 108:25
   117:15 121:8
   128:22 129:2,6
   159:10,18 205:9
   208:23 256:6
   312:11 318:11,18
**2014**   31:18
**2015**   29:25
**2020**   31:18 32:3,13
   32:20
**2021**   1:14 4:5 67:3
   67:8 143:11
   144:11 183:12,17
   226:2,7 290:9,14
   321:17 322:9
   323:22
**205**   324:14
**207,353.36**   156:10
**207,363.36**   156:9
**20th**   160:18
   165:10
**21**   290:20,21,23
   291:2 293:5
   301:20 305:7,13
   324:23
**21st**   155:25 317:12

**22**   135:22,24
   136:20 190:2
   253:13,19 311:12
   311:16,18 313:5
   324:8,24
**226**   324:15
**22nd**   285:14,21
**23rd**   240:17,20
**24**   150:22 174:14
   177:19 185:9
   188:2,15 255:6
   277:17,19 302:8
   324:22
**24th**   254:19 278:6
   280:14 285:7
   298:2 303:12
**25**   12:6 33:24
   182:17 285:23
   286:5 288:9
   324:23
**25th**   226:22 227:4
   286:10 288:25
   289:6,14,22
**26**   105:15,17
   125:22 126:14
   131:12 268:23
   324:7
**260**   324:16
**265**   324:17
**269**   324:18
**27**   209:2,3 226:23
**270**   324:19
**274**   324:20
**277**   324:21
**28**   1:14 4:5 67:3,8
   143:10 144:11
   183:12,17 184:4
   184:15 210:18
   211:24 226:2,7
   256:6 290:9,14
   321:17 322:8

**[286 - 5]**

**286**   324:22
**290**   324:23
**29th**   314:21 315:4
   323:21
**2:00**   183:16
**2:56**   226:2
**2c**   150:19 174:7
   185:6
**2nd**   265:2,19,23

**3**

**3**   34:22 126:18
   127:25 130:15
   132:13 135:25
   136:4,7 137:18
   144:12 165:20,21
   168:7,13 183:11
   233:16 239:21
   269:12,14 271:9
   275:3 286:15
   324:8
**3/1/12**   311:11
   324:24
**3/31/12**   186:11
   187:8 324:12
**30**   148:3 168:21
   170:19 171:15,17
   173:3 174:19,22
   176:9,9 193:14,17
   194:19 195:6
   196:14,20 197:18
   197:19 198:8,8
   199:19 203:9
   204:23 231:14
   233:2,7,13,24
   234:15 235:4,18
   236:3,16 325:14
**30th**   197:2
**31**   2:12 149:17
   153:17,24 164:4,5
   164:13 165:24
   182:10 185:11

186:2,5 189:3
191:7 192:10
205:9 208:23
210:9,10 211:18
213:3 228:15,18
229:10,25 234:13
255:11
**311**   324:24
**31st**   143:2 145:9
   151:9,17 154:4
   186:19 188:9
   189:18 191:19
   192:7,11 230:19
   230:24 253:5
   254:5 255:7 258:9
   303:2,16
**332,387**   149:19
   150:14,15
**332,987**   150:8
**333,000**   296:21
**333,287**   295:25
   296:13
**35**   128:4,19
**3586**   1:3 4:24
**37**   74:25 270:10
**38**   176:3 274:16
**39**   148:20 149:12
   173:2,10,11,22
**3:13**   226:6

**4**

**4**   132:14,18 134:10
   137:21 144:16,17
   144:19 145:2
   157:18 165:11,18
   165:21 166:14,22
   167:18 168:2,16
   174:8 183:18
   225:25 231:19,20
   231:23 232:9,23
   235:21 240:3
   265:3,11,13

275:23 278:13
282:7 288:13
294:5 295:17
304:19 324:8
**4,166,713**   295:4
**4,666,654**   294:4,8
   304:24
**4,739,428**   233:14
   234:15
**4,989,323**   231:14
   233:6
**4.666,654**   305:10
**40**   22:23 276:8,11
**41**   145:24,25 146:6
   150:20
**42**   277:22
**430**   2:17
**45**   198:2,6
**46**   207:9
**468**   56:18 57:3,4,8
   57:11,16,24 58:8,9
   58:13,15,23 59:24
   109:17,23 110:9
   110:14,22,24
   111:8 119:7,8
   120:5,5 121:7,12
   122:5,13,18,22
   123:4,8,13,21,22
   124:2,7,8,9,17
   142:25 144:18
   145:5,5,8,18,22
   147:2,8,13,15,15
   147:22 148:6,8
   153:3 154:6,11
   168:21 169:11,15
   170:11 171:20
   172:20 174:21
   176:7,20 177:2
   178:20 179:10
   180:13 182:8,18
   183:19 184:11,19

186:11,20 187:7
189:15,17 190:25
191:18 192:6
193:2,16,18 194:3
194:7 195:2
196:19 197:5,12
197:18 198:9
199:10,12,18,22
200:5,12,15 201:2
201:8,8,12,19
202:2,11 203:10
203:14 204:5,17
205:4 207:3
215:10 219:16,18
219:22 220:11
224:24 301:22
324:8,12,12,14
**468s**   49:12 120:9
   120:13,22 121:3,5
   191:5,11
**47**   207:22
**478,697**   186:7
**4:34**   290:9
**4:56**   290:14
**4c**   148:19 149:10
   172:25 173:17
   185:22
**4th**   2:5

**5**

**5**   36:25 94:9,16
   95:22 96:21 97:4
   97:21,22 105:15
   125:22 154:19,23
   154:25 155:4
   171:11 174:10,11
   185:19 206:14
   226:8 235:21
   236:12 237:12,16
   237:17 244:17
   245:2,2,12,20
   246:8,15 247:8,21

**[5 - added]**

248:20,21 250:6
259:24 263:15
268:11,19 269:3
282:24 283:10
290:8 324:9,17,18
**5,124,413**   185:12
185:13
**5,486,327**   228:21
229:17 230:23
231:5 234:14
**5,787,376**   229:5,6
**5.1**   302:9
**5.12**   302:20
**5.5**   228:21
**501**   34:22
**51,000**   249:2
**52nd**   2:12
**53**   171:8
**5:31**   320:22
**5:36**   321:2,17,18
**5th**   259:20 268:22
269:9

**6**

**6**   134:10 168:20,23
169:3,6,7 171:5,8
171:14 173:2,12
173:14 175:21
177:8,10,13 178:4
178:5 227:22
236:4,13 290:15
321:13 324:10
**6/30/11**   174:2
**6/30/12**   193:18
324:14
**6/30/2012**   199:13
**60**   7:5 198:6

**7**

**7**   170:21 173:16
175:22,24 176:4
177:7,9,13 236:8

236:13 282:8
324:11
**7/1/2012**   154:19
324:9
**730**   84:13
**75**   324:6
**7th**   285:20

**8**

**8**   75:2 78:23 79:2
79:6 182:15 183:4
183:20,23,25
184:2,3,8 190:2,5
190:18 226:20,21
227:3,9 231:20,23
231:24 232:10
233:8 264:9
301:24,25 302:3
324:4,6,12,13
**8/10/12**   254:23
**8/2/11**   265:4
324:17
**8k**   226:12 324:16
**8th**   156:2 189:22
192:12

**9**

**9**   186:12,24 187:3
187:6 232:12,13
232:22 270:10,14
302:14,17,22
318:9 324:12,19
**9,924,740**   208:24
**9/19/12**   254:23
**90**   108:15 197:22
198:6
**95**   93:20,22 94:4
94:13,15 95:10
96:10,18,24
101:13 212:11
**97**   19:11,23

**98**   19:23
**99**   93:25 96:24
101:14 212:11
**9:20**   1:15 4:4
**9th**   270:23 271:16
273:21 274:10

**a**

**a.m.**   1:15 4:4
**ability**   10:17 89:22
91:11,20,24 92:7
92:14 93:4 283:3
283:15
**able**   78:3 85:21
86:22 89:6 136:6
144:23 154:24
187:2 260:6
270:17 277:4,8
284:25
**absence**   162:20
**absolute**   179:18
**absolutely**   9:12
153:25 219:6
**access**   116:21
**account**   168:6
219:23 233:5
**accountants**
169:16 176:6
177:4 223:14
**accounted**   256:12
**accounting**   33:6,7
33:11,13,16,20,21
34:2 113:25
115:25 153:4
210:25 213:10
214:23 242:22
248:8,10
**accounts**   58:4,8,10
152:15,21,25
153:5 215:7
241:12 242:20
243:21

**accredited**   158:22
**accuracy**   146:25
147:3 208:7
**accurate**   61:15
155:11 224:7,12
247:6 325:16
**acknowledged**
216:5
**acquired**   211:5
**acquiring**   36:17
**acquisitions**   16:19
16:21 18:20,21
**acri**   313:24
**acrimony**   313:25
**act**   40:7 61:3
69:10 276:8,11,11
281:17
**acted**   61:13
112:16 130:22
**acting**   105:24
107:25 225:7
**action**   5:10 8:23
8:25 30:17 202:24
204:11,12 261:11
323:17
**actions**   30:13
203:22 281:15
**active**   85:12
310:21
**actively**   196:24
**activity**   129:11
**actual**   205:23
228:11,13 259:8
301:18
**ad**   40:20 41:2,3,9
41:12,20 42:3
43:9,11 44:19,21
44:25 45:10 46:10
47:2,6,15 48:13
**added**   36:9 65:14
126:23

**addition** 25:22
29:9 52:7,10
100:24 123:5
178:19 218:16
307:2,8
**additional** 7:11,14
8:9,12 100:23
133:24 139:3
180:9 223:3
**address** 7:5
**adds** 172:18
**adjustment**
160:10 248:16
**adjustments**
211:10 212:5
213:14,15,25
**administer** 5:8
**administering**
5:16
**administration**
1:4 4:18 6:2 69:2
69:10
**administrative**
211:3
**adopt** 58:7
**adopted** 204:9
249:7
**advance** 154:2
164:14 166:22
167:5 240:19
241:14 314:11
**advancement**
241:22
**advances** 153:18
223:6
**advice** 309:19
310:6,9,11,22
**advising** 281:11
**advisor** 308:15,17
308:20 309:3
310:22

**advisors** 308:19
313:15 315:21
**advisory** 315:22
317:19
**affairs** 93:13,19
99:7 101:8
**affect** 283:3
**affiliate** 292:21
**affiliated** 17:7,18
17:22 34:18
**affiliates** 292:16
292:19,20
**affiliations** 5:13
**affinity** 316:11
**afternoon** 144:14
**agency** 68:21,24
179:3
**agenda** 43:4 46:24
51:20
**ago** 33:24 104:16
129:9 203:12
272:21
**agree** 4:13
**agreed** 3:3,8,11
191:17 192:24
282:5 321:5
**agreement** 252:25
253:5 254:10,16
254:20 255:19
256:20,23 257:4,6
257:15 258:7
260:15,19,24
261:25 262:2
276:7 280:8 311:4
311:23 313:3,9,11
313:14 314:3,8
315:22 317:20
**agreements** 13:25
14:2,3 19:9
**ahead** 44:8 111:21
179:8 218:19

238:4 254:25
309:11,12
**al** 4:21
**allo** 157:4
**allocated** 157:15
160:6 161:22
163:9,13 212:17
**allocating** 159:13
161:6
**allocation** 151:23
156:17 157:5
158:14 159:2,24
160:2 162:2 164:6
164:16 165:2
166:16,17 167:9
168:9 174:24
175:14,17,18
185:17,20,21
188:23 213:25
238:9
**allocations** 158:16
**allowed** 93:2
204:4
**alongside** 38:6
**alternate** 201:11
**alternative** 134:23
200:24 201:6,13
205:3
**alternatively**
139:23
**amend** 260:23
**amended** 12:21,22
84:8
**ameri** 155:16
**ameritrans** 13:7
13:11,18,22 26:2,6
26:11,17,25 27:15
27:18 28:4,12,20
28:25 29:6,11
35:4,5,7,17 36:6
36:13,17 37:8,16

38:4,22 39:6,14,19
40:14,17 45:3
53:9,12 54:5,15
59:13,16 61:2
67:17 75:11,13,20
76:5,6,16 80:7,12
81:4,24 83:10,12
85:6 93:15,16
94:7,7,15,20,24
95:24,25 96:4,12
97:2,3,6,20 98:6,9
98:16,20 99:7,10
100:2,14,20,24
101:12,13,17
103:12,16 104:10
104:24 105:11
108:10,19,24
109:6,17 112:18
114:3,4,9,13,21,23
116:5,12 117:3
126:14 127:3,14
127:23 128:9
129:2,7,13,24
138:14 139:5
142:9 151:3,10,24
152:3,3 153:12,19
153:20,21 154:3
155:7,9,18 157:10
157:22,24 158:6,8
158:21 159:4
160:7 161:8
163:14,23 164:15
166:23 174:19,25
175:7,15,18
185:10,16,19
188:5,24 189:4,12
208:22 209:11
210:13 211:14
212:19 214:2,16
222:6 223:14
227:10,17,24

228:5,6,15,17
229:9 230:8,15,22
231:4,13 232:24
233:4,10,12
234:12,19 235:7
235:19 236:2,11
236:23 237:2,19
237:24 238:11,16
238:24 239:12,18
239:22 240:6,11
241:3,15 242:25
243:3,15 251:19
253:20 255:13,18
256:7 260:17,25
261:20,21 263:4
269:8 270:22
273:20 275:17,25
276:5 277:4,8
278:6,13 280:16
282:6,12 283:13
283:23 284:14,21
284:25 285:10
286:11,19,24
288:8 291:5,6,9,25
292:2,9,23 293:12
293:18,19 295:14
297:18 298:10,14
300:17,22,25
303:20,23 304:13
304:18 305:11,19
305:25 306:11,17
306:19 307:10,16
307:19,22 308:3
308:14,16 309:4
309:20 310:2,7,10
314:2 318:2,22
319:6,20 320:7,12
**ameritrans's**
52:21 93:23 94:3
117:19 238:17,25
299:15

**amount**  11:22
130:2 133:14
134:21 138:19
150:11,13 151:2
152:6 174:18
175:13 185:16
188:22 211:24
221:11,14,19
222:3 224:16
229:12 246:24
248:3 249:4,16
258:4
**amounts**  210:12
**amtc**  168:10
295:23 297:4
**analysis**  19:20
129:16,25 132:3
137:19 141:7
142:16 270:5
288:7
**analyst**  18:3,4
19:15,17 20:3
198:14,18
**analytical**  16:11
**analytics**  16:12
**ancillary**  13:25
46:14
**annual**  119:8,20
119:22 120:4,7
122:17,18 123:4,6
123:8 124:8,17,22
124:23 125:4,13
147:22 169:15
170:11,17 171:15
171:20,21 176:8
176:14,15 177:2
178:20,23 179:10
180:13,22 181:19
195:2 196:19
197:25 198:8

**annually**  112:23
113:10 217:25
**anonymous**  203:3
**answer**  9:8 10:14
10:19 14:19 36:3
41:16 44:8 51:2
59:19 76:13,19
77:6 80:16,25
81:8,12,17 84:2
87:8 88:8,9 89:7
90:2 96:25 106:15
114:18 130:10
131:20 151:18
179:18 202:17,18
204:23 218:20
229:5 238:5 245:7
246:4 271:3 274:4
279:17,19 302:18
319:13
**answered**  81:7
83:25 87:22 303:8
322:11
**answers**  12:21,22
213:21 310:15
322:12
**anymore**  22:17
53:6 54:8 77:14
114:10
**apart**  45:7
**apologize**  8:6,17
9:14 26:19 31:7
37:24 41:18 50:16
52:4 54:6 57:2
62:5 68:11 70:11
79:15 80:21 81:15
91:15 115:12
130:5 131:5 165:7
166:9 167:10
198:4 202:5
204:24 221:13
228:25 230:11

232:14 234:2
235:12 278:9
281:23 309:15
310:4 320:9
**apparent**  315:12
315:15
**appear**  264:9
271:17
**appearance**  5:18
**appearances**  5:13
**appeared**  2:3
**appears**  131:17
191:8 194:6
205:21 227:5
265:21 269:11
278:7,8 293:22
**applicable**  225:6
**applied**  161:9,14
161:15 220:17
**apply**  208:4
**appointed**  35:19
**appointing**  227:6
**appreciate**  9:3,20
82:4 114:20
**appropriate**
203:25 325:5
**appropriated**
122:20
**approval**  79:3
109:8 110:6,6
111:18,25 112:10
124:10 192:25
197:6 200:25
201:7 205:4
260:19 263:25
277:13
**approve**  201:12,19
203:14 204:5
266:6
**approved**  49:5
59:23,24 63:15

64:2,14 65:2,18
118:15,19 122:11
147:8 172:20
185:3 203:2
243:11 261:11
267:4 278:11
280:16 298:2
303:11
**approving** 203:9
**approximate**
24:13
**approximately**
22:12,22 27:25
28:6,9 29:19
31:16 35:15,16
43:25 47:5 54:18
71:17 94:4,8
98:21 104:14
138:19 178:3
231:5 235:20
301:12
**april** 27:13 75:2
78:23 192:11
226:22,23 227:4
231:7 285:23
286:5,10 288:9,25
289:6,14,22 324:6
324:22
**area** 218:14
**areas** 38:12
**arguing** 287:21
**arranged** 69:18
70:3
**art** 319:25
**arts** 15:15 34:14
**asked** 37:7,13,17
81:6 83:25 87:21
132:22 181:17
188:15 246:16
261:21 281:22
282:2 288:14

303:7 314:13
322:11
**asking** 8:24 9:4
14:15 48:13 59:10
63:20 73:24 79:19
80:17 81:20 85:3
87:11 88:15 92:14
92:17 131:2,9,21
141:23 166:7
175:12 192:17
223:21,22 225:11
225:14 242:15
245:18 251:24
266:12 281:20,24
287:23,23,24
**aspects** 40:22
**aspiration** 192:2
193:10
**asset** 42:18,18
51:7 96:13 137:17
237:11 275:22,25
293:24 311:21
316:8 317:3,4,7,16
**assets** 77:16,17
87:19 93:20,23
94:3,7,8,9,13,14
94:15 95:22 96:20
96:21,24 97:9,17
97:21 98:13,14,15
98:19,22 101:19
126:25 127:3,9,10
127:22 128:5,19
142:4 159:7,14,16
160:8 161:7 211:4
228:5,17 229:3,9
230:14,21 231:12
233:3,6,17 234:18
234:21 235:6
236:11,25 261:7
261:15 263:2,4
273:20 274:9

276:22 289:10,21
293:3,11,12 298:3
298:19,19,20,25
300:16 303:21,23
304:21,23 305:11
305:15,17,18,19
305:23 306:6,8,10
306:12,17,19
307:9 308:2,3
309:21,25 310:6
310:10,20,24
312:4,7,9 314:18
314:22 315:5,18
315:25 317:15,22
319:18,21 320:6,7
320:12
**assignments** 16:17
18:15,16 19:20
20:4 25:21 26:12
39:9
**assisted** 102:13
**assisting** 16:13
**associate** 16:6,18
18:10 73:4 79:11
79:13,21
**associated** 19:4
212:16
**associates** 1:5 4:19
6:3 26:3 80:6,12
81:4,25 96:16
126:13 146:10
147:9 151:4
155:16 163:22
209:9 237:18
241:2 261:5
292:19
**association** 70:22
**assume** 66:11
139:17 147:16
176:17 223:19,22

**assumes** 32:5
67:25 104:6
**assumption** 66:14
236:7
**assumptions**
223:18 237:9
**asta** 23:15,17,18
24:12,14 29:10
**attached** 111:3
131:18 274:18
324:20 325:11
**attachment** 19:8
**attachments**
168:23 170:21
324:10,11
**attend** 69:8 70:25
**attended** 15:9,22
69:19,19 70:5
71:3
**attention** 271:2
**attestations** 207:4
207:6,16,20
**attesting** 206:22
207:15,21
**attorney** 5:20 6:9
325:13
**attorneys** 5:24
14:17,17
**audio** 4:11 167:11
**audit** 39:25 110:10
110:13 111:17
112:4 113:20,24
114:6,22,24 116:4
116:12 117:20
118:4,10,10,14
122:6,9,10,17,20
124:18,20,22
125:4,8 178:25
179:2,4 180:18,21
180:24 181:8,9,19
181:20 189:20,21

[audit - believe]                                                                    Page 8

189:25 190:15,17
191:16,17 193:10
194:19 197:6
199:21,23 201:2
203:13,19,20
204:4,15 223:19
223:25 224:6,15
224:21,24 225:5,8
225:16 244:3,8,12
244:16 245:10
246:13 247:14,16
247:19 249:14
250:22,23 251:2
251:15
**audited** 112:22
123:4,6,9,9,13,13
147:15,17,22
177:3 178:21
180:13 195:4
**auditor** 112:13,17
116:24 119:10
124:19
**auditor's** 172:2
**auditors** 112:5,21
117:13 118:22
125:9,13 148:9,10
170:2,3 171:22
**audits** 115:17
181:23
**august** 254:18,19
254:24 255:3,5
265:2,19,23
**authority** 241:13
243:20

**authorized** 5:7
189:11 202:23
**automated** 121:16
**automatically**
152:11
**avenue** 2:17
**avoid** 68:18
**aware** 92:20,24
93:6 262:7

**b**

**b** 69:24 140:20
324:5
**bachelor** 15:15
**back** 29:6 56:22
56:23 67:6,10
70:9 78:8,17 93:5
115:3,7 144:9
168:20 171:3,4
177:8,9 183:15
187:15 194:23
197:8 210:18
211:18 221:19
222:6 226:5
237:12 240:12
276:6 277:10
285:2 290:12
296:23 301:19,20
305:6 308:4 310:8
320:25
**background** 15:6
**backward** 160:9
213:14
**backwards** 166:3
166:8
**balance** 136:24
137:5 152:2
154:18 155:6,15
155:17,25 156:7
157:15,24 158:8
160:3,13,19
163:20,23 165:3,8

165:10 166:19
167:21,25 173:9
181:14 228:2,4
229:25 230:3,7
232:25 237:19
241:21 324:9
**bank** 116:20
243:20
**bankrupt** 75:23
75:25
**bankruptcy** 76:5
**base** 237:11
**based** 33:16
159:13,15 160:7
161:6 256:19
259:12 280:23
281:5 287:2
313:10,13
**basis** 49:9 50:21
53:3,15 54:24
59:5 100:3 128:10
134:18 157:8
208:18,20 215:19
215:19 220:14
228:7,8,16,20
229:11 230:21
231:6,11 233:4,12
234:14,17 256:17
256:18 258:10
283:21
**bear** 149:3 170:14
206:8 207:25
260:8
**began** 36:16 69:3
102:11
**beginning** 5:19
36:15,24 66:10
132:22 278:24
287:25 288:14
**behalf** 2:4,10,16
6:20 101:24

105:25 106:10
111:7 121:18
138:13 139:5
153:11,20 197:10
199:16 206:3
207:7 216:24
227:10,17
**behavior** 278:25
**belief** 135:4
**believe** 13:10
18:13 26:13 27:14
27:16 28:8,23
34:12,24 35:20
36:7,24 37:23
41:23 42:24 44:24
45:13 55:2 56:15
57:5,12,14 58:9
60:6,6,16 61:11
63:18 64:17 65:17
69:13 71:7,10
73:18 74:21 76:2
76:20 78:19 87:21
95:5 96:5,15
106:5,18 107:23
108:12,15 111:9
113:23 117:4,7,16
119:11,16 120:7
120:11 121:9,21
122:15 123:8
124:25 125:16
134:5 135:22
137:2 139:6,8
149:7,25 153:4
158:23 159:6
163:10 167:22
171:24 174:10
175:21 176:10,11
179:5,9 185:20,24
188:25 192:14
194:14 196:4,17
197:22 199:20

200:2,10 203:18
204:8 206:5
213:16 214:12
215:17 217:7
218:9 223:16,16
223:22 224:9
227:21 229:22
236:2 238:20,22
240:4,14 241:19
243:12 244:6,10
244:21 246:6
249:25 250:2
251:3 255:2,21
257:6,7,22 262:13
262:20 265:2
267:8 275:23
279:25 291:7
292:11 293:2
297:19,22 301:2
304:5 305:14
306:24 311:3,9
312:25 313:12
318:14 319:4,21
**believed** 118:12
267:4
**benefit** 289:11
**benefits** 138:22,23
139:4 210:24
300:3
**best** 299:23
**better** 36:21
162:18 320:2
**beyond** 38:8
**bids** 311:25
**bilodeau** 2:7 6:4,5
125:24 136:3
154:22 169:2
182:14 183:7
186:23 190:8
193:21 205:14
259:21 265:7,14

**268:20,24 270:11**
274:22 277:23
285:16,24 290:21
301:24 311:15
**binder** 64:18
71:15,21 72:8,11
72:16
**binds** 7:24
**blocked** 11:9
**blood** 323:17
**board** 15:2 23:12
24:3,4,5,14 25:4,8
25:12 26:2,7,10,16
26:24 27:22 29:2
29:12,18,21,24
30:4,8,10,17,23,24
31:10,13,15,21
32:14,19 34:9,13
36:14 37:7,14,15
37:18 38:5 39:5,8
39:16,20 40:8
42:15 45:8 47:11
47:19 48:19,20
49:2,7,17,21,24,24
50:9,20 51:9,11,12
51:18,22 52:2,3,8
53:2,5,14,18 54:2
54:23 56:4 58:24
59:4,12,14 60:4,8
60:11,18,19 61:4
61:16,21 62:8,12
62:23,24 63:2,3,16
64:2,14 65:2,13,14
65:19,20,22,24,25
66:4 67:15 69:3
72:18 106:6,9,19
106:20 107:5,15
110:5,10,16,18
112:9,9 114:2
118:6,16,18,21,23
118:25 124:10

126:12 130:18,20
131:11 135:9,14
147:9 172:21
185:4 189:11
190:4 200:4,4,7,12
200:14,16 201:9
201:18,19 202:10
202:21,24,25
203:8 204:11,11
243:11 250:7,11
250:12,18,19,21
251:4,8,17 252:4
259:19,23 260:13
261:11 263:25
265:25 266:2
269:2,8,14,25
270:5,13,21,21
273:9,13,14
274:17,25 277:18
278:5,11,17
280:15 282:5
284:7 285:8 286:4
286:10 287:17,25
288:9,15,23 289:3
289:6,15,22
303:11 324:13,16
324:18,19,20,21
324:22
**board's** 49:11
247:15
**boarded** 25:24
**boards** 23:6,8 24:8
24:17,21 29:9
31:5 34:7,17
286:19,24
**bob** 2:22 162:11
183:3,6,22
**bold** 294:18
**bond** 16:14
**boockvar** 1:10
2:11 132:22

266:11
**bookkeeping**
32:24
**books** 181:5,23,24
214:4
**bothering** 9:19
**bottom** 126:17
127:25 156:11
227:23 232:10,20
275:8
**box** 146:18,18
**boyer** 17:24 19:13
19:17 20:20
**brasch** 2:22
**break** 10:21,23
11:3,5 66:8,23
130:6 143:3,6
290:5 321:3
**bridge** 261:3,17
263:9 277:2
291:11,12
**brief** 67:4 78:15
183:13 226:3
290:10 320:23
**briefly** 7:8 15:5
34:6 169:6 184:7
280:13
**broad** 56:11 97:12
**broken** 58:17
**broker** 17:8,19,22
**bulk** 98:9 279:4
312:13
**bullet** 140:17
141:3
**burn** 269:16 270:5
**business** 1:4 4:18
5:25 20:8,12 21:8
23:25 40:19 68:7
68:22,25 69:6,10
69:11 70:23 72:22
75:12,14,15,20,22

76:7,8,25 83:18
86:13,24 88:15
89:14 93:11
101:16 105:4
106:2 139:18
195:7,16,24 241:7
241:9,15 242:12
242:16,20 244:4,8
250:4 251:7,18
253:12,18,21
254:13 255:8,14
256:2,5,11 260:22
291:8
**buying**  242:24
243:2
**buyout**  18:4
**buyouts**  20:15

**c**

**c**  2:2 7:2 34:22
45:18 69:24
139:21,25 140:2,3
140:4,18,19 144:4
210:7,9 322:2
323:2,2
**cable**  16:22 18:18
**call**  43:15
**called**  17:9 20:23
25:9 29:17 73:9
77:23 123:25
139:7 146:5
234:20 278:12
**calling**  167:4
**calls**  73:23 75:17
76:11,18 77:4
80:9 84:24 85:9
85:24 87:16 89:2
89:25 90:18 175:4
189:6 200:18
201:21 241:18
242:11 257:21
259:4

**cancellation**
258:23
**cannabis**  31:10,13
31:21 32:3,12,18
**cap**  236:9,14
**capacities**  27:4
**capacity**  25:11
26:5 27:10 31:12
**capital**  20:23,24
21:3,6,8,14,18,23
21:25 22:3,6,9,25
23:2 26:3 36:16
36:18 37:4 42:25
94:20,24 95:6
96:5,8,13,19 97:5
97:8,18 99:18
126:14 151:3
155:18 163:24
210:13 214:2
227:17,25 229:10
232:24 237:19
241:4 269:9
270:22 295:22
297:3 300:10
308:19
**capital's**  21:7
**capitalization**
21:11
**card**  23:22,23
**carefully**  325:4
**carol**  69:20
**carole**  70:6
**case**  10:4,7 176:9
191:11
**cases**  19:5
**cash**  228:24
269:16 270:5
**castore**  1:19 5:5
323:6,24
**categories**  11:18
12:3,6

**category**  137:13
241:10 244:22,25
319:5
**caused**  213:10,13
**causing**  142:14
**caution**  213:20
**cco**  28:19
**cellar**  16:22 18:18
19:2
**center**  34:11
**ceo**  28:17 31:24
35:6,17,23 36:6,9
36:22 61:2 72:18
81:23 82:19,25
83:4,9 84:18,20
85:7 93:9 98:11
98:21 100:10,12
100:13,20 101:4
104:4,10,23
105:24 114:15
142:8 195:23
206:18
**certain**  33:5 40:22
76:21,23 105:10
117:6 160:5,6
189:8,9 208:3
216:6 287:3 306:6
**certainly**  292:20
**certification**  3:5
69:18 110:21
146:11,17,23,23
147:6 172:8,10,12
172:20 184:16,25
185:2,3 187:21
194:12 207:15
214:10
**certifications**  17:2
17:5 33:13 111:6
119:2 146:8 172:5
194:10 214:10

**certified**  1:19
**certify**  121:23
322:6 323:8,15
**certifying**  179:22
**cf**  121:22
**cfo**  28:17 108:2
121:22 206:6
208:4 246:22
247:4
**cfo's**  33:4,9
**cfr**  73:3 83:23
**chain**  265:18
**chair**  250:23
251:16
**chairman**  31:14
31:20 36:22 250:2
**chance**  126:6
169:5 175:23
194:2 199:9
226:17 260:4
265:10 291:2
**chance's**  197:15
**change**  97:11
235:5,5 248:12
273:18 289:9,19
326:7,9,11,13,15
326:17
**changed**  29:22
117:11 159:8,11
159:16
**changes**  65:3 84:7
112:7 131:16
248:7 325:10
326:3
**character**  51:6
**characterize**  57:20
142:18 271:8
**characterized**
242:20 320:15
**charged**  23:23

**charitable** 23:9 34:7
**charities** 24:20
**charity** 34:16
**chart** 58:7,10 137:3 139:21,21 139:25 140:2,4,9 140:12,13,14,20 141:2,2 152:15,20 152:25 215:7 241:12 242:19
**charter** 40:13 58:4
**charts** 139:21 140:10,18,18,21
**check** 72:15 181:13 187:16 206:10 224:16
**checking** 247:3
**chief** 108:2,5,9,18 108:23 111:15 120:20 146:24 172:8,14 206:19 227:15
**circle** 278:23 280:24 281:6
**circumstances** 135:16
**claim** 282:14
**claims** 8:24 267:10 286:25
**clarification** 19:6 23:13 25:15,18 39:10 45:16 50:14 69:21 78:24 89:4 142:21 153:7 167:6 179:15 184:21 186:21 187:13 188:7 193:7 202:7 207:18 213:7 215:21 218:6

219:11 221:23 226:25 235:9 249:11 252:6 258:13 264:6 268:7 272:13,18 276:9 279:9 286:2 286:21 287:13 288:21 290:18 291:19 294:6 307:6 315:13 316:18
**clarify** 41:17 52:5 54:9,12 88:14 92:3 96:23 119:14 230:2 232:8
**clarifying** 25:5
**clarity** 88:20
**clarke** 2:19 6:11 6:12 41:14 44:5 50:22,24 87:6 104:5 111:19 120:24 124:13 158:9 162:17 167:11 175:3 194:21 200:17 213:19 232:5,12 232:16 239:3 241:17 242:10 245:4 257:20 258:2 259:3 264:4 265:17 274:11 283:5 284:22 285:3 289:13,16 289:23 290:6 292:3 293:20 296:14 300:18,23 301:14,16 303:7 304:3,8,25 306:2,4 308:6 313:19 314:25 316:3,14 316:23

**class** 69:17 70:10 70:25 71:2,4,14,17 71:25 72:5,11,14
**classes** 33:20,21 34:2 70:4
**classified** 255:13 319:22,23
**clear** 24:24 35:14 43:23 48:20 221:12 299:20 319:15
**clearly** 167:12 245:7
**client** 11:25
**clients** 18:23
**close** 266:14 308:11 314:8,10
**closed** 314:13
**closeout** 181:20
**closing** 7:23
**cn** 269:22 275:14 276:25 294:13,19 294:21 295:9 296:10
**coined** 98:18
**collateral** 51:7 116:21 261:8,15 261:16 262:11,13 263:3,7 293:7,10 293:16 294:2 295:21 297:13,17 297:21,23 298:4 298:10,14 304:22 304:23 305:13,24
**college** 15:8,9,18
**columbus** 260:16 262:9 266:4,7,21 267:14,23 278:19 278:19 291:10 313:3,10,14 314:4 314:7,9

**column** 211:11 230:17 300:11
**columns** 210:8
**come** 29:6 34:20 34:23 35:5 36:11 47:21 48:16 60:25 72:17 89:18 126:24 168:19 177:4,11 179:3 180:4,24 250:6
**comes** 205:5 312:18 319:11
**comfortable** 236:10 266:13,15
**coming** 78:5 167:12 267:9
**comment** 65:23
**comments** 62:20 65:3,14,25 66:3
**commercial** 318:3 318:12,23,25 319:5,18,22 320:6
**commitment** 133:3,8,12,14,20 133:23 134:9
**committee** 14:6 25:21 26:12 30:6 39:25,25 40:6,9,12 40:17 41:4,9,12,20 42:4 43:10,12 45:7,11,13,20 46:10 47:2,7,16 48:13,24 50:9 60:12 110:10,13 111:17 112:4 118:4,10,15 122:6 122:9,10 189:21 189:21,25 190:15 190:17 191:16,17 192:24 193:11 197:6 199:21,23

201:3 203:13,19
203:20 204:4,16
244:3,8,12 245:11
246:13 247:19
249:15 250:3,22
250:23 251:2,15
**committee's**
244:16 247:15,17
**committees** 24:6
25:13,17 30:3
39:8,13,19,23
40:21,23 41:2
44:20,22 45:2
**common** 36:17
80:4 261:4 269:18
**commonly** 13:11
**communicated**
198:24,25
**communications**
265:19 287:3
**community** 34:10
**companies** 13:16
18:17 20:9 24:19
24:25 25:3,4,6
29:13,23,24 38:23
39:7 68:22 69:12
70:23 72:23 77:19
77:19,20,21
179:21 319:16
**companies's** 94:9
**company** 12:24
13:2,4,6,8,10,14
13:15 17:24 19:14
20:22 23:20 25:9
27:6,7,8 29:4,16
30:14,19 31:2,23
33:11 36:8,20,23
36:25 38:24,25
40:19 42:13,15
44:14,15,17 52:10
68:8 69:6 75:15

75:22,25 76:9
86:13,24 88:24
93:13,21 95:23
96:21 97:10,22
98:17,21 101:8,25
103:9 105:5 106:2
116:11,25 119:3
128:3,8,17 129:19
130:3 132:5,24
134:9 135:10
137:14 138:5
139:4,23,24 141:8
141:14 142:3
195:8,17,24 206:4
212:12,13 215:13
223:5 228:12,14
228:24 230:4,4
247:24 260:25
261:7 270:3,8
272:25 273:5,10
273:19 275:15
276:13 279:2
285:10 301:4
308:25 319:2
**company's** 38:7
38:13,15 93:20
134:12 191:21
205:23 237:10
261:3,16 269:15
269:17,20 307:13
**compared** 224:25
**compensated**
103:17
**compensation**
30:5 39:24 103:22
104:2 138:4,12
**complaints** 12:19
12:20,22
**complete** 18:24
204:20 269:21
276:17 322:10

**compliance** 40:3
106:11 181:3
211:2
**compliant** 113:24
**components**
158:10
**comprise** 94:16
**comprised** 94:13
94:14
**computer** 56:25
**concentrated**
16:20
**concentration**
179:25
**concern** 222:25
**concerned** 259:6
**concerning** 260:22
**concierge** 2:22
162:10
**conclude** 321:14
**conclusion** 73:23
75:17 76:11,18
77:4 80:9 84:24
85:9,25 87:16
89:3,25 90:18
175:4 189:6
241:18 242:11
257:21 259:4
**concurrently**
191:19 193:3
**condition** 10:17
228:12,14
**conditions** 91:3,5
**conduct** 116:11
122:12,17
**conducted** 114:6
114:24 115:17
116:4 117:18
124:16
**conferences**
218:23

**confirm** 145:13
206:9 224:7
**confirmed** 224:2
**conflict** 73:9,11,20
79:4
**conflicts** 73:16
**confused** 130:14
221:2
**confusing** 131:19
200:21 201:4
**confusion** 202:5
225:4
**conjunction** 31:24
**conklin** 41:3,11,21
42:3 43:4 44:4
**connection** 79:22
156:14 222:22
261:3
**consent** 201:25
202:24 203:3,15
**consider** 46:15
99:19 135:14
269:25 270:6
**considered** 40:8
40:10 58:19 64:19
71:11 248:16
262:6
**considering** 20:14
134:22
**consist** 125:18
185:17
**consisted** 124:21
312:7
**consistently**
219:24
**consisting** 293:11
**consolidated**
109:18 128:10
136:24 137:5
208:17,20 212:9
212:15 228:2,7

230:21 232:25
**consolidation**
212:6,13 213:11
214:6
**consternation**
142:15
**constitute** 123:2
259:2
**constitutes** 113:16
**constituting** 97:21
**constructed**
211:17
**construed** 100:9
**consult** 311:20
**consultation**
316:10,20
**consulted** 310:23
314:16,20 315:19
316:7
**consummation**
313:16
**contact** 196:25
**contacts** 312:3
**contained** 54:24
57:24 219:18
**contains** 84:4 91:2
104:12 282:8
**contemplating**
292:7
**content** 92:18
**context** 135:5
201:14 258:24
267:21
**continue** 4:12
15:18 17:17 47:17
321:4
**continued** 48:8
144:13
**continuing** 126:18
**contract** 103:19
103:21 138:2,21

**contracts** 137:22
138:7,9
**control** 82:10,14
82:15,21 83:6,11
248:19
**controller** 103:2
121:10
**controls** 116:25
117:14,20 125:3
125:10,10,12
214:21 223:4,10
242:18 249:8
289:9
**conversation**
14:18
**conversations** 4:9
14:16,21,25
268:12
**converse** 200:11
**cooper** 70:6
**copies** 63:13,22
130:12,18,25
145:4,7,21 163:6
169:14 299:18
**copy** 53:19 62:2,7
62:11 118:8
130:20,21 131:3
131:11,17,17,22
132:19 145:4
169:10 170:6
176:7 194:7
197:12 199:18
205:22 206:16
227:14
**corner** 9:16
149:10 173:18
177:12
**corp** 1:5 4:20 6:3
95:6 96:5,9,14,17
97:18 147:9 151:3
155:17 209:25

237:18
**corporate** 18:11
23:9,11 24:8,21
25:23 29:9 30:11
31:5 38:9,17,20
45:11,20 46:11
47:3,7,17,23 48:9
48:14,21 50:20
57:11,13 307:4,15
309:6,9 310:12,13
312:8,14 317:25
318:12
**corporation** 26:4
31:11 155:18
163:22,24 210:13
214:3 227:18,25
229:10 237:20
241:3,4 269:9
**correct** 37:10
48:10,11 49:3
66:13,14 67:18
77:2 87:14,20,24
88:5 89:16 91:6,7
104:24 110:11
113:7,8,10,11,14
119:4,25 121:5
122:14 147:4
154:14 156:4,6
158:24 163:25
164:2 165:25
166:19,20 168:4
172:15 184:24
185:5 187:22
195:17 206:23
207:2 208:18
210:4 211:12
214:11 217:13
227:20 237:3
253:14,15,21,22
254:6,21 256:7,8
261:13 276:20

279:7,24 287:20
295:15 297:14
302:21 303:3,6,9
305:3,25 306:12
306:13,17 312:8
313:12 314:8,15
314:19 315:23
316:5 318:7,9,13
318:15 319:3
322:10,14
**corrections** 66:2,3
325:4,6
**correctly** 114:19
152:9
**corresponding**
302:19
**counsel** 3:4 5:12
281:11 321:9
**counterpart**
198:23
**county** 322:4
323:4
**couple** 10:11
68:17 206:25
207:10 281:19
**course** 135:17
223:2
**court** 1:2 3:14
4:22 5:5,16 6:24
9:10 10:25 12:15
274:5 279:20
325:17
**cover** 25:3 52:3
165:23 169:12
**coverage** 69:16
**covered** 71:24
72:4,8
**covering** 196:23
199:12 253:2
**covers** 253:9,11

**create** 152:17
153:2
**created** 215:3,4
313:24
**creates** 153:5
**credit** 23:22,23
**credited** 157:23
158:7,21
**creditor** 91:21
92:8 257:19,24
288:17
**creditors** 274:9
289:12,21
**cross** 25:14 50:13
187:12 200:22
232:2 238:3
**cumulative** 154:8
154:12 175:5,6,9
175:16
**cure** 34:22 281:12
**current** 34:25
269:15
**currently** 34:9
35:3
**custodian** 299:5,7
299:11
**custody** 298:13
**cutting** 115:13
**cv** 1:3 4:24

**d**

**d** 7:2 23:16 45:18
139:21,25 140:2,3
140:4,9,12,13,18
140:19 144:4
211:19 213:6
322:2 324:2
**data** 141:9
**date** 1:18 50:5
55:8 69:15 75:4
97:14 105:19
135:3 136:2 137:4

137:7 144:20
154:21 156:22
157:3 168:25
170:23 183:21
185:15 186:13
190:7 193:20
196:11 205:13
216:11 218:12
226:14 236:15
256:22 257:23
259:17 260:2
265:6 268:21
269:5 270:16
274:21 277:21
286:7 290:24
311:13 325:8
326:21
**dated** 105:16
135:24 136:20
145:18 168:22
170:20 182:17,18
190:4 226:21,21
226:22 236:20
253:19 259:23
264:25 265:4
269:2 270:13
274:17 277:18
286:4 290:22
311:11 313:6
317:12 324:7,8,10
324:11,13,16,17
324:18,19,20,21
324:22,23,24
**dates** 24:13 37:24
166:7 189:7 198:3
**david** 140:12
**day** 11:8,9,9 31:23
31:23 42:14 93:12
93:12,17,17,18,18
99:7,7,9,9 100:3,3
100:23,23 101:5,5

101:7,7,16,16
153:14 218:10,10
321:5 322:19
323:21
**days** 108:15
197:22 198:6
325:14
**dc** 15:11 217:23
**dcap** 29:17,22
30:4,9
**de** 212:6,9,13,15
213:11 214:6
228:7 230:21
**deal** 73:4 83:17
92:25
**dealer** 17:8,19,22
**dealing** 73:7,16
84:17,22 85:5
179:20 262:25
**debenture** 89:22
90:23 91:2,12,21
92:8 93:5 133:15
133:25 220:17
**debentures** 90:5
142:11,20,23
283:4
**debt** 258:6,7,16,18
258:22,23 283:15
302:19
**dec** 274:18 324:20
**december** 19:18
28:9 143:2 145:9
149:17 151:9,17
153:17,24 154:4
160:18 164:4,5,13
165:24 182:10
185:11 186:5
228:12,15,18
229:10,25 230:19
230:24 234:13
235:4,18 236:3,16

250:25 253:13
256:4 267:24,25
274:16,25
**decide** 17:16
132:23
**decision** 106:19
**decisions** 32:2
61:19 106:8,10,20
107:6
**declaration** 208:5
**deemed** 325:16
**default** 42:11,14
275:13,14
**defendants** 1:12
2:10,16 6:13,18,22
7:15
**defined** 79:25
276:7 292:21
**definitely** 217:5
**definition** 79:16
82:14 243:7
**degree** 15:12
16:25
**delay** 134:4
142:20
**deliver** 281:16
**delivered** 11:25
51:16 181:18
312:25
**denied** 279:24
**department** 16:19
18:11
**depending** 141:15
180:14
**deposed** 9:24
**deposing** 325:13
**deposition** 1:17
3:6,12 4:16,25
7:10 8:11 10:10
11:19 14:22 15:3
114:12 321:4,13

321:15 322:8,12
323:10 325:3,11
325:14,16
**derived** 152:6
**described** 60:15
130:8 148:6
152:17 172:11
247:9
**describing** 225:9
**description** 167:18
167:24 168:8,12
168:15
**designated** 40:11
**desire** 315:17
**desks** 312:2
**detail** 159:22
**detailed** 49:18
50:3 58:16 86:6
113:25 161:17
318:20
**details** 77:14
162:2 217:18
**determination**
273:10 288:24
**determine** 129:17
272:24 273:4
285:9 289:4
**developed** 30:16
**development**
241:7,9,15 242:13
242:16,21 244:4,9
250:5 251:8,18
253:12,18,21
254:13 255:9,14
256:2,5,11
**diagram** 294:11
**dictate** 203:21
**difference** 122:23
130:24 181:25
182:4

**different** 16:4
19:22 21:21 22:19
22:20 55:13,19
57:5,6 58:18
93:24 98:23 99:25
100:7 102:7
104:25 109:10
111:14 123:20
141:13 161:9
207:5,24 219:22
224:23,24 234:8
312:2 319:10
**differentiate** 320:3
**difficult** 131:20
**diligence** 18:22
**direct** 121:12
262:20 270:25
**direction** 191:16
**directly** 242:14
**director** 6:17,21
27:16 67:16
**director's** 211:2
**directors** 29:13
39:20 43:21 51:17
60:8 80:5 106:7,9
200:5,13 251:17
269:8 270:22
321:11
**disagree** 33:3
**disagreement**
32:21,23
**disbursements**
55:22
**disclosures** 208:2
208:3,6
**discovered** 259:9
**discovery** 11:25
12:10 163:7 287:4
**discretion** 267:14
267:16,21

**discuss** 40:19,22
44:4,22 45:2
46:10 59:15 273:9
286:25
**discussed** 44:12,13
44:20 49:24 51:21
59:21,22 60:5,18
61:16 215:18
216:8 218:21
220:11,12,18
221:6,10,11,16
269:15 283:25
286:20 287:18
288:2
**discussing** 60:9
191:4 273:7 284:9
284:11
**discussion** 26:8
68:9 126:19 127:5
127:19 134:6
216:25 219:4,17
220:2,6,21 221:18
222:4 225:22
235:16 256:15,24
259:11,16 272:10
272:23 282:13,21
282:25 283:8,20
285:7
**discussions** 30:24
38:2,11,20 46:4
48:15,17 104:20
105:2,8 215:25
262:8
**disposals** 312:4
**distinction** 148:11
182:4,5
**distinguish** 120:17
**distinguishing**
102:8
**distributed** 53:19
54:2 55:7,9,10

74:15
**district** 1:2,2 4:22
4:23
**diversity** 267:11
**divorce** 10:6
**document** 51:4,4
51:15 56:10 58:17
64:9 82:3 112:8
116:22 118:11,12
118:14 131:7,10
131:13 136:14,18
136:23 137:11
141:13 145:24,24
164:13 171:9
172:24 174:2
176:13,23 177:14
177:17 208:8
232:23 234:9
253:19 257:16
260:7,12 264:17
264:19 293:4
**documentation**
162:3 243:25
**documented** 223:9
223:10
**documents** 7:14
8:9,13 11:17,18,23
12:3,10 13:24
14:3 46:14 52:8
53:20,25 54:23
55:4 56:3 131:8
166:8 179:15
193:12 240:23
298:20,21,24
299:3,6,8,13,14,16
299:19,20,24,25
300:2
**doing** 10:14 20:14
75:5 107:16
142:15 325:7

dollar  150:12
154:13 248:24
249:15
dollars  150:9
dominic  102:22,23
102:24,25
draft  52:25 53:19
53:21 62:2,7,11,20
62:22,25 63:4,13
63:19,22 64:6,7,8
64:16 65:15,18
110:9 111:16
118:5,6 120:22
121:3,5,7,19 122:5
130:19 131:16,17
162:9 163:19
168:3 188:14,18
190:14,19 194:7
194:14,17,18
222:17 264:15,19
264:22
drafting  109:22
drafts  163:4
drop  215:9,11,12
dropped  162:12
due  18:22 107:13
139:14 142:19
150:23,25 151:2
151:15,22 152:2
174:14 175:10
185:9 188:2,4
197:22,22,25
198:2,4,9 209:9,25
213:12 214:13,15
214:19,22 215:8
215:15 216:2
219:4 220:2,21
221:7 222:5,20
223:7,15 224:3,17
225:19 246:24
276:15 284:20

301:8 302:7,25
303:25 305:20
308:5
duff  168:10
duly  7:3 323:11
duplicative  12:8
dutied  288:16
duties  99:24 100:5
100:10,23 101:4
108:17,22 129:23
135:13 142:8

e

e  2:2,2 7:2,2 12:7,8
13:24 14:5 29:15
43:13,18,19 46:18
46:21,21,23 49:22
51:12 144:2,2,4,4
170:20 179:16
264:25 265:4,19
265:24 266:10
268:4,9,13 290:22
311:10,11 322:2,2
322:2 323:2 324:2
324:5,11,17,23,24
326:2
eafc  95:6,7,7
earlier  101:20
234:20 301:8
306:7
early  29:25 36:9
earnings  246:23
easier  9:10 166:13
eastern  1:2 4:4,23
eclarke  2:20
economics  15:16
edgar  205:10,22
205:24 226:11
324:14,15
education  15:19
educational  15:6
17:2,3

effect  3:13 228:9
231:7 313:10
egnyte  75:6 78:9
eight  85:13
either  15:25 51:16
95:24 121:24
160:7 209:18
237:10
elected  315:21
electronic  171:23
197:11
electronically
51:16 111:2
199:17
eligible  75:12
eliminated  214:5
elizabeth  2:19
6:11 162:16
232:15
elk  1:5 4:19 6:2
13:12,19,22 14:7
26:3,6,11,17,25
27:12,19 28:4,12
28:21 29:7,11
35:5,7,17 36:6,13
37:16 38:4,22
39:3,6,13,18 40:14
40:18 41:5,10,13
41:20 44:23 48:25
53:9,12 54:5,15
57:11,18,25 58:13
59:4,14,16 61:2
67:16,18,21 68:2
69:4 71:11,12
72:17 76:15 80:6
80:12 81:3,22,24
82:18 83:4,6
84:18,21 85:6,18
85:21 86:12,20,22
87:13 88:4 89:15
89:20 90:5,14,21

91:9,18,21 92:5
93:10,19 94:21
95:6,9,12,18 96:5
96:8,9,13,16,18,18
96:24 97:5,8,18
98:8 99:8,9 100:2
100:14,20 101:4
101:11,14,14,18
103:12,16 104:4,9
104:23 105:9,25
106:2,10,21 107:7
107:17 108:11,19
108:24 109:6,16
109:21 110:23
111:7 119:17
120:20 122:21,22
124:24 125:5,8,13
125:14 126:13,25
128:9,22 129:12
129:24 133:2,7,20
133:22 138:14
139:4,6,10 142:9
146:9 147:9,23
148:2 149:22
150:4,7 151:3,10
151:23 152:3
153:11,18,23
154:3 155:16
156:13 157:11,13
157:24 158:7,8,20
158:22 159:3,7,14
160:7 161:7
163:14,21 164:15
166:23 171:22
173:4,23 174:19
174:25 175:15
176:15 178:22
179:4 181:19
185:10,17,18
186:3 188:6,24
189:3,10 191:4

192:6,23 195:7,15
195:21,23 196:8
196:14 197:4,4,10
198:24 199:16
200:5,24 201:6,11
208:22 209:9,11
209:18,25 210:14
211:14,14 212:7,9
212:10,17,17,19
212:19 213:11
214:4,6,16,21
215:16 216:9,17
216:24 219:19
220:8 221:7 222:7
223:14 227:8
228:9 230:15
231:13 233:6
236:24 237:17,23
238:12,16,24
239:2,12,18,23
240:6,12 241:2,13
243:15 251:6,19
252:18,20 253:20
255:13,18 256:6,9
256:18 257:2,11
257:18,19,25
258:15,25 259:13
259:17 260:17
261:5,5,8,22,23
262:3,4,5,5 263:3
263:5,8 273:20
277:10 278:5,11
280:11,15,16
282:5,12,14
283:12,22 284:14
284:21 285:2,10
286:11,24 288:8
288:17,24 289:5,9
289:19,21 291:6
292:24 293:11,18
295:14 297:8,18

298:9,11,13,23
299:2 300:10,16
300:21,24 303:25
304:15 305:16,17
305:18,20,25
306:12,21 307:11
308:2,5 309:20,25
310:6,13,19
311:19 314:2
315:23 317:3,4,7
317:22 318:2,3,11
318:17 319:3,12
319:20 320:6
elk's  77:16,17
87:19 88:2,23
91:11 92:7 94:13
94:14 101:18
127:9,10,21,22
162:25 163:6
176:5 177:4
198:18 202:13,19
252:8 274:9,9
283:3,14 289:10
289:11,21 299:15
300:6 310:24
312:7,9 314:17,22
315:17
elks  43:3 286:20
ellen  286:17,25
elliott  1:10 2:10
employed  35:3
employee  32:15,19
102:15,20 103:5
116:22 210:24
301:3
employees  139:11
139:13 161:21,21
employment  15:24
18:7 20:21 35:2
103:18,20 137:22
137:25 138:7,9,21

ended  145:9 150:7
173:25 184:20,23
191:18
ends  140:8
engage  91:18 92:5
93:2
engaged  89:20
119:17 223:25
308:19
enter  66:18 92:22
entered  41:6,10
160:20 237:23
238:9 252:24,25
254:11 260:24
262:8 280:8
entire  40:8 48:21
50:9 114:12
entities  21:21 96:9
249:10
entitle  300:2
entitled  78:22
entity  160:9
entries  131:22
159:23 164:5,22
190:24 211:6,8
239:22 244:17,25
245:11 246:9,14
247:7,14,20 248:5
248:7 249:5,14
253:16
entry  157:2
164:14 167:24
209:8 224:3
239:17 240:25
246:25 248:11,13
248:17 249:18,24
294:18 314:2
equal  248:22
equities  20:17
23:4

equity  16:15 77:18
77:20,23
errata  325:6,7,10
325:13
errors  121:15
esq  2:6,7,13,14,18
2:19
essentially  177:13
establish  13:5
estimates  213:16
et  4:21
etra  1:9 292:13,17
evaluate  43:21
309:6,9
evaluating  20:12
281:14
event  226:24
227:4,5
eventually  266:14
evidence  32:5
104:6
exact  37:24
exactly  217:16
examination  8:20
14:8 144:13
179:13 180:19,20
180:23 181:16
323:12 324:3
examine  180:25
181:2,5,24
examined  7:6
144:7
examiner  180:24
example  7:16
28:17 263:22
exceed  244:17
245:2
excerpts  162:24
162:24
excess  245:12
246:15 247:21

295:22 297:2,3
302:8 303:3,5,21
303:25
**excluding** 231:13
233:6 308:2
**exclusively** 319:6
**excuse** 8:15 20:24
31:11 32:15 42:19
43:23 51:18 110:6
116:23 162:10
212:8 215:20
241:12 247:17
291:14,15 298:21
320:4
**executed** 260:14
261:25
**executive** 31:14,20
227:16 307:25
320:14
**exercising** 29:3
**exhibit** 74:25 75:3
75:9 78:2,20,21
80:19 81:14,16,18
85:14 105:14,18
105:21 125:21,25
126:2,7,10 130:7
130:12,15,15
131:10,18 132:10
135:21,25 136:4,7
140:24,25 144:15
144:16,17,19,21
144:24 145:2
154:17,19,23,25
155:4 162:8
168:20,23 169:3,6
169:7 170:17,21
171:5,8,12,14
175:21,21,22,24
176:4 177:7,8,10
178:4 182:11,13
182:15 183:4,20

183:23,25 184:2,3
184:8 186:10,12
186:14,24 187:3,6
189:25 190:5,9,10
190:13 193:19,22
205:12,15,20
206:15 226:10,13
226:17 235:23
237:12,16,17
250:6 254:6,8
259:22,24 260:4,5
265:5,8,11,13,18
268:25 269:3,6,7
270:12,14,18,20
271:15 274:20,23
274:24 277:19,24
277:25 278:4
285:25 286:5,8,9
290:17,20,21,23
291:2 293:5
301:20,24,25
302:3,5,14,15,17
302:22 305:5,7,13
308:11 311:8,12
311:16,18 313:5
324:6,6,7,8,8,9,10
324:11,12,12,13
324:14,14,15,16
324:17,18,19,20
324:21,22,23,24
**exhibits** 123:10
177:16 183:2
257:17
**exist** 22:17 53:5
54:8 107:19 114:9
297:22 299:16
**existed** 22:16,18
114:13 297:20
**existence** 216:4
220:12

**existing** 99:15
261:6
**exists** 22:15
**expand** 38:7,13
**expecting** 267:2
277:12
**expense** 139:16
167:20 168:9
241:8,10,16
242:16,21 249:17
253:12,21 254:13
256:3
**expenses** 139:18
151:23 153:11
156:17 159:24
160:2,6 161:6,10
161:14 163:13,24
164:6,17 165:2
166:18 174:24
175:14,17,19
185:18,21 188:23
210:21,22,23
211:3,4,13,15,23
212:14,18 214:2
223:6 237:20
238:9,18,25
241:23 242:13
244:5,9 250:5
251:8,18 253:18
255:9,14 256:12
**experience** 33:17
33:17 74:13 301:5
**explain** 87:10
**explained** 124:25
**extent** 77:18
216:15
**external** 112:4,12
112:16,20 116:24
148:8,10 308:20
309:3

**f**

**f** 7:2 23:16 144:2,4
323:2
**facilitate** 312:3
**facilitating** 18:22
**factors** 86:21
152:8
**facts** 32:5 104:6
**fail** 325:15
**failure** 281:16,17
314:11
**fair** 208:9,25
224:18 228:23
229:15 230:6,9,13
230:22 231:3
233:9,19 234:10
234:11 235:7
293:15,16,22,23
293:25 304:22
**fallen** 275:21
**falls** 241:10
**false** 267:10
**familiar** 90:7
196:7
**familiarizing**
218:11 234:9
**family** 292:13,15
**far** 33:18 258:3
**fault** 235:11
**favor** 275:17
**fcc** 19:2
**feb** 277:19 324:21
**february** 184:18
277:17 278:6
280:14 285:7,14
285:21 298:2
303:12 314:21
315:4,25
**fed** 121:11
**feel** 145:14

**fees**  210:25 211:2
211:2
**feinsod**  1:8,18
2:16 4:1,17,21 5:1
6:1,10,13 7:1 8:1
8:12,21 9:1,23
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1,10 68:1,12
69:1 70:1 71:1
72:1 73:1 74:1
75:1,19 76:1,12
77:1 78:1,3,19
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1,6 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1

112:1 113:1 114:1
115:1,4,16 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1,3 127:1
128:1,2 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
144:14 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
157:5 158:1 159:1
160:1 161:1 162:1
163:1,5 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1,24 184:1,3
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1,19
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1

226:1,9 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
260:21 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1,4
273:1 274:1 275:1
276:1,13 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1,25 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1 306:1
307:1 308:1 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:9
321:14 322:6,16
323:9 324:3
**feinstein**  1:8 2:16
6:10,14 14:21
146:24 172:13
187:22 206:19
207:14,17,21

321:9
**feinstein's**  8:10
208:5 243:18
**felt**  134:20
**fiduciary**  288:16
**figure**  106:18
235:23
**file**  56:20 206:16
217:12 219:10,15
**filed**  4:21 12:20,20
57:4,14,24 76:5
109:23 111:6
112:2 113:9 117:2
118:7 119:3 147:2
169:14 171:24
179:20 191:19
193:2,12 196:21
197:5 199:10,14
206:17 300:21,24
301:3
**files**  58:13 116:20
116:21,23 197:10
**filing**  3:5 52:15,16
53:18 56:19 57:8
57:10 110:21,22
110:25 111:3
124:11 170:11
191:5,20,21 192:5
192:25,25 193:3
201:25 203:9
205:21,22 206:4
209:3 221:16
227:5,9,14 231:7
231:11
**filings**  13:23,23
**fin**  69:20
**final**  64:19 112:7,7
118:12,13 124:10
162:6 244:12
263:23 264:10

**finance** 23:19,19 276:15
**financial** 16:11 56:3 57:17 58:2 87:4 89:21 91:10 91:19 92:6,7 93:3 105:10 108:2,6,10 108:18,23 109:2,8 109:14,14 111:15 112:23 113:6 119:21,22,25 120:21 122:21 123:6 124:23 125:14 129:8 135:6,18 136:21 146:25 161:18 170:6,17 171:21 172:9,14 176:5 177:3 178:21 181:12 206:20 228:10,14 234:6 236:18,22,24 237:7 247:6 248:12,13 269:16 294:19,23 298:7 307:14 318:20
**financially** 5:10
**financials** 54:4 109:18 119:18 169:20
**financing** 75:14,21 76:7,15 77:5,7,10 77:12 87:14,18 90:11,16,22 269:21
**financings** 58:12 76:24 77:24,24 90:11 176:21 217:10
**find** 152:22

**fine** 143:7 182:2
**finish** 8:4 9:5,7 218:19 238:5 279:13 319:13
**finished** 151:7
**finler** 70:6
**firm** 5:3
**firms** 16:5,10
**first** 45:12 56:18 131:4,12 132:18 145:11,16,17,17 165:17 170:2 184:4 187:15,17 194:23 269:13 271:14,20 275:4 288:13 294:18,18 317:21
**fiscal** 137:24 138:4 138:14 147:23 148:3
**fit** 244:21
**five** 66:8,23 131:4 207:9 268:2 290:5
**fixing** 9:13
**flip** 177:10
**flipped** 205:16
**flipping** 205:18
**floor** 2:5
**flows** 153:3
**flux** 219:24
**fly** 271:7
**flynn** 2:4 5:22 6:6
**fm** 164:25 167:19
**focus** 38:14
**focused** 21:10
**folder** 75:9 311:10
**follow** 45:11 47:2 111:13 124:6
**followed** 47:7 50:19 61:23 109:7 192:23 202:20

203:24 214:23 223:5 251:7
**following** 45:21 46:11 47:16,23 108:13 191:21 278:18 296:16 314:2 326:3,4
**follows** 7:6 58:10 144:8
**fonda** 179:16 198:20,20 215:18 215:23,25 216:13 216:25 218:8 219:16 220:3 221:6 222:19
**footnote** 213:6
**force** 3:13
**forced** 246:22
**fordham** 15:22 34:5
**forgetting** 233:23
**forlenza** 130:21 286:17 287:2
**form** 3:9 41:15 44:6 49:14 50:25 53:17 58:8,9,15 59:7,18 60:14 80:20 85:24 87:7 91:14 106:14,25 107:11,14,22 109:17,19,23 110:4,14,22 115:11 116:7,15 121:12 123:21,25 124:13 125:7 127:16 134:15,25 144:18 145:5 147:15,20 152:10 152:24 165:6 169:15 170:11 174:21 182:18,18

182:20 183:19 184:11 186:11 187:10,18 190:25 191:5,18,22,24 192:6 193:6,18 194:3,7,17,18,22 195:2 197:5 199:25 200:9,18 202:4,16 203:17 204:7 205:11 212:22 219:16 220:11,24 221:22 222:9 224:20 225:3 226:12,20 226:21 237:5 238:14 239:4 244:20 245:16 249:21 250:9 251:11 264:5 274:11 278:15 280:18 283:5 284:23 285:4 289:17,24 290:2 293:21 296:15 298:16 300:23 304:4,9 305:2 308:7 313:20 315:2 324:8,12,12 324:14,15,16
**forma** 211:10 212:2,4 213:15 227:25 228:4,8,16 228:19 229:11,13 229:22 230:5 231:6,10 232:24 233:4,12,20 234:13,16 258:10
**formal** 43:4 45:6
**formally** 46:3
**format** 58:3

**formed** 20:22 58:6
**former** 14:25
**forms** 123:21
  179:19
**formula** 159:12,15
  160:5 161:5,9,12
  161:14,15,23
  163:9
**forth** 141:13
  257:10 323:11
**forward** 166:5
**forwards** 166:3,9
**found** 8:10
**foundation** 32:6
  195:19 200:19
  202:16 244:20
  245:24 250:9
  251:12 274:2,12
  280:18 283:6
  284:23 289:17,24
  292:4 300:19
  313:20 315:4
  316:4,15,24
  317:14
**four** 139:20
  164:20 254:17
  255:6 267:25
  271:14 284:9,10
  303:21
**fourth** 148:23
  155:19 185:23
  287:19
**frame** 47:6 90:19
  92:15 97:12
  100:11 179:6
  192:9
**frames** 102:7
**freesamples.com**
  25:9,23 29:10
**front** 79:9 98:25
  99:5 231:17 236:6

236:19 248:24
  251:22 286:12
**fulfill** 38:4
**full** 11:9 19:14
  48:20 62:24 63:3
  112:9 116:21
  152:14 202:25
  278:22 280:24
  281:6 286:15
  288:13 304:14
**fully** 176:11
**function** 68:17
  101:6
**functions** 31:23
**fund** 243:22
**fundex** 42:24
**funding** 1:5 4:20
  6:3 23:15,16,17,18
  24:12 26:3 29:10
  38:8 96:16 126:13
  147:9 155:17
  163:22 209:9,25
  237:18 241:3
**funds** 126:23
**further** 3:8,11
  126:22 144:7
  323:15
**future** 269:22

## g

**g** 23:16 29:15
  154:18 322:2
  324:9
**gary** 1:8 36:21
  37:17 41:22 43:2
  43:20 44:3,14,16
  45:14 46:4 47:22
  48:6,15 102:10,10
  102:18 104:20
  108:13 121:24
  139:12 246:21
  249:6

**gary's** 247:4
**gathered** 103:3
**general** 12:2,5,22
  30:10 31:10,13,19
  31:21 32:3,12,18
  32:21 33:10 50:7
  50:18 51:19 53:8
  53:13 54:13 61:6
  61:12,23 62:8
  63:7,21 64:23
  65:8 66:16 83:17
  89:14 90:21 95:5
  107:2 108:17
  109:5 110:2
  111:11,25 112:12
  116:13 148:7
  154:16 156:8
  162:25 163:6
  167:25 180:7
  222:15 241:11
  246:15 247:13
  252:2 291:8
  306:14 309:5
**generalized**
  245:19
**generally** 16:9,17
  18:14 26:15 27:2
  44:2 52:22 53:22
  59:4 60:19,24
  61:9 78:21 90:7,9
  90:20 92:5 93:10
  99:8 106:11
  108:23 117:24
  120:9 121:7,11
  122:9 123:16
  125:2 126:6,10
  128:22 129:2
  136:7,9 142:6,10
  144:25 151:14
  153:16 155:4
  156:24 158:18

159:25 215:24
  246:3,4,6 247:18
  260:5,12 311:17
  311:19
**generated** 152:10
  154:10
**george** 15:10 34:4
  34:13
**getting** 36:20,21
  142:20 201:24
  218:11
**give** 9:5,6,8 10:13
  10:18 66:17 79:16
  81:14 82:2 146:13
  173:19 179:17
  184:9 192:8
  194:24,24 235:23
  268:16 310:22
**given** 100:5 135:2
  152:25 240:23
  247:2 315:12,15
  315:20 322:13
  323:13
**giving** 228:8 231:7
**gl** 181:6
**glare** 7:21 9:16
**glauberson** 2:23
  5:3
**go** 4:13 15:21 44:8
  78:10 82:10
  111:21 112:12
  118:3 122:5,8,9
  124:10 132:13
  139:19 142:25,25
  144:16 145:12,15
  145:21 147:11,12
  148:19,22 149:5
  150:18 154:16
  162:15 163:7,17
  166:2,4,4 168:18
  170:25 171:4

172:25 173:16
175:20 177:7,9
178:3 179:8 181:5
181:6 182:8,22
183:8 184:14
185:6 186:10
187:15,19,25
188:2 189:20
190:23 193:16
194:9 205:7,8
209:2 210:10,17
211:18 213:2
218:19 226:9
231:19 237:12,15
238:4 252:10
254:23,25 259:19
269:12 270:9
271:22 275:8
285:19,22 287:16
288:12 293:4
301:19,19 302:22
305:6 309:11,12
311:8 320:19
**goal** 204:12
**goes** 176:18
**going** 4:3 7:10
8:23 39:3 51:4
67:2 78:8,13 86:2
97:13 115:10
122:19 135:6
143:9 162:19
166:3,7,24 183:11
186:23 194:23
213:20 216:12
218:12 225:25
229:3 290:8
300:16 317:11
320:21 321:16
**good** 4:2 6:15 8:21
66:7 144:14
181:21

**gotta** 133:17
**gotten** 178:11
282:24
**gottesman** 2:4
5:22 6:5
**gottesmanlaw.c...**
2:7,8
**governed** 106:19
**government** 57:20
68:21
**governs** 92:21
**graduate** 15:13
**graduated** 15:14
18:6
**graduating** 15:23
**graduation** 16:23
**granito** 102:24,25
**granoff** 1:8 36:21
37:17 38:2,11,21
41:22 43:3 44:3
45:14 46:5 47:22
102:11,18 104:21
104:22 105:3,9
107:25 121:24
126:19 139:13
246:21
**granoff's** 108:13
**great** 89:13 144:22
146:2 160:16
**grew** 221:14
**ground** 181:12
**group** 29:18
**guaranteed** 90:13
**guarantor** 263:8
**guess** 13:17 37:20
40:2 46:15 58:5
69:25 84:6 121:14
160:12 162:4
172:17 179:5
181:2,4 186:19
213:9,15 216:11

220:13 241:11
246:10 247:8
**guidance** 215:4,5
215:14 242:22
**guided** 58:3
**guidelines** 79:3

**h**

**h** 7:2 144:4 324:5
**half** 10:22 11:6
140:9 143:6
218:10
**hand** 71:5 149:10
173:18 177:12
323:21
**handful** 218:13
**handle** 41:4,9
**handwriting**
271:6,19,21 275:6
**handwritten**
271:11,18 274:19
275:5 324:21
**handy** 152:21
**hanover** 2:5
**happened** 141:15
189:8 213:11
226:24 254:2
317:17
**happens** 63:4
68:14
**happy** 11:14
207:11
**hard** 169:10 170:6
197:12 199:18
232:19
**hashem** 2:18 6:8,8
32:4 43:7 49:13
66:24 67:19,24
73:13,22 75:16
76:10,17 77:3
80:8,15 81:6
82:22 83:13,24

84:23 85:8,23
86:14,25 87:15
88:13,25 89:24
90:17 91:22 92:10
92:12 94:10 100:4
127:15 134:14,24
166:24 167:3,13
189:5 195:18
224:10 278:14
279:11 280:17
282:18 317:10
321:8
**hastings** 16:7,16
18:10
**header** 205:10
226:11 324:14,15
**heading** 210:20
319:8,24
**hear** 37:11 86:4
89:8,9 115:2,6
258:19 278:9
**heard** 195:14
**held** 1:18 4:25
26:9 68:10 94:18
95:21 97:21
126:14 160:8
225:23 235:17
256:16,25 260:14
283:9 310:13
**help** 39:8,20 43:22
82:8 92:13 102:16
102:20 103:5
294:17 309:5
**helpful** 123:11
162:4 166:5
**helping** 18:23
**helps** 211:25
**hereinbefore**
323:10
**hereto** 3:4

**hereunto** 323:20
**historically** 34:17
 64:10 197:14
**history** 15:25 18:8
**hit** 8:19
**hklaw.com** 2:13
 2:14
**hoc** 40:20 41:2,3,9
 41:12,20 42:3
 43:9,11 44:19,21
 44:25 45:10 46:10
 47:2,6,15 48:13
**hold** 31:17 35:21
 96:10,18 97:9
 115:4 173:5
 245:15 284:4
 285:17
**holder** 300:2
**holders** 269:17
 292:10,12,25
**holding** 95:10
 292:2
**holdings** 95:6,7,7
 261:2,20 275:18
**holds** 96:19,20
**holland** 2:11 6:16
 6:20
**hopefully** 11:6
**hour** 10:22,22
 11:6 143:6
**hours** 284:9,9
**howard** 1:9 2:10
 70:6
**hum** 97:7 99:16
 132:20 142:13
 152:12 229:18
 253:22 260:20
 271:24
**human** 121:15
**hundred** 295:24
 303:22

**hypothetical**
 245:17

**i**

**idea** 180:8
**identification** 75:4
 105:18 136:2
 144:20 154:20
 168:24 170:22
 183:21 186:13
 190:6 193:20
 205:12 226:13
 259:25 265:6
 269:4 270:15
 274:20 277:20
 286:6 290:24
 311:13
**identifying** 20:9
**ii** 95:7
**immediately**
 191:20
**impairment** 211:4
**imperative** 325:12
**implications** 259:7
**imply** 100:9
 258:10 296:22,23
**importance**
 284:13
**important** 10:12
 284:19
**impractical** 249:5
**impression** 203:19
**improper** 283:14
**include** 107:17
 112:13 139:20
 170:6 174:25
 188:23 242:23
 243:4 248:9
**included** 66:9
 95:13 169:17
 177:5 180:3
 217:14 287:3

**includes** 303:18
**including** 164:4
**income** 148:20
 149:8,14,16
 173:11,22 186:2
 212:12,14 259:2
**incomplete** 245:17
**inconsistencies**
 280:20
**inconsistent**
 278:24
**incorrect** 213:24
 230:25 246:24
**increase** 303:19
**increased** 214:16
**increasing** 36:23
**incurred** 214:2
**incurring** 223:6
**independent** 6:17
 6:21 281:8 321:11
**independently**
 306:11
**indicate** 64:8
 195:3
**indicated** 157:8
 276:13
**indicates** 227:11
**indicating** 206:16
 239:17
**indick** 1:10 2:11
 45:18 46:5 47:11
 47:18,22
**individual** 179:21
 293:24
**inexplicably**
 142:12
**infinity** 20:23,24
 21:3,6,7,8,14,18
 21:20,22,25 22:3,6
 22:9,25 23:2
 36:16 37:4

**informally** 46:3,18
**information** 57:17
 57:23 58:2 71:20
 103:2 121:10
 152:14 153:6
 154:7 158:15
 172:15 180:9,12
 208:8 294:19,23
**initial** 38:10
 196:25
**initially** 102:9
**injunction** 279:7
 279:23
**inside** 93:25
**insofar** 89:2
 166:25
**insolvency** 272:11
 272:17
**insolvent** 259:13
 259:17 272:25
 273:5,11 285:11
 288:25 289:5
**instance** 216:22
 220:16
**instances** 216:21
**instituted** 247:5
**instruction** 66:16
**instructions** 325:2
**integrity** 264:17
**intentional** 162:13
**intercompany**
 154:18 155:6,15
 155:17,24 156:7
 156:15 157:15,23
 158:7 160:3,13,19
 161:23 163:20,23
 165:3,8,9 166:19
 167:21,25 237:18
 241:21 282:15,22
 324:9

**interest** 73:10,12
  73:17,21 79:4
  238:17 240:5
**interested** 5:11
  323:18
**interim** 110:8,12
**interjected** 126:20
**internal** 55:5
  114:5 116:25
  117:13,19 125:3
  125:12 214:20
  223:4
**interrupt** 7:18
  53:10 151:6
**interrupted** 99:21
  309:13
**interrupting**
  204:24
**intervale** 7:5
**interviewing**
  30:12
**intimately** 161:11
  216:13,13
**intrinsic** 20:10
**introduce** 74:6
**introduced** 36:13
  260:21 311:16
**invest** 38:22,23,23
  137:15
**invested** 23:2
**investigated** 259:6
  259:10
**investment** 14:6
  21:9 22:13 38:25
  39:2,4 40:5,9,12
  40:16 41:11,21
  42:3 43:3,22 44:4
  45:6,10 46:16
  48:24 50:8 60:11
  68:8,22 69:6,12
  70:23 72:22 75:15

75:22 76:8 86:13
  86:24 93:11 105:5
  106:2 137:17
  149:8 195:8,16,24
  229:2 242:4,9,24
  259:2 260:16
  308:15,17
**investments** 22:25
  23:21 52:9,18,23
  53:23 54:4,25
  55:16 56:5,17
  58:12,16 59:15
  77:18,21,23 87:20
  88:3,23 89:16
  99:17 101:24
  103:8 105:11
  126:21 127:14
  137:13 178:8
  208:16,17,22
  217:11 228:23
  229:15 230:6,7,9
  230:13 231:4
  233:10,10,19
  234:12 235:19
  236:2,11 242:24
  243:2 307:4,18,23
  309:7,10 318:17
  319:19
**investors** 20:14
  21:22,24 22:5,8
**invitation** 218:5
**invited** 272:4
**invoice** 168:10
**involved** 159:21
  161:11 216:14
**involvement** 30:18
  315:19
**ira** 139:8
**issue** 72:16
**issued** 275:15

**issues** 29:2 30:16
  30:24 42:2 99:22
  266:5
**item** 51:20 215:10
  222:11,14,25
  245:23 246:2
**items** 46:20 49:15
  49:16 52:4 74:17
  164:7,20 179:23
  211:11 219:17
**ivan** 1:9 2:10

**j**

**j** 1:9
**jacob's** 34:22
**jacobson** 34:10
**january** 160:18
  165:10
**jarring** 123:11
**jd** 16:24
**jewish** 34:10
**jmw** 1:3
**job** 18:21 93:16
  101:16 219:19
**john** 1:9 2:10
  263:19
**join** 26:6 36:12,14
  37:7,14,15,17 38:5
**joined** 18:9 19:13
  26:2 27:22 29:18
  36:7 39:5,15
  42:13,14 44:14
  67:15 102:12
  103:11
**joining** 98:17
**journal** 244:17,25
  245:11 246:9,14
  246:24 247:7,20
  248:5,7,11 249:10
  249:13,24
**js** 1:3

**judith** 1:19 323:6
  323:24
**judy** 5:5 10:25
  115:7 235:15
  274:4 279:19
**july** 27:16 155:25
  157:3 164:12
  165:24
**jumping** 166:6
  234:3,6,7
**june** 148:3 156:2
  168:19,21 170:19
  171:15,17 173:3
  173:24 174:19,22
  176:9,9 177:19
  193:17 194:19
  195:6 196:14,20
  197:2,18,19 198:8
  198:8 199:19
  203:9 204:23
  231:14 233:2,7,13
  233:24 234:15
  250:25 253:13,19

**k**

**k** 29:15 45:18
  52:18,25 53:14,22
  109:19 111:12
  112:2,13,17,22
  113:5,9,22 114:7
  114:23 115:18
  116:4,12,17 117:2
  117:21,25 118:3,5
  118:6,15 119:3,5
  224:25 226:20,21
  227:3,9 231:20,24
  233:8 322:2
**kbilodeau** 2:8
**keep** 9:15 61:15
  71:9 128:13
  162:19 239:5

**kelly** 198:21 217:2 220:4 221:6 222:20
**kelsey** 2:7 6:4 183:4
**kept** 60:19 71:10 216:11 263:20
**kind** 92:21
**kingstone** 29:13 29:23,24 30:4,6,9 30:23
**knew** 79:20
**knight** 2:11 6:16 6:20
**know** 7:9 8:22 9:9 9:9 10:24 11:2 17:8 36:20,21 37:24 41:19 50:6 58:17,19 66:19 67:21 68:2 70:2 70:15,18,20 73:8 73:15 74:3,9,10,19 75:8 76:14 77:22 84:4,5,6,10 86:20 87:2,17 89:18 90:3,4 92:13,19 112:24 113:15,20 114:4 116:3,9 117:10,17,22 120:5,8,12 122:25 123:3,19,20,24 124:15,20,21 125:17 128:15 131:2 133:19,22 138:25 139:3 140:19 147:19,20 149:25 151:14,19 152:19 154:24 156:23,24 158:10 158:15,25 159:8 161:13,19,24

162:6,13,22,23 163:8 179:14 180:2 181:22,24 181:25 182:3 189:3 194:16 195:5,6,9 196:5,8 196:19 197:2,3,8,8 198:3 201:22 203:7 204:13,15 206:12 213:15 216:5 222:11 223:12,13,23 225:16 231:17 234:22,24 239:13 239:14 240:22 241:8 242:12 243:3,5 248:15 251:16,17,25 252:5 257:9 260:11 262:16 264:16 267:18,18 267:20 275:12 279:22 281:3 292:14,18 298:17 299:4,10 300:7,21 300:24 304:16 305:4 306:5 309:14 310:3 316:25 317:2,3,6,9
**knowledge** 33:15 247:16 299:23
**known** 20:15 38:17 70:4 90:22 90:25 201:24
**knows** 225:12,15
**ks** 52:14,19,21 56:8,14

**l**

**l** 7:2 144:4 154:18 199:10 322:2 324:9

**lack** 32:6 88:19,19 289:24 320:2
**lacks** 200:19 283:6 284:23 313:20 316:24
**laird** 1:9 2:10
**lamken** 2:17 6:9 6:12
**land** 271:4
**large** 71:15 222:25 249:4
**larger** 246:11
**larsen** 2:14
**larson** 6:19,19
**late** 18:13 24:15 28:9,14 36:10 191:4,13 192:15 267:25
**launched** 45:12
**law** 15:22,25 16:2 16:3,24 18:7,11 34:5 202:21 203:22 204:3
**laws** 117:9 204:9
**lay** 297:10
**laying** 297:12
**lead** 36:19 42:7,16 42:20,23
**learning** 16:13 127:8
**lease** 163:8
**leave** 7:10 32:18 44:16
**led** 279:2
**ledger** 154:17 156:8 162:25 163:6 168:2 222:15 239:17 241:11 252:3
**lee** 2:5 130:21 286:17 287:2

**left** 32:2,12 44:14 48:18 71:11,11 97:14 104:9 294:21 295:16 297:15
**legacy** 98:13,14,19 234:20 236:11 306:7,10
**legal** 2:23,23,24 73:23 75:17 76:11 76:18 77:4 80:9 84:24 85:9,25 87:16 89:2,25 90:18 167:4 175:4 189:6 210:25 241:18 242:11 257:21 259:4 324:5
**legalese** 203:5
**lend** 75:25
**lender** 41:6 42:7 42:17,21,23
**lending** 41:10
**lendings** 41:4
**length** 218:22
**lesser** 77:18 216:15
**letter** 168:22 169:12 212:2 280:24 285:15,22 312:17,17,18,22 313:4,6 314:15 317:11 324:10
**letting** 162:22
**level** 129:11,17 159:21
**leverage** 18:4 133:3,8,24 134:9 141:16
**liabilities** 209:7,8 209:8,16,16,19,20

209:23,23 228:6
**liability** 209:10
  259:12
**liberal** 34:14
**license** 17:9,11,12
  17:14,17 195:25
  256:21 257:3,12
**licensed** 17:6
**licensee** 83:19
**licenses** 18:25 19:2
  19:3
**lieu** 204:10 261:8
**life** 126:20,23
  127:11,13,23
  242:8 276:14
  277:5,9 306:16,18
  307:3,8
**limit** 12:12 91:11
  92:25 93:4 248:20
  289:20
**limiting** 92:14
  289:10
**limits** 91:19,24
  92:6
**line** 20:11 23:24
  148:20 149:12
  150:22 173:2,10
  173:22 174:14
  185:9 186:2 188:2
  188:15 209:13,21
  229:3,4,16,20
  233:16 295:13,20
  302:8 326:6
**lines** 20:8 219:22
**liquid** 315:18
**liquidate** 134:11
  139:24 141:15
  142:4
**liquidated** 132:24
**liquidating** 227:8

**liquidation** 134:23
  135:8 137:19
  141:7 196:6,10,15
  196:16 198:24
  199:2 252:21
  269:24 280:21,23
  281:5,13 287:18
  288:2,8,18
**listed** 58:21 138:8
  190:16 208:23
  211:23 305:12,23
**listing** 296:25
**litigating** 279:2
**litigation** 99:21
  196:23 279:5
  280:5,10
**little** 42:9 130:14
**livenote** 1:19
**llc** 21:23 261:2
  275:18
**llp** 2:11,17 6:9,12
  6:17
**load** 186:16
  189:23,24
**loaded** 105:21
  170:24 182:13
**loading** 171:11,12
**loan** 42:10,12,16
  45:11 46:11 47:3
  47:7,17,24 48:9,14
  48:21 49:7,8,18
  50:3,21 55:5,23
  59:12 99:15
  116:19,20 154:2
  164:15 166:22
  167:5 168:13,16
  175:6,10,14
  178:11,17,20
  181:6 188:24
  189:4,11 237:23
  261:4,17,19,20

263:9 277:2
  278:13 280:16
  282:6,10,11,15,22
  283:3,13,22
  284:12,13,20
  285:2 291:5,11,12
  291:14,15,18,22
  291:23 292:24
  295:14 297:8
  299:20 300:17
  303:10 309:6,9
  310:12
**loans** 38:9,16,18
  38:20 41:5 45:20
  46:13 51:5 59:15
  59:22 60:4,9
  77:17,20,22 87:20
  88:2,23 89:15
  98:10 101:23
  103:8 129:12,18
  130:2 132:4
  153:19 174:25
  178:8 185:18
  211:5 217:11
  219:21 307:4,16
  307:21 310:13
  312:8,8,15 317:25
  318:4,5,6,8,12,12
  318:17,23,25
  319:5,18,22 320:4
  320:5,7,11
**local** 19:3
**lock** 236:23
**log** 78:8
**long** 18:12 19:16
  29:20 104:16
  203:11 260:7
  272:21 273:14
  284:7
**longer** 17:18 34:17
  85:13 198:17

249:6 256:10,19
  313:9
**look** 78:2 79:10
  83:16 126:16
  134:10,21 137:24
  144:24 169:6
  170:16 172:3
  174:7 177:8 178:2
  181:4 185:22
  194:2 208:11
  211:19 226:16,16
  227:21 236:17,21
  237:6 248:21
  260:18 263:12,24
  265:10 271:10
  277:16 280:3
  287:11,24 289:2
  291:2 298:7
  301:17,25 302:6,7
  302:14,15,17
  307:13 311:18
**looked** 12:3 13:3
  131:6 165:17
  176:22 184:7
  301:7
**looking** 38:3,12
  74:8 78:20 84:10
  99:23 111:2 130:9
  131:7 141:19
  147:13 157:17
  160:9 162:18
  165:13,14 176:25
  189:15 207:23
  213:14 229:2,4
  239:25 252:2,13
  252:15 253:16
  313:5
**looks** 130:17 155:5
  157:19 162:8,11
  169:8,8 170:10
  171:17 176:3

[looks - meeting]                                          Page 27

184:3,10 186:6
187:7 190:14
212:10 240:24
260:13 263:19
265:22 267:8
271:12 279:3
281:10 284:8
292:7 294:25
295:11
**los**   103:3
**loss**   128:23 129:3
129:7 148:20
149:14,17,23
150:5,7,15 173:4
173:11,22,23
174:3,4 186:2,3,6
186:7 211:4
**lost**   56:21,23
**lot**   7:20 206:25
207:3 264:13
**lower**   149:10
173:17 177:11
**lunch**   11:5 143:6
143:12

**m**

**m**   7:2 144:4 322:2
**mail**   49:22 51:12
170:20 264:25
265:4,19,24 268:4
268:13 290:22
311:10,11 324:11
324:17,23,24
**mailed**   171:25
197:19 199:17
**mailing**   197:12
**mails**   12:7,8 13:24
14:5 43:13,18,19
46:18,21,21,23
179:16 266:10
268:9

**maintain**   17:10,11
17:13,17 71:8
**maintaining**
309:25 310:4
**major**   21:7 23:24
**making**   30:12
86:17,19 128:16
182:6 248:11,13
273:9 281:4
**manage**   99:9
101:7
**managed**   31:22
**management**   16:4
16:10 20:15,23
27:3,5,6,7 29:4
30:19,25 32:22
50:23 51:3,10
52:11 55:14 82:25
85:12 101:23
102:5,12,15,20
107:16 110:5
112:3,6 114:14
120:22 121:2,4,6
121:19 122:4
146:11,16,22
172:5,7,12 184:15
184:25 187:20
194:11 267:11
**management's**
30:13
**managing**   21:4,8
93:12,17,18 99:6
101:17,18
**mandated**   57:21
**march**   186:18,19
188:9 189:3,15,18
191:7,19 192:7,10
205:9 208:23
240:17,20 256:6
285:20 303:2,16
310:25 311:3

313:6 314:18
317:12,12
**margaret**   197:15
199:9
**marie**   2:14 6:19
**marie.larsen**   2:14
**marja**   268:14,16
**mark**   17:24 19:13
19:17 20:20 74:24
105:14 248:20
**marked**   64:7 75:3
75:7,11 105:17
125:24 135:25
136:4 144:19
154:19,23 168:23
169:3 170:21
182:14 183:20
184:2 186:12
190:5,9 193:19,22
205:11,15 226:12
259:22,24 265:5,8
268:25 269:3
270:11,14 274:19
274:23 277:19,24
285:24 286:5
290:23 311:12
**market**   20:16,16
**markets**   16:13,14
16:15 135:6
**marking**   264:21
**marriage**   323:17
**martin**   2:13 6:16
112:20
**martin's**   221:2
**martin.seidel**   2:13
**material**   246:23
315:15
**materials**   14:7
71:6,9,13 287:4
**math**   248:23

**matter**   4:17 88:15
88:17 107:2
250:22 252:4
262:15 323:19
**maximize**   276:18
**mean**   21:16 77:5,8
87:2 91:24 121:22
139:17 151:6
171:11 195:19
239:15 241:25
242:7 248:22
266:23 267:21
291:24 298:12,18
**meaning**   164:25
169:12 300:8
**means**   86:16
135:20 243:7
248:11 310:4
**meant**   79:13 82:21
83:6
**measure**   285:9
**measures**   274:7
289:4
**mechanics**   161:25
**medallion**   38:8,15
38:16 318:5,6,8
320:3,4
**media**   4:15 67:2,9
143:9 144:12
183:11,18 225:25
226:8 290:8,15
321:13
**medication**   10:16
**meet**   46:10 202:6
202:9
**meeting**   43:5,8,10
45:8 46:19,24
49:2,25 51:22
59:12 61:4,10,14
61:17 62:4,5,8,12
62:23 63:2,16

65:24 105:16
126:13 130:23
172:21 190:4,18
190:21 200:7,15
201:3,9,18 202:10
203:2 216:8,20
217:3,4,21 218:3
219:2 222:21
250:19 259:23
260:14 261:12
263:14 269:2
270:13 271:15
273:13,14,21
274:10,17,25
277:18 278:5,10
278:17 280:15
282:5 284:7 285:6
286:4,10 288:9
289:6,15,22 298:2
324:7,13,16,18,19
324:20,21,22
**meetings** 43:12,14
43:15 45:6 52:2,3
59:22,23 60:2,2,4
60:9,10,18,20
61:21 250:12
251:2,4
**member** 21:4,19
21:23 24:4,14
25:12 26:7,10,16
26:24 29:8,21,24
30:4,8,10 32:14,19
42:15 69:4 72:18
168:6
**members** 15:2
21:19 50:20 51:18
57:13 59:14 60:11
107:5,15 266:2,2
292:13,15
**memo** 135:24
140:5 141:18,20

141:24 178:10
324:8
**memorialize** 61:17
61:25
**memorialized**
61:19,20
**memorializing**
43:20
**memory** 45:25
74:2 82:4 123:11
131:15 136:17
138:11 191:14
192:21 193:9
205:6 238:6 244:2
268:15 281:23
284:6
**memos** 46:22,24
142:2
**mention** 115:23
**mentioned** 1:18
18:9 101:9 115:16
115:22,24 145:20
164:8,20,23 273:6
**merger** 134:10,22
**mergers** 16:19,21
18:19
**met** 40:18,18,21
43:2 44:3 46:2,6
59:14 216:6 246:8
**metric** 285:8
**metrics** 272:23
273:4,7 289:4
**mf** 156:21 157:2,6
164:6 166:17
168:8
**mic** 67:11,12
**michael** 1:8,17
2:16 4:17,20 6:9
88:13 157:5
279:11 321:14
322:6,16 323:9

324:3
**microphone** 4:10
**microphones** 4:6
**middle** 283:12
**million** 12:9,9
22:23 128:4,19
134:5 185:19
212:15,16,20
214:17 235:21,21
236:4,8,12,13,13
240:3 248:24
258:9 275:23
278:13 282:7
292:8 294:5
295:17 301:9,13
302:9,11,20 303:3
303:6,14,17,21
304:2,6,14,19
305:21 308:4
**mind** 7:23 9:13
34:20,23 180:5
205:5
**mine** 140:8 207:24
**minimum** 275:22
**minor** 15:16
262:23
**minute** 66:8,23
79:17 82:3 115:5
173:20 184:9
192:8 194:25
290:5 320:20
**minutes** 9:18
43:11,18,19 46:25
60:19 61:10,14
62:2,7,12,21,22,25
63:5,9,11,14,22
64:6,15,16,19,25
65:4,12 66:4
68:17 105:14,16
125:23 126:12
128:13 130:12,18

130:20 131:11,23
132:19 189:21,22
190:2,4,14 191:4
194:24 199:23
200:7,15,16
259:20,23 263:13
263:21,23 264:10
264:15 268:19
269:2,7 270:9,13
270:21 271:5,10
271:15,23 272:12
274:15,17 275:2
277:17,18 278:2,5
278:17 280:4,13
281:21 282:3,24
283:19 285:22
286:4,9,23 289:8
324:7,13,16,18,19
324:20,21,22
**miramax** 316:22
316:25 317:3,5,6
**mis** 111:20
**mischaracterizes**
44:6 94:11 120:25
224:11 251:11
279:14
**misconstrue** 43:15
**misleading** 201:15
**misleadingly**
245:22
**misread** 173:15
**misstated** 255:4
**model** 288:8
**models** 139:22
141:6,13 142:3
287:18 288:2
**molo** 2:17 6:8,12
**mololamken.com**
2:19,20
**money** 16:4,10
142:16 175:13

212:20 291:10
292:10,24 296:5
**monitor** 99:14
**month** 134:4
150:3,6 157:7
186:4
**monthly** 157:8
**months** 134:10
145:9 149:18,24
173:25 184:12,20
197:19 267:25
268:2,11 281:19
**morning** 4:2 6:15
8:21
**motion** 261:10
**move** 7:21 9:15
68:18 280:20
281:12 285:18
**moved** 165:18,20
**movement** 280:22
**mullens** 1:8
102:10 147:6
172:22 197:15
199:9,14
**multi** 36:19
**multiple** 145:3,4,6
145:7,21 225:5
235:2 254:2,3,9
299:17
**municipal** 19:3
**murray** 1:9 2:11
45:15,18 46:5
47:22 48:6,16,18
**mute** 4:9
**mutually** 321:5

**n**

**n** 2:2 7:2 23:16,16
29:15,15 45:18
69:24 144:2,2,2,4
322:2,2 323:2
324:2

**name** 5:2 29:23
98:3 318:23 319:3
319:15,19
**named** 95:18
96:18
**names** 96:6 199:3
199:5,6
**nasbic** 69:20,23
70:10,17,20
**nasdaq** 40:3,4
**national** 70:22
**near** 269:22
302:11
**necessary** 129:18
130:2 132:4
203:23 325:4
**need** 10:23 11:2
26:18 61:18,20
72:14 117:5 130:5
183:4 260:23
269:20
**needed** 129:11
179:24 249:7
**negative** 149:19
150:14 157:16
**negotiable** 299:22
**net** 148:19 149:14
149:16 173:11,11
173:22 186:2
209:8,16,20,23
275:22,24
**never** 48:2,2,3,4
62:10 142:17
195:13 267:2
**new** 1:2,20 2:6,6
2:12,12,18,18 4:23
7:4,5 29:17 34:11
99:17 144:6
171:12 183:23
218:14 307:23
309:21 322:3,4

323:3,4,8
**non** 42:18 203:5
**normal** 63:8
135:17 222:25
**normally** 200:2
**notary** 1:20 3:12
7:3 144:6 322:22
323:7
**note** 4:6 160:11
189:11 210:7,9,15
211:19 237:25
238:2,7 240:3,7,9
240:13,15,17,20
243:10 263:10,11
274:19 275:14,14
276:23,24 277:2,6
278:12 292:10,12
292:25 293:17
294:13,20,21,24
295:9,9 296:10,22
297:18,19,22,25
304:7,19 324:21
**noted** 144:3
321:18 325:10
**notes** 14:12 170:7
269:19 271:5,11
271:13,18 275:5
276:16 294:14
296:11
**notice** 281:16
315:20
**noticing** 5:19
**notified** 262:3
**notify** 315:24
**nov** 270:14 324:19
**nova** 260:16 262:9
266:4,7,21 267:14
267:23 278:19
291:10 313:3,10
313:14 314:4,8,9

**november** 256:4
270:10,23 271:16
273:21 274:10
**novis** 278:19
**nuances** 33:6,8
320:9
**number** 78:23
79:2,6 152:5
174:23 175:6,9,16
211:17 221:10
224:7 227:23
231:16 232:9
**numbered** 233:18
**numbers** 98:25
99:4 239:10
295:12
**numerical** 208:12
209:3
**numerous** 264:15
268:12

**o**

**o** 7:2,2 29:15
144:2,2,2,4,4
322:2 323:2
**oath** 5:8,17 10:18
144:7 322:8
**object** 87:6 115:11
124:13 166:25
274:11 279:12
282:21 283:2,5,22
300:23 317:11
**objecting** 309:15
**objection** 32:4
41:14 43:7 44:5
49:13 50:22,24
53:16 59:6,17
60:13 67:24 73:13
73:14,22 75:16
76:10,17 77:3
80:8,15 82:22
83:13,24 84:23

85:8,23,24 86:14
86:25 87:15 88:25
89:24 90:17 91:13
91:22 92:9,10
94:10 100:4 104:5
106:13,24 107:3
107:10,21 111:19
116:6,14 120:24
125:6 127:15
134:14,24 158:9
165:5 175:2,3
189:5 191:23
193:5 194:21
195:18 199:24
200:8,17 201:20
202:3,15 203:16
204:6 212:21
220:23 221:2,9,21
222:8 224:10,19
225:2 237:4
238:13,19 239:3
241:17 242:10
244:19 245:4,16
249:20 250:8
251:10 257:20
258:2 259:3 264:4
273:25 274:13
278:14 279:14
280:17 282:18
284:22 285:3
289:13,16,23,25
292:3 293:20
296:14 298:15
300:18 301:14
304:3,8,25 306:2
308:6 313:19
315:2 316:3,14,23
**objections**   3:9
5:15
**obligation**   90:15
90:22,25 242:3

**obligations**   105:10
309:24 310:19
**observe**   27:2,5
**obtain**   133:3
**obtained**   133:22
**obtaining**   311:25
**obviously**   51:24
296:4 314:7
**occupancy**   210:25
**occurred**   31:25
120:14 192:4
228:10 254:4,10
254:17 268:11
**occurrence**   142:19
**oct**   269:3 324:18
**october**   1:14 4:5
67:3,8 143:10
144:11 183:12,17
196:3 218:23
226:2,7 253:5,23
254:5 255:6,7,11
258:9 268:19,22
269:9 290:9,14
321:17 322:8
323:21
**offer**   309:19,23
310:5
**offered**   310:9
**office**   116:19
181:16 195:9,11
196:5,9,16 198:16
198:19,23 199:2
252:20 280:21,23
281:5 299:15
**officer**   27:18,21
108:2,6,10,18,24
111:15 120:21
146:25 172:9,14
206:20 227:16
**officers**   80:5

**officials**   14:6
**oh**   110:11,17
111:20 133:13
209:22 228:25
**okay**   6:23 8:14,18
9:11,23 10:2 11:7
11:15 12:2,11,14
12:17 17:4 18:14
19:19 20:18 25:8
25:11 30:2,22
32:17 33:12 34:19
35:21,25 36:11
37:5,19,25 43:17
43:24 45:23 47:15
48:7,12,23 49:16
54:16,20 56:13,16
56:21 57:3 59:3,9
59:25 63:9 64:22
64:22 66:15,19
67:11,14 68:5,20
73:15 74:12 78:6
79:8,10 80:3,22,24
81:10 82:2,7,9,12
82:24 83:9 84:12
84:20 85:3 87:25
88:8 89:19 91:4
94:2 95:17,20
97:19 98:2 99:3
100:17 101:11
103:20 104:13
107:24 108:21
109:20 110:17
111:5,10 115:14
115:23 118:24
120:8 123:3 124:5
126:5,8,9 127:7,18
129:10 130:24
131:5,24 133:4
134:17 135:7
136:9,11,16 137:6
137:10,18 138:10

140:11,15,23
141:11,21 144:17
144:21,22 145:8
145:19 146:4,9
147:5,11,18,21
148:15,24 149:5
149:12,20 150:3
150:15,18,21
152:23 153:15,23
155:8,12,21,22
156:12,20 157:9
158:13,17,25
160:24 161:4
162:7 163:17,19
163:21 164:3,9,10
164:19 165:13
166:13,21 167:23
168:5 170:9,13
171:7,18 173:19
173:21 174:22
176:4 177:20
178:14,19 180:4
181:15 182:7,7,19
185:8,15,25
186:17 187:5,9,24
188:12,17,22
189:9,14,24
190:16,20 191:2,9
191:15 192:3
193:14,16,23,24
194:8,15 195:15
197:4 198:12,18
199:15 201:17
205:25 206:7
207:12 208:6,13
208:14,21 209:2,4
210:9,11,16,19,22
211:8,20 212:3
213:2,18 214:9
215:24 220:19
223:12 226:15

227:13 229:23
231:10 232:22
233:3,9,16,22,25
234:10 236:21
240:10,25 242:7
242:15 243:9
246:19 247:18
248:6 253:8
255:11 256:14
257:23 261:10
263:18 264:18
265:9,13 267:5,19
268:3,18 269:12
270:20 272:9
273:8,17 275:11
277:15 278:4,21
279:5,16,22 280:2
284:3 286:14
287:6 288:4 292:9
292:23 293:9
294:10,22 295:13
296:12,17 297:12
297:16,25 299:13
300:4,9 301:11
302:4,24 303:5,20
304:13 305:6,8
306:20 307:2,17
310:5,17 311:6
313:4,8 314:14,15
315:6 316:6,9
317:18 318:16
319:14 320:10,18
321:8
**ols** 55:6,10,12,18
55:21,24 121:11
319:8,9,24
**once** 10:3 75:7
182:13 212:9
218:9
**ones** 12:17,19
74:22,23 253:17

320:17
**open** 7:10 65:23
78:4 126:2 144:23
154:25 169:5
175:22,23 176:2
177:21 183:24
184:4 187:2,4
190:10 193:23
205:16 260:4
269:6 270:17
277:25 278:2
286:8 291:3 302:3
313:7
**opening** 175:25
**operate** 105:4
107:15 141:14
142:4 148:2 291:7
**operated** 13:8
40:13 106:3
107:18 150:7
**operating** 31:2
74:17 79:14,22
81:22 82:18 85:18
86:12 100:2
128:23 129:3,7
139:23 149:22
150:4 163:24
173:4,23 174:3
186:3 195:15,20
195:23 237:20
241:19
**operation** 72:22
85:6 107:7 273:19
**operations** 195:10
195:11 198:16,19
269:20
**opinion** 167:4
169:19 170:3
281:5
**opinions** 169:16

**opportunities**
99:18
**opportunity**
250:13
**opposed** 20:16
54:9 148:9 230:15
263:5
**option** 33:5
**orally** 51:13
**order** 17:7 46:9
61:25 116:11
128:17 129:12,16
129:18 130:3
131:14 181:21
203:21 204:3
227:6 231:8
236:25 237:8
243:13 247:13
257:11,14,14
260:22 261:4
276:17 277:9
**organized** 70:3,15
70:16,18
**organizing** 70:10
**original** 227:12
325:13
**originally** 29:17
291:17
**originated** 42:12
98:10 307:22,24
320:13
**ourself** 218:11
**outcome** 5:11
323:18
**outlined** 33:18
111:14
**outlining** 142:2
**outside** 10:9 40:22
180:9,12 271:5
**overdue** 133:10,12

**oversee** 107:6,16
218:15
**overseeing** 219:19
**overshot** 248:19
**oversight** 29:3
30:11,18,25 39:21
107:17 113:25
**owe** 151:10 238:16
288:15 292:9
**owed** 157:24 158:8
188:5 210:12
240:6 304:14
**owes** 174:19
185:10,16 211:14
212:19
**owned** 13:19
36:25 96:11 97:2
97:3 159:14 161:7
215:13 230:8,14
230:22 231:4
233:11,11 234:18
235:6,19 237:2
242:9 263:4
303:24 305:16,24
306:11,20 307:5
307:10,11,16,18
318:2,11 319:2,2
**owners** 80:5
**ownership** 267:11
**oxley** 249:7

| p |
|---|

**p** 2:2,2
**p&l** 173:9
**p.c.** 2:5 5:23 6:6
**p.m.** 143:10,13
144:3 183:16
290:14 321:17,18
**page** 82:10 83:15
126:17,18 127:25
132:13,14,18,18
136:23,25 137:12

[page - pdf]                                                                    Page 32

137:14,18,21
138:6 140:9,11
145:11,12,16,17
145:18,22,23,24
145:25 146:5,6
147:12 148:19,21
148:23 149:5,8,10
150:19,20 155:19
157:18 163:18
165:11,13,14,18
165:20 166:2,14
166:22 167:18
168:2,7,13,16
169:24,24,25
170:2,25 171:8
172:3,25 173:2,6
173:12,14,16,17
173:21 174:7,8,10
174:11 176:3
177:11,12 178:2,3
178:6 182:17
184:4,5,15,15
185:6,7,22,24
187:16,17,19,25
188:10,11 190:23
191:2 194:9,23
207:8,22 208:12
208:14 209:2,3
210:9,10,18
211:18,24 213:3
227:22,22,24
231:19,20,23,23
232:6,8,9,10,12,13
232:18,21,22,23
237:15 239:9,10
239:12,18,19,21
239:25 241:5,6,6
243:10 252:12,14
253:17,18 254:6,8
260:18 264:3,8
269:12,14 271:2

271:10,12,22
275:4,9 282:8,24
283:10 286:15
288:12,13 293:4
324:2,6 326:6
**pages**   131:4,13
139:20,22 147:12
158:11 165:21
205:17,19 206:14
264:9 271:9,11,14
271:20,20 275:3
284:10
**paid**   126:22 139:5
153:11 157:10,12
158:19 168:10
211:14 212:19
214:3 215:16
221:19 222:6
238:25 240:12
241:23 296:22,24
**paper**   51:15,17
168:6 169:13
170:12 171:25
176:7 222:16,17
251:23 252:3
**papers**   12:15
155:5 163:20
222:18
**paragraph**   126:17
128:2 132:21,25
133:5 134:8
146:19,20 192:14
192:18 269:14
271:25 275:9,10
283:11,12 286:16
287:7,8,17,19,25
288:5,13,20
315:11
**paragraphs**   272:2
272:3,7

**parallel**   179:6
**parent**   13:9 80:13
150:23,25 151:15
151:22 174:14
175:10,11 185:10
188:3,5 214:14,15
214:20,22 215:8
215:15,16 216:3
219:5 220:3,22
221:8 222:5,21
223:7,15 224:3,17
225:19 241:23
242:3,9 301:8
302:8,25 303:25
305:21 308:5
**parent's**   242:4
**park**   2:17
**part**   14:18 58:13
62:8 72:15 84:4
129:23 135:13
142:7 162:25
170:11 176:13
179:10 181:18
196:2 213:9 216:8
244:15 267:8
291:12,14 304:6
**participate**   91:9
**particular**   29:2
30:15 42:2
**particularly**
288:17
**parties**   2:3 3:4
4:13 321:6 323:16
**partner**   134:11,22
267:9
**partners**   21:9,14
22:6,9 23:3 36:16
37:4 83:19
**partnership**   21:10
**parts**   207:10

**party**   5:9 261:2
**pass**   9:17
**patent**   225:7
**paul**   16:6,16 18:9
215:18,23 216:2
216:14 220:14
278:25
**pay**   93:4 105:10
126:23 127:11,22
239:6 242:3,8
277:5,10 284:25
291:6,10 292:24
296:5,7,9 305:20
308:4
**paying**   242:23
**payment**   55:21
156:21,25 157:2
157:14 158:5
160:17,19,21
164:25 165:8,9
166:18 167:19,20
168:8 238:11,17
239:18 240:16
241:14 291:25
297:5,7
**payments**   55:22
156:13,16,20
157:22 158:12
163:9 165:3
166:17 239:8,11
239:14,15,16,22
255:21 276:15
**payroll**   156:22
157:2 158:17
164:6,25 166:17
167:19 168:9
**pca**   115:18
**pcaob**   113:24
115:25
**pdf**   51:14 132:15
132:16,18 148:21

148:23 149:6
155:20 163:18
169:25 171:2
172:4 173:2,12,14
173:16 174:8,12
176:3 177:5,10
182:17 184:3,4,15
185:7,24 187:20
187:25 188:11
207:22 227:22
231:23 232:10,13
232:22
**pdfed**  51:15
**people**  20:13
199:2 247:3
**percent**  36:25
93:20,22 94:4,9,13
94:15,16 95:10,22
96:10,18,19,21,24
97:4,21,22 101:13
101:14 212:10,11
212:11 244:17
245:2,2,12,20
246:8,15 247:8,21
248:20,21
**percentage**  159:6
159:14,16 160:8
161:7
**perfect**  9:21
**perform**  124:22
**performance**  51:5
129:9
**performed**  113:2
156:18
**performing**  42:18
128:5,19 129:12
129:17 130:2
132:3
**performs**  113:21
**period**  28:22 36:4
43:25 44:2 53:13

54:18,21 56:6
65:8 76:4 84:7
92:2 95:2 96:2,22
97:23 98:6,11
99:12,20,23
100:22 107:24
108:4,8,16,25
114:13 117:14
128:21,25 129:5
149:17 150:4,6
151:16 153:17
154:10,13 155:25
159:9,17 164:12
165:23 170:18
171:15 173:3,24
176:8 177:15,18
177:19 179:4
181:10 182:9
184:11 186:4
187:8 189:2,17
191:6,18,22
193:17 194:19
195:21 196:13,20
196:23 197:17,24
198:7 199:12,18
204:22 205:8,23
216:17 218:15
219:2 228:10
234:24 235:3
250:15,24 252:19
252:21 253:10,11
277:11 281:12
298:8 301:22
303:2 308:18,21
312:11 318:10
**periodic**  54:24
55:9 74:15
**periods**  117:6
164:10 234:3,8
235:2 237:7

**permanent**  227:7
**permitted**  106:22
204:10 239:5
262:21
**person**  82:11,15
83:6,12 217:21,22
**personally**  246:18
**peter**  1:10 2:10
266:11,12
**pf**  167:20
**phelps**  168:10
**phil**  2:23 5:2
**phone**  217:21
**physical**  197:11
298:13,17,23
**physically**  199:17
202:22
**pick**  4:7
**picked**  287:9
**pictures**  140:10
**place**  4:12 66:7
217:24,25 218:3
246:17,20 247:13
249:8 313:16
**places**  299:17
**plaintiff**  1:6 2:4
5:24
**plan**  114:5,5,23
135:9 141:7
269:24,24
**plans**  33:5 134:23
**pleadings**  12:15
**please**  4:6,9 5:12
5:17 6:25 10:23
11:2,13 14:18
24:22 31:8 37:10
66:19 74:25 78:3
79:18 87:12
105:22 109:11
111:23 113:4
115:7 126:11

133:17 136:7
144:16 158:2
184:8 218:20
226:10,18 230:12
237:13 238:4
275:10 278:2
279:11 287:17
288:20 290:5,17
302:2,17,23
305:22 325:3,7
**pledge**  260:19,24
261:6,21,22 262:3
262:4,5,9,22
**point**  17:6 22:14
35:24 37:6,19,20
45:14 48:16 63:10
91:4 117:23 122:3
133:6,10 157:9
162:5 188:13
189:10 198:14,15
206:6 208:15
217:8 219:16
221:15 234:22,25
237:22 250:20
252:11 256:8,9
260:9 266:16
281:10 297:23
302:10
**points**  140:17
141:3 216:6
**pole**  19:8
**policies**  32:24 33:2
127:14 214:24
242:19 276:15,19
277:5,9 281:18
306:16,18 307:3,9
**policy**  223:20
246:17,20 247:5
247:10,12
**political**  15:15

**pool** 22:13 293:7
293:11 294:2
295:22 297:13,17
297:21,23 298:4
304:22,23 305:13
305:24
**populating** 121:13
**portfolio** 38:7,13
38:15 48:22 49:8
54:4 77:24 99:15
101:18 134:12
176:17 179:21,25
181:7 216:7,14,19
217:2,4,10,10,15
217:20 218:4,25
234:23 312:13
315:10,16 319:7
**portion** 72:15
158:20,21 312:14
**position** 16:6 21:2
24:2 31:17 83:3
100:7 269:16
**possession** 298:9
298:18,24 299:2,5
299:8 300:5,6,7,8
312:22
**possible** 4:10
114:19 286:25
**post** 108:14
**potential** 287:18
288:2
**potentially** 135:16
**practice** 50:7,18
51:19 53:8,14
54:13 61:7,13,22
61:23 62:9,18
63:21 64:12,13,24
65:8 66:2 111:11
148:7 202:13
252:8 264:21
311:19

**practices** 223:20
**pre** 146:19
**preceded** 98:16
257:13
**preferred** 269:18
**prejudice** 83:18
**preliminary** 279:6
279:23
**premiums** 126:22
126:24 127:12,23
242:8
**preparation** 56:8
56:9 102:13
135:19 141:18
212:24
**prepare** 11:18
14:13 102:6,21
103:5 109:2
119:18 121:2,4,7
132:2 181:11
269:23 270:4
**prepared** 14:9
49:19 51:3 52:12
55:15 56:4,17
101:22,23 102:9
110:4 112:3
120:22 135:7
141:6,12,24 142:2
142:19 288:7
**prepares** 122:4
**preparing** 14:22
15:2 102:16 109:7
109:13 111:16
125:14 136:18
**prepay** 284:20
**prepaying** 284:13
**present** 2:22 54:7
190:17 202:22
**presentation**
112:8 217:7,9,15
250:11,13

**presented** 49:21
51:9,10,12 53:2
62:23 63:2 224:5
224:13,14 252:3
264:15
**president** 28:2,3
28:11,24 35:20,22
36:5,8,22 37:8,22
53:11 54:15 61:2
72:18 81:23 82:19
83:4,9 84:18,20
85:7 98:20 101:4
103:12,15 104:2
104:10,18,23
105:24 114:14
121:25 142:8
195:22 206:18
227:16
**press** 283:11
**previous** 154:6
**previously** 20:5
55:14 144:5
238:10
**primarily** 18:18
70:5
**primary** 18:21
20:8 109:3
**prior** 53:18 94:11
110:10,16 118:6
154:11,12 255:7
279:15 311:22
320:13
**private** 4:8 20:12
20:15 24:23,24
25:6
**pro** 211:10 212:2,4
213:15 227:25
228:4,8,16,19
229:11,12,21
230:5 231:6,10
232:24 233:4,12

233:20 234:13,16
258:10
**probably** 9:17
10:21 17:14 35:18
48:18 66:7 84:7
110:25 139:17
157:6 169:15
176:17 220:16,18
223:9,11 226:22
249:5 263:20
264:3,22 303:18
**problem** 9:4 68:13
302:13
**procedure** 50:19
54:14 64:4 65:6
109:21 110:3
111:13,14 124:7
200:25 201:7,11
201:14,23 202:14
202:19 203:14
204:16 205:3
224:6,15,21,24
225:8,17 251:6
**procedures** 32:25
33:2 113:16 204:8
224:2 225:6,18
242:19 281:18
289:19
**proceeding** 5:15
134:11
**proceeds** 127:10
127:21 274:8
289:20 291:5
**process** 36:20 63:8
109:6,21 110:2
111:25 112:12
113:24 118:4
120:13 121:17
122:4 179:10
192:22 264:23
276:16

**produced**  7:15
 8:13 163:7
**producing**  7:20
**production**  8:8
**profit**  85:22 86:23
 88:4,16,24 89:16
 128:23 129:3
 149:22 150:4
 173:4,23 186:3
**profitable**  128:4
 128:18 129:13,19
 130:4 132:5
**program**  45:12
 46:11 47:3,8,17,24
 48:14 121:13
 310:12
**programs**  48:9
**prohibited**  86:11
 86:16
**projections**  136:21
**promissory**
 269:19
**proper**  281:16
**property**  71:12
**proposed**  46:13
 135:8 294:12
 295:4,7,10,14
 296:5,9 297:20,21
**proposition**  89:15
**provide**  154:6
**provided**  11:23
 71:14 90:12,12
 241:21 287:4
**provision**  83:22
**public**  1:20 3:13
 7:3 20:16 24:23
 33:10 144:6
 322:22 323:7
**publicly**  20:9
 21:11 23:4,18
 24:19

**pull**  154:5
**purchase**  13:25
 14:2 260:15 262:2
 309:21 313:3,11
 313:14 314:3
 317:22
**purchased**  23:22
**purports**  244:14
**purpose**  249:17
**purposes**  229:21
**pursuant**  106:3,22
 107:18 160:4
 161:22 195:23
**put**  64:18 66:3
 85:14 132:10
 135:5 142:24
 168:19 246:17
 247:12 250:17,21
**putting**  248:20
 320:2

**q**

**qs**  49:11 52:14,17
 52:19,21 56:8,14
**qualifications**  33:9
**qualify**  51:25 76:6
 97:13 117:5
**quarter**  50:4 51:8
 108:13 119:8
 149:21 150:2
 153:3 156:19
 160:11,14 189:17
 191:6 192:6
 213:12 239:6,6
 247:25 248:25
**quarterly**  48:22
 49:9,17,19 50:12
 50:21 52:2,11
 53:3,15 55:11,19
 56:19 57:15 59:5
 59:23 102:6
 112:21 120:4,9

122:13 123:22
 124:17 146:7
 148:5,12 158:16
 184:10 215:19
 217:25 219:6,7,14
 220:8,9 222:22
 244:18 245:3,13
 247:21
**question**  3:9 8:11
 9:5,6 10:13 11:13
 14:19 19:25 24:11
 26:19 30:21 32:8
 35:14 37:12 46:8
 48:5 50:16 53:5
 54:12 56:11 59:11
 67:20 70:14 76:19
 80:23 81:2,17
 84:9,15 86:3
 87:10,12 88:6,9,10
 88:11 89:7,12
 91:16 92:4,11
 96:25 100:8
 105:22 106:17
 107:13 109:11
 113:3,4 114:9
 115:6,11,14
 120:18 125:11
 129:21 130:10
 131:20,25 133:18
 148:13 158:3
 166:10 200:23
 201:4 204:21
 220:24,25 221:25
 225:14 230:12
 231:22 232:4
 242:6,14 245:6,19
 246:5,11 255:23
 255:25 271:4
 273:24 281:25
 296:19 302:18
 304:10,12 305:2

305:22 306:23
 308:10 309:17
 310:15,16
**questions**  7:12,13
 8:24 10:19 51:22
 114:18 219:20,21
**quickly**  152:22
 262:8
**quote**  137:17
 247:11 312:3

**r**

**r**  2:2 7:2 144:2,4
 323:2 326:2,2
**raising**  99:18
 266:5
**range**  22:22 99:3
 235:20
**ranged**  22:15
 96:23
**rate**  269:16 270:5
**ratified**  63:7,12
 65:19,20
**ratify**  204:11,17
**ray**  6:8 162:11
 167:9,10
**rayiner**  2:18
**reached**  286:18
**read**  71:19 79:5
 115:7,9 141:20
 146:20 150:12
 151:19 155:14
 191:2 192:13
 207:11 229:16
 271:6 278:16
 281:20 322:7
 325:3
**reading**  79:15
 80:18 81:13 180:6
 231:18 232:20
**realize**  131:7
 234:2,5

**really** 87:9 92:17 114:20

**reason** 169:11 235:25 264:12 325:5 326:8,10,12 326:14,16,18

**reasonable** 134:21 236:9

**reasons** 326:4

**recall** 22:10 27:20 28:25 29:5 30:15 30:23 31:3 33:23 34:21 35:10 37:25 39:12,16 40:15,25 43:24 44:18 45:22 45:23 47:4,9,12,13 47:20 49:4 52:13 56:12 63:6,17 64:3,17,20 65:5,16 69:15 71:22 72:19 72:20 74:23 77:25 79:7 82:23 83:8 83:14 84:16,25 85:10,18 86:15 89:17 94:5 95:4 96:6 97:17,24 98:3,4,24,25 99:3 100:15 101:2,3 103:23,25 104:7,8 104:11,15,17 105:7,12 107:4 108:8,17 123:7,23 124:3 127:4,7,17 127:24 128:12,24 129:4,8,10,14 132:7,9 135:11 138:16 153:13 159:19,20 161:16 178:24 189:7,13 189:16 190:20 196:22 199:3,5,6

201:5,10 203:11 204:18,19,25 211:16 216:22 217:6,16 219:25 221:17 222:10,19 223:8 235:22 236:5 238:15 240:8,10,11,14 243:16,19,23 251:13 252:9 259:15,16 261:18 263:6,10 264:24 270:2,7 272:9,20 272:22 273:12 274:14 277:7,14 282:16,20,23,25 283:7,20,24 284:8 284:11,15,24 285:5,12 289:18 290:3 292:5 293:13 298:5 300:13,14,20 301:10,15,17 304:17,20 307:12 308:8,23 311:2 313:21 316:12 317:8,23 318:19 320:8,16

**recapitalization** 216:9,17

**receipt** 206:2 325:14

**receipts** 55:23

**receivables** 23:23 23:24

**receive** 67:17 69:4 74:18 75:21 76:7 118:8,20,21 138:12 157:21

**received** 138:17 139:15 158:4

276:18

**receiver** 1:4 4:19 6:2,7 8:22 227:7,8 282:14

**receivership** 27:13 42:8,9 213:13 227:6 228:9 231:8 231:12 233:5 257:11,13,14

**receiving** 139:12 139:14 142:23

**recess** 67:4 78:15 143:12 183:13 226:3 290:10 320:23

**recognize** 136:13

**recollection** 79:20 81:19 82:6 133:6 136:17 138:3 141:5,12,25 149:21 163:12 190:25 191:10 192:4,20 211:22 214:15 220:20 221:5 237:22 260:11 272:6 276:22 283:17 288:6

**reconciliations** 116:20

**record** 4:3,14 5:14 26:9 67:3,7 68:10 78:11,14,18 100:16,18 104:12 115:8 143:10 144:10 146:21 162:15 183:8,12 183:16 210:12 217:8 223:11 225:23 226:2,6 235:17 243:24

250:16,18 251:12 255:2 256:16,25 262:14 283:9 290:9,13 319:14 320:19,22 321:2 321:16 322:10,13 323:13

**recorded** 4:16 214:4 224:3,4

**recording** 4:11 321:15

**recordkeeping** 33:4

**records** 12:24 13:2 13:21 116:11 163:2 181:5 270:3 270:8 308:24

**reduced** 160:13 258:3,8 284:10

**reducing** 259:12

**reduction** 258:17 258:22

**refer** 53:20 95:9 96:8 102:23 109:13 140:19 169:9 208:2,3,7 216:16 234:18 293:23 295:8

**reference** 73:6,9 180:17 191:3 200:14 207:3 210:6 219:4 237:8 317:24 319:17

**referenced** 98:11 221:15 243:10 302:12

**references** 252:16

**referral** 281:4

**referred** 13:11 55:6 97:5 98:13 177:2 276:25

306:7 319:6
**referring** 40:24
49:10 60:3,3 70:9
88:12 93:22 95:11
95:17 102:24
109:15 118:14
128:9 155:6
156:25 160:22,25
169:22 209:13
215:6 216:18
219:8,9,13 222:15
234:19,25 293:5
305:5 317:16
**refers** 147:20
237:25 267:7,9
303:13
**refine** 271:3
**reflect** 228:11,13
**reflected** 199:23
200:6
**reflection** 202:11
**refresh** 75:8 82:4
125:21,25 131:14
133:5 136:5,16
138:2 141:4,24
144:15 149:20
163:12 169:4
186:25 190:24
191:9,13 192:3,19
205:6 211:21
214:14 237:21
243:25 260:10
272:5 276:21
281:22 283:16
284:5 288:5
290:16
**refreshes** 79:19
81:19 138:10
141:11 190:25
192:21 193:9
238:6 268:15

**refreshing** 78:7
**refusal** 317:21
**reg** 242:2 262:18
**regard** 74:16
**regarding** 30:24
42:2 43:3 57:18
62:20 69:11 72:16
72:21 73:21 85:20
117:20 311:21
314:21
**registered** 17:19
17:21
**regs** 84:7 241:24
**regular** 85:4
135:18,19 142:18
215:19 220:14
223:25 264:21,23
**regularity** 218:2
**regularly** 44:13
**regulates** 68:21
**regulating** 85:20
**regulation** 73:5,16
84:17 85:2 92:18
92:20 93:7 152:16
152:19 243:8
**regulations** 40:3,4
69:11 72:21,25
74:9 80:2 85:19
88:17,22 92:25
105:6 106:4,12,17
106:23 107:8,19
117:9 127:2,13
181:4 241:20
262:7
**regulatory** 70:4
71:3,14,25 72:5
181:10
**reimbursement**
139:16
**reject** 266:20
267:14,22

**rejected** 267:3
**rejecting** 280:24
**rejection** 268:5,10
278:22 281:6
**relate** 213:25
**related** 5:9 96:17
125:4 159:7
323:16
**relating** 7:13
**relation** 118:3
196:13
**relationship** 13:10
215:8
**release** 261:4
**relevant** 299:12
**relief** 279:23
**remaining** 96:20
97:4 297:3
**remember** 12:18
27:25 28:6 41:8
41:25 42:20 44:10
44:17 57:9 71:16
71:23 72:3,7
77:14 97:15 102:2
102:3 104:13
128:16,20 133:13
138:23 141:17
142:6 152:9
161:25 196:11,18
199:7 212:24
215:2 225:20
240:2 259:5,8,9
262:12 268:15
273:7 275:13
284:17 291:4
307:20
**remote** 1:17
**remotely** 5:2
**remove** 262:9
**rent** 163:8,15

**rents** 163:11
**repay** 89:22 90:15
90:22 91:11,20,25
92:7,15 283:3,15
303:24
**repayment** 91:6
222:12 238:24
**repeat** 30:21 32:10
35:13 48:5 70:12
87:12 109:11
113:4 114:8
129:20 133:17,18
158:3 220:25
221:25 230:12
245:6 305:22
309:17 310:14
**rephrase** 11:14
106:16 114:20
**replace** 262:10
**replacement** 184:2
**report** 49:19,20,23
50:2,3 55:21
57:21 116:19
121:14,20 122:5
172:2 176:15,18
178:11,17,20,23
179:14 180:13,18
180:19,20,21
246:7
**reported** 109:19
147:24 173:10
208:19 228:19
230:18,19,20
231:2
**reporter** 1:19 5:5
5:16 6:24 9:11
10:25 19:7 23:14
25:16,19 39:11
45:17 50:15 69:22
78:25 89:5 142:22
153:8 167:7

184:22 186:22
187:14 188:8
193:8 202:8
207:19 213:8
215:22 218:7
219:12 221:24
227:2 235:10
249:12 252:7
258:14 264:7
268:8 272:14,19
274:5 276:10
279:10,20 286:3
286:22 287:14
288:22 290:19
291:20 294:7
307:7 315:14
316:19 323:6
**reporting** 58:9
226:24 227:4
249:19
**reports** 14:6,8
55:5,6,10,12,13,19
55:20,24,25 56:2
59:12 101:22
102:6,17,21 103:6
153:5 179:25
229:12
**represent** 8:22
211:23 230:14
244:14 300:12
**representations**
237:10
**represented** 93:19
94:8 151:25 152:2
174:23 235:14
298:21
**representing**
244:13 298:25
299:21,25
**represents** 229:8
229:13 231:9

**reprint** 64:15
**request** 243:22
**requested** 135:15
**require** 88:18,23
202:25
**required** 30:17
40:2,2 52:15
56:20 58:7 91:5
105:3 117:7,8,14
126:21 128:4,18
181:20 243:14
288:18
**requirement** 74:4
246:8
**requirements** 57:6
57:8,10 76:22,23
202:10
**requires** 57:22
**research** 18:3
19:14,17,20 20:3
**reserve** 7:11
**reserved** 3:10
**resignation** 108:14
**resigned** 47:11,13
47:18
**resolution** 282:9
**resolutions** 61:18
**respect** 27:12,15
28:15 30:22 33:5
41:11,24 46:25
55:23 56:7,14
62:19 63:4 64:21
65:10 69:5,9 74:4
79:13 80:6 83:22
106:6,21 109:7,16
109:17 110:23,24
112:19 113:18,22
116:10 117:19
119:5,7 120:3
124:16 129:24
133:15,23 135:10

140:17 141:9,16
163:15 192:5
202:14,19 203:8
214:22 216:2
223:5,7,15 225:17
247:20 249:9
258:17 262:19
273:19 281:15
282:11 283:18
289:10 293:17
297:17 300:22,25
309:20,24 310:10
310:19,24 314:17
315:8,24 316:10
317:21 319:17
**respective** 3:4
**response** 134:19
**responsibilities**
26:15,21,24 30:8
30:11 31:20
**responsibility**
109:4 197:16
309:3
**responsible** 159:3
159:4
**rest** 218:5
**restate** 53:4 70:13
84:14 89:11
120:18 130:6
131:24 166:10
228:5 246:23
260:23
**restated** 233:13
234:16
**restating** 234:11
**restructured**
42:16
**result** 258:22
**resulting** 315:16
**resumed** 144:5

**retained** 324:5
**return** 325:12
**returns** 172:18
**revenue** 244:18
245:3,13 246:15
247:8,22
**revenues** 248:22
**review** 11:17,21
12:13,14,23 13:20
46:12,20 47:18
48:8 49:11,17,19
52:9 53:2,14,20
54:3 56:4 62:24
72:10,14 73:2
79:18 81:14,15,18
82:3 99:17,18
110:6,18 111:17
112:24 113:17
116:16,25 117:12
117:13,17 118:2
120:14 121:19
122:13 124:15
125:14,17 126:6
134:7 135:9 136:7
141:22 179:11
180:20 194:25
199:22 200:13,25
201:7,12 202:11
204:5 216:7,19
217:2,15,20 219:2
220:8 222:23
223:13 225:18
226:18 244:8,16
245:11,20 246:14
247:17,19 250:7
251:9 260:5
263:24 266:3
273:3,8 275:9
280:13 282:2
288:19 289:3

reviewed   13:21
  46:17 48:21 49:8
  50:10,20 51:21
  52:9 54:23 58:23
  59:4 63:3,15,23,25
  64:14 65:2,13
  74:19 79:5 83:21
  112:21 113:12
  116:10 118:22
  119:9 120:9
  121:14 122:2
  124:7,8 136:10
  147:8 148:8,16
  176:11 178:15,16
  199:22 200:5
  201:8 244:4
  245:23 246:9
  261:9
reviewing   47:24
  48:14 59:12 72:20
  80:19 84:16 109:8
  109:22 110:13
  112:17 118:5,6
  120:13 126:4
  127:8 146:13
  189:16 200:14,15
  249:15,16,22
  285:8
revisit   130:11
rhashem   2:19
richard   1:8 2:16
  6:10 146:24
  172:13 187:21
  206:19 243:18
right   9:16 20:18
  20:19 32:13 87:23
  93:23 97:16
  113:13 120:23
  121:3 122:18
  123:15 128:11
  132:8 136:25

137:13,19,22
  139:9 146:12
  147:24 148:10,17
  149:7,10,25 150:8
  150:15,16 151:12
  156:3,10,15
  157:18 158:22
  160:14,15,20
  161:2 164:18
  165:4,15 167:16
  168:2,18 170:4
  171:9,16 172:16
  172:22 173:13,18
  174:5,16,20
  177:12,23 182:24
  185:4,13 186:8
  187:11 188:20
  197:20 198:10
  208:24 211:9
  217:12 224:8
  227:18 228:24
  229:19 230:10,16
  230:23 231:15
  233:14 235:3
  240:18,21 254:7
  255:8,15,20
  261:12 263:15
  280:9 285:19
  294:8,20,24 295:5
  295:18,25 296:6
  297:9 303:12
  306:8 317:20
robert's   203:21
  204:3
role   38:3 93:9,10
  93:15 308:12
room   66:13,19
rosalyn   34:11
rose   103:25 104:2
rosen   112:19,25
  113:12,17,21

114:6,22,25
  115:17 116:3,9,16
  117:18 118:3
  119:9,16 120:6,10
  120:14 122:6,10
  122:12,16 123:5
  123:14 124:9,15
  124:21
roslyn   7:5
ross   1:17 322:6,16
  323:9 324:3
roughly   12:7
  179:6
rule   8:19,19 9:2
  83:17 287:15
rules   10:11 127:2
  127:12 181:3
  203:21 204:3
run   181:8
running   27:6 29:4
  30:13,19 101:17

**s**

s   2:2 7:2,2,2 23:15
  29:15 69:24 144:2
  144:2,2,4,4,4
  278:18 324:5
salaries   161:21
  163:11 210:24
salary   103:13,17
  103:21 104:9
  157:10,12,25
  158:5,18,20
  159:13 161:20
sale   126:25 127:9
  127:10,21,21
  274:8 276:16
  289:20 310:19,24
  311:21 314:17,21
  315:5,25 316:8,11
  316:21

sales   317:16
salgado   220:14
  278:25
sarbanes   249:7
sat   23:12 34:11,15
  34:16
satisfaction   211:5
satisfied   262:15
satisfy   267:10
  282:4
saw   217:7
saying   97:13 138:6
  169:12 225:9
  236:10 313:8
says   64:6 83:16
  137:9,16 140:11
  140:13 141:2
  145:11 146:7
  150:17 155:16
  161:3 162:17
  168:5 169:13
  174:2,6,21 187:18
  188:18 190:19
  209:15 210:5
  228:20 233:8
  254:22 260:23
  264:19 266:18
  292:5 293:7 294:9
  294:11,12,15
  295:3,22 296:3
sb   90:23 256:10
sba   12:20 13:23
  14:5,7,8,9 56:20
  57:4,21,25 58:14
  70:4,16 74:16,20
  75:24 79:3 83:20
  89:23 90:6,13,15
  91:6,11,20 92:8
  93:5 105:6 106:4
  106:12,17,22
  107:9,20 109:24

| | | | |
|---|---|---|---|
| 110:22 111:3 | 92:22 93:2 99:20 | 194:11 263:14 | 191:23 193:5 |
| 127:2,12 133:3,7 | 101:5 107:7,18 | **section** 209:19 | 199:24 200:8,20 |
| 133:15,23 134:8 | 152:24 153:2 | **sections** 58:18 | 201:20 202:3,15 |
| 142:20,23 147:2 | 195:16 196:4 | 73:3 209:17 | 203:16 204:6 |
| 152:16,25 153:5 | 215:11,12,12,13 | **secure** 261:17 | 212:21 220:23 |
| 169:14 176:7,15 | 252:18 256:10,19 | 276:23 304:13,18 | 221:9,21 222:8 |
| 178:23 179:2,7,11 | 257:18 262:22 | **secured** 38:17,19 | 224:19 225:2,13 |
| 179:19 180:18,23 | **sbic's** 93:4 | 238:2,7 240:3 | 237:4 238:13,19 |
| 180:23 181:9,23 | **sbics** 41:7 57:7 | 243:9 261:2 | 244:19 245:15 |
| 182:18 195:10 | 73:5 74:16 215:9 | 278:12 282:15 | 249:20 250:8 |
| 196:6,16,21,24 | 218:13 262:23 | 304:7 | 251:10 273:25 |
| 197:5,13 198:9 | **scanned** 194:5,6 | **securities** 299:19 | 274:13 289:25 |
| 199:11 214:23 | **schedule** 11:7 | 312:5 | 298:15 321:10 |
| 215:4 218:23 | 52:18,22 53:22 | **see** 82:13 88:14 | **self** 73:7 83:17 |
| 219:5 221:7,20 | 54:3,25 56:5 | 92:12 128:6 | 84:17,22 85:5 |
| 222:4 227:7 239:5 | 58:11,19 111:4 | 132:25 134:13,16 | 121:13 |
| 241:24 253:2,5 | 176:20 178:7 | 140:5,7,8 146:4 | **sell** 276:14 277:4,8 |
| 254:20 255:19,24 | 251:20,21,22,25 | 149:9 150:22 | 300:16 310:6 |
| 257:19,24 262:3 | 301:18 | 160:21,24 164:19 | 315:10,17 |
| 262:15,24 266:5,6 | **schedules** 56:17 | 164:21 169:17,18 | **seminar** 69:20 |
| 266:20 267:2,11 | 180:2 | 169:19 170:7 | 70:16 |
| 267:13,22 268:12 | **school** 15:23,25 | 182:24 183:2 | **sending** 111:16 |
| 277:13 278:25 | 16:2,3,24 18:7 | 189:23 190:24 | **senior** 38:17,19 |
| 280:25 281:4 | 34:5,15 | 194:3 209:15,17 | 237:25 238:7 |
| 282:13,21 283:2,4 | **science** 15:15 | 209:20,22,23 | 240:2 243:9 |
| 283:15,21 286:18 | **scroll** 150:19 | 210:2,15 211:6 | 278:12 292:10,12 |
| 287:5 288:16 | **sealing** 3:5 | 233:16,21 245:18 | 292:25 294:14,23 |
| **sba's** 58:3,7 | **sec** 13:23 52:15,15 | 250:5 264:18 | 295:9 296:11 |
| 152:15 180:19 | 112:2 117:8,9 | 276:12 280:14,19 | **sense** 88:7 125:11 |
| 266:3 281:15 | 118:7 119:4 | 286:14 294:10 | 201:16 |
| 314:11 | **second** 8:15 20:11 | **seeing** 243:7 | **sensitive** 4:7 |
| **sbi** 90:12 | 146:14 149:4 | **seeking** 133:20 | **sent** 110:5,9 112:3 |
| **sbic** 42:8 56:20 | 170:15 185:7 | **seen** 264:13 | 178:15,16 265:25 |
| 57:11 58:6 67:18 | 188:11 284:5 | **seidel** 2:13 6:15,16 | **sentence** 269:13 |
| 67:22 68:3,5,6 | 315:11 | 53:16 59:6,17 | 276:12 |
| 73:21 74:19 76:23 | **secretary** 61:3,7,9 | 60:13 91:13 92:9 | **sep** 139:7,12,14 |
| 76:24 77:10 78:22 | 61:13 62:15,17 | 92:11 106:13,24 | **separate** 45:7 |
| 79:6,14,23 81:22 | 63:14 128:14 | 107:3,10,21 | 59:14 179:3 |
| 82:18 83:7 85:12 | 130:22 147:5,7 | 111:22 115:2,10 | 236:25 |
| 85:18 87:13 88:4 | 172:6,10,19,22 | 115:15 116:6,14 | **separately** 40:18 |
| 89:20 90:13,14 | 184:16,24 185:2 | 125:6 165:5 175:2 | 40:19 123:4 |

**september** 259:14
**serve** 23:6,8 24:5
  25:4 29:8 30:3
  31:13
**served** 24:9,18
  25:8,24 27:4,9
  29:12 30:5 31:4,9
  34:7 41:19
**service** 24:13
**serving** 34:8
**set** 139:10 141:13
  257:10 323:11,21
**sets** 215:7
**settlement** 126:21
  126:24 127:11,13
  127:23 218:22
  242:8 252:25
  253:4 254:10,20
  255:19 256:20,23
  257:4,6,8,15,24
  258:6,8 276:14
  277:5,9 280:8
  291:21,23 294:12
  295:4,8,8,10 296:6
  296:8,23 297:6,8
  306:16,18 307:3,9
**settlements** 296:10
**seventh** 272:2
**seymour** 112:19
  112:25 113:13,17
  113:21 114:7,22
  114:25 115:17
  116:3,10,16
  117:18 118:3
  119:9,16 120:6,10
  120:15 122:7,10
  122:12,17 123:5
  123:14 124:9,16
  124:22
**shapss** 112:20

**share** 211:15
  212:20 238:18,25
**shared** 244:11
**shareholders**
  83:19
**shares** 36:17
**sheet** 136:25 137:5
  157:17 173:9
  228:2,5 230:2,3
  232:25 280:25
  281:7 325:6,8,10
  325:13
**shift** 38:14 315:9
  315:16
**short** 123:25
  147:15,20 182:18
  182:20 187:10,18
  284:12 300:13
**shorthand** 323:6
**shortly** 261:24
**show** 56:5 140:21
**showed** 222:10,18
**showing** 55:22
  156:8,12,16,17,21
  157:16
**sic** 305:10 317:13
**sid** 34:10
**side** 7:22,22
  297:15
**sideways** 178:5
  180:6
**sign** 64:25,25
  65:11,12 206:4
  227:9 325:7
**signal** 162:18
**signatory** 243:20
**signature** 65:22
  206:21 323:23
  326:21
**signatures** 194:10
  243:14

**signed** 3:12,13
  63:14,19,22 111:7
  118:11,23 119:2
  130:21 131:3,10
  131:11,22 132:18
  162:5 163:3 172:5
  172:8,21 184:16
  184:17 187:21
  206:17,19 227:12
  227:15,19 263:25
  313:2
**significance**
  244:24 245:10
**significant** 235:5
  268:5 313:25
  314:23
**significantly**
  258:15
**signing** 64:3,21
  110:21 325:9
**signs** 118:25
**silvia** 1:8 102:10
  102:10,18 147:6
  172:21 178:18
  197:14 199:9,14
  217:5 218:11
  222:22
**similar** 139:8
  172:10 180:16
  181:8
**simply** 131:21
**simultaneous**
  257:5
**simultaneously**
  26:4 112:5 177:22
  179:5
**singer** 1:10 2:10
  288:14
**single** 225:8
  257:16,16

**sir** 155:23 274:6
**sit** 34:9,13 46:19
**six** 6:21 85:11
  131:12 138:7
  145:9 149:18,24
  150:3,6 184:12,19
  186:4 271:25
  303:22
**sixth** 272:2
**size** 21:13 22:12
  51:6
**sizes** 22:19
**skip** 83:15
**sleep** 68:17
**slightly** 136:22
**small** 1:4 4:18
  5:25 21:10 68:7
  68:21,25 69:5,9,11
  70:22 72:22 75:11
  75:13,15,20,22
  76:7,8,25 83:18
  86:12,23 93:11
  105:4,25 112:6
  195:7,16,24
  212:13
**sold** 318:7,8
**sole** 21:18,23
**solely** 237:2
  289:11 319:19
**solutions** 2:23,24
  324:5
**somebody** 309:15
**somewhat** 121:16
**sommer** 1:9 2:10
**soon** 143:4
**sorry** 7:17 8:6
  11:24 19:24 21:15
  21:17 22:2,16
  24:11,21 25:2,25
  28:16 29:16,20
  31:6 36:2 37:12

38:25 39:7 50:23
53:10 56:25 58:5
58:25,25 61:7
62:3,16 68:11,12
78:8 80:25 83:2
86:6 89:9 93:17
110:11 111:20
117:5 125:21
132:14 133:11
139:2 149:2,3
150:12 151:5
155:10 156:9
165:12,16 167:2,8
167:14 169:18,25
171:3 173:15,15
175:8 179:8
181:14 182:23
183:2 193:13,15
199:4 201:22
209:22 210:17
228:22 232:5,16
233:17,24 234:4
235:11 238:4,21
240:19 247:16
252:23 258:19
265:16 274:3
282:19 285:14
287:10 301:16
302:15 308:10
309:11,12,17
314:24,25 316:16
317:10 318:9
319:13
**sort** 129:16 213:16
**sought** 279:6
**source** 309:6
**sources** 152:14
**space** 325:5
**speak** 47:25 48:6
99:20 180:10
207:12 220:15

243:6 311:24
312:12
**speaking** 54:7
92:3 198:17 268:6
**speaks** 44:9
137:15 149:24
**special** 135:15
**specialist** 2:23
**specialty** 23:19
**specific** 14:11
26:18 59:11 64:20
65:5 90:25 92:2
92:16 135:2
153:14 164:10,11
220:2,20 221:4,5
224:22 245:23
246:2 247:9
262:17 320:8
**specifically** 16:21
19:2 27:20 31:3
45:22 47:9 53:24
56:12 61:21 63:6
72:2,6,9 77:13
80:10 81:9 84:9
84:19,25 95:4
105:12 108:20
113:19 116:8
119:17 123:17
127:24 142:5
159:5 161:16
180:11 189:13,19
241:22 243:21
307:12 308:23
311:2 316:13
317:23 318:19
**specifics** 283:25
313:21
**specified** 14:4
207:8 240:15
257:7,10 262:14

**specifies** 203:23
**speculate** 213:21
251:25
**speculating**
212:23 214:8
**speculation**
200:18 201:21
**spell** 69:23
**spend** 218:9
**spent** 268:5 284:8
**spoke** 13:17
220:10 306:15
**spot** 166:4
**square** 2:5
**ss** 322:4 323:4
**staff** 103:4
**standalone** 119:18
119:22 122:20
169:19,22
**standalones**
169:17,18
**standard** 215:9,10
**standards** 116:2
**standing** 181:21
**stands** 70:21
**stapled** 257:15
**start** 111:23
**started** 229:16
**starting** 15:7
26:12,17
**starts** 265:24
**state** 1:20 5:12,17
7:4 144:6 286:23
322:3 323:3,7
325:5
**stated** 7:4 97:8
128:3 255:3 257:3
266:15 283:11
**statement** 8:4 9:6
9:7 16:12 113:6
119:21,25 124:23

125:15 128:6,17
154:8 170:18
171:22 173:8
176:5 177:3
181:12 213:24
256:18 315:9
**statements** 57:17
109:3,9,14,15
112:22,23 119:23
122:21 123:6
161:18 170:7
178:21 214:11
234:7 236:18,22
236:24 237:7
247:6 248:12,14
298:8 307:14
318:21
**states** 1:2 4:22
5:25 204:9
**stating** 147:7
**statute** 40:11
**stay** 181:21
**stayed** 249:8
**step** 110:8,12,18
110:20,24
**steps** 64:20 273:18
**steve** 183:7 265:14
292:13
**steven** 1:9 2:6 5:21
111:23 167:14
222:2 245:20
292:17
**stevens** 198:20
217:2 220:4 221:6
222:20
**stipulated** 3:3,8,11
**stock** 13:24 14:2
260:15,19,24
261:5,5,8,22,23,25
262:3,4,6,22 263:4
269:18,18 276:2

313:3,11,14 314:3
**stockbroker** 17:7
**stocks** 21:11,12
**stopped** 47:23
  48:17 198:13
**strategy** 315:16
**street** 2:12
**structure** 124:3
**sub** 207:10
**subject** 8:8 115:25
  325:9
**submission** 169:10
  176:14 205:10,24
  226:11 324:14,15
**submit** 251:7
**submitted** 14:7
  65:21 171:20
  176:6 178:22
  179:7 200:12
  217:6 262:2
**subscribed** 322:18
**subsection** 83:16
**subsequent** 62:23
  63:2,16 142:2
**subsequently**
  29:22 127:18
  129:6
**subsidiaries** 94:18
  94:20,24 95:8,12
  95:14,18 96:3,17
  97:25 98:4,5
**subsidiary** 13:9,19
  80:14 95:10,25
  96:12 97:2,6,20
**substance** 249:23
  263:11
**substantial** 11:22
  312:14
**substitute** 182:25
  183:3,23 261:7
  262:10 263:7

**substituted** 263:3
**substitution**
  313:15
**subverts** 283:14
**successful** 280:6
  280:11
**suggest** 245:22
**suggestion** 250:16
**suing** 196:24
**sum** 295:11
**summaries** 46:13
**summarize** 266:8
**summary** 51:4
  55:15 57:16 61:15
  84:11 136:24
  137:16 140:7,8
  178:12 203:5
  205:11 226:12
  273:16 300:14,15
  324:15,16
**summer** 16:5,6
**supposed** 88:3
  106:3,11,21 107:6
  224:4,13
**sure** 7:25 8:5 20:2
  20:25 26:20 27:3
  32:11 58:22 59:20
  59:22 66:20 70:13
  84:14 86:5 100:15
  104:11 109:12
  119:15,15 120:19
  122:23 129:22
  143:5 151:21
  152:22 161:17
  162:3,14 176:24
  202:18 206:10,14
  214:7 221:3 232:9
  232:17 233:15
  243:24 245:8
  247:5,13 256:11
  266:17,24,25

267:6 286:23
  296:20 308:24
  309:18 315:3
**swear** 6:25
**sweinberg** 2:7
**sworn** 3:14 7:3
  144:5 322:18
  323:11
**sylvia** 179:16
**system** 103:3
  153:4 241:11
**systems** 16:22

**t**

**t** 23:15 29:15
  144:2 322:2 323:2
  323:2 324:5 326:2
**tab** 74:25 105:15
  125:22 135:23
  183:5 190:2 265:3
  268:23 270:10
  274:16 277:22
  285:16 311:14
**take** 4:12 9:11
  10:21 14:12 33:25
  61:10 64:15 66:7
  66:22 78:11 130:5
  143:3,5 179:11
  217:24 218:3
  261:10 273:17,18
  274:7 276:17
  280:3 290:4 298:9
  298:13,23 313:15
**taken** 33:19,22
  43:11 46:25 67:5
  78:16 143:13
  183:14 226:4
  290:11 320:24
  322:7
**talk** 25:14 50:13
  130:16 187:12
  200:22 232:2

238:3
**talked** 217:9
  229:14 266:12
  279:4 280:19
  317:25
**talking** 13:6,7,8
  24:25 48:7,12
  50:7 53:7 54:12
  54:17 75:18 76:3
  90:20 91:25
  100:10 101:21
  114:11 153:15
  165:14 198:14
  246:2 254:12
  312:10
**talks** 139:22
  168:13,16
**taught** 70:5
**tax** 172:18 259:12
**taxicab** 38:16
**technical** 68:13
  122:23 158:2
  181:2 275:13
**technically** 70:2
  87:17
**technote** 75:2 79:6
  217:17 324:6
**technotes** 74:10,14
  74:20 78:23
**telecommunicati...**
  16:20 18:17
**tell** 15:5 78:21
  126:7 136:8 137:8
  144:25 148:25
  154:9 155:3 157:7
  169:7 173:7 184:6
  184:8 187:5
  188:14 190:12
  194:17 205:19
  209:14 226:18
  260:6 264:11

289:7 293:13
**tense** 54:7
**tenure** 307:24,25
　320:14
**term** 79:12,25
　82:20 98:18
　147:23 181:3
　248:8,10 276:7
　280:25 281:6
　284:12 292:22
　319:8,11,25
**terminate** 315:21
**terminated** 311:5
　312:20,24 314:6
**termination**
　278:18 311:9,22
　312:18,22 313:2
**terms** 18:5 20:19
　60:17 64:24 82:25
　83:3 85:5,17,17
　86:8,12 91:2,5
　99:6,25 101:5,20
　106:8 109:22
　111:15 117:24
　119:12 124:5
　128:8,16 134:19
　137:12 147:13,21
　154:13 168:7
　182:7 194:16
　214:9,13,19 231:2
　238:8,11 240:8,12
　249:9,13 280:12
　282:14 293:15
　298:18 304:21
　308:9 311:20
**test** 57:13 67:12
　223:17,17
**testified** 7:6 10:8
　19:21 20:5 55:14
　94:12 100:6,25
　144:7

**testimony** 10:18
　14:13 44:7,9
　66:12 94:12 97:11
　120:25 171:19
　176:25 224:11
　251:14 279:15
　322:7 323:13
**tests** 57:14
**thank** 7:7 8:2,7,16
　9:20,21 11:11
　19:10 66:15,21
　67:11,14 82:9
　85:15 87:12 92:4
　93:8 146:2 155:12
　162:21,21 182:16
　184:13 202:11
　206:12 213:22
　222:2
**thanks** 68:19
　85:16
**theory** 283:13
**thereof** 261:6
**thick** 58:17
**thing** 245:21
**things** 91:7 189:8
　206:25 208:10
　279:8,18,21
**think** 75:24,24
　88:18 137:15
　145:14,15 150:19
　155:11 174:9
　178:9,10 180:7
　181:13 203:22
　206:24 225:4
　285:19 320:19
**thinking** 306:22
**third** 163:17
　209:20 283:10
　286:15 287:12,20
**thirty** 325:14

**thought** 37:21
　101:9 111:20
　131:6 167:9 170:5
　171:10,11 284:19
**three** 164:22,23
　169:13 255:12
　271:20 284:9,10
　295:24
**throw** 248:25
**thrown** 267:12
**tied** 159:6 276:8
**ties** 152:8,9,16
**till** 27:12 44:14
**time** 1:18 3:10 4:4
　5:18 7:11 10:23
　11:12 19:14 27:11
　27:17 28:13,21
　35:6,22 36:4
　40:17,21,21 43:25
　44:2 47:6,10,21
　48:17 53:13 54:18
　54:21 55:9 59:15
　60:22,25 62:6
　63:11 65:9 67:7
　76:4 78:12,14,18
　84:6,7,8,8 86:3
　90:19 92:2,15
　94:25 97:12,23
　98:6 99:11,23
　100:11,12,19,22
　102:7 104:16
　107:25 108:5,9,16
　114:13 117:6
　121:8,21,21,24
　127:8 128:21,25
　129:5 133:7
　134:20,21 135:2
　144:3,10 151:16
　153:16,17,21,22
　157:9 159:9,17
　165:23 177:14,18

179:6 183:16
　189:10 191:12,12
　192:9 193:12
　195:6,22 196:2
　197:24 198:7,13
　199:8 203:12
　216:18 219:2
　220:9,22 222:2
　226:6 232:20
　237:23 238:23
　239:7,7 250:15,19
　250:24 253:2,10
　253:11 262:23,23
　268:6 272:21
　281:3 288:11
　290:13 297:21
　301:6 308:18,21
　312:11 318:10
　320:22 321:2,18
**timed** 56:25
**timeline** 132:23
**times** 10:2 22:20
　42:17 66:18 93:24
　98:23 101:15
　104:25
**timing** 57:7,10
　68:16
**title** 36:9 137:20
　137:21 155:10
　164:3 172:18
**titled** 137:18
　163:21 227:24
　232:23 237:17
**titles** 28:13,15
　35:22 227:20
**today** 10:12,19
　11:19 14:13 20:6
　22:16 33:18
　101:20 264:16
**today's** 14:22 15:2

**top** 126:18 155:11 168:6 294:11,15 294:21
**topic** 127:20 294:18
**topics** 20:4 44:22 45:2 71:24 72:4,8
**total** 211:8,11 220:8 228:22 229:3,9,14 230:6 230:13 231:12,25 233:3,19 294:12 295:3,7,10
**totality** 249:23 312:12
**touching** 57:2
**tradable** 312:6
**traded** 20:9 21:11 23:4,19 24:19
**trading** 16:14 20:10
**training** 69:5,9,16
**transaction** 86:11 86:18,19,23 87:3 87:11 89:21 91:10 91:19 92:6,16 247:24 248:4 266:4,7,21 267:3 267:15,23 268:17 269:21 278:20,23 313:17
**transactions** 18:19 18:24 20:13 79:4 85:20 86:16 92:21 93:3
**transcript** 9:11 322:7,9 323:12 325:15,16
**transfer** 18:25 87:5 241:2 243:13 243:15,22 253:20

**transferred** 196:9 196:15
**transfers** 18:23 253:3 254:2,4,9,17 255:7,12,17 256:3
**treatment** 213:10
**trial** 3:10
**tried** 12:12 203:24
**trouble** 107:12
**troubled** 42:17
**true** 147:4 172:15 184:23 200:11 206:22 207:2 215:16 322:9,13 323:13
**truthful** 10:18
**try** 68:18
**trying** 36:2 80:19 88:16 106:18 114:18 120:16 130:13 131:15 192:9,13,15 232:7 232:17 245:22 261:18 273:15 284:5
**tuesday** 105:17 324:7
**turn** 264:25 268:18 286:15
**turned** 256:21 257:2
**turns** 257:11
**two** 13:16 20:7,7 40:23 109:10 123:20 130:11,17 130:25 131:8 139:22 177:15 193:11 209:17 227:20 271:20 272:6 295:12

**type** 10:4 22:24 23:21 57:23 69:4 87:4 269:23 270:4
**typed** 271:13
**types** 57:6 76:24 161:9,13 307:17 318:17
**typically** 11:4
**typo** 137:11

**u**

**u** 23:16
**u.s.** 1:4 4:18
**ucc** 300:22,25
**uh** 142:13
**ultimate** 268:10
**ultimately** 121:23 267:24 280:5,11
**um** 97:7 99:16 132:20 152:12 229:18 253:22 260:20 271:24
**unable** 133:2
**unanimous** 201:25 202:23 203:15
**unaudited** 123:17 233:2
**undergraduate** 34:3
**underlying** 13:24
**understand** 11:13 19:25 30:20 32:7 36:2 39:17 76:22 87:9 91:16,23 114:16 130:13 131:15 182:5,21 192:9,16 211:25 213:5 223:23 242:5 273:23 296:18 299:11 304:11

**understanding** 13:14 16:12 33:10 68:6 73:11,19,25 74:14 75:19 76:9 76:13 77:11 79:12 79:21,24 80:4,11 80:20 81:3,11,21 81:24 82:20 83:5 83:11 84:21 85:5 86:10,21 88:2,21 91:8,17 105:23 107:13 108:22 159:25 202:20 203:5 204:2 212:4 223:24 242:2,14 244:23 245:9 246:12 266:19 284:18
**understood** 52:6 158:19
**unit** 4:15 67:2,9 143:9 144:12 183:11,18 225:25 226:8 290:8,15 321:13
**united** 1:2 4:22 5:25
**university** 15:10 34:5
**university's** 34:14
**unquote** 137:17 312:3
**unreportable** 25:14 50:13 187:12 200:22 232:2 238:3
**unsigned** 130:19 168:3
**unusual** 248:18
**updates** 74:15

**updating** 266:3
**upset** 314:5
**urgent** 315:17
**use** 103:2 159:15
    181:2 273:20
    291:5,9 292:21,23
**uses** 147:4
**utilize** 204:4 274:8
**utilized** 203:20
    204:16
**uwc** 202:6,9,14
    203:23 204:5,10
    204:14,16 205:2
**uwcs** 202:20

**v**

**vague** 200:20
    245:5,16
**validity** 223:19
**valuation** 55:20,25
    101:21 102:16
    103:6 176:18
    178:12
**valuations** 52:11
    59:13
**value** 20:11 51:7
    94:2,6 132:3
    154:13 208:21,25
    228:17,23 229:2,8
    229:15,19 230:7,9
    230:14,23 231:3
    233:9,20 234:11
    235:6,7,20 269:17
    275:22,25 276:18
    293:15,16,22,23
    293:25 304:22
**valued** 98:22
**variety** 152:7,7,13
**various** 12:19
    21:20 27:4 73:3
    139:20 140:17
    156:13 159:23

204:9 216:21
    265:25 292:13,16
**vary** 180:14
**vehicle** 39:2,4
**velocity** 308:9,19
    309:16,19,23
    310:5,9,11,23
    311:21,23 312:19
    312:24 313:9,25
    314:16,20 315:24
    316:7,10,21
    317:19,20
**velocity's** 309:2
    310:18
**verbal** 10:13
**verifying** 248:3
**veritext** 2:23,24
    5:3,6 324:5
**version** 170:12
    171:23,25 244:13
    263:23 264:10
**versus** 4:20
**viability** 46:16
**video** 2:23 4:11,16
**videoconference**
    2:3
**videographer** 4:2
    5:4 6:23 66:25
    67:6 78:13,17
    143:8 144:9
    183:10,15 225:24
    226:5 290:7,12
    320:21,25 321:12
**videotaped** 1:17
**view** 224:16
    268:14
**violate** 127:2,12
**violation** 262:6,18
    262:21
**violations** 262:24

**virtually** 5:17
**visit** 218:8 220:9
**visited** 220:10
**vocabulary**
    266:16
**vote** 201:18

**w**

**w** 322:2
**wait** 115:4 186:15
    245:15 279:12
**waiting** 75:10
    133:7 142:11
    277:13
**waived** 3:7
**walker** 286:18
    287:2
**want** 57:19 81:15
    81:16 92:19 97:10
    146:20 151:18
    166:2,4 171:4
    179:17 207:11
    230:2 247:11
    271:7 292:21
**wanted** 38:5
    260:11
**washington** 15:10
    15:11 34:4,14
    217:23
**watermark** 64:12
    64:16
**way** 7:19,22 13:17
    55:18 64:5 118:9
    201:19 235:23
    251:16 256:13
    262:24 268:16
    320:2 323:18
**we've** 191:12
**weeks** 276:17
**weinberg** 5:5,6
    5:21,22,23 6:6 7:7
    7:25 8:3,7,18,20

25:20 43:9 66:6
    66:22 73:24 74:24
    78:10 105:13
    115:12 125:20
    135:21 144:13
    162:14 167:8,15
    182:23 183:9,22
    225:11 232:3,14
    232:19 235:13
    245:25 265:15
    268:22 272:16
    274:3 277:22
    279:16 285:13,17
    290:4,20 301:21
    311:7,14 315:6
    317:18 320:18
    321:3 324:4
**weiner** 263:19
**welcome** 67:10
**went** 42:10 101:9
    152:8 171:3
    220:10 255:3
**west** 2:12
**whereof** 323:20
**whispering** 4:8
**wholly** 13:19
    96:11 97:2
**wifi** 162:18
**willing** 292:6
**wind** 269:24
**winding** 269:19
**window** 7:19,23
    9:14
**wish** 326:3
**withdraw** 200:23
**withdrawing**
    115:14
**withdrawn** 28:2
    37:8 44:20 55:25
    61:8,24 63:12
    73:7 74:5,7 75:12

**86:9,18 89:11**
**104:19,21 106:7**
**117:25 133:21**
**195:8 196:18**
**303:22 308:13**
**witness** 6:25 7:17
8:2,5,16 100:6
182:16 213:22
225:12,15 232:7
321:7 323:10,14
323:20 324:2
325:2 326:21
**witnesses** 66:17
**wolgel** 2:4 5:22
6:5
**wolpert** 1:9 2:10
**word** 29:17 79:11
82:14
**worded** 85:2,4
**words** 36:12 147:4
277:2 312:21
**work** 11:6 16:9
17:25 19:12 33:17
38:6 39:9,21
72:17 102:11
107:6 138:13
155:5 163:20
168:5 177:25
222:16,17,18
247:4 251:23
252:3
**worked** 16:3 166:9
**working** 18:16
20:20 295:22
297:2,3 300:10
**workings** 99:9
**worksheet** 244:11
244:13,15 296:2
305:9
**worries** 86:7 198:5

**worth** 236:3,12
**written** 46:12
146:19 201:25
202:24 203:3,15
247:10 271:5
272:11
**wrong** 137:4 174:9
229:4

**x**

**x** 1:3,13 324:2,5

**y**

**yeah** 37:23 45:9
77:7,9 82:16
91:15 93:18
106:16 119:6
149:13 158:23
160:23,23 166:12
177:6 178:9
197:21 208:10
222:18 236:10
265:21,22 275:3
295:16 302:10
315:7 318:14
**year** 35:16,16
36:19 71:16 90:10
90:11 119:19
137:25 138:4,14
147:23 148:3
179:12,22,23
180:14,14 181:18
181:20 218:9
312:18
**years** 12:6,7 22:19
31:16 33:24 34:12
34:15 85:11,13
129:9 225:21
**yep** 66:24 115:15
178:7
**york** 1:2,20 2:6,6
2:12,12,18,18 4:23

7:4,5 34:11 144:6
218:14 322:3,4
323:3,4,8

**z**

**zero** 22:23 96:19
**zone** 272:10,16
**zoom** 2:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 327

1

2  UNITED STATES DISTRICT COURT

3  EASTERN DISTRICT OF NEW YORK

4  17-cv-3586(JS)(JMW)

5  - - - - - - - - - - - - - - - - - - -x

6  U.S. Small Business Administration :

7  As Receiver of ELK ASSOCIATES FUNDING

8  CORP.,

9                          Plaintiff,

10         - against -

11  MICHAEL FEINSOD, SILVIA MULLENS,

12  RICHARD FEINSTEIN, GARY GRANOFF,

13  STEVEN ETRA, JOHN LAIRD, IVAN J.

14  WOLPERT, HOWARD SOMMER, MURRAY

15  INDICK, ELLIOTT SINGER, and PETER

16  BOOCKVAR,

17                          Defendants.

18  - - - - - - - - - - - - - - - - - - -x

19                          November 16, 2021

20                          9:15 a.m.

21

22

23

24

25

Page 328

```
 1
 2
 3          CONTINUED VIDEOTAPED DEPOSITION
 4   of MICHAEL FEINSOD, pursuant to notice,
 5   held remotely via Zoom videoconference,
 6   before Debbie Zaromatidis, a shorthand
 7   reporter and notary public of the State of
 8   New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 329

```
 1
 2   A P P E A R A N C E S :
 3
 4      GOTTESMAN WOLGEL FLYNN
 5      WEINBERG & LEE, P.C.
 6      Attorneys for Plaintiff
 7          11 Hanover Square
 8          New York, Yew York
 9      BY:   STEVEN WEINBERG, ESQ.
10            - and -
11          KELSIE BILODEAU, ESQ.
12
13      MOLO LAMKEN, LLP
14      Attorneys for Defendants
15      Michael Feinsod and Richard Feinstein
16          430 Park Avenue
17          New York, New York
18      BY:   RAYINER HASHEM, ESQ.
19            - and -
20          ELIZABETH CLARKE, ESQ.
21
22
23
24
25
```

Page 330

```
 1
 2   A P P E A R A N C E S :   (CONTINUED)
 3
 4      HOLLAND & KNIGHT, LLP
 5      Attorneys for Defendants
 6      Independent Directors
 7          31 West 51st Street
 8          New York, New York
 9      BY:   MARTIN L. SEIDEL, ESQ.
10            - and -
11          MARIE LARSEN, ESQ.
12
13
14   ALSO PRESENT:
15      DAVID ROTHSTEIN, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 331

```
 1
 2          S T I P U L A T I O N S
 3
 4          IT IS HEREBY STIPULATED AND
 5   AGREED by and between the Attorneys for
 6   the respective parties hereto that filing
 7   and sealing be and the same are hereby
 8   waived.
 9          IT IS FURTHER STIPULATED AND
10   AGREED that all objections except as to
11   the form of the question, shall be
12   reserved to the time of the trial.
13          IT IS FURTHER STIPULATED AND
14   AGREED that the within examination may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before this
18   Court.
19
20
21
22
23
24
25
```

---

Page 332

1
2       THE VIDEOGRAPHER:   Good
3   morning.   We are going on the record
4   at 9:22 a.m. on November 16, 2021.
5   Please note that the microphones are
6   sensitive and may pick up whispering,
7   private conversations, and cellular
8   interference.   Please turn off all
9   cell phones or place them away from
10  the microphones as they can interfere
11  with the deposition audio.   Audio
12  and video recording will continue to
13  take place unless all parties agree
14  to go off the record.
15      This deposition is being held
16  remotely.   This is media unit number
17  1, Volume 2 of the video-recorded
18  deposition of Michael Feinsod located
19  at 200 South Service Road in Roslyn,
20  New York.   This deposition is being
21  taken by counsel for plaintiff in the
22  matter of U.S. Small Business
23  Administration as receiver of Elk
24  Associates Funding Corp. versus
25  Michael Feinsod, et al. filed in the

---

Page 333

1
2       United States District Court, Eastern
3   District of New York, Civil Case
4   Number 17CV3586JS-JMW, which is
5   related to Civil Case Number 131326.
6       My name is David Rothstein from
7   the firm Veritext New York, and I am
8   the videographer.   The court
9   reporter is Debbie Zaromatidis from
10  the firm Veritext New York.
11      I am not related to any party
12  in this action nor am I financially
13  interested in the outcome.
14      Counsel, will now please state
15  their appearances and affiliations
16  for the record.   If there are any
17  objections to the proceeding, please
18  state them at the time of your
19  appearance beginning with the
20  noticing attorney.
21      MR. WEINBERG:   Steven Weinberg
22  with the law firm Gottesman Wolgel
23  Flynn & Weinberg, PC, attorneys for
24  plaintiff Small Business
25  Administration as receiver for Elk

---

Page 334

1       FEINSOD
2   Associates Funding Corp.
3       MS. BILODEAU:   Kelsey
4   Bilodeau also of Gottesman Wolgel
5   Flynn & Weinberg for the receiver.
6       MR. HASHEM:   Ray Hashem
7   counsel for defendants Feinsod and
8   Feinstein.
9       MR. SEIDEL:   Martin Seidel,
10  Holland & Knight, LLC counsel for the
11  independent director defendants.
12      MS. LARSEN:   Marie Larsen also
13  from Holland & Knight on behalf of
14  the independent director defendants.
15      THE VIDEOGRAPHER:   Will the
16  court reporter please swear in the
17  witness.
18  M I C H A E L   F E I N S O D,
19  having first been duly sworn by a Notary
20  Public of the State of New York, was
21  examined and testified as follows:
22  EXAMINATION BY MR. WEINBERG:
23      Q.   Good morning, Mr. Feinsod.
24      A.   Good morning.
25      Q.   As you are aware, this is a

---

Page 335

1       FEINSOD
2   continuation of the deposition of October
3   28, and the same instructions apply.
4       Q.   Do you have any questions about
5   that?
6       A.   No.
7       Q.   Okay.   We understand that you
8   have taken a new position.
9   Congratulations.
10      What is your new position for
11  employment?
12      A.   I have not.
13      Q.   Okay.   Do you --
14      A.   I'm sorry.
15      Q.   Do you anticipate starting
16  employment soon?
17      A.   Potentially, yes.   Thank you.
18      Q.   Good luck.   Do you know who
19  that will be with or you don't know yet?
20      A.   It's been announced, but the
21  transaction hasn't closed yet.
22      Q.   Okay.   In terms of -- and will
23  that be a position as a chief officer or
24  financial -- executive or financial
25  officer with the company?

Page 336

```
1           FEINSOD
2      A.    I'm sorry.   What was the
3  question?
4      Q.    Will you be in management for a
5  publically-traded company?
6      A.    If the transaction closes
7  potentially, yes.
8           (Exhibit 23 marked for
9      identification.)
10     Q.    If you would turn to Exhibit 23,
11 please.  Let me know when you have it open.
12     A.    I have it open.
13     Q.    Okay.   Do you see that there is
14 an e-mail dated March 7, 2012, and would
15 you review that.  The first line of the
16 e-mail is that there was a wire transfer
17 received into --
18     A.    To Silvia Mullens is the first
19 line?
20     Q.    It's from Dominic Granito to
21 Silvia Mullens.  It is an e-mail dated
22 March 7, 2012, correct?
23     A.    I believe so.
24     Q.    Okay.   And in terms of the
25 substance of the message of the e-mail if
```

Page 337

```
1           FEINSOD
2  you skip down below bank debt summary
3  line, summary it talks about a wire
4  transfer?
5      A.    I see -- yes.
6      Q.    Okay.   Did that take
7  place -- and/or does this e-mail refresh
8  year your recollection that Elk assets of
9  Affinity Group and Mirimax were sold, and
10 the money was wired into the Elk Signature
11 Bank account?
12     A.    No.
13     Q.    Do you know --
14     A.    I am not a party to this e-mail.
15 It is the first time I've seen it.
16     Q.    Do you have any reason to doubt
17 whether this information is incorrect that
18 the Elk assets at around March of '12 for
19 Affinity and Mirimax were sold resulting
20 in proceeds of $2.7 million to the Elk
21 Signature Bank account?
22        MR. HASHEM:     Objection.   It
23     says $2.5 million.
24        MR. WEINBERG:  "Wire transfer
25     was received into EAFC Signature Bank
```

Page 338

```
1           FEINSOD
2      for the sale of Affinity Group and
3      Mirimax $2,743,878.
4        MR. HASHEM:     Are we referring
5      now to the second page or the first
6      page?
7        MR. WEINBERG:   Just the first
8      page.
9        MR. HASHEM:  Okay.
10       MR. WEINBERG:  Just the first
11     page of the exhibit.
12     A.    I hadn't looked at the second
13 page.  I apologize.
14     Q.    We are just looking at the first
15 page of the exhibit.
16     A.    Okay.
17     Q.    Do you have any reason to
18 believe that that transfer -- that the
19 wire transfer into the Elk account from
20 the sale of Affinity and Mirimax did not
21 occur?
22     A.    I have know recollection of
23 this.
24     Q.    Okay. If we look at the second
25 page of the exhibit, it is a funds
```

Page 339

```
1           FEINSOD
2  transfer request dated March 7, 2012 from
3  Elk to Ameritrans of $2.5 million; is that
4  correct?
5      A.    I have read the document, the
6  second page.  What is the question now?
7      Q.    Is this the page -- is this a
8  funds transfer requested on March 7 from
9  Elk to Ameritrans in the amount of 2 half
10 million dollars that you authorized by
11 your signature?
12     A.    It appears to be.  Yes.
13     Q.    Okay.   And is this -- and there
14 is a reference information.  Is this part
15 of the senior -- what was referenced as
16 the senior secured note advance?
17     A.    It appears to say that at the
18 bottom of the page.
19     Q.    Okay.  Do you have any
20 independent recollection of this transfer
21 occurring?
22     A.    No.   It occurred almost ten
23 years ago.
24     Q.    Okay.  Would this transfer have
25 been part of what was discussed as a
```

Page 340

```
1              FEINSOD
2    senior secured note advance at a February
3    24, 2012 board meeting?
4         A.    I don't recall.
5         Q.    If we look at the third page of
6    the exhibit, it is a funds transfer
7    request of the same date, March 7, 2012,
8    from Ameritrans to Ameritrans Holdings,
9    LLC in the amount of $1420,000 with your
10   signature; is that correct?
11        A.    It appears to be.
12        Q.    Do you have any reason to doubt
13   that this is not an accurate funds
14   transfer request form that you executed?
15        A.    I don't.  No, I don't.
16        Q.    Okay.  And in the reference
17   information it says "payoff amount."  Is
18   the payoff amount for the Renova bridge
19   loan?
20        A.    I'm sorry.  What --
21        Q.    The $1,420,000, is this the
22   payoff amount from Ameritrans Capital
23   Corporation to Ameritrans Holdings for the
24   Renova bridge loan or what is commonly
25   referred to as Columbus Nova?
```

Page 341

```
1              FEINSOD
2         A.    I don't recall.
3         Q.    You can put this away, and can
4    we go to Exhibit 24.
5              (Exhibit 24 marked for
6          identification.)
7         Q.    If we could go to page 20 -- 5
8    of Exhibit 24.
9         A.    Page 5, is that what you said?
10        Q.    It is an e-mail --
11        A.    Is it marked?
12        Q.    No.  You have to count.   I
13   think it would be PDF page 5.
14        A.    I believe I am there.
15        Q.    Okay.  This is an e-mail from
16   Dominic Granito to Silvia Mullens that is
17   dated it looks like March 19, 2012.  There
18   is a CC to Rick Feinstein.  You are not a
19   CC on this e-mail.
20             In terms -- the first line of
21   the information below bank debt summary
22   line summary, "Wire transfer received into
23   Elk EAFC Signature Bank for the sale
24   Synscort $853,776.71."
25             Do you see that?
```

Page 342

```
1              FEINSOD
2         A.    Yes, I see it.
3         Q.    Okay.  Do you recall that the
4    Elk assets of Synscort was paid -- was
5    sold at this time, and Elk received the
6    proceeds of the sale of Synscort?
7         A.    No.
8         Q.    Do you recall the next line 1.7
9    million was transferred from Elk to
10   Ameritrans both at Signature Bank for the
11   senior secured loan?
12        A.    I see the e-mail.  I see what it
13   is, but I am -- this is the first time
14   I've seen this e-mail.
15        Q.    In terms of a transfer from Elk
16   to Ameritrans, would you be one of the two
17   authorized signers to effectuate that
18   transfer?
19        A.    Say that again.  I didn't
20   understand the question. I apologize.
21        Q.    In order to transfer funds -- in
22   order t do a funds transfer request from
23   Elk to Ameritrans, were signatures
24   required for such a transfer?
25        A.    I believe so.  Yes.
```

Page 343

```
1              FEINSOD
2         Q.    For the $1.7 million transfer
3    from Elk Funds to Ameritrans, whose
4    signatures would be required to affect the
5    transfer?
6         A.    I don't recall.  It would
7    be -- it wasn't specific as to personnel I
8    believe.
9         Q.    Okay.  Did you have signature
10   authority to make that transfer?
11        A.    I don't recall.
12        Q.    Did Mr. Feinstein have signature
13   authority to make that transfer?
14        A.    I don't recall.
15        Q.    And then the next line
16   "$2,650,000 were paid out of AMTC
17   Signature Bank for AMTC notes payable."
18             Do you see that information?
19        A.    The next line --
20        Q.    The note --
21        A.    Yes, I see the line.  Sorry.
22   I went to the next page.
23        Q.    Do you know who the notes
24   payable was at AMTC?
25        A.    No.  I don't recall.
```

Page 344

```
 1              FEINSOD
 2      Q.   Do you know if that was the Etra
 3  for the -- or what has been called the
 4  senior notes or Etra affiliated notes?
 5      A.   I don't recall.
 6      Q.   If you turn to the next page,
 7  page 6, you have a transfer dated -- a
 8  funds transfer request dated March 16,
 9  2012 from Elk Funds to Ameritrans Capital
10  Corporation in the amount of $1.7 million.
11          Do you see that?
12      A.   In the amount of what?
13      Q.   $1.7 million?
14      A.   I have that one.
15      Q.   I'm sorry?
16      A.   Yes.  I have that page open.
17      Q.   Okay.  And is that your
18  signature on the client signature line?
19      A.   Yes.   It appears to be.
20      Q.   And do you see the reference
21  information "senior secured note advance"?
22      A.   Yes.
23      Q.   Okay.  Do you have any reason to
24  believe -- to believe that the information
25  on the funds transfer request from page 6
```

Page 345

```
 1              FEINSOD
 2  is inaccurate?
 3      A.   It is the first time I have seen
 4  it.  I don't know.
 5      Q.   Do you recall seeing it when you
 6  signed it?
 7      A.   You asked if I had -- this is
 8  the first time I have seen this -- that I
 9  recall seeing this copy.
10      Q.   Okay.  I mean do you have any
11  reason to believe that the information of
12  the transfer from Elk of 1.7 million on
13  March 16, 2012 to Ameritrans for the
14  senior secured note advance signed by you
15  is inaccurate in any way?
16      A.   No.  I don't believe this is
17  inaccurate.
18      Q.   Okay.  Page 7 is an e-mail from
19  Dominic Granito to you, Michael Feinsod,
20  and Silvia Mullens with a CC to Rick
21  Feinstein; is that right?
22      A.   Yes.
23      Q.   And it is dated March 21, 2012,
24  correct?
25      A.   Yes.
```

Page 346

```
 1              FEINSOD
 2      Q.   Okay.  And the first line of the
 3  substance of the e-mail is "Wire transfer
 4  was received into EAFC Signature Bank for
 5  the sale of Fairway $1,428,001.29; is that
 6  right?
 7      A.   Yes.  That is what it says.
 8      Q.   Okay.  Do you recall that
 9  Fairway was an Elk asset that was sold,
10  and the proceeds were received as stated
11  in this e-mail of March 21, 2012?
12      A.   No, I don't recall.
13      Q.   If you go to page -- I'm sorry.
14  On -- on the page that we were looking at,
15  page 6, do you have any reason to believe
16  that that information regarding the sale
17  of Fairway and the proceeds into Elk's
18  bank account is inaccurate?
19      A.   No.
20      Q.   Okay. Page 7 is an e-mail from
21  you, Michael Feinsod, dated March 23, 2012
22  to Dominic Granito with a CC to Rick
23  Feinstein.  The subject is "Senior note";
24  is that right?
25      A.   Yes.
```

Page 347

```
 1              FEINSOD
 2      Q.   Okay.  "Please wire 300,000
 3  from Elk to Ameritrans.  This is the final
 4  advance under the note."
 5          Do you recall that transfer?
 6      A.   No, I don't.
 7      Q.   Do you have any reason to
 8  believe the information in the e-mail is
 9  inaccurate?
10      A.   It is different than the other
11  e-mails you showed me.
12      Q.   Do you have any reason to
13  believe that the -- the information about
14  please wire -- the request to wire 300,000
15  from Elk to Ameritrans and this is the
16  final advance under the note as to whether
17  or not that is inaccurate in any way?
18      A.   As I said, it looks
19  significantly different from the other
20  e-mails you have shown me today.
21      Q.   Other than looking different, do
22  you think the substance of that
23  information is accurate?
24      A.   I don't have an opinion on that.
25      Q.   Sorry.  What?
```

Page 348

```
 1             FEINSOD
 2     A.    I don't have an opinion on that.
 3     Q.    If we go to the funds -- the
 4  next page, page 9, funds transfer request
 5  form dated March 23, 2012 in the
 6  amount -- it is from Elk Associates to
 7  Ameritrans Capital Corporation in the
 8  amount of $300,000 with your signature as
 9  the -- one of the client signatures; is
10  that correct?
11     A.    Yes, that is correct.
12     Q.    And is Mr. Feinstein the other
13  client signature?
14     A.    I do not know.
15     Q.    In the reference information
16  the -- for the fund transfer request of
17  300,000 on March 23, 2012 from Elk to
18  Ameritrans, it states it is for the senior
19  secured note advance; is that correct?
20     A.    That is what it says.
21     Q.    Do you have any reason to
22  believe that information is inaccurate?
23     A.    No.
24     Q.    If we go to the next page, page
25  10, the March 23, 2012 funds transfer
```

Page 349

```
 1             FEINSOD
 2  request is from Ameritrans Capital
 3  Corporation to John Hancock Life Insurance
 4  Company of New York in the amount of
 5  $140,941.91; is that correct?
 6     A.    That is correct.
 7     Q.    Okay.  And is that your
 8  client -- is that your signature where it
 9  says "Client signature authorizing the
10  transfer on March 23, 2012 from Ameritrans
11  Capital Corp. to John Hancock Life
12  Insurance Company of New York?
13     A.    Yes.
14     Q.    Was that a payment of premium
15  for one of the life settlement policies
16  owned by Ameritrans Capital Corporation?
17     A.    I don't recall.
18     Q.    Do you know what the payment was
19  for the -- that is in the reference
20  information of the Bernard Pollack policy
21  number, and then it gives a policy number
22  for the John Hancock Life Insurance
23  Company of New York on behalf of
24  Ameritrans Capital Corporation?
25     A.    It says "Bernard Pollack policy
```

Page 350

```
 1             FEINSOD
 2  number 59669523" on the reference number
 3  page.
 4     Q.    Okay.  I asked you if you knew
 5  what that payment was for.
 6     A.    I don't recall.
 7     Q.    Okay.  Do you recall that
 8  Ameritrans Capital Corporation had life
 9  settlement policies as an asset of
10  Ameritrans?
11     A.    Yes.
12     Q.    Do you recall that Ameritrans
13  Capital Corporation made payments of
14  premiums for those life settlement
15  policies from advances that Elk had made
16  to Ameritrans?
17     A.    I don't understand the question.
18  I apologize.
19     Q.    Elk loaned money to Ameritrans,
20  right?
21          MR. HASHEM:    Objection.
22      Foundation.
23     Q.    Do you know if Elk loaned money
24  to Ameritrans?
25     A.    Not that I am familiar with.
```

Page 351

```
 1             FEINSOD
 2     Q.    Did Elk make a $4.1 million loan
 3  to Ameritrans?
 4     A.    Elk had a senior secured note,
 5  yes.
 6     Q.    Okay.  And we just looked at the
 7  transfers previously from Elk to
 8  Ameritrans.
 9          Did Ameritrans use those monies
10  to pay among other things the premium due
11  for the life settlement policies?
12     A.    I don't recall.
13     Q.    Did Elk use those funds to pay
14  Columbus Nova -- I'm sorry.   Did
15  Ameritrans use the funds received from Elk
16  to pay the loan for Columbus Nova?
17     A.    I don't recall.
18     Q.    Did Ameritrans use the monies
19  received from Elk to pay the Etra
20  affiliated note holders?
21     A.    I don't recall.
22     Q.    On page 11, we have an e-mail
23  from Michael Feinsod to Dominic Granito
24  dated June 22, 2012.   "Please transfer
25  $175,000 from Elk to Ameritrans for
```

Page 352

```
1              FEINSOD
2  business development expenses."
3        Do you see that e-mail?
4     A.   Yes.
5     Q.   Okay.   What was -- was that an
6  advance from Elk to Ameritrans?
7     A.   I don't recall.
8     Q.   What -- were there terms for the
9  advance in terms of when Ameritrans had to
10 repay Elk for the 175,000?
11    A.   No, not specifically.   It was
12 the normal course of business.
13    Q.   What was normal course of
14 business?
15    A.   The advancement of business
16 development expenses from -- between the
17 parent and the subsidiary.
18    Q.   Was there any -- prior to Elk
19 make the advance to Ameritrans, was there
20 any determination as to solvency of Elk by
21 management?
22    A.   I don't recall.
23    Q.   Was there any determination of
24 solvency prior to the advancement of the
25 $175,000 solvency by the Board of
```

Page 353

```
1              FEINSOD
2  Directors?
3        MR. SEIDEL:   Objection to
4     form.   No foundation.
5     Q.   You can answer.
6     A.   Yes, I don't -- I don't recall
7  and I don't know.
8     Q.   Okay.   Did Ameritrans owe Elk
9  interest for the advance for business
10 developments expenses of $175,000?
11    A.   I don't recall.
12    Q.   And the next -- on the same
13 date, June -- if you go to the next page
14 on the same date, June 22, 2012, the funds
15 transfer request in the amount of
16 $156,688.28 from Ameritrans to John
17 Hancock Life Insurance Company for the
18 Bernard Pollack, and then it gives a
19 policy number.
20        Is that your signature on the
21 bottom of the transfer request?
22    A.   It is.
23    Q.   Okay.   Does this page refresh
24 your recollection as to whether this was a
25 payment for the premium of the life
```

Page 354

```
1              FEINSOD
2  settlement policy by Ameritrans to John
3  Hancock?
4     A.   No.   Again, it looks
5  significantly different than the other
6  wire transfers you have shown me.
7     Q.   Other than looking different, do
8  you have any reason to question the
9  accuracy of this document for the funds
10 transfer request of June 22, 2012?
11    A.   Potentially, yes.
12    Q.   Is that your signature on the
13 page? Is the same information -- is that
14 your signature on the page?
15    A.   On what page?
16    Q.   Page 12 of -- page 12.
17    A.   It appears to be.   Yes.
18    Q.   Okay.   On the -- now, what was
19 the -- what was -- what was the basis for
20 management to advance monies to -- from
21 Elk to Ameritrans for business development
22 expenses?
23    A.   What was the basis in general?
24 It was permitted -- we were -- that was
25 the guidance we were given it was an SBIC
```

Page 355

```
1              FEINSOD
2  on how -- on how to handle parent company
3  intertransfers.
4     Q.   And was this a transaction that
5  was authorized by the Board of Directors?
6        MR. SEIDEL:   Objection.
7     A.   What transaction are you talking
8  about?
9     Q.   The advance of $175,000 from Elk
10 to Ameritrans.
11    A.   I don't recall that
12 specifically.
13    Q.   Was this a transaction that was
14 reviewed by the Board of Directors
15 directors?
16        MR. SEIDEL:   Objection to
17     form.
18    A.   I don't recall.   Sorry.
19    Q.   Would the Board of Directors
20 authorize advances from Elk to Ameritrans?
21        MR. SEIDEL:   Objection vague
22    A.   In general, yes.
23    Q.   Can you recall a -- an example
24 of under what basis the board would
25 generally authorize advances from Elk to
```

Page 356

```
1           FEINSOD
2  Ameritrans?
3           MR. SEIDEL:  Objection.
4      A.   Repeat the question, so I
5  can -- I apologize.
6      Q.   You said in general yes, the
7  board would authorize advances from Elk to
8  Ameritrans.
9      A.   Yes.
10     Q.   And how would the board do that?
11     A.   Through the normal course of
12 business, since Ameritrans was formed in
13 1999.
14     Q.   What would be the normal of
15 practice as to how the board would
16 generally review and authorize advances
17 from Elk to Ameritrans?
18          MR. SEIDEL:  Objection.
19     A.   Retroactively -- sorry.
20 Retroactively on a quarterly basis they
21 would review the Form 468.  They would
22 also review reports from the annual audits
23 sent to the board, which would show those
24 intercompany balances.
25     Q.   Would the board also review the
```

Page 357

```
1           FEINSOD
2  10Ks and 10Qs for Ameritrans?
3           MR. HASHEM:   I am going to
4      object just to -- you said for
5      Ameritrans.  They are consolidated
6      10Ks.
7      Q.   For Ameritrans Capital
8  Corporation, is that right, Mr. Feinsod?
9      A.   The board would review
10 for -- while I was CEO for the -- each of
11 those filings.  Yes.
12          (Exhibit 25 marked for
13      identification.)
14     Q.   If you go to Exhibit 25, please.
15 Are you at the first page, page 1 of
16 Exhibit 25?
17     A.   I am at the first page of the
18 PDF, 1, 3 --
19     Q.   Okay.
20     A.   I have a ten-page PDF.  Would
21 you like me to read the whole thing or
22 stop --
23     Q.   No.  The memo exhibit -- the
24 first page is an e-mail from Dominic
25 Granito to Silvia Mullens and Michael
```

Page 358

```
1           FEINSOD
2  Feinsod dated August 8th, 2012
3  acknowledging receipt of the corrected
4  amount of $967,385.58 cents, and if you
5  look at the -- and the subject is Sheerer
6  funding memo.  It looks like a misspelling
7  memeo, 8/7/2012; is that right?
8      A.   Yes.
9      Q.   Sheerer is an Elk asset that was
10 sold at about this time, August 7, 2012?
11     A.   I don't recall.
12     Q.   If you go to the next page, we
13 have a funds transfer request dated August
14 10 of 2012 from -- of a hundred thousand
15 dollars from Elk to Ameritrans Capital
16 Corporation; is that correct?
17     A.   Yes.  That looks to be correct.
18     Q.   And is that your signature for
19 the client signature?
20     A.   It appears to be.
21     Q.   Okay.  And do you have -- and
22 again this is an advance for business
23 development expense; is that correct?
24     A.   The page says business
25 development expenses.
```

Page 359

```
1           FEINSOD
2      Q.   And again as a business
3  development expense, that was an advance
4  for which there were no terms between when
5  this had to be repaid or interest by
6  Ameritrans bank to Elk; is that right?
7      A.   I don't recall the terms.
8      Q.   Okay.  Do you recall -- do you
9  know if there were terms as to when it had
10 to be repaid back and if interest was to
11 be paid?
12     A.   However -- I don't recall, but I
13 assume it tracks the regulation.
14     Q.   And if you go to the next page,
15 we have a transfer request dated September
16 19, 2012 in the amount of 175,000 from Elk
17 to Ameritrans.
18     A.   This is the sideways page?
19     Q.   Correct.
20     A.   Okay.
21     Q.   Do you recognize the signatures,
22 the two signatures that were on the page
23 for the $175,000 transfer?
24     A.   No, I definitely do not.
25     Q.   Okay.
```

Page 360

```
1              FEINSOD
2      A.    Do you?
3      Q.    And if you go to the next
4 page --
5      A.    Should I go to the one that you
6 just -- so we are putting the one
7 away that doesn't --
8      Q.    We are just going to the next
9 page of the exhibit, which is page 4.
10     A.    Okay.
11     Q.    There is an entry 9/24/12.  This
12 is the Ameritrans general ledger of the
13 payment by Ameritrans to the John Hancock
14 Life Insurance Company in the amount of
15 $156,161.98.
16           Do you see that?
17     A.    I see Marino Partners credit
18 457, and I see multiple entries.
19     Q.    Do you see the miscellaneous
20 deposit of September 9, 2012 for the
21 $175,000?
22     A.    In the debit column?
23     Q.    Yes.
24     A.    Yes, I see that.  I see it
25 twice.  It is there in two instances.
```

Page 361

```
1              FEINSOD
2      Q.    And then you see the September
3 24, 2012 entry of the payment of 156,000
4 to the John Hancock Life Insurance
5 Company; is that right??
6      A.    I see it what looks like in two
7 places, yes.  One place, I am sorry, for
8 that case.  Yes.
9      Q.    Does the general ledger entry
10 refresh your recollection as to whether
11 this was an Ameritrans payment to John
12 Hancock Life Insurance Company for the
13 premium of a life settlement policy?
14     A.    Does it refresh my memory as to
15 what, the last page or --
16     Q.    That Ameritrans owned life
17 settlement policies, and that
18 Ameritrance -- does this refresh --
19     A.    These documents -- these
20 documents don't refresh my memory at all.
21     Q.    Okay.  Let's -- the next e-mail,
22 which is page 5, we have from Dominic
23 Granito to Michael Feinsod.  It is an
24 e-mail dated October 5, 2012, and below
25 the subject line says, "Proceeds from the
```

Page 362

```
1              FEINSOD
2 sale of Hudson Products wired into Elk
3 Signature Bank account
4 $1,000,235 -- $1,235,855.37; is that
5 correct?
6      A.    That is what is it says, yes.
7      Q.    Okay.  And then there was a
8 transfer of 64,000 from Elk to Ameritrans
9 and then a payment -- life settlement
10 premium payment paid out of Ameritrans of
11 63,300 -- $63,827.  Do you see that?
12     A.    I see -- yes, I see where it
13 says that.
14     Q.    Does that refresh your
15 recollection that Ameritrans used Elk
16 advances to pay Ameritrans life settlement
17 premium payments?
18     A.    No.  It does not.
19     Q.    Do you have any reason to
20 believe that the information in this
21 e-mail is inaccurate?
22     A.    Again, it looks different than
23 all the others, the various e-mails you
24 showed me.
25     Q.    Other than looking different in
```

Page 363

```
1              FEINSOD
2 the terms of substance of the three lines
3 that we read, do you have any reason to
4 believe that the lines that we read are
5 inaccurate?
6      A.    I don't recall at least the
7 numbers.  So --
8      Q.    You can put this -- any other
9 reason other than the specific numbers?
10     A.    Unsigned.  I don't know.
11     Q.    An e-mail would not be signed,
12 would it?
13     A.    Sometimes they would be.
14     Q.    You haven't seen an e-mail yet
15 that has been signed, have you?
16     A.    I have seen a lot of unsigned
17 documents.
18           (Exhibit 26 marked for
19      identification.)
20     Q.    If we turn to -- let's put this
21 away, and let's turn to Exhibit 25.  Do
22 you see how the first page -- this is
23 dated -- an e-mail dated November 19, 2012
24 to Dominic Granito to Michael Feinstein;
25 is that correct?
```

Page 364

```
 1           FEINSOD
 2    A.   Exhibit 25?
 3    Q.   Yes.
 4    A.   It is Michael Feinstein.
 5         MS. BILODEAU:   Exhibit 26.
 6    Apologies.
 7         THE WITNESS:  I'm sorry?
 8         MS. BILODEAU:   Exhibit 26.
 9    A.   So close this exhibit and go to
10    26.  Okay.  Thank you.  I don't have an
11    Exhibit 26.  I will refresh.
12         MR. HASHEM:    You might need
13    to refresh.
14         THE WITNESS:   I'm sorry?
15         MR. HASHEM:    I am you might
16    of need to refresh right now,
17    Michael.
18         THE WITNESS:  I am
19    waiting -- the circle is spinning
20    right new for Egnyte.  It is still
21    spinning.  I apologize.
22    A.   There is exhibit 26 and 27 now.
23    Q.   Go to 26, please, page 1.  Let
24    me know when it is open.
25    A.    Okay.   I have -- it looks like
```

Page 365

```
 1           FEINSOD
 2    a multipage -- the first page --
 3    A.   It is a nine-page PDF.  I have
 4    it.  Thank you.
 5    Q.   The first page is an e-mail
 6    dated November 19, 2012 from Dominic
 7    Granito to Michael Feinsod and Silvia
 8    Mullens, CC Rick Feinstein; is that
 9    correct?
10    A.   It looks -- it appears to be,
11    yes.
12    Q.   "We were paid off on Sterling
13    Info systems 959,000 plus interest of
14    $3,123 - Elk Signature Bank."
15         Does that refresh your
16    recollection that Sterling Info Systems
17    was sold and the proceeds were deposited
18    into Signature Bank?
19    A.   It appears to say that, yes.
20    Q.   And do you have any reason to
21    believe that that information is
22    inaccurate?
23    A.   No.
24    Q.   And on November 19 of 2012 Elk
25    -- on the second page Elk advances via a
```

Page 366

```
 1           FEINSOD
 2    funds transfer request $100,000 to
 3    Ameritrans as a business development
 4    expense.
 5         Do you see that?
 6    A.   This was after -- I do.  This
 7    was after the settlement agreement I
 8    believe.
 9    Q.   Okay.
10    A.   So this was after we had entered
11    into the settlement agreement -- I am just
12    trying to refresh my memory -- with the
13    SBA.
14    Q.   Okay. Is that your signature on
15    the client signature page where it says
16    the client signature on the bottom funds
17    transfer request of November 19, 2012
18    $100,000 from Elk to Ameritrans.
19    A.   Page 2 of the PDF?
20    Q.   Correct.
21    A.   It looks like my signature, but
22    there is only one signature on this page.
23    So it is a bid odd.
24    Q.   Okay.  Is there -- in terms of
25    the transfer by Elk to Ameritrans as a
```

Page 367

```
 1           FEINSOD
 2    business development expense, do you have
 3    any reason to believe that that was
 4    inaccurate on November 19, 2012?
 5    A.   No.  It was consistent with past
 6    business expense -- past business
 7    practices, and again this was after the
 8    settlement that we entered into.
 9    Q.   What was the authority for Elk
10    to make a -- what was your authority on
11    behalf of Elk to make an advance to
12    Ameritrans for business development
13    expense on November 19, 2012?
14    A.   My authority.  I don't
15    understand --
16    Q.   What was the basis by which you
17    are making -- Elk is making advances to
18    Ameritrans for a business development
19    expense on November 19, 2012?
20    A.   Well, we don't have any evidence
21    -- I mean I don't if it was or wasn't.
22    So I don't -- I am just looking at a
23    e-mail here that is dated -- that is
24    signed by one person that you pointed out
25    would usually have two signatures, so I
```

Page 368

```
1            FEINSOD
2  actually have doubts as to the validity of
3  it.
4      Q.   I'm sorry?
5      A.   I don't know what this document
6  is or the validity of it.
7      Q.   All right.  Let's go to page 3,
8  November 19, 2012.  It is a fund transfer
9  request of $100,000.  This is from
10 Ameritrans Capital Corporation to Bradway
11 Capital GAB LLC, and it says "per
12 subscription agreement."   With your -- is
13 that your signature on behalf of the
14 client?
15     A.   Yes.   And there is another
16 signature below this.
17     Q.   Okay.  And what is the basis for
18 Ameritrans to make an investment into
19 Bradway Capital Corporation with advanced
20 from Elk?
21     A.   What does that question have to
22 do with this?
23     Q.   Is an Ameritrans --
24     A.   This an Ameritrans -- the wire
25 you showed me is an Ameritrans wire.
```

Page 369

```
1            FEINSOD
2      Q.   Okay.  Did Ameritrans Capital
3  Corporation make an investment into
4  Bradway Capital GAB, LLC?
5      A.   I don't recall.
6           MR. HASHEM:   I object to
7       foundation.
8      Q.   Okay.  If you go to the next
9  page it is dated December 19, 2012.  It is
10 a fund transfer request in the amount
11 of -- this is page 4.   It is a fund
12 transfer request in the amount of 450,000
13 from Elk Associates Funding Corporation to
14 Ameritrans Capital Corporation for
15 business development expenses, and the
16 client signature is Michael -- what
17 appears to be -- is that your signature on
18 the client signature line?
19     A.   It appears to be.
20     Q.   Okay.  And what was the basis
21 for Elk to make an advance to Ameritrans
22 as a business development expense on
23 December 19 of 2012?
24     A.   This -- I mean if I recall, this
25 was after the settlement agreement had
```

Page 370

```
1            FEINSOD
2  been entered into, and we were
3  working -- we had surrendered our SBIC
4  license, and we were working to save -- we
5  had agreed with the SBA to -- the SBA was
6  going to forgive a significant amount of
7  debt, and we were going to part ways after
8  settling our lawsuit against them.  So
9  that would appear this would be when we
10 were working on funding -- working toward
11 that settlement, fulfilling that
12 settlement agreement.
13     Q.   Did you find -- did Elk make
14 payment to the SBA as required under the
15 settlement agreement?
16     A.   Yes, we did.
17     Q.   Wasn't the payment that was made
18 $1.2 million?
19     A.   Yes, it was.
20     Q.   Was anything more than wasn't
21 1.2 million AS THE consideration for the
22 settlement with the SBA?
23           MR. SEIDEL:   Objection to
24       form.
25     A.   No.  At the time the 1.2 was
```

Page 371

```
1            FEINSOD
2  wired it was exactly the amount that was
3  agreed to within the SBA.
4      Q.   Who was your agreement with?
5      A.   My agreement was with your
6  client.
7           MR. NAMESH:  Counsel --
8      A.   Elk's agreement was with your
9  client.
10     Q.   Wasn't the -- any settlement
11 agreement with the SBA required
12 consideration or payment in excess of $8
13 million?
14           MR. SEIDEL:  Objection.
15           MR. HASHEM:   Objection,
16       foundation.  Objection.
17       Mischaracterizes testimony in the
18       record.
19     A.   It mischaracterizes the
20 agreement.
21     Q.   You --
22     A.   If you pull it out -- if you
23 pull out the agreement, we can point it
24 out.
25     Q.   Let's finish with this document,
```

Page 372

```
1            FEINSOD
2  Exhibit 26.  On December 20 we have
3  payments to John Hancock Life Insurance
4  Company.  That is payments from
5  Ameritrans to John Hancock Life Insurance
6  Company.  This is on December 20 on pages
7  5 and pages 6 for two different policies.
8            Do you see that?
9       A.    Sure.
10      Q.    Do you see those transfer
11 requests?
12      A.    Which page are you asking about?
13      Q.    The amount $165,154.77.
14      A.    Yes, I see that.
15      Q.    Okay.  Is that your signature or
16 the client's signature?
17      A.    It appears to be.
18      Q.    Does that page refresh your
19 recollection as to what the payment of the
20 premium was for?
21      A.    No, I apologize.  It does not.
22      Q.    Go to page 6.  It refers to a
23 fund transfer request of December 20, 2012
24 in the amount of $87,192.98?
25      A.    Yes, I have it in front of me.
```

Page 373

```
1            FEINSOD
2       Q.    And that is a payment to John
3  Hancock Life Insurance that is for a
4  different policy, George Boris policy; is
5  that correct?
6       A.    It appears to be.
7       Q.    And is -- was George Boris an
8  employee of Ameritrans?
9       A.    I don't recall.
10      Q.    Is that your signature on the
11 client signature page?
12      A.    Page 6, yes.
13      Q.    Does this refresh your
14 recollection that this is a payment for
15 premium for the life settlement policy by
16 Ameritrans to John Hancock?
17      A.    No, it doesn't.
18      Q.    Go to page 7.  Okay.  That is
19 a fund transfer request dated December 20
20 of 2012 from Ameritrans to John Hancock.
21            Is that your signature on the
22 client signature line?
23      A.    Yes.
24      Q.    And we have a Margaret Bassio
25 policy number.  Was Margaret Bassio an
```

Page 374

```
1            FEINSOD
2  employee of Ameritrans?
3       A.    I don't recall.
4       Q.    Does this refresh your
5  recollection that this was one of the life
6  settlement policies that were an asset of
7  Ameritrans?
8       A.    No.
9       Q.    If we go to the next page, it is
10 December -- there is a date in December of
11 2012 that appears to be the 20th.  It is
12 handwritten, and it is from Ameritrans to
13 Bradway Capital GAB, LLC, a hundred
14 thousand dollars for a subscription
15 agreement; is that correct?
16      A.    That is what it says, yes.
17      Q.    Is that your signature on the
18 client signature line?
19      A.    It appears to be, yes.
20      Q.    Okay.  And do you have any
21 reason to believe that the information on
22 the funds transfer request in December of
23 2012 from Ameritrans to Bradway Capital is
24 inaccurate in any way?
25      A.    I don't -- no.
```

Page 375

```
1            FEINSOD
2       Q.    And the last page of the exhibit
3  is Badway Capital GAB dated January 28,
4  2013.  It is a letter addressed to you,
5  Michael Feinsod.  "Please accept this
6  letter as verification of your company's
7  investment of 200,000 in Bradway Capital
8  GAB LLC subject to the private placement
9  memorandum dated October 19, 2012.  This
10 equates to a 6.2 percent membership
11 interest in the company." And it is signed
12 by Brian Kay, case manager.
13            Do you ever recall receiving
14 this letter?
15      A.    I don't.
16      Q.    Does this letter refresh your
17 recollection that Ameritrans Capital
18 Corporation made an investment in Bradway
19 Capital GAB, LLC?
20      A.    No -- yes, it does actually.
21      Q.    Okay.
22      A.    Just to the extent that what
23 Bradway Capital was, a bicycle company in
24 Saratoga, New York that we were trying to
25 make an investment in.  So that -- to
```

Page 376

```
                    FEINSOD
1
2   that extent now I remember Bradway
3   Capital.
4        Q.    Okay. What was the -- did you
5   have -- did you yourself individually or
6   on behalf of one of your companies have
7   any interest in Bradway Capital?
8        A.    I believe Elk and Ameritrans
9   were looking to make an investment in
10  Bradway.   In Seratta I think it was the
11  underlying investment, which Seratta was a
12  25-year old bicycle company in Saratoga,
13  New York that was -- had used some SBA
14  financing TO build its business, came
15  across us because we were an SBIC, spent a
16  significant time doing due diligence with
17  them, and seemed like a growth oriented
18  investment that would be helpful to
19  Ameritrans and Elk, as we were trying to
20  recapitalize the companies in the wake of
21  the of settlement.
22       Q.    What was the -- was this an
23  investment that was reviewed by the Board
24  of Directors?
25       A.    I don't recall.
```

Page 377

```
                    FEINSOD
1
2        Q.    And were monies -- we previously
3   saw that monies were advanced from Elk to
4   Ameritrans, correct?
5        A.    Today or last time? We have
6   seen a lot --
7        Q.    Today.
8        A.    We looked at a lot of papers
9   today.  I apologize.
10       Q.    Okay.
11       A.    I am not -- I just want to be
12  specific.
13       Q.    What is the basis -- based upon
14  -- if monies were advanced from Elk to
15  Ameritrans, what is the basis for
16  Ameritrans to make the investment into
17  Bradway Capital in Ameritrans' name as
18  opposed to Elk's name?
19       A.    I don't know what -- I don't
20  understand the question.   I don't
21  know --
22       Q.    Would Elk advance --
23       A.    I don't know.
24       Q.    -- monies to Ameritrans for
25  Ameritrans to make an investment in
```

Page 378

```
1                   FEINSOD
2   Bradway Capital GAB, LLC --
3        MR. HASHEM:   Objection.
4      Foundation, mischaracterizes the
5      record.
6        A.    The business --
7        MR. HASHEM:   Go ahead.
8        A.    We were in the business of
9   trying to save Elk, and Elk and Ameritrans
10  were managed together as a unified
11  company.  So I don't know exactly what
12  you are referring to with the name of the
13  investment, but--
14       Q.    Doesn't this letter state that
15  the investment is being made by Ameritrans
16  Capital Corporation?
17       A.    It is an e-mail that
18  says -- from our company.   It
19  doesn't -- there is no -- I guess let's
20  look at the private placement memorandum
21  to see who made the investment.
22       Q.    Okay.  On the -- okay.  "Please
23  accept this letter as verification of your
24  company's investment of 200,000 in Bradway
25  Capital GAB, LLC."
```

Page 379

```
1                   FEINSOD
2        A.    Again, this was an SBA -- this
3   was a star SBA investment.  They had a
4   big plaque outside the business swearing
5   their allegiance to SBA and how they have
6   sworn -- how they helped the company grow.
7        Q.    The --
8        A.    There were other SBICs I believe
9   that participated as well in investing in
10  Bradway Capital or Seratta, whatever the
11  different iterations of the company.
12       Q.    Was there a determination this
13  time by you as to whether Elk was
14  insolvent? This is in January 28, 2013.
15       A.    I don't recall the date, no.
16       Q.    Was there a determination by the
17  board as to whether Elk was insolvent as
18  of January 28, 2013?
19       MR. SEIDEL:   Object to form.
20       A.    I don't recall.  Wasn't
21  settlement agreement in effect at that
22  time.
23       Q.    Okay.
24       A.    I believe it was.  I am just
25  trying to refresh my memory.  So we were
```

Page 380

```
1              FEINSOD
2  operating under the settlement agreement
3  during that time.
4      Q.    Under the settlement agreement,
5  would the investment in Bradway be in
6  Ameritrans' name or Elk's name?
7      A.    I don't recall the structure of
8  any investment being made, but I am sure
9  we had no debt due during the time that
10 the settlement agreement was in effect.
11     Q.    Did you as an individual have
12 any interest in Bradway Capital GAP, LLC?
13     A.    I am sorry.  Do you want say
14 that question very clearly?
15     Q.    Sure.
16         Did you have an investment in
17 your name individually in Bradway Capital
18 GAB, LLC?
19     A.    Never.
20     Q.    Did a company such as
21 one -- Afinity have an investment in
22 Bradway Capital GAB?
23     A.    Never.
24     Q.    Did any other company in which
25 you had an interest in other than Elk or
```

Page 381

```
1              FEINSOD
2  Ameritrans have an investment in Bradway
3  Capital GAB, LLC?
4          MR. HASHEM:   Objection to
5      form.
6      A.    Never.
7      Q.    We can put this away and go to
8  Exhibit 27.
9          (Exhibit 27 marked for
10     identification.)
11     Q.    The first page is an e-mail from
12 Dominic Granito to Michael Feinsod and
13 Silvia Mullens.  It is dated March 28,
14 2013.  "Wire was received into Elk
15 Signature Bank from the sale of Impact in
16 the amount of $1,178,900 -- I'm sorry --
17 $911.10; is that right?
18     A.    That is what the e-mail says,
19 purports to say.
20     Q.    Do you have any reason to -- to
21 doubt the accuracy of the e-mail of the
22 sale of Elk's asset of Impact and
23 depositing the money into Elk's bank
24 account?
25     A.    I -- I am looking at the e-mail
```

Page 382

```
1              FEINSOD
2  and again it is different in form, but I
3  don't -- I have no reason to doubt what it
4  says.
5      Q.    Okay.  You transferred $550,000
6  from Elk Signature Bank to AMTC Signature
7  Bank.  Do you see that information?
8      A.    That is below the line that says
9  -- when bills are paid that invoice for
10 Elk was paid $324,000 was paid
11     Q.    Yes.
12     A.    204 for Katten.
13     Q.    Right.
14     A.    That was litigation related.
15 Yes, I see what -- yes, it says we
16 transferred $550 --
17     Q.    550,000.
18     A.    It looks like a period.
19     Q.    Well, we will -- we will get to
20 that.  There are three zeros after what
21 you -- what looks like a period; is that
22 right?
23     A.    There is a three zeros after
24 what is a period.
25     Q.    You paid the Pollack premium in
```

Page 383

```
1              FEINSOD
2  the amount of $156,191.94 out of AMCTC; is
3  that correct?
4      A.    That is what the e-mail says on
5  that.  Yes.
6      Q.    Do you have any reason to doubt
7  the accuracy of that information on that
8  line, the Pollack payment?
9      A.    Other than what I stated before.
10     Q.    Does that refresh your
11 recollection that Elk was advancing money
12 to Ameritrans, and Ameritrans was using
13 the money to pay the life settlement
14 policy premium?
15     A.    No.
16     Q.    If you go --
17     A.    How would it?
18     Q.    All right. Just a yes or no if
19 it refreshes your recollection or not.
20     A.    It doesn't.
21     Q.    If you go to the next page, it
22 is a funds transfer request dated March
23 28, 2013 in the amount of 550,000 from Elk
24 to Ameritrans for business development
25 expenses, and with -- is that your
```

Page 384

```
 1              FEINSOD
 2  signature on the page?
 3      A.    Yes, it appears to be.
 4      Q.    And March 28, 2013, what was the
 5  basis for Elk making advances to
 6  Ameritrans for business development
 7  expenses?
 8      A.    Normal course of business.
 9      Q.    We were operating under the
10  settlement agreement.   We were no longer
11  an SBIC.   We were working to recapitalize
12  both companies.
13      Q.    And had you -- in terms of the
14  settlement agreement, who did you -- you
15  say you are no longer an SBIC.
16          Who did you turn in your license
17  to?
18      A.    I don't recall specifically.
19      Q.    Okay.
20      A.    It would be -- I believe Diana
21  Seaborn.   I'm sorry.   It might have been
22  Arlene Embrey.  Yes.  You know what?  We
23  entered into a settlement agreement, and
24  the signature -- I was a signatory.
25  Arlene was a signatory, and I believe one
```

Page 385

```
 1              FEINSOD
 2  of the first items in the settlement
 3  agreement was that we were turning in our
 4  Elk -- that we, Elk Associates finance
 5  committee was ceasing to be an SBIC in
 6  terms of that settlement, and Arlene
 7  signed that, and I signed that.   There
 8  was also other, you know, paragraphs with
 9  the release.  What else was there?  Arlene
10  you know -- they had done -- they had done
11  a significant amount of work.   We had a
12  significant meeting.   I believe Tom
13  Morris might have actually been even
14  involved with it as the head of
15  liquidation.  Sorry. I lost the question.
16      Q.    Okay.  In terms of the advance
17  that was made by Elk to Ameritrans, were
18  there any terms of repayment?
19      A.    I don't recall.
20      Q.    Any interest that Ameritrans
21  would owe Elk?
22      A.    I don't recall.
23      Q.    Did the board authorize this
24  advance of $550,000 a month to Ameritrans?
25      A.    I don't recall.
```

Page 386

```
 1              FEINSOD
 2      Q.    On page 3, we have March 28,
 3  2013 $125,000.  That would be from
 4  Ameritrans -- actually it is from Elk to
 5  Ameritrans, and this is for D&O coverage;
 6  is that right?
 7      A.    That is what it says.
 8      Q.    Okay.  Is that your signature on
 9  the client signature line?
10      A.    It appears to be.
11      Q.    March -- next page, March -- I
12  am sorry.  Before we go to the next page,
13  do you have any reason to believe that the
14  funds transfer request of March 28 in the
15  amount of $125,000 is inaccurate?
16      A.    No.
17      Q.    The March 27, 2013, there is a
18  fund transfer request in the amount of
19  $156,194.51 from Ameritrans --
20      A.    We are going back.  I am sorry.
21  We are bouncing around in time.   I
22  apologize.   So the 27th is now after the
23  28th.
24      Q.    It is the next page, page 4.
25      A.    I -- they were going
```

Page 387

```
 1              FEINSOD
 2  chronologically.  I apologize.  Got it.
 3      Q.    Okay.  And this is a funds
 4  transfer request from Ameritrans to John
 5  Hancock Life Insurance policy again for
 6  Bernard Pollack, and is that your
 7  signature on the client signature line?
 8      A.    Yes, it appears to be.
 9      Q.    Okay.  This is dated March 27,
10  2013 in the amount of $156,000,194.51; is
11  that right?
12      A.    That is what it says.
13      Q.    And that is the -- does this
14  refresh your recollection -- I am sorry.
15  Was Bernard Pollack an employee of the
16  company of Ameritrans?
17      A.    I don't recall.
18      Q.    Does this refresh your
19  recollection of Elk advancing funds to
20  Ameritrans, and Ameritrans using the funds
21  to pay life settlement premiums?
22      A.    No, it doesn't.
23      Q.    If he would could look at -- we
24  are on Exhibit 27.
25          MR. WEINBERG:  Can we go off
```

```
                                    Page 388
 1          FEINSOD
 2      the record for a minute, please.
 3          THE VIDEOGRAPHER:    The time is
 4      10:31.  We are going off the record.
 5      This is the end of media unit number
 6      1.
 7          (Recess taken.)
 8          (Exhibit 28 marked for
 9      identification.)
10          THE VIDEOGRAPHER:    The time is
11      10: 44.  We are back on the record.
12      This is the beginning of media unit
13      number 2.
14      Q.    Mr. Feinsod, if you would
15   refresh your exhibits.
16      A.    One second.  I have it.  Thank
17   you!
18      Q.    Okay.  Is Exhibit 28 the Bradway
19   Capital GAB, LLC membership subscription
20   agreement?
21      A.    Yes.
22      Q.    The first page says signed by
23   MRF.
24      A.    Correct.
25      Q.    Who is MRF?
```

```
                                    Page 389
 1          FEINSOD
 2      A.    Me.
 3      Q.    If we go to page -- if you could
 4   look at PDF page 7.  Let's see.
 5      A.    7.
 6      Q.    We are looking at PDF page 7.
 7   Are you there?
 8      A.    I am trying to get there.  Got
 9   it.  The entity signature page?
10      Q.    Yes.
11      A.    Right.
12      Q.    Okay. And is that your
13   signature?
14      A.    It appears to be, yes.
15      Q.    And did you sign that as the
16   president of Ameritrans Capital
17   Corporation?
18      A.    Yes, I appear to have.
19      Q.    Does this refresh your
20   recollection that the investment in
21   Bradway was by Ameritrans Capital
22   Corporation, not Elk?
23      A.    I don't recall.
24      Q.    Okay.  If we go to page 11, PDF
25   page 11.
```

```
                                    Page 390
 1          FEINSOD
 2      A.    Got it.
 3      Q.    There is a signature page dated
 4   November 19, 2012.
 5      A.    Okay.
 6      Q.    It was effective as of October
 7   1, and then as of the 19th day of November
 8   2012 the legal name of the member is
 9   Ameritrans Capital Corporation; is that
10   correct?
11      A.    That is when the document says.
12      Q.    Do you have any reason to
13   believe that the document is inaccurate?
14      A.    In what way? No, it speaks for
15   itself, the signature page.
16      Q.    Is that your signature?
17      A.    Yes.
18      Q.    This is the member signature
19   page for the subscription agreement that
20   is marked as Exhibit 28, correct?
21      A.    Page 11, yes.  The member's
22   signature page.
23      Q.    And then the next page, page 12
24   is the subscribers who are entity's tax
25   certification?
```

```
                                    Page 391
 1          FEINSOD
 2      A.    Got it.
 3      Q.    And who is the entity that is
 4   signing the tax certification for the
 5   subscription agreement?
 6      A.    Ameritrans Capital Corporation.
 7      Q.    And is that your signature,
 8   Michael Feinstein as president?
 9      A.    Yes.
10      Q.    Okay. We can put this away.  No,
11   there is another -- I'm sorry.  Also on
12   page 20, we have an entity signature page
13   on PDF page 20 for a hundred thousand
14   dollars.
15          What is the name of the entity
16   on that PDF page 20?
17      A.    The same exact page that you
18   showed me above.  It is a copy of the
19   page that I talked about above.
20      Q.    Okay.
21      A.    It is an exact copy.
22      Q.    It is --
23      A.    You have two copies of the same
24   agreement here apparently, counsel.
25      Q.    Not the agreement, but the
```

Page 392

```
 1           FEINSOD
 2  signature pages.  Okay.
 3       A.   No, you have two -- you have
 4  shown me two copies.  Your exhibit here is
 5  multiple copies of the same -- same
 6  exhibit.  So to the extent you asked me
 7  to -- you have shown me the same pages
 8  over and over again.
 9       Q.   It was executed and duplicated.
10  Okay.  If we could put this away.  We
11  will go to the next be exhibit.
12            Before we go to this exhibit,
13  Mr. Feinstein, have you ever --
14       A.   It is Mr. Feinsod.
15       Q.   I apologize, Mr. Feinsod.  Have
16  you ever reviewed the standard operating
17  procedure for liquidation?
18       A.   I did at one point I am sure.
19  Yes.  I -- I am assuming you are talking
20  about the Small Business Associations SOP
21  for Liquidation.
22       Q.   Yes.
23       A.   At one point I reviewed it, yes,
24  years ago.
25       Q.   Okay.  Other than reviewing
```

Page 393

```
 1           FEINSOD
 2  that from years ago, were you familiar
 3  with the chapter on receivership?
 4       A.   Not specifically.
 5       Q.   Okay.  Do you know when an
 6  entity is receivership as to when the SBIC
 7  license is turned into the SBA?
 8       A.   In a typical receivership, yes.
 9  Our receivership was a negotiated
10  receivership, so that is when it was
11  turned over.
12       Q.   In a typical receivership?
13       A.   I have never been involved in a
14  typical receivership.
15       Q.   Do you know in what you call a
16  typical receivership when the license is
17  turned in?
18       A.   No, I do not.
19            (Exhibit 29 marked for
20       identification.)
21       Q.   If we looked at Exhibit 29, is
22  this the settlement agreement between SBA
23  and Elk?
24       A.   It is loading.  This is the
25  agreement --
```

Page 394

```
 1           FEINSOD
 2            (Pause.)
 3       A.   I have it.
 4       Q.   Okay.  Is this the settlement
 5  agreement between the SBA and Elk?
 6       A.   It is part of it.
 7       Q.   Okay.  Well, what is the other
 8       A.   It is am incomplete copy.  There
 9  are exhibits to it that seem to be
10  missing.
11       Q.   Okay.  What exhibits is that
12  that you claim are missing?
13       A.   There are -- there are exhibits
14  missing that were pertinent to this
15  agreement.
16       Q.   Okay.  What exhibits do you
17  claim are missing?
18       A.   We can look online and find it,
19  but there are exhibits that are missing.
20       Q.   Okay.
21       A.   I'm sorry.  It is -- I am sorry.
22  It is the agreement appointing SBA as
23  permanent liquidating receiver of Elk.
24       Q.   Okay.
25       A.   So we entered into a specific
```

Page 395

```
 1           FEINSOD
 2  receivership order as part of this.
 3  There might have been other agreements,
 4  but there was a receivership agreement
 5  attached to this that was part of this
 6  settlement agreement, an integral part of
 7  it.
 8       Q.   So this is titled "Settlement
 9  Agreement and Release."
10       A.   Mutual release it is titled.
11       Q.   What was the receivership
12  agreement that was part of this settlement
13  agreement and mutual release?
14       A.   If you could pull it up, I could
15  refresh my recollection, but I don't have
16  it in front of me.
17       Q.   Okay.  Do you know what the
18  terms -- was that the consent order of
19  receivership?
20       A.   I don't recall, but if you pull
21  it up I would be happy to review it.
22       Q.   Well, it is not -- besides the
23  receivership agreement that you are
24  referring to, what terms did it include?
25       A.   I don't recall.  I would be
```

Page 396

FEINSOD

1
2  happy to review it if you refresh my
3  memory.
4      Q.    Well, what -- we are trying to
5  understand what document or attachments
6  you are referring to, what it was titled?
7      A.    I believe I answered that there
8  was one -- I described one exhibit that is
9  missing already that appointed SBA as
10 permanent liquidating receiver.
11     Q.    Okay.
12     A.    And I believe there may have
13 been other documents.  This was at the
14 end of a significant litigation where the
15 SBA had found -- the SBA decided that they
16 wanted to settle with us in our
17 meritorious lawsuit, and that was where
18 the settlement agreement came from.  So
19 there are a lot of agreements.  There are
20 agreements from the settlement.  There
21 are documents that would probably be
22 helpful in SBA's possession as far -- that
23 led us up to this settlement agreement.
24     Q.    But in the exhibit appointing
25 the SBA as permanent receiver, can you

Page 397

FEINSOD

1
2  recall what other exhibits there were to
3  this agreement, this settlement agreement
4  and mutual release?
5      A.    Permanent liquidating receiver
6  is the term I remember.  I don't remember
7  the other agreements.  If you showed it
8  to me, I could probably refresh my memory.
9      Q.    If we look at paragraph 1 of the
10 agreement, "Subject to the terms of this
11 agreement, Elk shall tender to SBA and SBA
12 shall accept $7,900,00 (the payment) in
13 full and final satisfaction of Elk's SBA
14 debt."
15          Do you see that?
16     A.    I do.
17     Q.    Does that refresh your
18 recollection that the amount of the
19 settlement payment was to be $7,900,000?
20     A.    That refreshes my memory that at
21 the time this was entered into the
22 original settlement agreement was agreed
23 upon at that time.  It changed over time.
24     Q.    What changes were those?
25     A.    We had several negotiations with

Page 398

FEINSOD

1
2  Arlene Embrey and Thomas Morris of the
3  Office of Liquidation and were
4  consistently in conversation with them
5  between whenever this was signed until
6  March when we went into receivership.
7      Q.    Was there an extension of time
8  to make the payment?
9      A.    There was.  I believe so, yes.
10     Q.    And was the partial payment made
11 of $1.2 million?
12     A.    I don't recall the exact amount.
13     Q.    Okay.  Was there a balance that
14 was due and owing of the 7.9 million plus
15 interest until the final payment was paid
16 made?
17     A.    I don't recall the amount.
18     Q.    Was the final payment made by
19 Elk to the SBA?
20     A.    I don't recall.  It does say in
21 paragraph 3 where we surrendered our
22 SBIC -- I am sorry.  Elk's SBIC license
23 was surrendered, and I guess refresh my
24 memory the surrender letter looks like it
25 might have been an exhibit.  There is an

Page 399

FEINSOD

1
2  Exhibit A.  There is an Exhibit B.  So
3  there are significant exhibits here if you
4  want to go through them.
5      Q.    Where is Exhibit B to this
6  agreement?
7      A.    I don't have it.  It is not
8  attached.  You haven't given it to me.
9      Q.    Where is the reference to
10 Exhibit B in the agreement?
11     A.    Paragraph 4.
12     Q.    Okay.  On Exhibit A, was
13 Exhibit A -- was a surrender letter
14 executed?
15     A.    I don't recall, but I would
16 assume --
17     Q.    You are assuming it was; is that
18 right?  Is that your testimony?
19     A.    I believe -- I believe of it
20 was, counselor.
21     Q.    And who would the Exhibit A
22 surrender letter have been turned over to?
23     A.    Most likely Arlene Embrey.
24     Q.    Okay.
25     A.    I am sorry.  Most likely it

Page 400

```
1              FEINSOD
2    would have been given top Elk's attorneys
3    to turn over.
4         Q.    Okay.  To turn over to Arlene
5    Embrey?
6         A.    Yes.  Or to turn over to Arlene
7    or I guess -- I guess Arlene was -- Arlene
8    was the SBA representative at that point
9    in our case versus Elk, and this was to
10   settle our case versus SBA.
11        Q.    Exhibit E makes reference to
12   consent order receivership; is that right?
13        A.    It seems to.  It is mistitled I
14   believe.
15        Q.    Okay.  And Exhibit C is A
16   stipulation of dismissal; is that right?
17        A.    That was where we dismissed our
18   claims for arbitrary and capricious
19   conduct by SBA against Elk.  So yes, that
20   was one of the other exhibits.
21        Q.    Okay. And do you -- and on the
22   last page of the document, page PDF 7, we
23   have -- is that your signature?
24        A.    The last page of the document.
25   Page 6.  Yes, it is.
```

Page 401

```
1              FEINSOD
2         Q.    And you're signing that as
3    president -- you would sign that as
4    president of Elk Associates Funding Corp.;
5    is that correct?
6         A.    That is what the document says,
7    yes.
8         Q.    Elk subsequently was placed in
9    receivership; is that right?
10        A.    Placed in, no.  That is
11   incorrect.
12        Q.    What?
13        A.    That's incorrect.
14        Q.    Was the consent order of
15   receivership filed, and the receivership
16   was commenced; is that correct?
17        A.    I believe so.  Yes.
18              (Exhibit 30 marked for
19   identification.)
20        Q.    Okay. If you can refresh your
21   exhibits.  If you look at Exhibit 30.
22              Is Exhibit 30 bank balances for
23   Elk and Ameritrans as of April 26, 2013?
24        A.    I have never seen this.  I don't
25   know what it is.
```

Page 402

```
1              FEINSOD
2              (Pause.)
3         Q.    Sorry.
4         A.    I have never seen this.  I
5    don't know what it is.
6         Q.    You have never seen the
7    Ameritrans daily bank account balances for
8    Ameritrans Capital Corporation -- for
9    Ameritrans and Elk?
10        A.    I have never seen this one.
11        Q.    The last page, report date of
12   April 19, 2013?
13        A.    No -- yes, I am looking at it.
14   I apologize.  I have never even it.
15        Q.    Okay.  In April of 2013, do you
16   recall was that when Ameritrans -- Elk
17   Associates -- Elk Associates Funding Corp.
18   a receivership action was commenced?
19        A.    I don't recall the date.
20        Q.    Do you recall -- as of
21   April -- in April of 2013, do you recall
22   that the Elk Associates Funding Corp bank
23   balance was $17,400 -- I'm sorry.  Let me
24   get the exact amount -- 481.95?
25        A.    What number are you looking at?
```

Page 403

```
1              FEINSOD
2    I don't see -- I am looking at a
3    PDF -- Exhibit 30.
4         Q.    The last page, page 30.
5         A.    Okay.
6         Q.    There is a line that says "EAFC
7    total."
8         A.    Okay.
9         Q.    And there are dates on top, and
10   the last date on that page is May -- April
11   9, 2013, and the balance in the Elk bank
12   accounts total $17,481.95; is that right?
13        A.    That is what it says, but I have
14   never seen this report before.
15        Q.    Does that refresh your
16   recollection as to what the balance would
17   have been in Elk's bank accounts by that
18   time?
19        A.    No.  It does not.
20        Q.    Okay.  We can put that away.
21   Do we have --
22        A.    This looks like -- this is
23   marked as an internal worksheet.  This is
24   not something I would have seen.
25        Q.    Okay.  We will take a minute,
```

Page 404

```
1              FEINSOD
2  and I think we can wrap it up.
3              (Pause.)
4         THE VIDEOGRAPHER:   Would you
5     like to go off record.
6         MS. BILODEAU:   Yes.   The
7     time is 11:04, and we are going off
8     the record.
9         (Recess taken.)
10        THE VIDEOGRAPHER:   The time
11    is -- the time is 11:06, and we are
12    back on the record.
13        MR. WEINBERG:   Thank you, Mr.
14    Feinsod.
15        THE WITNESS:   Thank you.
16 EXAMINATION BY MR. SEIDEL:
17    Q.   Good morning, Mr. Feinsod.   We
18 met before.   I am Martin Seidel, and as
19 you know I am the attorney for the
20 independent director defendants.
21        I have a few questions for you
22 today.   It shouldn't take that long.   I
23 would like to start by talking about the
24 intercompany expense allocations for a
25 minute, and you gave some testimony about
```

Page 405

```
1              FEINSOD
2  that over the last several days.
3     A.   Okay.
4     Q.   First just so we are on the same
5  you page, this is an accounting entry,
6  correct, the allocation --
7     A.   Correct.
8     Q.   -- between the parent and the
9  sub?
10    A.   Correct.   That was an
11 accounting entry.
12    Q.   Now, you are not an accountant,
13 right?
14    A.   No, I am am ot.
15    Q.   But you certainly worked at both
16 public and public companies.   You were a
17 lawyer at Paul Hastings.   You did M&A
18 work, right?
19    A.   Yes.
20    Q.   So you have some familiarity
21 basically I am not saying as an accounting
22 expert or even as an accountant, but you
23 have some familiarity with GAAP, right?
24    A.   Yes.
25    Q.   And by GAAP, I mean generally
```

Page 406

```
1              FEINSOD
2  accepted accounting principles, and I
3  refer to it as GAAP you'LL understand what
4  I am talking about?
5     A.   Yes.
6     Q.   Turning to expense allocations
7  when you consolidated the parent's sub
8  relationship and there IS expenses shared
9  between the parties, as there were at Elk
10 and Ameritrans, correct?
11    A.   Correct.
12    Q.   GAAP requires the parties
13 particularly where one -- where the
14 subsidiary in this case reports on an
15 independent basis to its regulator, and
16 the parent reports on a consolidated basis
17 to make some effort to allocate the
18 expenses, right?
19    A.   Correct.
20    Q.   Now, let's pick an example,
21 rent.   Elk and Ameritrans occupied the
22 same pace, right.
23    A.   Yes.
24    Q.   It paid one rent, didn't it?
25    A.   One monthly rent check, yes.
```

Page 407

```
1              FEINSOD
2     Q.   So it wasn't as if there was an
3  Elk rent and an Ameritrans rent, right?
4  There was just a rent?
5     A.   Correct.
6     Q.   And then each month or each
7  quarter or each period you as management
8  had an obligation to try and figure out a
9  proper -- I mean you had a formula for
10 this.   I understand that.   I am am not
11 asking you because I know this was done by
12 accounting staff, but there was a formula
13 for allocating that one rent check between
14 the two parties, correct?
15    A.   Correct.
16    Q.   So if you hadn't allocated it to
17 Ameritrans, it would still be rent for
18 Elk, right, and Elk itself would still pay
19 monthly rent?
20    A.   Correct.
21    Q.   And if -- you look confused.
22 This isn't hard stuff.
23        If -- conversely if Ameritrans
24 paid the rent, it wouldn't be a different
25 rent than if it is allocated between Elk
```

Page 408

```
 1            FEINSOD
 2  and Ameritrans.    It is still the rent,
 3  right?
 4       A.    Correct.
 5       Q.    And the employees' salary, your
 6  salary, Mr. Feinstein's salary,
 7  Ms. Mullens' salary, some other employees,
 8  Mr. Granito, those were shared because you
 9  did work for both companies, right?
10       A.    Yes.
11       Q.    And again your salary wouldn't
12  change if there wasn't an allocation,
13  right?
14       A.    Correct.
15       Q.    So it is not like Elk was
16  loaning money to Ameritrans to pay your
17  salary.    It was paying you a salary and
18  then allocating it between the two book
19  entry accounts, right?
20            MR. WEINBERG:    Objection.
21       A.    Correct.
22       Q.    And you said earlier today and I
23  think you said this last time we met in
24  October that generally the intercompany
25  expense policy is something that goes back
```

Page 409

```
 1            FEINSOD
 2  all the way to 1999, right?
 3       A.    Yes, at least.
 4       Q.    And it was the subject -- and it
 5  was something that was approved as a
 6  policy matter by the board, right?
 7       A.    It -- it was approved by policy
 8  matter by the board when we adopted the
 9  canning guidance given by the SBA.
10       Q.    Okay.    And I think there
11  -- wasn't there also some sort of no
12  action or consent agreement with either
13  the SEC or the SBA on how to do this going
14  way back in time?
15            MR. WEINBERG:    Objection.
16       A.    There is an -- sorry.    We had
17  had a multiple -- sorry. Ameritrans and
18  Elk were parties to an exemptive order
19  with SEC.  Elk was a 40 Act company,
20  Ameritrans was a 40 Act company.    Both
21  companies were required under SEC
22  regulations to submit stand-alone
23  financial statements to the SEC and to
24  follow certain policies and procedures for
25  how to deal with each other as wholly
```

Page 410

```
 1            FEINSOD
 2  owned BBCs, and we had --
 3       Q.    And one of those is expense
 4  allocation, right?
 5       A.    And one one of those was expense
 6  allocations and --
 7       Q.    And that is something the board
 8  was aware of, and you followed it, right?
 9       A.    Yes, we had mirror image boards
10  to protect that as an element to that.
11       Q.    And in terms of the day-to-day,
12  management actually executed the
13  allocation process.  By management I mean
14  you and the accounting staff would execute
15  whatever transfers or allocations or book
16  entries were necessary, right?
17       A.    Book entries would be done by
18  the accounting department and the CFO.
19       Q.    And then as a general matter you
20  said this earlier, the Form 468s and 10Ks
21  and 10Qs were reviewed by the audit
22  committee and the full board and by doing
23  so were -- they were -- and also by the
24  accountants I might add, right?
25       A.    Every -- yes, every 468 was
```

Page 411

```
 1            FEINSOD
 2  reviewed by the external auditors --
 3       Q.    And --
 4       A.    -- for Elk.
 5       Q.    Right. And once a year they were
 6  audited?
 7       A.    And once a year they were
 8  audited.
 9       Q.    And that was what you referred
10  to as the retroactive review by the board
11  of the expense allocations?
12            MR. WEINBERG:    Objection to
13       form.
14       A.    Correct.
15       Q.    Now, Mr. Weinberg questioned you
16  about a bunch of allocations, some
17  transfers and allocations that were
18  itemized as business development expenses.
19            Do you recall that?
20       A.    From -- from October, yes, I do.
21       Q.    And I think there is some
22  earlier ones he asked you about in
23  October.  If you -- okay.  Let's break
24  -- let me withdraw that and try again
25  because I think we are at a bit of cross
```

Page 412

```
1        FEINSOD
2  purposes.
3        In October he showed you some
4  general ledger entries that identified BD
5  expenses, correct?
6      A.   He showed me unsigned work
7  papers that I -- that identified what
8  might be business development expenses,
9  but they were workers papers.
10     Q.   And then he showed you some cash
11 transfer authorizations that
12 identified -- I wouldn't call it the re
13 line, but the subject was business
14 development expense in a couple of the
15 exhibits today, right?
16     A.   Right.
17     Q.   I don't think he ever asked you
18 this, but I am just curious what were Elk
19 and Ameritrans' business development
20 expenses typically? What does refer to?
21     A.   The management of Elk -- the
22 business of Ameritrans was managing Elk
23 and running its day-to-day operations.
24 Business development expenses quote,
25 unquote were all the expenses of the
```

Page 413

```
1        FEINSOD
2  company, and since 1995 when they were
3  allocated based on an asset based formula.
4  So I guess to -- to your question,
5  historically the assets had been in the
6  high  90s in the consolidated companies.
7  So the consolidated expenses allocation
8  would have been high 90s to Elk
9  percentage-wise.
10     Q.   Okay.  And I think you started
11 to answer where I was headed, and I want
12 to just drill down on what I am talking
13 about is what tort of sort of things went
14 into the business -- what sort of expenses
15 would be categorized as BD, and you -- you
16 were at a law firm, so you know us as
17 lawyers we have a different vision of what
18 BD means, and I just want to understand.
19     A.   I guess it was probably a
20 loosely used term to run the business.
21 The business -- the expense didn't have a
22 ledger entry, you know, with the SBA GL
23 but which might have been expenses about
24 such as in this case rent or personnel or
25 legal, maybe some -- what you call it,
```

Page 414

```
1        FEINSOD
2  business development, traditional business
3  development expenses, you know, client
4  introductions and things like that, but
5  they were day-to-day expenses for the
6  company, for the consolidated companies.
7      Q.   So would banker external
8  advisors associated with acquisition of
9  potential investments be a form of BD
10 expenses under that rubric?
11     A.   Yes, and to the extent
12 legal -- to clarify it, like legal
13 expenses in the case of the mergers, the
14 attempted mergers and financings of Elk,
15 those what were considered might fall
16 under that business development expense.
17     Q.   What about personnel cost? What
18 kind of personnel expense would in the BD
19 expense category?
20     A.   Probably every employee I guess,
21 and that was -- I believe it was at -- it
22 was always done at the end of the quarter
23 based on this asset based formula at the
24 end of quarter that, you know, 94 percent
25 of the assets and 99 percent of the
```

Page 415

```
1        FEINSOD
2  business was conducted at Elk, and then
3  Ameritrans operated to hold and carry on
4  Elk.  So --
5      Q.   Okay.  What about directors
6  fees?  Those were separately registered --
7  recorded, correct?
8      A.   I believe so.
9      Q.   So they wouldn't be a
10 part of the BD expense then?
11     A.   Part of them might have been
12 because directors were serving as dual
13 directors, so I don't recall exactly how.
14     Q.   Okay.  And one last accounting
15 question, and I will move on from that.
16 The other thing is certain types of
17 expenses -- you are familiar with the
18 consent of accrual accounting, right?
19     A.   Yes.
20     Q.   And Elk and Ameritrans were both
21 -- used an accrual, not a cash accounting
22 methodology, correct?
23     A.   Correct.  Once I got there.
24     Q.   So, for example, if a salary was
25 owed in a particular quarter but wasn't
```

**Page 416**

FEINSOD

1  paid, ad I am not satisfying that ever
2  happened; I realize I am asking a
3  hypothetical, but I want to get into
4  something else.  You would have to accrue
5  that on the books, right? So if you
6  owed -- if the company owed you 50,000 in
7  a quarter but didn't pay, they still
8  accrue it as an expense item, right?
9      A.   Correct, under GAAP.
10     Q.   And I realize that never
11 happened because you received your salary
12 on a regular basis, right? Just so we are
13 clear.  I am just saying this is a
14 hypothetical.  Is that a yes?
15     A.   Yes, I received my salary on a
16 regular basis.
17     Q.   And you received it all the way
18 through the time that you resigned from
19 the company, correct?
20     A.   Correct.
21     Q.   Okay.  We have seen evidence I
22 know they showed you some documents on the
23 October 28 portion of the deposition.
24 There was a period where directors were

**Page 417**

FEINSOD

1  not receiving their fees, correct, because
2  the company was essentially in a finanial
3  strain, but they were still accruing as
4  owed to them, correct?
5      A.   Correct.
6      Q.   All right.  Let's move on.
7  There are a couple of other areas I would
8  like to cover, and I know this has been a
9  long process, so I want to get through
10 this quickly with you.
11     I want to talk about the
12 Columbus Nova transaction for a minute and
13 sort of the run up to that.  Columbus
14 Nova was the only party that was out there
15 looking at you guys, right?
16     A.   Correct.  We -- we ran a pretty
17 competitive process.  But -- what
18 progressed into a pretty competitive
19 bidding process.
20     Q.   Right.  Now, are you familiar
21 from your -- digging back into your Paul
22 Hastings days with the concept of a go
23 shop?
24     A.   Yes.

**Page 418**

FEINSOD

1      Q.   Did this CN deal have a go shop
2  in it?
3      A.   It had the opposite of one, an
4  exclusivity agreement where --
5      Q.   No shop?
6      A.   A very tight no shop.
7      Q.   A very tight no shop?
8      A.   Right.
9      Q.   So if you had, for example,
10 entered into another deal during the
11 exclusivity period, you would have
12 owed -- you would have been in breach of
13 the Columbus Nova agreement.  Isn't that
14 right?
15     A.   Correct.
16     Q.   Okay.  But that didn't stop
17 people from approaching you during that
18 time period, did it?
19     A.   No.  The provisions allowed not
20 a go shop, but if an unsolicited in bound
21 came knocking on the door, we were -- we
22 were permitted to engage in discussions
23 with them.  There was a complicated
24 notice procedure under the document --

**Page 419**

FEINSOD

1  under the stock purchase agreement, but we
2  were permitted.
3      Q.   Okay.  And there was always a
4  fiduciary out.  In other words, if
5  somebody else came along with a better
6  deal, and you -- you and the board
7  considered it and reached certain
8  conclusions, and I am oversimplifying this
9  grossly, and I know there are pages in the
10 agreement, you had a right to blow of out
11 the deal?
12     A.   We had a heavily negotiated
13 right to get out of the deal and a heavily
14 technical and analyzed process that would
15 protect the shareholders and give us the
16 ability to maximize value.
17     Q.   Okay.
18     A.   It was a superior offer.
19     Q.   A superior offer, and just so we
20 are clear a superior offer would have been
21 in the agreement capital S, capital O
22 offer.  It is a defined term, right?
23     A.   Heavily negotiated, yes.
24     Q.   Not just we got

Page 420

```
        FEINSOD
1
2   better -- somebody offered us more money
3   or something else.   So, for instance, if
4   somebody came in and offered you double
5   what CN was offering on a per share basis
6   but the board and you and your advisors in
7   your judgment determined that the
8   execution risk -- and if I use that term
9   you know what I am talking about, right?
10      A.   Correct.
11      Q.   -- that the execution risk WAS
12  so high on the deal that you might not be
13  able to get it through or the regulatory
14  execution risk was so high that you might
15  never get the SBA to approval for it, you
16  didn't have to drop CN for that deal,
17  right?
18      A.   Correct.
19      Q.   That is not a superior offer in
20  the capital S, capital O meaning of the
21  term?
22      A.   Correct.   It was a heavily
23  defined term.
24      Q.   And that ment that you -- and I
25  am going to focus -- I know the board has
```

Page 421

```
        FEINSOD
1
2   a role in this, but I want to focus on you
3   because you are here today, on the front
4   lines as a deal guy it was important for
5   you to look at the execution risk and the
6   regulatory risk of any proposal that came
7   in and make sure that you weren't walking
8   the company into something that wasn't
9   going to fly, right?
10      A.   That -- yes, the likelihood of a
11  transaction that would come to fruition or
12  close was my job.
13      Q.   I didn't ask you this, but just
14  out of curiosity what was it that -- I
15  mean I saw -- you know, I think when I was
16  talking -- looking through this I saw  15,
17  16, 17 potential parties including people
18  as big as GSO, which is Blackstone.
19      A.   Right.
20      Q.   What was it that made this
21  company so attractive given that Mr.
22  Weinberg keeps talking about how the
23  portfolio was lucrative money?
24      A.   The corporate structure, the way
25  it had been structured, the permanency of
```

Page 422

```
        FEINSOD
1
2   the license, of the SBIC license, the
3   evergreen agreement.   Most SBIC for last
4   few years receive seven-year licenses.
5   Elk had a permanent license.   It was one
6   of five remaining evergreen licenses in
7   the country at this point.   I believe the
8   other ones had been -- I believe they had
9   been closed down, but there was a
10  concerted -- this was a unique type of
11  SBIC license, and to your questioning, as
12  the word got out of the Elk/Ameritrans
13  structure and more people found out about
14  it, we met with some of the largest
15  organizations in New York ranging from the
16  Soros Asset Management to Arlon Asset
17  Management to GSO in the final days of
18  shopping the company.   So we -- we were
19  also represented by Moelis & Company.
20  Moelis & Company investigated purchasing
21  the company.   The proxy details I
22  think -- I would think it was in the 20s
23  the number of sophisticated parties that
24  did a deep dive into Elk, and including
25  Columbus Nova did a deep dive into Elk and
```

Page 423

```
        FEINSOD
1
2   found that it was worth substantially more
3   than -- it had the potential to be worth
4   substantially more if it was grown
5   properly.
6       Q.   And just to kind of put a bow
7   around what you just testified to, when
8   you say the corporate structure, it is an
9   evergreen SBIC license sitting inside a
10  BDC that is a wholly owned subsidiary of a
11  public BDC, right?
12      A.   Correct, and at that time there
13  was no other entity like it.
14      Q.   Okay.   So a lot of these
15  entities were really interested
16  essentially in buying the structure more
17  than the company, right?
18      A.   That would be a broad
19  generalization, but yes.   The
20  structure -- the structural viability of
21  it, yes, that it was a powerful structure.
22      Q.   Okay.   And -- but that in and of
23  itself, a buyer who is just basically
24  coming in and buying the structure poses a
25  form of execution risk of its he own,
```

Page 424

                    FEINSOD

1  doesn't it?
2
3      A.    Absolutely.  We had several
4  buyers that looked at it like that.
5      Q.    I mean the simplest one is SBA
6  approval because there is no continuity of
7  management.   There is no continuity of
8  programmatic policy?
9      A.    Correct.
10     Q.    If somebody just buys the
11 license, it is a whole new ballgame.   It
12 is new applicants.   There is some risk to
13 that, right?
14     A.    There is substantial risk.
15     Q.    And that is one of the reasons
16 CN in your view was a better deal because
17 continuity of program and management took
18 off the table the regulatory risk of
19 somebody just buying a license, right?
20     A.    I would just enhance that by
21 saying continuity of management and
22 enhancement of management that we were
23 getting from Columbus Nova in the space we
24 were in was second to none.
25     Q.    All right.  And, you know, you

Page 425

                    FEINSOD

1  mentioned something about this evergreen
2  license, and I know you talked about that
3  a little bit before.   That in and of it
4  was a problem in the CN approval, wasn't
5  it? Going to the --
6      A.    Yes.
7      Q.    In other words, that was
8  something that you saw behind the scenes
9  was an impediment of getting SBA to buy
10 into a -- a transaction that everybody
11 believed should be a no brainer and was
12 going to save the company, right?
13         MR. WEINBERG:    Objection to
14     the form.
15     A.    Correct.  At the beginning it
16 seemed -- at the beginning of the review
17 process Paul Salgado and Fonda seemed a
18 hundred percent behind the transaction.
19 They were happy about the capital
20 impairment cure.  They were happy about
21 the investment into the company which
22 would eliminate the due to parent at that
23 point, and they were all for it and even
24 had given us confirmation that they were

Page 426

                    FEINSOD

1  recommending it to the investment
2  committee -- recommending approval of the
3  transaction as early as maybe May or June
4  that they were recommending it, and he
5  would thought that we were -- you know,
6  achieved the right purpose.
7      Q.    And you let the board know about
8  that, right?  You let them --
9      A.    Exhaustively.
10     Q.    Okay.  But then there came a
11 point where -- where the management
12 ownership diversity issue came up, right,
13 in the summer.   It started getting
14 flagged?
15     A.    Correct.  It was raised.  It
16 didn't feel ingenious.  It felt arbitrary
17 and capricious in terms of how it was
18 being held.  It was a summer when there
19 was no progress made when there should
20 have been progress.
21         You mentioned that my background
22 was in mergers and acquisitions.   I have
23 been involved in the transfer of at least
24 a hundred federal licenses regarding

Page 427

                    FEINSOD

1  cellular and cable assets and have never
2  had one -- have never seen one turned
3  down.  So in the normal course we had
4  expected this to be reviewed and
5  transferred, and when MOD came -- when MOD
6  came up our lawyers gave us guidance that
7  it was a manufactured -- it wasn't a real
8  issue.   And I believe our law firm
9  delivered a memo to SBA explaining our
10 position, and while they continued to act
11 somewhat arbitrarily and capriciously
12 husbandly in not giving guidance and not
13 explaining to us what was wrong with that
14 perception of MOD I guess on December 22
15 probably on the last night of the business
16 year at 5 o'clock I was e-mailed a letter
17 citing MOD as the issue and some other,
18 you know, somewhat arbitrarily claims.
19 Sorry to ramble.
20     Q.    And during the course of the
21 summer, I want to back up, and this
22 started in July and went through December,
23 and I don't want to go through the
24 exhaustive process you went through,

Page 428

FEINSOD

1  
2  however during that time period you made
3  efforts to work with Columbus Nova to
4  restructure the deal in order to satisfy
5  the MOD requirement even though you
6  thought it was -- you call it arbitrary,
7  but I would have said pretextural, right?
8          MR. WEINBERG:  ObjectION.
9      A.   I would agree.  It was
10  pretextural, and it was -- it was a false
11  flag I guess would be the best.  We were
12  consistently banging our heads against the
13  wall and got no guidance on what might
14  help with the issue, even maybe
15  misguidance.  Maybe -- internally Paul
16  Salgado was trying to get the transaction
17  done for us is what we believed at that
18  point through the summer.
19      Q.   And you -- to my point, the
20  question I asked is you made efforts with
21  Columbus Nova to restructure the deal to
22  get around the transaction to issue,
23  right?
24      A.   I believe we amended the
25  transaction --

Page 429

FEINSOD

1  
2      Q.   And the board --
3      A.   -- substantially.
4      Q.   And the board made efforts to
5  get around the MOD issue, correct?
6      A.   That's correct.
7      Q.   And that was -- and that was the
8  issue that was discussed over and over
9  again with the board as to what was the
10  SBA's concern here together with this fact
11  that there was something hiding behind it,
12  which was we want to kill the license?
13          MR. WEINBERG:  Objection to
14      the form.
15      Q.   That is what you told them,
16  right?
17      A.   Yes.
18      Q.   You didn't just tell them there
19  was an MOD issue.  You told them there
20  was an MOD, but it was pretext to kill the
21  license, right?
22          MR. WEINBERG:  Objection to
23      form.
24      A.   That was what was said.  To use
25  your term it seemed like pretextural to

Page 430

FEINSOD

1  
2  keep us from transferring the license and
3  prolong the process as long as possible.
4  Questions that could have been answered in
5  hours were answered in weeks in terms of
6  responses.
7      Q.   And did you discuss with the
8  board any other concerns besides those two
9  sort of twin concerns that the SBA had?
10      A.   Probably among others the black
11  hole of information.  That there was an
12  intangible, and, you know, I will refer to
13  this what I refer to it as arbitrary.  It
14  just didn't make sense.  Nothing was
15  following a linear path in a regulated
16  organization.  To the extent that we were
17  he following -- looking at SOPs and trying
18  to understand the review process and
19  provide information, nothing was done.
20  According to SOP, this is standard
21  operating procedure.  You know, this was
22  a -- there was a process here, and SBA
23  threw it out the window, and actually I
24  think they even used the term relicensing
25  at some point.  So what was supposed to be

Page 431

FEINSOD

1  
2  a change of control morphed into a
3  relicensing process without guidance,
4  without SOP, without any -- any
5  appropriate conduct by SBA in my opinion.
6      Q.   Thank you.  So.
7          One other -- another area I want
8  to turn to is Mr. Indick.  Mr. Indick was
9  on your board as a designee of his PE
10  found Pride Capital, right?
11      A.   Yes.  Yes, he came on when they
12  made a substantial investment.
13      Q.   And his director fees were in
14  fact paid to Pride Capital, right?
15      A.   I don't recall, but that would
16  make sense.
17      Q.   Okay.  And there came a time
18  when Pride closed and went into the mode
19  of essentially monetizing its investments
20  and returning money to shareholders,
21  correct?
22      A.   Correct.  They had one
23  investment that they were focusing on, and
24  they were -- they were going in different
25  directions.

Page 432

```
 1            FEINSOD
 2      Q.    And at that point Mr. Indick
 3 wanted to money advertise his -- I
 4 shouldn't say his -- Pride's investment in
 5 Ameritrans, right?
 6      A.    Correct.
 7      Q.    And that would have been in late
 8 2010 or early 2011.  In fact, you -- your
 9 fund Infinity purchased his interest,
10 correct?
11      A.    Correct.
12      Q.    Let me rephrase it -- withdraw
13 and rephrase it.  Infinity purchased
14 Pride's interests, correct?
15      A.    Infinity Capital Partners
16 purchased Pride's interest, and I just
17 note I brought to the board, and we
18 completed the transaction.
19      Q.    And at that point Mr. Indick
20 indicated to you that he wished to step
21 off the board, correct?
22      A.    Yes, that sounds right.
23      Q.    So that would have been in early
24 2011?
25      A.    I believe it would correspond
```

Page 433

```
 1            FEINSOD
 2 with shortly after he sold his investment.
 3      Q.    And you asked him not to step
 4 down until the Columbus Nova deal was
 5 closed because you were close on that, and
 6 there was going to be a board change
 7 anyway?
 8      A.    I don't recall.  I think that
 9 he was helpful in -- he was helpful when
10 we were out marketing I believe.  I don't
11 remember the dates exactly, but the optics
12 seemed better to have continuity at the
13 board level.
14      Q.    Got it.  But then -- so the deal
15 gets signed in April.  You have a
16 shareholder meeting in June to approve it.
17 The proxy goes to the shareholders?
18      A.    Right.
19      Q.    And after that point Mr. Indick
20 effectively was off the board although he
21 doesn't formally resign until September;
22 isn't that right?
23            MR. WEINBERG:  Objection.
24      A.    That sounds about correct
25 timewise.
```

Page 434

```
 1            FEINSOD
 2      Q.    Got it.  Give me a minute.
 3            (Pause.)
 4      Q.    Just a couple of other points.
 5 We went through a number of sales of
 6 assets in 2012 and 2013 today with Mr.
 7 Weinberg, correct?
 8      A.    Correct.
 9      Q.    Okay.  You recall the sale of
10 something called the Affinity Group?
11      A.    Not specifically, no.
12      Q.    Okay.  Did -- were any of the
13 proceeds from the sale of Affinity Group
14 paid over to Mr. Laird?
15            MR. WEINBERG:  Objection to
16      form.
17      A.    Definitively not.
18      Q.    I --
19      A.    I'm sorry.
20      Q.    Sorry.  The answer is no.  It
21 will be faster -- I like definitively for
22 my client's sake, but no is your answer,
23 right?
24      A.    No.  No.  I -- no.
25      Q.    This is going to be repetitive.
```

Page 435

```
 1            FEINSOD
 2 I apologize.
 3      A.    Sorry.  I was caught off guard.
 4      Q.    The same would be true with
 5 respect to Mr. Wolpert.  Nothing was paid
 6 to him out the Affinity Group asset sale,
 7 correct?
 8            MR. WEINBERG:  Objection to
 9      form.
10      A.    Correct.
11      Q.    Similarly Howard Sommer.
12 Nothing was paid to him?
13            MR. WEINBERG:  Objection to
14      the form.
15      A.    Correct.
16      Q.    And Elliott Singer, nothing was
17 paid to him?
18            MR. WEINBERG:  Objection to
19      form.
20      A.    Correct.
21      Q.    Peter Boockvar, the same thing.
22 Nothing was paid to him?
23      A.    Correct.
24            MR. WEINBERG:  Objection to
25      the form.
```

Page 436

```
1                FEINSOD
2      Q.    Plainly Mr. Indick was already
3  off the board, so nothing was paid to him,
4  correct?
5      A.    Correct.
6      Q.    And then the Mirimax Film, LLC
7  asset, the proceeds from the sale of that
8  nothing was directed to Mr. Laird,
9  correct?
10         MR. WEINBERG:   Objection to
11      the form.
12      A.    Correct.
13      Q.    Nothing was paid to Mr. Wolpert?
14      A.    Correct.
15         MR. WEINBERG:   Objection to
16      form.
17      Q.    And nothing was paid to Mr.
18  Summer, correct?
19         MR. WEINBERG:   Objection to
20      the form.
21      A.    Correct.
22      Q.    And nothing was paid to Mr.
23  Singer?
24         MR. WEINBERG:  Objection to the
25      form.
```

Page 437

```
1                FEINSOD
2      A.    That would be correct.
3      Q.    And the same would be true with
4  respect to Mr. Boockvar?
5         MR. WEINBERG:   Objection to
6      the form.
7      A.    That would be correct.
8      Q.    And again the same would be true
9  with respect to Mr. Indick?
10         MR. WEINBERG:   Objection to
11      the form.
12      A.    Correct.
13      Q.    Okay.  I am going to ask -- I am
14  going to do this for everybody.  Just tell
15  me if I am wrong for any one individual,
16  but for Center Plate did any independent
17  directors receive any money from the
18  proceeds of the sale of Center Plate?
19         MR. WEINBERG:   Objection to
20      the form.
21      A.    No.   They did not.
22      Q.    Would the same be true with
23  respect to the Synscort Incorporated?
24         MR. WEINBERG:   Objection to
25      the form.
```

Page 438

```
1                FEINSOD
2      A.    The same would be correct.
3      Q.    And the same for Fairway
4  Acquisition Group, right?
5      A.    Correct.
6         MR. WEINBERG:   Objection to
7      the form.
8      Q.    And the same with Sheerer Foods,
9  correct?
10         MR. WEINBERG:   Objection to
11      the form.
12      A.    Correct.
13      Q.    And the same for Hudson Products
14  Holdings, correct?
15         MR. WEINBERG:   Objection to
16      the form.
17      A.    Correct.
18      Q.    And the same with Sterling Info
19  Systems, correct?
20         MR. WEINBERG:   Objection to
21      the form.
22      A.    Correct.
23      Q.    The same with respect to the
24  Sealmax, correct?
25         MR. WEINBERG:  Objection to to
```

Page 439

```
1                FEINSOD
2      the form.
3      A.    Correct.
4      Q.    And the same with respect to
5  Impact Confections, correct?
6         MR. WEINBERG:   Objection to
7      the form.
8      A.    Correct.
9      Q.    And then I am going try to speed
10  this up by lumping them together, but to
11  the extent that life settlement policies
12  were paid -- were sold off, which I think
13  all of these were done in March, April,
14  proceeds from those policies sales were
15  paid over to any of the independent
16  directors, correct?
17         MR. WEINBERG:   Objection to
18      the form.
19      A.    Correct.
20      Q.    Okay.  And in fact to the
21  extent sales of assets were done in 2012
22  -- after February of 2012, which I think
23  all of these were done in March, April,
24  later in the fall, they were done either
25  for the purpose of paying off the Columbus
25  Nova and Etra notes, correct?  Those are
```

Page 440

FEINSOD

1
2  the primary reason --
3      A.   I believe so.
4      Q.   Or to pay the SBA settlement in
5  the fall?
6          MR. WEINBERG:  Objection to
7      the form.
8      A.   I believe so.
9      Q.   Okay.  And to the extent that
10 more money -- that -- rough justice that
11 is 4 million and 1.2 million, right?
12         MR. WEINBERG:  Objection to
13     the form.
14     Q.   Call it $5.7 million?
15     A.   Roughly.  I haven't been
16 keeping track.  I apologize.
17     Q.   No.  I am talking about -- I am
18 coming from the other direction.  The Etra
19 note was 3 million.  The Columbus Nova
20 note was 1.5.  Both of those were
21 discounted down -- negotiated down at the
22 time of settlement with them and then 1.2
23 million to the SBA.  That is where I am
24 getting roughly 5 and a half to 5?
25     A.   Correct.  That sounds correct.

Page 441

FEINSOD

1
2      Q.   Okay.  To the extent that the
3  various sales resulted in proceeds above
4  that, those were used to pay Elk and
5  Ameritrans operating expenses during that
6  time period, including business
7  development expenses, correct?
8          MR. WEINBERG:  Objection to the
9      form.
10     A.   Correct.
11     Q.   Okay.
12         MR. SEIDEL:  Can we take a
13     short break, and I would like to have
14     five minutes in a breakout room with
15     my colleague, Ms. Larsen.
16         THE VIDEOGRAPHER:  The time is
17     11:41, and we are going off the
18     record.
19         (Recess taken.)
20         THE VIDEOGRAPHER:  The time is
21     11:53, and we are back on the record.
22         MR. HASHEM:  Could we pull up
23     Exhibit A, please.  And then in the
24     meantime, Mr. Feinsod, I am going to
25     ask you a few questions, and

Page 442

FEINSOD

1
2      hopefully we can wrap this up.
3          THE WITNESS:  Just bear with
4      me -- I need to log back into
5      Veritext.  It timed out.  Sorry.
6          MR. WEINBERG:  Sorry, ray.
7      Where would the exhibit be displayed?
8          MR. HASHEM:  Mr. Feinsod, is
9      trying to log into Veritext, but it
10     should be in the marked exhibits
11     folder that we have been using.
12         MR. WEINBERG:  Okay.
13         MR. HASHEM:  It is Exhibit
14     31.
15         (Exhibit 31 marked for
16     identification.)
17 EXAMINATION BY MR. HASHEM:
18     Q.   Exhibit 31, before we turn to
19 it, let me ask a couple of questions.  So
20 Elk was founded or started, created in
21 1980; is that correct?
22     A.   I believe it was '79.
23     Q.   And it was licensed by SBA
24 around 1979 or 1980?
25     A.   Correct.

Page 443

FEINSOD

1
2      Q.   And around 1999, was Ameritrans
3  created to be a holding company for Elk?
4      A.   Yes.
5      Q.   And in 1999, there was a process
6  by which Elk -- Ameritrans bought all of
7  the outstanding stock of Elk; is that
8  correct?
9      A.   Correct.  It was a single
10 share, which merged, and it was a share
11 exchange.
12     Q.   And so Elk became a wholly-owned
13 subsidiary with no other shareholders
14 other than Ameritrans?
15     A.   Correct.
16     Q.   Now, was it your
17 understanding -- so let's turn to Exhibit
18 31.  It is a letter from Strasburg & Bell
19 dated November 25, 1998 to the U.S.
20 Securities and Exchange Commission.
21 Please take a look at maybe the first page
22 and then the attached document, which
23 starts at page 5 of the PDF, and let me
24 know when you have had a chance to look at
25 it.

```
 1           FEINSOD
 2           (Pause.)
 3     Q.   Do you recognize this document?
 4     A.   Yes.
 5     Q.   What is it?
 6     A.   This was the application for
 7  exemptive relief that forms the basis for
 8  the exemptive order for Elk and
 9  Ameritrans.
10     Q.   What do you mean by exemptive
11  relief?
12     A.   As I mentioned before, Elk and
13  Ameritrans were both known as business
14  development companies, which requires them
15  each to file under the 34 Act with the SEC
16  on a regular basis.  Since Elk was going
17  to be a hundred percent owned --
18  wholly-owned subsidiary of Ameritrans, and
19  there are certain -- Elk applied --
20  Ameritrans and Elk applied for a
21  reorganization, which would allow
22  Ameritrans to file consolidated financial
23  statements.  That was the main gist of the
24  exemptive order.
25           The exemptive order also applied
```

```
 1           FEINSOD
 2  to different sections regarding operations
 3  between business development companies and
 4  exemptive relief that Ameritrans might
 5  need to operate as this -- under the
 6  exemptive order, and I also believe
 7  looking at the index, which is page 7, it
 8  details other important precedents, which
 9  I believe most of them were evergreen
10  SBICs.  So --
11     Q.   What is an evergreen SBIC?
12     A.   A typical SBIC -- an Everygreen
13  SBIC is one that is licensed -- that is
14  given a perpetual license meaning it is
15  allowed to operate in perpetuity as
16  opposed to the typical SBIC now is
17  licensed for seven years.  This was not
18  by regulation but by internal decision.
19  The SBIC -- the SBA has made certain
20  decisions to only license SBICs for seven
21  years, and I believe they publish that on
22  their website that they will no longer
23  license perpetual SBICs.
24     Q.   Let me --
25     A.   So you have a seven -- sorry.
```

```
 1           FEINSOD
 2     Q.   Go ahead.
 3     A.   It is important because you have
 4  a seven year life the -- SBICs that are
 5  issued today have a seven-year life and
 6  are given one chance to invest their
 7  money, and then it is -- the structure
 8  generally goes into runoff.  The
 9  value -- the inherent value, which we
10  alluded to in the permanent license or the
11  evergreen license is the ability to
12  reinvest proceeds from other investments.
13     Q.   Let me ask you to turn to page
14  13, please.  So if you lock at -- I lost
15  my place.  So if we look at page 13 of
16  the document, it -- the first -- I guess
17  the second paragraph says, "In addition
18  since Ameritrans will operate Elk as a
19  wholly-owned subsidiary, the acquisition
20  of the securities of Elk, any loans or
21  advances made to Elk by Ameritrans or any
22  other transfer from Ameritrans to Elk will
23  be exempt from the prohibitions of Section
24  12D1A and C by virtue of Rule 60A1."
25           Then it says, "Exemption
```

```
 1           FEINSOD
 2  requests.  In general the purpose of
 3  Section 12D(1) is to prohibit investment
 4  companies from permitting control of
 5  management fees."
 6           Looking at this section, do you
 7  recall whether Elk or
 8  Ameritrans -- Ameritrans had sought
 9  permission from the SBA to be able to make
10  loans and advances to Elk?
11     A.   Advances -- not so much loans
12  but advances I guess?  I am not following
13  the question.  I apologize, Ray.
14     Q.   Let's strike that question.
15     MR. HAMESH:  Can we -- can you
16  mark as Exhibit B, please.
17     Q.   I'm sorry, Mr. Feinsod.  I
18  apologize.
19     A.   No problem.
20     Q.   Staying on page 15 of Exhibit
21  31, if you look down where it says --
22     A.   Hold on one second.  I have to
23  go back to that.  So page 15 of Exhibit
24  31.  15 of the document.  Okay.  I am
25  there.
```

Page 448

```
1            FEINSOD
2      Q.    So it says under "Exemption
3   requested, subject to condition 6 set
4   forth in Section 5 of this application
5   Ameritrans and Elk request that the
6   commission render an order exempting from
7   the sections the provisions of section 17
8   A and 17 Act one translation solely
9   between Ameritrans and Elk with respect to
10  purchase and sale of securities or other
11  property and the borrowing of money or
12  other property."
13           Is it your understanding that
14  Ameritrans had requested from the SEC
15  permission to exempt transactions between
16  Ameritrans and Elk with respect to
17  purchase and sale of securities or other
18  property and the borrowing of money?
19        MR. WEINBERG:   Objection to
20     form.
21     A.    Yes, and that it was granted.
22     Q.    So is it your understanding that
23  the -- that the exemptive order had sought
24  permission from the SEC to allow
25  Ameritrans to borrow money or make
```

Page 449

```
1            FEINSOD
2   advances or purchase and sell securities
3   with Elk?
4        MR. WEINBERG:   Objection to
5     the form.
6     A.    Yes.
7        MR. HAMESH:  If we could pull
8     up exhibit 32, please, which is what
9     I have marked Exhibit B.
10       (Exhibit 32 marked for
11    identification.)
12    Q.    It is still loading for me.  So
13  give me a moment.
14       (Pause.)
15    Q.    Mr. Feinsod, for the record,
16  Exhibit B is a letter dated November 29,
17  1999 from Strausberg & Bell to the U.S.
18  Securities and Exchange Commission with an
19  attachment.
20       Mr. Feinsod, do you recognize
21  this document?
22    A.    Yes.
23    Q.    What is this document?
24    A.    I believe it is part two of the
25  application for exemptive relief.   It is
```

Page 450

```
1            FEINSOD
2   the first amendment that was filed.
3   So --
4     Q.    If I could draw your attention
5   to page 10.
6     A.    Got it.
7     Q.    Okay.  So the section says,
8   "Proposed operations as one company." Do
9   you see this section heading?
10    A.    Yes.
11    Q.    And it says "A, futue operations
12  of Ameritrans and Elk."  Do you
13  understand this part of application to be
14  describing to the SEC the proposed
15  operations of Elk and Ameritrans?
16    A.    Yes.
17    Q.    And was it your understanding
18  that in the exemptive or application
19  Ameritrans proposed that Elk and
20  Ameritrans would be operated as a single
21  company?
22       MR. WEINBERG:   Objection to
23    form.
24    A.    Yes, and this was negotiated
25  with the SBA from my understanding.
```

Page 451

```
1            FEINSOD
2     Q.    What is your knowledge of what
3   negotiations were conducted with the sBA?
4     A.    That there were significant
5   negotiations between the SBA and Elk with
6   respect to the formation of Ameritrans,
7   the -- the continued operation of Elk and
8   the exemptive order that was needed for
9   Ameritrans to be a public company.
10    Q.    Now, if you look at the
11  paragraph right under A on page 10 it says
12  "As currently contemplated by applicant
13  after the share exchange, the following
14  type of transactions may arise in the
15  future involving Ameritrans, its
16  subsidiary Elk, and one or more future
17  subsidiaries."
18       Do you see that?
19    A.    I do.
20    Q.    And if we go down to 3, it says
21  "The subsidiaries might from time to time
22  make loans or other
23  advancement" -- "advances to Ameritrans or
24  to each other subject to the requirements
25  of the 1958 Act and regulations.  Such
```

Page 452

```
                    FEINSOD
1
2   loans and advances might be made for the
3   purpose of providing funds to Ameritrans
4   with which to pay dividends, to maintain
5   its qualifications as a regulated
6   investment company or to make investments
7   for its own account or to pay operating
8   expenses.   The subsidiaries will not
9   purchase or otherwise acquire any of the
10  capital or stock in Ameritrans."
11          Do you understand the exemptive
12  order to have or -- sorry.   We were
13  talking about the application.   Did you
14  understand that the application -- in the
15  application Ameritrans had requested
16  permission from SBA to allow Elk to make
17  advances for -- to Ameritrans?
18          MR. WEINBERG:   Objections to
19      the form, and the document speaks for
20      itself.   It is subject --
21  A.   Yes.
22          MR. WEINBERG:   -- to the
23      requirements of the 1958 Act and
24      regulation.
25  Q.   I am asking, Mr. Feinsod, about
```

Page 453

```
                    FEINSOD
1
2   your understanding of what Elk had
3   requested from -- sorry -- your
4   understanding of what Ameritrans had
5   requested from the SBA -- from the SEC?
6   A.   My understanding was that --
7          MR. WEINBERG:   Objection to
8      form.
9   A.   I'm sorry.   Can I start?
10         MR. WEINBERG:   I objected to
11     the form.   If the court reporter has
12     it, please answer the question.
13  A.   My understanding of this
14  paragraph is that this is specifically
15  because transactions between Ameritrans
16  and Elk may have been considered improper
17  without this exemptive relief.   As two
18  BDCs one being wholly owned, that this was
19  respect to track with respect to 1958 Act
20  and Regulations the chart of accounts
21  managed by an SBIC and then as the
22  paragraph tracks the language about how
23  loans loans and advances might be made to
24  a parent company, and on the contra there
25  is another regulation within the chart of
```

Page 454

```
                    FEINSOD
1
2   accounts which would show loans and
3   advances going the other way, but this was
4   an understanding that Ameritrans was the
5   public property of Elk-- of doing the
6   business of Elk.
7          So to be as clear as possible,
8   this had to have been heavily negotiated
9   because Ameritrans and Elk could not have
10  conducted any business with each other
11  without this.
12  Q.   Let me step back for a second.
13  Do you recall when you first
14  invested -- did you make an investment in
15  Ameritrans before you came to work for
16  Ameritrans?
17  A.   No, that is not possible. You
18  can only invest in Ameritrans. I'm sorry
19  you can only invest in Ameritrans, not
20  Elk.
21  Q.   And when did you first encounter
22  Ameritrans?
23  A.   In 2002, I found it after it
24  broke off a merger agreement with
25  Medallion Financial, which was another
```

Page 455

```
                    FEINSOD
1
2   publically traded SBIC with a drop down
3   BDC specializing in the taxicab medallion
4   industry.
5   Q.   And what -- did you eventually
6   make an investment in Ameritrans?
7   A.   A significant investment.
8   Between 2002 and 2006 I believe I acquired
9   99.9 percent of the company.
10  Q.   And what was the reason for
11  that?
12  A.   I thought that the value  -- the
13  structural value of the company was
14  powerful, meaning that the SBIC license
15  within an SBIC properly capitalized and
16  properly managed had the likelihood to
17  become a very successful finance company.
18  Q.   And so is it fair to say that
19  one of the things that initially persuaded
20  you to invest in Elk and Ameritrans was
21  the structure of the Ameritrans holding
22  company and the Elk subsidiary?
23  A.   It absolutely was, and that it
24  was a publically traded company and
25  subject to -- while it was an SBIC,
```

Page 456

```
 1            FEINSOD
 2  subject to rules and regulations, and in
 3  the normal course of business such license
 4  could be traded or merged, and the
 5  corporate subsidiary had an approved
 6  merger at one point with Medallion
 7  Financial, which is how I found it.   So
 8  in a process that was run not arbitrarily,
 9  it appeared that Elk could either
10  recapitalize itself or merge into another
11  entity and grow -- and grow that way.  So
12  it was a belief in the -- in he total
13  existence of the package, which was both
14  the SEC exemptive order and the SBIC
15  license and Ameritrans structure.
16      Q.   I am going to ask you --
17          MR. HASHEM:   Could you please
18      mark Exhibit C or what I have marked
19      as Exhibit C what will become Exhibit
20      33.
21          (Exhibit 33 marked for
22      identification.)
23      A.   Are we waiting on me or are we
24  waiting for the exhibit to be loaded?
25      Q.   If you could just refresh, you
```

Page 457

```
 1            FEINSOD
 2  should see it.
 3      A.   It just came up.   Thank you.
 4  Exhibit C order granted.   Okay.
 5      Q.   Okay.  If you look at page
 6  is -- first have you seen this document
 7  before?
 8      A.   Yes.
 9      Q.   What is this document?
10      A.   This is the order granting a
11  relief requested in the other two -- the
12  first two -- the document and the
13  amendment that we discussed.
14      Q.   If you look at the last
15  paragraph on the page it says, "Elk
16  Associates Funding Corporation, et al.
17  filed and application on November 27, 1998
18  and amended the application on November
19  30, 1999."
20          Do you understand that to refer
21  to the two documents we just reviewed?
22      A.   Yes, and that Elk was the bigger
23  company.   Sorry.
24      Q.   And if you look at the last
25  sentence of this paragraph the order also
```

Page 458

```
 1            FEINSOD
 2  would permit the two companies and any
 3  additional wholly-owned BDC subsidiaries
 4  of the parent established in the future to
 5  engage in certain transactions that
 6  otherwise would be permitted with the
 7  parent and its BDC subsidiaries for one
 8  another company and adhere to modified
 9  assets reporting requirement and file
10  certain reports on a consolidated basis."
11          Do you see that?
12      A.   I do.
13      Q.   Is it your understanding that
14  the SEC granted the relief in the
15  applications we discussed?
16          MR. WEINBERG:   Objection to
17      the form.  The document speaks for
18      itself.
19      A.   This is signed by the -- by
20  someone at the SEC.  It seems to be the
21  order granting it, and I guess that
22  everything was approved by SBA before it
23  was submitted to SEC.  So the SBA had
24  signed off on all these documents prior.
25      Q.   So you mentioned you had seen
```

Page 459

```
 1            FEINSOD
 2  this document before.
 3          Were you aware of the exemptive
 4  order at the time you were in -- at the
 5  time you became an investor in Elk and
 6  Ameritrans?
 7      A.   I was mildly familiar with it as
 8  I became more -- I became more familiar
 9  with it over time, and it was a
10  significant factor in making my investment
11  in Ameritrans.
12      Q.   And were you aware of it at the
13  time that you became a -- a board member?
14      A.   Yes.
15      Q.   And the exemptive order -- you
16  mentioned earlier that there was a company
17  Medallion Financial Corp.; is that
18  correct?
19      A.   Correct.
20      Q.   Were you aware that Medallion
21  Financial Corp. also had an exemptive
22  order from the SEC?
23      A.   Yes.
24      Q.   And was that something notable
25  about Medallion Financial Corp. that in
```

Page 460

                    FEINSOD
1
2  your view the fact that Elk -- Ameritrans
3  having an exemptive order was something
4  that made it more attractive as an
5  investment?
6      A.   Yes.  Medallion Financial had
7  successfully leveraged a similar structure
8  to grow in size to be probably four to
9  five times the size of Ameritrans by the
10 time I got there between 1999 and when I
11 formed the company in '02, '03.
12     Q.   So at some point -- you can take
13 this exhibit away.
14         At some point you joined the
15 board of Ameritrans; is that correct?
16     A.   Yes, roughly 200, 2005.
17     Q.   Why did you join the board of
18 Ameritrans?
19     A.   I had made a significant
20 investment in the company and was
21 concerned that the company wasn't
22 generating a profit.
23     Q.   What was the basis for your
24 concern?
25     A.   It seemed that management was

Page 461

                    FEINSOD
1
2  understaffed, that it was a thin
3  management team and adding more staff
4  would be helpful.
5      Q.   And who was on the management
6  team at the time you joined the company?
7      A.   The management team when I
8  joined was Gary Granoff, Steven Etra, Lee
9  Forlenza, Owen Walker.
10     Q.   Now, is it correct that during
11 your time as a board member you observed
12 that the management team was not -- this
13 is in 2006, with Gary Granoff and Lee
14 Forlenza, was not operating the company in
15 your opinion effectively?
16     A.   Yes, that was any opinion.
17     Q.   Why -- what led you to that
18 opinion?
19     A.   A variety of factors from their
20 dedication to -- dedication of the amount
21 of time that they spent working at the
22 company both Lee -- all -- each of those
23 employees held other salaried positions
24 during that time outside of
25 Elk/Ameritrans.  They were either lawyers

Page 462

                    FEINSOD
1
2  or working in their own businesses.  The
3  law firm of Granoff Walker & Forlenza was
4  the single largest vendor to Elk in terms
5  of providing legal services that were
6  charged to the borrowers for
7  taxi -- primarily for taxicab loans, and I
8  felt that the company's focus on taxicab
9  loans at the time was self-serving for the
10 law firm and porr business judgment as an
11 asset class to be in.  So sometime in
12 2007 I believe we made a decision to try
13 an market the Medallion portfolio, and we
14 sold the taxicab medallion portfolio
15 during the summer of 2008 I believe and
16 then began -- sorry.
17     Q.   Let me interrupt you there for a
18 second.
19         So you mentioned the law firm of
20 Granoff Walker & Forlenza.  Granoff
21 Walker & Forlenza at that time were in the
22 management of Elk as well?
23     A.   Correct.  They held themselves
24 out as taxicab attorneys and SBA attorneys
25 as well handling representation of other

Page 463

                    FEINSOD
1
2  SBICs in front of SBA, specifically
3  taxicab medallions.
4      Q.   And you mentioned that you sold
5  the taxicab medallion portfolio.  What was
6  the reason?
7      A.   The taxicab medallion business
8  in New York had become overvalued on a
9  financial level and in my opinion corrupt.
10 There were too many people pushing up the
11 values of medallions to unsustainable
12 levels, and it was just not -- it was an
13 improper place to be lending money on
14 taxicab medallions, and it became -- I
15 believe it became -- after we sold there
16 has been a significant collapse in the
17 market and some exposure of organized
18 crime participating in the taxicab market.
19     Q.   So did you at some point become
20 president of Ameritrans?
21     A.   When I joined the company, I
22 joined as president I believe, and I
23 became CEO after the medallion sale.
24     Q.   And what time -- about what time
25 did you become CEO?

Page 464

FEINSOD

1
2       A.    I believe the beginning of 2008.
3   I'm sorry.   It would be 2009 when I was
4   CEO after the closing of the transaction.
5       Q.    And when you refer to the
6   transaction, you are referring to the sale
7   of the taxicab portfolio; is that correct?
8       A.    Yes.  We paid down all our
9   outstanding debt with all -- all the
10  outstanding bank debt and had -- became a
11  non-bank borrower at that point.
12      Q.    I want to talk a little bit
13  about that bank debt.  So prior to 2009
14  when Elk had a taxicab portfolio, about
15  how big was its portfolio?
16      A.    I believe it peaked at $60
17  million, somewhere around there.
18      Q.    And you mentioned earlier that,
19  you know, out of combined company
20  Ameritrans and Elk 90 -- what did you say,
21  95 to 99 percent of the assets were held,
22  right?
23      A.    Yes.  And to follow-up on that,
24  it was probably 90 percent of those assets
25  were medallion assets.  So --

Page 465

FEINSOD

1
2       Q.    So is it fair to say that the
3   operational -- the work of --
4             MR. HAMESH:  Strike the
5       question.
6       Q.    You mentioned that there was an
7   expense allocation of expenses -- when a
8   shared expense like rent was paid, it was
9   allocated between the companies; is that
10  correct?
11      A.    Correct.
12      Q.    And you mentioned that the
13  formula to your recollection was based on
14  the amount of assets that the companies
15  had; is that correct?
16      A.    Yes, retroactively at the end of
17  each quarter.
18      Q.    And at the time when 95 to 99
19  percent of the assets were Elk's assets,
20  the allocation -- is it fair to say the
21  allocation allocated almost all of the
22  shared expenses to Elk?
23            MR. WEINBERG:   Objection to
24      the form.
25      A.    It would be fair to say that 95

Page 466

FEINSOD

1
2   to 99 percent of the expenses were Elk's.
3       Q.    So in 2009, you sold the taxicab
4   medallion -- in 2008 you sold the taxicab
5   medallion portfolio; is that correct?
6       A.    Correct.
7       Q.    That caused Elk's assets to
8   shrink dramatically, right?
9       A.    Overnight.
10      Q.    Now, is it true that this
11  reduced Elk's revenue?
12      A.    Yes, it reduced Elk's revenue?
13      Q.    Why?
14      A.    Because we sold a significant
15  amount of assets that were
16  revenue-producing assets.   The -- if I
17  remember, I would guess it was a 7 percent
18  yield when we sold the portfolio.  So
19  roughly 40 million plus in assets.   I
20  don't remember the exact amount, but it
21  was approximately 40 million in taxi
22  assets that were sold.  So that would be
23  roughly 3 million in revenue that would
24  just disappear from that, but our
25  corresponding bank borrowings at 5 percent

Page 467

FEINSOD

1
2   also disappeared at the same time.   So it
3   was a leveraged business, and while
4   revenue was declining our interest expense
5   went down dramatically as well.
6       Q.    So now you -- the plan wasn't
7   for Elk to just have a small portfolio; is
8   that correct?
9       A.    Correct.   The plan was, you
10  know -- again, the taxicab business was
11  frothy and filled with questionable
12  characters, and the plan was to move into
13  what we called senior secured loans.
14  After doing significant research, we
15  determined that there was a world of SBIC
16  eligible loans that Elk was -- that were
17  open to Elk to invest in that had high
18  collateral quality, high liquidity, and
19  had a much better profile than the taxicab
20  medallion business ever would, and we made
21  a decision, and we called that the
22  corporate loan strategy and decided to
23  move towards that.
24      Q.    So your strategy, when you
25  became CEO, the company's strategy was to

Page 468

```
                    FEINSOD
1
2   pivot towards this corporate loan
3   strategy; is that correct?
4        A.    Yes, of lending to
5   well-capitalized companies at the top of
6   the capital structure.  Meaning we would
7   be the most senior lender, and there would
8   be significant capital or equity beneath
9   us.   He would be giving up yield for
10  security of principal.
11       Q.    And did you make any loans
12  during this period pursuant to that
13  strategy?
14       A.    Yes.  I think we originated over
15  $30 million in loans in this strategy and
16  presented it to SBA on numerous occasions.
17       Q.    And what was the performance of
18  this strategy?
19       A.    It was significant.  It was
20  significant.  It was very good.  I don't
21  have the numbers in front of me, but I
22  believe on the SBA metrics we were in the
23  mid teens in terms of returns, which
24  historically, like I said, we had sold a
25  portfolio that was yielding 7 percent, and
```

Page 469

```
                    FEINSOD
1
2   when we gave -- I reviewed some materials
3   at one point in the record that showed a
4   mid teens return in the first year of the
5   corporate launch strategy.
6        Q.    And that is the lower risk,
7   right, higher yield, lower risk?
8        A.    We believe significantly lower
9   risk, and I guess time has proven out that
10  it was a significantly better strategy
11  than staying in the medallion business.
12       Q.    And you had discussions -- did
13  you have discussions in this 2009 time
14  frame with the SBA regarding the corporate
15  loan strategy program?
16       A.    Yes.  Fonda Stevens-Kelly was
17  our account executive, as we -- the
18  process of getting rid of the medallion
19  loan was a significant process, meaning it
20  was probably three to six months from
21  signing to closing.  She was given all
22  the documents, familiarized with the
23  transaction, familiarized with the change
24  in business plan.  We spent a significant
25  time talking to different people at SBA
```

Page 470

```
                    FEINSOD
1
2   including Paul Salgado about the corporate
3   loan strategy, and that would -- that
4   would segue into the 2009 debenture
5   application because at that point they
6   were familiar -- we had the beginnings of
7   a track record, and Paul and
8   Fonda went -- for our debenture
9   application we got additional debentures
10  based on the expansion of the corporate
11  loan strategy, and that is to go back to
12  my point when they examined some of our
13  performance.
14       Q.    So you -- when did you -- so you
15  sold the medallion portfolio, and you are
16  looking for new capital; is that correct?
17       A.    Correct.  October 2008 we
18  closed.  We were really -- we were short
19  staffed, so there wasn't the ability to go
20  out and look -- we had to close one
21  transaction before we started looking
22  forward is the best way to describe it.
23            MR. HASHEM:   Can we pull up
24       what I marked as Exhibit E.
25            (Exhibit 34 marked for
```

Page 471

```
                    FEINSOD
1
2       identification.)
3        Q.    Mr. Feinsod, if you could just
4   hit refresh.
5        A.    I just have C still.  There it
6   is.  Got it.
7        Q.    Okay.  Give me a second.
8            Mr. Feinsod, do you recognize
9   this document?
10       A.    I do.
11       Q.    What is it?
12       A.    It was a -- it is a term sheet
13  or the first page of a letter that
14  contains a term sheet for a line of credit
15  from KBC Bank.
16       Q.    It is dated September 29, 2008;
17  is that correct?
18       A.    Yes.  The loan was
19  originally -- sorry.
20       Q.    What was that?
21       A.    The loan was originally for $20
22  million with the ability to scale it to
23  $50 million, which was $10 million more
24  than would have been available under our
25  previous facility that we paid off.
```

Page 472

```
1            FEINSOD
2      Q.    And was it your intention that
3  -- the company's intention at the time as
4  of September 29, 2008 to use this credit
5  facility to scale Elk's investment
6  portfolio back up?
7      A.    It was specifically to scale Elk
8  up, and as you can see from the term sheet
9  Elk was the borrower.   There is even some
10 history of the borrower here in the term
11 sheet and the description that -- of
12 Ameritrans as the hundred percent owner of
13 the borrower, and then I guess some
14 description about the operations of the
15 company.
16     Q.    Now, this corporate loan
17 strategy that you mentioned, was it an Elk
18 strategy or an Ameritrans strategy?
19     A.    It was an Elk strategy.   It was
20 all to leverage the ability of the SBIC to
21 grow exponentially and then to use -- to
22 maximize the value and the assets held by
23 Ameritrans -- by Elk, excuse me, in order
24 to maximize the value of the exemptive
25 order, which had certain exemptions for
```

Page 473

```
1            FEINSOD
2  asset coverage for BDCs.
3      Q.    Now, you mentioned earlier in
4  this deposition, the first part, the
5  legacy Ameritrans assets.   What were
6  those roughly generally speaking?
7      A.    I guess the legacy Ameritrans
8  assets were generally referred to a
9  non-taxicab loans that were left
10 after -- after the sale of the medallion
11 portfolio.   The taxicab medallion
12 portfolio provided the bulk of the cash
13 flow for the consolidated company, and
14 when that was sold we were left with the
15 legacy loans and the corporate loan
16 portfolio.
17     Q.    Now, were there certain assets
18 of Ameritrans and Elk -- so Ameritrans had
19 some of its own investments; is that
20 correct, that were separate from Elk --
21     A.    Yes.
22     Q.    -- and its subsidiaries?
23     A.    It had a handful of investments
24 that were all made prior to me joining the
25 company other than --
```

Page 474

```
1            FEINSOD
2      Q.    Go ahead.
3      A.    Other than the Bradway form that
4  Mr. Weinberg showed before, I believe that
5  was -- I don't believe that Ameritrans
6  made an investment while I was there.   A
7  new investment.   Excuse me.
8      Q.    And so when you joined the
9  company Ameritrans had these existing
10 investments.   It was -- those investments
11 were part of a strategy by your
12 predecessor; isn't that correct?
13     A.    They were -- there was two
14 buckets.   There was a hodgepodge of loans
15 that were owned by -- they were coowned by
16 other SBICs, the majority of which were in
17 receivership.   New York SBICs that were
18 clients Granoff Walker & Forlenza that
19 were in default from when I got -- when I
20 joined the company and were in the control
21 of the Office of Liquidation.   So very
22 little happened -- actually nothing
23 happened with those loans during my tenire
24 at the company, and then there was a small
25 portfolio of I guess again legacy assets,
```

Page 475

```
1            FEINSOD
2  partnership interests and other -- then
3  the life settlement policies.
4      Q.    We have been talking about the
5  life settlement policies.   Did
6  you -- were the life settlement policies
7  something that you decided to invest in
8  originally?
9      A.    As a -- the board approved the
10 settlement of the life settlement
11 policies.   It was made before I was a
12 manager of management.   Gary Granoff set
13 up the structure.   It was a joint venture
14 between the company and something called
15 Vibrant I believe.
16     Q.    You mentioned this corporate
17 loan strategy portfolio.   So when you
18 became CEO, was it -- was it your
19 intention to -- let me rephrase the
20 question.
21           When you became CEO, is it fair
22 to say you were focused on building Elk's
23 corporate loan portfolio?
24     A.    Yes.   To be clear when I became
25 CEO, we had over 850 loans with an average
```

```
                    FEINSOD
1
2   balance probably below 200,000 and with a
3   yield that was close to our cost of
4   capital that it required high touch with
5   the borrowers and were expensive to
6   manage.  So the business plan was to get
7   out of those loans both for the credit
8   quality and the expense to manage them and
9   then find an asset class that could be
10  managed more efficiently, which was
11  corporate loans and more profitable.
12  Excuse me.
13      Q.   And your plan wasn't to have
14  Ameritrans own these corporate loans; is
15  that correct?
16      A.   Never.  It was always Elk, the
17  first -- again, this was -- you know, this
18  was day two -- this term sheet was
19  two days -- was I guess while the
20  medallion transaction was closing.  This
21  was to be the takeout, and Elk was always
22  the engine.
23      Q.   Was -- did that KBC transaction
24  we were looking at go through?
25      A.   No.  We started documentation on
```

```
                    FEINSOD
1
2   it, and due to reasons in the broader
3   market, nothing to do with Elk or
4   Ameritrans, KBCs New York office closed
5   that December as probably part of the
6   greater banks crisis.
7       Q.   Now, there was a banking crisis
8   in the U.S. financial and global financial
9   markets in 2008 and 2009; is that correct?
10      A.   Yes.  It is referred to as the
11  great recession sometimes.
12      Q.   And was part of that crisis a
13  liquidity crisis?
14      A.   Absolutely.  Liquidity and both
15  banks -- banks weren't making investments,
16  which was why the fed was flooding the
17  market with money because banks had
18  started pulling in lines of credit.  You
19  know, rather than being in the -- in the
20  business of lending money, they were in
21  the business of getting paid back at this
22  time.
23      Q.   So, now, it is 2009.  You are
24  CEO.  You are trying to grow Elk's
25  portfolio backup; is that correct?
```

```
                    FEINSOD
1
2       A.   Correct.
3       Q.   And growing Elk's portfolio
4   backup is the way to increase Elk's
5   revenue, right?
6       A.   Absolutely.
7       Q.   And so in 2009 did you explore
8   getting financing from the SBA?
9       A.   Yes.  And the reason we hadn't
10  looked before is because it was -- it was
11  more expensive -- it was the most
12  expensive financing in the market at the
13  point.  Interest rates had dropped
14  significantly during 2008, so we had -- so
15  this bank just turning from the KBC
16  facility it was a less expensive facility,
17  but it was a single one-year facility.
18  So we -- SBA -- so I am looking at -- this
19  is Libor plus 250.  So we were paying 2
20  and a half, 3 percent expense interest
21  rate line.  SBA financing was around 5
22  percent or -- but coming down due to
23  market forces.
24          In January, we decided since we
25  computed -- we spoke to Fonda and
```

```
                    FEINSOD
1
2   determined that we were eligible for
3   additional debentures, and Fonda helped us
4   get the package together for a debenture
5   application.  We filed that debenture
6   application sometime I would say in
7   January, a very detailed package.  It
8   includes the Form 468, and then for
9   reasons that didn't make sense, but the
10  market was familiar with, the SBA
11  generally stopped issuing debentures in
12  2009 while they were waiting for a new
13  head of the agency.
14          So we waited again without
15  explanation other than we should get
16  approved.  We should get approved.  We
17  don't know why -- Fonda would tell us she
18  put it in for approval, and sometime in
19  September Fonda called and orally gave us
20  an indication that we had been approved
21  for I believe $11 million in debentures,
22  and we filed for those and drew them down
23  by the end of the year, but for all of
24  September -- sorry.  Just to finish the
25  thought, for that whole period of nine to
```

Page 480

FEINSOD

1
2  eleven months while we were waiting, which
3  should have been funded in two months, and
4  we had a robust pipeline that we submitted
5  with the application of money that was
6  ready to be put to work, we didn't get
7  funded.  So those -- those investments
8  disappeared.  They were taken by the
9  market.  We kept the pipeline robust.  We
10  submitted -- you know, we updated
11  documents, and when the money was funded
12  we found suitable investments.
13      Q.  So you sold your medallion loan
14  portfolio in 2008, and you are trying to
15  get financing in 2009 to grow your
16  portfolio back up, and you are -- was
17  it -- so in 2009 when the banks weren't
18  lending, were you aware that the federal
19  government had a plan of action to make
20  money available through the SBA to be able
21  to lend to small businesses?
22      A.  Yes.  President Obama had
23  announced the Economic Recovery Act in
24  2009 with significant funding specifically
25  to go to the SBIC division.  It will be

Page 481

FEINSOD

1
2  for other people to figure out took the
3  delay for so long, but it was on the front
4  page of the New York Times on the day he
5  was -- on the day President Obama was
6  confirmed, he announced the Economic
7  Recovery Act, and that the SBA would be
8  the primary engine for it.
9      Q.  You mentioned previously that
10  you expected to get the SBA loans within a
11  couple of months.  Why was that?
12      A.  To my historical experience with
13  government agencies was when you have a
14  right to -- a right it is usually granted
15  as long as you are in conformance with the
16  regulations.  So that was my expectation
17  that we would apply for -- the same way I
18  had applied to join to be an officer of
19  Elk and completed the forms, and those
20  were completed in due course.  I expected
21  that the application for debentures would
22  be completed and processed in due course
23  the same way Elk had historically accessed
24  the debenture program more than fifteen
25  times in its history.

Page 482

FEINSOD

1
2      Q.  And you mentioned instead of
3  taking a couple of month it wasn't until
4  September before it was approved; is that
5  correct, late September?
6      A.  Yes, and there is other SBICs,
7  publically traded SBICs that were
8  similarly waiting for action from the SBA
9  during that time like Waterside Capital
10  and Medallion Financial.
11      Q.  And while waiting for SBA
12  financing, so the banks aren't lending;
13  the SBA isn't responding, you are unable
14  to borrow money and build your portfolio;
15  is that correct?
16      A.  Correct.
17      Q.  And you are unable to get Elk's
18  revenues back up while the SBA is -- until
19  you can rebuild your portfolio; Is that
20  correct?
21      A.  Yes, and it seemed like a waste
22  of the resources to do anything other than
23  to wait for the SBA.  It seems we were in
24  possession of the license.  We had
25  borrowing ability under the regulations,

Page 483

FEINSOD

1
2  and it was confirmed by our analyst, and
3  we were told by our analyst that we would
4  receive the funds.  At that point we
5  stopped going to banks at that point
6  because we were waiting on the SBA
7  debentures.
8      Q.  Now, after you got the money
9  from SBA in late 2009, did you put that
10  capital to work? Did you invest it?
11      A.  I believe we did.  Yes.
12      Q.  And generally speaking what were
13  the nature of the investments?
14      A.  So 750,000 to $2 million
15  participations in senior secured loans.
16  We would look for top quality sponsors.
17  We would look for leverage -- low leverage
18  usually high collateral packages, and
19  generally an equity sponsor or a lead
20  partner that had the wherewithal to manage
21  a large loan where we were a small
22  participant.
23      Q.  Could we get -- sorry.  Let me
24  finish this thought.
25          Did you become aware at some

Page 484

```
1            FEINSOD
2  point that Elk had entered capital
3  impairment?
4     A.   Yes, in the summer -- right
5  after Gary resigned as CFO I believe we
6  filed a 468, and that 468 -- when the 468
7  is delivered to SBa they analyze the 468,
8  and that 468 was analyzed BY I guess Paul
9  or Fonda, and they computed that we had a
10 40 -- a fractional percentage, I think it
11 was about a $36,000 capital impairment
12 based on the formula IN the regulations.
13    Q.   And what were -- had you been
14 aware of that before -- so you mentioned
15 that Gary Granoff was CFO.  Was that
16 something that you had discussed with Mr.
17 Granoff before the 468?
18    A.   No.  Gary was unhappy and on his
19 way out and was doing di minimus work on
20 the way out and probably knew this was
21 coming but didn't share it with me.
22    Q.   Now, so we are now in kind of
23 summer late 2010.  What are you doing as
24 CEO at this time prior to the capital
25 impairment issue coming up?
```

Page 485

```
1            FEINSOD
2     A.   We talked about -- we were
3  trying to raise money to execute the
4  corporate loan strategy before -- this is
5  before we heard about the capital
6  impairment.  We were in contact with a
7  handful of investors that were probably in
8  the 10 to 15 million range.  I believe
9  Paul came -- we went down in October for
10 what is known as a portfolio review
11 meeting, which is mandated under the regs.
12 We walked through the 468.  We walked
13 through on an asset-by-asset basis at the
14 SBA --
15    Q.   You said we went down.  Where
16 where did you go?
17    A.   I believe it was me and Silvia.
18 We went down to SBA and went over the
19 portfolio with Paul and Fonda on an
20 asset-by-asset basis.  We were given a
21 couple of days to repair.  We had known
22 about the presentation in advance.  We
23 walked through everything that was going
24 on.  We would say -- we walked through
25 what we had done to cure the capital
```

Page 486

```
1            FEINSOD
2  impairment.  We got the notice in July or
3  August.  When we first found out that we
4  had about a 40,000 dollar shortfall, we
5  made probably what Martin -- what Martin
6  would refer to as a gap investment.  In
7  order to come back to compliance we made
8  sure -- we spoke be to auditors and spoke
9  to the board and decided and determined
10 with SBA counsel that we were curing our
11 capital impairment within the 15-dare cure
12 period.  That was our goal, and that was
13 the guidance that we got.
14    MR. HAMESH:  Could we pull up
15    Exhibit F, please.
16        THE TECHNICIAN:  I lost it for
17 some reason.
18    MR. WEINBERG:  Yes, i lost it,
19 too.
20    THE WITNESS: I lost exhibit
21 share.
22    THE TECHNICIAN:  It went down.
23    THE WITNESS: It is not just me
24 at this time.
25    THE TECHNICIAN: Yes, it is
```

Page 487

```
1            FEINSOD
2  down.  I could screen share it and
3  put it in there later.
4    MR. HAMESH:  Let's do that.
5    THE TECHNICIAN:  It will take
6  me a few minutes.
7    MR. HAMESH:  Is that okay with
8  you, Steven and Martin?
9    MR. WEINBERG:  Yes.  I think
10 the witness is asking for a
11 five-minute bathroom break.
12    THE WITNESS:  Yes, two minutes.
13    MR. HASHEM:  Sure.  Let's take
14 five minutes.
15    THE VIDEOGRAPHER:  The time is
16 12:48.  We are going off the record.
17    (Recess taken.)
18    (Exhibit 35 marked for
19 identification.)
20    THE VIDEOGRAPHER:  The time is
21 1:12, and we are back on the record.
22 This is the beginning of media unit
23 number 3.
24    Q.   Mr. Feinsod, could you please
25 take a look at Exhibit 34.
```

Page 488

```
 1              FEINSOD
 2        MR. WEINBERG:  Sorry, Ray.  Do
 3   you mean 35?
 4        MR. HASHEM:  Sorry, 35.
 5        THE VIDEOGRAPHER:  I am not
 6   seeing Mr. Feinsod on the video.
 7        THE WITNESS:  No, I am here.
 8   I'm sorry.  I am just trying to get
 9   Egnyte.  I have a spinning wheel but
10   not --
11        MR. WEINBERG:  Does everybody
12   else have Egnyte.
13        THE WITNESS:  I almost had it
14   and then I hit refresh.  I apologize.
15   I don't know what is taking so long.
16   I have a little circular spinning
17   wheel in the middle.  It is almost
18   here.
19        (Pause.)
20   A.    Exhibit 35, thanks for your
21   patience.  35 Project Arrow.  I have a
22   four-page PDF.
23   Q.    So for the record, this is an
24   e-mail dated July 23, 2012 from Michael
25   Feinsod to Gene Maio.
```

Page 489

```
 1              FEINSOD
 2        MR. WEINBERG:  Maio.
 3   Q.    Mr. Feinsod, do you recognize
 4   this document?
 5   A.    Yes, I do.
 6   Q.    What is the context of this
 7   e-mail?
 8   A.    I had been introduced to Gene
 9   Maio, who is the head at this point of
10   High FieldS Capital Management, which was
11   part of J.P. Morgan.  It was the
12   entrepreneurial hedge fund division of
13   J.P. Morgan, and the Arrow equity
14   presentation -- I guess we had been
15   introduced to him to Gene by Moelis &
16   Company.  So the Arrow equity presentation
17   is the presentation that Moelis -- the
18   investment Moelis had helped create when
19   we engaged them to raise money when we
20   capitalized Elk and Ameritrans in April of
21   '11.  So this was a year later.  This
22   seems to be a, if I am looking at the
23   dates, July was I guess we were waiting
24   on -- we were in no man's land with the
25   SBA at this point.  So somehow I guess
```

Page 490

```
 1              FEINSOD
 2   that he had gotten around -- by reaching
 3   out to us, he had probably gotten around
 4   the no shop, and I gave this -- I prepared
 5   an e-mail giving the background of the
 6   situation as of this the summer.
 7   Q.    This is an e-mail kind of giving
 8   the background to a potential investor; is
 9   that correct, in July of 2012?
10   A.    A potential investor while we
11   were in no man's land on the Columbus Nova
12   transaction so like an alternate.
13   Q.    I would like to flip to page 2
14   and talk about a couple of things.  So
15   under Elk's capital needs, do you see
16   that?
17   A.    Uh-huh.
18   Q.    On the left.
19         And it says at the end "In
20   October 2010, Elk met with SBA and
21   informed them of their portfolio condition
22   and its intent to raise new equity."
23         Do you see that?
24   A.    Yes.
25   Q.    Are you referring to the meeting
```

Page 491

```
 1              FEINSOD
 2   you mentioned earlier between yourself and
 3   Silvia Mullens and Paul Salgado of the
 4   SBA?
 5   A.    Yes, what I referred to as the
 6   portfolio review meeting.
 7   Q.    And as part of portfolio review
 8   meeting, you informed the SBA that you had
 9   a plan to raise new equity; is that
10   correct?
11        MR. WEINBERG:  Objecting to
12        form.
13   Q.    And what was the SBA's -- what
14   was Paul Salgado's response to your
15   proposal?
16   A.    He was pleased with it.  If it
17   was going to keep us out of capital
18   impairment and keep us out of his hair for
19   lack of a better way of putting it, as
20   long as we were back in compliance he was
21   happy with it.
22   Q.    When you left the meeting, what
23   was your understanding of where you had
24   left things with the SBA?
25   A.    That we had given them a full
```

Page 492

```
         FEINSOD
 1
 2   update of our financial condition of how
 3   we had gotten there, how we fell into
 4   capital impairment at that point, and what
 5   we were doing to cure it.  So we were in
 6   the midst of talking to people.  I believe
 7   the presentation showed at least a $10
 8   million capital raise, and it seemed like
 9   a rational way to return to active
10   lending, you know, back to active
11   business.
12       Q.   You mentioned a -- we have been
13   discussing the due from parent line in
14   Form 468.  Do you understand what I am
15   talking about?
16       A.   Sure.
17       Q.   At the meeting with Paul Salgado
18   in October 2010, did you discuss a -- the
19   due from parent or any advances from Elk
20   to Ameritrans, intercompany balance?
21       A.   Yes.  We went through the Form
22   468.  It was an item -- it was a line item
23   in the discussions, and he was relieved
24   that it would be paid down with the
25   capital raise.
```

Page 493

```
         FEINSOD
 1
 2       Q.   So the SBA understood that the
 3   proposal to raise new equity would pay
 4   down the intercompany balance?
 5       MR. WEINBERG:   Objection to
 6    the form as to what the SBA
 7    understood.
 8       Q.   You can answer the question.
 9       A.   Yes.  Paul Salgado seemed to
10   understand  that part of the capital would
11   remove the due to parent.
12       Q.   Going to the next page or going
13   to page 3, we had discussed the Columbus
14   Nova transaction, right?
15       A.   Uh-huh.
16       Q.   Was that the only transaction
17   that Elk was considering in the 2010 time
18   frame?
19       A.   In 2010, we had started I think
20   -- we had started with a bunch of
21   different companies that got progressively
22   larger and more significant in terms of
23   stature and in terms of size of capital.
24   So I don't have a list, you know, like,
25   for instance, full circle we had agreed to
```

Page 494

```
         FEINSOD
 1
 2   a deal with one of the first companies we
 3   met, but -- and then once again engagin
 4   Moelis the universe became quite large.
 5       Q.   When you say you engaged -- so
 6   here it says "Ameritrans had over 20
 7   different financial firms competing to
 8   partner with Ameritrans management and
 9   scale up the investment strategy."
10       Do you see that?
11       A.   Yes.
12       Q.   Does that sound accurate?
13       A.   Yes.
14       Q.   So you had 20 different
15   potential investors.  Why did you pick CN?
16       A.   A variety of reasons.  They had
17   significant -- they just completed a very
18   significant transaction in structured
19   finance.  They bought Dearfield, CIFC
20   Dearfield, which was a multibillion dollar
21   fund pursuing a similar strategy in
22   larger, non-SBIC-sized loans.  The
23   principals of Columbus Nova were kind of
24   best in class from across Wall Street
25   having significant experience at firms
```

Page 495

```
         FEINSOD
 1
 2   from Solomon Brothers to Goldman Sachs.
 3   They had a good understanding of leveraged
 4   loans and a significant amount of capital.
 5   At the end of the day, they agreed to pay
 6   the highest premium in order to make their
 7   investment.  In I guess the last hours
 8   there was -- there was at least one other
 9   potential investor, and Columbus Nova
10   given the size and given the dollars
11   decided that the price per share that they
12   were going to invest in
13   Columbus -- in -- I'm sorry, in
14   Ameritrans/Elk they kind of gave us a
15   business -- an offer that we couldn't
16   refuse.
17       Q.   So in -- Columbus Nova and
18   Ameritrans entered in a stock purchase
19   agreement in April of 2011; is that
20   correct?
21       A.   Yes.
22       Q.   Did you present either, you
23   know, in 2011 before or slightly after the
24   agreement, did you present the Columbus
25   Nova transaction to the SBA?
```

Page 496

```
1              FEINSOD
2      A.   On several occasions before
3   signing the agreement.
4      Q.   Did you -- did you discuss the
5   agreement with Paul Salgado?
6      A.   We discussed that we were
7   working on the agreement.  We asked
8   him -- we gave him drafts of the
9   agreement, and then ultimately we just
10  gave him the executed -- when we entered
11  into the Definitive Agreement in April we
12  sent it him that -- I believe that night
13  and then began the change of control
14  application.
15     Q.   What was your recollection of
16  what Paul Salgado said when you first told
17  him about the agreement?
18     A.   Initially he liked it.  He
19  seemed to say that it would be processed
20  in the normal course, and we honestly
21  believed this Fonda would the key person
22  handling the documentation.  We believed
23  that there would be a change in control
24  application that should really involve
25  background checks, and then Fonda got
```

Page 497

```
1              FEINSOD
2   maybe -- it had gotten away from
3   Fonda at one point after it got -- the
4   process while Fonda and Paul were
5   recommending it it seemed once it got to
6   the investment committee in the summer it
7   was taken out of their hands.
8      Q.   So focusing on your initial
9   contact with Paul Salgado, did they -- did
10  you have any belief in this time frame
11  whether the transaction was likely to get
12  approved or not?
13     A.   Yes.  I had a strong belief
14  that it was going to be approved.
15     Q.   What was your basis for that
16  belief?
17     A.   It met all the technical
18  requirements.  It met the spirit of the
19  regulations.  It was going to position Elk
20  to be a larger and better participant
21  within the SBIC program.  It seemed like
22  it was -- it was in the best interests of
23  the shareholders.  It was in the best of
24  interests of all the constituents.  There
25  was no conceivable reason why it would get
```

Page 498

```
1              FEINSOD
2   turned down.  Much less we had no
3   real -- no real interaction as to the
4   substance on why -- as to the substance of
5   this review.
6      Q.   At this point in mid 2011 was
7   the SBA aware of the performance of the
8   corporate loan program to date, the
9   corporate loan strategy to date?
10     A.   Yes.  Yes.  During the Columbus
11  Nova process, we gave them as I mentioned
12  before a pretty exhaustive valuation using
13  their metrics, a spreadsheet that the SBA
14  uses to evaluate return on capital and
15  cash on cash returns, and our numbers were
16  spectacular.
17     Q.   Turning to the next page, page
18  5, it says on August 2011 SBA first
19  expressed concern regarding -- with the
20  transaction.  It talks about the
21  management ownership diversity regulations
22  we have been talking about.
23         Does that sound roughly accurate
24  about the first time the SBA raised the
25  MOD issue?
```

Page 499

```
1              FEINSOD
2      A.   Yes.
3      Q.   Okay.
4      A.   Yes, it does.
5      Q.   What was your understanding of
6   the MO -- of the SBA's concern with this
7   MOD regulation?
8      A.   My understanding of it was that
9   it was -- again, I thought it was like a
10  false -- a false issue.  Our lawyers gave
11  us guidance that the regulation that it
12  was actually specifically an investment
13  company should have ended the discussions
14  there.  We prepared exhaustive materials
15  to go through all sorts of hypotheticals
16  on the MOD, but there was no rhyme or
17  reason as to how they were reviewing it
18  and why they were reviewing it.  There was
19  di minimus contact between Elk and SBA on
20  any substantive review of anything that
21  might have been MOD-related.  We knocked
22  on doors.  We begged for answers.  We
23  lobbied.  We were just -- I can't tell you
24  the dates here exactly, but I know that
25  between the summer and December we neither
```

Page 500

FEINSOD

1       got encouragement or discouragement just a
2       bunch of false -- a bunch of arbitrary
3       requests that had no -- no tie in to the
4       process or -- sorry -- What seemed like
5       the process to either approve or
6       disapprove a change of control.
7           Q.    So you -- when you say change in
8       control, what was your understanding of
9       what a change in controlling was?
10          A.    SBA approval according to the
11      regulations of a change in control, which
12      specified -- I don't have the regs in
13      front of me, but there were a handful of
14      things, a handful of items including
15      MOD -- including a review of MOD.
16          Q.    Now, as part of the CN
17      transaction, is it fair to say that Elk
18      would be keeping most of the same board?
19          A.    We went to great length --
20                MR. WEINBERG:  Objection to the
21          form.
22                MR. HAMESH:  Sorry, Steven.
23                MR. WEINBERG:  I am sorry.
24          Objection to the form.
25

Page 501

FEINSOD

1           A.    So we went to great lengths to
2       keep continuity of the company, continuity
3       of the management, continuity of the
4       board, continuity of strategy.  We were
5       adding smarter people and more capital.
6           Q.    You mentioned you were adding
7       some additional people.  There were
8       people from CN; is that correct?
9           A.    Correct.
10          Q.    Okay.  And what -- did the SBA
11      ever express any concern to you about
12      the -- the expertise or the qualifications
13      of the new -- the new people from CN that
14      would be added to the company?
15          A.    Never.
16          Q.    Did the SBA ever express any
17      concern to you that the transaction
18      wouldn't actually cure the capital
19      impairment?
20          A.    No, they did not.
21          Q.    Did the SBA ever express any
22      concern to you that the transaction wasn't
23      economically sound for any reason?
24          A.    No, and that would have been
25

Page 502

FEINSOD

1       disingenuous.
2           Q.    So staying on the same page, it
3       says, "restructuring the transaction." At
4       one point did CN and Ameritrans
5       restructure the transaction?
6           A.    Yes.  It was at a significantly
7       lower price, but we thought that we had
8       to -- every change that we made was meant
9       to -- every change that we made was meant
10      to address the SBA's concerns, and to the
11      extent we had to accept a lower price from
12      Columbus Nova, you know, from a business
13      decision it was to move forward under this
14      transaction, which would allow us to
15      resume lending and growing.
16          Q.    But the SBA rejected the revised
17      transaction as well; is that correct?
18          A.    Yes, on December 22, on the last
19      day of the year.
20          Q.    And what was your reaction to
21      that rejection?
22          A.    That it was consistent with
23      their arbitrary and capricious conduct
24      over the year.  They had spent the year
25      kicking the can down the road with

Page 503

FEINSOD

1       like -- I guess at this point now it
2       is -- you know, it was when
3       knowledge -- we started to learn about
4       some of the issues going on with the SBIC
5       division with respect to the evergreen
6       issue.  That was when -- when that began
7       to come out.  We first started to hear
8       rumors, you know, that they were -- that
9       it was a desire to push evergreen SBICs
10      out of business, and I think there had
11      even been a point when Paul Salgado had
12      asked me to consider in the medallion --
13      the Columbus Nova transaction we
14      would -- we would organize it as a
15      seven-year limited partnership.
16          Q.    Do you recall when Paul Salgado
17      asked you about that?
18          A.    Sometime between the summer and
19      his letter, and it didn't seem -- it
20      wasn't -- it really wasn't -- we weren't
21      open to it.  The buyer wasn't open it.
22      The investors weren't open to it either.
23      That was when we really understood the
24      focus on the seven -- the indefinite life
25

Page 504

```
 1         FEINSOD
 2  versus the limited partnership -- the LT
 3  structure.
 4      Q.    Now, this transaction is it fair
 5  to say that it involved a lot of work on
 6  the part of the employees of Elk and
 7  Ameritrans?
 8      A.    An enormous amount of work.  We
 9  were diligenced.  Every document was
10  diligenced.  Columbus Nova brought in
11  Grant Thornton to do a quality of the
12  underlying earnings, which is known as a
13  QOE.  We had fifteen people in the office
14  for over ten days.  We had Duff & Phelps
15  come in.  This was vetted and revetted,
16  and it was a significant amount of work.
17      Q.    This was also a public company
18  transaction; is that correct?
19      A.    Correct.  And since it was a
20  change of control, it was subject to SEC
21  review through a proxy process.
22      Q.    So there was a public disclosure
23  of some sort, and you had to get SEC
24  approval for the transaction; is that
25  correct?
```

Page 505

```
 1         FEINSOD
 2      A.    We had to get shareholder
 3  approval through the use of a proxy
 4  statement to which we filed.  The proxy
 5  statement was approved by the SEC in the
 6  normal course of business without
 7  comments.  We set a shareholder meeting to
 8  approve the transaction.  There were
 9  various laws.  We were operating under
10  Delaware law, New York law.  A
11  couple -- there were a lot of nuances that
12  needed to be ticked off in order for the
13  transaction to be approved correctly, and
14  it was I believe in mid June with the only
15  item -- we were ready to close the
16  transaction but for one item, which was
17  SBA approval.
18      Q.    So you mentioned you had been
19  involved in transactions that involved
20  regulatory approval; is that correct?
21      A.    Yes.
22      Q.    And is it common for a
23  transaction to -- for there to be an
24  agreement at the beginning of a
25  transaction and then a regulatory process
```

Page 506

```
 1         FEINSOD
 2  and then a closing once regulatory
 3  approval is received?
 4      A.    Sure.  To the extent that there
 5  is -- we are talking about underlying
 6  licenses that are issued by government,
 7  yes.
 8      Q.    Okay.  And in your experience,
 9  does the government -- the regulatory
10  agency ever come back and ask you to
11  revise the transaction or raise some
12  concerns?
13      A.    They always come back with some
14  some --
15          MR. WEINBERG:   Object to the
16      form.
17      A.    I am sorry.  My experience is
18  that nothing is ever perfect, so there
19  could be a typo on a form.  There could
20  be a misspelling on a form or there could
21  be -- but there is -- usually the
22  regulator's job is to process that, get it
23  done if it is in compliance with the rules
24  and regulations.  So I had never fallen
25  into a black hole with any transfer other
```

Page 507

```
 1         FEINSOD
 2  than a regulator giving me specific
 3  instructions to go back and address an
 4  issue that needs to be addressed or
 5  highlighting an issue of concern or
 6  typographical error.
 7      Q.    Based on your prior experiences
 8  with the SEC and other regulatory agencies
 9  before the SBA denied the transaction, so
10  we are talking just about your state of
11  mind before you receive the rejection, did
12  you expect that the SBA was going to
13  approve this transaction?
14      A.    A hundred percent.
15      Q.    Was this transaction -- so you
16  said this, you know, was a lot of work for
17  Elk and Ameritrans.
18          Was this transaction -- was the
19  purpose of this transaction to expand what
20  we have been discussing as the legacy
21  Ameritrans assets business, the assets
22  that are only owned by Ameritrans?
23      A.    Not at all.  It was to build a
24  business that would leverage off the SBIC
25  market in the middle market, originating
```

Page 508

```
1              FEINSOD
2  senior secured loans in the middle market.
3      Q.    So you were trying to raise
4  capital for Elk to build out its
5  portfolio, right?
6      A.    Correct.
7      Q.    So all --
8      A.    We had secured a party with an
9  enormous amount of cap.
10     Q.    So all of the work you mentioned
11 that the employees of Elk and Ameritrans,
12 legal expenses, all of that was trying to
13 achieve this transaction that would raise
14 capital for Elk to grow its portfolio,
15 right?
16     A.    That's correct.
17     Q.    After the rejection, so now we
18 are in February 2012, at the bottom of
19 page 4 it says "In February 2012 Elk
20 secured a new investor."
21        So after the rejection of the CN
22 transaction, did you stop fundraising?
23     A.    No. I was trying to save the
24 company.  We went back to full circle to
25 the first people we had met.   They were
```

Page 509

```
1              FEINSOD
2  like a BDC -- if SBA fel that they were
3  too big of an investor, we went to a
4  smaller investor that wouldn't raise
5  concerns.
6         MR. HAMESH:  Can we pull up
7      Exhibit G, please.  Could you please
8      mark exhibit G and GG at the same
9      time.
10        (Exhibits 36 and 37 marked for
11     identification.)
12     A.    I have G open.
13     Q.    Actually, Michael -- excuse me,
14 Mr. Feinsod.  Could you skip to GG.
15     A.    It is loading I apologize.  GG.
16 Got it.
17     Q.    This is an e-mail dated April
18 28, 2011 from Michael Feinsod to Elliott
19 Press and Jonathan Weiner.  Who is Elliott
20 Press and Jonathan Weiner?
21     A.    Elliott Press was a partner at
22 Katten, and Jonathan Weiner was a senior
23 associate, who was with our attorneys, my
24 primary attorneys.
25     Q.    It says "Attached is a revised
```

Page 510

```
1              FEINSOD
2  background for proxy."  Is that referring
3  to the proxy statement disclosing to
4  shareholders of the post transaction?
5      A.    Yes, that is required when you
6  do a transaction by the SEC.
7      Q.    What is this list of companies
8  that says here firms A, B, C, D, E?  What
9  is that exactly referring it?
10     A.    We entered into -- these are
11 over the year -- I'm sorry.  When you do a
12 change of control transaction in a proxy,
13 you have to give a background of what led
14 up to the proxy, generally meetings,
15 shared information, nondisclosure
16 agreements.  All these companies were
17 under nondisclosure agreements.  So for
18 purposes of the proxy, we identified them
19 as -- used letters next to their name, and
20 this was a list that was meant to
21 correspond with the proxy, which would
22 identify them by the letters next to their
23 name.
24     Q.    So these are all companies that
25 you had meetings with attempting to raise
```

Page 511

```
1              FEINSOD
2  capital?
3      A.    Everyone of them, yes.  The top
4  four are banks, and then the A through O
5  were private equity firms, and they go in
6  chronological order.  So from top to
7  bottom it is significantly larger and more
8  prestigious.
9      Q.    So looking here at just some of
10 these names, Soros.  I've heard of George
11 Soros.  Is that a pretty big fund?
12     A.    It is one of the largest.
13 Arlon is Continental Grain.  Pinebrook is
14 one of the largest funds in the country,
15 and GSO is owned by Blackstone.  Gracie
16 Capital is owned by Moelis.  BTIG was
17 acquired by Goldman Sachs.  Union Capital
18 is still around.  CRP is Robert Ammerman.
19 Full Circle and Convest are smaller
20 private equity firms.
21     Q.    So is it fair to say that you
22 were having meetings with pretty major and
23 significant financial firms?
24     A.    The largest private equity firms
25 in the country.
```

---

Page 512

FEINSOD

1
2      Q.     And what was their response to
3  the proposed investment in Ameritrans and
4  Elk?
5      A.     How -- how it could be
6  completed.  One of the limitations is the
7  size of an SBIC and the amount of capital
8  that could be leveraged within it.  So for
9  some of these organizations that was a
10 limiting factor.   Some -- some of them it
11 was not a limiting factor at all because
12 they had smaller subsidiaries that could
13 leverage - that could take advantage of
14 it, of the Elk/Ameritrans structure.
15     Q.     So we have been talking
16 about -- so Elk is a wholly-owned
17 subsidiary of Ameritrans, right?
18     A.     Correct.
19     Q.     Or was.   There was one share of
20 Elk, right?
21     A.     Yes.
22     Q.     And you were trying to raise
23 equity investments; is that correct?
24     A.     Right.
25     Q.     What is an equity investment?

---

Page 513

FEINSOD

1
2      A.     Cash -- I'm sorry.   New capital
3  that would come in as equity and be the
4  lowest capital on the capital structue, so
5  would be subordinate to any debt,
6  preferred stock.  We had preferred stock
7  outstanding.  So it would be subordinate
8  to that in terms of liquidation and
9  dividends, and it would be subordinate to
10 any debt that the company had.
11     Q.     Now, could -- you mentioned
12 earlier you were raising the money for
13 Elk's -- corporate loan -- the
14 corporate loan portfolio -- the strategy
15 that we were talking about; is that
16 correct?
17     A.     Correct.
18     Q.     That was Elk strategy, right?
19     A.     Correct.
20     Q.     Could you raise -- could Elk
21 issue equity for somebody to invest in?
22     A.     No, not on a practical basis.
23     Q.     Because there was one share of
24 Elk, and it was held by Ameritrans,
25 correct?

---

Page 514

FEINSOD

1
2      A.     Correct.
3      Q.     So --
4      A.     And -- and Elk -- I apologize.
5  I just wanted to clarify something.
6  Ameritrans was able to raise money from
7  outside investors if they got approval
8  from the SBA.   Following up on just your
9  question before about whether or not
10 approval -- whether or not I expected
11 approval, I a hundred expected  approval
12 based on the process that Pride Capital
13 had gone through when they
14 acquired -- when they were considered a
15 change of control as an investor.  So I
16 had significant experience in that.  I
17 might not have highlighted that in my
18 answer before.
19     Q.     So structurally although the
20 investor would be in Ameritrans because
21 Ameritrans would issue equity that the
22 investor would purchase; is that correct?
23     A.     Correct.
24     Q.     But the purpose of the capital
25 raise was to fund Elk, right?

---

Page 515

FEINSOD

1
2      A.     Correct.  Elk couldn't raise any
3  money directly without SBA approval.  It
4  would be impossible.  Any equity capital
5  would be impossible to do without that SBA
6  approval, so that is why Ameritrans was
7  set up to raise money.
8      Q.     So you can put away this
9  document.   In 2012 or early 2012, did at
10 a certain point you contemplate filing
11 litigation against the SBA?
12     A.     In 2012, yes.  Following the
13 rejection prior -- as the process being
14 evaluated was coming to the end, I started
15 to investigate lawyers who had litigated
16 against SBIC for arbitrary treatment by
17 the SBA.   And then once we were rejected
18 -- once the Columbus Nova transaction was
19 rejected, I immediately engaged the first
20 attorney to evaluate the SBA's actions and
21 consider litigation.
22     Q.     What was your basis for
23 believing that you might be -- well, did
24 you believe that you would be successful
25 in this litigation?

```
                                              Page 516
 1           FEINSOD
 2      A.   Yes, absolutely.  I knew
 3  that --
 4      Q.   And what was --
 5      A.   I had watched what had gone on,
 6  and I am on honest broker, and I watched
 7  people at the SBA be dishonest in their
 8  actions, be dishonest in what they told us
 9  in the process.  If you -- anybody who
10  watched every member on board, every
11  person at Columbus Nova believed that this
12  was just -- you know, that there was no
13  truth coming out of SBA, and that it had
14  been an arbitrary and capricious review,
15  and I was actually -- the first suggestion
16  might have even come from Columbus Nova
17  about suing the SBA.
18      Q.   Now, you said every person.  So
19  did you talk about this issue with
20  Columbus Nova?
21      A.   At length, yes.
22      Q.   And what was your understanding
23  of their -- what was your impression of
24  what they said?
25      A.   Regarding the process?  The
```

```
                                              Page 517
 1           FEINSOD
 2  rejection?  I apologize.
 3      Q.   About your -- about their view
 4  of -- what was your impression of their
 5  view of what the SBA's process leading the
 6  rejection was --
 7           MR. WEINBERG:  Object to form.
 8      Q.   You can answer.
 9      A.   They were -- the principals at
10  Columbus Nova that I spoke to considerably
11  Jason Epstein was one of the people who
12  raised how ridiculous the process had
13  been.  Each of the individuals who were
14  potential board members I discussed it
15  with them.  There had been no substantive
16  review.  There had been no interaction
17  with them.  There had been no review of
18  their application.  So it was just all
19  these missing pieces, which again led to
20  this feeling, and after
21  consulting -- after finding Bill Heyman,
22  who had successfully sued the same
23  division for arbitrary and capricious
24  conduct in the evaluation of a license,
25  and then as we began to learn more and
```

```
                                              Page 518
 1           FEINSOD
 2  more about the revolving door of people
 3  who worked within the SBIC division, the
 4  investment division, and what was actually
 5  going on with the review, it was
 6  concerned.  There was no real review.
 7  There was a decision made to reject it,
 8  and then everything else was -- might have
 9  been smoke and mirrors and bad faith.
10      Q.   Could we pull up Exhibit I,
11  please.
12           (Exhibit 38 marked for
13       identification.)
14           MR. HASHEM:  Just let me know.
15      A.   Here it is.  Got it.
16      Q.   Do you recognize this document?
17      A.   Yes, I haven't seen it in a long
18  time, but yes.
19           MR. WEINBERG:  Can you hold
20       up.  Go ahead.  I am sorry.
21      Q.   So you -- Elk sued the SBA
22  around March 2012.  Does that sound about
23  right?
24      A.   Yes.  That sounds correct.
25      Q.   And at some point do you recall
```

```
                                              Page 519
 1           FEINSOD
 2  a legal document, the summary judgment
 3  briefs being filed?
 4      A.   Yes.
 5      Q.   And as part of Elk's response to
 6  the summary judgment briefs, do you recall
 7  that Elk got a declaration from a former
 8  SBA executive?
 9      A.   Yes.  Yes, I do.
10      Q.   And could we -- could you please
11  go to page 53 of this document.
12      A.   53 of the original document?
13      Q.   Sorry.  It is 53 of the PDF.
14      A.   It starts with paragraph 5.
15      Q.   Yes.  Do you see it says
16  declaration of Ronald C. Cibolski?
17      A.   Yes.
18      Q.   And if you go to paragraph 4 it
19  says, "Prior thereto from 1993 to 2003 I
20  was employed by is the SBA as the director
21  of the Oficce of SBIC operations."
22           Do you see that?
23      A.   Yes.
24      Q.   "In that position I managed the
25  growth of the SBIC program from 2 billion
```

Page 520

```
1              FEINSOD
2  to 20 billion and was responsible for
3  managing the licensing of the new SBICs
4  and changes of control of established
5  SBICs."
6          Do you see that?
7      A.   I do.
8      Q.   Do you recall what Mr. Cibolski
9  said about -- well let me go back.
10          Did -- as part of the
11 litigation, did Elk ask Mr. Cibolski to
12 review the facts of the CN transaction and
13 the SBA's review of the transaction?
14     A.   Yes.
15     Q.   And do you recall what Mr.
16 Cibolski's opinion was about the conduct
17 of the SBA?
18     A.   Yes.  I'll summarize that it
19 was arbitrary and capricious, and that
20 everything was -- you know, piece by piece
21 was every hurdle that they threw up was a
22 false hurdle.  Looking here the
23 traditional investment company should have
24 been -- that our original MOD argument was
25 compliant -- not argument.  I am sorry.
```

Page 521

```
1              FEINSOD
2  Our initial submission was MOD compliant,
3  and that all our work for that wasn't
4  necessary all that, and there was a
5  consistent effort throughout the
6  department, the investment division to get
7  rid of evergreen SBICs like Elk.
8      Q.   Now, taking you back --
9      A.   I was flabbergasted.
10     Q.   Taking you back to September
11 2012 when you filed this summary judgement
12 motion, did you review this declaration
13 either before or after it was filed?
14     A.   Yes.
15     Q.   And you were aware in the
16 September 2012 time frame of Mr.
17 Cibolski's conclusions?
18     A.   Yes.
19     Q.   And looking specifically now --
20 I want to draw your attention to paragraph
21 13.  It says, "I have reviewed the
22 administrative record produced by the SBA
23 and cannot discern any reason why the
24 agency would have departed from its
25 long-standing practice and interpretation
```

Page 522

```
1              FEINSOD
2  of the MOD regulation.  Further I could
3  find no justification in the record for
4  the SBA to conclude that AMTC was not a
5  traditional investment company or any
6  reasonable explanation by the SBA as to
7  why it so found."
8          To your recollection, did Mr.
9  Cibolski's opinion confirm what you had
10 thought previously about the SBA approval
11 process?
12          MR. WEINBERG:  Objection to the
13     form.
14     A.   More than confirm.  I had
15 suspicions, and he went into great detail
16 and explained and gave me more color.  So
17 it more than confirmed it.
18     Q.   On page --
19     A.   It disgusted -- it disgusted me.
20     Q.   You previously testified that
21 you had heard in various conversations
22 that the SBA was seeking to get rid of
23 evergreen SBICs; is that correct? That was
24 your testimony?
25          MR. WEINBERG:   Objection to
```

Page 523

```
1              FEINSOD
2      the form.
3      A.   Correct.  We had heard
4  that -- from numerous SBICs.
5      Q.   And it was your belief at the
6  time in 2012 that the SBA was trying to
7  get rid of evergreen SBAs.  Is that
8  accurate?
9      A.   By experience only and by
10 experience and what we heard through the
11 process.
12     Q.   So paragraph 16 says, "I am
13 aware that members of current investment
14 committee disfavor the corporate perpetual
15 license of the type held by Elk, and based
16 on my experience they have attempted to
17 eliminate the corporate perpetual life
18 SBICs."
19          Do you see that?
20     A.   I do.
21     Q.   Do you recall when you reviewed
22 this back in 2012 what was your response
23 to Mr. Cibolski's opinion?
24     A.   I agreed with it, and I was
25 disgusted.  I found it -- I found it
```

Page 524

                    FEINSOD

1  reprehensible what the SBA had done, what
2  they had done to Elk, what they had done
3  to Elk shareholders, and how they wasted
4  an enormous amount of time and money by
5  being dishonest.
6      Q.   Now, this is September this was
7  filed, looking at the top of the document,
8  September 12, 2012; is that correct?
9      A.   Correct.
10     Q.   Okay.  And do you recall that
11 in your allegations of Elk's lawsuit
12 against the SBA, right, the basis of the
13 allegations was that the SBA had acted
14 arbitrarily and capriciously in denying
15 the CN and Full Circle transactions; is
16 that correct?
17     A.   That was the basis of this
18 lawsuit.  Yes.
19     Q.   Okay.  After you filed this
20 declaration, did you engage in settlement
21 negotiations with the SBA?
22     A.   Yes, but there was a
23 couple -- but that was after some things
24 happened with discovery.  At some point

Page 525

                    FEINSOD

1  between this being filed, the judge
2  determined that the privilege log that had
3  been submitted by the SBA was -- I am
4  going to be generous here -- it was
5  inaccurate, and that certain
6  marked -- certain documents that were
7  favorable to Elk had been marked as
8  privileged when they weren't privileged,
9  and due to sloppy bookkeeping they were
10 produced in other parts of what is known
11 as the administrative record.
12     At the hearing, the last hearing
13 with the judge was -- let's say
14 angry to say the least with where we were
15 and gave all parties a strong admonition
16 to settle and get the case put to bed.
17 But it was after -- it was a combination
18 of this, the privilege, and what was going
19 on with what Elk was discovering in SBA's
20 incomplete and I want to say fraudulent
21 productions.
22     Q.   Now, you engaged in settlement
23 negotiations with the SBA in October of
24 2012; is that correct?

Page 526

                    FEINSOD

1      A.   Yes, we had an in-person
2  meeting.
3      Q.   Do you recall who was present at
4  that meeting?
5      A.   Myself, Justin Shur, who was
6  representing Elk at the time; Arlene
7  Embrey who was representing the SBA, and
8  Tom Morris.
9      Q.   And who is Tom Morris?
10     A.   Tom Morris is the head of the
11 Office of Liquidation or was.  Excuse me.
12     Q.   And the -- did you did
13 ultimately reach a settlement with the
14 SBA?
15     A.   We did.  We did.  That was the
16 first time we -- I met with Tom Morris,
17 but he was intimately familiar with the
18 portfolio.  We walked through the
19 portfolio, what was in the portfolio.  We
20 walked through the Form 468 and other
21 materials.  We went on an asset-by-asset
22 basis what was left in Elk's portfolio.
23 We discussed the case and presented a
24 settlement offer.

Page 527

                    FEINSOD

1      Q.   And at the time, do you recall
2  how much SBA -- how much Elk owed on the
3  SBA debentures?
4      A.   $21.7 million I believe.
5      Q.   And do you recall how much you
6  settled for?
7      A.   I believe it was $9 million, $9
8  and a half million.
9      Q.   So is it fair to say that was a
10 significant discount on the original debt?
11     A.   Yes.  Somehow the parties at
12 that meeting managed to go to the
13 investment committee and convince the
14 people on the investment committee for SBA
15 or whoever approved such a settlement that
16 the settlement was in the best interest of
17 SBA, and they approved it.
18     Q.   And your reaction to the
19 settlement at the time, did it vindicate
20 in your opinion, in your view the decision
21 to bring the lawsuit in the first place?
22     A.   I considered it a win, an
23 absolute win.  We were ready to go to
24 court.  We had been vindicated.  More

Page 528

```
1              FEINSOD
2   than vindicated.  It was a winning end to
3   the lawsuit.  I couldn't have done better.
4   I couldn't -- you know, we could have done
5   slightly better, $9.6 million better, but
6   it was a win.
7       Q.    Was it a benefit to Elk to
8   reduce the debt it owed to SBA by more
9   than half?
10      A.    Theoretically, yes, it was.  It
11  was the way to move -- it was a way to
12  move on that point.
13      Q.    That was in October of 2012.
14  Could we now switch to the next -- so the
15  document ending in 0345.PM  in the PDF and
16  mark that as the next exhibit, please.
17          MR. WEINBERG:  Ray, what was
18      the document ending in?
19          MR. HAMESH:  The document
20      ending in 0345PM.PDF.  It starts
21      with 1185885.  If you could mark it
22      as the next exhibit, please.
23          (Exhibit 39 marked for
24      identification.)
25      Q.    And, Mr. Feinsod, once the
```

Page 529

```
1              FEINSOD
2   exhibit is marked, please refresh and take
3   a look at it.
4       A.    Got it.
5       Q.    So this is a November 26, 2012
6   e-mail from yourself to John Laird, Peter
7   Boockvar, Ivan Wolpert, Elliott Singer,
8   correct?
9       A.    Correct.
10      Q.    This was after the settlement
11  agreement was signed; is that correct?
12      A.    Yes.
13      Q.    And it says "Attached please
14  find some background materials for our
15  meeting tomorrow."
16          To your understanding, does that
17  reflect a board meeting?
18      A.    Yes.
19      Q.    If you could scroll down to the
20  attachment, the first page, it says "Board
21  of Directors meeting November 27, 2012."
22  If you scroll down to the third page of
23  the PDF, it says "Update on SBA
24  settlement."
25          Do you see that?
```

Page 530

```
1              FEINSOD
2       A.    I apologize.  Update on SBA
3   settlement.  What page? Sorry.
4       Q.    Page 4 of the PDF.
5       A.    Got it.  I got it.  It has a
6   handful of blanks.
7       Q.    Yes.  $7.9 million due on
8   November 15. Do you see that? December
9   15.
10      A.    Collateral senior loan
11  collateral -- yes.
12      Q.    I am looking at 7.9 million due
13  on December 15 of the page that is labeled
14  2.
15      A.    Sorry.  Got it.
16      Q.    Okay.  Does this refresh your
17  recollection about how much you negotiated
18  with the SBA to settle the --
19      A.    Yes.  This is referring to I
20  believe the initial projected date of the
21  settlement.  We signed the settlement
22  during the hurricane, so that was -- there
23  was a delay initially.  Sorry.
24      Q.    It was a $7.9 million due to the
25  SBA, right?
```

Page 531

```
1              FEINSOD
2       A.    Correct.
3       Q.    Okay.  At this stage did you
4   have -- did Elk seek to raise money to pay
5   off the settlement amount -- to pay the
6   settlement amount?
7       A.    Consistently, yes.  Every day.
8       Q.    And what did you do?
9       A.    Met with a handful of different
10  lenders between December -- or investors
11  and lenders between this period and I
12  guess March, whenever the receivership
13  order was entered.
14      Q.    And did you seek to sell assets
15  of Elk or Ameritrans to pay the amount due
16  to the SBA?
17      A.    Yes.  There were corporate
18  loans, and then there was even a legacy
19  loan here called Soundview that was being
20  marketed.  So yes.  We were trying to
21  raise capital to meet the SBA settlement
22  and to operate the combined companies.
23      Q.    If we go down to page 7 of the
24  PDF.  Do you see that?
25      A.    Yes.  Overview.
```

Page 532

```
                        FEINSOD
 1
 2        Q.   It says "Given the recent SBA
 3   settlement and surrender of Elk's SBIC
 4   license, Ameritrans management is
 5   currently considering the following."
 6             Do you see that?
 7        A.   Yes.
 8        Q.   Is that consistent with your
 9   recollection that as part of the
10   settlement SB -- Elk gave up its SBA
11   license?
12        A.   Yes.
13             MR. WEINBERG:   Objection to
14        the form.  The settlement will speak
15        for itself as well as whether or not
16        the license was surrendered.
17        Q.   Was it your belief at the time
18   that the settlement required Elk to give
19   up its SBIC license?
20        A.   It was.  I signed it, and I
21   believe I turned -- physically turned it
22   over at this point it looks like.
23        Q.   Now --
24        A.   It was in a big -- it is in a
25   big frame.  It is probably 24 by 24 if
```

Page 533

```
                        FEINSOD
 1
 2   you are looking for it.  Sorry.
 3        Q.   So at this stage, which is
 4   November of 2012, is it fair to say that
 5   you were trying to figure out how to
 6   operate the company, not as an SBIC?
 7        A.   Yes.  We were no longer an
 8   SBIC.  Period.  We ceased to be one on
 9   the settlement.
10        Q.   And so --
11        A.   And even here it looks like we
12   were considering renaming the company as
13   well because the Ameritrans business
14   wasn't the -- it was more about Elk, which
15   we still owned.
16        Q.   And was part of the -- so
17   your -- as part of -- let me go back and
18   ask the question.
19             In November of 2012, did you
20   believe that you would be able to pay off
21   the amount that you owed the SBA as part
22   of the settlement?
23        A.   Yes, we had term sheets.  We
24   had people doing -- we had firms doing due
25   diligence.  We had a firm -- up until the
```

Page 534

```
                        FEINSOD
 1
 2   last minute, Tom Morris was intimately
 3   from the record it seems that they had
 4   been talk stalking us for the two years
 5   prior to -- to the SB -- I guess from 2012
 6   Tom Morris had been giving an outside firm
 7   information about our portfolio and
 8   indicating that it was imminent that we
 9   may be placed in liquidation.  That firm
10   popped up as a leading lender -- as a
11   potential lender during that time and did
12   a significant amount of work.
13        Q.   And so at this stage your -- let
14   me go back and ask the question.
15             Are you still taking meetings
16   with potential lenders or potential
17   investors at the end of 2012?
18        A.   Through March of 2013, we were
19   taking meetings and having people on site
20   completing due diligence.
21        Q.   And in April of 2013, Elk was --
22   the receivership order was entered; is
23   that correct?
24        A.   Yes.  It was entered in the
25   Eastern District Court.
```

Page 535

```
                        FEINSOD
 1
 2        Q.   And do you recall that Diana
 3   Seaborn was sent or came to review the
 4   books and records of Elk in 2013?
 5        A.   I believe -- I believe she came
 6   before that.  I believe once the
 7   receivership happened it was Kevin Dale,
 8   who was -- was the person.  I believe
 9   that I spoke to Seaborn during 2012 when
10   she came in to review the status of the
11   company, and I spent some time with Diana
12   Seaborn giving her a runoff report where
13   she was -- she represented that OLS WAS
14   going to give us an opportunity to
15   present -- I forget.  Mr. Weinberg
16   referred to the SOPs and the receivership
17   deal with self-managed liquidations, and
18   that is what -- we prepared for her a
19   self-managed liquidation report.
20        Q.   So let's go back a little bit.
21   In February of 2012, you get a letter from
22   the SBA saying you are being transferred
23   into the Office of Liquidation; is that
24   right?
25        A.   We got a phone call I believe.
```

Page 536

```
           FEINSOD
1
2  I don't remember a letter.
3       Q.    A phone call from Paul Salgado,
4  right?
5       A.    Uh-huh.
6       Q.    Did Diana -- did you Diana
7  Seaborn in February of 2012?
8       A.    No.  I believe she came in
9  during the summer and May or in the warmer
10 weather a couple of months later.
11      Q.    Did you ever come to hear that
12 Paul Salgado had asked Ms. Seaborn to hold
13 off on proceeding with the liquidatio?
14            MR. WEINBERG:   Objection to
15       the form.
16      A.    I don't believe so.   No.   The
17 only thing I remember is that we had a
18 clean audit report.   That was the last I
19 heard Paul was that he held it back, and
20 Paul disappeared after that.
21      Q.    When you first met with
22 Ms. Seaborn, did you propose to
23 Ms. Seaborn a proposal that Elk would
24 raise money and get itself out of the
25 Office of Liquidation?
```

Page 537

```
           FEINSOD
1
2       A.    No.  I believe we gave her
3  a -- what would be a runoff report that
4  would show the sale of investments with
5  the proceeds going to pay down debentures
6  on an expedited basis and included
7  overhead, salary, and self-managing the
8  process during that time.
9       Q.    And what was Ms. Seaborn's
10 reaction?
11      A.    She never responded to --
12            MR. WEINBERG:    Sorry.
13       Objection to the form.   You can
14       answer.
15      A.    She never responded to it.   I
16 guess a few months later she contacted me
17 and told me she was being transferred to a
18 different department.
19      Q.    And what was your experience
20 with the Office of Liquidation between
21 Ms. Seaborn's transfer and when the
22 receivership order was entered into?
23      A.    None other than that.   I don't
24 recall.
25      Q.    And what was Elk's -- what was
```

Page 538

```
           FEINSOD
1
2  Elk's board -- what was Elk's -- what was
3  Elk doing during the -- this time frame
4  when you're waiting to hear back from the
5  Office of Liquidation?
6       A.    I believe we were in -- I
7  believe we were litigating at this point.
8  We were dual tracking, being respectful to
9  OLS and giving them the information that
10 they wanted while the lawsuit was
11 proceeding.
12      Q.    Did Office of Liquidation come
13 to you with any further actions during the
14 period of the lawsuit?
15      A.    I don't believe so, no.
16      Q.    So you settled the case now in
17 October of 2012, and after October of 2012
18 what were you doing?
19      A.    After we signed the settlement
20 agreement, we were exploring selling
21 assets, exploring finding a lender to help
22 support a longer hold of the assets.   You
23 know, again there was about $3 and half
24 million in terms of SIBC legacy loans,
25 which worked out hand in hand with
```

Page 539

```
           FEINSOD
1
2  the OLS.  So that would be an issue.   We
3  were looking for lenders to help the
4  growth of the company and makeup any
5  capital shortfalls, so --
6       Q.    And you were working on that
7  right up until the receivership order was
8  entered?
9       A.    Right up until what?
10      Q.    The receivership order was
11 entered.
12      A.    Yes, right until the
13 last -- right up until the last minute we
14 were talking again with Tradewinds
15 Capital, which was somehow affiliated with
16 Tom Morris.   Tradewinds Capital had given
17 us a term sheet, and that was going to be
18 sufficient to get the deal done, and they
19 became more vulture-like and decided they
20 were going to step away and tried
21 to -- you know, again it was something
22 from the SBA production that I only -- I
23 realized Tom was talking to Tradewinds
24 Financial simultaneously and shared
25 information about our portfolio.   So I
```

Page 540

```
1            FEINSOD
2  don't know -- some of the time he would do
3  it and wasted in bad faith on that.
4            MR. HAMESH:  All right.  I
5       don't have any further -- no.  I do.
6       Sorry.
7       Q.   Two more things.  And one -- so
8  he would discussed -- we discussed
9  previously in the first part of this
10 deposition the custodian agreement and the
11 security agreement.
12           Do you recall that?
13      A.   Sure.
14      Q.   And what is your recollection of
15 those agreement?
16      A.   They spring from the
17 intercreditor agreement, the primary
18 agreement, and the inter-creditor was
19 agreed and negotiated between the SBA and
20 Elk and the SBA --
21           MR. WEINBERG:  I apologize for
22      interrupting.  The sound quality is
23      very poor.  Is the court reporter
24      getting it?
25           It is -- Bob, are you hearing
```

Page 541

```
1            FEINSOD
2  any kind of --
3            THE VIDEOGRAPHER:  I am sure
4       we are all hearing the same thing.
5       It is very static.
6            MR. WEINBERG:  Is there a way
7       to reset that, Mr. Feinsod?
8            THE WITNESS:  Is there a way to
9       what?  It is not my static.  It is
10      static in the system.
11           THE VIDEOGRAPHER:  It is your
12      audio that is having an issue right
13      now.  It is your microphone.
14           THE WITNESS:  It is mine.
15      Hold on one second.
16           (Pause.)
17      A.   Ray, I apologize.
18      Q.   No worries.  You were saying
19 the intercreditor agreement.
20      A.   The intercreditor agreement was
21 the primary agreement.  Historically Elk
22 had been a bank borrower and as well as
23 had SBA debentures.  The intercreditor
24 agreement was set up between Elk and its
25 banks for the sole purpose where the SBA
```

Page 542

```
1            FEINSOD
2  agreed to subordinate its senior interest
3  to the banks.  So once -- once the bank
4  debt was gone, they were the senior
5  creditor, and the agreements weren't
6  relevant.  The -- there was no need for an
7  intercreditor agreement, and we were like
8  every other SBA operating with the SBA as
9  the senior creditor.
10      Q.   Did you have any discussions
11 with Fonda Stevens-Kelly or Paul Salgado
12 regarding Elk's obligations under the
13 intercreditor agreement or the custodian
14 agreement and security agreement?
15      A.   We did.  Immediately after
16 paying down -- after completing the
17 medallion transaction in 2008 -- let me
18 back up.  Under the intercreditor
19 agreement Elk was required to submit a
20 borrowing base I believe on a monthly
21 basis to SBA and its banks.  Once the
22 intercreditor -- once the banks had been
23 paid off, that borrowing agreement -- that
24 borrowing base did not work any more.  It
25 was a math -- it mathematically failed
```

Page 543

```
1            FEINSOD
2  because historically it always had a
3  negative cash balance, and once you put a
4  cash balance into that borrowing base the
5  borrowing base formula failed, which
6  sounds complex, but if you look at it it
7  made sense at the time to everybody who
8  looked at it, and since there were no
9  senior creditors and since the borrowing
10 basis would technically fail from that
11 point in time, Paul Salgado told Elk to
12 stop submitting the borrowing base, and
13 the bank said the same thing.
14      Q.   So after the bank debt was paid
15 off, were you aware of obligations that
16 Elk had under those agreements?
17      A.   We believe they had all -- they
18 disappeared, all the benefits.  The
19 benefits ran to the banks, and then they
20 got to a point where IDB was lead lender
21 and custodian, and they reduced our fee
22 immediately and then asked us to leave.
23 They didn't -- since we weren't a borrower
24 any more, it just was -- it was an expense
25 that they didn't want to do business with
```

Page 544

```
1          FEINSOD
2  us.  It was more profitable to have Elk as
3  a borrower than any other party.
4       Q.   Was it your understanding at
5  this time after the bank debt was paid off
6  that Elk was required to deposit
7  particular funds from asset sales in IDB
8  accounts?
9       A.   NO --
10          MR. WEINBERG:   Objection to
11      form.  The agreements speak for
12      themselves.
13      A.   My understanding --
14          MR. HAMESH:  I am asking for
15      Mr. Feinsod's understanding.
16      A.   My understanding is that it
17  absolutely wasn't required any more.  If
18  you look at the agreements, you know, when
19  the agreement are read closely, you could
20  see that there is no -- the
21  responsibilities lapse at that point.
22      Q.   Did -- would it have been
23  possible for Elk to deposit those funds in
24  an IDB account at that time?
25      A.   No, they stopped taking -- they
```

Page 545

```
1          FEINSOD
2  stopped wanting to do business with us
3  after a certain period of time.
4       Q.   So --
5       A.   And they asked us to remove the
6  collateral, you know, what was -- we were
7  asked to remove all the documents from
8  their safe at one point towards the end.
9          MR. HAMESH:  Could we get just
10      a -- go off the record for a minute.
11      Let me go into a breakout room with
12      Mr. Feinsod, and then we can -- I
13      think we are done, but I just want to
14      double-check.
15          THE VIDEOGRAPHER:   The time is
16      2:23, and We are going off the
17      record.
18          (Recess taken.)
19          THE VIDEOGRAPHER:   Time is
20      2:35.  We are back on the record.
21  EXAMINATION BY WEINBERG:
22      Q.   Mr. Feinsod, you understand that
23  was later with respect to the
24  communication from IDB with respect to
25  removing documents from the safe --
```

Page 546

```
1          FEINSOD
2          MR. HASHEM:   Sorry.
3       A.   I apologize.  Could you--
4       Q.   Sure.  I could start again.
5       A.   Thank you.
6       Q.   Can you hear me now?
7       A.   Now I can.
8       Q.   Okay.  You had said that it was
9  much closer to the end when IDB had
10 communicated with Elk about removing
11 documents that IDB had as custodian.
12          Do you remember when that was?
13 Was that late in 2011 or 2012?
14      A.   I don't recall.
15      Q.   Okay.  And in terms of the
16 identification of the custodian is that
17 something that is identified in the 10Q
18 and 10Ks that Ameritrans files with the
19 SEC?
20      A.   I don't recall.   They don't
21 file anything any more.
22      Q.   In terms of what they did, would
23 -- the disclosures of the who custodians
24 were in the 10Q that would have been --
25 whatever the filing was by Ameritrans that
```

Page 547

```
1          FEINSOD
2  would have been accurate, correct?
3       A.   The whole document was filed as
4  an exhibit with the SEC.  So the documents
5  are held there.
6          MR. HASHEM:   Objection so far
7       as this calls for a legal conclusion
8       that the custodian -- the term
9       custodian in the agreement is the
10      same as the term custodian in the
11      10Q.
12      Q.   Okay.   In terms of the
13 intercreditor agreement that you are
14 referring to, was that a document that
15 required you any amendments to be in
16 writing?
17      A.   I don't recall.   I don't have
18 it in front of me.
19      Q.   Okay. In terms of the checking
20 account, if you go to Exhibit 30, please.
21 If you go to the last page.
22      A.   Just bear with me I am waiting
23 on Veritext.
24      Q.   Of course.
25      A.   Or Egnyte. Sorry.   Exhibit 3-0?
```

Page 548

```
            FEINSOD
1
2      Q.   Yes, page 3.  It lists the Elk
3  bank accounts.   Is there an Elk bank
4  account that is listed as a checking
5  account at IDB with a balance as of April
6  19, 2019?
7      A.   On this sheet, yes.
8      Q.   Okay. We can put that away.
9  On -- in terms of the discussions with
10 counsel regarding the commencement of the
11 lawsuit by Elk against the SBA, do you
12 recall that counsel had explained that it
13 would be difficult to successfully
14 prosecute a claim if the SBA was -- is
15 entitled to pursue a liquidation based on
16 Elk's capital impairment?
17     A.   I mean the minutes or a summary.
18 I am sure it was difficult but not
19 impossible as it proved.
20     Q.   Yet the litigation was
21 authorized by -- was recommended by you
22 and authorized by the board to try to
23 leverage a settlement with the SBA; is
24 that right?
25     A.   To try and actually expose the
```

Page 549

```
            FEINSOD
1
2  SBA's arbitrary and capricious conduct and
3  to secure whatever damages we were
4  entitled to in the rejection.
5      Q.   Okay.  You didn't get any
6  damages.  In fact counsel advised you that
7  you were not entitled to monetary damages;
8  isn't that right?
9      A.   No, it is not.  Counsel advised
10 that we may not be entitled unless the
11 fact -- once we found out the actions by
12 the SBA we believed that damages may have
13 been available.
14     Q.   Elk remained in the Office of
15 Liquidation for the entire period until it
16 was placed in receivership; is that right?
17     A.   I don't believe so.
18     Q.   What evidence do you have that
19 Elk was removed from the Office of
20 Liquidation?
21     A.   I don't have any evidence that
22 it was placed in the Office of
23 Liquidation.
24     Q.   In terms of -- can we load
25 the --
```

Page 550

```
            FEINSOD
1
2      MR. WEINBERG:  Kelsey, do you
3   have the document that was --
4      MS. BILODEAU:   It is marked
5   Exhibit 40.
6      (Exhibit 40 marked for
7   identification.)
8      Q.   If you could take a look at
9  Exhibit 40, please.  During the -- after
10 February of 2012 weren't you dealing with
11 Diana Seaborn with the Office of
12 Liquidation?
13     A.   After what?  I didn't hear the
14 date.
15     Q.   After February of 2012, didn't
16 you hear from Paul Salgado that you
17 wouldn't hear from him because he was with
18 operations, and you would hear from the
19 Office of Liquidation?
20     A.   If I you say so.  I don't
21 recall.
22     Q.   And didn't you just testify that
23 you spoke to Diana Seaborn of the Office
24 of Liquidation with respect to drafting a
25 self-liquidation plan?
```

Page 551

```
            FEINSOD
1
2      A.   I said I met with her.
3      Q.   Okay.  But she was with the
4  Office of Liquidation?
5      A.   I don't know who she was with at
6  the time.
7      Q.   And you were -- you met with her
8  because Elk was placed in the Office of
9  Liquidation, didn't you?
10     A.   I don't recall.
11     Q.   Okay.  When you were in
12 discussions with Tom Morris, wasn't that
13 on behalf of the -- between Elk and SBA by
14 the Office of Liquidation?
15     A.   No.  It was actually between Elk
16 as plaintiff and SBA as defendant in our
17 case.  That was the one time I met with
18 him to settle the lawsuit.
19     Q.   Okay.  If you look at Exhibit
20 40, please.  If you would review -- this
21 is a letter to you from Sean Green dated
22 March 6, 2012.
23     A.   Okay.
24     Q.   Does this letter state history
25 of Elk's condition of capital impairment?
```

Page 552

```
1              FEINSOD
2        MR. HASHEM:   Objection.
3    A.   I need to read it if you want.
4    Q.   Sure.
5         (Pause.)
6    A.   Okay.  I read the letter.
7    Q.   Does this letter reflect the
8  history of Elk's condition of capital
9  impairment?
10   A.   Incorrectly and fraudulently.
11   Q.   Okay.  Did you -- does
12 this -- did you write a letter back to the
13 SBA?
14   A.   I don't --
15        MR. WEINBERG:  Withdrawn.
16   Q.   This letter gives Elk a notice
17 to cure period within 15 days; is that
18 right?
19   A.   Which letter?  Are we still
20 looking at the same letter, the one with
21 the fraudulent statements?
22        MR. WEINBERG:  Objection to the
23     characterization of fraudulent
24     statements.
25   Q.   There are statements there with
```

Page 553

```
1              FEINSOD
2  respect to the condition of capital
3  impairment.  Do you have a letter back to
4  the SBA refuting the percentage
5  calculation of the capital impairment?
6    A.   I don't recall, but you said
7  that Paul Salgado no longer wanted to hear
8  from us, and Paul Salgado is still the
9  contact person here.  So we are confusing
10 persons and time frames.
11   Q.   Okay.  This is a letter dated
12 March 6, 2012, and it is from Sean Green,
13 and it is giving notice with -- there is a
14 reference to the transfer to the Office of
15 Liquidation; is that correct? That is in
16 the third to last paragraph on the second
17 page.
18   A.   A potential transfer.   There
19 is -- we have a can't secure in this
20 letter, and Paul -- you said Paul Salgado
21 doesn't work in the Office of Liquidation,
22 so it doesn't appear -- I am
23 getting -- you are confusing me here.
24   Q.   The letter speaks for itself.
25 It doesn't say potential transfer.   It
```

Page 554

```
1              FEINSOD
2  says notwithstanding the transfer to the
3  Office of Liquidation, correct?
4    A.   Comma "SBA will suspend
5  liquidation at least for a period of 15
6  days from the date of this letter to allow
7  the licensee to cure its condition," which
8  is similar to the paragraph two paragraphs
9  above that was the genesis of the
10 litigation.  Okay.  So just to flesh it
11 out.
12   Q.   Did it --
13   A.   You can conflate the two.
14   Q.   Did Elk cure the condition of
15 capital impairment?
16   A.   Yes, absolutely.
17   Q.   When?
18   A.   February -- it was shortly in
19 October of 2010.
20   Q.   I am you talking about in
21 response to this letter of March of 2012.
22   A.   Okay.  As I said --
23   Q.   Did the SBA -- let me finish
24 finish the question.   Did Elk make the
25 payment to the SBA to cure the condition
```

Page 555

```
1              FEINSOD
2  of capital impairment?
3    A.   Elk would not be required to
4  make a payment to the SBA to cure any
5  condition of capital impairment.   Would
6  they?  I don't understand.  Why would make
7  a payment to SBA?
8    Q.   In response to this letter, did
9  Elk make a payment -- did Elk get an
10 investment to secure capital impairment?
11   A.   In response to that second
12 paragraph of this page, Elk secured its
13 capital impairment.
14   Q.   I am not asking about the second
15 paragraph.   I am asking --
16   A.   This letter was a fraudulent
17 attempt to stop our litigation, so --
18   Q.   That wasn't the --
19   A.   It speaks to itself.
20   Q.   The letter speaks to itself.
21 The litigation will speak to itself.
22        I am asking the notice to cure
23 that was given for Elk to cure its capital
24 impairment to the SBA's satisfaction
25 within 15 days from the date of this
```

Page 556

```
1            FEINSOD
2   letter, did Elk do that?
3        A.   Yes.
4        Q.   When?
5        A.   Sometime between October 5 and
6   October 20 as required by the paragraph
7   above it.
8        Q.   You are talking about paragraph
9   2?
10       A.   Yes.
11       Q.   Okay.  This letter talks about
12  the condition of capital impairment
13  continuing after the payment of the
14  $40,000 investment capital contribution
15  into Elk.
16       MR. HASHEM:  Just one second,
17       Michael.  I am going to object.
18       This calls for a legal conclusion.
19       Mr. Feinsod disagrees with the
20       letter's legal characterization of
21       when there was and when there was not
22       a condition of capital impairment
23       and, you are asking him to accept the
24       letter's characterization that the
25       gap payment to cure the capital
```

Page 557

```
1            FEINSOD
2        impairment on a gap basis wasn't
3        sufficient as a point that wasn't
4        disputed, and it is still disputed.
5        Q.   Okay.  After February of 2012
6   you were advised by Paul Salgado that Elk
7   would be transferred to the Office of:
8   Liquidation based upon its condition of
9   capital impairment, correct?
10       A.   You are referring to a phone
11  call?
12       Q.   Yes.
13       A.   I received a voicemail from Paul
14  Salgado, yes.
15       Q.   After February of 2012, did Elk
16  have a condition of capital impairment?
17       A.   We --
18       MR. HASHEM:   Objection.
19       Calls for a legal conclusion.
20       MR. WEINBERG:  No. It is a
21       factual calculation.
22       Q.   Is Elk responsible for reporting
23  whether or not it has a condition of
24  capital impairment to the SBA, Mr.
25  Feinsod?
```

Page 558

```
1            FEINSOD
2        MR. HASHEM:   Objection.
3        Calls for a legal conclusion.
4        Q.   You can answer.
5        A.   Not any more.  Elk is not
6   responsible for anything.
7        Q.   Did -- in February of 2012, did
8   Elk have an obligation to report a
9   condition of capital impairment to the
10  SBA?
11       A.   I don't recall.
12       Q.   Did Elk calculate a percentage
13  for a condition of capital impairment as
14  of February of 2012?
15       A.   I don't recall.
16       Q.   As of -- at any time in 2012 did
17  Elk calculate the -- a condition of
18  capital impairment?
19       A.   I don't recall specifically.
20       Q.   Okay.  Did Elk receive any
21  investment in 2012 that cured any capital
22  impairment percentage?
23       A.   I don't recall.
24       Q.   You can put this exhibit away.
25  Thank you.
```

Page 559

```
1            FEINSOD
2        You had referred that the
3   exemptive order -- that the application
4   that was submitted to the SEC was
5   negotiated or discussed with the SBA.  Do
6   you recall that testimony?
7        A.   Yes.
8        Q.   Okay.  Who was the discussions
9   or negotiation between Elk and the SBA?
10       A.   I don't recall.  Carol Fenler
11  was one of the people.  I have seen Carol
12  Fenler's name on one of the documents.
13       Q.   When you say on the documents,
14  what documents are you referring to?
15       A.   The correspondence relating
16  to -- in the record regarding --
17       Q.   Referring to the SEC exemptive
18  order application?
19       A.   Yes.
20       Q.   And based upon the SEC
21  application and exemptive order, Elk was
22  still a licensed SBIC, correct?
23       A.   When?
24       Q.   When it was operating as an
25  SBIC.
```

```
                                          Page 560
1            FEINSOD
2      A.    Until when? Yes.  Until the date
3  it surrendered its SBIC license, it was
4  operating as an SBIC.
5      Q.    And as an SBIC it was operating
6  under the Small Business Investment Act
7  and the regulations, correct?
8      A.    I believe so.
9      Q.    In terms of -- if you look at
10 Exhibit 39, please.  Hold on.  I am sorry.
11 Now I am in the wrong exhibit.
12           Let's go back to Exhibit 38.
13           MR. WEINBERG:  We were looking
14      at the Declaration.  Was that page
15      53?
16           MR. HASHEM:  That is 53.
17           MR. WEINBERG:  Was that Ronald
18      Cibolski?
19           MR. HASHEM:  Cibolski I think.
20           MR. WEINBERG:  Cibolski.  Ron
21      Cibolski.
22      Q.    Mr. Feinsod, was Mr. Cibolski
23 retained as an expert by you?
24      A.    Yes, I believe so.
25      Q.    And how much was Mr. Cibolski
```

```
                                          Page 561
1            FEINSOD
2  paid for his services for Elk?
3      A.    I don't recall.
4      Q.    In addition to the affidavit,
5  did Mr. Cibolski provide any other
6  documents to Elk?
7      A.    I don't recall.
8      Q.    Other than being paid for -- do
9  you know if Mr. Cibolski was paid a set
10 fee or an hourly rate for his services to
11 Elk?
12      A.    I don't recall.
13      Q.    And how did you come to learn of
14 Mr. Cibolski?
15      A.    I don't recall.  I
16 believe -- actually I believe that Ron --
17 the lawyers found him.  He had maybe
18 testified in other cases.
19      Q.    Okay.  And in addition to the
20 declaration, do you know what other
21 services Mr. Cibolski rendered to Elk as a
22 consultant/expert?
23      A.    I don't believe any.  Does it
24 say that he did?
25      Q.    I am just asking what you
```

```
                                          Page 562
1            FEINSOD
2  recall.
3      A.    Okay.
4      Q.    Do you recall any other
5  services?
6      A.    No.  None.
7      Q.    Okay.  You had referenced that
8  during the Columbus -- prior to entering
9  into the agreement with Columbus Nova
10 there was one other potential investor
11 that Elk was considering, but that
12 Columbus Nova had made an offer that
13 Ameritrans and Elk could not refuse.
14           Do you remember that testimony,
15 your statement?
16           MR. HASHEM:  Objection
17      mischaracterizes the testimony.  I
18      believe the testimony said that there
19      was 20 potential investors.
20           MR. WEINBERG:  We are talking
21      about two different things.
22      Q.    There was -- over the period of
23 time you talked with a total of 20
24 potential investors; is that right?
25      A.    More than 20.
```

```
                                          Page 563
1            FEINSOD
2      Q.    More than 20?
3      A.    Yes.
4      Q.    Did you -- prior to any no shop
5  agreement with CN, did you enter into an
6  agreement with any other potential
7  investor?
8      A.    We entered into nondisclosure
9  agreements and due diligence agreements.
10      Q.    Okay.  But did you -- okay.
11 Did you agree to the terms with any other
12 potential investor prior to entering into
13 the agreement with CN?
14           MR. HASHEM:  Objection to
15      form.
16      A.    No.  We didn't enter into a
17 stock purchase agreement with any other
18 investors.  We had term sheets, but a
19 stock purchase agreement takes a long time
20 to negotiate and complete, as did this
21 one.
22      Q.    Do you recall your testimony
23 earlier that at the time that you
24 considered -- that you accepted CN's offer
25 that Ameritrans or Elk could not refuse
```

Page 564

```
             FEINSOD
 1
 2   there was one other potential investor
 3   that Ameritrans was considering for
 4   investment?
 5          MR. SEIDEL:   Objection to
 6      form.
 7      A.    I don't know if it is verbatim
 8   my testimony, but I believe I know
 9   about --
10      Q.    Okay. Do you know who was the
11   name -- at the time that you were
12   considering entering into the
13   nondisclosure agreement with Columbus
14   Nova --
15      A.    Lattenberg Thalman and Howard
16   Lorber, L-O-R-B-E-R.
17      Q.    I am sorry.   Lattenberg?
18      A.    Lattenberg Thalman, a New York
19   Stock Exchange listed firm and its
20   chairman Howard Lorber.
21      Q.    Okay.   What were the terms of
22   the -- was there a term sheet?
23      A.    I belief there was.
24      Q.    What were the terms of that
25   potential agreement -- investor?
```

Page 565

```
             FEINSOD
 1
 2      A.    I don't recall.
 3      Q.    How were the Columbus Nova terms
 4   better than the terms from Lattenberg?
 5      A.    Based on the price of their
 6   investment and the size of their
 7   investment.
 8      Q.    Do you know how the price
 9   compared to the Lattenberg offer?
10      A.    I don't, but it was -- I am sure
11   it was a premium.
12      Q.    Do you know --
13      A.    It was probably --
14      Q.    Go ahead.
15      A.    It was -- and is documented in
16   the proxy statement.
17      Q.    Do you remember how the size was
18   different by Columbus Nova compared to the
19   Lattenberg investment on the term sheet?
20      A.    I do not.
21      Q.    If you go to Exhibit 39.  Go to
22   page 2.
23      A.    Yes.
24      Q.    Actually before we -- I am
25   sorry.  You can leave that open please,
```

Page 566

```
             FEINSOD
 1
 2   but before we ask a question on page 2 of
 3   Exhibit 39, in the litigation by Elk
 4   against the SBA, do you recall there was a
 5   decision by the judge denying Elk's
 6   application for a preliminary injunction?
 7      A.    No, I don't.
 8      Q.    Okay.
 9      A.    Was it a TRO or was it a PI? I
10   don't remember.
11      Q.    Either one.  Do you recall the
12   decision denying the TRO?
13      A.    I recall an initial decision
14   denying it but with a footnote encouraging
15   us to proceed.
16      Q.    Okay.  On the -- looking at page
17   2 of the Exhibit 39, do you see that "must
18   use debt raise to mitigate taxability of
19   COD," and then there is an arrow "BDO
20   memo."
21          What is COD?
22      A.    I bet it is cancellation of
23   indebtedness income.
24      Q.    Okay.  And how would you
25   mitigate taxability of COD?
```

Page 567

```
             FEINSOD
 1
 2      A.    I don't recall.
 3      Q.    Wasn't there a
 4   consideration -- did the BDO memo discuss
 5   limiting the taxability of the
 6   cancellation based upon the determination
 7   of whether or not Elk was insolvent?
 8      A.    I don't recall.
 9      Q.    During the time -- I'm sorry.
10   When -- we have talked about the
11   structure of Elk, correct?
12      A.    Yes.
13      Q.    Okay.  And you were the
14   president of Ameritrans, correct?
15      A.    And Elk.
16      Q.    And Elk.   Okay.
17          At the time -- at different
18   intervals in 2011 and 2012 there were
19   discussions as to what the duties are to
20   Elk or Elk's creditors if Elk is
21   insolvent; is that correct?
22      A.    There were board -- there were
23   board meetings where that was discussed.
24      Q.    Okay.   And obviously you and
25   the board members and officers owe a
```

Page 568

```
                              FEINSOD
1
2    fiduciary duty to Elk, correct?
3         MR. SEIDEL:  Objection to form.
4         A.   We owe fiduciary duties to
5    numerous parties, but we did --
6         Q.   Among which that includes Elk;
7    is that right?
8         A.   Among which that includes Elk.
9    That is correct.
10        Q.   Okay.  And during 2010, did you
11   at any time make -- did Elk at any time
12   make a determination whether Elk was
13   insolvent?
14        A.   I don't recall.
15        Q.   During 2011 did you at --
16        MR. WEINBERG:  Well withdrawn.
17        Q.   During 2010 did you at any time
18   make a determination as to whether
19   Ameritrans was insolvent?
20        A.   I don't recall.
21        Q.   During 2011 did you or the board
22   at any time make a determination that Elk
23   was insolvent?
24        A.   I don't recall.
25        Q.   During 2011 did you or the board
```

Page 569

```
                              FEINSOD
1
2    make a determination at any time that
3    Ameritrans was insolvent?
4         A.   I don't recall.
5         Q.   During 2012, the same question.
6    Did you or the board make a determination
7    that either Elk or Ameritrans were
8    insolvent?
9         A.   I don't recall.
10        Q.   During 2013 before Elk was
11   placed in receivership, did you or the
12   board make any determination that either
13   Elk or Ameritrans was insolvent?
14        A.   I don't recall.
15        MR. WEINBERG:  One minute
16     please.
17        (Pause.)
18        Q.   You admitted -- I am sorry, Mr.
19   Feinsod.  One other follow-up.
20        THE VIDEOGRAPHER:  He is not
21     here.
22        MR. WEINBERG:  Then it's the
23     perfect time to ask I guess.
24        MS. BILODEAU:   We are still
25     recording.
```

Page 570

```
                              FEINSOD
1
2         MR. WEINBERG:  My apologies.
3         MS. BILODEAU:  Should we go off
4      the record until the witness comes
5      back?
6         MR. WEINBERG:   Sure.
7         THE VIDEOGRAPHER:  The time is
8      3:04, and we are going off the
9      record.   This is the end of media
10     unit number 3.
11        (Recess taken.)
12        THE VIDEOGRAPHER:   The time is
13     3: 05, and we are back on the record.
14     This is the beginning of media unit
15     number 4.
16        Q.   Mr. Feinsod, you had made a
17   statement about that at its peak Elk and
18   Ameritrans had over $60 million in
19   assets; is that right?
20        A.   I believe so.  Yes.
21        Q.   So --
22        A.   During my tenure.
23        Q.   I am sorry.   What?
24        A.   During my tenure with the
25   company.
```

Page 571

```
                              FEINSOD
1
2         Q.   As long as you were on the Board
3    of Directors; is that right?
4         A.   I believe so.  Yes.
5         Q.   And after the sale of the
6    medallion loans the -- obviously the 10K
7    would reflect the total value of the
8    assets of Ameritrans Capital Corporation
9    on a consolidated basis, correct?
10        A.   That wouldn't be filed until a
11   year later.
12        Q.   Okay.  So if we looked at the
13   10K from the year before and the year
14   later, we could see what the value was of
15   the company's assets for Ameritrans
16   Capital Corporation on a consolidated
17   basis, correct?
18        A.   On those specific dates, yes,
19   but not on any interim dates.
20        Q.   Okay.
21        A.   There is quarterly report in
22   between 10Ks, and the 10Ks lagged by 90
23   days.
24        Q.   Sure.  And the same thing with
25   the 468s.  If we look at the 468s before
```

Page 572

```
 1            FEINSOD
 2  the medallion loan portfolio was sold and
 3  after the medallion loan portfolio was
 4  sold, we would have the total value of
 5  assets that were owned by Elk, correct?
 6       A.    Yes.
 7       Q.    Okay.   Thank you.
 8       A.    They were recorded differently
 9  just to point it out.
10       Q.    Okay.
11       A.    One is under GAAP, and one is
12  under a different accounting standard.
13       Q.    Was that GAAS?
14       A.    I don't recall, but I know that
15  SEC is under GAAP.
16       Q.    Okay.   And if we compare the
17  identification of the assets in the 468s
18  compared with the identification of assets
19  that are in a 10K or a 10Q, we could
20  determine which assets were owned in
21  Ameritrans Capital Corporation's name --
22            MR. HAMESH:   Objection to --
23       Q.    As well as any assets that were
24  owned in the name of Elk Funding Corp.; is
25  that right?
```

Page 573

```
 1            FEINSOD
 2       A.    Sure.   Yes.
 3            MR. WEINBERG:   Thank you.   No
 4       further questions.
 5            MR. HASHEM:   Can I ask one
 6       question on one thing?
 7            MR. SEIDEL:   I have actually
 8       one more question for him.
 9            MR. HASHEM:   Why don't you go
10       ahead.
11            MR. SEIDEL:   Okay.
12  EXAMINATION BY MR. SEIDEL:
13       Q.    Mr. Feinsod, Mr. Weinberg asked
14  you a bunch of questions about agreements
15  and offers and term sheets and the like.
16  I want you to put yourself back in time to
17  January of 2011, the time when you
18  began -- when you reach a preliminary
19  agreement with Columbus Nova to begin to
20  pay for the deal; is that right?
21       A.    Correct.
22       Q.    Okay.   At that time if Columbus
23  Nova hadn't come around, were there other
24  bidders who had put offers on the table
25  that would have turned into a paid
```

Page 574

```
 1            FEINSOD
 2  transaction?
 3            MR. WEINBERG:   Objection to
 4       the form.   Highly speculative.
 5       Q.    You can answer the question.
 6       A.    It would be highly likely that
 7  we would have gotten term sheets from at
 8  least five of them and probably more
 9  considering the tempo of the -- the tempo
10  and size of the people that we were
11  dealing with at that time as I showed you
12  in that A through M memo.   It was
13  accelerating.   The interest was --
14       Q.    And in fact you had term sheets
15  from some of them already, didn't you?
16       A.    We had several, yes.
17       Q.    So you had term sheets to
18  compare between Columbus Nova and others,
19  and as we talked about there were
20  questions of price -- value.   There were
21  questions of execution risk for some of
22  them, but if there was no Columbus Nova
23  you would have been -- you would have
24  easily able to proceed with another
25  transaction, correct?
```

Page 575

```
 1            FEINSOD
 2            MR. WEINBERG:   Objection to
 3       the form.
 4       A.    Easily, yes.   And --
 5       Q.    And you -- I'm sorry.   I just
 6  want to speed this up for you,
 7  Mr. Feinsod.   You worked at Paul Hastings,
 8  right, and you did a lot of cellular
 9  deals?
10       A.    Yes.
11       Q.    Okay.   And some of these were
12  for public cellular companies, right?
13       A.    Yes.
14       Q.    And they -- the companies
15  went -- hired investment bankers and went
16  through an auction process?
17       A.    In many instances, yes.
18       Q.    More than a dozen of those in
19  your career?
20       A.    Yes, many.
21       Q.    Okay.   In exactly how many of
22  those did competing bidders all come to
23  written agreements?
24       A.    None.
25       Q.    Okay.   Tell me what it would
```

Page 576

```
1            FEINSOD
2  look like -- this is going to be --
3       A.    I apologize.
4       Q.    This is going to a jury.  So for
5  someone who is not experienced, who hasn't
6  done a dozen of these things, tell me what
7  it looks like.   You got an auction
8  process, right.   You do sign some NDAs.
9       A.    Yes.
10      Q.    Some bidders fall away at that
11 point because they look in the data room,
12 and they don't want to proceed.   Others
13 proceed.  Some put in term sheets, right?
14           MR. WEINBERG:   Objection.
15      Q.    Okay.  Walk me through how it
16 works.  Tell me how you get to a signed
17 agreement.
18      A.    For a process like this and to
19 use the January time frame that you have
20 asked about, we had been talking to
21 sophisticated investors since April at
22 that point, signed NDAs with I believe
23 according to that list 20 of them, and if
24 I -- I believe at the time this was signed
25 we had at least four active term sheets in
```

Page 577

```
1            FEINSOD
2  front of the company, including
3  Lattenberg, which I referred to, and the
4  other parties the latter parties and maybe
5  even earlier parties.  So we would have
6  been -- bringing in the highest and best
7  offer along and at the other end of the
8  spectrum the most certain offer to close
9  and anything in between trying to satisfy
10 those potential investors with due
11 diligence, a rapid responsive of
12 information, clarity in the flow of the
13 information, and the ability for them to
14 refine their term sheet, so that a public
15 company like hours could undertake the
16 significant time and investment to enter
17 into a stock purchase agreement, proxy
18 approval process, and simultaneously
19 approach the SBA for change of control
20 approval.  Does that help with --
21      Q.    That is very helpful, and I want
22 to break that down just a little bit
23 further before we wrap up today.
24           You mentioned that the
25 substantial cost of entering into written
```

Page 578

```
1            FEINSOD
2  agreements.  So people don't just enter
3  into them willy-nilly.  You wait until you
4  have your highest and best, and then you
5  enter into an agreement with them, right?
6       A.    Yes, while keeping the next two
7  warm simultaneously.
8       Q.    You keep them warm, but you
9  don't sign agreements with them?
10      A.    No.
11      Q.    And once you've got an
12 agreement, you are usually bound by
13 exclusivity, so you can't sign any other
14 agreements at that point, right, until the
15 deal terminates?
16      A.    It is bargained in the deal.  In
17 this case Columbus Nova justified getting
18 a no show.
19      Q.    So the notion of signing
20 multiple agreements when you are subject
21 to a no shop is frankly silly, isn't it?
22      A.    It opens the company to
23 liability.  It wouldn't be prudent.
24           MR. SEIDEL:  Thanks.   That is
25      it.
```

Page 579

```
1            FEINSOD
2           MR. HASHEM:   One more question
3  on my part, Mr. Feinsod.  I guess
4  two more questions.  Really just one.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 580

```
 1            FEINSOD
 2      EXAMINATION BY MR. HASHEM:
 3      Q.    Elk and Ameritrans filed -- we
 4 had been talking about 10Ks and 10Qs, and
 5 Elk and Ameritrans filed -- or Ameritrans
 6 filed SEC disclosures on a consolidated
 7 basis; is that correct?
 8      A.    Correct.
 9      Q.    And a consolidated basis means
10 that the companies financials were
11 reported as a whole, right?
12      A.    Correct.
13      Q.    So if you look in the 10K or the
14 10Q, the disclosure of the assets there,
15 is that list just including -- well, let
16 me back up.
17      Do Elk's assets get recorded on
18 the 10K and 10Q of Ameritrans?
19      A.    Yes.
20      MR. HAMESH:  Okay.  That's it.
21 EXAMINATION BY MR. WEINBERG:
22      Q.    Mr. Feinsod was another reason
23 that the SBA had rejected the agreement
24 with Columbus Nova that ultimately common
25 ownership of Columbus Nova failed to
```

Page 581

```
 1            FEINSOD
 2 Victor Vexelberg?
 3      A.    I have never heard that.  Is
 4 that written somewhere?
 5      Q.    Okay.  Have you heard of Victor
 6 Vexelberg?
 7      A.    Yes.
 8      Q.    Okay.  Are you -- are you
 9 aware -- do you know if the Columbus Nova
10 agreement was rejected based in part on
11 Victor Vexelberg not willing to submit to
12 a background check with the SBA?
13      A.    I don't recall that.  I don't
14 even know -- I didn't --
15      Q.    You didn't know that?
16      A.    No.
17      Q.    Okay.  In terms of the other --
18 prior to entering into a no shop agreement
19 with Columbus Nova, the term sheets with
20 other companies, do you know if they
21 involved companies that did not have a
22 common ownership in one person?
23      A.    No, I have no idea what your
24 question means.
25      Q.    In terms of the -- of any term
```

Page 582

```
 1            FEINSOD
 2 sheet with any other investor in
 3 Ameritrans, do you know if any of those
 4 term sheets involved a company making the
 5 investment that did not come down to
 6 common ownership by one person?
 7      A.    Of 20 or so significant
 8 companies that looked at us there were
 9 significant principals at ten of them.  So
10 in the instance of George Soros, it is
11 George Soros' money I believe.  So, you
12 know, at Blackstone it is a publically
13 held company.  It is a broadly held
14 company.  So that never came up -- I
15 believe I read in the affidavit before the
16 MOD analysis was fraudulent.  Cibolski
17 testified that it was fraudulent.
18      Q.    That is your opinion, but that
19 is to be disputed.
20      A.    No, that is his opinion.  Not
21 mine.
22      Q.    That is to be disputed and
23 resolved at trial, correct, but Blackstone
24 you just said is broadly held, right, and
25 doesn't have ownership in one person?
```

Page 583

```
 1            FEINSOD
 2      A.    No, I said it may.  I am not
 3 familiar with Blackstone publically held.
 4 I didn't say that.
 5      Q.    I thought you said it was
 6 publically held?
 7      A.    I did not.
 8      Q.    You said ten of the investors
 9 had -- where it was one -- ten of the
10 significant investors came to add one
11 person as a common owner.  Do you know if
12 the other ten did not?
13      A.    That is not accurate.  I don't
14 believe I said that.
15      Q.    Okay.  What did you say?
16      A.    I don't know.  I think I said it
17 was five.
18      Q.    Okay.
19      A.    And I give you the example of
20 George Soros, and Arlon Capital is owned
21 by Paul Freiberg.  It's a large company
22      Q.    Of the others that are not owned
23 by one person, who were the other
24 potential investors that were not owned by
25 one person?
```

Page 584

```
 1              FEINSOD
 2      A.   I don't have the list in front
 3  of me, and your question is meant to be
 4  confusing I think so --
 5      Q.   I am not trying to confuse you.
 6  I guess let's look at your exhibit that
 7  you list A through O.   I believe it is
 8  Exhibit GG, which is number 37.   Do you
 9  have that open?
10      A.   I do.
11      Q.   Okay.   Of the potential
12  investors that are listed as A through O
13  on Exhibit 37, which are the potential
14  investors that were not owned by a single
15  individual?
16      A.     None of them are owned by a
17  single individual.   I am going
18  to -- looking at the list now, some have
19  significant -- some have significant
20  investment -- have more single significant
21  investors than others.
22      Q.     Which are the ones that you know
23  of have more single significant investors?
24      A.   Soros, Arlon, CRP, Convest,
25  Union Capital, Matlin Patterson certainly
```

Page 585

```
 1              FEINSOD
 2  does.  Saratoga certainly does.  They all
 3  have significant principals.
 4      Q.     Which -- which has ownership
 5  that is broader than a single person?
 6          MR. HASHEM:   Objection.
 7      A.     That is a meaningless -- that
 8  doesn't mean anything to me.  I apologize.
 9      Q.     Is there a potential investor
10  here that is -- that is publically traded
11  that is owned by more than one person?
12      A.     There is nobody there that is
13  publically traded.  I am going to clarify
14  what I said now looking at the list other
15  than Lattenberg Thalman and now Moelis
16  have become publically traded in the ten
17  years since this started.
18      Q.     So Lattenberg was publically
19  traded; is that right?
20      A.     I believe it was on the New York
21  Stock Exchange.  Yes.
22      Q.     And just do clarify, Blackstone
23  was not publically traded?
24      A.     I don't believe it is.   It is
25  still not.
```

Page 586

```
 1              FEINSOD
 2          MR. WEINBERG:   Thank you.   I
 3  think we are done.
 4          MR. HASHEM:   All right.
 5          THE VIDEOGRAPHER:   We are off
 6  the record at 3:20 p.m., and this
 7  concludes today's testimony given by
 8  Michael Feinsod.   The total number
 9  of media units used was four and will
10  be retained by Veritext New York.
11          (Time noted: 3:20 p.m.)
12
13
14
15
16
17
18          MICHAEL FEINSOD
19
20  Subscribed and sworn to before me
21  this     day of          , 2021
22
23                            .
24
25
```

Page 587

```
 1              FEINSOD
 2      C E R T I F I C A T I O N
 3
 4
 5
 6      I, DEBBIE ZAROMATIDIS, a Shorthand
 7  Reporter and a Notary Public, do hereby
 8  certify that the foregoing witness,
 9  MICHAEL FEINSOD, was duly sworn on the
10  date indicated, and that the foregoing is
11  a true and accurate transcription of my
12  stenographic notes.
13      I further certify that I am not
14  employed by nor related to any party to
15  this action.
16
17
18
19
20
21
22
23  DEBBIE ZAROMATIDIS
24
25
```

Page 588

```
 1              FEINSOD
 2          E X H I B I T S
 3
 4
 5   EXHIBIT      DESCRIPTION          PAGE
 6   Exhibit 23      E-mail 3/2/12        336
 7   Exhibit 24      E-mail               341
 8   Exhibit 25      E-mail               357
 9   Exhibit 26      E-mail 11/19/12      363
10   Exhibit 27      E-mail 3/28/13       381
11   Exhibit 28      Bradway Capital membership
12            subscription agreement     388
13   Exhibit 29      Settlement agreement  393
14   Exhibit 30      Bank balances         401
15   Exhibit 31      Letter 11/25/98       442
16   Exhibit 32      Letter 11/29/99       449
17   Exhibit 33      Order                 456
18   Exhibit 34      Term sheet            470
19   Exhibit 35      E-mail 7/23/12        487
20   Exhibit 36      E-mail                509
21   Exhibit 37      E-mail 4/28/11        509
22   Exhibit 38      Declaration           518
23   Exhibit 39      E-mail 11/26/12       528
24   Exhibit 40      Letter 3/6/12         550
25
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 589

```
 1              FEINSOD
 2           ERRATA SHEET
     VERITEXT/NEW YORK REPORTING, LLC
 3   CASE NAME:  SBA V. FEINSOD
     DATE OF DEPOSITION: NOVEMBER 16, 2021
 4   WITNESSES' NAME:  MICHAEL FEINSOD
     PAGE LINE CHANGE          REASON
 5   ____|____|_____|_____
     ____|____|_____|_____
 6   ____|____|_____|_____
     ____|____|_____|_____
 7   ____|____|_____|_____
     ____|____|_____|_____
 8   ____|____|_____|_____
     ____|____|_____|_____
 9   ____|____|_____|_____
     ____|____|_____|_____
10   ____|____|_____|_____
     ____|____|_____|_____
11   ____|____|_____|_____
     ____|____|_____|_____
12   ____|____|_____|_____
     ____|____|_____|_____
13   ____|____|_____|_____
     ____|____|_____|_____
14   ____|____|_____|_____
     ____|____|_____|_____
15   ____|____|_____|_____
     ____|____|_____|_____
16   ____|____|_____|_____
     ____|____|_____|_____
17   ____|____|_____|_____
     ____|____|_____|_____
18   ____|____|_____|_____
19        MICHAEL FEINSOD
20   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS _____ DAY OF _____, 20__.
21
22   _____
     (NOTARY PUBLIC)
23   MY COMMISSION EXPIRES:
24
25
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

| & |
|---|
| **&** 329:5 330:4 333:23 334:5,10 334:13 422:19,20 443:18 449:17 462:3,20,21 474:18 489:15 504:14 |

| 0 |
|---|
| **02** 460:11 |
| **03** 460:11 |
| **0345.pm** 528:15 |
| **0345pm.pdf.** 528:20 |
| **05** 570:13 |

| 1 |
|---|
| **1** 332:17 357:15,18 364:23 388:6 390:7 397:9 447:3 |
| **1,000,235** 362:4 |
| **1,178,900** 381:16 |
| **1,235,855.37** 362:4 |
| **1,420,000** 340:21 |
| **1,428,001.29** 346:5 |
| **1.2** 370:18,21,25 398:11 440:11,22 |
| **1.5.** 440:20 |
| **1.7** 342:8 343:2 344:10,13 345:12 |
| **10** 348:25 358:14 388:11 450:5 451:11 471:23 485:8 492:7 |
| **100,000** 366:2,18 368:9 |
| **10:31** 388:4 |
| **10k** 571:6,13 572:19 580:13,18 |
| **10ks** 357:2,6 410:20 546:18 |

571:22,22 580:4
**10q** 546:17,24 547:11 572:19 580:14,18
**10qs** 357:2 410:21 580:4
**11** 329:7 351:22 389:24,25 390:21 479:21 489:21
**11/19/12** 588:9
**11/25/98** 588:15
**11/26/12** 588:23
**11/29/99** 588:16
**1185885** 528:21
**11:04** 404:7
**11:06** 404:11
**11:41** 441:17
**11:53** 441:21
**12** 337:18 354:16 354:16 390:23 524:9
**125,000** 386:3,15
**12:48** 487:16
**12d** 447:3
**12d1a** 446:24
**13** 446:14,15 521:21
**131326** 333:5
**140,941.91** 349:5
**1420,000** 340:9
**15** 421:16 447:20 447:23,24 485:8 486:11 530:8,9,13 552:17 554:5 555:25
**156,000** 361:3
**156,000,194.51** 387:10
**156,161.98.** 360:15
**156,191.94** 383:2

**156,194.51** 386:19
**156,688.28** 353:16
**16** 327:19 332:4 344:8 345:13 421:17 523:12 589:3
**165,154.77.** 372:13
**17** 327:4 421:17 448:7,8
**17,400** 402:23
**17,481.95** 403:12
**175,000** 351:25 352:10,25 353:10 355:9 359:16,23 360:21
**17cv3586js** 333:4
**19** 341:17 359:16 363:23 365:6,24 366:17 367:4,13 367:19 368:8 369:9,23 375:9 390:4 402:12 548:6
**1958** 451:25 452:23 453:19
**1979** 442:24
**1980** 442:21,24
**1993** 519:19
**1995** 413:2
**1998** 443:19 457:17
**1999** 356:13 409:2 443:2,5 449:17 457:19 460:10
**19th** 390:7
**1:12** 487:21

| 2 |
|---|
| **2** 332:17 339:9 366:19 388:13 478:19 483:14 490:13 519:25 |

530:14 556:9 565:22 566:2,17
**2,650,000** 343:16
**2,743,878** 338:3
**2.5** 337:23 339:3
**2.7** 337:20
**20** 341:7 372:2,6 372:23 373:19 391:12,13,16 471:21 494:6,14 520:2 556:6 562:19,23,25 563:2 576:23 582:7 589:20
**200** 332:19 460:16
**200,000** 375:7 378:24 476:2
**2002** 454:23 455:8
**2003** 519:19
**2005** 460:16
**2006** 455:8 461:13
**2007** 462:12
**2008** 462:15 464:2 466:4 470:17 471:16 472:4 477:9 478:14 480:14 542:17
**2009** 464:3,13 466:3 469:13 470:4 477:9,23 478:7 479:12 480:15,17,24 483:9
**2010** 432:8 484:23 490:20 492:18 493:17,19 554:19 568:10,17
**2011** 432:8,24 495:19,23 498:6 498:18 509:18 546:13 567:18

568:15,21,25
573:17
**2012**  336:14,22
339:2 340:3,7
341:17 344:9
345:13,23 346:11
346:21 348:5,17
348:25 349:10
351:24 353:14
354:10 358:2,10
358:14 359:16
360:20 361:3,24
363:23 365:6,24
366:17 367:4,13
367:19 368:8
369:9,23 372:23
373:20 374:11,23
375:9 390:4,8
434:6 439:20,21
488:24 490:9
508:18,19 515:9,9
515:12 518:22
521:11,16 523:6
523:22 524:9
525:25 528:13
529:5,21 533:4,19
534:5,17 535:9,21
536:7 538:17,17
546:13 550:10,15
551:22 553:12
554:21 557:5,15
558:7,14,16,21
567:18 569:5
**2013**  375:4 379:14
379:18 381:14
383:23 384:4
386:3,17 387:10
401:23 402:12,15
402:21 403:11
434:6 534:18,21
535:4 569:10

**2019**  548:6
**2021**  327:19 332:4
586:21 589:3
**204**  382:12
**20s**  422:22
**20th**  374:11
**21**  345:23 346:11
**21.7**  527:5
**22**  351:24 353:14
354:10 427:15
502:18
**23**  336:8,10 346:21
348:5,17,25
349:10 488:24
588:6
**24**  340:3 341:4,5,8
361:3 532:25,25
588:7
**25**  357:12,14,16
363:21 364:2
376:12 443:19
588:8
**250**  478:19
**26**  363:18 364:5,8
364:10,11,22,23
372:2 401:23
529:5 588:9
**27**  364:22 381:8,9
386:17 387:9,24
457:17 529:21
588:10
**27th**  386:22
**28**  335:3 375:3
379:14,18 381:13
383:23 384:4
386:2,14 388:8,18
390:20 416:24
509:18 588:11
**28th**  386:23
**29**  393:19,21
449:16 471:16

472:4 588:13
**2:23**  545:16
**2:35**  545:20

---

**3**

---

**3**  357:18 368:7
386:2 398:21
440:19 451:20
466:23 478:20
487:23 493:13
538:23 548:2
570:10,13
**3,123**  365:14
**3-0**  547:25
**3/2/12**  588:6
**3/28/13**  588:10
**3/6/12**  588:24
**30**  401:18,21,22
403:3,4 457:19
468:15 547:20
588:14
**300,000**  347:2,14
348:8,17
**31**  330:7 442:14,15
442:18 443:18
447:21,24 588:15
**32**  449:8,10 588:16
**324,000**  382:10
**33**  456:20,21
588:17
**336**  588:6
**34**  444:15 470:25
487:25 588:18
**341**  588:7
**35**  487:18 488:3,4
488:20,21 588:19
**357**  588:8
**3586**  327:4
**36**  509:10 588:20
**36,000**  484:11
**363**  588:9

**37**  509:10 584:8,13
588:21
**38**  518:12 560:12
588:22
**381**  588:10
**388**  588:12
**39**  528:23 560:10
565:21 566:3,17
588:23
**3919**  587:22
**393**  588:13
**3:04**  570:8
**3:20**  586:6,11

---

**4**

---

**4**  360:9 369:11
386:24 399:11
440:11 508:19
519:18 530:4
570:15
**4.1**  351:2
**4/28/11**  588:21
**40**  409:19,20
466:19,21 484:10
550:5,6,9 551:20
588:24
**40,000**  486:4
556:14
**401**  588:14
**430**  329:16
**44**  388:11
**442**  588:15
**449**  588:16
**450,000**  369:12
**456**  588:17
**457**  360:18
**468**  356:21 410:25
479:8 484:6,6,6,7
484:8,17 485:12
492:14,22 526:21
**468s**  410:20
571:25,25 572:17

**470** 588:18
**481.95** 402:24
**487** 588:19

**5**

**5** 341:7,9,13
361:22,24 372:7
427:17 440:24,24
443:23 448:4
466:25 478:21
498:18 519:14
556:5
**5.7** 440:14
**50** 471:23
**50,000** 416:7
**509** 588:20,21
**518** 588:22
**51st** 330:7
**528** 588:23
**53** 519:11,12,13
560:15,16
**550** 382:16 588:24
**550,000** 382:5,17
383:23 385:24
**59669523** 350:2

**6**

**6** 344:7,25 346:15
372:7,22 373:12
400:25 448:3
551:22 553:12
**6.2** 375:10
**60** 464:16 570:18
**60a1** 446:24
**63,300** 362:11
**63,827** 362:11
**64,000** 362:8

**7**

**7** 336:14,22 339:2
339:8 340:7
345:18 346:20
358:10 373:18

389:4,5,6 400:22
445:7 466:17
468:25 531:23
**7,900,00** 397:12
**7,900,000** 397:19
**7.9** 398:14 530:7
530:12,24
**7/23/12** 588:19
**750,000** 483:14
**79** 442:22

**8**

**8** 371:12
**8/7/2012** 358:7
**850** 475:25
**853,776.71.** 341:24
**87,192.98** 372:24
**8th** 358:2

**9**

**9** 348:4 360:20
403:11 527:8,8
**9.6** 528:5
**9/24/12** 360:11
**90** 464:20,24
571:22
**90s** 413:6,8
**911.10** 381:17
**94** 414:24
**95** 464:21 465:18
465:25
**959,000** 365:13
**967,385.58** 358:4
**99** 414:25 464:21
465:18 466:2
**99.9** 455:9
**9:15** 327:20
**9:22** 332:4

**a**

**a.m.** 327:20 332:4
**ability** 419:17
446:11 470:19

**471**:22 472:20
482:25 577:13
**able** 420:13 447:9
480:20 514:6
533:20 574:24
**absolute** 527:24
**absolutely** 424:3
455:23 477:14
478:6 516:2
544:17 554:16
**accelerating**
574:13
**accept** 375:5
378:23 397:12
502:11 556:23
**accepted** 406:2
563:24
**accessed** 481:23
**account** 337:11,21
338:19 346:18
362:3 381:24
402:7 452:7
469:17 544:24
547:20 548:4,5
**accountant** 405:12
405:22
**accountants**
410:24
**accounting** 405:5
405:11,21 406:2
407:12 410:14,18
415:14,18,21
572:12
**accounts** 403:12
403:17 408:19
453:20 454:2
544:8 548:3
**accrual** 415:18,21
**accrue** 416:5,9
**accruing** 417:4

**accuracy** 354:9
381:21 383:7
**accurate** 340:13
347:23 494:12
498:23 523:8
547:2 583:13
587:11
**achieve** 508:13
**achieved** 426:7
**acknowledging**
358:3
**acquire** 452:9
**acquired** 455:8
511:17 514:14
**acquisition** 414:8
438:4 446:19
**acquisitions**
426:23
**act** 409:19,20
427:11 444:15
448:8 451:25
452:23 453:19
480:23 481:7
560:6
**acted** 524:14
**action** 333:12
402:18 409:12
480:19 482:8
587:15
**actions** 515:20
516:8 538:13
549:11
**active** 492:9,10
576:25
**ad** 416:2
**add** 410:24 583:10
**added** 501:15
**adding** 461:3
501:6,7
**addition** 446:17
561:4,19

additional  458:3 470:9 479:3 501:8
address  502:10 507:3
addressed  375:4 507:4
adhere  458:8
administration  327:6 332:23 333:25
administrative  521:22 525:12
admitted  569:18
admonition  525:16
adopted  409:8
advance  339:16 340:2 344:21 345:14 347:4,16 348:19 352:6,9,19 353:9 354:20 355:9 358:22 359:3 367:11 369:21 377:22 385:16,24 485:22
advanced  368:19 377:3,14
advancement  352:15,24 451:23
advances  350:15 355:20,25 356:7 356:16 362:16 365:25 367:17 384:5 446:21 447:10,11,12 449:2 451:23 452:2,17 453:23 454:3 492:19
advancing  383:11 387:19

advantage  512:13
advertise  432:3
advised  549:6,9 557:6
advisors  414:8 420:6
affect  343:4
affidavit  561:4 582:15
affiliated  344:4 351:20 539:15
affiliations  333:15
affinity  337:9,19 338:2,20 434:10 434:13 435:6
afinity  380:21
agencies  481:13 507:8
agency  479:13 506:10 521:24
ago  339:23 392:24 393:2
agree  332:13 428:9 563:11
agreed  331:5,10 331:14 370:5 371:3 397:22 493:25 495:5 523:24 540:19 542:2
agreement  366:7 366:11 368:12 369:25 370:12,15 371:4,5,8,11,20,23 374:15 379:21 380:2,4,10 384:10 384:14,23 385:3 388:20 390:19 391:5,24,25 393:22,25 394:5 394:15,22 395:4,6

395:9,12,13,23 396:18,23 397:3,3 397:10,11,22 399:6,10 409:12 418:5,14 419:2,11 419:22 422:3 454:24 495:19,24 496:3,5,7,9,11,17 505:24 529:11 538:20 540:10,11 540:15,17,18 541:19,20,21,24 542:7,13,14,14,19 542:23 544:19 547:9,13 562:9 563:5,6,13,17,19 564:13,25 573:19 576:17 577:17 578:5,12 580:23 581:10,18 588:12 588:13
agreements  395:3 396:19,20 397:7 510:16,17 542:5 543:16 544:11,18 563:9,9 573:14 575:23 578:2,9,14 578:20
ahead  378:7 446:2 474:2 518:20 565:14 573:10
al  332:25 457:16
allegations  524:12 524:14
allegiance  379:5
allocate  406:17
allocated  407:16 407:25 413:3 465:9,21
allocating  407:13 408:18

allocation  405:6 408:12 410:4,13 413:7 465:7,20,21
allocations  404:24 406:6 410:6,15 411:11,16,17
allow  444:21 448:24 452:16 502:14 554:6
allowed  418:20 445:15
alluded  446:10
alternate  490:12
amctc  383:2
amended  428:24 457:18
amendment  450:2 457:13
amendments  547:15
ameritrance  361:18
ameritrans  339:3 339:9 340:8,8,22 340:23 342:10,16 342:23 343:3 344:9 345:13 347:3,15 348:7,18 349:2,10,16,24 350:8,10,12,16,19 350:24 351:3,8,9 351:15,18,25 352:6,9,19 353:8 353:16 354:2,21 355:10,20 356:2,8 356:12,17 357:2,5 357:7 358:15 359:6,17 360:12 360:13 361:11,16 362:8,10,15,16 366:3,18,25

367:12,18 368:10
368:18,23,24,25
369:2,14,21 372:5
373:8,16,20 374:2
374:7,12,23
375:17 376:8,19
377:4,15,16,17,24
377:25 378:9,15
380:6 381:2
383:12,12,24
384:6 385:17,20
385:24 386:4,5,19
387:4,16,20,20
389:16,21 390:9
391:6 401:23
402:7,8,9,16
406:10,21 407:3
407:17,23 408:2
408:16 409:17,20
412:19,22 415:3
415:20 422:12
432:5 441:5 443:2
443:6,14 444:9,13
444:18,20,22
445:4 446:18,21
446:22 447:8,8
448:5,9,14,16,25
450:12,15,19,20
451:6,9,15,23
452:3,10,15,17
453:4,15 454:4,9
454:15,16,18,19
454:22 455:6,20
455:21 456:15
459:6,11 460:2,9
460:15,18 461:25
463:20 464:20
472:12,18,23
473:5,7,18,18
474:5,9 476:14
477:4 489:20

492:20 494:6,8
495:14,18 502:5
504:7 507:17,21
507:22 508:11
512:3,14,17
513:24 514:6,20
514:21 515:6
531:15 532:4
533:13 546:18,25
562:13 563:25
564:3 567:14
568:19 569:3,7,13
570:18 571:8,15
572:21 580:3,5,5
580:18 582:3
**ammerman**
511:18
**amount** 339:9
340:9,17,18,22
344:10,12 348:6,8
349:4 353:15
358:4 359:16
360:14 369:10,12
370:6 371:2
372:13,24 381:16
383:2,23 385:11
386:15,18 387:10
397:18 398:12,17
402:24 461:20
465:14 466:15,20
495:4 504:8,16
508:9 512:7 524:5
531:5,6,15 533:21
534:12
**amtc** 343:16,17,24
382:6 522:4
**analysis** 582:16
**analyst** 483:2,3
**analyze** 484:7
**analyzed** 419:15
484:8

**angry** 525:15
**announced** 335:20
480:23 481:6
**annual** 356:22
**answer** 353:5
413:11 434:20,22
453:12 493:8
514:18 517:8
537:14 558:4
574:5
**answered** 396:7
430:4,5
**answers** 499:22
**anticipate** 335:15
**anybody** 516:9
**anyway** 433:7
**apologies** 364:6
570:2
**apologize** 338:13
342:20 350:18
356:5 364:21
372:21 377:9
386:22 387:2
392:15 402:14
435:2 440:16
447:13,18 488:14
509:15 514:4
517:2 530:2
540:21 541:17
546:3 576:3 585:8
**apparently** 391:24
**appear** 370:9
389:18 553:22
**appearance**
333:19
**appearances**
333:15
**appeared** 456:9
**appears** 339:12,17
340:11 344:19
354:17 358:20

365:10,19 369:17
369:19 372:17
373:6 374:11,19
384:3 386:10
387:8 389:14
**applicant** 451:12
**applicants** 424:12
**application** 444:6
448:4 449:25
450:13,18 452:13
452:14,15 457:17
457:18 470:5,9
479:5,6 480:5
481:21 496:14,24
517:18 559:3,18
559:21 566:6
**applications**
458:15
**applied** 444:19,20
444:25 481:18
**apply** 335:3
481:17
**appointed** 396:9
**appointing** 394:22
396:24
**approach** 577:19
**approaching**
418:18
**appropriate** 431:5
**approval** 420:15
424:6 425:5 426:3
479:18 500:11
504:24 505:3,17
505:20 506:3
514:7,10,11,11
515:3,6 522:10
577:18,20
**approve** 433:16
500:6 505:8
507:13

[approved - back]

**approved** 409:5,7
456:5 458:22
475:9 479:16,16
479:20 482:4
497:12,14 505:5
505:13 527:16,18
**approximately**
466:21
**april** 401:23
402:12,15,21,21
403:10 433:15
439:22 489:20
495:19 496:11
509:17 534:21
548:5 576:21
**arbitrarily** 427:12
427:19 456:8
524:15
**arbitrary** 400:18
426:17 428:6
430:13 500:3
502:23 515:16
516:14 517:23
520:19 549:2
**area** 431:7
**areas** 417:8
**argument** 520:24
520:25
**arlene** 384:22,25
385:6,9 398:2
399:23 400:4,6,7,7
526:7
**arlon** 422:16
511:13 583:20
584:24
**arrow** 488:21
489:13,16 566:19
**asked** 345:7 350:4
392:6 411:22
412:17 428:20
433:3 496:7

503:13,18 536:12
543:22 545:5,7
573:13 576:20
**asking** 372:12
407:11 416:3
452:25 487:10
544:14 555:14,15
555:22 556:23
561:25
**asset** 346:9 350:9
358:9 374:6
381:22 413:3
414:23 422:16,16
435:6 436:7
462:11 473:2
476:9 485:13,13
485:20,20 526:22
526:22 544:7
**assets** 337:8,18
342:4 413:5
414:25 427:2
434:6 439:20
458:9 464:21,24
464:25 465:14,19
465:19 466:7,15
466:16,19,22
472:22 473:5,8,17
474:25 507:21,21
531:14 538:21,22
570:19 571:8,15
572:5,17,18,20,23
580:14,17
**associate** 509:23
**associated** 414:8
**associates** 327:7
332:24 334:2
348:6 369:13
385:4 401:4
402:17,17,22
457:16

**associations**
392:20
**assume** 359:13
399:16
**assuming** 392:19
399:17
**attached** 395:5
399:8 443:22
509:25 529:13
**attachment**
449:19 529:20
**attachments** 396:5
**attempt** 555:17
**attempted** 414:14
523:16
**attempting** 510:25
**attention** 450:4
521:20
**attorney** 333:20
404:19 515:20
**attorneys** 329:6,14
330:5 331:5
333:23 400:2
462:24,24 509:23
509:24
**attractive** 421:21
460:4
**auction** 575:16
576:7
**audio** 332:11,11
541:12
**audit** 410:21
536:18
**audited** 411:6,8
**auditors** 411:2
486:8
**audits** 356:22
**august** 358:2,10
358:13 486:3
498:18

**authority** 343:10
343:13 367:9,10
367:14
**authorizations**
412:11
**authorize** 355:20
355:25 356:7,16
385:23
**authorized** 339:10
342:17 355:5
548:21,22
**authorizing** 349:9
**available** 471:24
480:20 549:13
**avenue** 329:16
**average** 475:25
**aware** 334:25
410:8 459:3,12,20
480:18 483:25
484:14 498:7
521:15 523:13
543:15 581:9

**b**

**b** 399:2,5,10
447:16 449:9,16
510:8 564:16
588:2
**back** 359:10
386:20 388:11
404:12 408:25
409:14 417:22
427:22 441:21
442:4 447:23
454:12 470:11
472:6 477:21
480:16 482:18
486:7 487:21
491:20 492:10
506:10,13 507:3
508:24 520:9
521:8,10 523:22

533:17 534:14
535:20 536:19
538:4 542:18
545:20 552:12
553:3 560:12
570:5,13 573:16
580:16
**background**
426:22 490:5,8
496:25 510:2,13
529:14 581:12
**backup**  477:25
478:4
**bad**  518:9 540:3
**badway**  375:3
**balance**  398:13
402:23 403:11,16
476:2 492:20
493:4 543:3,4
548:5
**balances**  356:24
401:22 402:7
588:14
**ballgame**  424:11
**banging**  428:12
**bank**  337:2,11,21
337:25 341:21,23
342:10 343:17
346:4,18 359:6
362:3 365:14,18
381:15,23 382:6,7
401:22 402:7,22
403:11,17 464:10
464:11,13 466:25
471:15 478:15
541:22 542:3
543:13,14 544:5
548:3,3 588:14
**banker**  414:7
**bankers**  575:15

**banking**  477:7
**banks**  477:6,15,15
477:17 480:17
482:12 483:5
511:4 541:25
542:3,21,22
543:19
**bargained**  578:16
**base**  542:20,24
543:4,5,12
**based**  377:13
413:3,3 414:23,23
465:13 470:10
484:12 507:7
514:12 523:15
548:15 557:8
559:20 565:5
567:6 581:10
**basically**  405:21
423:23
**basis**  354:19,23
355:24 356:20
367:16 368:17
369:20 377:13,15
384:5 406:15,16
416:13,17 420:5
444:7,16 458:10
460:23 485:13,20
497:15 513:22
515:22 524:13,18
526:23 537:6
542:21 543:10
557:2 571:9,17
580:7,9
**bassio**  373:24,25
**bathroom**  487:11
**bbcs**  410:2
**bd**  412:4 413:15
413:18 414:9,18
415:10

**bdc**  423:10,11
455:3 458:3,7
509:2
**bdcs**  453:18 473:2
**bdo**  566:19 567:4
**bear**  442:3 547:22
**bed**  525:17
**began**  462:16
496:13 503:7
517:25 573:18
**begged**  499:22
**beginning**  333:19
388:12 425:16,17
464:2 487:22
505:24 570:14
**beginnings**  470:6
**behalf**  334:13
349:23 367:11
368:13 376:6
551:13
**belief**  456:12
497:10,13,16
523:5 532:17
564:23
**believe**  336:23
338:18 341:14
342:25 343:8
344:24,24 345:11
345:16 346:15
347:8,13 348:22
362:20 363:4
365:21 366:8
367:3 374:21
376:8 379:8,24
384:20,25 385:12
386:13 390:13
396:7,12 398:9
399:19,19 400:14
401:17 414:21
415:8 422:7,8
427:9 428:24

432:25 433:10
440:3,8 442:22
445:6,9,21 449:24
455:8 462:12,15
463:15,22 464:2
464:16 468:22
469:8 474:4,5
475:15 479:21
483:11 484:5
485:8,17 492:6
496:12 505:14
515:24 527:5,8
530:20 532:21
533:20 535:5,5,6,8
535:25 536:8,16
537:2 538:6,7,15
542:20 543:17
549:17 560:8,24
561:16,16,23
562:18 564:8
570:20 571:4
576:22,24 582:11
582:15 583:14
584:7 585:20,24
**believed**  425:12
428:17 496:21,22
516:11 549:12
**believing**  515:23
**bell**  443:18 449:17
**beneath**  468:8
**benefit**  528:7
**benefits**  543:18,19
**bernard**  349:20,25
353:18 387:6,15
**best**  428:11 470:22
494:24 497:22,23
527:17 577:6
578:4
**bet**  566:22
**better**  419:6 420:2
424:16 433:12

467:19 469:10
491:19 497:20
528:3,5,5 565:4
**bicycle** 375:23
376:12
**bid** 366:23
**bidders** 573:24
575:22 576:10
**bidding** 417:20
**big** 379:4 421:18
464:15 509:3
511:11 532:24,25
**bigger** 457:22
**bill** 517:21
**billion** 519:25
520:2
**bills** 382:9
**bilodeau** 329:11
334:3,4 364:5,8
404:6 550:4
569:24 570:3
**bit** 411:25 425:4
464:12 535:20
577:22
**black** 430:10
506:25
**blackstone** 421:18
511:15 582:12,23
583:3 585:22
**blanks** 530:6
**blow** 419:11
**board** 340:3
352:25 355:5,14
355:19,24 356:7
356:10,15,23,25
357:9 376:23
379:17 385:23
409:6,8 410:7,22
411:10 419:7
420:6,25 426:8
429:2,4,9 430:8

431:9 432:17,21
433:6,13,20 436:3
459:13 460:15,17
461:11 475:9
486:9 500:19
501:5 516:10
517:14 529:17,20
538:2 548:22
567:22,23,25
568:21,25 569:6
569:12 571:2
**boards** 410:9
**bob** 540:25
**boockvar** 327:16
435:21 437:4
529:7
**book** 408:18
410:15,17
**bookkeeping**
525:10
**books** 416:6 535:4
**boris** 373:4,7
**borrow** 448:25
482:14
**borrower** 464:11
472:9,10,13
541:22 543:23
544:3
**borrowers** 462:6
476:5
**borrowing** 448:11
448:18 482:25
542:20,23,24
543:4,5,9,12
**borrowings**
466:25
**bottom** 339:18
353:21 366:16
508:18 511:7
**bought** 443:6
494:19

**bouncing** 386:21
**bound** 418:21
578:12
**bow** 423:6
**bradway** 368:10
368:19 369:4
374:13,23 375:7
375:18,23 376:2,7
376:10 377:17
378:2,24 379:10
380:5,12,17,22
381:2 388:18
389:21 474:3
588:11
**brainer** 425:12
**breach** 418:13
**break** 411:23
441:13 487:11
577:22
**breakout** 441:14
545:11
**brian** 375:12
**bridge** 340:18,24
**briefs** 519:3,6
**bring** 527:22
**bringing** 577:6
**broad** 423:18
**broader** 477:2
585:5
**broadly** 582:13,24
**broke** 454:24
**broker** 516:6
**brothers** 495:2
**brought** 432:17
504:10
**btig** 511:16
**buckets** 474:14
**build** 376:14
482:14 507:23
508:4

**building** 475:22
**bulk** 473:12
**bunch** 411:16
493:20 500:3,3
573:14
**business** 327:6
332:22 333:24
352:2,12,14,15
353:9 354:21
356:12 358:22,24
359:2 366:3 367:2
367:6,6,12,18
369:15,22 376:14
378:6,8 379:4
383:24 384:6,8
392:20 411:18
412:8,13,19,22,24
413:14,20,21
414:2,2,16 415:2
427:16 441:6
444:13 445:3
454:6,10 456:3
462:10 463:7
467:3,10,20
469:11,24 476:6
477:20,21 492:11
495:15 502:12
503:11 505:6
507:21,24 533:13
543:25 545:2
560:6
**businesses** 462:2
480:21
**buy** 425:10
**buyer** 423:23
503:22
**buyers** 424:4
**buying** 423:16,24
424:19
**buys** 424:10

**c**

c  329:2 330:2
  334:18 400:15
  446:24 456:18,19
  457:4 471:5 510:8
  519:16 587:2,2
cable  427:2
calculate  558:12
  558:17
calculation  553:5
  557:21
call  393:15 412:12
  413:25 428:6
  440:14 535:25
  536:3 557:11
called  344:3
  434:10 467:13,21
  475:14 479:19
  531:19
calls  547:7 556:18
  557:19 558:3
cancellation
  566:22 567:6
canning  409:9
cap  508:9
capital  340:22
  344:9 348:7 349:2
  349:11,16,24
  350:8,13 357:7
  358:15 368:10,11
  368:19 369:2,4,14
  374:13,23 375:3,7
  375:17,19,23
  376:3,7 377:17
  378:2,16,25
  379:10 380:12,17
  380:22 381:3
  388:19 389:16,21
  390:9 391:6 402:8
  419:22,22 420:20
  420:20 425:20

431:10,14 432:15
  452:10 468:6,8
  470:16 476:4
  482:9 483:10
  484:2,11,24 485:5
  485:25 486:11
  489:10 490:15
  491:17 492:4,8,25
  493:10,23 495:4
  498:14 501:6,19
  508:4,14 511:2,16
  511:17 512:7
  513:2,4,4 514:12
  514:24 515:4
  531:21 539:5,15
  539:16 548:16
  551:25 552:8
  553:2,5 554:15
  555:2,5,10,13,23
  556:12,14,22,25
  557:9,16,24 558:9
  558:13,18,21
  571:8,16 572:21
  583:20 584:25
  588:11
capitalized  455:15
  468:5 489:20
capricious  400:18
  426:18 502:23
  516:14 517:23
  520:19 549:2
capriciously
  427:12 524:15
career  575:19
carol  559:10,11
carry  415:3
case  333:3,5 361:8
  375:12 400:9,10
  406:14 413:24
  414:13 525:17
  526:24 538:16

551:17 578:17
  589:3
cases  561:18
cash  412:10
  415:21 473:12
  498:15,15 513:2
  543:3,4
categorized
  413:15
category  414:19
caught  435:3
caused  466:7
cc  341:18,19
  345:20 346:22
  365:8
ceased  533:8
ceasing  385:5
cell  332:9
cellular  332:7
  427:2 575:8,12
center  437:16,18
cents  358:4
ceo  357:10 463:23
  463:25 464:4
  467:25 475:18,21
  475:25 477:24
  484:24
certain  409:24
  415:16 419:8
  444:19 445:19
  458:5,10 472:25
  473:17 515:10
  525:6,7 545:3
  577:8
certainly  405:15
  584:25 585:2
certification
  390:25 391:4
certify  587:8,13
cfo  410:18 484:5
  484:15

chairman  564:20
chance  443:24
  446:6
change  408:12
  431:2 433:6
  469:23 496:13,23
  500:7,8,10,12
  502:9 504:20
  510:12 514:15
  577:19 589:4
changed  397:23
changes  397:24
  520:4
chapter  393:3
characterization
  552:23 556:20,24
characters  467:12
charged  462:6
chart  453:20,25
check  406:25
  407:13 545:14
  581:12
checking  547:19
  548:4
checks  496:25
chief  335:23
chronological
  511:6
chronologically
  387:2
cibolski  519:16
  520:8,11 560:18
  560:19,20,21,22
  560:25 561:5,9,14
  561:21 582:16
cibolski's  520:16
  521:17 522:9
  523:23
cifc  494:19
circle  364:19
  493:25 508:24

[circle - company's]                                                    Page 10

511:19 524:16
circular 488:16
citing 427:18
civil 333:3,5
claim 394:12,17
548:14
claims 400:18
427:19
clarify 414:12
514:5 585:13,22
clarity 577:12
clarke 329:20
class 462:11 476:9
494:24
clean 536:18
clear 416:14
419:21 454:7
475:24
clearly 380:14
client 344:18
348:9,13 349:8,9
358:19 366:15,16
368:14 369:16,18
371:6,9 373:11,22
374:18 386:9
387:7 414:3
client's 372:16
434:22
clients 474:18
close 364:9 421:12
433:5 470:20
476:3 505:15
577:8
closed 335:21
422:9 431:18
433:5 470:18
477:4
closely 544:19
closer 546:9
closes 336:6

closing 464:4
469:21 476:20
506:2
cn 418:2 420:5,16
424:16 425:5
494:15 500:17
501:9,14 502:5
508:21 520:12
524:16 563:5,13
cn's 563:24
cod 566:19,21,25
collapse 463:16
collateral 467:18
483:18 530:10,11
545:6
colleague 441:15
color 522:16
columbus 340:25
351:14,16 417:13
417:14 418:14
422:25 424:23
428:3,21 433:4
439:24 440:19
490:11 493:13
494:23 495:9,13
495:17,24 498:10
502:12 503:14
504:10 515:18
516:11,16,20
517:10 562:8,9,12
564:13 565:3,18
573:19,22 574:18
574:22 578:17
580:24,25 581:9
581:19
column 360:22
combination
525:18
combined 464:19
531:22

come 421:11 486:7
503:8 504:15
506:10,13 513:3
516:16 536:11
538:12 561:13
573:23 575:22
582:5
comes 570:4
coming 423:24
440:18 478:22
484:21,25 515:14
516:13
comma 554:4
commenced
401:16 402:18
commencement
548:10
comments 505:7
commission
443:20 448:6
449:18 589:23
committee 385:5
410:22 426:3
497:6 523:14
527:14,15
common 505:22
580:24 581:22
582:6 583:11
commonly 340:24
communicated
546:10
communication
545:24
companies 376:6
376:20 384:12
405:16 408:9
409:21 413:6
414:6 444:14
445:3 447:4 458:2
465:9,14 468:5
493:21 494:2

510:7,16,24
531:22 575:12,14
580:10 581:20,21
582:8
company 335:25
336:5 349:4,12,23
353:17 355:2
360:14 361:5,12
372:4,6 375:11,23
376:12 378:11,18
379:6,11 380:20
380:24 387:16
409:19,20 413:2
414:6 416:7,20
417:3 421:8,21
422:18,19,20,21
423:17 425:13,22
443:3 450:8,21
451:9 452:6
453:24 455:9,13
455:17,22,24
457:23 458:8
459:16 460:11,20
460:21 461:6,14
461:22 463:21
464:19 472:15
473:13,25 474:9
474:20,24 475:14
489:16 499:13
501:3,15 504:17
508:24 513:10
520:23 522:5
533:6,12 535:11
539:4 570:25
577:2,15 578:22
582:4,13,14
583:21
company's 375:6
378:24 462:8
467:25 472:3
571:15

compare 572:16 574:18
compared 565:9 565:18 572:18
competing 494:7 575:22
competitive 417:18,19
complete 563:20
completed 432:18 481:19,20,22 494:17 512:6
completing 534:20 542:16
complex 543:6
compliance 486:7 491:20 506:23
compliant 520:25 521:2
complicated 418:24
computed 478:25 484:9
conceivable 497:25
concept 417:23
concern 429:10 460:24 498:19 499:6 501:12,18 501:23 507:5
concerned 460:21 518:6
concerns 430:8,9 502:10 506:12 509:5
concerted 422:10
conclude 522:4
concludes 586:7
conclusion 547:7 556:18 557:19 558:3

conclusions 419:9 521:17
condition 448:3 490:21 492:2 551:25 552:8 553:2 554:7,14,25 555:5 556:12,22 557:8,16,23 558:9 558:13,17
conduct 400:19 431:5 502:23 517:24 520:16 549:2
conducted 415:2 451:3 454:10
confections 439:5
confirm 522:9,14
confirmation 425:25
confirmed 481:6 483:2 522:17
conflate 554:13
conformance 481:15
confuse 584:5
confused 407:21
confusing 553:9 553:23 584:4
congratulations 335:9
consent 395:18 400:12 401:14 409:12 415:18
consider 503:13 515:21
considerably 517:10
consideration 370:21 371:12 567:4

considered 414:15 419:8 453:16 514:14 527:23 563:24
considering 493:17 532:5 533:12 562:11 564:3,12 574:9
consistent 367:5 502:22 521:5 532:8
consistently 398:4 428:12 531:7
consolidated 357:5 406:7,16 413:6,7 414:6 444:22 458:10 473:13 571:9,16 580:6,9
constituents 497:24
consultant 561:22
consulting 517:21
contact 485:6 497:9 499:19 553:9
contacted 537:16
contains 471:14
contemplate 515:10
contemplated 451:12
context 489:6
continental 511:13
continuation 335:2
continue 332:12
continued 328:3 330:2 427:11 451:7

continuing 556:13
continuity 424:6,7 424:17,21 433:12 501:3,3,4,5
contra 453:24
contribution 556:14
control 431:2 447:4 474:20 496:13,23 500:7,9 500:12 504:20 510:12 514:15 520:4 577:19
controlling 500:10
conversation 398:4
conversations 332:7 522:21
conversely 407:23
convest 511:19 584:24
convince 527:14
coowned 474:15
copies 391:23 392:4,5
copy 345:9 391:18 391:21 394:8
corp 327:8 332:24 334:2 349:11 401:4 402:17,22 459:17,21,25 572:24
corporate 421:24 423:8 456:5 467:22 468:2 469:5,14 470:2,10 472:16 473:15 475:16,23 476:11 476:14 485:4 498:8,9 513:13,14 523:14,17 531:17

**corporation**
340:23 344:10
348:7 349:3,16,24
350:8,13 357:8
358:16 368:10,19
369:3,13,14
375:18 378:16
389:17,22 390:9
391:6 402:8
457:16 571:8,16
**corporation's**
572:21
**correct** 336:22
339:4 340:10
345:24 348:10,11
348:19 349:5,6
358:16,17,23
359:19 362:5
363:25 365:9
366:20 373:5
374:15 377:4
383:3 388:24
390:10,20 401:5
401:16 405:6,7,10
406:10,11,19
407:5,14,15,20
408:4,14,21
411:14 412:5
415:7,22,23
416:10,20,21
417:2,5,6,17
418:16 420:10,18
420:22 423:12
424:9 425:16
426:16 429:5,6
431:21,22 432:6
432:10,11,14,21
433:24 434:7,8
435:7,10,15,20,23
436:4,5,9,12,14,18
436:21 437:2,7,12

438:2,5,9,12,14,17
438:19,22,24
439:3,5,8,15,18,25
440:25,25 441:7
441:10 442:21,25
443:8,9,15 459:18
459:19 460:15
461:10 462:23
464:7 465:10,11
465:15 466:5,6
467:8,9 468:3
470:16,17 471:17
473:20 474:12
476:15 477:9,25
478:2 482:5,15,16
482:20 490:9
491:10 495:20
501:9,10 502:17
504:18,19,25
505:20 508:6,16
512:18,23 513:16
513:17,19,25
514:2,22,23 515:2
518:24 522:23
523:3 524:9,10,17
525:25 529:8,9,11
531:2 534:23
547:2 553:15
554:3 557:9
559:22 560:7
567:11,14,21
568:2,9 571:9,17
572:5 573:21
574:25 580:7,8,12
582:23
**corrected** 358:3
**correctly** 505:13
**correspond**
432:25 510:21
**correspondence**
559:15

**corresponding**
466:25
**corrupt** 463:9
**cost** 414:17 476:3
577:25
**counsel** 332:21
333:14 334:7,10
371:7 391:24
486:10 548:10,12
549:6,9
**counselor** 399:20
**count** 341:12
**country** 422:7
511:14,25
**couple** 412:14
417:8 434:4
442:19 481:11
482:3 485:21
490:14 505:11
524:24 536:10
**course** 352:12,13
356:11 384:8
427:4,21 456:3
481:20,22 496:20
505:6 547:24
**court** 327:2
331:18 333:2,8
334:16 453:11
527:25 534:25
540:23
**cover** 417:9
**coverage** 386:5
473:2
**create** 489:18
**created** 442:20
443:3
**credit** 360:17
471:14 472:4
476:7 477:18
**creditor** 540:18
542:5,9

**creditors** 543:9
567:20
**crime** 463:18
**crisis** 477:6,7,12
477:13
**cross** 411:25
**crp** 511:18 584:24
**cure** 425:21
485:25 486:11
492:5 501:19
552:17 554:7,14
554:25 555:4,22
555:23 556:25
**cured** 558:21
**curing** 486:10
**curiosity** 421:14
**curious** 412:18
**current** 523:13
**currently** 451:12
532:5
**custodian** 540:10
542:13 543:21
546:11,16 547:8,9
547:10
**custodians** 546:23
**cv** 327:4

**d**

**d** 334:18 510:8
**d&o** 386:5
**daily** 402:7
**dale** 535:7
**damages** 549:3,6,7
549:12
**dare** 486:11
**data** 576:11
**date** 340:7 353:13
353:14 374:10
379:15 402:11,19
403:10 498:8,9
530:20 550:14
554:6 555:25

560:2 587:10
589:3
**dated** 336:14,21
339:2 341:17
344:7,8 345:23
346:21 348:5
351:24 358:2,13
359:15 361:24
363:23,23 365:6
367:23 369:9
373:19 375:3,9
381:13 383:22
387:9 390:3
443:19 449:16
471:16 488:24
509:17 551:21
553:11
**dates** 403:9 433:11
489:23 499:24
571:18,19
**david** 330:15
333:6
**day** 390:7 410:11
410:11 412:23,23
414:5,5 476:18
481:4,5 495:5
502:19 531:7
586:21 589:20
**days** 405:2 417:23
422:17 476:19
485:21 504:14
552:17 554:6
555:25 571:23
**deal** 409:25 418:2
418:11 419:7,12
419:14 420:12,16
421:4 424:16
428:4,21 433:4,14
494:2 535:17
539:18 573:20
578:15,16

**dealing** 550:10
574:11
**deals** 575:9
**dearfield** 494:19
494:20
**debbie** 328:6
333:9 587:6,23
**debenture** 470:4,8
479:4,5 481:24
**debentures** 470:9
479:3,11,21
481:21 483:7
527:4 537:5
541:23
**debit** 360:22
**debt** 337:2 341:21
370:7 380:9
397:14 464:9,10
464:13 513:5,10
527:11 528:8
542:4 543:14
544:5 566:18
**december** 369:9
369:23 372:2,6,23
373:19 374:10,10
374:22 427:15,23
477:5 499:25
502:18 530:8,13
531:10
**decided** 396:15
467:22 475:7
478:24 486:9
495:11 539:19
**decision** 445:18
462:12 467:21
502:13 518:7
527:21 566:5,12
566:13
**decisions** 445:20
**declaration** 519:7
519:16 521:12

524:21 560:14
561:20 588:22
**declining** 467:4
**dedication** 461:20
461:20
**deep** 422:24,25
**default** 474:19
**defendant** 551:16
**defendants** 327:17
329:14 330:5
334:7,11,14
404:20
**defined** 419:23
420:23
**definitely** 359:24
**definitive** 496:11
**definitively**
434:17,21
**delaware** 505:10
**delay** 481:3
530:23
**delivered** 427:10
484:7
**denied** 507:9
**denying** 524:15
566:5,12,14
**departed** 521:24
**department**
410:18 521:6
537:18
**deposit** 360:20
544:6,23
**deposited** 365:17
**depositing** 381:23
**deposition** 328:3
332:11,15,18,20
335:2 416:24
473:4 540:10
589:3
**describe** 470:22

**described** 396:8
**describing** 450:14
**description** 472:11
472:14 588:5
**designee** 431:9
**desire** 503:10
**detail** 522:15
**detailed** 479:7
**details** 422:21
445:8
**determination**
352:20,23 379:12
379:16 567:6
568:12,18,22
569:2,6,12
**determine** 572:20
**determined** 420:7
467:15 479:2
486:9 525:3
**development**
352:2,16 354:21
358:23,25 359:3
366:3 367:2,12,18
369:15,22 383:24
384:6 411:18
412:8,14,19,24
414:2,3,16 441:7
444:14 445:3
**developments**
353:10
**di** 484:19 499:19
**diana** 384:20
535:2,11 536:6,6
550:11,23
**different** 347:10
347:19,21 354:5,7
362:22,25 372:7
373:4 379:11
382:2 407:24
413:17 431:24
445:2 469:25

493:21 494:7,14
531:9 537:18
562:21 565:18
567:17 572:12
**differently** 572:8
**difficult** 548:13,18
**digging** 417:22
**diligence** 376:16
533:25 534:20
563:9 577:11
**diligenced** 504:9
504:10
**directed** 436:8
**direction** 440:18
**directions** 431:25
**directly** 515:3
**director** 334:11,14
404:20 431:13
519:20
**directors** 330:6
353:2 355:5,14,15
355:19 376:24
415:5,12,13
416:25 437:17
439:15 529:21
571:3
**disagrees** 556:19
**disappear** 466:24
**disappeared** 467:2
480:8 536:20
543:18
**disapprove** 500:7
**discern** 521:23
**disclosing** 510:3
**disclosure** 504:22
580:14
**disclosures** 546:23
580:6
**discount** 527:11
**discounted** 440:21

**discouragement** 500:2
**discovering** 525:20
**discovery** 524:25
**discuss** 430:7
492:18 496:4
567:4
**discussed** 339:25
429:8 457:13
458:15 484:16
493:13 496:6
517:14 526:24
540:8,8 559:5
567:23
**discussing** 492:13
507:20
**discussions** 418:23
469:12,13 492:23
499:13 542:10
548:9 551:12
559:8 567:19
**disfavor** 523:14
**disgusted** 522:19
522:19 523:25
**dishonest** 516:7,8
524:6
**disingenuous** 502:2
**dismissal** 400:16
**dismissed** 400:17
**displayed** 442:7
**disputed** 557:4,4
582:19,22
**district** 327:2,3
333:2,3 534:25
**dive** 422:24,25
**diversity** 426:13
498:21
**dividends** 452:4
513:9

**division** 480:25
489:12 503:6
517:23 518:3,4
521:6
**document** 339:5
354:9 368:5
371:25 390:11,13
396:5 400:22,24
401:6 418:25
443:22 444:3
446:16 447:24
449:21,23 452:19
457:6,9,12 458:17
459:2 471:9 489:4
504:9 515:9
518:16 519:2,11
519:12 524:8
528:15,18,19
547:3,14 550:3
**documentation** 476:25 496:22
**documented** 565:15
**documents** 361:19
361:20 363:17
396:13,21 416:23
457:21 458:24
469:22 480:11
525:7 545:7,25
546:11 547:4
559:12,13,14
561:6
**doing** 376:16
410:22 454:5
467:14 484:19,23
492:5 533:24,24
538:3,18
**dollar** 486:4
494:20
**dollars** 339:10
358:15 374:14

391:14 495:10
**dominic** 336:20
341:16 345:19
346:22 351:23
357:24 361:22
363:24 365:6
381:12
**door** 418:22 518:2
**doors** 499:22
**double** 420:4
545:14
**doubt** 337:16
340:12 381:21
382:3 383:6
**doubts** 368:2
**dozen** 575:18
576:6
**drafting** 550:24
**drafts** 496:8
**dramatically** 466:8 467:5
**draw** 450:4 521:20
**drew** 479:22
**drill** 413:12
**drop** 420:16 455:2
**dropped** 478:13
**dual** 415:12 538:8
**due** 351:10 376:16
380:9 398:14
425:23 477:2
478:22 481:20,22
492:13,19 493:11
525:10 530:7,12
530:24 531:15
533:24 534:20
563:9 577:10
**duff** 504:14
**duly** 334:19 587:9
**duplicated** 392:9
**duties** 567:19
568:4

| | | | |
|---|---|---|---|
| **duty**   568:2 | **economically** | 355:25 356:7,17 | 472:9,17,19,23 |
| **e** | 501:24 | 358:9,15 359:6,16 | 473:18,20 476:16 |
| **e**   329:2,2 330:2,2 | **effect**   331:16 | 362:2,8,15 365:14 | 476:21 477:3 |
| 334:18,18 336:14 | 379:21 380:10 | 365:24,25 366:18 | 481:19,23 484:2 |
| 336:16,21,25 | **effective**   390:6 | 366:25 367:9,11 | 489:20 490:20 |
| 337:7,14 341:10 | **effectively**   433:20 | 367:17 368:20 | 492:19 493:17 |
| 341:15,19 342:12 | 461:15 | 369:13,21 370:13 | 495:14 497:19 |
| 342:14 345:18 | **effectuate**   342:17 | 376:8,19 377:3,14 | 499:19 500:18 |
| 346:3,11,20 347:8 | **efficiently**   476:10 | 377:22 378:9,9 | 504:6 507:17 |
| 347:11,20 351:22 | **effort**   406:17 | 379:13,17 380:25 | 508:4,11,14,19 |
| 352:3 357:24 | 521:5 | 381:14 382:6,10 | 512:4,14,16,20 |
| 361:21,24 362:21 | **efforts**   428:3,20 | 383:11,23 384:5 | 513:18,20,24 |
| 362:23 363:11,14 | 429:4 | 385:4,4,17,21 | 514:4,25 515:2 |
| 363:23 365:5 | **egnyte**   364:20 | 386:4 387:19 | 518:21 519:7 |
| 367:23 378:17 | 488:9,12 547:25 | 389:22 393:23 | 520:11 521:7 |
| 381:11,18,21,25 | **either**   409:12 | 394:5,23 397:11 | 523:15 524:3,4 |
| 383:4 400:11 | 439:23 456:9 | 398:19 400:9,19 | 525:8,20 526:7 |
| 427:17 470:24 | 461:25 495:22 | 401:4,8,23 402:9 | 527:3 528:7 531:4 |
| 488:24 489:7 | 500:6 503:23 | 402:16,17,22 | 531:15 532:10,18 |
| 490:5,7 509:17 | 521:13 566:11 | 403:11 406:9,21 | 533:14 534:21 |
| 510:8 529:6 | 569:7,12 | 407:3,18,18,25 | 535:4 536:23 |
| 564:16 587:2 | **element**   410:10 | 408:15 409:18,19 | 538:3 540:20 |
| 588:2,6,7,8,9,10 | **eleven**   480:2 | 411:4 412:18,21 | 541:21,24 542:19 |
| 588:19,20,21,23 | **eligible**   467:16 | 412:22 413:8 | 543:11,16 544:2,6 |
| **eafc**   337:25 341:23 | 479:2 | 414:14 415:2,4,20 | 544:23 546:10 |
| 346:4 403:6 | **eliminate**   425:23 | 422:5,12,24,25 | 548:2,3,11 549:14 |
| **earlier**   408:22 | 523:17 | 441:4 442:20 | 549:19 551:8,13 |
| 410:20 411:22 | **elizabeth**   329:20 | 443:3,6,7,12 444:8 | 551:15 552:16 |
| 459:16 464:18 | **elk**   327:7 332:23 | 444:12,16,19,20 | 554:14,24 555:3,9 |
| 473:3 491:2 | 333:25 337:8,10 | 446:18,20,21,22 | 555:9,12,23 556:2 |
| 513:12 563:23 | 337:18,20 338:19 | 447:7,10 448:5,9 | 556:15 557:6,15 |
| 577:5 | 339:3,9 341:23 | 448:16 449:3 | 557:22 558:5,8,12 |
| **early**   426:4 432:8 | 342:4,5,9,15,23 | 450:12,15,19 | 558:17,20 559:9 |
| 432:23 515:9 | 343:3 344:9 | 451:5,7,16 452:16 | 559:21 561:2,6,11 |
| **earnings**   504:12 | 345:12 346:9 | 453:2,16 454:5,6,9 | 561:21 562:11,13 |
| **easily**   574:24 | 347:3,15 348:6,17 | 454:20 455:20,22 | 563:25 566:3 |
| 575:4 | 350:15,19,23 | 456:9 457:15,22 | 567:7,11,15,16,20 |
| **eastern**   327:3 | 351:2,4,7,13,15,19 | 459:5 460:2 | 567:20 568:2,6,8 |
| 333:2 534:25 | 351:25 352:6,10 | 461:25 462:4,22 | 568:11,12,22 |
| **economic**   480:23 | 352:18,20 353:8 | 464:14,20 465:22 | 569:7,10,13 |
| 481:6 | 354:21 355:9,20 | 467:7,16,17 472:7 | 570:17 572:5,24 |

580:3,5
elk's  346:17 371:8
  377:18 380:6
  381:22,23 397:13
  398:22 400:2
  403:17 465:19
  466:2,7,11,12
  472:5 475:22
  477:24 478:3,4
  482:17 490:15
  513:13 519:5
  524:12 526:23
  532:3 537:25
  538:2,2 542:12
  548:16 551:25
  552:8 566:5
  567:20 580:17
elliott  327:15
  435:16 509:18,19
  509:21 529:7
embrey  384:22
  398:2 399:23
  400:5 526:8
employed  519:20
  587:14
employee  373:8
  374:2 387:15
  414:20
employees  408:5,7
  461:23 504:6
  508:11
employment
  335:11,16
encounter  454:21
encouragement
  500:2
encouraging
  566:14
ended  499:13
engage  418:23
  458:5 524:21

engaged  489:19
  494:5 515:19
  525:23
engagin  494:3
engine  476:22
  481:8
enhance  424:20
enhancement
  424:22
enormous  504:8
  508:9 524:5
enter  563:5,16
  577:16 578:2,5
entered  366:10
  367:8 370:2
  384:23 394:25
  397:21 418:11
  484:2 495:18
  496:10 510:10
  531:13 534:22,24
  537:22 539:8,11
  563:8
entering  562:8
  563:12 564:12
  577:25 581:18
entire  549:15
entities  423:15
entitled  548:15
  549:4,7,10
entity  389:9 391:3
  391:12,15 393:6
  423:13 456:11
entity's  390:24
entrepreneurial
  489:12
entries  360:18
  410:16,17 412:4
entry  360:11
  361:3,9 405:5,11
  408:19 413:22

epstein  517:11
equates  375:10
equity  468:8
  483:19 489:13,16
  490:22 491:9
  493:3 511:5,20,24
  512:23,25 513:3
  513:21 514:21
  515:4
errata  589:2
error  507:6
esq  329:9,11,18,20
  330:9,11
essentially  417:3
  423:16 431:19
established  458:4
  520:4
et  332:25 457:16
etra  327:13 344:2
  344:4 351:19
  439:25 440:18
  461:8
evaluate  498:14
  515:20
evaluated  515:14
evaluation  517:24
eventually  455:5
evergreen  422:3,6
  425:2 445:9,11
  446:11 503:6,10
  521:7 522:23
  523:7
everybody  425:11
  437:14 488:11
  543:7
everygreen  423:9
  445:12
evidence  367:20
  416:22 549:18,21
exact  391:17,21
  398:12 402:24

466:20
exactly  371:2
  378:11 415:13
  433:11 499:24
  510:9 575:21
examination
  331:14 334:22
  404:16 442:17
  545:21 573:12
  580:2,21
examined  334:21
  470:12
example  355:23
  406:20 415:24
  418:10 583:19
excess  371:12
exchange  443:11
  443:20 449:18
  451:13 564:19
  585:21
exclusivity  418:5
  418:12 578:13
excuse  472:23
  474:7 476:12
  509:13 526:12
execute  410:14
  485:3
executed  340:14
  392:9 399:14
  410:12 496:10
execution  420:8
  420:11,14 421:5
  423:25 574:21
executive  335:24
  469:17 519:8
exempt  446:23
  448:15
exempting  448:6
exemption  446:25
  448:2

**exemptions**
472:25
**exemptive** 409:18
444:7,8,10,24,25
445:4,6 448:23
449:25 450:18
451:8 452:11
453:17 456:14
459:3,15,21 460:3
472:24 559:3,17
559:21
**exhaustive** 427:25
498:12 499:14
**exhaustively**
426:10
**exhibit** 336:8,10
338:11,15,25
340:6 341:4,5,8
357:12,14,16,23
360:9 363:18,21
364:2,5,8,9,11,22
372:2 375:2 381:8
381:9 387:24
388:8,18 390:20
392:4,6,11,12
393:19,21 396:8
396:24 398:25
399:2,2,5,10,12,13
399:21 400:11,15
401:18,21,22
403:3 441:23
442:7,13,15,18
443:17 447:16,20
447:23 449:8,9,10
449:16 456:18,19
456:19,21,24
457:4 460:13
470:24,25 486:15
486:20 487:18,25
488:20 509:7,8
518:10,12 528:16

**528**:22,23 **529**:2
547:4,20,25 550:5
550:6,9 551:19
558:24 560:10,11
560:12 565:21
566:3,17 584:6,8
584:13 588:5,6,7,8
588:9,10,11,13,14
588:15,16,17,18
588:19,20,21,22
588:23,24
**exhibits** 388:15
394:9,11,13,16,19
397:2 399:3
400:20 401:21
412:15 442:10
509:10
**existence** 456:13
**existing** 474:9
**expand** 507:19
**expansion** 470:10
**expect** 507:12
**expectation**
481:16
**expected** 427:5
481:10,20 514:10
514:11
**expedited** 537:6
**expense** 358:23
359:3 366:4 367:2
367:6,13,19
369:22 404:24
406:6 408:25
410:3,5 411:11
412:14 413:21
414:16,18,19
415:10 416:9
465:7,8 467:4
476:8 478:20
543:24

**expenses** 352:2,16
353:10 354:22
358:25 369:15
383:25 384:7
406:8,18 411:18
412:5,8,20,24,25
413:7,14,23 414:3
414:5,10,13
415:17 441:5,7
452:8 465:7,22
466:2 508:12
**expensive** 476:5
478:11,12,16
**experience** 481:12
494:25 506:8,17
514:16 523:9,10
523:16 537:19
**experienced** 576:5
**experiences** 507:7
**expert** 405:22
560:23 561:22
**expertise** 501:13
**expires** 589:23
**explained** 522:16
548:12
**explaining** 427:10
427:14
**explanation**
479:15 522:6
**explore** 478:7
**exploring** 538:20
538:21
**exponentially**
472:21
**expose** 548:25
**exposure** 463:17
**express** 501:12,17
501:22
**expressed** 498:19
**extension** 398:7

**extent** 375:22
376:2 392:6
414:11 430:16
439:11,20 440:9
441:2 502:11
506:4
**external** 411:2
414:7

**f**

**f** 334:18 486:15
587:2
**facility** 471:25
472:5 478:16,16
478:17
**fact** 429:10 431:14
432:8 439:19
460:2 549:6,11
574:14
**factor** 459:10
512:10,11
**factors** 461:19
**facts** 520:12
**factual** 557:21
**fail** 543:10
**failed** 542:25
543:5 580:25
**fair** 455:18 465:2
465:20,25 475:21
500:18 504:4
511:21 527:10
533:4
**fairway** 346:5,9
346:17 438:3
**faith** 518:9 540:3
**fall** 414:15 439:23
440:5 576:10
**fallen** 506:24
**false** 428:10
499:10,10 500:3
520:22

| | | | |
|---|---|---|---|
| **familiar** 350:25 | 365:7 366:1 367:1 | 473:1 474:1 475:1 | 579:3 580:1,22 |
| 393:2 415:17 | 368:1 369:1 370:1 | 476:1 477:1 478:1 | 581:1 582:1 583:1 |
| 417:21 459:7,8 | 371:1 372:1 373:1 | 479:1 480:1 481:1 | 584:1 585:1 586:1 |
| 470:6 479:10 | 374:1 375:1,5 | 482:1 483:1 484:1 | 586:8,18 587:1,9 |
| 526:18 583:3 | 376:1 377:1 378:1 | 485:1 486:1 487:1 | 588:1 589:1,3,4,19 |
| **familiarity** 405:20 | 379:1 380:1 381:1 | 487:24 488:1,6,25 | **feinsod's** 544:15 |
| 405:23 | 381:12 382:1 | 489:1,3 490:1 | **feinstein** 327:12 |
| **familiarized** | 383:1 384:1 385:1 | 491:1 492:1 493:1 | 329:15 334:8 |
| 469:22,23 | 386:1 387:1 388:1 | 494:1 495:1 496:1 | 341:18 343:12 |
| **far** 396:22 547:6 | 388:14 389:1 | 497:1 498:1 499:1 | 345:21 346:23 |
| **faster** 434:21 | 390:1 391:1 392:1 | 500:1 501:1 502:1 | 348:12 363:24 |
| **favorable** 525:8 | 392:14,15 393:1 | 503:1 504:1 505:1 | 364:4 365:8 391:8 |
| **february** 340:2 | 394:1 395:1 396:1 | 506:1 507:1 508:1 | 392:13 |
| 439:21 508:18,19 | 397:1 398:1 399:1 | 509:1,14,18 510:1 | **feinstein's** 408:6 |
| 535:21 536:7 | 400:1 401:1 402:1 | 511:1 512:1 513:1 | **fel** 509:2 |
| 550:10,15 554:18 | 403:1 404:1,14,17 | 514:1 515:1 516:1 | **fell** 492:3 |
| 557:5,15 558:7,14 | 405:1 406:1 407:1 | 517:1 518:1 519:1 | **felt** 426:17 462:8 |
| **fed** 477:16 | 408:1 409:1 410:1 | 520:1 521:1 522:1 | **fenler** 559:10 |
| **federal** 426:25 | 411:1 412:1 413:1 | 523:1 524:1 525:1 | **fenler's** 559:12 |
| 480:18 | 414:1 415:1 416:1 | 526:1 527:1 528:1 | **fiduciary** 419:5 |
| **fee** 543:21 561:10 | 417:1 418:1 419:1 | 528:25 529:1 | 568:2,4 |
| **feel** 426:17 | 420:1 421:1 422:1 | 530:1 531:1 532:1 | **fields** 489:10 |
| **feeling** 517:20 | 423:1 424:1 425:1 | 533:1 534:1 535:1 | **fifteen** 481:24 |
| **fees** 415:6 417:2 | 426:1 427:1 428:1 | 536:1 537:1 538:1 | 504:13 |
| 431:13 447:5 | 429:1 430:1 431:1 | 539:1 540:1 541:1 | **figure** 407:8 481:2 |
| **feinsod** 327:11 | 432:1 433:1 434:1 | 541:7 542:1 543:1 | 533:5 |
| 328:4 329:15 | 435:1 436:1 437:1 | 544:1 545:1,12,22 | **file** 444:15,22 |
| 332:18,25 334:1,7 | 438:1 439:1 440:1 | 546:1 547:1 548:1 | 458:9 546:21 |
| 334:23 335:1 | 441:1,24 442:1,8 | 549:1 550:1 551:1 | **filed** 332:25 |
| 336:1 337:1 338:1 | 443:1 444:1 445:1 | 552:1 553:1 554:1 | 401:15 450:2 |
| 339:1 340:1 341:1 | 446:1 447:1,17 | 555:1 556:1,19 | 457:17 479:5,22 |
| 342:1 343:1 344:1 | 448:1 449:1,15,20 | 557:1,25 558:1 | 484:6 505:4 519:3 |
| 345:1,19 346:1,21 | 450:1 451:1 452:1 | 559:1 560:1,22 | 521:11,13 524:8 |
| 347:1 348:1 349:1 | 452:25 453:1 | 561:1 562:1 563:1 | 524:20 525:2 |
| 350:1 351:1,23 | 454:1 455:1 456:1 | 564:1 565:1 566:1 | 547:3 571:10 |
| 352:1 353:1 354:1 | 457:1 458:1 459:1 | 567:1 568:1 569:1 | 580:3,5,6 |
| 355:1 356:1 357:1 | 460:1 461:1 462:1 | 569:19 570:1,16 | **files** 546:18 |
| 357:8 358:1,2 | 463:1 464:1 465:1 | 571:1 572:1 573:1 | **filing** 331:6 515:10 |
| 359:1 360:1 361:1 | 466:1 467:1 468:1 | 573:13 574:1 | 546:25 |
| 361:23 362:1 | 469:1 470:1 471:1 | 575:1,7 576:1 | **filings** 357:11 |
| 363:1 364:1 365:1 | 471:3,8 472:1 | 577:1 578:1 579:1 | |

**filled**  467:11
**film**  436:6
**final**  347:3,16
  397:13 398:15,18
  422:17
**finance**  385:4
  455:17 494:19
**financial**  335:24
  335:24 409:23
  444:22 454:25
  456:7 459:17,21
  459:25 460:6
  463:9 477:8,8
  482:10 492:2
  494:7 511:23
  539:24
**financially**  333:12
**financials**  580:10
**financing**  376:14
  478:8,12,21
  480:15 482:12
**financings**  414:14
**finanial**  417:3
**find**  370:13 394:18
  476:9 522:3
  529:14
**finding**  517:21
  538:21
**finish**  371:25
  479:24 483:24
  554:23,24
**firm**  333:7,10,22
  413:16 427:9
  462:3,10,19
  533:25 534:6,9
  564:19
**firms**  494:7,25
  510:8 511:5,20,23
  511:24 533:24
**first**  334:19
  336:15,18 337:15

338:5,7,10,14
341:20 342:13
345:3,8 346:2
357:15,17,24
363:22 365:2,5
381:11 385:2
388:22 405:4
443:21 446:16
450:2 454:13,21
457:6,12 469:4
471:13 473:4
476:17 486:3
494:2 496:16
498:18,24 503:8
508:25 515:19
516:15 526:17
527:22 529:20
536:21 540:9
**five**  422:6 441:14
  460:9 487:11,14
  574:8 583:17
**flabbergasted**
  521:9
**flag**  428:11
**flagged**  426:15
**flesh**  554:10
**flip**  490:13
**flooding**  477:16
**flow**  473:13
  577:12
**fly**  421:9
**flynn**  329:4 333:23
  334:5
**focus**  420:25 421:2
  462:8 503:25
**focused**  475:22
**focusing**  431:23
  497:8
**folder**  442:11
**follow**  409:24
  464:23 569:19

**followed**  410:8
**following**  430:15
  430:17 447:12
  451:13 514:8
  515:12 532:5
**follows**  334:21
**fonda**  425:18
  469:16 470:8
  478:25 479:3,17
  479:19 484:9
  485:19 496:21,25
  497:3,4 542:11
**foods**  438:8
**footnote**  566:14
**force**  331:16
**forces**  478:23
**foregoing**  587:8
  587:10
**forget**  535:15
**forgive**  370:6
**forlenza**  461:9,14
  462:3,20,21
  474:18
**form**  331:11
  340:14 348:5
  353:4 355:17
  356:21 370:24
  379:19 381:5
  382:2 410:20
  411:13 414:9
  423:25 425:15
  429:14,23 434:16
  435:9,14,19,25
  436:11,16,20,25
  437:6,11,20,25
  438:7,11,16,21
  439:2,7,17 440:7
  440:13 441:9
  448:20 449:5
  450:23 452:19
  453:8,11 458:17

465:24 474:3
479:8 491:12
492:14,21 493:6
500:22,25 506:16
506:19,20 517:7
522:13 523:2
526:21 532:14
536:15 537:13
544:11 563:15
564:6 568:3 574:4
575:3
**formally**  433:21
**formation**  451:6
**formed**  356:12
  460:11
**former**  519:7
**forms**  444:7
  481:19
**formula**  407:9,12
  413:3 414:23
  465:13 484:12
  543:5
**forth**  448:4
**forward**  470:22
  502:13
**found**  396:15
  422:13 423:2
  431:10 454:23
  456:7 480:12
  486:3 522:7
  523:25,25 549:11
  561:17
**foundation**  350:22
  353:4 369:7
  371:16 378:4
**founded**  442:20
**four**  460:8 488:22
  511:4 576:25
  586:9
**fractional**  484:10

**frame** 469:14
493:18 497:10
521:16 532:25
538:3 576:19
**frames** 553:10
**frankly** 578:21
**fraudulent** 525:21
552:21,23 555:16
582:16,17
**fraudulently**
552:10
**freiberg** 583:21
**front** 372:25
395:16 421:3
463:2 468:21
481:3 500:14
547:18 577:2
584:2
**frothy** 467:11
**fruition** 421:11
**fulfilling** 370:11
**full** 397:13 410:22
491:25 493:25
508:24 511:19
524:16
**fund** 348:16 368:8
369:10,11 372:23
373:19 386:18
432:9 489:12
494:21 511:11
514:25
**funded** 480:3,7,11
**funding** 327:7
332:24 334:2
358:6 369:13
370:10 401:4
402:17,22 457:16
480:24 572:24
**fundraising**
508:22

**funds** 338:25
339:8 340:6,13
342:21,22 343:3
344:8,9,25 348:3,4
348:25 351:13,15
353:14 354:9
358:13 366:2,16
374:22 383:22
386:14 387:3,19
387:20 452:3
483:4 511:14
544:7,23
**further** 331:9,13
522:2 538:13
540:5 573:4
577:23 587:13
**futue** 450:11
**future** 451:15,16
458:4

**g**

**g** 509:7,8,12
**gaap** 405:23,25
406:3,12 416:10
572:11,15
**gaas** 572:13
**gab** 368:11 369:4
374:13 375:3,8,19
378:2,25 380:18
380:22 381:3
388:19
**gap** 380:12 486:6
556:25 557:2
**gary** 327:12 461:8
461:13 475:12
484:5,15,18
**gene** 488:25 489:8
489:15
**general** 354:23
355:22 356:6
360:12 361:9
410:19 412:4

447:2
**generalization**
423:19
**generally** 355:25
356:16 405:25
408:24 446:8
473:6,8 479:11
483:12,19 510:14
**generating** 460:22
**generous** 525:5
**genesis** 554:9
**george** 373:4,7
511:10 582:10,11
583:20
**getting** 424:23
425:10 426:14
440:24 469:18
477:21 478:8
540:24 553:23
578:17
**gg** 509:8,14,15
584:8
**gist** 444:23
**give** 419:16 434:2
449:13 471:7
510:13 532:18
535:14 583:19
**given** 354:25
399:8 400:2 409:9
421:21 425:25
445:14 446:6
469:21 485:20
491:25 495:10,10
532:2 539:16
555:23 586:7
**gives** 349:21
353:18 552:16
**giving** 427:13
468:9 490:5,7
507:2 534:6
535:12 538:9

553:13
**gl** 413:22
**global** 477:8
**go** 332:14 341:4,7
346:13 348:3,24
353:13 357:14
358:12 359:14
360:3,5 364:9,23
368:7 369:8
372:22 373:18
374:9 378:7 381:7
383:16,21 386:12
387:25 389:3,24
392:11,12 399:4
404:5 417:23
418:2,21 427:24
446:2 447:23
451:20 470:11,19
474:2 476:24
480:25 485:16
499:15 507:3
511:5 518:20
519:11,18 520:9
527:13,24 531:23
533:17 534:14
535:20 545:10,11
547:20,21 560:12
565:14,21,21
570:3 573:9
**goal** 486:12
**goes** 408:25
433:17 446:8
**going** 332:3 357:3
360:8 370:6,7
386:20,25 388:4
404:7 409:13
420:25 421:9
425:6,13 431:24
433:6 434:25
437:13,14 439:9
441:17,24 444:16

454:3 456:16
483:5 485:23
487:16 491:17
493:12,12 495:12
497:14,19 503:5
507:12 518:5
525:5,19 535:14
537:5 539:17,20
545:16 556:17
570:8 576:2,4
584:17 585:13
**goldman** 495:2
511:17
**good** 332:2 334:23
334:24 335:18
404:17 468:20
495:3
**gotten** 490:2,3
492:3 497:2 574:7
**gottesman** 329:4
333:22 334:4
**government**
480:19 481:13
506:6,9
**gracie** 511:15
**grain** 511:13
**granito** 336:20
341:16 345:19
346:22 351:23
357:25 361:23
363:24 365:7
381:12 408:8
**granoff** 327:12
461:8,13 462:3,20
462:20 474:18
475:12 484:15,17
**grant** 504:11
**granted** 448:21
457:4 458:14
481:14

**granting** 457:10
458:21
**great** 477:11
500:20 501:2
522:15
**greater** 477:6
**green** 551:21
553:12
**grossly** 419:10
**group** 337:9 338:2
434:10,13 435:6
438:4
**grow** 379:6 456:11
456:11 460:8
472:21 477:24
480:15 508:14
**growing** 478:3
502:15
**grown** 423:4
**growth** 376:17
519:25 539:4
**gso** 421:18 422:17
511:15
**guard** 435:3
**guess** 378:19
398:23 400:7,7
413:4,19 414:20
427:15 428:11
446:16 447:12
458:21 466:17
469:9 472:13
473:7 474:25
476:19 484:8
489:14,23,25
495:7 503:2
531:12 534:5
537:16 569:23
579:3 584:6
**guidance** 354:25
409:9 427:7,13
428:13 431:3

486:13 499:11
**guy** 421:4
**guys** 417:16

**h**

**h** 334:18 588:2
**hair** 491:18
**half** 339:9 440:24
478:20 527:9
528:9 538:23
**hamesh** 447:15
449:7 465:4
486:14 487:4,7
500:23 509:6
528:19 540:4
544:14 545:9
572:22 580:20
**hancock** 349:3,11
349:22 353:17
354:3 360:13
361:4,12 372:3,5
373:3,16,20 387:5
**hand** 538:25,25
**handful** 473:23
485:7 500:14,15
530:6 531:9
**handle** 355:2
**handling** 462:25
496:22
**hands** 497:7
**handwritten**
374:12
**hanover** 329:7
**happened** 416:3
416:12 474:22,23
524:25 535:7
**happy** 395:21
396:2 425:20,21
491:21
**hard** 407:22
**hashem** 329:18
334:6,6 337:22

338:4,9 350:21
357:3 364:12,15
369:6 371:15
378:3,7 381:4
441:22 442:8,13
442:17 456:17
470:23 487:13
488:4 518:14
546:2 547:6 552:2
556:16 557:18
558:2 560:16,19
562:16 563:14
573:5,9 579:2
580:2 585:6 586:4
**hastings** 405:17
417:23 575:7
**head** 385:14
479:13 489:9
526:11
**headed** 413:11
**heading** 450:9
**heads** 428:12
**hear** 503:8 536:11
538:4 546:6
550:13,16,17,18
553:7
**heard** 485:5
511:10 522:21
523:3,10 536:19
581:3,5
**hearing** 525:13,13
540:25 541:4
**heavily** 419:13,14
419:24 420:22
454:8
**hedge** 489:12
**held** 328:5 332:15
426:19 461:23
462:23 464:21
472:22 513:24
523:15 536:19

547:5 582:13,13
582:24 583:3,6
**help**  428:14
538:21 539:3
577:20
**helped**  379:6
479:3 489:18
**helpful**  376:18
396:22 433:9,9
461:4 577:21
**hereto**  331:6
**heyman**  517:21
**hiding**  429:11
**high**  413:6,8
420:12,14 467:17
467:18 476:4
483:18 489:10
**higher**  469:7
**highest**  495:6
577:6 578:4
**highlighted**
514:17
**highlighting**  507:5
**highly**  574:4,6
**hired**  575:15
**historical**  481:12
**historically**  413:5
468:24 481:23
541:21 543:2
**history**  472:10
481:25 551:24
552:8
**hit**  471:4 488:14
**hodgepodge**
474:14
**hold**  415:3 447:22
518:19 536:12
538:22 541:15
560:10
**holders**  351:20

**holding**  443:3
455:21
**holdings**  340:8,23
438:14
**hole**  430:11
506:25
**holland**  330:4
334:10,13
**honest**  516:6
**honestly**  496:20
**hopefully**  442:2
**hourly**  561:10
**hours**  430:5 495:7
577:15
**howard**  327:14
435:11 564:15,20
**hudson**  362:2
438:13
**huh**  490:17 493:15
536:5
**hundred**  358:14
374:13 391:13
425:19 426:25
444:17 472:12
507:14 514:11
**hurdle**  520:21,22
**hurricane**  530:22
**husbandly**  427:13
**hypothetical**
416:4,15
**hypotheticals**
499:15

**i**

**idb**  543:20 544:7
544:24 545:24
546:9,11 548:5
**idea**  581:23
**identification**
336:9 341:6
357:13 363:19
381:10 388:9

393:20 401:19
442:16 449:11
456:22 471:2
487:19 509:11
518:13 528:24
546:16 550:7
572:17,18
**identified**  412:4,7
412:12 510:18
546:17
**identify**  510:22
**image**  410:9
**immediately**
515:19 542:15
543:22
**imminent**  534:8
**impact**  381:15,22
439:5
**impairment**
425:21 484:3,11
484:25 485:6
486:2,11 491:18
492:4 501:20
548:16 551:25
552:9 553:3,5
554:15 555:2,5,10
555:13,24 556:12
556:22 557:2,9,16
557:24 558:9,13
558:18,22
**impediment**
425:10
**important**  421:4
445:8 446:3
**impossible**  515:4,5
548:19
**impression**  516:23
517:4
**improper**  453:16
463:13

**inaccurate**  345:2
345:15,17 346:18
347:9,17 348:22
362:21 363:5
365:22 367:4
374:24 386:15
390:13 525:6
**include**  395:24
**included**  537:6
**includes**  479:8
568:6,8
**including**  421:17
422:24 441:6
470:2 500:15,16
577:2 580:15
**income**  566:23
**incomplete**  394:8
525:21
**incorporated**
437:23
**incorrect**  337:17
401:11,13
**incorrectly**  552:10
**increase**  478:4
**indebtedness**
566:23
**indefinite**  503:25
**independent**  330:6
334:11,14 339:20
404:20 406:15
437:16 439:14
**index**  445:7
**indicated**  432:20
587:10
**indicating**  534:8
**indication**  479:20
**indick**  327:15
431:8,8 432:2,19
433:19 436:2
437:9

**individual** 380:11 437:15 584:15,17
**individually** 376:5 380:17
**individuals** 517:13
**industry** 455:4
**infinity** 432:9,13 432:15
**info** 365:13,16 438:18
**information** 337:17 339:14 340:17 341:21 343:18 344:21,24 345:11 346:16 347:8,13,23 348:15,22 349:20 354:13 362:20 365:21 374:21 430:11,19 510:15 534:7 538:9 539:25 577:12,13
**informed** 490:21 491:8
**ingenious** 426:17
**inherent** 446:9
**initial** 497:8 521:2 530:20 566:13
**initially** 455:19 496:18 530:23
**injunction** 566:6
**inside** 423:9
**insolvent** 379:14 379:17 567:7,21 568:13,19,23 569:3,8,13
**instance** 420:3 493:25 582:10
**instances** 360:25 575:17

**instructions** 335:3 507:3
**insurance** 349:3 349:12,22 353:17 360:14 361:4,12 372:3,5 373:3 387:5
**intangible** 430:12
**integral** 395:6
**intent** 490:22
**intention** 472:2,3 475:19
**inter** 540:18
**interaction** 498:3 517:16
**intercompany** 356:24 404:24 408:24 492:20 493:4
**intercreditor** 540:17 541:19,20 541:23 542:7,13 542:18,22 547:13
**interest** 353:9 359:5,10 365:13 375:11 376:7 380:12,25 385:20 398:15 432:9,16 467:4 478:13,20 527:17 542:2 574:13
**interested** 333:13 423:15
**interests** 432:14 475:2 497:22,24
**interfere** 332:10
**interference** 332:8
**interim** 571:19
**internal** 403:23 445:18

**internally** 428:15
**interpretation** 521:25
**interrupt** 462:17
**interrupting** 540:22
**intertransfers** 355:3
**intervals** 567:18
**intimately** 526:18 534:2
**introduced** 489:8 489:15
**introductions** 414:4
**invest** 446:6 454:18,19 455:20 467:17 475:7 483:10 495:12 513:21
**invested** 454:14
**investigate** 515:15
**investigated** 422:20
**investing** 379:9
**investment** 368:18 369:3 375:7,18,25 376:9,11,18,23 377:16,25 378:13 378:15,21,24 379:3 380:5,8,16 380:21 381:2 389:20 425:22 426:2 431:12,23 432:4 433:2 447:3 452:6 454:14 455:6,7 459:10 460:5,20 472:5 474:6,7 486:6 489:18 494:9 495:7 497:6

**499:12 512:3,25 518:4 520:23 521:6 522:5 523:13 527:14,15 555:10 556:14 558:21 560:6 564:4 565:6,7,19 575:15 577:16 582:5 584:20
**investments** 414:9 431:19 446:12 452:6 473:19,23 474:10,10 477:15 480:7,12 483:13 512:23 537:4
**investor** 459:5 490:8,10 495:9 508:20 509:3,4 514:15,20,22 562:10 563:7,12 564:2,25 582:2 585:9
**investors** 485:7 494:15 503:23 514:7 531:10 534:17 562:19,24 563:18 576:21 577:10 583:8,10 583:24 584:12,14 584:21,23
**invoice** 382:9
**involve** 496:24
**involved** 385:14 393:13 426:24 504:5 505:19,19 581:21 582:4
**involving** 451:15
**issue** 426:13 427:9 427:18 428:14,22 429:5,8,19 484:25 498:25 499:10

503:7 507:4,5
513:21 514:21
516:19 539:2
541:12
**issued** 446:5 506:6
**issues** 503:5
**issuing** 479:11
**item** 416:9 492:22
492:22 505:15,16
**itemized** 411:18
**items** 385:2
500:15
**iterations** 379:11
**ivan** 327:13 529:7

**j**

**j** 327:13
**j.p.** 489:11,13
**january** 375:3
379:14,18 478:24
479:7 573:17
576:19
**jason** 517:11
**jmw** 327:4 333:4
**job** 421:12 506:22
**john** 327:13 349:3
349:11,22 353:16
354:2 360:13
361:4,11 372:3,5
373:2,16,20 387:4
529:6
**join** 460:17 481:18
**joined** 460:14
461:6,8 463:21,22
474:8,20
**joining** 473:24
**joint** 475:13
**jonathan** 509:19
509:20,22
**js** 327:4
**judge** 525:2,14,14
566:5

**judgement** 521:11
**judgment** 420:7
462:10 519:2,6
**july** 427:23 486:2
488:24 489:23
490:9
**june** 351:24
353:13,14 354:10
426:4 433:16
505:14
**jury** 576:4
**justice** 440:10
**justification** 522:3
**justified** 578:17
**justin** 526:6

**k**

**katten** 382:12
509:22
**kay** 375:12
**kbc** 471:15 476:23
478:15
**kbcs** 477:4
**keep** 430:2 491:17
491:18 501:3
578:8
**keeping** 440:16
500:19 578:6
**keeps** 421:22
**kelly** 469:16
542:11
**kelsey** 334:3 550:2
**kelsie** 329:11
**kept** 480:9
**kevin** 535:7
**key** 496:21
**kicking** 502:25
**kill** 429:12,20
**kind** 414:18 423:6
484:22 490:7
494:23 495:14
541:2

**knew** 350:4
484:20 516:2
**knight** 330:4
334:10,13
**knocked** 499:21
**knocking** 418:22
**know** 335:18,19
336:11 337:13
338:22 343:23
344:2 345:4
348:14 349:18
350:23 353:7
359:9 363:10
364:24 368:5
377:19,21,23
378:11 384:22
385:8,10 393:5,15
395:17 401:25
402:5 404:19
407:11 413:16,22
414:3,24 416:23
417:9 419:10
420:9,25 421:15
424:25 425:3
426:6,8 427:19
430:12,21 443:24
464:19 467:10
476:17 477:19
479:17 480:10
488:15 492:10
493:24 495:23
499:24 502:12
503:3,9 507:16
516:12 518:14
520:20 528:4
538:23 539:21
540:2 544:18
545:6 551:5 561:9
561:20 564:7,8,10
565:8,12 572:14
581:9,14,15,20

582:3,12 583:11
583:16 584:22
**knowledge** 451:2
503:4
**known** 444:13
485:10,21 504:12
525:11

**l**

**l** 330:9 331:2
334:18 564:16
**labeled** 530:13
**lack** 491:19
**lagged** 571:22
**laird** 327:13
434:14 436:8
529:6
**lamken** 329:13
**land** 489:24
490:11
**language** 453:22
**lapse** 544:21
**large** 483:21 494:4
583:21
**larger** 493:22
494:22 497:20
511:7
**largest** 422:14
462:4 511:12,14
511:24
**larsen** 330:11
334:12,12 441:15
**late** 432:7 482:5
483:9 484:23
546:13
**lattenberg** 564:15
564:17,18 565:4,9
565:19 577:3
585:15,18
**launch** 469:5
**law** 333:22 413:16
427:9 462:3,10,19

505:10,10
**laws** 505:9
**lawsuit** 370:8
396:17 524:12,19
527:22 528:3
538:10,14 548:11
551:18
**lawyer** 405:17
**lawyers** 413:17
427:7 461:25
499:10 515:15
561:17
**lead** 483:19
543:20
**leading** 517:5
534:10
**learn** 503:4 517:25
561:13
**leave** 543:22
565:25
**led** 396:23 461:17
510:13 517:19
**ledger** 360:12
361:9 412:4
413:22
**lee** 329:5 461:8,13
461:22
**left** 473:9,14
490:18 491:22,24
526:23
**legacy** 473:5,7,15
474:25 507:20
531:18 538:24
**legal** 390:8 413:25
414:12,12 462:5
508:12 519:2
547:7 556:18,20
557:19 558:3
**lend** 480:21
**lender** 468:7
534:10,11 538:21

543:20
**lenders** 531:10,11
534:16 539:3
**lending** 463:13
468:4 477:20
480:18 482:12
492:10 502:15
**length** 500:20
516:21
**lengths** 501:2
**letter** 375:4,6,14
375:16 378:14,23
398:24 399:13,22
427:17 443:18
449:16 471:13
503:20 535:21
536:2 551:21,24
552:6,7,12,16,19
552:20 553:3,11
553:20,24 554:6
554:21 555:8,16
555:20 556:2,11
588:15,16,24
**letter's** 556:20,24
**letters** 510:19,22
**level** 433:13 463:9
**levels** 463:12
**leverage** 472:20
483:17,17 507:24
512:13 548:23
**leveraged** 460:7
467:3 495:3 512:8
**liability** 578:23
**libor** 478:19
**license** 370:4
384:16 393:7,16
398:22 422:2,2,5
422:11 423:9
424:11,19 425:3
429:12,21 430:2
445:14,20,23

446:10,11 455:14
456:3,15 482:24
517:24 523:15
532:4,11,16,19
560:3
**licensed** 442:23
445:13,17 559:22
**licensee** 554:7
**licenses** 422:4,6
426:25 506:6
**licensing** 520:3
**life** 349:3,11,15,22
350:8,14 351:11
353:17,25 360:14
361:4,12,13,16
362:9,16 372:3,5
373:3,15 374:5
383:13 387:5,21
439:11 446:4,5
475:3,5,6,10
503:25 523:17
**liked** 496:18
**likelihood** 421:10
455:16
**limitations** 512:6
**limited** 503:16
504:2
**limiting** 512:10,11
567:5
**line** 336:15,19
337:3 341:20,22
342:8 343:15,19
343:21 344:18
346:2 361:25
369:18 373:22
374:18 382:8
383:8 386:9 387:7
403:6 412:13
471:14 478:21
492:13,22 589:4

**linear** 430:15
**lines** 363:2,4 421:4
477:18
**liquidating** 394:23
396:10 397:5
**liquidatio** 536:13
**liquidation** 385:15
392:17,21 398:3
474:21 513:8
526:12 534:9
535:19,23 536:25
537:20 538:5,12
548:15 549:15,20
549:23 550:12,19
550:24,25 551:4,9
551:14 553:15,21
554:3,5 557:8
**liquidations**
535:17
**liquidity** 467:18
477:13,14
**list** 493:24 510:7
510:20 576:23
580:15 584:2,7,18
585:14
**listed** 548:4
564:19 584:12
**lists** 548:2
**litigated** 515:15
**litigating** 538:7
**litigation** 382:14
396:14 515:11,21
515:25 520:11
548:20 554:10
555:17,21 566:3
**little** 425:4 464:12
474:22 488:16
535:20 577:22
**llc** 334:10 340:9
368:11 369:4
374:13 375:8,19

378:2,25 380:12
380:18 381:3
388:19 436:6
589:2
**llp**   329:13 330:4
**load**   549:24
**loaded**   456:24
**loading**   393:24
   449:12 509:15
**loan**   340:19,24
   342:11 351:2,16
   467:22 468:2
   469:15,19 470:3
   470:11 471:18,21
   472:16 473:15
   475:17,23 480:13
   483:21 485:4
   498:8,9 513:13,14
   530:10 531:19
   572:2,3
**loaned**   350:19,23
**loaning**   408:16
**loans**   446:20
   447:10,11 451:22
   452:2 453:23,23
   454:2 462:7,9
   467:13,16 468:11
   468:15 473:9,15
   474:14,23 475:25
   476:7,11,14
   481:10 483:15
   494:22 495:4
   508:2 531:18
   538:24 571:6
**lobbied**   499:23
**located**   332:18
**lock**   446:14
**log**   442:4,9 525:3
**long**   404:22
   417:10 430:3
   481:3,15 488:15

491:20 518:17
521:25 563:19
571:2
**longer**   384:10,15
   445:22 533:7
   538:22 553:7
**look**   338:24 340:5
   358:5 378:20
   387:23 389:4
   394:18 397:9
   401:21 407:21
   421:5 443:21,24
   446:15 447:21
   451:10 457:5,14
   457:24 470:20
   483:16,17 487:25
   529:3 543:6
   544:18 550:8
   551:19 560:9
   571:25 576:2,11
   580:13 584:6
**looked**   338:12
   351:6 377:8
   393:21 424:4
   478:10 543:8
   571:12 582:8
**looking**   338:14
   346:14 347:21
   354:7 362:25
   367:22 376:9
   381:25 389:6
   402:13,25 403:2
   417:16 421:16
   430:17 445:7
   447:6 470:16,21
   476:24 478:18
   489:22 511:9
   520:22 521:19
   524:8 530:12
   533:2 539:3
   552:20 560:13

566:16 584:18
585:14
**looks**   341:17
   347:18 354:4
   358:6,17 361:6
   362:22 364:25
   365:10 366:21
   382:18,21 398:24
   403:22 532:22
   533:11 576:7
**loosely**   413:20
**lorber**   564:16,20
**lost**   385:15 446:14
   486:16,18,20
**lot**   363:16 377:6,8
   396:19 423:14
   504:5 505:11
   507:16 575:8
**low**   483:17
**lower**   469:6,7,8
   502:8,11
**lowest**   513:4
**lt**   504:2
**luck**   335:18
**lucrative**   421:23
**lumping**   439:10

**m**

**m**   334:18 574:12
**m&a**   405:17
**mail**   336:14,16,21
   336:25 337:7,14
   341:10,15,19
   342:12,14 345:18
   346:3,11,20 347:8
   351:22 352:3
   357:24 361:21,24
   362:21 363:11,14
   363:23 365:5
   367:23 378:17
   381:11,18,21,25
   383:4 488:24

489:7 490:5,7
509:17 529:6
588:6,7,8,9,10,19
588:20,21,23
**mailed**   427:17
**mails**   347:11,20
   362:23
**main**   444:23
**maintain**   452:4
**maio**   488:25 489:2
   489:9
**major**   511:22
**majority**   474:16
**makeup**   539:4
**making**   367:17,17
   384:5 459:10
   477:15 582:4
**man's**   489:24
   490:11
**manage**   476:6,8
   483:20
**managed**   378:10
   453:21 455:16
   476:10 519:24
   527:13 535:17,19
**management**
   336:4 352:21
   354:20 407:7
   410:12,13 412:21
   422:16,17 424:7
   424:17,21,22
   426:12 447:5
   460:25 461:3,5,7
   461:12 462:22
   475:12 489:10
   494:8 498:21
   501:4 532:4
**manager**   375:12
   475:12
**managing**   412:22
   520:3 537:7

mandated  485:11
manufactured
  427:8
march  336:14,22
  337:18 339:2,8
  340:7 341:17
  344:8 345:13,23
  346:11,21 348:5
  348:17,25 349:10
  381:13 383:22
  384:4 386:2,11,11
  386:14,17 387:9
  398:6 439:22
  518:22 531:12
  534:18 551:22
  553:12 554:21
margaret  373:24
  373:25
marie  330:11
  334:12
marino  360:17
mark  447:16
  456:18 509:8
  528:16,21
marked  336:8
  341:5,11 357:12
  363:18 381:9
  388:8 390:20
  393:19 401:18
  403:23 442:10,15
  449:9,10 456:18
  456:21 470:24,25
  487:18 509:10
  518:12 525:7,8
  528:23 529:2
  550:4,6
market  462:13
  463:17,18 477:3
  477:17 478:12,23
  479:10 480:9
  507:25,25 508:2

marketed  531:20
marketing  433:10
markets  477:9
martin  330:9
  334:9 404:18
  486:5,5 487:8
materials  469:2
  499:14 526:22
  529:14
math  542:25
mathematically
  542:25
matlin  584:25
matter  332:22
  409:6,8 410:19
maximize  419:17
  472:22,24
mean  345:10
  367:21 369:24
  405:25 407:9
  410:13 421:15
  424:5 444:10
  488:3 548:17
  585:8
meaning  420:20
  445:14 455:14
  468:6 469:19
meaningless  585:7
means  413:18
  580:9 581:24
meant  502:9
  510:20 584:3
medallion  454:25
  455:3 456:6
  459:17,20,25
  460:6 462:13,14
  463:5,7,23 464:25
  466:4,5 467:20
  469:11,18 470:15
  473:10,11 476:20
  480:13 482:10

503:13 542:17
  571:6 572:2,3
medallions  463:3
  463:11,14
media  332:16
  388:5,12 487:22
  570:9,14 586:9
meet  531:21
meeting  340:3
  385:12 433:16
  485:11 490:25
  491:6,8,22 492:17
  505:7 526:3,5
  527:13 529:15,17
  529:21
meetings  510:14
  510:25 511:22
  534:15,19 567:23
member  390:8,18
  459:13 461:11
  516:10
member's  390:21
members  517:14
  523:13 567:25
membership
  375:10 388:19
  588:11
memeo  358:7
memo  357:23
  358:6 427:10
  566:20 567:4
  574:12
memorandum
  375:9 378:20
memory  361:14
  361:20 366:12
  379:25 396:3
  397:8,20 398:24
ment  420:24
mentioned  425:2
  426:22 444:12

458:25 459:16
  462:19 463:4
  464:18 465:6,12
  472:17 473:3
  475:16 481:9
  482:2 484:14
  491:2 492:12
  498:11 501:7
  505:18 508:10
  513:11 577:24
merge  456:10
merged  443:10
  456:4
merger  454:24
  456:6
mergers  414:13,14
  426:23
meritorious
  396:17
message  336:25
met  404:18 408:23
  422:14 490:20
  494:3 497:17,18
  508:25 526:17
  531:9 536:21
  551:2,7,17
methodology
  415:22
metrics  468:22
  498:13
michael  327:11
  328:4 329:15
  332:18,25 345:19
  346:21 351:23
  357:25 361:23
  363:24 364:4,17
  365:7 369:16
  375:5 381:12
  391:8 488:24
  509:13,18 556:17
  586:8,18 587:9

589:4,19
**microphone**
541:13
**microphones**
332:5,10
**mid**  468:23 469:4
498:6 505:14
**middle**  488:17
507:25 508:2
**midst**  492:6
**mildly**  459:7
**million**  337:20,23
339:3,10 342:9
343:2 344:10,13
345:12 351:2
370:18,21 371:13
398:11,14 440:11
440:11,14,19,23
464:17 466:19,21
466:23 468:15
471:22,23,23
479:21 483:14
485:8 492:8 527:5
527:8,9 528:5
530:7,12,24
538:24 570:18
**mind**  507:11
**mine**  541:14
582:21
**minimus**  484:19
499:19
**minute**  388:2
403:25 404:25
417:13 434:2
487:11 534:2
539:13 545:10
569:15
**minutes**  441:14
487:6,12,14
548:17

**mirimax**  337:9,19
338:3,20 436:6
**mirror**  410:9
**mirrors**  518:9
**miscellaneous**
360:19
**mischaracterizes**
371:17,19 378:4
562:17
**misguidance**
428:15
**missing**  394:10,12
394:14,17,19
396:9 517:19
**misspelling**  358:6
506:20
**mistitled**  400:13
**mitigate**  566:18,25
**mo**  499:6
**mod**  427:6,6,15,18
428:5 429:5,19,20
498:25 499:7,16
499:21 500:16,16
520:24 521:2
522:2 582:16
**mode**  431:18
**modified**  458:8
**moelis**  422:19,20
489:15,17,18
494:4 511:16
585:15
**molo**  329:13
**moment**  449:13
**monetary**  549:7
**monetizing**  431:19
**money**  337:10
350:19,23 381:23
383:11,13 408:16
420:2 421:23
431:20 432:3
437:17 440:10

446:7 448:11,18
448:25 463:13
477:17,20 480:5
480:11,20 482:14
483:8 485:3
489:19 513:12
514:6 515:3,7
524:5 531:4
536:24 582:11
**monies**  351:9,18
354:20 377:2,3,14
377:24
**month**  385:24
407:6 482:3
**monthly**  406:25
407:19 542:20
**months**  469:20
480:2,3 481:11
536:10 537:16
**morgan**  489:11,13
**morning**  332:3
334:23,24 404:17
**morphed**  431:2
**morris**  385:13
398:2 526:9,10,11
526:17 534:2,6
539:16 551:12
**motion**  521:12
**move**  415:15
417:7 467:12,23
502:13 528:11,12
**mrf**  388:23,25
**mullens**  327:11
336:18,21 341:16
345:20 357:25
365:8 381:13
408:7 491:3
**multibillion**
494:20
**multipage**  365:2

**multiple**  360:18
392:5 409:17
578:20
**murray**  327:14
**mutual**  395:10,13
397:4

**n**
**n**  329:2 330:2
331:2 334:18
587:2
**name**  333:6
377:17,18 378:12
380:6,6,17 390:8
391:15 510:19,23
559:12 564:11
572:21,24 589:3,4
**names**  511:10
**namesh**  371:7
**nature**  483:13
**ndas**  576:8,22
**necessary**  410:16
521:4
**need**  364:12,16
442:4 445:5 542:6
552:3
**needed**  451:8
505:12
**needs**  490:15
507:4
**negative**  543:3
**negotiate**  563:20
**negotiated**  393:9
419:13,24 440:21
450:24 454:8
530:17 540:19
559:5
**negotiation**  559:9
**negotiations**
397:25 451:3,5
524:22 525:24

**neither** 499:25
**never** 380:19,23
  381:6 393:13
  401:24 402:4,6,10
  402:14 403:14
  416:11 420:15
  427:2,3 476:16
  501:16 506:24
  537:11,15 581:3
  582:14
**new** 327:3 328:8
  329:8,17,17 330:8
  330:8 332:20
  333:3,7,10 334:20
  335:8,10 349:4,12
  349:23 364:20
  375:24 376:13
  422:15 424:11,12
  463:8 470:16
  474:7,17 477:4
  479:12 481:4
  490:22 491:9
  493:3 501:14,14
  505:10 508:20
  513:2 520:3
  564:18 585:20
  586:10 589:2
**night** 427:16
  496:12
**nilly** 578:3
**nine** 365:3 479:25
**non** 464:11 473:9
  494:22
**nondisclosure**
  510:15,17 563:8
  564:13
**normal** 352:12,13
  356:11,14 384:8
  427:4 456:3
  496:20 505:6

**notable** 459:24
**notary** 328:7
  331:15 334:19
  587:7 589:22
**note** 332:5 339:16
  340:2 343:20
  344:21 345:14
  346:23 347:4,16
  348:19 351:4,20
  432:17 440:19,20
**noted** 586:11
**notes** 343:17,23
  344:4,4 439:25
  587:12
**notice** 328:4
  418:25 486:2
  552:16 553:13
  555:22
**noticing** 333:20
**notion** 578:19
**notwithstanding**
  554:2
**nova** 340:25
  351:14,16 417:13
  417:15 418:14
  422:25 424:23
  428:3,21 433:4
  439:25 440:19
  490:11 493:14
  494:23 495:9,17
  495:25 498:11
  502:12 503:14
  504:10 515:18
  516:11,16,20
  517:10 562:9,12
  564:14 565:3,18
  573:19,25 574:18
  574:22 578:17
  580:24,25 581:9
  581:19

**november** 327:19
  332:4 363:23
  365:6,24 366:17
  367:4,13,19 368:8
  390:4,7 443:19
  449:16 457:17,18
  529:5,21 530:8
  533:4,19 589:3
**nuances** 505:11
**number** 332:16
  333:4,5 349:21,21
  350:2,2 353:19
  373:25 388:5,13
  402:25 422:23
  434:5 487:23
  570:10,15 584:8
  586:8
**numbers** 363:7,9
  468:21 498:15
**numerous** 468:16
  523:4 568:5

**o**

**o** 331:2 334:18
  419:22 420:20
  511:4 564:16
  584:7,12 587:2
**o'clock** 427:17
**obama** 480:22
  481:5
**object** 357:4 369:6
  379:19 506:15
  517:7 556:17
**objected** 453:10
**objecting** 491:11
**objection** 337:22
  350:21 353:3
  355:6,16,21 356:3
  356:18 370:23
  371:14,15,16
  378:3 381:4
  408:20 409:15

411:12 425:14
  428:8 429:13,22
  433:23 434:15
  435:8,13,18,24
  436:10,15,19,24
  437:5,10,19,24
  438:6,10,15,20,25
  439:6,16 440:6,12
  441:8 448:19
  449:4 450:22
  453:7 458:16
  465:23 493:5
  500:21,25 522:12
  522:25 532:13
  536:14 537:13
  544:10 547:6
  552:2,22 557:18
  558:2 562:16
  563:14 564:5
  568:3 572:22
  574:3 575:2
  576:14 585:6
**objections** 331:10
  333:17 452:18
**obligation** 407:8
  558:8
**obligations** 542:12
  543:15
**observed** 461:11
**obviously** 567:24
  571:6
**occasions** 468:16
  496:2
**occupied** 406:21
**occur** 338:21
**occurred** 339:22
**occurring** 339:21
**october** 335:2
  361:24 375:9
  390:6 408:24
  411:20,23 412:3

416:24 470:17
485:9 490:20
492:18 525:24
528:13 538:17,17
554:19 556:5,6
**odd** 366:23
**offer** 419:19,20,21
419:23 420:19
495:15 526:25
562:12 563:24
565:9 577:7,8
**offered** 420:2,4
**offering** 420:5
**offers** 573:15,24
**office** 398:3
474:21 477:4
504:13 526:12
535:23 536:25
537:20 538:5,12
549:14,19,22
550:11,19,23
551:4,8,14 553:14
553:21 554:3
557:7
**officer** 335:23,25
481:18
**officers** 567:25
**oficce** 519:21
**okay** 335:7,13,22
336:13,24 337:6
338:9,16,24
339:13,19,24
340:16 341:15
342:3 343:9
344:17,23 345:10
345:18 346:2,8,20
347:2 349:7 350:4
350:7 351:6 352:5
353:8,23 354:18
357:19 358:21
359:8,20,25

360:10 361:21
362:7 364:10,25
366:9,14,24
368:17 369:2,8,20
372:15 373:18
374:20 375:21
376:4 377:10
378:22,22 379:23
382:5 384:19
385:16 386:8
387:3,9 388:18
389:12,24 390:5
391:10,20 392:2
392:10,25 393:5
394:4,7,11,16,20
394:24 395:17
396:11 398:13
399:12,24 400:4
400:15,21 401:20
402:15 403:5,8,20
403:25 405:3
409:10 411:23
413:10 415:5,9,14
416:22 418:17
419:4,18 423:14
423:22 426:11
431:17 434:9,12
437:13 439:19
440:9 441:2,11
442:12 447:24
450:7 457:4,5
471:7 487:7 499:3
501:11 506:8
524:11,20 530:16
531:3 546:8,15
547:12,19 548:8
549:5 551:3,11,19
551:23 552:6,11
553:11 554:10,22
556:11 557:5
558:20 559:8

561:19 562:3,7
563:10,10 564:10
564:21 566:8,16
566:24 567:13,16
567:24 568:10
571:12,20 572:7
572:10,16 573:11
573:22 575:11,21
575:25 576:15
580:20 581:5,8,17
583:15,18 584:11
**old** 376:12
**ols** 535:13 538:9
539:2
**once** 411:5,7
415:23 494:3
497:5 506:2
515:17,18 528:25
535:6 542:3,3,21
542:22 543:3
549:11 578:11
**ones** 411:22 422:8
584:22
**online** 394:18
**open** 336:11,12
344:16 364:24
467:17 503:22,22
503:23 509:12
565:25 584:9
**opens** 578:22
**operate** 445:5,15
446:18 531:22
533:6
**operated** 415:3
450:20
**operating** 380:2
384:9 392:16
430:21 441:5
452:7 461:14
505:9 542:8
559:24 560:4,5

**operation** 451:7
**operational** 465:3
**operations** 412:23
445:2 450:8,11,15
472:14 519:21
550:18
**opinion** 347:24
348:2 431:5
461:15,16,18
463:9 520:16
522:9 523:23
527:21 582:18,20
**opportunity**
535:14
**opposed** 377:18
445:16
**opposite** 418:4
**optics** 433:11
**orally** 479:19
**order** 342:21,22
395:2,18 400:12
401:14 409:18
428:4 444:8,24,25
445:6 448:6,23
451:8 452:12
456:14 457:4,10
457:25 458:21
459:4,15,22 460:3
472:23,25 486:7
495:6 505:12
511:6 531:13
534:22 537:22
539:7,10 559:3,18
559:21 588:17
**organization**
430:16
**organizations**
422:15 512:9
**organize** 503:15
**organized** 463:17

oriented 376:17
original 397:22
  519:12 520:24
  527:11
originally 471:19
  471:21 475:8
originated 468:14
originating 507:25
ot 405:14
outcome 333:13
outside 379:4
  461:24 514:7
  534:6
outstanding 443:7
  464:9,10 513:7
overhead 537:7
overnight 466:9
oversimplifying
  419:9
overvalued 463:8
overview 531:25
owe 353:8 385:21
  567:25 568:4
owed 415:25 416:7
  416:7 417:5
  418:13 527:3
  528:8 533:21
owen 461:9
owing 398:14
owned 349:16
  361:16 410:2
  423:10 443:12
  444:17,18 446:19
  453:18 458:3
  474:15 507:22
  511:15,16 512:16
  533:15 572:5,20
  572:24 583:20,22
  583:24 584:14,16
  585:11

owner 472:12
  583:11
ownership 426:13
  498:21 580:25
  581:22 582:6,25
  585:4

**p**

p 329:2,2 330:2,2
  331:2
p.c. 329:5
p.m. 586:6,11
pace 406:22
package 456:13
  479:4,7
packages 483:18
page 338:5,6,8,11
  338:13,15,25
  339:6,7,18 340:5
  341:7,9,13 343:22
  344:6,7,16,25
  345:18 346:13,14
  346:15,20 348:4,4
  348:24,24 350:3
  351:22 353:13,23
  354:13,14,15,16
  354:16 357:15,15
  357:17,20,24
  358:12,24 359:14
  359:18,22 360:4,9
  360:9 361:15,22
  363:22 364:23
  365:2,3,5,25
  366:15,19,22
  368:7 369:9,11
  372:12,18,22
  373:11,12,18
  374:9 375:2
  381:11 383:21
  384:2 386:2,11,12
  386:24,24 388:22
  389:3,4,6,9,24,25

390:3,15,19,21,22
  390:23,23 391:12
  391:12,13,16,17
  391:19 400:22,22
  400:24,25 402:11
  403:4,4,10 405:5
  443:21,23 445:7
  446:13,15 447:20
  447:23 450:5
  451:11 457:5,15
  471:13 481:4
  488:22 490:13
  493:12,13 498:17
  498:17 502:3
  508:19 519:11
  522:18 529:20,22
  530:3,4,13 531:23
  547:21 548:2
  553:17 555:12
  560:14 565:22
  566:2,16 588:5
  589:4
pages 372:6,7
  392:2,7 419:10
paid 342:4 343:16
  359:11 362:10
  365:12 382:9,10
  382:10,25 398:15
  406:24 407:24
  416:2 431:14
  434:14 435:5,12
  435:17,22 436:3
  436:13,17,22
  439:12,14 464:8
  465:8 471:25
  477:21 492:24
  542:23 543:14
  544:5 561:2,8,9
  573:25
papers 377:8
  412:7,9

paragraph 397:9
  398:21 399:11
  446:17 451:11
  453:14,22 457:15
  457:25 519:14,18
  521:20 523:12
  553:16 554:8
  555:12,15 556:6,8
paragraphs 385:8
  554:8
parent 352:17
  355:2 405:8
  406:16 425:23
  453:24 458:4,7
  492:13,19 493:11
parent's 406:7
park 329:16
part 339:14,25
  370:7 394:6 395:2
  395:5,6,12 415:10
  415:11 449:24
  450:13 473:4
  474:11 477:5,12
  489:11 491:7
  493:10 500:17
  504:6 519:5
  520:10 532:9
  533:16,17,21
  540:9 579:3
  581:10
partial 398:10
participant 483:22
  497:20
participated 379:9
participating
  463:18
participations
  483:15
particular 415:25
  544:7

**particularly**
406:13
**parties** 331:6
332:13 406:9,12
407:14 409:18
421:17 422:23
525:16 527:12
568:5 577:4,4,5
**partner** 483:20
494:8 509:21
**partners** 360:17
432:15
**partnership** 475:2
503:16 504:2
**parts** 525:11
**party** 333:11
337:14 417:15
508:8 544:3
587:14
**path** 430:15
**patience** 488:21
**patterson** 584:25
**paul** 405:17
417:22 425:18
428:15 470:2,7
484:8 485:9,19
491:3,14 492:17
493:9 496:5,16
497:4,9 503:12,17
536:3,12,19,20
542:11 543:11
550:16 553:7,8,20
553:20 557:6,13
575:7 583:21
**pause** 394:2 402:2
404:3 434:3 444:2
449:14 488:19
541:16 552:5
569:17
**pay** 351:10,13,16
351:19 362:16

383:13 387:21
407:18 408:16
416:8 440:4 441:4
452:4,7 493:3
495:5 531:4,5,15
533:20 537:5
573:20
**payable** 343:17,24
**paying** 408:17
439:24 478:19
542:16
**payment** 349:14
349:18 350:5
353:25 360:13
361:3,11 362:9,10
370:14,17 371:12
372:19 373:2,14
383:8 397:12,19
398:8,10,15,18
554:25 555:4,7,9
556:13,25
**payments** 350:13
362:17 372:3,4
**payoff** 340:17,18
340:22
**pc** 333:23
**pdf** 341:13 357:18
357:20 365:3
366:19 389:4,6,24
391:13,16 400:22
403:3 443:23
488:22 519:13
528:15 529:23
530:4 531:24
**pe** 431:9
**peak** 570:17
**peaked** 464:16
**people** 418:18
421:17 422:13
463:10 469:25
481:2 492:6 501:6

501:8,9,14 504:13
508:25 516:7
517:11 518:2
527:15 533:24
534:19 559:11
574:10 578:2
**percent** 375:10
414:24,25 425:19
444:17 455:9
464:21,24 465:19
466:2,17,25
468:25 472:12
478:20,22 507:14
**percentage** 413:9
484:10 553:4
558:12,22
**perception** 427:15
**perfect** 506:18
569:23
**performance**
468:17 470:13
498:7
**period** 382:18,21
382:24 407:7
416:25 418:12,19
428:2 441:6
468:12 479:25
486:12 531:11
533:8 538:14
545:3 549:15
552:17 554:5
562:22
**permanency**
421:25
**permanent** 394:23
396:10,25 397:5
422:5 446:10
**permission** 447:9
448:15,24 452:16
**permit** 458:2

**permitted** 354:24
418:23 419:3
458:6
**permitting** 447:4
**perpetual** 445:14
445:23 523:14,17
**perpetuity** 445:15
**person** 367:24
496:21 516:11,18
526:2 535:8 553:9
581:22 582:6,25
583:11,23,25
585:5,11
**personnel** 343:7
413:24 414:17,18
**persons** 553:10
**persuaded** 455:19
**pertinent** 394:14
**peter** 327:15
435:21 529:6
**phelps** 504:14
**phone** 535:25
536:3 557:10
**phones** 332:9
**physically** 532:21
**pi** 566:9
**pick** 332:6 406:20
494:15
**piece** 520:20,20
**pieces** 517:19
**pinebrook** 511:13
**pipeline** 480:4,9
**pivot** 468:2
**place** 332:9,13
337:7 361:7
446:15 463:13
527:22
**placed** 401:8,10
534:9 549:16,22
551:8 569:11

**placement** 375:8
378:20
**places** 361:7
**plainly** 436:2
**plaintiff** 327:9
329:6 332:21
333:24 551:16
**plan** 467:6,9,12
469:24 476:6,13
480:19 491:9
550:25
**plaque** 379:4
**plate** 437:16,18
**please** 332:5,8
333:14,17 334:16
336:11 347:2,14
351:24 357:14
364:23 375:5
378:22 388:2
441:23 443:21
446:14 447:16
449:8 453:12
456:17 486:15
487:24 509:7,7
518:11 519:10
528:16,22 529:2
529:13 547:20
550:9 551:20
560:10 565:25
569:16
**pleased** 491:16
**plus** 365:13
398:14 466:19
478:19
**point** 371:23
392:18,23 400:8
422:7 425:24
426:12 428:18,19
430:25 432:2,19
433:19 456:6
460:12,14 463:19

464:11 469:3
470:5,12 478:13
483:4,5 484:2
489:9,25 492:4
497:3 498:6 502:5
503:2,12 515:10
518:25 524:25
528:12 532:22
538:7 543:11,20
544:21 545:8
557:3 572:9
576:11,22 578:14
**pointed** 367:24
**points** 434:4
**policies** 349:15
350:9,15 351:11
361:17 372:7
374:6 409:24
439:11,13 475:3,5
475:6,11
**policy** 349:20,21
349:25 353:19
354:2 361:13
373:4,4,15,25
383:14 387:5
408:25 409:6,7
424:8
**pollack** 349:20,25
353:18 382:25
383:8 387:6,15
**poor** 540:23
**popped** 534:10
**porr** 462:10
**portfolio** 421:23
462:13,14 463:5
464:7,14,15 466:5
466:18 467:7
468:25 470:15
472:6 473:11,12
473:16 474:25
475:17,23 477:25

478:3 480:14,16
482:14,19 485:10
485:19 490:21
491:6,7 508:5,14
513:14 526:19,20
526:20,23 534:7
539:25 572:2,3
**portion** 416:24
**poses** 423:24
**position** 335:8,10
335:23 427:11
497:19 519:24
**positions** 461:23
**possession** 396:22
482:24
**possible** 430:3
454:7,17 544:23
**post** 510:4
**potential** 414:9
421:17 423:3
490:8,10 494:15
495:9 517:14
534:11,16,16
553:18,25 562:10
562:19,24 563:6
563:12 564:2,25
577:10 583:24
584:11,13 585:9
**potentially** 335:17
336:7 354:11
**powerful** 423:21
455:14
**practical** 513:22
**practice** 356:15
521:25
**practices** 367:7
**precedents** 445:8
**predecessor**
474:12
**preferred** 513:6,6

**preliminary** 566:6
573:18
**premium** 349:14
351:10 353:25
361:13 362:10,17
372:20 373:15
382:25 383:14
495:6 565:11
**premiums** 350:14
387:21
**prepared** 490:4
499:14 535:18
**present** 330:14
495:22,24 526:4
535:15
**presentation**
485:22 489:14,16
489:17 492:7
**presented** 468:16
526:24
**president** 389:16
391:8 401:3,4
463:20,22 480:22
481:5 567:14
**press** 509:19,20,21
**prestigious** 511:8
**pretext** 429:20
**pretextural** 428:7
428:10 429:25
**pretty** 417:17,19
498:12 511:11,22
**previous** 471:25
**previously** 351:7
377:2 481:9
522:10,20 540:9
**price** 495:11 502:8
502:11 565:5,8
574:20
**pride** 431:10,14,18
514:12

**pride's** 432:4,14
432:16
**primarily** 462:7
**primary** 440:2
481:8 509:24
540:17 541:21
**principal** 468:10
**principals** 494:23
517:9 582:9 585:3
**principles** 406:2
**prior** 352:18,24
458:24 464:13
473:24 484:24
507:7 515:13
519:19 534:5
562:8 563:4,12
581:18
**private** 332:7
375:8 378:20
511:5,20,24
**privilege** 525:3,19
**privileged** 525:9,9
**probably** 396:21
397:8 413:19
414:20 427:16
430:10 460:8
464:24 469:20
476:2 477:5
484:20 485:7
486:5 490:3
532:25 565:13
574:8
**problem** 425:5
447:19
**procedure** 392:17
418:25 430:21
**procedures** 409:24
**proceed** 566:15
574:24 576:12,13
**proceeding** 333:17
536:13 538:11

**proceeds** 337:20
342:6 346:10,17
361:25 365:17
434:13 436:7
437:18 439:13
441:3 446:12
537:5
**process** 410:13
417:10,18,20
419:15 425:18
427:25 430:3,18
430:22 431:3
443:5 456:8
469:18,19 497:4
498:11 500:5,6
504:21 505:25
506:22 514:12
515:13 516:9,25
517:5,12 522:11
523:11 537:8
575:16 576:8,18
577:18
**processed** 481:22
496:19
**produced** 521:22
525:11
**producing** 466:16
**production** 539:22
**productions**
525:22
**products** 362:2
438:13
**profile** 467:19
**profit** 460:22
**profitable** 476:11
544:2
**program** 424:17
469:15 481:24
497:21 498:8
519:25

**programmatic**
424:8
**progress** 426:20
426:21
**progressed** 417:19
**progressively**
493:21
**prohibit** 447:3
**prohibitions**
446:23
**project** 488:21
**projected** 530:20
**prolong** 430:3
**proper** 407:9
**properly** 423:5
455:15,16
**property** 448:11
448:12,18 454:5
**proposal** 421:6
491:15 493:3
536:23
**propose** 536:22
**proposed** 450:8,14
450:19 512:3
**prosecute** 548:14
**protect** 410:10
419:16
**proved** 548:19
**proven** 469:9
**provide** 430:19
561:5
**provided** 473:12
**providing** 452:3
462:5
**provisions** 418:20
448:7
**proxy** 422:21
433:17 504:21
505:3,4 510:2,3,12
510:14,18,21
565:16 577:17

**prudent** 578:23
**public** 328:7
331:16 334:20
405:16,16 423:11
451:9 454:5
504:17,22 575:12
577:14 587:7
589:22
**publically** 336:5
455:2,24 482:7
582:12 583:3,6
585:10,13,16,18
585:23
**publish** 445:21
**pull** 371:22,23
395:14,20 441:22
449:7 470:23
486:14 509:6
518:10
**pulling** 477:18
**purchase** 419:2
448:10,17 449:2
452:9 495:18
514:22 563:17,19
577:17
**purchased** 432:9
432:13,16
**purchasing** 422:20
**purports** 381:19
**purpose** 426:7
439:24 447:2
452:3 507:19
514:24 541:25
**purposes** 412:2
510:18
**pursuant** 328:4
468:12
**pursue** 548:15
**pursuing** 494:21
**push** 503:10

pushing  463:10
put  341:3 363:8,20
  381:7 391:10
  392:10 403:20
  423:6 479:18
  480:6 483:9 487:3
  515:8 525:17
  543:3 548:8
  558:24 573:16,24
  576:13
putting  360:6
  491:19

**q**

qoe  504:13
qualifications
  452:5 501:13
quality  467:18
  476:8 483:16
  504:11 540:22
quarter  407:7
  414:22,24 415:25
  416:8 465:17
quarterly  356:20
  571:21
question  331:11
  336:3 339:6
  342:20 350:17
  354:8 356:4
  368:21 377:20
  380:14 385:15
  413:4 415:15
  428:20 447:13,14
  453:12 465:5
  475:20 493:8
  514:9 533:18
  534:14 554:24
  566:2 569:5 573:6
  573:8 574:5 579:2
  581:24 584:3
questionable
  467:11

questioned  411:15
questioning
  422:11
questions  335:4
  404:21 430:4
  441:25 442:19
  573:4,14 574:20
  574:21 579:4
quickly  417:11
quite  494:4
quote  412:24

**r**

r  329:2 330:2
  564:16,16 587:2
raise  485:3 489:19
  490:22 491:9
  492:8,25 493:3
  506:11 508:3,13
  509:4 510:25
  512:22 513:20
  514:6,25 515:2,7
  531:4,21 536:24
  566:18
raised  426:16
  498:24 517:12
raising  513:12
ramble  427:20
ran  417:17 543:19
range  485:8
ranging  422:15
rapid  577:11
rate  478:21 561:10
rates  478:13
rational  492:9
ray  334:6 442:6
  447:13 488:2
  528:17 541:17
rayiner  329:18
reach  526:14
  573:18

reached  419:8
reaching  490:2
reaction  502:20
  527:19 537:10
read  339:5 357:21
  363:3,4 544:19
  552:3,6 582:15
ready  480:6
  505:15 527:24
real  427:8 498:3,3
  518:6
realize  416:3,11
realized  539:23
reallt  496:24
really  423:15
  470:18 503:21,24
  579:4
reason  337:16
  338:17 340:12
  344:23 345:11
  346:15 347:7,12
  348:21 354:8
  362:19 363:3,9
  365:20 367:3
  374:21 381:20
  382:3 383:6
  386:13 390:12
  440:2 455:10
  463:6 478:9
  486:17 497:25
  499:17 501:24
  521:23 580:22
  589:4
reasonable  522:6
reasons  424:15
  477:2 479:9
  494:16
rebuild  482:19
recall  340:4 341:2
  342:3,8 343:6,11
  343:14,25 344:5

345:5,9 346:8,12
347:5 349:17
350:6,7,12 351:12
351:17,21 352:7
352:22 353:6,11
355:11,18,23
358:11 359:7,8,12
363:6 369:5,24
373:9 374:3
375:13 376:25
379:15,20 380:7
384:18 385:19,22
385:25 387:17
389:23 395:20,25
397:2 398:12,17
398:20 399:15
402:16,19,20,21
411:19 415:13
431:15 433:8
434:9 447:7
454:13 503:17
518:25 519:6
520:8,15 523:21
524:11 526:4
527:2,6 535:2
537:24 540:12
546:14,20 547:17
548:12 550:21
551:10 553:6
558:11,15,19,23
559:6,10 561:3,7
561:12,15 562:2,4
563:22 565:2
566:4,11,13 567:2
567:8 568:14,20
568:24 569:4,9,14
572:14 581:13
recapitalize
376:20 384:11
456:10

receipt 358:3
receive 422:4
  437:17 483:4
  507:11 558:20
received 336:17
  337:25 341:22
  342:5 346:4,10
  351:15,19 381:14
  416:12,16,18
  506:3 557:13
receiver 327:7
  332:23 333:25
  334:5 394:23
  396:10,25 397:5
receivership 393:3
  393:6,8,9,10,12,14
  393:16 395:2,4,11
  395:19,23 398:6
  400:12 401:9,15
  401:15 402:18
  474:17 531:12
  534:22 535:7,16
  537:22 539:7,10
  549:16 569:11
receiving 375:13
  417:2
recess 388:7 404:9
  441:19 487:17
  545:18 570:11
recession 477:11
recognize 359:21
  444:3 449:20
  471:8 489:3
  518:16
recollection 337:8
  338:22 339:20
  353:24 361:10
  362:15 365:16
  372:19 373:14
  374:5 375:17
  383:11,19 387:14

387:19 389:20
  395:15 397:18
  403:16 465:13
  496:15 522:8
  530:17 532:9
  540:14
recommended
  548:21
recommending
  426:2,3,5 497:5
record 332:3,14
  333:16 371:18
  378:5 388:2,4,11
  404:5,8,12 441:18
  441:21 449:15
  469:3 470:7
  487:16,21 488:23
  521:22 522:3
  525:12 534:3
  545:10,17,20
  559:16 570:4,9,13
  586:6
recorded 332:17
  415:7 572:8
  580:17
recording 332:12
  569:25
records 535:4
recovery 480:23
  481:7
reduce 528:8
reduced 466:11,12
  543:21
refer 406:3 412:20
  430:12,13 457:20
  464:5 486:6
reference 339:14
  340:16 344:20
  348:15 349:19
  350:2 399:9
  400:11 553:14

referenced 339:15
  562:7
referred 340:25
  411:9 473:8
  477:10 491:5
  535:16 559:2
  577:3
referring 338:4
  378:12 395:24
  396:6 464:6
  490:25 510:2,9
  530:19 547:14
  557:10 559:14,17
refers 372:22
refine 577:14
reflect 529:17
  552:7 571:7
refresh 337:7
  353:23 361:10,14
  361:18,20 362:14
  364:11,13,16
  365:15 366:12
  372:18 373:13
  374:4 375:16
  379:25 383:10
  387:14,18 388:15
  389:19 395:15
  396:2 397:8,17
  398:23 401:20
  403:15 456:25
  471:4 488:14
  529:2 530:16
refreshes 383:19
  397:20
refuse 495:16
  562:13 563:25
refuting 553:4
regarding 346:16
  426:25 445:2
  469:14 498:19
  516:25 542:12

548:10 559:16
registered 415:6
regs 485:11
  500:13
regular 416:13,17
  444:16
regulated 430:15
  452:5
regulation 359:13
  445:18 452:24
  453:25 499:7,11
  522:2
regulations 409:22
  451:25 453:20
  456:2 481:16
  482:25 484:12
  497:19 498:21
  500:12 506:24
  560:7
regulator 406:15
  507:2
regulator's 506:22
regulatory 420:13
  421:6 424:18
  505:20,25 506:2,9
  507:8
reinvest 446:12
reject 518:7
rejected 502:16
  515:17,19 580:23
  581:10
rejection 502:21
  507:11 508:17,21
  515:13 517:2,6
  549:4
related 333:5,11
  382:14 499:21
  587:14
relating 559:15
relationship 406:8

**release**  385:9
395:9,10,13 397:4
**relevant**  542:6
**relicensing**  430:24
431:3
**relief**  444:7,11
445:4 449:25
453:17 457:11
458:14
**relieved**  492:23
**remained**  549:14
**remaining**  422:6
**remember**  376:2
397:6,6 433:11
466:17,20 536:2
536:17 546:12
562:14 565:17
566:10
**remotely**  328:5
332:16
**remove**  493:11
545:5,7
**removed**  549:19
**removing**  545:25
546:10
**renaming**  533:12
**render**  448:6
**rendered**  561:21
**renova**  340:18,24
**rent**  406:21,24,25
407:3,3,4,13,17,19
407:24,25 408:2
413:24 465:8
**reorganization**
444:21
**repaid**  359:5,10
**repair**  485:21
**repay**  352:10
**repayment**  385:18
**repeat**  356:4

**repetitive**  434:25
**rephrase**  432:12
432:13 475:19
**report**  402:11
403:14 535:12,19
536:18 537:3
558:8 571:21
**reported**  580:11
**reporter**  328:7
333:9 334:16
453:11 540:23
587:7
**reporting**  458:9
557:22 589:2
**reports**  356:22
406:14,16 458:10
**reprehensible**
524:2
**representation**
462:25
**representative**
400:8
**represented**
422:19 535:13
**representing**
526:7,8
**request**  339:2
340:7,14 342:22
344:8,25 347:14
348:4,16 349:2
353:15,21 354:10
358:13 359:15
366:2,17 368:9
369:10,12 372:23
373:19 374:22
383:22 386:14,18
387:4 448:5
**requested**  339:8
448:3,14 452:15
453:3,5 457:11

**requests**  372:11
447:2 500:4
**required**  342:24
343:4 370:14
371:11 409:21
476:4 510:5
532:18 542:19
544:6,17 547:15
555:3 556:6
**requirement**
428:5 458:9
**requirements**
451:24 452:23
497:18
**requires**  406:12
444:14
**research**  467:14
**reserved**  331:12
**reset**  541:7
**resign**  433:21
**resigned**  416:19
484:5
**resolved**  582:23
**resources**  482:22
**respect**  435:5
437:4,9,23 438:23
439:4 448:9,16
451:6 453:19,19
503:6 545:23,24
550:24 553:2
**respectful**  538:8
**respective**  331:6
**responded**  537:11
537:15
**responding**  482:13
**response**  491:14
512:2 519:5
523:22 554:21
555:8,11
**responses**  430:6

**responsibilities**
544:21
**responsible**  520:2
557:22 558:6
**responsive**  577:11
**restructure**  428:4
428:21 502:6
**restructuring**
502:4
**resulted**  441:3
**resulting**  337:19
**resume**  502:15
**retained**  560:23
586:10
**retroactive**  411:10
**retroactively**
356:19,20 465:16
**return**  469:4
492:9 498:14
**returning**  431:20
**returns**  468:23
498:15
**revenue**  466:11,12
466:16,23 467:4
478:5
**revenues**  482:18
**revetted**  504:15
**review**  336:15
356:16,21,22,25
357:9 395:21
396:2 411:10
425:17 430:18
485:10 491:6,7
498:5 499:20
500:16 504:21
516:14 517:16,17
518:5,6 520:12,13
521:12 535:3,10
551:20
**reviewed**  355:14
376:23 392:16,23

410:21 411:2
427:5 457:21
469:2 521:21
523:21
**reviewing** 392:25
499:17,18
**revise** 506:11
**revised** 502:16
509:25
**revolving** 518:2
**rhyme** 499:16
**richard** 327:12
329:15
**rick** 341:18 345:20
346:22 365:8
**rid** 469:18 521:7
522:22 523:7
**ridiculous** 517:12
**right** 345:21 346:6
346:24 350:20
357:8 358:7 359:6
361:5 364:16,20
368:7 381:17
382:13,22 383:18
386:6 387:11
389:11 399:18
400:12,16 401:9
403:12 405:13,18
405:23 406:18,22
407:3,18 408:3,9
408:13,19 409:2,6
410:4,8,16,24
411:5 412:15,16
415:18 416:6,9,13
417:7,16,21 418:9
418:15 419:11,14
419:23 420:9,17
421:9,19 423:11
423:17 424:13,19
424:25 425:13
426:7,9,13 428:7

428:23 429:16,21
431:10,14 432:5
432:22 433:18,22
434:23 438:4
440:11 451:11
464:22 466:8
469:7 478:5
481:14,14 484:4
493:14 508:5,15
512:17,20,24
513:18 514:25
518:23 524:13
530:25 535:24
536:4 539:7,9,12
539:13 540:4
541:12 548:24
549:8,16 552:18
562:24 568:7
570:19 571:3
572:25 573:20
575:8,12 576:8,13
578:5,14 580:11
582:24 585:19
586:4
**risk** 420:8,11,14
421:5,6 423:25
424:12,14,18
469:6,7,9 574:21
**road** 332:19
502:25
**robert** 511:18
**robust** 480:4,9
**role** 421:2
**ron** 560:20 561:16
**ronald** 519:16
560:17
**room** 441:14
545:11 576:11
**roslyn** 332:19
**rothstein** 330:15
333:6

**rough** 440:10
**roughly** 440:15,24
460:16 466:19,23
473:6 498:23
**rubric** 414:10
**rule** 446:24
**rules** 456:2 506:23
**rumors** 503:9
**run** 413:20 417:14
456:8
**running** 412:23
**runoff** 446:8
535:12 537:3

**s**

**s** 329:2 330:2
331:2,2 334:18
419:22 420:20
588:2
**sachs** 495:2
511:17
**safe** 545:8,25
**sake** 434:22
**salaried** 461:23
**salary** 408:5,6,6,7
408:11,17,17
415:24 416:12,16
537:7
**sale** 338:2,20
341:23 342:6
346:5,16 362:2
381:15,22 434:9
434:13 435:6
436:7 437:18
448:10,17 463:23
464:6 473:10
537:4 571:5
**sales** 434:5 439:13
439:20 441:3
544:7
**salgado** 425:18
428:16 470:2

491:3 492:17
493:9 496:5,16
497:9 503:12,17
536:3,12 542:11
543:11 550:16
553:7,8,20 557:6
557:14
**salgado's** 491:14
**saratoga** 375:24
376:12 585:2
**satisfaction**
397:13 555:24
**satisfy** 428:4 577:9
**satisfying** 416:2
**save** 370:4 378:9
425:13 508:23
**saw** 377:3 421:15
421:16 425:9
**saying** 405:21
416:14 424:21
535:22 541:18
**says** 337:23
340:17 346:7
348:20 349:9,25
358:24 361:25
362:6,13 366:15
368:11 374:16
378:18 381:18
382:4,8,15 383:4
386:7 387:12
388:22 390:11
401:6 403:6,13
446:17,25 447:21
448:2 450:7,11
451:11,20 457:15
490:19 494:6
498:18 502:4
508:19 509:25
510:8 519:15,19
521:21 523:12
529:13,20,23

**[says - seeking]**                                                      Page 39

532:2 554:2

**sb**  532:10 534:5

**sba**  366:13 370:5,5
370:14,22 371:3
371:11 376:13
379:2,3,5 393:7,22
394:5,22 396:9,15
396:15,25 397:11
397:11,13 398:19
400:8,10,19 409:9
409:13 413:22
420:15 424:5
425:10 427:10
430:9,22 431:5
440:4,23 442:23
445:19 447:9
450:25 451:3,5
452:16 453:5
458:22,23 462:24
463:2 468:16,22
469:14,25 478:8
478:18,21 479:10
480:20 481:7,10
482:8,11,13,18,23
483:6,9 484:7
485:14,18 486:10
489:25 490:20
491:4,8,24 493:2,6
495:25 498:7,13
498:18,24 499:19
500:11 501:11,17
501:22 502:16
505:17 507:9,12
509:2 514:8 515:3
515:5,11,17 516:7
516:13,17 518:21
519:8,20 520:17
521:22 522:4,6,10
522:22 523:6
524:2,13,14,22
525:4,24 526:8,15

527:3,4,15,18
528:8 529:23
530:2,18,25
531:16,21 532:2
532:10 533:21
535:22 539:22
540:19,20 541:23
541:25 542:8,8,21
548:11,14,23
549:12 551:13,16
552:13 553:4
554:4,23,25 555:4
555:7 557:24
558:10 559:5,9
566:4 577:19
580:23 581:12
589:3

**sba's**  396:22
429:10 491:13
499:6 502:10
515:20 517:5
520:13 525:20
549:2 555:24

**sbas**  523:7

**sbic**  354:25 370:3
376:15 384:11,15
385:5 393:6
398:22,22 422:2,3
422:11 423:9
445:11,12,13,16
445:19 453:21
455:2,14,15,25
456:14 467:15
472:20 480:25
494:22 497:21
503:5 507:24
512:7 515:16
518:3 519:21,25
532:3,19 533:6,8
559:22,25 560:3,4
560:5

**sbics**  379:8 445:10
445:20,23 446:4
463:2 474:16,17
482:6,7 503:10
520:3,5 521:7
522:23 523:4,18

**scale**  471:22 472:5
472:7 494:9

**scenes**  425:9

**screen**  487:2

**scroll**  529:19,22

**seaborn**  384:21
535:3,9,12 536:7
536:12,22,23
550:11,23

**seaborn's**  537:9
537:21

**sealing**  331:7

**sealmax**  438:24

**sean**  551:21
553:12

**sec**  409:13,19,21
409:23 444:15
448:14,24 450:14
453:5 456:14
458:14,20,23
459:22 504:20,23
505:5 507:8 510:6
546:19 547:4
559:4,17,20
572:15 580:6

**second**  338:5,12
338:24 339:6
365:25 388:16
424:24 446:17
447:22 454:12
462:18 471:7
541:15 553:16
555:11,14 556:16

**section**  446:23
447:3,6 448:4,7

450:7,9

**sections**  445:2
448:7

**secure**  549:3
553:19 555:10

**secured**  339:16
340:2 342:11
344:21 345:14
348:19 351:4
467:13 483:15
508:2,8,20 555:12

**securities**  443:20
446:20 448:10,17
449:2,18

**security**  468:10
540:11 542:14

**see**  336:13 337:5
341:25 342:2,12
342:12 343:18,21
344:11,20 352:3
360:16,17,18,19
360:24,24 361:2,6
362:11,12,12
363:22 366:5
372:8,10,14
378:21 382:7,15
389:4 397:15
403:2 450:9
451:18 457:2
458:11 472:8
490:15,23 494:10
519:15,22 520:6
523:19 529:25
530:8 531:24
532:6 544:20
566:17 571:14

**seeing**  345:5,9
488:6

**seek**  531:4,14

**seeking**  522:22

seen  337:15
  342:14 345:3,8
  363:14,16 377:6
  401:24 402:4,6,10
  403:14,24 416:22
  427:3 457:6
  458:25 518:17
  559:11
segue  470:4
seidel  330:9 334:9
  334:9 353:3 355:6
  355:16,21 356:3
  356:18 370:23
  371:14 379:19
  404:16,18 441:12
  564:5 568:3 573:7
  573:11,12 578:24
self  462:9 535:17
  535:19 537:7
  550:25
sell  449:2 531:14
selling  538:20
senior  339:15,16
  340:2 342:11
  344:4,21 345:14
  346:23 348:18
  351:4 467:13
  468:7 483:15
  508:2 509:22
  530:10 542:2,4,9
  543:9
sense  430:14
  431:16 479:9
  543:7
sensitive  332:6
sent  356:23 496:12
  535:3
sentence  457:25
separate  473:20
separately  415:6

september  359:15
  360:20 361:2
  433:21 471:16
  472:4 479:19,24
  482:4,5 521:10,16
  524:7,9
seratta  376:10,11
  379:10
service  332:19
services  462:5
  561:2,10,21 562:5
serving  415:12
  462:9
set  448:3 475:12
  505:7 515:7
  541:24 561:9
settle  396:16
  400:10 525:17
  530:18 551:18
settled  527:7
  538:16
settlement  349:15
  350:9,14 351:11
  354:2 361:13,17
  362:9,16 366:7,11
  367:8 369:25
  370:11,12,15,22
  371:10 373:15
  374:6 376:21
  379:21 380:2,4,10
  383:13 384:10,14
  384:23 385:2,6
  387:21 393:22
  394:4 395:6,8,12
  396:18,20,23
  397:3,19,22
  439:11 440:4,22
  475:3,5,6,10,10
  524:21 525:23
  526:14,25 527:16
  527:17,20 529:10

529:24 530:3,21
  530:21 531:5,6,21
  532:3,10,14,18
  533:9,22 538:19
  548:23 588:13
settling  370:8
seven  422:4
  445:17,20,25
  446:4,5 503:16,25
share  420:5
  443:10,10 451:13
  484:21 486:21
  487:2 495:11
  512:19 513:23
shared  406:8
  408:8 465:8,22
  510:15 539:24
shareholder
  433:16 505:2,7
shareholders
  419:16 431:20
  433:17 443:13
  497:23 510:4
  524:4
sheerer  358:5,9
  438:8
sheet  471:12,14
  472:8,11 476:18
  539:17 548:7
  564:22 565:19
  577:14 582:2
  588:18 589:2
sheets  533:23
  563:18 573:15
  574:7,14,17
  576:13,25 581:19
  582:4
shop  417:24 418:2
  418:6,7,8,21 490:4
  563:4 578:21
  581:18

shopping  422:18
short  441:13
  470:18
shortfall  486:4
shortfalls  539:5
shorthand  328:6
  587:6
shortly  433:2
  554:18
show  356:23 454:2
  537:4 578:18
showed  347:11
  362:24 368:25
  391:18 397:7
  412:3,6,10 416:23
  469:3 474:4 492:7
  574:11
shown  347:20
  354:6 392:4,7
shrink  466:8
shur  526:6
sibc  538:24
sideways  359:18
sign  389:15 401:3
  576:8 578:9,13
signatory  384:24
  384:25
signature  337:10
  337:21,25 339:11
  340:10 341:23
  342:10 343:9,12
  343:17 344:18,18
  346:4 348:8,13
  349:8,9 353:20
  354:12,14 358:18
  358:19 362:3
  365:14,18 366:14
  366:15,16,21,22
  368:13,16 369:16
  369:17,18 372:15
  372:16 373:10,11

373:21,22 374:17
374:18 381:15
382:6,6 384:2,24
386:8,9 387:7,7
389:9,13 390:3,15
390:16,18,22
391:7,12 392:2
400:23 587:22
**signatures** 342:23
343:4 348:9
359:21,22 367:25
**signed** 331:15,17
345:6,14 363:11
363:15 367:24
375:11 385:7,7
388:22 398:5
433:15 458:19,24
529:11 530:21
532:20 538:19
576:16,22,24
**signers** 342:17
**significant** 370:6
376:16 385:11,12
396:14 399:3
451:4 455:7
459:10 460:19
463:16 466:14
467:14 468:8,19
468:20 469:19,24
480:24 493:22
494:17,18,25
495:4 504:16
511:23 514:16
527:11 534:12
577:16 582:7,9
583:10 584:19,19
584:20,23 585:3
**significantly**
347:19 354:5
469:8,10 478:14
502:7 511:7

**signing** 391:4
401:2 469:21
496:3 578:19
**silly** 578:21
**silvia** 327:11
336:18,21 341:16
345:20 357:25
365:7 381:13
485:17 491:3
**similar** 460:7
494:21 554:8
**similarly** 435:11
482:8
**simplest** 424:5
**simultaneously**
539:24 577:18
578:7
**singer** 327:15
435:16 436:23
529:7
**single** 443:9
450:20 462:4
478:17 584:14,17
584:20,23 585:5
**site** 534:19
**sitting** 423:9
**situation** 490:6
**six** 469:20
**size** 460:8,9
493:23 495:10
512:7 565:6,17
574:10
**sized** 494:22
**skip** 337:2 509:14
**slightly** 495:23
528:5
**sloppy** 525:10
**small** 327:6
332:22 333:24
392:20 467:7
474:24 480:21

483:21 560:6
**smaller** 509:4
511:19 512:12
**smarter** 501:6
**smoke** 518:9
**sold** 337:9,19
342:5 346:9
358:10 365:17
433:2 439:12
462:14 463:4,15
466:3,4,14,18,22
468:24 470:15
473:14 480:13
572:2,4
**sole** 541:25
**solely** 448:8
**solomon** 495:2
**solvency** 352:20
352:24,25
**somebody** 419:6
420:2,4 424:10,19
513:21
**somewhat** 427:12
427:19
**sommer** 327:14
435:11
**soon** 335:16
**sop** 392:20 430:20
431:4
**sophisticated**
422:23 576:21
**sops** 430:17
535:16
**soros** 422:16
511:10,11 582:10
582:11 583:20
584:24
**sorry** 335:14
336:2 340:20
343:21 344:15
346:13 347:25

351:14 355:18
356:19 361:7
364:7,14 368:4
380:13 381:16
384:21 385:15
386:12,20 387:14
391:11 394:21,21
398:22 399:25
402:3,23 409:16
409:17 427:20
434:19,20 435:3
442:5,6 445:25
447:17 452:12
453:3,9 454:18
457:23 462:16
464:3 471:19
479:24 483:23
488:2,4,8 495:13
500:5,23,24
506:17 510:11
513:2 518:20
519:13 520:25
530:3,15,23 533:2
537:12 540:6
546:2 547:25
560:10 564:17
565:25 567:9
569:18 570:23
575:5
**sort** 409:11 413:13
413:14 417:14
430:9 504:23
**sorts** 499:15
**sought** 447:8
448:23
**sound** 494:12
498:23 501:24
518:22 540:22
**sounds** 432:22
433:24 440:25
518:24 543:6

soundview   531:19
south   332:19
space   424:23
speak   532:14
   544:11 555:21
speaking   473:6
   483:12
speaks   390:14
   452:19 458:17
   553:24 555:19,20
specializing   455:3
specific   343:7
   363:9 377:12
   394:25 507:2
   571:18
specifically   352:11
   355:12 384:18
   393:4 434:11
   453:14 463:2
   472:7 480:24
   499:12 521:19
   558:19
specified   500:13
spectacular
   498:16
spectrum   577:8
speculative   574:4
speed   439:9 575:6
spent   376:15
   461:21 469:24
   502:24 535:11
spinning   364:19
   364:21 488:9,16
spirit   497:18
spoke   478:25
   486:8,8 517:10
   535:9 550:23
sponsor   483:19
sponsors   483:16
spreadsheet
   498:13

spring   540:16
square   329:7
staff   407:12
   410:14 461:3
staffed   470:19
stage   531:3 533:3
   534:13
stalking   534:4
stand   409:22
standard   392:16
   430:20 572:12
standing   521:25
star   379:3
start   404:23 453:9
   546:4
started   413:10
   426:14 427:23
   442:20 470:21
   476:25 477:18
   493:19,20 503:4,8
   515:14 585:17
starting   335:15
starts   443:23
   519:14 528:20
state   328:7 333:14
   333:18 334:20
   378:14 507:10
   551:24
stated   346:10
   383:9
statement   505:4,5
   510:3 562:15
   565:16 570:17
statements   409:23
   444:23 552:21,24
   552:25
states   327:2 333:2
   348:18
static   541:5,9,10
stature   493:23

status   535:10
staying   447:20
   469:11 502:3
stenographic
   587:12
step   432:20 433:3
   454:12 539:20
sterling   365:12,16
   438:18
steven   327:13
   329:9 333:21
   461:8 487:8
   500:23
stevens   469:16
   542:11
stipulated   331:4,9
   331:13
stipulation   400:16
stock   419:2 443:7
   452:10 495:18
   513:6,6 563:17,19
   564:19 577:17
   585:21
stop   357:22
   418:17 508:22
   543:12 555:17
stopped   479:11
   483:5 544:25
   545:2
strain   417:4
strasburg   443:18
strategy   467:22,24
   467:25 468:3,13
   468:15,18 469:5
   469:10,15 470:3
   470:11 472:17,18
   472:18,19 474:11
   475:17 485:4
   494:9,21 498:9
   501:5 513:14,18

strausberg   449:17
street   330:7
   494:24
strike   447:14
   465:4
strong   497:13
   525:16
structue   513:4
structural   423:20
   455:13
structurally
   514:19
structure   380:7
   421:24 422:13
   423:8,16,20,21,24
   446:7 455:21
   456:15 460:7
   468:6 475:13
   504:3 512:14
   567:11
structured   421:25
   494:18
stuff   407:22
sub   405:9 406:7
subject   346:23
   358:5 361:25
   375:8 397:10
   409:4 412:13
   448:3 451:24
   452:20 455:25
   456:2 504:20
   578:20
submission   521:2
submit   409:22
   542:19 581:11
submitted   458:23
   480:4,10 525:4
   559:4
submitting   543:12
subordinate   513:5
   513:7,9 542:2

subscribed 586:20 589:20
subscribers 390:24
subscription 368:12 374:14 388:19 390:19 391:5 588:12
subsequently 401:8
subsidiaries 451:17,21 452:8 458:3,7 473:22 512:12
subsidiary 352:17 406:14 423:10 443:13 444:18 446:19 451:16 455:22 456:5 512:17
substance 336:25 346:3 347:22 363:2 498:4,4
substantial 424:14 431:12 577:25
substantially 423:2,4 429:3
substantive 499:20 517:15
successful 455:17 515:24
successfully 460:7 517:22 548:13
sued 517:22 518:21
sufficient 539:18 557:3
suggestion 516:15
suing 516:17
suitable 480:12

summarize 520:18
summary 337:2,3 341:21,22 519:2,6 521:11 548:17
summer 426:14,19 427:22 428:18 436:18 462:15 484:4,23 490:6 497:6 499:25 503:19 536:9
superior 419:19 419:20,21 420:19
support 538:22
supposed 430:25
sure 372:9 380:8 380:15 392:18 421:7 486:8 487:13 492:16 506:4 540:13 541:3 546:4 548:18 552:4 565:10 570:6 571:24 573:2
surrender 398:24 399:13,22 532:3
surrendered 370:3 398:21,23 532:16 560:3
suspend 554:4
suspicions 522:15
swear 334:16
swearing 379:4
switch 528:14
sworn 331:15,17 334:19 379:6 586:20 587:9 589:20
synscort 341:24 342:4,6 437:23
system 541:10

systems 365:13,16 438:19

**t**

t 331:2,2 342:22 587:2,2 588:2
table 424:18 573:24
take 332:13 337:6 403:25 404:22 441:12 443:21 460:12 487:5,13 487:25 512:13 529:2 550:8
taken 332:21 335:8 388:7 404:9 441:19 480:8 487:17 497:7 545:18 570:11
takeout 476:21
takes 563:19
talk 417:12 464:12 490:14 516:19 534:4
talked 391:19 425:3 485:2 562:23 567:10 574:19
talking 355:7 392:19 404:23 406:4 413:12 420:9 421:16,22 440:17 452:13 469:25 475:4 492:6,15 498:22 506:5 507:10 512:15 513:15 539:14,23 554:20 556:8 562:20 576:20 580:4
talks 337:3 498:20 556:11

tax 390:24 391:4
taxability 566:18 566:25 567:5
taxi 462:7 466:21
taxicab 455:3 462:7,8,14,24 463:3,5,7,14,18 464:7,14 466:3,4 467:10,19 473:9 473:11
team 461:3,6,7,12
technical 419:15 497:17
technically 543:10
technician 486:16 486:22,25 487:5
teens 468:23 469:4
tell 429:18 437:14 479:17 499:23 575:25 576:6,16
tempo 574:9,9
ten 339:22 357:20 504:14 582:9 583:8,9,12 585:16
tender 397:11
tenire 474:23
tenure 570:22,24
term 397:6 413:20 419:23 420:8,21 420:23 429:25 430:24 471:12,14 472:8,10 476:18 533:23 539:17 547:8,10 563:18 564:22 565:19 573:15 574:7,14 574:17 576:13,25 577:14 581:19,25 582:4 588:18
terminates 578:15

**terms** 335:22
336:24 341:20
342:15 352:8,9
359:4,7,9 363:2
366:24 384:13
385:6,16,18
395:18,24 397:10
410:11 426:18
430:5 462:4
468:23 493:22,23
513:8 538:24
546:15,22 547:12
547:19 548:9
549:24 560:9
563:11 564:21,24
565:3,4 581:17,25
**testified** 334:21
423:7 522:20
561:18 582:17
**testify** 550:22
**testimony** 371:17
399:18 404:25
522:24 559:6
562:14,17,18
563:22 564:8
586:7
**thalman** 564:15
564:18 585:15
**thank** 335:17
364:10 365:4
388:16 404:13,15
431:6 457:3 546:5
558:25 572:7
573:3 586:2
**thanks** 488:20
578:24
**theoretically**
528:10
**thereto** 519:19
**thin** 461:2

**thing** 357:21
415:16 435:21
536:17 541:4
543:13 571:24
573:6
**things** 351:10
413:13 414:4
455:19 490:14
491:24 500:15
524:24 540:7
562:21 576:6
**think** 341:13
347:22 376:10
404:2 408:23
409:10 411:21,25
412:17 413:10
421:15 422:22,22
430:24 433:8
439:21 468:14
484:10 487:9
493:19 503:11
545:13 560:19
583:16 584:4
586:3
**third** 340:5 529:22
553:16
**thomas** 398:2
**thornton** 504:11
**thought** 426:6
428:6 455:12
479:25 483:24
499:9 502:8
522:10 583:5
**thousand** 358:14
374:14 391:13
**three** 363:2 382:20
382:23 469:20
**threw** 430:23
520:21
**ticked** 505:12

**tie** 500:4
**tight** 418:7,8
**time** 331:12
333:18 337:15
342:5,13 345:3,8
358:10 370:25
376:16 377:5
379:13,22 380:3,9
386:21 388:3,10
397:21,23,23
398:7 403:18
404:7,10,11
408:23 409:14
416:19 418:19
423:12 428:2
431:17 440:22
441:6,16,20
451:21,21 459:4,5
459:9,13 460:10
461:6,11,21,24
462:9,21 463:24
463:24 465:18
467:2 469:9,13,25
472:3 477:22
482:9 484:24
486:24 487:15,20
493:17 497:10
498:24 509:9
518:18 521:16
523:6 524:5 526:7
526:17 527:2,20
532:17 534:11
535:11 537:8
538:3 540:2 543:7
543:11 544:5,24
545:3,15,19 551:6
551:17 553:10
558:16 562:23
563:19,23 564:11
567:9,17 568:11
568:11,17,22

569:2,23 570:7,12
573:16,17,22
574:11 576:19,24
577:16 586:11
**timed** 442:5
**times** 460:9 481:4
481:25
**timewise** 433:25
**titled** 395:8,10
396:6
**today** 347:20
377:5,7,9 404:22
408:22 412:15
421:3 434:6 446:5
577:23
**today's** 586:7
**told** 429:15,19
483:3 496:16
516:8 537:17
543:11
**tom** 385:12 526:9
526:10,11,17
534:2,6 539:16,23
551:12
**tomorrow** 529:15
**top** 400:2 403:9
468:5 483:16
511:3,6 524:8
**tort** 413:13
**total** 403:7,12
456:12 562:23
571:7 572:4 586:8
**touch** 476:4
**track** 440:16
453:19 470:7
**tracking** 538:8
**tracks** 359:13
453:22
**traded** 336:5
455:2,24 456:4
482:7 585:10,13

585:16,19,23
**tradewinds**
539:14,16,23
**traditional**  414:2
520:23 522:5
**transaction**
335:21 336:6
355:4,7,13 417:13
421:11 425:11,19
426:4 428:16,22
428:25 432:18
464:4,6 469:23
470:21 476:20,23
490:12 493:14,16
494:18 495:25
497:11 498:20
500:18 501:18,23
502:4,6,14,17
503:14 504:4,18
504:24 505:8,13
505:16,23,25
506:11 507:9,13
507:15,18,19
508:13,22 510:4,6
510:12 515:18
520:12,13 542:17
574:2,25
**transactions**
448:15 451:14
453:15 458:5
505:19 524:16
**transcription**
587:11
**transfer**  336:16
337:4,24 338:18
338:19 339:2,8,20
339:24 340:6,14
341:22 342:15,18
342:21,22,24
343:2,5,10,13
344:7,8,25 345:12

346:3 347:5 348:4
348:16,25 349:10
351:24 353:15,21
354:10 358:13
359:15,23 362:8
366:2,17,25 368:8
369:10,12 372:10
372:23 373:19
374:22 383:22
386:14,18 387:4
412:11 426:24
446:22 506:25
537:21 553:14,18
553:25 554:2
**transferred**  342:9
382:5,16 427:6
535:22 537:17
557:7
**transferring**  430:2
**transfers**  351:7
354:6 410:15
411:17
**translation**  448:8
**treatment**  515:16
**trial**  331:12
582:23
**tried**  539:20
**tro**  566:9,12
**true**  435:4 437:3,8
437:22 466:10
587:11
**truth**  516:13
**try**  407:8 411:24
439:9 462:12
548:22,25
**trying**  366:12
375:24 376:19
378:9 379:25
389:8 396:4
428:16 430:17
442:9 477:24

480:14 485:3
488:8 508:3,12,23
512:22 523:6
531:20 533:5
577:9 584:5
**turn**  332:8 336:10
344:6 363:20,21
384:16 400:3,4,6
431:8 442:18
443:17 446:13
**turned**  393:7,11
393:17 399:22
427:3 498:2
532:21,21 573:25
**turning**  385:3
406:6 478:15
498:17
**twice**  360:25
**twin**  430:9
**two**  342:16 359:22
360:25 361:6
367:25 372:7
391:23 392:3,4
407:14 408:18
430:8 449:24
453:17 457:11,12
457:21 458:2
474:13 476:18,19
480:3 487:12
534:4 540:7 554:8
554:13 562:21
578:6 579:4
**type**  422:10
451:14 523:15
**types**  415:16
**typical**  393:8,12
393:14,16 445:12
445:16
**typically**  412:20
**typo**  506:19

**typographical**
507:6

**u**

**u**  331:2
**u.s.**  327:6 332:22
443:19 449:17
477:8
**uh**  490:17 493:15
536:5
**ultimately**  496:9
526:14 580:24
**unable**  482:13,17
**underlying**  376:11
504:12 506:5
**understaffed**
461:2
**understand**  335:7
342:20 350:17
367:15 377:20
396:5 406:3
407:10 413:18
430:18 450:13
452:11,14 457:20
492:14 493:10
545:22 555:6
**understanding**
443:17 448:13,22
450:17,25 453:2,4
453:6,13 454:4
458:13 491:23
495:3 499:5,8
500:9 516:22
529:16 544:4,13
544:15,16
**understood**  493:2
493:7 503:24
**undertake**  577:15
**unhappy**  484:18
**unified**  378:10
**union**  511:17
584:25

unique  422:10
unit  332:16 388:5
  388:12 487:22
  570:10,14
united  327:2 333:2
units  586:9
universe  494:4
unquote  412:25
unsigned  363:10
  363:16 412:6
unsolicited  418:21
unsustainable
  463:11
update  492:2
  529:23 530:2
updated  480:10
use  351:9,13,15,18
  420:8 429:24
  472:4,21 505:3
  566:18 576:19
uses  498:14
usually  367:25
  481:14 483:18
  506:21 578:12

**v**

v  589:3
vague  355:21
validity  368:2,6
valuation  498:12
value  419:17
  446:9,9 455:12,13
  472:22,24 571:7
  571:14 572:4
  574:20
values  463:11
variety  461:19
  494:16
various  362:23
  441:3 505:9
  522:21

vendor  462:4
venture  475:13
verbatim  564:7
verification  375:6
  378:23
veritext  333:7,10
  442:5,9 547:23
  586:10 589:2
versus  332:24
  400:9,10 504:2
vetted  504:15
vexelberg  581:2,6
  581:11
viability  423:20
vibrant  475:15
victor  581:2,5,11
video  332:12,17
  488:6
videoconference
  328:5
videographer
  330:15 332:2
  333:8 334:15
  388:3,10 404:4,10
  441:16,20 487:15
  487:20 488:5
  541:3,11 545:15
  545:19 569:20
  570:7,12 586:5
videotaped  328:3
view  424:16 460:2
  517:3,5 527:21
vindicate  527:20
vindicated  527:25
  528:2
virtue  446:24
vision  413:17
voicemail  557:13
volume  332:17
vulture  539:19

**w**

wait  482:23 578:3
waited  479:14
waiting  364:19
  456:23,24 479:12
  480:2 482:8,11
  483:6 489:23
  538:4 547:22
waived  331:8
wake  376:20
walk  576:15
walked  485:12,12
  485:23,24 526:19
  526:21
walker  461:9
  462:3,20,21
  474:18
walking  421:7
wall  428:13
  494:24
want  377:11
  380:13 399:4
  413:11,18 416:4
  417:10,12 421:2
  427:22,24 429:12
  431:7 464:12
  521:20 525:21
  543:25 545:13
  552:3 573:16
  575:6 576:12
  577:21
wanted  396:16
  432:3 514:5
  538:10 553:7
wanting  545:2
warm  578:7,8
warmer  536:9
waste  482:21
wasted  524:4
  540:3

watched  516:5,6
  516:10
waterside  482:9
way  345:15 347:17
  374:24 390:14
  409:2,14 416:18
  421:24 454:3
  456:11 470:22
  478:4 481:17,23
  484:19,20 491:19
  492:9 528:11,11
  541:6,8
ways  370:7
weather  536:10
website  445:22
weeks  430:5
weinberg  329:5,9
  333:21,21,23
  334:5,22 337:24
  338:7,10 387:25
  404:13 408:20
  409:15 411:12,15
  421:22 425:14
  428:8 429:13,22
  433:23 434:7,15
  435:8,13,18,24
  436:10,15,19,24
  437:5,10,19,24
  438:6,10,15,20,25
  439:6,16 440:6,12
  441:8 442:6,12
  448:19 449:4
  450:22 452:18,22
  453:7,10 458:16
  465:23 474:4
  486:18 487:9
  488:2,11 489:2
  491:11 493:5
  500:21,24 506:15
  517:7 518:19
  522:12,25 528:17

532:13 535:15
536:14 537:12
540:21 541:6
544:10 545:21
550:2 552:15,22
557:20 560:13,17
560:20 562:20
568:16 569:15,22
570:2,6 573:3,13
574:3 575:2
576:14 580:21
586:2
**weiner**  509:19,20
509:22
**went**  343:22 398:6
413:13 427:23,25
431:18 434:5
467:5 470:8 485:9
485:15,18,18
486:22 492:21
500:20 501:2
508:24 509:3
522:15 526:22
575:15,15
**west**  330:7
**wheel**  488:9,17
**wherewithal**
483:20
**whispering**  332:6
**wholly**  409:25
423:10 443:12
444:18 446:19
453:18 458:3
512:16
**willing**  581:11
**willy**  578:3
**win**  527:23,24
528:6
**window**  430:23
**winning**  528:2

**wire**  336:16 337:3
337:24 338:19
341:22 346:3
347:2,14,14 354:6
368:24,25 381:14
**wired**  337:10
362:2 371:2
**wise**  413:9
**wished**  432:20
**withdraw**  411:24
432:12
**withdrawn**  552:15
568:16
**witness**  334:17
364:7,14,18
404:15 442:3
486:20,23 487:10
487:12 488:7,13
541:8,14 570:4
587:8
**witnesses'**  589:4
**wolgel**  329:4
333:22 334:4
**wolpert**  327:14
435:5 436:13
529:7
**word**  422:12
**words**  419:5 425:8
**work**  385:11
405:18 408:9
412:6 428:3
454:15 465:3
480:6 483:10
484:19 504:5,8,16
507:16 508:10
521:3 534:12
542:24 553:21
**worked**  405:15
518:3 538:25
575:7

**workers**  412:9
**working**  370:3,4
370:10,10 384:11
461:21 462:2
496:7 539:6
**works**  576:16
**worksheet**  403:23
**world**  467:15
**worries**  541:18
**worth**  423:2,3
**wrap**  404:2 442:2
577:23
**write**  552:12
**writing**  547:16
**written**  575:23
577:25 581:4
**wrong**  427:14
437:15 560:11

**x**

**x**  327:5,18 588:2

**y**

**year**  337:8 376:12
411:5,7 422:4
427:17 446:4,5
469:4 478:17
479:23 489:21
502:19,24,24
503:16 510:11
571:11,13,13
**years**  339:23
392:24 393:2
422:4 445:17,21
534:4 585:17
**yew**  329:8
**yield**  466:18 468:9
469:7 476:3
**yielding**  468:25
**york**  327:3 328:8
329:8,8,17,17
330:8,8 332:20

333:3,7,10 334:20
349:4,12,23
375:24 376:13
422:15 463:8
474:17 477:4
481:4 505:10
564:18 585:20
586:10 589:2
**youl**  388:17

**z**

**zaromatidis**  328:6
333:9 587:6,23
**zeros**  382:20,23
**zoom**  328:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.