**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
U.S. SMALL BUSINESS ADMINISTRATION,
*as Receiver of* ELK ASSOCIATES FUNDING CORP.,

                *Plaintiff,*

                                  **MEMORANDUM**
                                  <u>**AND ORDER**</u>
                           17-CV-03586 (JS) (JMW)

          -against-

MICHAEL FEINSOD, SILVIA MULLENS, RICHARD
FEINSTEIN, GARY GRANOFF, STEVEN ETRA,
JOHN LAIRD, IVAN J. WOLPERT, HOWARD
SOMMER, MURRAY INDICK, ELLIOTT SINGER, and
PETER BOOCKVAR

                *Defendants.*
------------------------------------------------------------X

**A P P E A R A N C E S:**

Steven Weinberg
Kelsey Bilodeau
**Gottesman Wolgel Flynn & Weinberg PC**
11 Hanover Square
New York, NY 10005

Arlene M. Embrey
**U.S. Small Business Administration**
Office of General Counsel
409 3rd Street
Washington, DC 20416
*Attorneys for Plaintiff*

Justin Vaun Shur
Elizabeth Kathleen Clarke
Rayiner Hashem
Sara Ellen Margolis
**MoloLamken LLP**
600 New Hampshire Ave
Washington, D.C. 20037
*Attorneys for Defendants*

1

**WICKS,** Magistrate Judge:

Plaintiff U.S. Small Business Administration, as Receiver for Elk Associates Funding Corp. ("Plaintiff" or "Receiver") commenced this action on June 14, 2017 against, among others,[1] Michael Feinsod ("Feinsod") and Richard Feinstein ("Feinstein") (collectively, "Defendants") for: (1) breach of fiduciary duty; (2) ultra vires acts; (3) waste of corporate assets; (4) conversion; (5) negligence; and (6) gross negligence based upon Defendants' acts and omissions in connection with the management and performance of their duties with respect to Elk Associates Funding Corp. (*See generally* ECF No. 166.)

Presently before the Court, on referral from the Honorable Joanna Seybert (Electronic Order dated 06/09/2025; *see also* Electronic Order dated 10/01/2024) are four motions in limine: (i) Defendants' motion to exclude the expert testimony of Jim Neal, Plaintiff's expert offered to opine on whether actions or inaction by Defendants at certain periods of time relevant to the Complaint were consistent with corporate governance best practices, and whether their actions or inaction posed a conflict of interest (*see* ECF No. 235); (ii) Defendants' motion to exclude the expert opinion of Adam Hanover, Plaintiff's expert retained to opine as to whether Elk and Elk's parent company, Ameritrans, were solvent or insolvent at certain periods of time (*see* ECF No. 231); (iii) Defendants' motion to exclude the expert testimony of Jeffrey Manning, Plaintiff's expert offered to assist in determining the likely recovery from the Elk and Ameritrans portfolio of assets as of the measurement dates for solvency (*see* ECF No. 233); and (iv) Plaintiff's motion

---

[1] The original Defendants included: Michael Feinsod, Silvia Mullens, Richard Feinstein, Gary Granoff, Steven Etra, John Laird, Ivan J. Wolpert, Howard Sommer, Murray Indick, Elliott Singer, and Peter Boockvar. Since this action's commencement, Defendants Mullens, Granoff, Etra, and Singer have been dismissed following the Court entering Plaintiff's Stipulations of Partial Dismissal against these parties. (*See* Electronic Order dated 7/17/2020, ECF Nos. 132, 134, 157-158, 256-257.) Similarly, Defendants Laird, Wolpert, Sommer, and Indick were all dismissed on March 9, 2023 following Judge Seybert "so-ordering" Plaintiff's Stipulation of Partial Dismissal against them. (ECF No. 253; Electronic Order dated 3/9/2023.)

to strike the expert report of Robert Lashway, an expert engaged by Defendants to rebut the testimony of Jeffrey Manning, preclude Defendants from relying on Lashway's opinions, strike the expert report of Craig Jacobson and the expert rebuttal reports of Jacobson, James Howard, and Clifford Wright, and preclude Defendants from relying on the testimony or reports of Jacobson, Wright, or Howard. (*See* ECF No. 224.)

For the reasons set forth below, Defendants' motions to preclude the opinions of Plaintiff's experts Jim Neal (ECF No. 235), Adam Hanover (ECF No. 231); and Jeffrey Manning (ECF No. 233) are **GRANTED**. Plaintiff's motion to strike (ECF No. 224) is **GRANTED in part and DENIED in part** as detailed below.

## FACTUAL BACKGROUND

### A. *The Parties*

Elk Associates Funding Corp. ("Elk") is a New York corporation that, on or about July 24, 1980, was licensed to do business as a Small Business Investment Company ("SBIC") pursuant to Section 301(d), and later Section 301(c) of the Small Business Administration Act (the "Act"). (ECF No. 166 at ¶¶ 1, 10, 26.) As an SBIC, Elk was regulated by, and received initial funding from, the U.S. Small Business Administration ("SBA"). (*Id.* at ¶¶ 33-36.) Ameritrans Capital Corporation ("Ameritrans"), a Delaware corporation, is Elk's parent company and sole shareholder. (*Id.* at ¶ 60.)

Feinsod is a New York resident who, from approximately 2005 through July 2013, allegedly "held either all or one of the offices of President, Chief Executive Officer, Chief Financial Officer, and director of Elk." (*Id.* at ¶ 11.) During this time, Feinsod was allegedly "also a 36% common shareholder and served as President, Chief Executive Officer and Chairman of the Board, and Chief Compliance Officer of Ameritrans[.]" (*Id.*) Feinstein, a New

Jersey resident, served as the Chief Financial Officer of both Elk and Ameritrans from approximately September 2010 through April 2013, and was a signatory on Elk's bank accounts. (*Id.* at ¶ 13.)

**B.  *Initial Relationship Between Elk, Ameritrans, and SBA***

In connection with the funding noted above, Elk and SBA "entered into a security agreement on September 9, 1993 (the "SBA Security Agreement") pursuant to which Elk granted a security interest to SBA in all of Elk's assets, including among other things, Elk's portfolio of loans receivable, together with any guarantees thereon, and all other obligations owing to Elk, to secure payment of Debentures and any other indebtedness or liability to SBA, including future debentures which may be issued to or guaranteed by SBA." (*Id.* at ¶ 37.) Also on September 9, 1993, Elk received funding from certain banks (the "Senior Lenders"), and Elk, the Senior Lenders, and SBA "entered into an Intercreditor Agreement (the "Intercreditor Agreement"), which provide[d] that the security interest of SBA rank[ed] junior in priority to the security interests of the Senior Lenders." (*Id.* at ¶¶ 38-39.) Elk, SBA, and the Senior Lenders also entered into a Custodian Agreement with Israel Discount Bank ("IDB"), pursuant to which IDB "was appointed custodian to hold all of Elk's assets for the benefit of the Senior Lenders and SBA." (*Id.* at ¶¶ 43-46.)

Under the Custodian Agreement, if Elk intended "to sell all or a portion of [Elk's] interest in any note or other evidence of indebtedness," it was required to provide IDB with "written certification that the net proceeds from such sale [would] be utilized immediately to reduce [Elk's] Senior Indebtedness." (*Id.* at ¶ 49.) If Elk did not, however, "intend to utilize the proceeds to repay the Senior Indebtedness," it was required to provide written notice to "the SBA, the [Senior Lenders] and the Custodian" of the amount that would not be used to pay back Elk's

debt, and could only consummate a proposed transaction "[i]f the SBA and the Banks d[id] not object." (*Id.*)

**C.** *Elk's Payment of Ameritrans's Expenses*

From approximately 2009 through April 2013, while under Defendants' control, "Ameritrans received over $14 million in funds from Elk." (*Id.* at ¶ 60.) Based on both Elk's and Ameritrans's accounting ledgers, "from June 2009 through April 2013, the total amount of Ameritrans's expenses paid by Elk and allocated to Ameritrans, and the resulting liability from Ameritrans to Elk increased yearly from $418,595 in 2009, to $590,199 in 2010, to $2,949,442 in 2011, to $10,901,847 in 2012, and finally to $14,271,038 by April 2013." (*Id.* at ¶ 83.) According to the Receiver, "[f]rom 2009 through 2013, the Defendants approved and/or caused Elk to pay $7,491,139 of Ameritrans' expenses and transferred $6,779,898 of Elk's cash to Ameritrans for no consideration." (*Id.* at ¶ 82.) "Elk's general ledger for the period ended March 31, 2013 shows the receivable due from Ameritrans was $12,339,926.76[,]" and "additional expenses of Ameritrans of $1,931,111.24 that were paid by Elk ... were not recorded on Ameritrans's books until after April 2013, were never reimbursed by Ameritrans and which debt, to date, remains unpaid." (*Id.*) Minutes from a May 26, 2009 special meeting of the Boards of Directors of Ameritrans and Elk indicate that Ameritrans was, according to Feinsod, believed to be "at a crossroads," and without further funding or debt financing, would be "unlikely [to] achieve any level of meaningful profitability." (*Id.* at ¶¶ 84-85.) During that meeting, Feinsod stated that "the Board had to determine whether Ameritrans was facing only a liquidation scenario without SBA leverage [or funding]." (*Id.* at ¶ 88.)

Minutes from a September 23, 2009 meeting of the Boards of Directors of Ameritrans and Elk reflect that Feinsod informed the Board that SBA "was amenable to approving Elk's

pending leverage application but that SBA was requesting some updated information." (*Id.* at ¶ 91.) In the following months, Defendants continued to propose and discuss ways to acquire funding for Ameritrans, and became increasingly aware that "SBA Debenture funding was critical if Ameritrans was to remain viable." (*Id.* at ¶¶ 92-97.) According to Elk's quarterly statements filed with SBA, for fiscal years 2009 and 2010, Ameritrans's outstanding expense reimbursements owed to Elk were $418,595 and $590,199, respectively. (*Id.* at ¶¶ 101-104.) As of December 31, 2010, Plaintiff contends that Elk was insolvent. (*Id.* at ¶ 105.) Throughout March 2012, Elk received approximately $5.9 million from the sale of its investments in five portfolios and, at the instruction of Feinsod, supposedly transferred nearly all of those funds to Ameritrans. (*Id.* at ¶¶ 129-138.)

### D. *Transfer of Elk into Receivership*

On April 24, 2012, a ruling was issued in favor of SBA and against Elk, and Elk was immediately transferred to SBA's Office of Liquidation and placed into receivership. (*Id.* at ¶ 139.) As part of the receivership, Elk's Board of Directors was required to notify SBA of any external transfer of funds from Elk's accounts to the accounts of other entities, including Ameritrans. (*See id.* at ¶ 140.) For the period of August 2012-April 2013, although Elk was in receivership, Feinsod and Defendant Mullens directed approximately $10.9 million to be transferred to an external bank account, without notifying SBA. (*See id.* at ¶¶ 140-154.) On or about October 31, 2012, Elk and SBA entered into a settlement agreement which, if violated, would permit SBA to seek appointment as Receiver for Elk's assets. (*See id.* at ¶ 3.)

On February 14, 2013, after Elk failed to meet the terms of the Settlement Agreement, SBA filed a complaint seeking its appointment as Receiver of Elk. (*Id.* at ¶ 68.) On April 24, 2013, this Court appointed Plaintiff to serve as Receiver and entered judgment in favor of SBA

for the amount of its outstanding funding, "which at the time totaled over $20 million." (*Id.* at ¶ 69.) The Receiver was tasked with "liquidating all of Elk's assets and satisfying the claims of creditors[.]" (*Id.* at ¶ 70.) On or about July 2, 2013, Ameritrans filed a notice with the Securities and Exchange Commission, "which stated that [Feinsod] and the entire board of directors had resigned en masse." (*Id.* at ¶ 72.) "In its last quarterly financial statement filed with SBA for the quarter ending June 30, 2012, Elk reported, as an asset, a "Due From Parent" (Ameritrans) amount of $10,901,847. On May 15, 2013, Ameritrans filed a Form 10-Q with the SEC reporting that Elk was due $14,271,038." (*Id.* at ¶ 74.)

On or about October 2, 2015, Plaintiff "made demand upon Ameritrans for $12,339,927 to be paid on or before October 15, 2015," but "Ameritrans failed to remit any payments on the amount due Elk." (*Id.* at ¶ 75.) Ameritrans did, however, "ma[ke] its documents, including corporate minutes, available to the Receiver for inspection and production." (*Id.* at ¶ 77.) After reviewing these materials, Plaintiff "determined that from on or about 2009 through April 2013, [Defendants] repeatedly and improperly used Elk's funds to operate and conduct business for the benefit of Ameritrans and its shareholders." (*Id.* at ¶ 78.) On October 5, 2016, Ameritrans filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts, and the Receiver "was named as a creditor for $12,339,927 in Ameritrans's bankruptcy schedules." (*Id.* at ¶ 79.) Through a forensic analysis of the financial records of both Elk and Ameritrans from the 2008-2013 time period, the Receiver concluded "that another $1,931,111 of Elk funds was used by Ameritrans to pay Ameritrans expenses for the nine-month period ending March 31, 2013," meaning the "total outstanding amount due Elk from Ameritrans is $14,271,038." (*Id.* at ¶ 80.)

By letter dated January 6, 2016, Plaintiff made demands upon each of the Defendants for the then-outstanding funds owed by Ameritrans to Elk, and gave each Defendant until February

16, 2016 "to remit payment or make financial arrangements with the Receiver." (*See id.* at ¶¶ 159-166.) The Receiver renewed its demand upon each Defendant by letter dated April 28, 2017, and gave each Defendant until May 26, 2017 "to remit payment or make financial arrangements with the Receiver." (*See id.* at ¶¶ 167-176.) As of the date of this action's commencement, no payments or arrangements for repayment to the Receiver have been made. (*Id.* at ¶ 176.)

**PROCEDURAL BACKGROUND**

Plaintiff commenced this action against Defendants on June 14, 2017 alleging that Defendants: (1) breached their fiduciary duties to Elk; (2) failed to act in accordance with the Elk Articles of Incorporation, and applicable federal and state laws; (3) wasted and converted Elk's corporate assets; (4) failed to exercise professional competence and care in the exercise of their professional duties; (5) were negligent in their acts and omissions; (6) aided and abetted other Defendants in breaching their own fiduciary duties; and (7) through their grossly negligent acts and omissions, caused Elk to violate applicable laws and regulations. (*See id.* at ¶ 8.)

On September 30, 2018, then-District Judge Joseph F. Bianco issued an Order granting in part and denying in part Defendants' individual Motions to Dismiss. *United States Small Business Administration v. Feinsod*, 347 F. Supp. 3d 147, 151 (E.D.N.Y. 2018). Judge Bianco dismissed the Receiver's claims for aiding and abetting breach of fiduciary duty, and conspiracy, but allowed the Receiver's other causes of action to survive. (*See id.*) Moreover, Judge Bianco determined that Defendants owed a duty to Elk once it had been rendered insolvent. (*Id.* at 160) (referencing *Teras Int'l Corp. v. Gimbel*, No. 13-CV-6788 (VEC), 2014 WL 7177972, at *11 (S.D.N.Y. Dec. 17, 2014) (citing *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 729 N.E.2d 683, 688 (N.Y. 2000) ("[O]nce a corporation is insolvent, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of creditors.")). Similarly, the court

found "that, prior to December 31, 2010, [D]efendants owed fiduciary duties to Ameritrans" and that whether Elk was insolvent following December 31, 2010 "is a question of fact that cannot be resolved at [the motion to dismiss] stage." (*Id.* at p. 161, n. 9.)

Beginning March 14, 2022, the parties began filing motions for pre-motion conference on their anticipated motions for summary judgment and *Daubert* motions. (*See* ECF Nos. 205-214.) Subsequent to these filings, Judge Seybert noted:

> The Court is in receipt of pre-motion conference requests regarding anticipated summary judgment motions by Plaintiff (ECF No. 205), the Independent Director Defendants (ECF No. 206) . . . Defendant Feinsod (ECF No. 208), and Defendant Feinstein (ECF No. 209). In addition to seeking leave to move for summary judgment, the parties also intend to file Daubert motions.
>
> Having reviewed the parties' letters and respective responses, the Court is WAIVING its pre-motion conference requirement and GRANTING the parties leave to file their motions. Counsel shall brief their Daubert motions in tandem with their cross-motions for summary judgment. In so doing, Holland & Knight LLP shall file a consolidated summary judgment motion, Daubert motion, and any opposition brief on behalf of all Independent Director Defendants. Similarly, MoloLamken LLP shall file consolidated motions and oppositions on behalf of Defendants Feinsod and Feinstein. As a result, for all parties, the Court is sua sponte expanding its page limitation to thirty (30) pages for memoranda of law in support of and in opposition to summary judgment motions only.
>
> Within two weeks, by August 29, 2022, counsel shall confer and submit a proposed briefing schedule to the Court.

(Electronic Order dated August 15, 2022.)

Shortly thereafter, Judge Seybert adopted the parties briefing schedule indicating that all *Daubert* motions and motions for summary judgment be filed on or before December 6, 2022, oppositions be filed on or before January 24, 2023, and replies be filed on or before February 21, 2023. (Electronic Order dated November 19, 2022.)

In accordance with those directives, Defendants filed: (i) a motion to exclude the expert opinion of Adam Hanover (ECF No. 231) which Plaintiff opposed (ECF No. 242) followed by

Defendants' reply. (ECF No. 251); (ii) a motion to exclude the expert testimony of Plaintiff's expert Jim Neal (ECF No. 235) which Plaintiff opposed (ECF No. 246) followed by Defendants' reply (ECF No. 249); and (iii) a motion to exclude the expert testimony of Plaintiff's expert, Jeffrey Manning (*see* ECF No. 233) which Plaintiff opposed (ECF No. 245) followed by Defendants reply. (ECF No. 250.) Separately, Plaintiff filed one *Daubert* motion to strike the expert report of Robert Lashway, preclude Defendants from relying on Lashway's opinions, strike the expert report of Craig Jacobson, strike the expert rebuttal reports of Jacobson, James Howard, and Clifford Wright, and preclude Defendants from relying on the testimony or reports of Jacobson, Wright, or Howard. (*See* ECF No. 224.) Defendants opposed (ECF No. 244) and Plaintiff submitted a reply. (ECF No. 248.)

These collective motions were referred to the undersigned by the Hon. Joanna Seybert. (*See* Electronic Orders dated 10/1, 2024 and 6/9/2025.)

## **MOTIONS IN LIMINE: THE LEGAL FRAMEWORK**

Before trial, parties may seek *in limine* relief to exclude anticipated evidence that may be inadmissible or irrelevant. *See Jaquez v. Flores* (*In re Estate of Jaquez*), No. 10-cv-2881 (KBF), 2016 U.S. Dist. LEXIS 34521, at *4 (S.D.N.Y. Mar. 17, 2016). "The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015) (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)). "Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n. 4 (2023); *Rivera v. Inc. Vill. of Farmingdale,* 29 F. Supp. 3d

121, 125 (E.D.N.Y. 2013) ("A motion *in limine* lies in this Court's 'inherent authority to manage the course of its trials.") (citation omitted).

### ADMISSIBILITY OF EXPERT TESTIMONY: THE LEGAL FRAMEWORK

"The admission of expert testimony is governed primarily by the Federal Rules of Evidence." *United States v. Walker*, No. 18-3506, 2023 WL 3451419, at *1 (2d Cir. May 15, 2023). Rule 702 of the Federal Rules of Evidence was recently amended, and this new Amendment took effect December 1, 2023. The rule now provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, ... the district court is the ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *2 (2d Cir. May 17, 2023) (same); *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) ("The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." (citations omitted)).

"Prior to permitting a person to testify as an expert under Rule 702, the court must make the following findings: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will 'assist the

trier of fact.'" *Silva v. Heil, Inc.*, 692 F. Supp. 3d 29, 35 (E.D.N.Y. 2023) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005)); *see also United States v. Napout*, 963 F.3d 163, 187–88 (2d Cir. 2020) (explaining that the court is tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993))); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (expanding *Daubert*'s holding to all expert testimony, not just scientific testimony)).

Testimony is relevant where it has "any tendency" to make the existence of any fact that is of consequence to the determination of the action "more or less probable than it would be without the evidence . . . ." *RVC Floor Décor, Ltd. v. Floor & Décor Outlets of Am., Inc.*, No. 18-CV-6449 (JS) (ARL), 2023 WL 2838423, at *6 (E.D.N.Y. Apr. 7, 2023) (quoting Fed. R. Evid. 401). Moreover, in *Daubert* the Supreme Court set forth a list of factors, in addition to the criteria set forth in Rule 702, that bear on the determination of reliability:

> (1) whether a theory or technique has been or can be tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

509 U.S. at 593–94.

The *Daubert* inquiry for reliability is a "flexible one" and does not "constitute a definitive checklist or test," and thus, the *Daubert* factors "neither necessarily nor exclusively appl[y] to all experts or in every case." *Kumho Tire*, 526 U.S. at 141, 150 (internal quotation marks and citation omitted); *In re Mirena IUS Levonorgestrel-Related Prods. Liability Litigation (Mirena II)*, 982 F.3d 113, 123 (2d Cir. 2020) (noting the *Daubert* inquiry is "fluid and will necessarily vary from case to case") (citation omitted).

The district court is afforded "the same broad latitude when it decides how to determine reliability as it enjoys [with] respect to its ultimate reliability determination." *Williams*, 506 F.3d at 160 (emphasis omitted) (citing *Kuhmo Tire*, 526 U.S. at 142)); *Kogut v. Cnty. of Nassau*, 894 F. Supp. 2d 230, 239 (E.D.N.Y. 2012) (Seybert, J.) ("The decision whether to admit or exclude a proposed expert's testimony is committed to the Court's broad discretion."). Expert testimony should be excluded if it is "speculative or conjectural." *Jones*, 965 F.3d at 162 (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). "[W]hen an expert's opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Paruirigan v. Prompt Nursing Employment Agency LLC*, No. 17-cv-1302 (NG) (JO), 2019 WL 4647648, at *9 (E.D.N.Y. Sept. 24, 2019) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002)); *see also Nimely*, 414 F.3d at 396 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (alteration in original) (quoting *Gen. Elec.*, 522 U.S. at 146)).

"[I]n deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Mirena II*, 982 F.3d at 123 (citation omitted). "In short, the district court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Amorgianos*, 303 F.3d at 265-66 (quoting

*Carmichael*, 526 U.S. at 152). Nevertheless, "in accordance with the liberal admissibility standards of the Federal Rules of Evidence, only serious flaws in reasoning or methodology will warrant exclusion." *Hasemann v. Gerber Products Co.*, No. 15-cv-2995 (EK) (JAM), 2024 WL 1282368, at *8 (E.D.N.Y. Mar. 25, 2024) (citation omitted).

It is with this framework in mind that the undersigned analyzes each *Daubert* motion.

## DISCUSSION

**A.  *Defendants' Motion to Preclude Expert Testimony of Jim Neal (ECF No. 235)***

Defendants seek to exclude the opinions of Plaintiff's expert, Jim Neal, the founder and managing member of Agema LLC, who was "retained by Plaintiff to provide a written report as to the effect of insolvency, as of a date certain, as to whether actions or inaction by the Defendants at certain periods of time relevant to the complaint were consistent with corporate governance best practices." (ECF No. 223-61, Neal Decl. at ¶ 2.) Neal determined that:

> Defendants did not act in a manner consistent with corporate governance best practices, that Defendants failed to exercise duties owed to Elk to the detriment of Elk's creditors. Further, Defendants' acts and inactions constituted a conflict of interest between the fiduciary duties they owed to Ameritrans and the fiduciary duties they owed to Elk and Elk's creditors. Lastly, Defendants elevated the interests of Ameritrans above the interest of creditors in Elk at a time when Elk was insolvent and thereafter.

(*Id.* at ¶ 12.)

Defendants seek to specifically exclude those opinions regarding corporate governance best practices, alleged regulatory violations, and those "laundering" fact testimony and inferences about Defendants' mental states through an expert, under *Daubert* and Rule 702. (ECF No. 236 at p. 1.) Neal's findings are memorialized in a report dated December 16, 2021 which

was amended on May 17, 2022.[2] (*See* ECF No. 223-61, Neal Decl. at ¶ 5; *see also* ECF No. ECF No. 237-38.)

### i. Neal's Opinions are Unreliable

Neal's conclusions hinge on whether the directors, including Feinsod, acted in accordance with "corporate governance best practices." (*See* ECF No. 237-38, Neal Amended Report at p. 38 ("Boards of directors that follow corporate governance best practices perform best when they receive good quality reports that contain sufficient information to make well-informed decisions."); *see also id.* ("The Defendants did not act in a manner consistent with corporate governance best practices by their failure to consider retaining an independent financial advisor to render a solvency opinion to the Board of Ameritrans and Elk.")).

Further, Neal contends that Feinsod's dual roles at Ameritrans "raise[d] a red flag" in that the "disproportionate amount of responsibility and power [he maintained] created a dynamic in which the likelihood of abuses- actual or perceived- of his duties of care and loyalty to Ameritrans and Elk and their stakeholders was heightened." (*Id.* at p. 18.) "Such overlapping and interconnected roles provided Mr. Feinsod with a degree of influence and control that, in my opinion, were inconsistent with sound corporate governance best practices." (*Id.*) Similarly, Neal determined that Feinsod did not act as "a prudent person would have" by disregarding the obligations Elk according to its Articles of Incorporation. (*See* ECF No. 237-38 at pp. 27-28.)

Notably, however, Neal fails to explain whether or how this "best practices" approach is applied in the corporate governance field, how one determines what the subjective meaning of "best" is, what makes one practice better than another, and whether this approach has been criticized, published, tested, or reviewed. *See Great White Bear, LLC v. Mervyns, LLC*, No. 06

---

[2] The amendments made were purely grammatical (*e.g.* correcting the spelling of words, removing quotation marks, and adding or removing periods). (*See* ECF No. 223-61 at p. 2.)

Civ. 13358, 2008 WL 2220662, at *4 (S.D.N.Y. May 2, 2008) (excluding expert report for failing to show how and why the expert arrived at the conclusions). Neal states that the basis of his opinion regarding sound corporate governance practices was formed through his experience and through reference to the sources cited in his opinion. (ECF No. 237-39, Neal Dep. at p. 151:5-20.) A majority, if not all, of these sources, however, contain information relevant to large, S&P 500 companies. (ECF No. 237-38, Neal Amended Report at pp. 17-18 (relying on compiled data from The Wall Street Journal which analyzed these dual positions in S&P 500 Companies to determine that Feinsod's role as President of Ameritrans and as Chairman of the Board of Directors "has become more controversial in corporate governance circles over the past decade"). Elk and Ameritrans, on the other hand, are small companies. Neal addressed this distinction during his deposition (*see* ECF No. 223-39, Neal Dep. at p. 153:15-25 ("I don't have any particular opinion about corporate governance best practices and how they are . . . fungible vis-à-vis the size of an organization") before admitting that he "did [not] perform an analysis in [his] report regarding how the size of Ameritrans or Elk affected the best practices." (ECF No. 223-29, Neal Dep. at p. 154:12-15.)

Forming generalized conclusions based on a methodology tailored towards certain companies that are inapposite to the size or industry of the company at issue renders the opinion unreliable in the current context. *See SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 282 (D. Conn. 2017) (finding that corporate governance testimony "must be tailored to address that particular form of business entity") (citing *Tindall v. H & S Homes, LLC*, No. 5:10-CV-044 CAR, 2012 WL 3241885, at *10, 12 (M.D. Ga. Aug. 7, 2012) (excluding portions of expert's corporate governance testimony because he did "not appear to rely upon any materials or publications

related to private, closely-held companies like those involved in this case" and thus rendered an unreliable opinion)).

Furthermore, Neal admits to not considering the impact of the application of the business judgment rule in his analysis, stating that the "business judgment rule wasn't really relevant" in forming his conclusions. (*See* ECF No. 237-39, Neal Dep. at p. 125:18-20, p. 126:2-4.) Likewise, even though Elk is a New York corporation, Neal neglected to "look at New York law as part of [his] analysis for [his] opinion." (*Id.* at p. 222:4-9.) In this case, a juror's eventual responsibility will be to determine whether Defendants breached a legal duty under the standards prescribed by New York law,[3] not under theoretical, generalized "best practices" for large public companies. *See In re Al-Naji*, 521 B.R. 65, 71 (W.D. Bankr. 2014) (concluding that because the corporation at issue was a New York corporation, analyzing New York law for the controlling standard for corporate officers and directors' actions was appropriate, namely New York's Business Corporation Law). Notably, New York Business Corporation Law provides that "a director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances." N.Y. Bus. Corp. L. § 717(a), § 715(h) (applying the same standard to officers of a corporation). Failure to analyze Defendants acts under these standards, while at the same time opining on an ambiguous "best practices" standard, renders Neal's opinion unreliable.

---

[3] "[U]nder New York choice-of-law rules, the law of the state of incorporation controls in adjudicating a corporation's "internal affairs," including the liability of directors and officers." *Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (referencing *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980)); *In re Grumman Olson Industries, Inc.*, 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005) ("Grumman is a New York corporation, and hence, the claim for breach of fiduciary duty is governed by New York law."). Here, Elk is incorporated in New York, thus New York law governs. (*See* ECF No. 223-11 (Elk Certificate of Incorporation)).

Moreover, to the extent Neal relies on Hanover's conclusion (*see* ECF No. 237-38 ("I have accepted Mr. Hanover's conclusion" relating to Elk and Ameritrans's insolvency "as an assumption in reaching conclusions in this analysis")), this does not weigh in favor of permitting his opinions because, as detailed below, Hanover's conclusions themselves were unreliable. Indeed, an expert's reliance on an unreliable report to generate its opinions is by itself unreliable and thus inadmissible. *See Brown v. Mermaid Plaza Assocs., LLC*, No. 13 CV 760 (AMD) (CLP), 2016 WL 5802779, at *9 (E.D.N.Y. July 20, 2016) (noting that an expert may rely on another expert's report so long as the other report is reliable) (citing *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007)).

### b. Neal's Conclusions on the Ultimate Legal Conclusion Usurp the Role of the Fact-Finder

Proffered expert testimony is generally found to be unhelpful to the trier of fact where it states a legal opinion and thereby usurps the role of the trier of fact. *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 517 (S.D.N.Y. 2010) (referencing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). Courts have found that although an expert may at times be permitted to opine about an ultimate issue of fact, this does not extend to proposed testimony or opinions that effectively tell the jury what legal result to reach. *See Nimely*, 414 F.3d at 397.

Here, Neal concludes that a conflict of interest existed (*see* ECF No. 237-39, Neal Dep., at p. 135:3-9 ("I certainly make a conclusion that a conflict of interest arose, yes"), an opinion sprinkled throughout his report. For instance, Neal concluded that the dual roles served between directors at Ameritrans and Elk "*de facto* subjected them to expanded duties and potential conflicts of interest than would have been the case if Ameritrans and Elk had separate executive officers and boards of directors." (ECF No. 237-38, Neal Amended Report at p. 16.) Indeed, Neal stated that Feinsod's role as Ameritrans' Chairman, President, CEO, CCO, and largest

18

shareholder "posed a conflict of interest" considering he had "more to lose than anyone inside or outside the Board room should Ameritrans not secure funding for its operations." (*Id.* at p. 37.) Most notably, Neal ultimately concluded that "[Defendants'] acts and inactions *constituted a conflict of interest*" between the fiduciary duties owed to both entities. (*Id.* at p. 39.)

Conclusions like these, that a conflict of interest exists, are ordinarily excluded because they encroach upon a juror's role to apply the facts to the law. *See Kleban*, 277 F. Supp. 3d at 285 (excluding the expert's testimony that "[t]his was a clear conflict," noting that the determination as to whether the director failed to manage or disclose conflicts of interest are questions for the jury). Neal elaborated on this conclusion when he noted that "in the face of *such a* conflict of interest" none of the defendants called for an independent valuation "as was consistent with corporate governance best practices," nor did the independent directors "identify *the* conflict of interest." (ECF No. 237-38 at p. 37) (emphasis added). *Au fond*, not only did Neal conclude that a conflict of interest existed, but he also determined that such a conflict meant Defendants breached the "best practices" standard—another issue to be determined by the trier of fact. *See Kleban*, 277 F. Supp. 3d at 285 (concluding the expert was precluded from testifying that the investor's "failure to disclose and to manage his obvious conflicts of interest constituted breaches of fiduciary duty").

Similarly, where experts opine as to the mental state or intent of the parties, such opinions will be excluded on grounds that they usurp the role of the trial judge in instructing on the applicable law and the jury's role in applying the law to the facts. *See In re Rezulin Products Liability Litigation*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("[P]lainitffs are precluded from offering expert opinion evidence . . . of the alleged motive, intent or state of mind of defendants or others."). Here, Neal opined that, despite being required to obtain consent from the SBA

before disposing of Elk's assets to Ameritrans, "Defendants engaged *knowingly* in self-dealing transactions" for Ameritrans's benefit. (ECF No. 237-38, Neal Amended Report at p. 34 (emphasis added); *see also* ECF No. 223-61, Neal Decl. at ¶ 44 ("Defendants engaged knowingly in conflict of interest transactions . . . ."). Neal's opinions about the Defendants mental state should, therefore, be excluded. *See Kleban*, 277 F. Supp. at 258 (noting the expert's opinion describing "the intention and mental processes" of the parties was "not an acceptable subject for an expert witness's opinion").

The court in *Billstein v. Goodman* addressed circumstances strikingly similar to those here. *See* No. 8-13415, 2012 WL 1048468, at *4 (E.D. Mich. Mar. 28, 2012). There, plaintiff's expert opined as to what the corporate "best practices" were with respect to corporate governance practice and corporate fiduciary duties, rather than opine on what Michigan law stood for in these areas. *Id.* Though "theoretical best practices" was her proposed standard, "that is not the law in Michigan" and thus her opinion was deemed unhelpful because "Defendants' liability will be assessed under Michigan law" and Michigan law is the law in which the jury will be instructed. *Id.* As such, the court determined that "[the expert's] testimony must be excluded because it is irrelevant, because it invades the sole province of the Court, and because the potential for confusion, misdirection and unfair prejudice to the Defendants greatly outweighs any arguable relevance it might have." *Id.*

The same potential concerns exist here. Neal attempts to submit "theoretical best practices" in place for New York's standards which, if permitted, would undoubtedly have the potential to confuse and misdirect the jurors into applying the wrong standard when evaluating Defendants' conduct. Accordingly, Defendants' motion to exclude the expert opinions of Jim Neal is granted.

B. _**Defendants Motion to Preclude Adam Hanover (ECF No. 231)**_

Defendants seek to exclude the expert opinion of Adam Hanover, Plaintiff's insolvency expert who was retained to provide an opinion as to "whether [Elk] was insolvent or solvent as of December 31, 2010 and whether Elk, and its parent, Ameritrans Capital Corporation, was insolvent or solvent as of December 31, 2011." (ECF No. 223-57, Hanover Decl. at ¶ 2.) He is a Managing Director in CohnReznick LLP, a financial and accounting consulting firm, and purports to have "extensive experience working with financially troubled companies, solvency analyses, as well as forensic accounting matters, having advised debtors, trustees and creditors in many chapter 11 matters." (ECF No. 237-35, Hanover Report at p. 2.) Hanover utilized a cashflow test to conclude that Elk was insolvent as of December 31, 2010 or, in the alternative that Elk and Ameritrans were insolvent as of December 31, 2011 based on the cashflow test, balance sheet test, and small capital test. (_See id._ at pp. 2, 23.)

i.      **Hanover Utilizes the Incorrect Approach to Measure Insolvency under the Balance Sheet Test, Making his Opinions Unreliable**

"There are two approaches to measuring insolvency: the balance sheet test and the cash flow test." _SOL-MM III LLC v. JPMorgan Chase Bank, N.A._, No. 23-cv-6479 (JGK), 2025 WL 936414, at *13 (S.D.N.Y. Mar. 27, 2025). A cashflow test is used to determine if the party can pay their debts as they become due in the ordinary course of business. _Id._ The balance sheet test is used to determine if the company's assets, at fair value, exceeds their liabilities. _Id._ A third test, the small capital test—which was also utilized by Hanover—is implemented to determine if the company conducted their business with unreasonably small capital to the point that the company is technically solvent but "doomed to fail." _In re Operations NY LLC_, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013).

21

The solvency of a business is ordinarily calculated based on revenues that the business "may generate as a going concern, and not based on the present liquidation value of its assets." *Jalbert v. Flom (In re Bicomny, LLC)*, 633 B.R. 25, 46 (Bankr. S.D.N.Y. 2021); *Graham v. Serafis (In re Red Rest. Corp.)*, 2021 Bankr. LEXIS 2377, at *32 (Bankr. S.D.N.Y. Aug. 31, 2021) (same). A "going concern" is defined as "the value of a commercial enterprise's assets as an active business with future earning power." *Am. Greenfuels Rockwood Tenn., LLC v. Aik Chuan Constr. PTE. Ltd.*, 702 F. Supp. 3d 217, 244 (S.D.N.Y. 2023) (quoting *In re TransCare Corp.*, 81 F.4th 37, 52 (2d Cir. 2023) (citation omitted)). Indeed, "[s]olvency should be measured on a going concern basis unless the demise of the business is so clearly imminent that the business is incapable of generating any ongoing revenues." *In re Bicomny, LLC*, 633 B.R. at 46 (collecting cases where solvency is to be determined by the going concern, not the liquidation value of a corporation's assets less its liabilities, unless the business is on its "deathbed").

In implementing the balance sheet test, Hanover relied on a liquidation valuation rather than a going concern valuation. (*See* ECF No. 223-57, Hanover Decl. at ¶ 33; ECF No. 237-35, Hanover Report at p. 16.) Specifically, in determining whether Elk and Ameritrans' assets exceeded the fair value under the balance sheet test, he based his analysis off "an orderly liquidation [] of all its assets." (ECF No. 237-35, Hanover Report at p. 16 ("I used orderly liquidation values in my analysis"); *id.* at p. 20 ("As I did with Ameritrans, I used orderly liquidation values in my analysis [for Elk].") Importantly, Hanover concluded that "the orderly liquidation of Elk's assets was less than the value of its liabilities" and thus Elk was insolvent as of December 31, 2011. (*Id.* at p. 21.) Similarly, Hanover determined, for Ameritrans, that "the orderly liquidation value of Ameritrans' individual assets is less than the amount of the value of its liabilities." (*Id.* at p. 18.)

22

The flaw with Hanover's analysis is that he neglects to address, nor is it palpable from review of the submissions, how Elk or Ameritrans were "on their deathbed" or were unable to generate ongoing revenues—the set of circumstances warranting the use of a liquidation valuation method over a going concern method. For instance, in April 2011, Columbus Nova entered into an agreement to purchase $25-65 million of Ameritrans equity, thereby disproving an assumption that Elk or Ameritrans was incapable of generating future revenues. Indeed, courts have "consistently frowned upon the use of calculations that are based on liquidation values rather than going concern values, unless the demise of a business is so clearly imminent that the business is incapable of generating any further revenues." *In re HHE Choices Health Plan, LLC*, No. 15-11158, 2019 WL 6112679, at *5 (Bankr. S.D.N.Y. Nov. 15, 2019) (collecting cases); *In re Adler, Coleman Clearing Corp.*, 247 B.R. 51, 110 (Bankr. S.D.N.Y. 1999) (illustrating that only where a company is on its "deathbed" will a court not give the assets a going concern value). Utilizing the incorrect standard and method for determining insolvency renders Hanover's opinion unreliable considering the determination of insolvency under one test may in fact be the opposite under another valuation method. *See Amorgianos*, 303 F.3d at 268-69 (affirming the exclusion of an expert's opinion as unreliable where he failed to apply the proper method of calculation).

Furthermore, Hanover's opinion and analysis relating to the balance sheet test suffers from an additional flaw. Hanover made "several adjustments" to Elk and Ameritrans' balance sheets in connection with his solvency analysis. (ECF No. 237-35, Hanover Report at pp. 17, 20.) In conducting Elk's solvency analysis under the balance sheet test, he "assumed that all of Ameritrans Capital's loans and investments resided at Elk, except for the life insurance settlement contracts, which were maintained by Ameritrans" and subsequently used the higher

orderly liquidation value of these loans and investments based on the range Manning arrived at in his report—the range from $5.5 million to $9.8 million. (*Id.* at p. 20.) Additionally, he "assumed" that Elk's $1.1 million of assets acquired in satisfaction of loans "would have an orderly liquidation value of 80% of their net cost and therefore reduced that value by 20%." (*Id.*)

Similarly, in conducting Ameritrans' solvency analysis, Hanover "used the higher 40% amount" of the orderly liquidation values of commercial loans being 20-40% of their net costs. (*Id.* at pp. 17-18.) He also "assumed" that assets acquired in order to satisfy loans as of December 31, 2011 "would have an orderly liquidation value of 80% of their net costs" and Hanover "therefore reduced the value by 20%." (*Id.* at p. 18.) Though Hanover states he arrived at this range from relying on Manning's report, Hanover's basis for this assumption of using 80 percent is that it "was the highest value that Mr. Manning came up with for any asset . . . .". (ECF No. 237-32, Hanover Dep. at p. 218:2-6.) In making these aforementioned adjustments, Hanover relied on the figures and amounts found in Manning's report. (*See* ECF No. 237-35 at pp. 17-18, 20-21; ECF No. 237-32, Hanover Dep., pp. 167-169.)

It is well settled that an expert may rely on the conclusions of another expert. *United States Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) ("One expert is permitted to rely on facts, opinions, and data not of the expert's own making — including analyses performed or findings made by another expert in the case.") Notwithstanding, Hanover's adjustments were made to the orderly liquidation value which, as detailed *supra*, is problematic. Importantly, Hanover offers no explanation for why these adjustments were made, why certain figures were assumed or chosen over others, and, crucially, whether acting as he did was warranted under these circumstances and why. Indeed, an expert may not, like Hanover has done, rely on certain figures to the exclusion of other figures without an explanation. *See Stewart*

*v. Estate of Sugar Hill Music Pub. Ltd.,* 2013 WL 1405422, at *1 (S.D.N.Y. Apr. 8, 2013) (granting a *Daubert* challenge and excluding testimony in part because the expert's testimony was based on an "unexplained assumption"); *see also Bank of America, N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 358 (S.D.N.Y. 2013) ("Because Dr. Bajaj's opinions were premised upon an unfounded assumption, his conclusions will not be helpful to the finder of fact."). Therefore, Hanover's determinations and opinions based on his balance sheet analysis are rejected.

> **ii.    Hanover Utilizes the Incorrect Approach under the Cash Flow Test, Thereby Rendering his Opinions Unreliable**

With respect to the cash flow test, Hanover determined that Ameritrans was insolvent under this test because it "did not have the ability to pay its debts as they matured." (ECF No. 237-35, Hanover Report at p. 19.) Similarly, Hanover concluded that Elk was insolvent under this test largely based upon the fact that the SBA had the right to declare its loans "immediately due and payable" and "Elk did not have the ability to cure the impairment or to immediately pay the SBA the amount of its outstanding debt.") (*Id.* at pp. 21-22.) Indeed, Hanover considered the cash flow test to be a forward-looking test, (ECF No. 237-32, Hanover Dep. at p. 195:23-25) ("[The cash flow test is] a forward-looking test), and admittedly applied this forward-looking approach to his insolvency analysis. (*See* ECF No. 237-32, Hanover Dep., pp. 196-198, 204-205.) A forward-looking approach like this used to determine solvency is not reliable because this approach has been explicitly rejected by this Circuit. *See In re Tribune Company Fraudulent Conveyance Litigation*, 10 F.4th 147, 166 (2d Cir. 2021) (following Second Circuit precedent to conclude that a "forward-looking approach" that considers future debts as part of an insolvency analysis is improper and should be rejected).

Additionally, Hanover's insolvency conclusion from the cash flow test is dependent upon his assumption that $21 million SBA debt was due and payable as of December 31, 2010. In contrast, however, the SBA *could have* accelerated the debt at that time but did not do so until 2012. Hanover's analysis is therefore founded in a hypothetical situation that did not occur during the relevant solvency period, and, therefore, cannot form the basis for a reliable expert report. *See Buckley v. Deloitte & Touche USA LLP,* 888 F. Supp. 2d 404, 413 (S.D.N.Y. 2012) (excluding an expert's report because it relied "on unfounded assumptions about what [plaintiff] and lenders would have done if certain hypothetical events took place"). As such, Hanover's cash flow analysis is rejected as unreliable.

### iii. The Small Capital Test Used by Hanover is Irrelevant and Unhelpful to a Trier of Fact

The small capital test is simply not tied to the concept of insolvency. *See Tronox Inc. v. Kerr McGee Corp.* (*In re Tronox Inc.*), 503 B.R. 239, 321 (Bankr. S.D.N.Y. 2013) (noting that the small capital test pertains to financial difficulties "short of insolvency" but may led to insolvency "at some time in the future") (citation omitted); *see also In re Omansky*, No. 18-13809 (LGB), 2022 WL 4281472, at *14 (Bankr. S.D.N.Y. Sept. 15, 2022) ("The applicable case law supports an unreasonably small capital finding where the debtor is not insolvent at the time of the transaction . . . ."). It follows, therefore, that for Hanover—the expert hired to opine as to the solvency or insolvency of Elk and Ameritrans at two specified dates—to draw solvency conclusions using a test that "denotes a financial condition short of equitable insolvency" or whether "insolvency was inevitable in the reasonably foreseeable future" would not assist the trier of fact in determining Elk or Ameritrans' insolvency as of the relevant time periods. *In re Operations NY LLC.*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013); *In re Adelphia Commc'ns Corp.*, 652 F. App'x 19, 21 (2d Cir. 2016) (citation omitted).

26

Accordingly, Defendants' motion to exclude Hanover's opinions and testimony is granted.

### C.  *Defendants' Motion to Preclude Expert Testimony of Jeffrey Manning (ECF No. 233)*

Defendants next seek to exclude expert testimony from Jeffrey R. Manning under *Daubert* and Federal Rule of Evidence 702. (ECF Nos. 233-234.) Manning is Plaintiff's expert hired in conjunction with Hanover to "evaluate and assess the most likely process, timeline, and outcome relating to liquidating the associated loan portfolios" on December 31, 2010 and December 31, 2011. (ECF No. 237-37 at p. 3.)

In Manning's Original Report dated December 16, 2021, he concluded that "the commercially reasonable liquidation process" of the investment portfolio based on the SEC Forms 10-Q filed as of December 31, 2010 and 2011 "to third-party investors in an arms-length transaction would require between 70 to 120+ days to complete and would result in approximate recovery percentages between 20-40% of their net cost value." (*Id.*) Manning determined that "a process to sell the portfolio *en bloc* is the only practical business solution" because "[a]ny attempt to monetize the Investment Portfolio on an asset-by-asset basis would be inefficient, arduous, costly, and likely unsuccessful, leaving "orphans" investments behind with no viable bids . . . .". (ECF No. 237-37 at p. 4.) He arrived at this conclusion after considering "other portfolio sales" he analyzed and executed (*Id.*)

On February 22, 2022, Manning submitted an Amended Report. The Amended Report adds:

- Two footnotes that indicate that Manning *included* equity investments with net costs from $4,000 to $700,000 whereas he previously *excluded* them (ECF No. 237-67, Manning Amended Report at p. 4 n.3, 5);

- A footnote naming the two prior "other portfolio sales" he previously analyzed and executed (ECF No. 237-67, Manning Amended Report at p. 4, n.6);

- A footnote purporting to explain how he arrived at his conclusion that value investors stand to receive roughly 20-40% returns (ECF No. 237-67, Manning Amended Report at p. 5, n.7);

- An entire new section and opinion relating to Manning's subsequent review of a Financial Due Diligence Draft Report by Grant Thornton ("GT")—a company retained "to prepare and present a due diligence report related to Columbus Nova's proposed investment" into Ameritrans—from March of 2011 (ECF No. 237-67, Manning Amended Report at p. 8); and

- The Financial Due Diligence Draft Report by GT. (ECF No. 237-67, Manning Amended Report at p. 9.)

In light of the Amended Report, the undersigned must first determine whether this Court ought to accept and consider the newly added opinions and conclusions found in the Amended Report, or whether the Court must engage in its analysis with reference solely to the Original Report. *See Alan L. Frank Law Assocs., P.C. v. OOO RM Invest*, No. 17-CV-1338 (NGG) (ARL), 2021 WL 1906468, at *3 (E.D.N.Y. May 12, 2021) (noting that the question of whether to consider the supplemental expert declaration "is logically prior" to the issues raised in the *Daubert* motion "since the resolution of that question will determine whether the court may consider that declaration in evaluating the admissibility of [the expert's] other testimony.")

### i.    Admissibility of Manning's Amended Report

Rule 26(e)(2) clearly states: "[f]or an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Notably, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion,

at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed R. Civ. P. 37(c)(1); *see Design Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006) (noting trial courts "have discretion to determine whether or not a substantial justification exists and whether or not the failure to disclose is harmless.").

Following the conclusion of expert discovery, an expert's supplemental report may be submitted if it is "within the scope of the initial expert report." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co.*, 769 F. Supp. 2d 269, 279–80 (S.D.N.Y. 2011) (allowing an expert's supplemental affidavit as it "provided evidentiary details for the conclusions originally espoused in [the expert's] report—which remain unchanged—and is thus properly within the scope of that report."); *see also Washington v. Kellwood Co.*, No. 05-CV-10034 (SN), 2016 WL 3920348, at *19 (S.D.N.Y. July 15, 2016) ("Experts can update their conclusions after discovery, but their updated conclusions must be consistent with the methods used in the expert report.")

Conversely, courts "will not admit supplemental expert evidence following the close of discovery when it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report." *Cedar Petrochemicals*, 769 F. Supp. 2d at 269 (internal quotations and citation omitted).  To allow such new evidence to be presented would undermine the purpose of the discovery rules, circumvent the discovery schedule that was ordered by the court, and prejudice a plaintiff.  *City of New York*, 637 F. Supp. 2d at 108. "It is only if the expert subsequently learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete, that the duty to supplement arises." *Lidle v. Cirrus Design Corp.*, No. 08- Civ. 1253 (BSJ) (HPB), 2009 WL 4907201, at *6 (S.D.N.Y. Dec. 18, 2009).

Here, the deadline to submit expert-in-chief reports was December 22, 2021, and the conclusion of all discovery, including expert discovery, was February 14, 2022. (*See* Electronic Orders dated October 28, 2021 and December 2, 2021.) Manning's Amended Report, filed on February 22, 2022, was therefore submitted two months past expert report deadline, nine days after his deposition, and eight days past close of discovery. Notably, Manning provides no explanation, let alone good cause, nor can the Court ascertain how the information now included in the Amended Report was "unknown or unavailable" to Manning. The added information includes, *inter alia*, portfolio sales that Manning *himself* analyzed and executed in the past and prior financial reports from March of 2011 relating to the Columbus Nova proposed transaction.

Further, Manning offers several new conclusions in his Amended Report. For example, Manning's Amended Report states that the GT Report confirmed his opinion that Ameritrans was not a going concern as of 2010 or 2011. Nowhere in Manning's Original Report does he make this conclusion. Additionally, he also concludes that the "entities were clearly insolvent and operating in the 'Zone of Insolvency.'" Considering a determination of whether Elk and Ameritrans were insolvent or solvent lies at the heart of this case, an amended report raising this conclusion for the first time at this late stage is undoubtedly prejudicial and, thus, impermissible. *See Coene v. 3M Co.*, 303 F.R.D. 32, 42 (W.D.N.Y. 2014) ("Although Rule 26(e) does not itself define the word supplement, common sense suggests (and numerous decisions confirm) that an expert report that discloses new opinions is in no way a mere supplement to a prior request."); *see also Williams v. East Meadow Union Free School District*, No. 21-cv-3310 (NJC) (JMW), 2025 WL 218829, at *5 (E.D.N.Y. Jan. 16, 2025) (collecting cases); *but see Alan L. Frank Law Assocs., P.C.*, 2021 WL 1906468, at *3–4 (permitting supplemental expert evidence submitted after discovery deadlines where the report contained "no new substantive evidence, analytical

30

approaches, or opinions," but rather made general assertions intended to clarify certain assumptions forming the basis of the initial report).

Accordingly, the Court will not consider Manning's Amended Report and now proceeds to determine whether the opinions and testimony of Manning meet *Daubert* and 702's standard.

### ii.   Reliability of Manning's Opinions and Testimony

Manning, in forming his Original Report, relied upon the conclusions drawn from Hanover's report. (*See* ECF No. 237-37 at p. 7 ("This report is based upon review and analysis of Mr. Hanover's Report and the Consolidated Statement of Investments found in the 10-Qs filed by Ameritrans Capital as of December 31, 2010 and 2011. The accuracy of this report and the findings therein are dependent upon the reliability and completeness of this information."). The Court opts not reiterate the issues with Hanover's opinions but will briefly focus on how Manning's report and conclusions suffer from the same flaws. First, Manning does not use a going concern analysis (*see* ECF No. 237-31, Manning Dep. at p. 61-62 (stating he did not offer any opinion as to whether Elk or Ameritrans were going concerns)), nor does he provide a comparable analysis of what the outcome would be during a liquidation sale or sold on a going concern. (*See* ECF No. 237-31, Manning Dep. at p. 64:17-21.) Indeed, Manning formed his conclusions based on the assumption that Elk and Ameritrans were insolvent—the conclusion Hanover arrived at using, as noted above, incorrect methodologies and standards. (*See* ECF No. 237-31 at pp. 54-56 (indicating that Manning's analysis was "clearly directed by the fact" that the company was insolvent and the assumption that the company was technically insolvent "is what's underlying [Manning's] assessment and [his] analysis in [his] expert report.")).

Though Manning may rely on the opinions adduced from other experts, it runs contrary to the principles underlying a *Daubert* analysis for Manning to use unreliable expert opinions

and conclusions in forming his own. *PRCM Advisers LLC v. Two Harbors Inv. Corp.*, No. 20-CV-5649 (LAK) (BCM), 2025 WL 1276513, at *19 (S.D.N.Y. May 2, 2025) ("[I]f one expert's opinion is excluded by the court (for example, because that expert was inadequately qualified, or her methodology was unreliable), any calculations, analyses, or conclusions reached by other experts in reliance on the excluded opinion must themselves be excluded."); *see In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 340, 494 (S.D.N.Y. 2018) (concluding the expert was not entitled to rely on another expert's "unreliable opinions for support," especially when considering both expert's opinions suffer from the same flaw). Manning's conclusions in reliance on Hanover, therefore, should be excluded.

### iii.    Qualifications of Manning as an Expert

Manning candidly admits that he is not a valuation expert or an accountant, rather he is an investment banker with forty years' experience in the corporate recovery industry and practical application of principles of corporate turnaround and liquidation and recovery are the basis of his report. (*See* ECF No. 223-39, Manning Decl., ¶ 23; *see also* ECF No. 237-31, Manning Dep., p. 52:16-18.) When, like here, an expert's opinion is based on his experience, courts will rely on the relationship between the cited experience and the opinion and determine whether the opinion is rationally based on the experience. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 538 (S.D.N.Y. 2004) ("An expert may indeed be excluded when his training and experience is lacking in the particular area in which his testimony is offered.").

Here, however, Manning fails to demonstrate how his specific experience in this industry has led him to formulate the conclusions found in his Original Report. *See SR Int'l Bus. Inc. Co. v. World Trade Center Props. LLC*, 467 F.3d 107, 113 (2d Cir. 2006). For example, in his Original Report, Manning states that "[r]elative to other portfolio sales I have analyzed and

executed [certain] assets are extremely small and would be challenging to liquidate in both 2010 and 2011.". (ECF No. 237-37 at p. 4.) He neglects to explain what these other portfolios were, how they were similar to Elk and Ameritrans's portfolios, how much experience he has with similar portfolios, and whether he has arrived at similar conclusions in the past. Similarly, he notes that "[t]o get a confident and accurate bid, the process needs to give bidders 45-60 days of due diligence – shorter periods would likely yield increased uncertainty and lower yields." (*Id.* at p. 5.) Manning does not explain how common this practice is, under what circumstances bidders may be given more or less than that range, or how "likely" there would be a higher or lower yield.

Without more, this Court is left to speculate whether his forty years' experience in the broad "corporate recovery industry" renders him qualified to offer opinions in the current case. *See Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 235-36 (E.D.N.Y. 2014) ("In considering a witness' practical experience and educational background as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.") (internal citations omitted). In addition, Manning did not discuss any academic literature employing his methodology used, any professional standards that call for his employed methodology, whether his methodology was known to be accurate, and what the potential error rate of this methodology was (*see* ECF No. 237-31, Manning Decl. at p. 86:5-22), any one of which would provide the Court some assurance that what Manning used here was consistent with what is done in the "corporate recovery industry."

The issue is not that Manning is inexperienced, but it is that he fails to demonstrate how this experience applies to the opinions rendered in this case and how the experience was

formative in making his conclusions. As such, Defendants' motion to preclude Manning's Original Report is granted.

**D.** ***Plaintiff's Motion to Preclude Reports of Lashway, Jacobson, Wright, and Howard (ECF No. 224)***

Plaintiff moves pursuant to Fed. R. Evid. 702 and *Daubert* to:

(i)     strike the rebuttal report of Robert Lashway, the expert engaged by Defendants as a rebuttal expert to Manning;

(ii)    preclude Defendants from offering or relying on Lashway's opinion testimony;

(iii)   strike the Original and Rebuttal report of Craig Jacobson, an insolvency expert retained to review various financial and business records associated with Elk and perform a solvency analysis, strike the Rebuttal Report of James Howard, Defendants' rebuttal expert for Manning, and striking the Rebuttal Report of Clifford Wright, Defendants' rebuttal expert for Neal; and

(iv)    preclude Defendants from relying or offering the expert testimony or reports of Jacobson, Wright, or Howard.

(*See generally* ECF No. 224-54.)

a.     *Expert Rebuttal Report of Robert Lashway*

Lashway, an accounting and valuation expert, was retained by Defendants to respond to certain opinions contained in Manning's report, in addition to certain opinions in Hanover's report on which Manning relied upon. (ECF No. 237-36, Lashway Report at p. 2.) In doing so, he relied upon numerous documents (*see id.*, Exhibit A) and considered facts represented to him by counsel. (*See id.*) Lashway reached the following four conclusions:

(i)     Manning's Report and his use of an orderly liquidation premise to estimate asset values was inconsistent with valuation and accounting guidance, and Manning and Hanover's Reports rely on information (e.g. the assumption that the entire $21,175,000 in SBA debenture was due and payable as of the measurement dates) contradicts information that was "known or knowable" as of the measurement dates;

(ii)     Manning does not consider publicly available information as well as testimony related to the SBA receivership process;

(iii)    The values reported in the Forms 10-Q provide the Company's contemporaneous estimation of the value at which an orderly transaction to sell the Assets to market participants would yield, in accordance with generally accepted accounting principles; and

(iv)    Manning Report's assessment of the Assets values lacks detailed analysis, a thorough discussion of the quantitative and qualitative factors considered, third-party sources, as well as other common best practices in a valuation context.

(*Id.* at pp. 2-3.)

### i.  Whether Certain Conclusions and Opinions Were Drawn from Lashway's Communications with Counsel

Plaintiff avers that Lashway's opinion as to valuation and accounting guidance should be excluded because it is "solely based on his legal research and opinions of Defendants' counsel, not any specialized expertise of knowledge." (ECF No. 224-54 at p. 6.) Lashway's Report, however, demonstrates that he considered far more than just statements made by counsel. He first explains, and analyzes, the differences between going concern values and liquidation values, referring to the "Business Valuation Standards published by the American Society of Appraisers . . .". (ECF No 237-36, Lashway Report at p. 9.) He then concludes, "[b]ased on [his] research of accepted accounting and valuation guidelines" that a going concern should be used unless the debtor is "on its deathbed," citing two cases in support as well. (*See id.* at p. 10.) Lashway additionally reviewed the relevant financial statements to conclude that Ameritrans was not incapable of generating any further revenues. (*See id.*) Only then did "counsel inform[] [him], *consistent with [his] research*," that going concern calculations are used for balance sheet calculations. (*Id.*) (emphasis added).

Similarly, though Plaintiff argues that the "Information Regarding the SBA Process from Counsel" portion of Lashway's Report is inappropriate for the same reasons (*see* ECF No. 224-54 at p. 8), his Report makes clear that because he was not an expert in the SBA lending process, counsel provided him with SBA Regulations in addition to two depositions of former SBA analysts and administrators. (*See id.*) Lashway then analyzed "[t]he depositions, together with the public filings" to arrive at his conclusions. (*See id.*)

Likewise, Plaintiff contends that Lashway's opinion that the SEC Filings provide the company's contemporaneous estimation of the value of its assets is inappropriate because is "based entirely on Lashway's communication with counsel and fails to include any independent expert analysis." (ECF No. 224-54 at p. 10.) This is false. In fact, Lashway explicitly stated that he reviewed the company's Forms 10-Qs as of the 2010 and 2011 measurement dates, provided an extensive analysis based on this review pursuant to the generally accepted accounting principles. (*See id.*) Lashway's conversations with counsel—where he learned that "a public accounting firm reviewed the Company's valuation processes on at least a quarterly basis"—do not affect the prior conclusions he formed from his extensive independent analysis.

Indeed, Lashway's statements are reliable because he reached his conclusions following his own review of the evidence and documents presented to him, only to then discuss—and confirm—his findings with counsel *after* drawing conclusions from discernable methodologies. *Contra Caruso v. Bon Secours Charity Health Sys.*, No. 14 CV 4447, 2016 WL 8711396, at *6 (S.D.N.Y. Aug. 5, 2016) ("[The expert's] testimony must be excluded as unreliable under *Daubert* because she relies solely on facts that plaintiff's counsel chose to share with her and did not conduct an independent review of evidence upon which her conclusions are based, and fails to use or describe any discernible methodology.").

The same does not hold true, however, for Lashway's determination that Manning failed to consider the SBA Receivership process. Lashway admits that he "is not an expert on the SBA receivership process." (ECF No. 237-36, Lashway Report at p. 15.) As a result, he asked counsel for relevant information on the topic which he reviewed what counsel provided, discussed with counsel, and formed his opinions based on these communications. (*Id.*) Though an expert need not know all information pertaining to a certain topic, where the expert relies upon information from a client or from counsel, the expert's opinion should not rely solely on the information they supply. *See Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003). Here, Lashway's conclusion seems to be drawn exclusively from his review of "relevant information on the topic" provided by counsel and repeated discussions with counsel. (*See* ECF No. 237-36, Lashway Report p. 15.) Without an explanation as to how Lashway took this information and conducted an independent analysis of it before drawing his own conclusions, that opinion is excluded. *See Caruso*, 2016 WL 8711396, at *6.

### ii. Whether Lashway's Remaining Opinions are Proper for Rebuttal Reports

Plaintiff avers that Lashway's opinion as to the "Facts Known of Knowable as of the Measurement Dates" is improper because he is not an expert in insolvency or acceleration of debentures. (ECF No. 224-54 at p. 7.) Here, however, Lashway states that an "important" tenet in valuation of a corporation is information known or knowable at the time of the valuation date. (*See* ECF No. 237-36, Lashway Rep. p. 11.) This is hardly a solvency opinion. Rather, he is opining as to the information at his disposal and whether Manning and Hanover should have known of certain information, including that the debentures were not accelerated until 2012, in determining that the debentures were not due and payable. (*See id.* at p. 12.) Whether there

remains a dispute as to whether the debt was *actually* due and payable goes to the weight of the testimony, not the admissibility of it.

Additionally, Lashway's opinion regarding the lack of "detailed analysis" and "thorough discussion" of certain factors is a quintessential opinion within a rebuttal report. "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." *Luitpold Pharmaceuticals, Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015). Indeed, "[t]here is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Id.* Lashway's opinion points out the issues with Manning's report (*see* ECF No. 237-36, Lashway Report at pp. 18-19), includes a discussion of the assessments Manning provides (*see* ECF No. 237-36, Lashway Report at p. 20), and draws his conclusions from these observations and based on his own valuation experience. (ECF No. 237-36, Lashway Report at p. 20.) Plaintiff argues that Lashway was required to offer what other standards or analysis' Manning should have provided (*see* ECF No. 224-54 at p. 12), but such is not a requirement of an admissible rebuttal report. *See Joffe v. King & Spalding LLP*, No. 17 Civ. 3392, 2019 WL 4673554, at *14 (S.D.N.Y. Sept. 24, 2019) ("[A] rebuttal expert need not identify alternative or better methodologies."); *see also Scott*, 315 F.R.D. at 51 ("As a rebuttal witness, [defendant's expert] was under no obligation to create models or methods of his own.").

Accordingly, Plaintiff's motion to preclude the opinions of Lashway is denied, with the exception that Lashway's opinion that Manning did not consider publicly available information as well as testimony related to the SBA receivership process, is to be precluded.

b.  _Expert Rebuttal Reports of Howard and Wright, and the Original and Rebuttal Report of Jacobson_

Plaintiff avers that because James Howard, Clifford Wright, and Craig Jacobson were all experts engaged by Defendants Laird, Boockvar, Singer, Sommer, Indick, and Wolpert, who have all since settled, these experts' opinions are no longer before the Court. (ECF No. 224-54 at p. 1.) Notwithstanding, Plaintiff argues that "to the extent Defendants [] seek to rely on the reports of . . . Jacobson and Wright, those opinions should in the alternative, be precluded as they are based solely on Defendants' counsel's statements and arguments, are expressly contradicted by the undisputed facts, are unsupported, and/or are outside the scope of the expert's experience and qualifications." (_Id._ at pp. 1-2.)

Merely because these experts were hired by parties who have since been dismissed does not preclude reliance on these experts' reports. _See Carter-Wallace, Inc. v. Otte_, 474 F.2d 529, 536 (2d Cir. 1972) (noting that courts maintain authority to compel prior expert testimony to be used in a current proceeding, namely that it can require the expert to provide previously formed opinions and conclusions). The key consideration when determining whether to consider an expert's testimony is whether the testimony "fits" with the facts of the case. _Daubert_, 509 U.S. at 591. "Fit" is a consideration of relevance, meaning that an expert's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." _Id._ As such, it is not the fact that the _parties_ who retained the experts are no longer before the court, it is whether the _issues_ that the experts opine to remain before the court, which, as here, they do. _See In re Refco Inc. Securities Litigation_, No. 07-md-1902 (JSR), 2012 WL 7007795, at *4 (S.D.N.Y Nov. 29, 2012) (collecting cases where only in situations where _issues_ were dismissed were the expert's opinions relating to the dismissed claims deemed irrelevant).

For example, in *DG&G, Inc. v. FlexSol Packaging Corp.*, the United States Court of Appeals for the Eighth Circuit determined that reports generated by an expert retained by "a settling party" could be relied upon by other parties for summary judgment purposes. 576 F.3d 820, 826 (8th Cir. 2009). There, plaintiff argued that because the expert was retained by a party no longer in the action, coupled with the fact that the expert was not produced for a deposition, the expert's report should not be considered. *Id.* The court, however, determined that not only did plaintiff have the opportunity to depose the expert "when the settling party identified him as a retained expert," but also that plaintiff offered "no authority prohibiting the use of another party's expert report for summary judgment purposes." *Id.* at 826-827. Similarly, here, merely because these experts were hired by now-settled parties does not automatically preclude their reports or opinions where they may be relied upon for summary judgment purposes. Like in *FlexSol*, Plaintiff offers "no authority" for its generalized, prohibitive position and, as such, should the parties wish to consider the expert opinions and reports of James Howard, Clifford Wright, and Craig Jacobson, they may do so subject to the limitations detailed below.

### i. *James Howard*

In a footnote on page 11 of Plaintiff's Memorandum of Law in support of its motion in limine, Plaintiff sets forth its only argument for precluding Howard's Report: "Howard's Report on the same subject matter also asserts that Manning should have followed a standard or performed additional analysis; however, Howard did not identify such a standard, as the standard is based on experience, nor did Howard perform any analysis." (ECF No. 224-54 at p. 11, n.3). As such, Plaintiff contends that Howard should be precluded on the same basis as Lashway's Rebuttal report. (*Id.*)

Courts in this Circuit overwhelmingly find that "arguments made only in footnotes need not be considered by the Court." *Guerra v. Commissioner of Social Security*, No. 16-CV-991 (MAT), 2018 WL 3751292, at *2, n.1 (W.D.N.Y. Aug. 7, 2018) (referencing *F.T.C. v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled ... that a court need not consider arguments relegated to footnotes[.]")); *see Diesel v. Town of Lewisboro*, 232 F.3d 92, 110 (2d Cir. 2000) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."); *see also Scott*, 315 F.R.D. at 45 ("Arguments made only in a footnote are generally deemed to be waived."). Even if this Court were to consider the argument contained in the footnote, the undersigned reiterates that a rebuttal report need not identify a particular standard or perform an independent analysis, contrary to Plaintiff's alleged justification for preclusion. *See In re Aluminum Warehousing Antitrust Litigation*, 336 F.R.D. 5, 29-30 (S.D.N.Y. 2020) (collecting cases determining that a rebuttal report may criticize the methodologies of another expert without offering a competing analysis, methods, or theories). Accordingly, Plaintiff's motion to strike the expert rebuttal report of James Howard is denied.

### ii. *Clifford Wright*

Wright, a rebuttal expert for Neal, determined that the standards that apply to officers and directors of a corporation include the duty of care, duty of loyalty, and business judgment rule. (ECF No. 224-51 at p. 6.) He formed this conclusion following his "decades of experience as an officer, director, employee, member, and manager of entities" in varying industries. (*Id.* at p. 5.) Wright concluded that Neal's report suffers from the following flaws:

a. The Neal Report does not use a reliable methodology that is accepted as a customary and ordinary standard for directors;
b. Mr. Neal has no experience as a [corporate] governance expert witness;

41

     c.  Mr. Neal does not differentiate between the actions of inside directors versus the Outside Directors;

     d.  The Neal Report does not describe how each Director failed to perform his customary and ordinary duty of care under the appropriate standard;

     e.  Mr. Neal infers, without evidentiary support, that directors of both a subsidiary and a parent company have inherent conflicts of interest and have self-dealing interests;

     f.  A conflict of interest addressed in the industry standards noted above applies to an undisclosed interest to decision makers and where that undisclosed interest is a financial interest;

     g.  Mr. Neal assumes Elk was insolvent as of December 31, 2010 and that Elk and Ameritrans were insolvent as of December 31, 2011, as concluded by the Hanover Report dated December 22, 2021;

     h.  Business Judgment Rule is not addressed;

     i.  Does not consider in his opinion material acts taken by the Board over the course of 2011 to capitalize Ameritrans through the $65 million capital infusion with Columbus Nova;

     j.  In alleging certain regulatory violations such as the late filings of certain SBA Forms, Mr. Neal does not consider that while the Outside Directors approved the content of various filings, filing timely was the responsibility of management; and

     k.  Mr. Neal incorrectly characterizes to the "Due From Parent" receivable as Elk improperly "lending to its Parent".

(ECF No. 224-51 at pp. 7-11.)

Plaintiff contends that Wright's report should be precluded because he does not state why Neal's methodology was unreliable, nor does he identify how the National Association of Corporate Directors ("NACD") standards differ from Neal's "best practices." (ECF No. 224-54 at pp. 20-21.) Moreover, Plaintiff states that Wright's opinion is unreliable because he "fails to identify upon what other basis the NACD standards of care have been determined by this, or any, Court to be exclusive standard applicable to officers and directors upon which an expert opinion must be based." (ECF No. 224-54 at p. 21.)

This argument misstates the principles underlying a *Daubert* analysis because to determine the reliability of an expert's opinion, a party needs to show that the method or standard relied upon by the expert was used in the community (*e.g.* whether it was an industry standard) and whether other experts would apply that same methodology. *See Lickteig v. Cerberus Cap.*

*Mgmt., L.P.*, 589 F. Supp. 3d 202, 331-332 (S.D.N.Y 2022) (concluding proposed testimony satisfied *Daubert* where the expert relied on "well-established industry standards" and "applied such industry-standard valuation methodologies"). Wright's report does just that. (*See* ECF No. 224-51, Wright Report, at p. 5 (noting Wright's conclusion was based in part on the guidance of the NACD which "comport with [his] own experience and knowledge of best practices in corporate governance. The customary standards of care developed by NACD and published in NACD Blue Ribbon Commission Reports have been derived through collaboration of top individuals in their fields including business executives, general counsels, law professors, accountants, bankers, and regulators.") Indeed, Wright's report offers more of a basis for how and why his cited standard was used more so than Neal does with his "best practices" approach.

Additionally, Plaintiff misstates Wright's conclusion about Neal having no experience as a corporate governance expert. Plaintiff argues that this opinion "seems to be solely based on Mr. Neal's CV showing he has not been admitted as an expert before a Court." (ECF No. 224-54 at p. 22.) Nowhere does Wright indicate this is the reasoning for his position. In contrast, Wright arrived at his conclusion because his experience "spans more than 10 years with recent activity." (ECF No. 224-51, Wright Report, at p. 8.) The Court declines to entertain Plaintiff's arguments that "Wright's opinion suggests that only those who have testified and been admitted as an expert previously may be admitted as an expert" (ECF No. 224-54 at p. 23) when the record is silent as to anything supporting this contention.

Nonetheless, after carefully analyzing each of Wright's conclusions, Opinion 7 of Wright's report should be precluded. In Opinion 7, Wright determined: "Mr. Neal assumes Elk was insolvent as of December 31, 2010 and that Elk and Ameritrans were insolvent as of December 31, 2011, as concluded by the Hanover Report dated December 22, 2021. *Although*

*outside the scope of my own report*, I understand that this conclusion is disputed by Mr. Craig Jacobson." (ECF No. 224-51 at p. 9) (emphasis added). "Where an expert testifies outside the scope of his discipline, the Court must exclude that portion of his testimony." *RVC Floor Décor, Ltd.*, 2023 WL 2838423, at *6; *see Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) ("[W]here an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case.") (emphasis in original).

Accordingly, Plaintiff's motion to preclude Wright's Rebuttal Report is denied, with the exception that Opinion 7 from Wright's Rebuttal Report is precluded.

### iii. *Jacobson Original Report*

Jacobson was retained to review various financial and business records associated with Elk and perform a solvency analysis of Elk each quarter from December 31, 2010 until June 30, 2012. (ECF No. 224-49, Jacobson Report at p. 1.) In his Original Report, Jacobson determined that Elk was solvent during each of these quarters, a conclusion reflecting that:

(i) The balance sheet of Elk at each of these dates showed assets that were greater than liabilities. In other words, as of each of these dates, Elk could have sold its assets and fully satisfied its obligations; and

(ii) While Elk was losing money and had a high level of debt as of these dates, these factors do not speak to the Company's solvency because Elk management under the direction of the Board of Directors had sought and obtained equity financing that, had the Small Business Administration not blocked it, would have recapitalized the Company and allowed it to become profitable.

(*Id.* at p. 2.)

Jacobson formed his opinions based on his "review of the documents, the financial and valuation analyses referred to in this report and contained in the attached

schedules, independent research and [his] past experience, education, training and professional judgment, which techniques are regularly relied upon by experts in the fields of financial analysis, forensic accounting, business valuation, and corporate finance." (*Id.* at p. 1.)

He specifically utilized the balance sheet test based on Elk's financials with no adjustments made, an adjusted balance sheet test used by preparing "pro forma" financial statements assuming that the expected $25 million equity investment by Columbus Nova actually took place, a cash flow analysis based on this assumption, and finally a capital adequacy test based on this assumption. (*See id.* at ¶¶ 33-66.) Plaintiff contends that Jacobson's Report ought to be excluded because he assumed that the Columbus Nova Transaction would be completed and formed his solvency opinions based on this—an event that never occurred. (*See* ECF No. 224-54 at p. 14; *see also* ECF No. 244-71, Jacobson Dep. at p. 62:22-25 (answering "yes" when asked whether Jacobson made the assumption that the CN financing was going to go through)).

It is undisputed that the Columbus Nova transaction never occurred. Jacobson's assumption that it did, and subsequent determination that Elk was solvent using three separate tests *assuming* that the transaction occurred, will undoubtedly not assist the trier of fact in determining whether Elk was solvent during the measurement dates. Contrary to Defendants' arguments, Jacobson is doing more than "appropriately account[ing] for the possibility of Elk obtaining an equity investment" through use of those pro forma financial statements. (ECF No. 243 at p. 18.) Jacobson is seeking to interpose a completely separate set of financial circumstances into his testimony and then form opinions based on those altered facts.

Moreover, for example, Defendants contend that "[t]o the extent the cash-flow test applies and is forward-looking, it properly considers all 'reasonably anticipated' sources of

funds." (*Id.* at p. 17.) Such an argument cuts directly against Defendants positions with respect to other experts, like Hanover (*see infra*), that the Second Circuit has explicitly declined a forward-looking cash flow test. Defendants cannot have it both ways. Proving that Elk was able to obtain future financing is one thing. It is an entirely separate situation to opine as to Elk's solvency—a key issue in this case—through changing the reality of a situation and accounting for a $25 million investment that never occurred. *See Union Bank of Switz. v. Deutsche Fin. Servs. Corp.*, No. 98 Civ. 3251, 2000 WL 178278, at *10 (S.D.N.Y. Feb. 16, 2000) (finding an adjustment improper where rather than "shed light on a fair and accurate assessment," it "tend[ed] to change the reality that existed on [the relevant solvency date]").

To the extent Jacobson does not consider the Columbus Nova transaction in forming his conclusions, which he does when conducting his "historical" (unadjusted) balance sheet analysis, Jacobson details the unadjusted balance sheets from June 30, 2009 through June 30, 2009, considers the current and long term assets and liabilities, and concludes Elk had a positive equity value of each of the dates. His opinion in this context is both relevant and reliable. *See In re LATAM Airlines Group S.A.*, No. 20-11254, 2022 WL 2206829, at *17-18 (Bankr. S.D.N.Y. June 18, 2022) (accepting an expert's conclusion based on his balance sheet analysis that compared total liabilities and assets reflected in financial statements and balance sheets).

As such, Plaintiff's motion seeking to preclude Jacobson's Original Report is granted in part and denied in part. To the extent Jacobson wishes to rely on his unadjusted balance sheet analysis, he may do so, but Jacobson is precluded from relying on his "pro forma" conclusions that assume the Columbus Nova transaction occurred.

### iv.  *Jacobson Rebuttal Report*

46

Jacobson also prepared a Rebuttal Report to Hanover's report, opining that it was "fundamentally incorrect" for Hanover to "not consider whether [Elk] and [Ameritrans] would pass the Balance Sheet Test using a going-concern, and not a liquidation, premise of value." (ECF No. 224-49, Jacobson Rebuttal Report at ¶ 15.) Moreover, Jacobson avers that Hanover failed to perform relevant or required analyses for his cash flow and capital adequacy test.

Plaintiff seeks to preclude Jacobson's Rebuttal Report on the grounds that it is not based on accurate data and should therefore be precluded under Rule 702. (ECF No. 224-54 at p. 13.) Specifically, as Plaintiff avers, "Jacobson admits that he did not consider the ability of the debentures to be accelerated at any time . . . .". (*Id.* at pp. 18-19.) Such an argument fails to account for the fact that Jacobson considered that the SBA could accelerate the debt, but such acceleration did not occur until May of 2012. (*See* ECF No. 224-19, Jacobson Rebuttal Report at ¶ 15.) Similarly, the Court finds Plaintiff's additional argument that "Jacobson's allegations throughout both [of] his Report[s] related to SBA are simply restatements of Defendants' arguments and are not expert opinions . . . and are irrelevant to Jacobson's insolvency analysis" to be unpersuasive. (ECF No. 224-54 at p. 19.) Nowhere does Plaintiff pinpoint what arguments or opinions it is referring to in this overarching, generalized argument.

Nonetheless, Jacobson's Rebuttal Report details why Hanover's balance sheet test was inaccurate, points out the flawed analysis in Hanover's cash flow and capital adequacy tests, and raises how many unexplained conclusions are in Hanover's report. As such, it is a proper rebuttal report and should be admitted. *See Scientific Components Corp. v. Sirenza Microdevices*, No. 03 CV 1851 (NGG) (RML), 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) (finding that a rebuttal report arguing that another report's flawed methodologies resulted in "unjustified

conclusions" was "archetypical rebuttal testimony: it identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's experience").

Plaintiff's motion to preclude Jacobson's Rebuttal Report, therefore, is denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendants' motions to preclude the opinions and testimony of Plaintiff's experts Jim Neal (ECF No. 235), Adam Hanover (ECF No. 231), and Jeffrey Manning. (ECF No. 233.)

As for Plaintiff's motion (ECF No. 224),

(i)     Plaintiff's motion to strike the expert rebuttal report of Robert Lashway is **GRANTED in part** and **DENIED in part** in that all opinions formed by Lashway are permitted with the exception that Lashway's opinion that Manning did not consider publicly available information as well as testimony related to the SBA receivership process is to be precluded;

(ii)     Plaintiff's motion to strike the expert report of James Howard is **DENIED**;

(iii)     Plaintiff's motion to strike Clifford Wright's rebuttal report is **GRANTED in part** and **GRANTED in part** in that Wright's Rebuttal Report is permitted, with the exception that Opinion 7 from his Rebuttal Report is to be precluded; and

(iv)     Plaintiff's motion to strike the Original Report of Craig Jacobson is **GRANTED in part** and **DENIED in part** in that to the extent Jacobson wishes to rely on his unadjusted balance sheet analysis, he may do so, but Jacobson is precluded from relying on his "pro forma" conclusions that assume the Columbus Nova transaction occurred.  In addition, Plaintiff's motion to strike Jacobson's Rebuttal Report is **DENIED**.

Dated:  Central Islip, New York.
       June 13, 2025

**SO ORDERED**,

/S/ *James M. Wicks*
     JAMES M. WICKS
United States Magistrate Judge

48